UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Case No. 4-23-mc-5- MW/MAF

Case Pending in the U.S. District Court for the Central District of California:
Pacific Western Bank v. AIG Specialty Insurance Co., et al.,
2:20-cv-11085-DMG-PD

IN RE SUBPOENA SERVED ON
THE FLORIDA DEPARTMENT OF FINANCIAL
SERVICES, AS RECEIVER FOR PHYSICIANS
UNITED PLAN, INC.

## MOTION TO QUASH RULE 45 DEPOSITION
## SUBPOENA AND FOR PROTECTIVE ORDER AND
## INCORPORATED MEMORANDUM OF LAW

Non-Party, the Florida Department of Financial Services ("Department" or

"Receiver"), as Receiver[1] for Physicians United Plan, Inc. ("PUP"), pursuant to

Rules 45(d)(3) and 26(c) of the Federal Rules of Civil Procedure, respectfully

requests that this Court enter an order quashing Defendant AIG Specialty Insurance

---

[1] Pursuant to Chapter 631, Part I, Florida Statutes, the Florida Department of
Financial Services acts as the court appointed Receiver of financially impaired or
insolvent Florida domestic insurance companies. The Division of Rehabilitation and
Liquidation, a statutory division within the Department of Financial Services, acts
as the court appointed Receiver of behalf of the Department. *See* Affidavit of Miriam
O. Victorian attached hereto as Exhibit 1 at ¶4.



FILED USDC FLND GV
AUG 1 '23 AM9:52
1st

Company's ("AIG")[2] Non-Party Subpoena to Testify at a Deposition in a Civil Action (the "Subpoena"), which orders it to appear for a deposition[3] in this District[4], and an order protecting the Receiver from having to appear for deposition, and states as follows:

1.      The non-party Department was appointed as the Receiver of PUP on June 9, 2014, by the Circuit Court, Second Judicial Circuit, Leon County, Florida ("the Receivership Court") pursuant to Chapter 631, Part I, Florida Statues due to PUP's financial impairment and insolvency in a case styled *In Re Receivership of*

---

[2] AIG is a defendant in a coverage action that that Pacific Western Bank ("PacWest") brought against it and other insurers in the United States District Court for the Central District of California, *Pacific Western Bank v. AIG Specialty Insurance Co., et al.*, 2:20-cv-11085-DMG-PD ("Coverage Action"). PacWest brought the Coverage Action against AIG and others insurers on December 7, 2020. According to the pleadings in the Coverage Action, AIG denied coverage for the claims that the Department brought against PacWest and the two other banks. *See* Affidavit of Peter W. Bellas attached hereto as Exhibit 2 at ¶9.

[3] Pursuant to the agreement of counsel for AIG, the time within which the Receiver may file this motion was extended to through and including August 1, 2023. Currently, counsel for AIG has indicated that it would like to take the Receiver's deposition after August 21, 2023, but before September 1, 2023, discovery cutoff in the Coverage Action. For the reasons set forth in this motion, the subpoena should be quashed. Nevertheless, if this Court were to allow the taking of the deposition, the Receiver has conferred with the damages expert that it retained in its action against PacWest that gave rise to the Coverage Action, Scott Bouchner. Mr. Bouchner is currently on vacation and has other depositions upon his return but could be available on August 31, 2023.

[4] Under Rule 45(d)(3), this Court has jurisdiction to enter an order quashing the Subpoena given that it is the district in which compliance is required. Fed. R. Civ. P. 45(d)(3).

*Physicians United Plan, Inc.,* Case No. 2014-CA-001472, Second Judicial Circuit, Leon County, Florida. *See* Exhibit 1 at ¶5.

2.      On May 20, 2016, the Department as Receiver under its statutory authority filed an action against Pacific Western Bank ("PacWest") and two other banks, the Central Bank of St. Louis and MB Financial Bank, N.A. in a case styled *Florida Department of Financial Services, as Receiver for Physicians United Plan, Inc. v. Pacific Western Bank Corp., et. al.,* Ninth Judicial Circuit, Orange County, Florida, Case No. 2016-CA-004588-O, to recover damages due to the PUP estate because of lease back transactions that the banks marketed to PUP as an alleged method to increase their admitted assets under the Florida Insurance Code ("Receiver Action"). *See* Exhibit 2 at ¶6.

3.      The Department as Receiver settled the Receiver Action against AIG's insured Pacific Western Bank ("PacWest") and the two other banks over two years ago in March 2021. *See* Exhibit 1 at ¶6-7. The settlement was approved by the Receivership Court that same month. *Id.* at ¶9.

4.      According to PacWest's Amended Complaint, PacWest brought the Coverage Action against AIG, because AIG denied coverage with respect to the Receiver Action. *See* Exhibit 2 at ¶9.

5.    AIG subsequently served two subpoenas on the non-party Receiver, including the subject Subpoena, two years after the settlement, seeking testimony relating to myriad objectionable topics. *See* Exhibit 1 at ¶10.

6.    After almost weekly conference calls at times since March 2023, AIG has narrowed the topics to those set forth in Paragraph 6(a)-(f) and 19 of the Subpoena. *See* Exhibit 2 at ¶23.

7.    As set forth in the Receiver's Memorandum of Law below, the Subpoena violates Rules 45 and 26 of the Federal Rules of Civil Procedure in that it imposes an undue burden and expense on the Receiver and seeks testimony that is not relevant or would invade the Receiver's attorneys' work product.

8.    AIG already has all the underlying pleadings, discovery, expert report, and testimony in the Receiver's action against PacWest. *See* Exhibit 2 at ¶¶11, 12, and 25.

9.    As AIG repeatedly states in its answer to PacWest's amended complaint, "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves." *See* Exhibit 2 at ¶10, Exhibit C at ¶¶37-42, 52.

10.    Because AIG already has the pertinent documents relating to the topics for which it seeks testimony, the testimony sought is not proportional to the needs

of the case, is duplicative, and would only serve to cause the non-party Receiver undue burden and expense and prejudice the statutory creditors of the PUP estate.[5]

11.    Accordingly, the Department as Receiver respectfully requests that the Court quash AIG's Subpoena and enter an order protecting it from having to appear at deposition.

## MEMORANDUM OF LAW

## INTRODUCTION

This is an action to prevent discovery abuse by AIG in the form of an extraordinary non-party deposition of the Receiver, which brought and settled claims against AIG's insured, PacWest, and two other banks. PacWest brought its Coverage Action against AIG and others after AIG denied coverage.

There is no legitimate need for the deposition that AIG now seeks. AIG seeks to take the Receiver's deposition to obtain information that it *already* has. Prior to the issuance of the subject Subpoena, the Receiver's outside counsel worked with both AIG and PacWest from May 2022 to January 2023 so that AIG could have all the pleadings, discovery (including documents designated as confidential), and deposition transcripts in the Receiver's action against PacWest. *See* Exhibit 2 at ¶¶11, 12, 15, 16, 25. Later, after the issuance of the Subpoena, the Department as

---

[5] The classes of creditors in an insurance receivership estate in Florida are outlined in Fla. Stat. §631.271.

Receiver voluntarily produced an additional 34,595 pages of communications and attachments between the Receiver's outside counsel and PacWest's counsel. *See* Exhibit 2 at ¶22.

The non-privileged information that AIG seeks can be found in the documents that AIG already has without burdening the limited resources of the Department as Receiver and prejudicing the creditors of the PUP estate. As AIG itself repeatedly asserted in its answer to PacWest's amended complaint, "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves." *See* Exhibit 2 at ¶10.

AIG's continued refusal to withdraw its subpoena has and continues to unduly burden the Receiver and deplete the limited resources of the PUP receivership to the detriment of the estate's creditors.[6]  When the Receiver's outside counsel asked whether AIG had any authority that would entitle AIG, in a coverage action, to take the deposition of the opposing plaintiff in the underlying litigation regarding

---

[6] The time and expenses of not only Venable, who is outside legal counsel, but also internal department counsel is charged against the assets of the PUP estate as a Class 1, Administrative expense.  *See* Fla. Stat. 631.271(1)(a)1. *See* Exhibit 1 at ¶4. All Division of Rehabilitation and Liquidation employees, except the Director, are division and not state employees. *Id.* at ¶16. The vast majority of the Division's budget is funded by the assets of the receivership estates it manages, not directly by the state of Florida. These administrative expenses are paid prior to any creditors of a lower class. *Id.* at ¶17.

damages under these circumstances, AIG was not able to provide any authority that held that it did.[7] *See* Exhibit 2 at ¶28.

The subject subpoena should be quashed.

## **BACKGROUND**

On June 9, 2014, the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida appointed the Department as the Receiver of PUP.[8] *See* Exhibit 1 at ¶5. The Department brought the Receiver Action against PacWest and two other banks, the Central Bank of St. Louis, and MB Financial Bank, N.A. on May 20, 2016. *See* Exhibit 2 at ¶5-6.  On April 16, 2019, the Receiver filed and served its amended complaint against these same defendants. *Id.* at ¶6.  At mediation, the parties agreed to a settlement in the amount of $12,500,000.00 subject to the approval of the receivership court. *See* Exhibit 1 at ¶7. The Receiver did not allocate the $12,500,000.00 settlement between or among the three defendants. *Id.* at ¶8. The Receivership court approved the settlement on March 18, 2021. *Id.* at ¶9.

---

[7] AIG's counsel advised the Receiver's outside counsel that in, *Ditech Fin. LLC v. AIG Specialty Ins. Co.*, No. 8:20-CV-409-WFJ-AEP (M.D. Fla.), their firm represented an insurer that deposed a non-party government entity that had settled with the insured. In a conference call, the Receiver's outside counsel asked whether the court in that case had specifically addressed this issue in an order or if the deposition went forward without objection. AIG's counsel responded that the deposition went forward without the court addressing the issue in an order.

[8] The general life cycle of a receivership estate is five to seven years. *See* Exhibit 2 at ¶18. This timeframe may be longer due to recovery litigation against third parties in other courts. *Id*. The PUP estate is now what the Division refers to as a mature estate as it has been nearing ten years since the inception of the receivership. *Id.*

PacWest brought its Coverage Action against AIG and other insurers. *See* Exhibit 2 at ¶9. In response to PacWest's amended complaint, AIG repeatedly asserted that "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves." *Id.* at ¶10.

In May 2022, over a year after the PacWest settlement, AIG's counsel contacted the Receiver's outside counsel informing him that PacWest had brought its Coverage Action and seeking the Receiver's help in the production of documents and deposition transcripts in the Receiver's underlying action against PacWest. *Id.* at ¶11. From May 2022 to January 2023, the Receiver's counsel worked with counsel for AIG, PacWest, and the defendants in other the actions that the Receiver brought to accomplish this task. *Id.* at ¶12. As an accommodation to the Department, the outside counsel did not bill the Department for any of the attorney time spent working to assist AIG from May 2022 to January 2023. *Id.* at ¶13. At no time from May 2022 to January 2023 did AIG inform the Department that it wanted anything from the Department other than its assistance in the production of documents, ESI, and testimony that were subject to a confidentiality agreement in the Receiver's underlying action against PacWest. *Id.* at ¶14. After several months of negotiation, AIG finally agreed to be bound by pertinent terms of the confidentiality agreement in the underlying Receiver action. *Id.* at ¶15. Accordingly, on January 5, 2023, the

Department's outside counsel authorized AIG's counsel to file in the Coverage Action the stipulation to which the parties agreed. *Id.* at ¶16.

No good deed goes unpunished.

On March 22, 2023, AIG's counsel emailed a subpoena duces tecum and a subpoena to testify to the Receiver's outside counsel. *Id.* at ¶17. As a result of the issuance of the subpoenas, the Department was forced to engage its outside attorneys, Venable LLP, to represent it in addressing the issues raised by the subpoenas.[9] *See* Exhibit 1 at ¶11. Over the course of the intervening months, the Department and AIG have had numerous conference calls in an attempt to resolve these issues. *See* Exhibit 2 at ¶19.  The Department and AIG managed to narrow down the documents requested.  *Id.* at ¶21.  Yet, even after narrowing down the subpoena duces tecum, the Department produced 34,595 pages of communications and attachments between the Receiver's outside counsel and PacWest's counsel. *Id.* at ¶22.

The Department and AIG have not been able to reach agreement relating to the deposition that AIG seeks to take. Although AIG has abandoned most of the subjects upon which it seeks to take the Department's deposition, it still improperly

---

[9] Although the subpoenas were served in March 2023, as an accommodation to the Department, outside counsel did not begin billing for its time until June 1, 2023, after already spending numerous hours attempting to resolve all the issues raised by the AIG subpoenas. *See* Exhibit 2 at ¶¶13.

insists on taking the deposition relating to subjects for which it already has the underlying pleadings and documents or are work product.  These subjects are as follows:

      6.    The RECEIVER ACTION, including but not limited to:

          a.    The claims and allegations against any of the BANKS;

          b.    The BANK'S actual and/or potential defenses;

          c.    The factual and legal bases for those claims, allegations, and defenses;

          d.    Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, YOU, and/or PUP related to those claims and/or defenses;

          e.    The damages, other amounts, and other relief that YOU sought to recover from any of the BANKS; and

          f.    Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, the [sic] YOU and/or PUP related to the damages, other than amounts, and/or relief that the [sic] YOU sought to recover from any of the BANKS.

      19.   All expert reports exchanged in connection with the Receiver ACTION . . . .

*See* Exhibit 1 at ¶10 at Exhibit A. AIG already has all pleadings in the underlying Receiver Action against PacWest as well the discovery taken in that action including the Receiver's expert report and deposition transcripts. *See* Exhibit 2 at ¶25. For this

and other reasons, the Subpoena should be quashed and an order should be entered protecting the Receiver from having to appear for deposition.

The Department as Receiver has limited resources and each dollar that it is forced to spend addressing the issues raised by AIG's subpoenas is a dollar that is not available for the creditors of the PUP estate. *See* Exhibit 1 at ¶15. The same is true if the Receiver is forced to compensate its damages experts to sit for yet third deposition.[10] *Id.*

## ARGUMENT

## AIG Has Violated its Duty to Avoid Imposing Undue Burden or Expense

Rule 45 of the Federal Rules of Procedure requires that parties seeking to depose non-parties avoid imposing undue burden and expense:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.

Fed. R. Civ. P. 45(d)(1). "[T]he entire tenor of Rule 45 is to prohibit a party from shifting its litigation expenses to a non-party." *Georgia-Pacific LLC. American Intern Spec. Lines Inc. Co.*, 278 F.R.D. 187, 190 (S.D. Ohio 2010). "A third-party

---

[10] The Receiver's damages expert, Scott Bouchner, appeared for deposition twice in the underlying action against PacWest. *See* Exhibit 2 at ¶27. AIG has copies of both of those deposition transcripts as well as Mr. Bouchner's expert report. *Id.* As stated previously, Mr. Bouchner's charges will be considered administrative expenses of the PUP estate and paid as Class 1 expenses prior to payments to any other creditors. *See* Exhibit 1 at ¶14.

subpoena [also] is subject to the relevance and proportionality requirements of Rule 26(b)(1)." *Solamere Cap. V. DiManno*, 625 F. Supp. 3d 152, 158 (D. Mass. 2022); Fed. R. Civ. P. 26(b)(1). Under Rule 26(b)(1), discovery must be "proportional to the needs of the case," and courts should consider, *inter alia*, the "parties' resources" and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Courts also consider whether the deposition topics are "unreasonably cumulative of what" a party "already obtained." *Id*. Under Rule 26(b)(2)(C)(i), courts must limit discovery if it determines that the "discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

Rule 45(d)(1) further mandates that courts enforce this duty and impose appropriate sanctions:

> The court for the district where compliance is required must enforce this duty and impose an appropriate sanction – which may include lost earnings and reasonable attorney's fees – on a party or attorney who fails to comply.

Fed. R. Civ. P. 45(d)(1). "So long as the duty to avoid imposing an undue burden is violated, it is of no consequence that the party or attorney who served the subpoena acted in good faith." *Georgia-Pacific*, 278 F.R.D. at 190.

Moreover, Rule 45(d)(3) requires that courts quash a subpoena that, as here, "subjects a person to undue burden" or "requires disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv).

In deciding whether a deposition should go forward, the "'Court engages in a balancing test to determine whether undue burden exists' because a subpoena is unreasonable." *Anwar v. Fairfield Greenwhich Ltd.*, 297 F.R.D. 223, 226 (S.D.N.Y. 2013)(*quoting Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co Americas*, 262 F.R.D. 293, 299 (S.D.N.Y. 2009). Courts also are required to "'consider whether the information is necessary and whether it is available from any other source.'" *Id.* (*quoting* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §2463.1 (3d ed. 2008). Courts further consider whether the deposition topics are "unreasonably cumulative of what" a party "already obtained." *Solamere Cap.*, 625 F. Supp. 3d at 159. Under Rule 26(b)(2)(C)(i), the "discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

Clearly, the deposition testimony that is sought not only is "cumulative or duplicative," but was or could be "obtained from some other source that is more convenient, less burdensome, or less expensive." Topic 6 (a) seeks testimony relating to the "claims and allegations against the BANKS." AIG already has all of

the pleadings, motions, responses, discovery, and testimony taken in the Receiver's action against PacWest. Not only are the pleadings the best evidence of the claims, AIG itself also agrees. As it stated several times in its answer to PacWest's amended complaint in the coverage action: "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves." *See* Exhibit 2 at ¶10. The same is true with topic 6(b) [the "BANK's actual . . . defenses"[11]], topic 6 (e)[the "damages, other amounts, and other relief that YOU sought to recover from any of the BANKS, and topic 19 ["expert reports"].[12]

Topic 6(f), moreover, is objectionable. Because AIG already has Mr. Bouchner's expert report, it has "evaluations, analysis, and/or recommendations" relating to "damages." Once again, as AIG correctly states in its answer to PacWest's amended complaint, "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves."

### AIG is Precluded from Seeking Testimony that Would Violate the Work Product Doctrine and is Not Relevant

To the extent that AIG seeks testimony relating to any other "evaluations, analysis, and/or recommendations" pursuant to topics 6(d) or (f) in addition to Mr.

---

[11] Topic 6(b) also lists "potential defenses." How could the Receiver testify about defenses that were never asserted and how could such "potential defenses" be in any way relevant to the Coverage Action? Further, even if one could divine PacWest's unasserted, potential defenses, that testimony likely would be work product.

[12] AIG no longer seeks testimony relating to the balance of topic 19 ["drafts"] according to its counsel.

Bouchner's, such topics are objectionable for two additional reasons. First, these topics are classic work product. Under Rule 26(b)(3)(B), for example, courts "must protect against disclosure of the mental impressions, conclusions, opinions or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Second, there is no good faith argument that such "evaluations, analysis, and/or recommendations" could in any way be relevant to PacWest's Coverage Action and, in any event, overcome the undue burden hurdle.

## Courts Give Special Consideration to Governmental Agencies

In addition to taking into account the burdens caused by forcing the Department as Receiver to testify, courts also may take into account "'the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations.'" *Solomon v. Nassau Cnty.*, 274 F.R.D. 455, 460 (S.D.N.Y. 2011)(*quoting Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994). This consideration is more important here given that, unlike typical government agencies, the vast majority of the Receiver's budget is funded by the assets of the receivership estates it manages, not directly by the state of Florida. Accordingly, to allow this discovery to go forward only serves to diminish the Receiver's already limited resources. Allowing the proposed deposition would serve as precedent that "could open the floodgates to discovery of this sort" where

an insurer seeks discovery from the Department or any other non-party governmental receiver in a coverage action subsequent to such receiver obtaining a successful resolution to an underlying claim. This discovery would unduly burden the limited government resources and prejudice creditors of other estates.

## **CONCLUSION**

The Receiver respectfully requests that the Court quash the Subpoena and enter an order protecting it from having to appear for deposition. For the reasons set forth herein, AIG has violated its duty to avoid imposing undue burden and expense on the non-party Receiver. AIG already has all of the underlying pleadings and discovery in the Receiver's action against PacWest – including the expert report and deposition testimony of the Receiver's expert. As AIG itself correctly states several times in its answer to PacWest's amended complaint: "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves." There is no need for the non-party Receiver to incur the burden and expense of attorneys and expert's fees to have someone testify when AIG already has all of the underlying pertinent and relevant documents. This is especially so here where the Receiver has limited resources and any money spent complying with the subject Subpoena diminishes what is available to creditors of the PUP estate.

Alternatively, if the Court were to require the Receiver to appear for deposition, Rule 45(d)(3)(C) allows the Courts to specify conditions including

ensuring that the "subpoenaed person will be reasonably compensated." Accordingly, in the event that the deposition were to go forward, the Receiver respectfully requests that the Court order AIG to compensate the Receiver for all of the fees that it has or may be forced to incur including attorneys' fees and the fees of the expert whom it would designate to testify. Further, the Receiver requests that the Court order AIG not to inquire as to any matters that are protected by the work product doctrine including subjects 6(c), (d), and (f).

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(B), I hereby certify that counsel for the Receiver have conferred several times over the past four months with counsel for AIG in a good faith effort to resolve whether the Receiver should be forced to appear for deposition (as well as other issues) and have been unable to do so.

## CERTIFICATE OF WORD LIMIT

This is to certify that pursuant to Local Rule 7.1(F) the word count of this document is 3482 in total, and therefore complies with the word limit of 8,000 words.

Dated: August 1, 2023

[Continued on Next Page]

Respectfully submitted,

Venable, LLP
100 S.E. 2nd Street, Suite 4400
Miami, FL  33131
Tel:  305-349-2330
Attorneys for The Florida
   Department of Financial Services,
   Receiver for Physicians United Plan, Inc.

s/  Aaron Blynn
Aaron Blynn / FBN 73464
ABlynn@venable.com
Peter W. Bellas / FBN 611387
(seeking admission to this Court)
PBellas@venable.com

-AND-

Miriam O. Victorian / FBN 355471
(seeking admission to this Court)
Chief Attorney
Florida Department of Financial Services
Division of Rehabilitation and Liquidation
325 John Knox Road, Suite 101
The Atrium
Tallahassee, FL  32303
Miriam.Victorian@myfloridacfo.com
Tel:  850-413-4408
Counsel for The Florida
   Department of Financial Services,
   Receiver for Physicians United Plan, Inc.

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that, on August 1, 2023, a true and correct copy of the foregoing motion and exhibits were served on Counsel for AIG using the following methods:

**<u>Via Email</u>:**  Counsel for Defendants

Andrew K. Daechsel, Esq.; [Akdaechsel@carltonfields.com](mailto:Akdaechsel@carltonfields.com)
Carlton Fields, P.A., 525 Okeechobee Blvd., Suite 1200,
West Palm Beach, FL  33401

Steven J. Brodie, Esq.; [sbrodie@carltonfields.com](mailto:sbrodie@carltonfields.com)
Carlton Fields, P.A., 700 N.W. 11st Avenue, Suite 1200,
Miami, FL  33136

Mark A. Neubauer, Esq.; [MNeubauer@carltonfields.com](mailto:MNeubauer@carltonfields.com)
Carlton Fields, LLP, 2029 Century Park East, Suite 1200,
Los Angeles, CA  90067

Daniel G. Enriquez, Esq.; [denriquez@carltonfields.com](mailto:denriquez@carltonfields.com)
Carlton Fields, P.A., 700 N.W. 11st Avenue, Suite 1200,
Miami, FL  33136

Amanda D. Proctor, Esq.; [AProctor@carltonfields.com](mailto:AProctor@carltonfields.com)
Carlton Fields, 1201 West Peachtree Street, Suite 3000,
Atlanta, GA  30309

# EXHIBIT  1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Case No.

Case Pending in the U.S. District Court for the Central District of California:
Pacific Western Bank v. AIG Specialty Insurance Co., et al.,
2:20-cv-11085-DMG-PD

_____

IN RE SUBPOENA SERVED ON
THE FLORIDA DEPARTMENT OF FINANCIAL
SERVICES, AS RECEIVER FOR PHYSICIANS
UNITED PLAN, INC.

_____

## **AFFIDAVIT OF MIRIAM O. VICTORIAN**

1.      My name is Miriam O. Victorian.

2.      I am over 18 years of age, and I am the Chief Attorney for the Florida

Department of Financial Services, Division of Rehabilitation and Liquidation.

3.      I have held my position since January 3, 2017.  I currently am assigned

to nine estates in addition to my supervisory role.  I also participate on the National

Association of Insurance Commissioners [NAIC] Receivership Financial Analysis

(E) Working Group and the Receiver's Handbook (E) Subgroup [Vice Chair]. Our

division's small legal section is not part of the Department of Financial Services

Office of General Counsel. Like all the other employees at our division, except our

Director, I am an employee of the division and not the state of Florida.  My salary

Page **1** of **5**

EXHIBIT 1

and benefits are paid for by the assets of the insolvent estates that the division manages on behalf of the Department of Financial Services. As a result, I keep a record of my daily time on an estate basis so that it can be charged to the pertinent estate as a Class 1 administrative expense of the estate pursuant to Fla. Stat. 631.271(1)(a)1.

4.      Pursuant to Chapter 631, Part I, Florida Statutes, the Florida Department of Financial Services ("Department") acts as the court appointed Receiver of financially impaired or insolvent Florida domestic insurance companies. The Division of Rehabilitation and Liquidation, a statutory division within the Department of Financial Services, acts as the court appointed Receiver on behalf of the Department.

5.      The Department was appointed as Receiver of PUP on June 9, 2014, by the Circuit Court, Second Judicial Circuit, Leon County, Florida ("the Receivership Court") pursuant to Chapter 631, Part I, Florida Statues due to PUP's financial impairment and insolvency in a case styled *In Re Receivership of Physicians United Plan, Inc.,* Case No. 2014-CA-001472, Second Judicial Circuit, Leon County, Florida.

6.      The Department as Receiver settled the action ("Receiver Action") that it brought against Pacific Western Bank ("PacWest") and the two other banks over two years ago in March 2021.

2

7.    At mediation, the parties agreed to a settlement in the amount of $12,500,000.00 subject to the approval of the receivership court.

8.    The Receiver did not allocate the $12,500,000.00 settlement between or among the three defendants.

9.    The Receivership court approved the settlement on March 18, 2021.

10.    On March 27, 2023, AIG served the Department with two subpoenas. A true and correct copy of AIG's Subpoena to Testify at Deposition in a Civil Action is attached hereto as Exhibit A. A true and correct copy of AIG's Subpoena Duces Tecum to Produce Documents, Information, or Objects in a Civil Action is attached hereto as Exhibit B.

11.    As a result of the issuance of the subpoenas, the Department was forced to engage its outside attorneys, Venable LLP, to represent it in addressing the issues raised by the subpoenas. As an accommodation to the Department our outside counsel did not bill the Department for any of the work that it did in assisting AIG and PacWest in the California Coverage Action from May 2022 through January 2023 or any of the time spent addressing the issues raised by the subpoenas until June 1, 2023.

12.    At that time, the Department and Venable LLP entered into a fee agreement relating to addressing the issues raised by AIG's subpoenas. So far, Venable LLP has invoiced the Department $17,033.00 for the work that it performed

in June 2023. The Department also will have to compensate Venable LLP for the work that it performed in July 2023 and thereafter relating to this matter.

13.    In the event that the Department's damages expert, Scott Bouchner, were to testify in this matter, his charges will be considered administrative expenses of the PUP estate and paid as Class 1 expenses prior to payments to any other creditors.

14.    The time and expenses of not only our outside counsel Venable LLP, but also internal department counsel is charged against the assets of the PUP estate as a Class 1, Administrative expense. *See* Fla. Stat. 631.271(1)(a)1. To date, those expenses total $ 25,861.66.

15.    The Department as Receiver has limited resources and each dollar that it is forced to spend addressing the issues raised by AIG's subpoenas is a dollar that is not available for the creditors of the PUP estate. The same is true if the Receiver is forced to compensate its damages experts to sit for yet a third deposition.

16.    All Division of Rehabilitation and Liquidation employees, except the Director, are division and not state employees.

17.    The vast majority of the Division's budget is funded by the assets of the receivership estates it manages, not directly by the state of Florida. These administrative expenses are paid prior to any creditors of a lower class.

18.    The general life cycle of a receivership estate is five to seven years. This timeframe may be longer due to recovery litigation against third parties in other courts. The PUP estate is now what the Division refers to as a mature estate as it has been nearly ten years since the inception of the receivership.

FURTHER AFFIANT SAYETH NAUGHT

_Miriam O. Victorian_

Miriam O. Victorian

STATE OF FLORIDA            )

COUNTY OF LEON            )

Before me, the undersigned authority, personally appeared Miriam O. Victorian, who is personally known to me on this 1st day of August, 2023, who executed this instrument in my presence and who has sworn that the contents thereof are true and correct.

_Donna M. White_

Notary Public

My Commission Expires:



DONNA M. WHITE
MY COMMISSION # HH 043483
EXPIRES: November 12, 2024
Bonded Thru Notary Public Underwriters

5

# EXHIBIT  A

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action



# UNITED STATES DISTRICT COURT
## for the
## CENTRAL DISTRICT OF CALIFORNIA

Date  3/27/23  Time: 1:42 pm

ZS # 277

is a certified process server in the Circu
and County Courts in and for the Secon
Judicial Circuit

| | |
|---|---|
| PACIFIC WESTERN BANK, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation; FEDERAL INSURANCE COMPANY, an Indiana corporation; XL SPECIALTY INSURANCE COMPANY, a Delaware corporation,<br><br>Defendants. | Civil Action<br><br>Case No. 2:20-cv-11085-DMG-PD<br><br>Assigned to the Hon. Dolly M. Gee<br>Hon. Patricia Donahue (Mag. Judge)<br><br>Complaint filed:    12/07/20<br>Pretrial Conference:  12/12/23<br>Trial Date:         01/30/24 |

## DEFENDANT AIG SPECIALTY INSURANCE COMPANY'S
## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

**To:** **Florida Department of Financial Services, as Receiver for Physicians United Plan, Inc.**
**325 John Knox Road, Suite 101**
**The Atrium**
**Tallahassee, Florida 32303**

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

### SEE EXHIBIT A
### **YOU MUST DESIGNATE A WITNESS PREPARED TO TESTIFY ON THE TOPICS AS INDICATED ON ATTACHED EXHIBIT A*

| | |
|---|---|
| **Place:**  Carlton Fields P.A.<br>215 S. Monroe St., Suite 500<br>Tallahassee, FL  32301-1866 | **Date and Time:** May 23, 2023 at 9:30 am ET<br><br>**Method of Recording:** Audiovisual and stenographic means |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __March 23, 2023_____

CLERK OF COURT

_____
*Signature of Clerk or Deputy Clerk*

OR

_____
*Attorney Signature*

# EXHIBIT A

The name, address, e-mail, and telephone number of the attorney representing Defendant AIG Specialty Insurance Company, who issues or requests this subpoena, is: Amanda D. Proctor, Carlton Fields, P.A., 1201 West Peachtree Street, Suite 3000, Atlanta, Georgia 30309 (404) 815-3392, (404) 815-3415 (fax), aproctor@carltonfields.com.

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

Civil Action No. 2:20-cv-11085-DMG-PD
Central District of California

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

     I received this subpoena for (name of individual and title, if any)_____
on (date)_____.

     ☐ I served the subpoena by delivering a copy to the named individual as follows:_____

_____ on (*date*)_____ ; or

     ☐ I returned the subpoena unexecuted because:_____

_____

     Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of $44.59.

My fees are $_____ for travel and $_____ for services, for a total of $_____.

     I declare under penalty of perjury that this information is true.

Date:_____            _____
                                                         *Server's Signature*

                                   _____
                                                   *Printed name and title*

                                 _____
                                                    *Server's address*

Additional information regarding attempted service, etc.

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

    **(i)** is a party or a party's officer; or

    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested.

The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;

    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

    **(iv)** subjects a person to undue burden.

  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on

motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified

conditions if the serving party:

  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These

procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

    **(i)** expressly make the claim; and

    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

129348315.2

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## DEFINITIONS

As used in this NOTICE, the following terms have the meanings specified below and shall be interpreted to the broadest extent possible. The singular also includes the plural. Terms not defined below shall have their ordinary and common meanings.

1.    The term "PERSON" means a natural person, firm, association, organization, partnership, business, trust, limited liability company, corporation, public entity, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

2.    The terms "YOU" and "YOUR" mean the Florida Department of Financial Services, as Receiver for PUP, including but not limited to its present or former officers, directors, affiliates, agents, employees, representatives, attorneys, or other individuals or entities acting on its behalf.

3.    The term "PACWEST" means Pacific Western Bank, named as a defendant in the Receiver Action, including but not limited to all of its present or former officers, directors, subsidiaries, affiliates, parents, sister companies, joint ventures, shareholders, agents, employees, representatives, attorneys, or other individuals or entities acting on its behalf.

4.    The term "PUP" means Physicians United Plan, Inc., including but not limited to all of its present or former officers, directors, subsidiaries, affiliates, parents, sister companies, joint ventures, shareholders, agents, employees, representatives, attorneys, or other individuals or entities acting on its behalf.

5.    The term "RECEIVER ACTION" means the underlying action filed against PACWEST, CBSL, and MB FINANCIAL by YOU in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida in Case No. 2016-CA-004588.

6.    The term "CBSL" means Central Bank of St. Louis f/k/a First National Bank of St. Louis, named as a defendant in the RECEIVER ACTION, including but not limited to its present or former officers, directors, subsidiaries, parents, sister companies, shareholders, agents, employees, representatives, attorneys, or other individuals or entities acting on its behalf.

7.    The term "MB FINANCIAL" means MB Financial, N.A., named as a defendant in the RECEIVER ACTION, including but not limited to its present or former officers, directors, subsidiaries, parents, sister companies, shareholders,

agents, employees, representatives, attorneys, or other individuals or entities acting on its behalf.

8.    The term "BANKS" refers collectively to PACWEST, CBSL, and MB FINANCIAL.

9.    The term "RECEIVER ACTION COMPLAINT" means the Complaint filed in the RECEIVER ACTION on or about May 20, 2016, and any amended complaints in the RECEIVER ACTION.

10.    The term "SETTLEMENT" means the settlement agreement executed on or about March 11, 2021, by or on behalf of YOU, PACWEST, CBSL, and MB FINANCIAL.

11.    The terms "DOCUMENT" or "DOCUMENTS" shall be interpreted in their broadest sense and mean any and all writings including (but not limited to) correspondence, e-mails, letters, texts, instant messages, notes, memoranda, inter-office communications, reports, forecasts, projections, calendars, appointment books, diaries, drawings, graphs, photographs, sound reproduction media, voice mail recordings, data compilations from which information can be obtained or can be translated through detection devices into reasonably usable form, computer inputs or outputs, and any other tangible thing. For avoidance of doubt, "DOCUMENT" includes but is not limited to any "DOCUMENT" evidencing any COMMUNICATION.

12.    The terms "COMMUNICATION" or "COMMUNICATIONS" refer to all written, electronic, oral, telephonic, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, advertisement, computer mail, e-mail, text message, instant message, tweet, and all DOCUMENTS evidencing any verbal or nonverbal interaction between or among any individuals or entities.

13.    The terms "RELATING TO" or "RELATED TO" mean constitutes, mentions, discusses, identifies, contains, embodies, comprises, states, comments on, responds to, refers to, reflects, describes, analyzes, evidences, summarizes, memorializes, has any logical or factual connection with, or concerns.

14.    The term "PRE-LIT MATTERS" means any formal or informal discovery requests or subpoenas issued by or on behalf of YOU to PACWEST outside the RECEIVER ACTION.

15.    The term "COVERAGE ACTION" means the lawsuit filed by YOU

styled *Pacific Western Bank v. AIG Specialty Insurance Company*, *et al.*, Case No. 2:20-cv-11085-DMG-PD currently pending in the United States District Court for the Central District of California.

16.    The terms "and" and "or" mean both "and" and "or," unless the context requires otherwise, and shall always be read to require the more inclusive response.

17.    The time period for each deposition topic is from January 1, 2010 (or, if earlier, the earliest date on which PUP was first contacted in connection with any of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, and/or any similar product) through the present.

## SUBJECT MATTERS FOR EXAMINATION

1.    The sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, including but not limited to:

   a.    The Master Lease Agreement No. MEF0979;

   b.    Any lease schedules, assignments, security agreements, release agreements, and deposit control agreements;

   c.    Any collections and/or efforts to collect, by any of the BANKS, any of the accounts receivables and/or other property and/or assets that were the subject of the sale/leaseback transactions;

   d.    Any payments made by and/or on behalf of PUP in connection with the sale/leaseback transactions;

   e.    The operation of the sale/leaseback transactions; and

   f.    Any analysis, evaluations, and/or legal opinions related to the sale/leaseback transactions.

2.    All defaults issued in connection with the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, including the notices of default referenced in paragraph 58 of the RECEIVER ACTION COMPLAINT.

3.    The May 2, 2011 report from the Florida Office of Insurance Regulation referenced in paragraph 41 of the RECEIVER ACTION COMPLAINT.

4.      The *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT.

5.      COMMUNICATIONS related to the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT and/or the ConvertaLease product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, including but not limited to:

    a. YOUR internal COMMUNICATIONS;

    b. PUP's internal COMMUNICATIONS;

    c. YOUR COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

    d. PUP's COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

    e. COMMUNICATIONS with any auditors, regulators, regulatory bodies, and/or governmental entities; and

    f. COMMUNICATIONS with Aaron Henry, Imtiaz H. Sattaur, and/or Sandeep Bajaj.

6.      The RECEIVER ACTION, including but not limited to:

    a. The claims and allegations against any of the BANKS;

    b. The BANKS' actual and/or potential defenses;

    c. The factual and legal bases for those claims, allegations, and defenses;

    d. Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, YOU and/or PUP related to those claims and/or defenses;

    e. The damages, other amounts, and other relief that YOU sought to recover from any of the BANKS; and

    f. Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, the YOU and/or PUP related to the damages, other amounts, and/or other relief that the YOU sought to recover from any of the BANKS.

7.      The PRE-LIT MATTERS.

8.    COMMUNICATIONS related to the RECEIVER ACTION and/or any of the PRE-LIT MATTERS, including but not limited to:

    a.  YOUR internal COMMUNICATIONS;

    b.  PUP's internal COMMUNICATIONS;

    c.  YOUR COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

    d.  PUP's COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

    e.  COMMUNICATIONS with any auditors, regulators, regulatory bodies, and/or governmental entities; and

    f.  COMMUNICATIONS with Aaron Henry, Imtiaz H. Sattaur, and/or Sandeep Bajaj.

9.    The March 11, 2021 mediation in the RECEIVER ACTION, including but not limited to: (i) YOUR and/or PUP's COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL related to the mediation, (ii) internal COMMUNICATIONS of YOU and/or PUP related to the mediation, and (iii) any other COMMUNICATIONS of YOU and/or PUP related to the mediation (including but not limited to any COMMUNICATIONS with the mediator).

10.    The SETTLEMENT and all settlement negotiations in connection with the RECEIVER ACTION, including but not limited to all related agreements, all related COMMUNICATIONS, all related court filings, the substance of all settlement negotiations, the rationale for settlement offers and/or demands, whether to include allocation in the SETTLEMENT, and the payment of the SETTLEMENT.

11.    Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, YOU and/or PUP related to the SETTLEMENT and/or any settlement negotiations in connection with the RECEIVER ACTION.

12.    The damages, other amounts, and other relief that YOU sought to recover in the RECEIVER ACTION.

13.    Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, YOU and/or PUP related to any damages, other amounts, and/or other relief that YOU sought to recover in the RECEIVER ACTION.

14.   The factual and legal bases for the claims YOU asserted in the RECEIVER ACTION.

15.   Any evaluations, analysis, and/or recommendations conducted by, and/or on behalf of, YOU and/or PUP related to the factual and/or legal bases for the claims YOU asserted in the RECEIVER ACTION.

16.   Any oral and/or written demands and/or requests for relief YOU and/or PUP made against any of the BANKS pertaining to the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, including but not limited to any such demands and/or requests predating the RECEIVER ACTION COMPLAINT.

17.   All discovery exchanged and/or conducted during the RECEIVER ACTION including, but not limited to, any written discovery (interrogatories, requests for admission, requests for production, subpoenas, etc.), responses thereto, depositions, and document productions.

18.   All discovery exchanged and/or conducted in connection with any of the PRE-LIT MATTERS including, but not limited to, any written discovery (interrogatories, requests for admission, requests for production, subpoenas, etc.), responses thereto, deposition transcripts, and document productions.

19.   All expert reports exchanged in connection with the RECEIVER ACTION, as well as drafts of any expert reports prepared in connection with the RECEIVER ACTION.

20.   The value and realization of the receivables that were the subject of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT.

21.   All legal expenses (including but not limited to fees and/or costs of any attorneys, paralegals, assistants, experts, consultants, other vendors, and/or any other people and/or entities) incurred by and/or on behalf of YOU and/or PUP in the RECEIVER ACTION and/or in connection with any of the PRE-LIT MATTERS, including but not limited to:

   a.   The amount, rationale for, and necessity of the legal expenses;

   b.   The amounts actually paid by and/or on behalf of YOU and/or PUP for the legal expenses;

   c.   Any write-offs, write-downs, and/or discounts that were requested, offered, received, approved, and/or rejected for the legal expenses;

d. The reasons for offering, approving, requesting, rejecting, and/or receiving any write-offs, write-downs, and/or discounts;

e. Any budgets for any legal expenses in connection with the RECEIVER ACTION and/or any of the PRE-LIT MATTERS;

f. Whether the budgets were approved, modified, and/or rejected; and

g. The rationale for the budgets as well as approving, rejecting, and/or modifying them.

22.    YOUR analysis of admitted and non-admitted assets for PUP as of the time PUP went into Receivership.

23.    All DOCUMENTS used, relied upon, and/or reviewed by the person(s) YOU designate to testify pursuant to this Notice of Deposition in preparation for testimony regarding any matter listed in this Notice.

24.    All DOCUMENTS and information produced and/or provided by YOU in response to any discovery requests in the COVERAGE ACTION, the basis for any of YOUR responses and objections to any discovery requests in the COVERAGE ACTION, and the process undertaken by and/or on behalf of YOU to locate, obtain, compile, produce, and provide DOCUMENTS and information in response to any discovery requests in the COVERAGE ACTION.

25.    All deposition testimony in the RECEIVER ACTION of YOU and/or any of YOUR present or former employees, directors, officers, agents, representatives, attorneys, and/or other individuals or entities acting on YOUR behalf.

26.    The maintenance and inspections of any of the property and/or assets that were the subject of any of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT.

27.    Marketing DOCUMENTS and COMMUNICATIONS received by PUP in connection with the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT.

28.    All DOCUMENTS used, relied upon, and/or reviewed by the person(s) YOU designate to testify pursuant to this subpoena in preparation for testimony regarding any matter listed in this subpoena.

29.    The steps YOU took in determining who would testify on YOUR behalf in response to this subpoena.

30.    YOUR document retention, storage, filing, and destruction procedures in effect from the date on which YOU first became receiver for PUP through the present.

31.    PUP's document retention, storage, filing, and destruction procedures in effect from January 1, 2010 (or, if earlier, the earliest date on which PUP was first contacted in connection with any of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, and/or any similar product) through the present.

# EXHIBIT  B

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action



# UNITED STATES DISTRICT COURT
for the
## CENTRAL DISTRICT OF CALIFORNIA

Date 3/27/23 Time: 1:42 pm

ZS # 277

| | |
|---|---|
| PACIFIC WESTERN BANK, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation; FEDERAL INSURANCE COMPANY, an Indiana corporation; XL SPECIALTY INSURANCE COMPANY, a Delaware corporation,<br><br>Defendants. | Civil Action    is a certified process server in the Circuit and County Courts in and for the Second<br>Case No. 2:20-cv-11085-DMG-Judicial Circuit<br><br>Assigned to the Hon. Dolly M. Gee<br>Hon. Patricia Donahue (Mag. Judge)<br><br>Complaint filed:       12/07/20<br>Pretrial Conference:   12/12/23<br>Trial Date:            01/30/24 |

## DEFENDANT AIG SPECIALTY INSURANCE COMPANY'S
## SUBPOENA DUCES TECUM TO PRODUCE
## DOCUMENTS, INFORMATION, OR OBJECTS IN A CIVIL ACTION

To:   **Florida Department of Financial Services, as Receiver for Physicians United Plan, Inc.**
**325 John Knox Road, Suite 101**
**The Atrium**
**Tallahassee, Florida 32303**

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

### SEE EXHIBIT A
### **YOU MUST PROVIDE RECORDS AS INDICATED ON ATTACHED EXHIBIT A*

| Place:   **Carlton Fields P.A.**<br>215 S. Monroe St., Suite 500<br>Tallahassee, FL  32301-1866<br><br>**OR IN THE ALTERNATIVE:  Documents may be e-mailed to Amanda D. Proctor, aproctor@carltonfields.com** | Date and Time:<br><br>April 12, 2023 at 9:00 am ET |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  March 23, 2023

CLERK OF COURT                                      OR

_____          _____
*Signature of Clerk or Deputy Clerk*                  *Attorney Signature*

The name, address, e-mail, and telephone number of the attorney representing Defendant AIG Specialty Insurance Company, who issues or requests this subpoena, is: Amanda D. Proctor, Carlton Fields, P.A., 1201 West Peachtree Street, Suite 3000, Atlanta, Georgia 30309 (404) 815-3392, (404) 815-3415 (fax), aproctor@carltonfields.com.

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

Civil Case No. 2:20-cv-11085-DMG-PD
Central District of California

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for (name of individual and title, if any)_____
on (date)_____.

☐ I served the subpoena by delivering a copy to the named individual as follows:_____

_____

_____ on (*date*)_____; or

☐ I returned the subpoena unexecuted because:_____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$_____.

My fees are $_____ for travel and $_____ for services, for a total of $_____.

I declare under penalty of perjury that this information is true.

Date:_____      _____
                                        *Server's Signature*

                                   _____
                                        *Printed name and title*

                                   _____
                                        *Server's address*

Additional information regarding attempted service, etc.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

**Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)**

**(c) Place of Compliance.**
**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.
**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.
**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.
**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested.
The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on
motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified
conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.
**(e) Duties in Responding to a Subpoena.**
**(1)** *Producing Documents or Electronically Stored Information.* These
procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule  26(b)(2)(C). The court may specify conditions for the discovery.
**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

129348315.2

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## DEFINITIONS

The following definitions shall apply to these requests for production, and shall be interpreted to the broadest extent possible. The singular also includes the plural. Terms not defined below shall have their ordinary and common meanings.

1.    The term "PERSON" means a natural person, firm, association, organization, partnership, business, trust, limited liability company, corporation, public entity, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

2.    The terms "YOU" or "YOUR" means the Florida Department of Financial Services, as Receiver for PUP, including but not limited to its present or former officers, directors, affiliates, agents, employees, representatives, attorneys, or other individuals or entities acting on its behalf.

3.    The term "PACWEST" means Pacific Western Bank, named as a defendant in the RECEIVER ACTION, including but not limited to all of its present or former officers, directors, subsidiaries, affiliates, parents, sister companies, joint ventures, shareholders, agents, employees, representatives, attorneys or other individuals or entities acting on its behalf.

4.    The term "PUP" means Physicians United Plan, Inc., including but not limited to all of its present or former officers, directors, subsidiaries, affiliates, parents, sister companies, joint ventures, shareholders, agents, employees, representatives, attorneys or other individuals or entities acting on its behalf.

5.    The term "RECEIVER ACTION" means the underlying action filed against PACWEST, CBSL, and MB FINANCIAL by YOU in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida in Case No. 2016-CA-004588.

6.    The term "CBSL" means Central Bank of St. Louis f/k/a First National Bank of St. Louis, named as a defendant in the RECEIVER ACTION, including but not limited to its present or former officers, directors, subsidiaries, parents, sister companies, shareholders, agents, employees, representatives, attorneys or other individuals or entities acting on its behalf.

7.    The term "MB FINANCIAL" means MB Financial, N.A., named as a defendant in the RECEIVER ACTION, including but not limited to its present or former officers, directors, subsidiaries, parents, sister companies, shareholders,

agents, employees, representatives, attorneys or other individuals or entities acting on its behalf.

8.    The term "BANKS" refers collectively to PACWEST, CBSL, and MB FINANCIAL.

9.    The term "RECEIVER ACTION COMPLAINT" means the Complaint filed in the RECEIVER ACTION on or about May 20, 2016, and any amended complaints in the RECEIVER ACTION.

10.    The term "SETTLEMENT" means the settlement agreement executed on or about March 11, 2021, by or on behalf of YOU, PACWEST, CBSL, and MB FINANCIAL.

11.    The terms "DOCUMENT" or "DOCUMENTS" shall be interpreted in their broadest sense and mean any and all writings including (but not limited to) correspondence, e-mails, letters, texts, instant messages, notes, memoranda, inter-office communications, reports, forecasts, projections, calendars, appointment books, diaries, drawings, graphs, photographs, sound reproduction media, voice mail recordings, data compilations from which information can be obtained or can be translated through detection devices into reasonably usable form, computer inputs or outputs, and any other tangible thing. For avoidance of doubt, "DOCUMENT" includes but is not limited to any "DOCUMENT" evidencing any COMMUNICATION.

12.    The terms "COMMUNICATION" or "COMMUNICATIONS" refer to all written, electronic, oral, telephonic, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, advertisement, computer mail, e-mail, text message, instant message, tweet, and all DOCUMENTS evidencing any verbal or nonverbal interaction between or among any individuals or entities.

13.    The terms "RELATING TO" or "RELATED TO" mean constitutes, mentions, discusses, identifies, contains, embodies, comprises, states, comments on, responds to, refers to, reflects, describes, analyzes, evidences, summarizes, memorializes, has any logical or factual connection with, or concerns.

14.    The term "PRE-LIT MATTERS" means any formal or informal discovery requests or subpoenas issued by or on behalf of YOU to PACWEST outside the RECEIVER ACTION.

15.    The term "COVERAGE ACTION" means the lawsuit filed by YOU

styled *Pacific Western Bank v. AIG Specialty Insurance Company*, *et al.*, Case No. 2:20-cv-11085-DMG-PD currently pending in the United States District Court for the Central District of California.

16.     The terms "and" and "or" each mean both "and" and "or," unless the context requires otherwise, and shall always be read to require the more inclusive answer.

17.     The requests for production seek DOCUMENTS, COMMUNICATIONS, and information created, sent, and/or received from January 1, 2010 (or, if earlier, the earliest date on which PUP was first contacted in connection with any of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, and/or any similar product) through the present.

## INSTRUCTIONS

1.     You must produce documents as they are kept in the usual course of business or you must organize and label them to correspond to the categories of documents to be produced set forth below.

2.     Please add Bates numbering at the page level to all documents (including electronically stored information) that you produce.

3.     Please produce all electronically stored information with metadata intact in the form of individual .TIFF/.JPG files with a load file containing associated metadata along with text files containing the extracted text for each file at the document level. Please also comply with the following parameters. All images should be single page TIFF, with the exception of color images, which must be JPG format. All images should contain Bates numbering at the page level. The production should include an accompanying DAT load file in Concordance format containing metadata, extracted text path, and native file path, as well as an OPT file containing the image paths for each page of each produced document. Extracted text should be in a TXT file for each produced document at the document level and named to reflect the first bates number of the document it represents. Excel spreadsheets and any document that cannot be imaged should be produced in native format with a placeholder indicating that the document was produced natively.

## DOCUMENTS TO BE PRODUCED

1.     All DOCUMENTS related to the sale/leaseback transactions alleged in the RECEIVER ACTION COMPLAINT, including but not limited to:

a. The Master Lease Agreement No. MEF0979;

b. Any lease schedules, assignments, security agreements, release agreements, and deposit control agreements;

c. DOCUMENTS evidencing any collections and/or efforts to collect, by any of the BANKS, any of the accounts receivables and/or other property and/or assets that were the subject of the sale/leaseback transactions;

d. DOCUMENTS evidencing any payments made by and/or on behalf of PUP in connection with the sale/leaseback transactions;

e. DOCUMENTS evidencing the operation of the sale/leaseback transactions; and

f. DOCUMENTS evidencing any analysis, evaluations, and/or legal opinions related to the sale/leaseback transactions.

2. All defaults issued in connection with the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, including the notices of default referenced in paragraph 58 of the RECEIVER ACTION COMPLAINT.

3. A copy of the May 2, 2011 report from the Florida Office of Insurance Regulation referenced in paragraph 41 of the RECEIVER ACTION COMPLAINT.

4. All DOCUMENTS evidencing COMMUNICATIONS related to the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT and/or the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, including but not limited to:

a. YOUR internal COMMUNICATIONS;

b. PUP's internal COMMUNICATIONS;

c. YOUR COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

d. PUP's COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

e. COMMUNICATIONS with any auditors, regulators, regulatory bodies, and/or governmental entities; and

 f. COMMUNICATIONS with Aaron Henry, Imtiaz H. Sattaur, and/or Sandeep Bajaj.

 5. All DOCUMENTS related to the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, including but not limited to DOCUMENTS related to YOUR and/or PUP's analysis and/or evaluation of, and/or recommendations regarding, the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT.

 6. All DOCUMENTS evidencing COMMUNICATIONS related to the RECEIVER ACTION and/or any of the PRE-LIT MATTERS, including but not limited to:

  a. YOUR internal COMMUNICATIONS;

  b. PUP's internal COMMUNICATIONS;

  c. YOUR COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

  d. PUP's COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL;

  e. COMMUNICATIONS with any auditors, regulators, regulatory bodies, and/or governmental entities; and

  f. COMMUNICATIONS with Aaron Henry, Imtiaz H. Sattaur, and/or Sandeep Bajaj.

 7. All DOCUMENTS related to the March 11, 2021 mediation in the RECEIVER ACTION, including but not limited to all DOCUMENTS evidencing: (i) YOUR and/or PUP's COMMUNICATIONS with PACWEST, MB FINANCIAL, and/or CBSL related to the mediation, (ii) internal COMMUNICATIONS of YOU and/or PUP related to the mediation, and (iii) any other COMMUNICATIONS of YOU and/or PUP related to the mediation (including but not limited to any COMMUNICATIONS with the mediator).

 8. All DOCUMENTS relating to the SETTLEMENT and/or any other settlement negotiations in connection with the RECEIVER ACTION, including but not limited to any related COMMUNICATIONS, offers/counteroffers, evaluations, allocations, negotiations, agreements, analyses, recommendations, court filings (including but not limited to dismissals), and mediation statements/briefs.

9.    DOCUMENTS sufficient to identify all of the damages, other amounts, and other relief that YOU sought to recover in the RECEIVER ACTION.

10.    All DOCUMENTS evidencing any analysis, evaluations, and/or recommendations conducted by, and/or on behalf of, YOU and/or PUP related to any of the damages, other amounts, and other relief that YOU sought to recover in the RECEIVER ACTION.

11.    DOCUMENTS sufficient to identify all of the factual and legal bases for the claims YOU asserted in the RECEIVER ACTION.

12.    All DOCUMENTS evidencing any analysis, evaluations, and/or recommendations conducted by, and/or on behalf of, YOU and/or PUP related to the factual and/or legal bases for the claims YOU asserted in the RECEIVER ACTION.

13.    DOCUMENTS sufficient to evidence the manner and timing of the payment of the SETTLEMENT, as well as the payor(s) and payee(s) of the payment.

14.    All discovery exchanged and/or conducted during the RECEIVER ACTION including, but not limited to, any written discovery (interrogatories, requests for admission, requests for production, subpoenas, etc.), responses thereto, deposition transcripts, and document productions.

15.    All discovery exchanged and/or conducted in connection with any of the  PRE-LIT MATTERS including, but not limited to, any written discovery (interrogatories, requests for admission, requests for production, subpoenas, etc.), responses thereto, deposition transcripts, and document productions.

16.    All expert reports exchanged in connection with the RECEIVER ACTION, as well as drafts of any expert reports prepared in connection with the RECEIVER ACTION.

17.    All DOCUMENTS filed, received, and/or served in the RECEIVER ACTION, including but not limited to all DOCUMENTS filed with the court.

18.    DOCUMENTS sufficient to identify: (i) the total amount of legal expenses (including but not limited to fees and/or costs of any attorneys, paralegals, assistants, experts, consultants, other vendors, and/or any other people or entities) incurred by YOU and/or PUP in connection with the RECEIVER ACTION and/or any of the PRE-LIT MATTERS; (ii) the identities and rates of YOUR and/or PUP's attorneys, experts, consultants, and other vendors (including but not limited to their respective paralegals and support staff) who completed the work reflected in those legal expenses; and (iii) the total time and amount of money charged by each of

YOUR and/or PUP's attorneys, experts, consultants, and other vendors reflected in those legal expenses.

19.    DOCUMENTS evidencing the value and realization of the receivables that were the subject of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT.

20.    All DOCUMENTS (including but not limited to itemized invoices and bills) evidencing: (i) the legal expenses (including but not limited to fees and/or costs of any attorneys, paralegals, assistants, experts, consultants, other vendors, and/or any other people or entities) incurred by YOU and/or PUP in connection with the RECEIVER ACTION and/or any of the PRE-LIT MATTERS; (ii) the amounts actually paid by YOU and/or PUP for those legal expenses; (iii) any write-offs, write-downs, and/or discounts that were requested, offered, received, approved, and/or rejected for the legal expenses; (iv) the reasons for offering, approving, requesting, rejecting, and/or receiving any write-offs, write-downs, and/or discounts; (v) any budgets for any legal expenses in connection with the RECEIVER ACTION and/or any of the PRE-LIT MATTERS; (vi) whether the budgets were approved, modified, and/or rejected; and (vii) the rationale for the budgets as well as approving, rejecting, and/or modifying them.

21.    DOCUMENTS and COMMUNICATIONS evidencing YOUR analysis of admitted and non-admitted assets for PUP as of the time PUP went into Receivership.

22.    DOCUMENTS evidencing any maintenance and/or inspections of any of the property and/or assets that were the subject of any of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT.

23.    Marketing DOCUMENTS and COMMUNICATIONS received by PUP in connection with the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT.

24.    All DOCUMENTS used, relied upon, and/or reviewed by the person(s) YOU designate to testify pursuant to the deposition subpoena from AIG Specialty Insurance Company to YOU in the COVERAGE ACTION in preparation for testimony regarding any matter listed in the subpoena.

25.    The steps YOU took in determining who would testify on YOUR behalf in response to the deposition subpoena from AIG Specialty Insurance Company to YOU in the COVERAGE ACTION.

26.    DOCUMENTS evidencing all of YOUR document retention, storage, filing, and destruction procedures in effect from the date on which YOU first became receiver for PUP through the present.

27.    DOCUMENTS evidencing all of PUP's document retention, storage, filing, and destruction procedures in effect from January 1, 2010 (or, if earlier, the earliest date on which PUP was first contacted in connection with any of the sale/leaseback transactions referenced in the RECEIVER ACTION COMPLAINT, the *ConvertaLease* product referenced in Exhibit A to the RECEIVER ACTION COMPLAINT, and/or any similar product) through the present.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Case No. _____

Case Pending in the U.S. District Court for the Central District of California:
Pacific Western Bank v. AIG Specialty Insurance Co., et al.,
2:20-cv-11085-DMG-PD

_____

IN RE SUBPOENA SERVED ON
THE FLORIDA DEPARTMENT OF FINANCIAL
SERVICES, AS RECEIVER FOR PHYSICIANS
UNITED PLAN, INC.

_____

## **AFFIDAVIT OF PETER W. BELLAS**

1.      My name is Peter W. Bellas.

2.      I am over 18 years of age, and I am a partner at the law firm Venable
LLP.

3.      I have been a member of the Florida Bar since 1986.

4.      I have represented the Florida Department of Financial Services
("Department") as the Receiver of Physicians United Plan ("PUP") since 2014.

5.      This representation included bringing various actions on the
Department's behalf including its action against Pacific Western Bank ("PacWest")
and two other banks, the Central Bank of St. Louis and MB Financial Bank, N.A.

Page **1** of **6**

EXHIBIT 2

6.     On May 20, 2016, the Department as Receiver under its statutory authority filed an action against PacWest and the two other banks in a case styled *Florida Department of Financial Services, as Receiver for Physicians United Plan, Inc. v. Pacific Western Bank Corp., et. al.,* Ninth Judicial Circuit, Orange County, Florida, Case No. 2016-CA-004588-O, to recover damages due to the PUP estate because of lease back transactions that the banks marketed to PUP as an alleged method to increase their admitted assets under the Florida Insurance Code ("Receiver Action"). On April 16, 2019, the Receiver filed and served its amended complaint against these same defendants.

7.     The Department settled the Receiver Action at mediation for $12,500,000.00.

8.     I also currently represent the Department with respect to the issues raised by the subpoenas that AIG Specialty insurance Company ("AIG") served on the Department.

9.     Based on my review of the docket and certain pleadings, it is my understanding that PacWest brought a Coverage Action against AIG and other insurers on December 7, 2020 (the "Coverage Action"). According to the pleadings in the Coverage Action, AIG denied coverage for the claims that the Department brought against PacWest in the Receiver Action. A true and correct copy of PacWest's amended complaint is attached hereto as Exhibit B.

10.    In its answer to the Amended Complaint, AIG repeatedly stated: "the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves." A true and correct copy of AIG's answer to PacWest's amended complaint that I retrieved from the court docket is attached hereto as Exhibit C; *see id.* at ¶¶ 37-42, 52.

11.    In May 2022, over a year after the PacWest settlement, AIG's counsel contacted me and informed me that PacWest had brought its Coverage Action and sought the Receiver's help in the production of documents and deposition transcripts in the Receiver Action against PacWest.

12.    From May 2022 to January 2023, I worked with counsel for AIG, PacWest, and defendants in other the actions that the Receiver brought to accomplish this task.

13.    As an accommodation to the Department, I did not bill the Department for any of the attorney time spent working to assist AIG from May 2022 to January 2023.

14.    At no time from May 2022 to January 2023 did AIG inform me that it wanted anything from the Department other than its assistance in the production of documents, ESI, and testimony that were subject to a confidentiality agreement in the Receiver's underlying action against PacWest.

3

15.    After several months of negotiation, AIG finally agreed to be bound by pertinent terms of the confidentiality agreement in the underlying Receiver Action.

16.    Accordingly, on January 5, 2023, on behalf of the Department, I authorized AIG's counsel to file the stipulation to which the parties agreed.

17.    On March 22, 2023, AIG's counsel emailed a subpoena duces tecum and a subpoena to testify.

18.    AIG served the two subpoenas on the non-party Receiver two years after the settlement, including the subpoena to testify that is the subject of the Department's Motion to Quash.

19.    Over the course of the intervening months, the Department and AIG have had numerous conference calls in an attempt to resolve these issues.

20.    Although the subpoenas were served in March 2023, as an accommodation to the Department, I did not begin billing for the firm's time until June 1, 2023 after already spending numerous hours attempting to resolve all of the issues raised by the AIG subpoenas.

21.    The Department and AIG managed to narrow down the documents requested.

22.    Yet, even after narrowing down the subpoena duces tecum, the Department produced 34,595 pages of communications and attachments between the Receiver's outside counsel and PacWest's counsel.

4

23.    After almost weekly conference calls at times since March 2023, AIG has narrowed the topics to those set forth in Paragraph 6(a)-(f) and 19 of the subject Subpoena.

24.    Prior to the issuance of the subpoenas, on behalf of the Department, I worked with both AIG and PacWest from May 2022 to January 2023 so that AIG could have all the pleadings, discovery (including documents designated as confidential), and deposition transcripts in the Receiver's action against PacWest.

25.    It is my understanding that AIG already has all the underlying pleadings, discovery, expert report, and testimony in the Receiver's action against PacWest.

26.    These include: the Receiver's amended complaint [Exhibit A hereto]; the Receiver's response to PacWest's motion to dismiss [Exhibit J hereto]; the Receiver's opposition to PacWest's motions for summary judgment[1] [Exhibits G and H hereto]; Scott Bouchner's deposition transcripts and exhibits including his expert report [Exhibits D, E, F, K, and L hereto].

27.    The Receiver's damages expert, Scott Bouchner, appeared for deposition twice in the underlying action against PacWest. As set forth above, it is

_____

[1] Due to their volume, the exhibits to the Receiver's opposition to the motions for summary judgment are not included in the exhibits.

my understanding that AIG has copies of both of those deposition transcripts as well as Mr. Bouchner's expert report.

28.     When I asked counsel whether AIG had any authority that would entitle AIG, in a coverage action, to take the deposition of the opposing plaintiff in the underlying litigation regarding damages under these circumstances, AIG was not able to provide any authority that held that is. AIG's counsel advised that in, *Ditech Fin. LLC v. AIG Specialty Ins. Co.*, No. 8:20-CV-409-WFJ-AEP (M.D. Fla.), their firm represented an insurer that deposed a non-party government entity that had settled with the insured. In a conference call, I asked whether the court in that case had specifically addressed this issue in an order or if the deposition went forward without objection. AIG's counsel responded that the deposition went forward without the court addressing the issue in an order.

FURTHER AFFIANT SAYETH NAUGHT

_____
Peter W. Bellas

STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE  )

Before me, the undersigned authority, personally appeared Peter W. Bellas, who   is   personally   known   to   me   or   who   has   presented _____ as identification on this _1st_ day of __August__, 2023, who executed this instrument in my presence and who has sworn that the contents thereof are true and correct.

My Commission Expires:

_____
Notary Public

LINDA PIOTROWSKI
MY COMMISSION # HH 364805
EXPIRES: June 18, 2027

6

# EXHIBIT  A

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN
AND FOR ORANGE COUNTY,
FLORIDA

The FLORIDA DEPARTMENT OF
FINANCIAL  SERVICES, as Receiver for
PHYSICIANS UNITED PLAN, INC.,

      Plaintiff,

v.

PACIFIC WESTERN BANK CORPORATION,
a/k/a PACIFIC WESTERN BANK,
CENTRAL BANK OF ST. LOUIS *f/k/a*
FIRST NATIONAL BANK OF ST. LOUIS, and
MB FINANCIAL BANK, N.A.,

      Defendants.

_____/

Case No.: 2016-CA-004588-O
Judge: JOHN E. JORDAN

### AMENDED COMPLAINT OF FLORIDA DEPARTMENT OF FINANCIAL SERVICES, DIVISION OF REHABILITATION AND LIQUIDATION, AS RECEIVER FOR PHYSICIANS UNITED PLAN, INC., TO AVOID AND RECOVER AVOIDABLE TRANSFERS, FOR DECLARATORY JUDGMENT, FOR DAMAGES, AND FOR RELATED RELIEF

Plaintiff, the Florida Department of Financial Services, Division of

Rehabilitation and Liquidation ("DFS" or "Department"), as Receiver in

liquidation of Physicians United Plan, Inc. ("PUP"), files this Amended

Complaint to Avoid and Recover Avoidable Transfers, for Declaratory

Judgment, for Damages, and for Related Relief in accordance with Part I of

Chapter 631, *et seq.*, Florida Statutes, Chapter 726, *et seq.*, Florida Statutes

and Florida common law against defendants Pacific Western Bank

Corporation a/k/a Pacific Western Bank ("PacWest"), Central Bank of St.

[11381-003/3162872/1]

EXHIBIT A

Louis ("CBSL"), and MB Financial Bank, N.A. ("MB Financial") (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.    The Department brings this action to, *inter alia*, avoid any obligations of PUP to Defendants and recover millions of dollars of PUP's property that PUP transferred to the Defendants primarily on the eve of the Department's appointment as receiver for PUP. The transfers were made in furtherance of a scheme that PacWest conceived and executed with CBSL and MB Financial to hide PUP's financial condition from Florida's insurance regulators. The Department also seeks a declaratory judgment, *inter alia*, as to the sham nature of certain so-called sale/leaseback transactions at the center of the scheme (the "Purported Sale/Leaseback Transactions"), and to recover damages that PUP suffered as a result of the Defendants' wrongful conduct.

2.    PUP was a health maintenance organization ("HMO") operating in the State of Florida. To ensure PUP's financial health and ability to provide critical health services to its members, Florida law required PUP (as with all HMOs) to maintain a minimum capital surplus to continue operating in Florida.

3.    The distinction between "admitted" and "non-admitted" assets is critical to determining whether an HMO, such as PUP, is in compliance with surplus requirements. Non-admitted assets are assets that are not available to fulfill policyholder obligations, and, as such, are prohibited from being included in an HMO's statutory financial statements or counted towards its statutory capital surplus. For example, receivables that are not collected within 90 days of billing are deemed non-admitted assets under the applicable statutory accounting principles.

4.    The goal of PacWest's scheme, among other things, was to disguise PUP's 90-plus-days past due (and, therefore, non-admitted) receivables and other assets as admitted "financing proceeds" and to purportedly "convert" non-admitted assets into admitted assets through a series of convoluted Purported Sale/Leaseback Transactions. These transactions were a sham that PacWest designed to hide PUP's true financial condition and for the purpose of cheating Florida's statutory surplus requirements, and the Defendants collected hefty fees from PUP in exchange for that "service." The Purported Sale/Leaseback structure was a façade that PacWest created to magically "convert" non-admitted assets into supposed admitted assets to mask the financial condition of the company.

5.      On paper, a typical Purported Sale/Leaseback Transaction, for example, consisted of PUP "selling" non-admitted past-due receivables and then "leasing" the same assets back at a premium. In turn, PUP (at PacWest's direction and with the Defendants' encouragement) removed the burdensome non-admitted assets from its books and instead listed the proceeds of the "sales" as admitted assets.

6.      In reality, though, the proceeds were deposited directly into a restricted account pledged to secure PUP's obligations under the lease. The proceeds were not available to satisfy PUP's obligations to policyholders or any other obligations. Thus, a Purported Sale/Leaseback Transaction left PUP with the same non-admitted assets and only the illusion of admitted assets. Further, the Purported Sale/Leaseback Transactions actually *worsened* PUP's financial condition by creating a new obligation to make substantial lease payments to the Defendants, and by allowing PUP to continue to operate past the point it should have, thereby allowing PUP to incur additional debt and other obligations.

7.      Further, PacWest structured transactions so that a default occurred if, *inter alia*, PUP became the subject of a liquidation proceeding by a state regulatory agency, or suffered the entry of an adverse ruling affecting either the accounting or regulatory treatment of the leases or PUP's

4

financial condition. In other words, if Florida's regulators detected the sham nature of the Purported Sale/Leaseback Transactions that the Defendants had arranged, Defendants would declare a default and bail out of the improper arrangement.

8.     In response to the determination of the Florida Office of Insurance Regulation ("OIR") that assets pledged as collateral in the Purported Sale/Leaseback Transactions were deemed non-admitted, PacWest declared PUP in default, and the Defendants swept nearly **$30 million** from PUP's accounts on the eve of its liquidation, leaving policy holders and PUP's other creditors holding the bag.

9.     On behalf of PUP's estate, its policyholders, creditors, Florida taxpayers and other innocent victims of this scheme, the Department was appointed to, among other things, investigate and bring any claims against any culpable parties such as the Defendants.

## THE PARTIES, JURISDICTION, AND VENUE

10.     This is an action for damages far in excess of $15,000, exclusive of interest, attorneys' fees, and costs. The Department is authorized to bring this action under Section 631.3915, Florida Statutes.

11.     On June 5, 2014 (the "Petition Date"), DFS filed a Petition for Order Appointing DFS as Receiver for Purposes of Immediate

Rehabilitation and Automatic Liquidation Effective July 1, 2014, Injunction, and Notice of Automatic Stay for PUP in the Second Judicial Circuit in and for Leon County, Florida ("Receivership Court") in an action styled *In Re: Receivership of Physicians United Plan, Inc.*, Case No. 14-CA-1472.

12.     On June 9, 2014, the Receivership Court appointed DFS Receiver of PUP by its Consent Order Appointing DFS as Receiver for Purposes of Immediate Rehabilitation and Automatic Liquidation Effective July 1, 2014, Injunction and Notice of Automatic Stay (the "Receivership Order").

13.     Under Section 631.3915 of the Florida Statutes, DFS, in its capacity as receiver, "may pursue any actions for damages or other recoveries on behalf of the insurer's estate and the insurer's policyholders, creditors, and other claimants."  The statute grants the Department standing to bring claims authorized under common law and statutes other than the general receivership statute.

14.     Prior to the Receivership Order, PUP was an HMO that provided insurance, healthcare management, and related services in Florida. PUP's headquarters was in Orlando, Florida.

15.    PUP was incorporated on February 22, 2005 in Florida. During 2005, PUP applied for and was issued a certificate of authority by OIR to operate as an HMO in Florida beginning on July 29, 2005.

16.    PUP began collecting premiums and rendering services on January 1, 2006.

17.    In 2006, PUP serviced only one county in Florida.  From 2007 to 2013, however, PUP dramatically expanded to service from seven to seventeen Florida counties.

18.    PUP grew to become a Medicare Advantage Plan with approximately 50,000 Medicare subscribers, which provided Medicare hospital services and benefits to the elderly.

19.    From 2010 to 2013, PUP's revenues (net premium earned) nearly *tripled* from $132,172,295 to $374,978,411 (according to PUP's audited financial statements).

20.    Pacific Western Equipment Finance, formerly known as Marquette Equipment Finance, was a division of PacWest at all times material hereto.[1]  PacWest is a foreign corporation incorporated under the laws of the State of California and registered to transact business in the State of Florida.

---

[1] Upon information and belief, PacWest purchased Marquette Equipment Finance on or about January 3, 2012.

21. On or about April 4, 2016, BofI Holding, Inc., the parent company of BofI Federal Bank ("BofI Bank") announced that the BofI Bank acquired certain assets and assumed certain operations of PacWest's Pacific Western Equipment Finance.

22. Upon information and belief, PacWest retained any liability to the Department in this matter.

23. MB Financial Bank, N.A., is a national bank with its headquarters located at 800 West Madison Street, Chicago, Illinois 60607 and with the following mailing address: 6111 N. River Rd., Rosemont, Illinois 60018.

24. Central Bank of St. Louis, formerly known as First National Bank of St. Louis, is a bank organized under the laws of the State of Missouri with its registered agent, principal place of business, and mailing address at 7707 Forsyth Boulevard, Clayton, Missouri 63131.

25. At all times material to this action, upon information and belief, PacWest (i) conducted business in the State of Florida, (ii) engaged in substantial and not isolated activity within the State of Florida, (iii) aided and abetted the commission of tortious acts within the State of Florida, (iv) caused injury to PUP and others within the State of Florida while engaged in solicitation or service activities; or (v) is in possession of funds improperly

8

or preferentially transferred from PUP that have been identified by the Receiver as assets that are subject to avoidance and recovery by the receivership estate.

26.    At all times material to this action, upon information and belief, CBSL and MB Financial, either individually or through their agent, PacWest (i) conducted business in the State of Florida, (ii) engaged in substantial and not isolated activity within the State of Florida, (iii) aided and abetted the commission of tortious acts within the State of Florida, (iv) caused injury to PUP and others within the State of Florida while engaged in solicitation or service activities; or (v) are in possession of funds improperly or preferentially transferred from PUP that have been identified by the Department as assets that are subject to avoidance and recovery by the receivership estate.

27.    Defendants knew or should have known that property that was the subject of the Purported Sale/Leaseback Transactions (e.g., MSO Receivables and equipment) was located in Florida. By making property located in Florida the subject of the Purported Sale/Leaseback Transactions, Defendants availed themselves of the benefits and protections of Florida. Defendants' conduct also was purposely directed to PUP and creditors of PUP located in Florida. The consequences of Defendants' actions as set

forth herein were seriously harmful to PUP and its creditors and were intended or highly likely to follow from the Defendants' conduct. For all of these reasons in this Amended Complaint, it is not unreasonable or unexpected for Defendants to be haled into a Florida court and be subject to the jurisdiction of the courts of Florida.

28.    Venue is appropriate in this Court under Sections 47.041 and 47.051, Florida Statutes, because the causes of action alleged herein accrued in Orange County, Florida. Defendants are subject to the jurisdiction of the courts in Florida under Section 48.193, Florida Statutes.

## FACTS COMMON TO ALL COUNTS

**A.    PUP, the Regulatory Process and the Receivership Proceedings.**

29.    Florida law establishes minimum capitalization requirements for insurance companies. These include Sections 624.407 (new insurers), 624.408 (current insurers), and 641.225 (health maintenance organizations) of the Florida Statutes.

30.    To maintain a Certificate of Authority to transact business in Florida, an HMO at all times must maintain a surplus as to policyholders of the greater of $1.5 million or "10 percent of total liabilities, or 2 percent of total annualized premiums." These thresholds are the regulatory minimum surplus requirements that PUP was required to maintain to continue

operating in Florida in accordance with Sections 641.22, 641.221, and 641.225, Florida Statutes.

31.    Under Florida law, an insurer is solvent if all the readily available assets of the insurer are sufficient to discharge all its liabilities, and the insurer is able to pay its debts as they become due in the usual course of business.

32.    By contrast, an insurer is "insolvent" when its assets, if made immediately available, would not be sufficient to discharge all its liabilities or when the insurer is unable to pay its debts as they become due in the usual course of business.  Moreover, under Florida law, "insolvency" also includes and is defined as "impairment of surplus," as defined in Section 631.011(13), or "impairment of capital," as defined in Section 631.011(12), Florida Statutes. Fla. Stat. §631.011(14).

33.    OIR monitors the financial condition of insurers in Florida through examinations and audits using financial reports and periodic on-site examinations.  Insurance companies such as PUP are required to submit filings with OIR confirming whether they are financially viable and operating in compliance with the Florida statutes and regulations governing the insurance industry.

34.    Insurers are required to submit, *inter alia*, financial filings and audits with OIR and submit to examinations.

35.    In accordance with Section 641.26(1), Florida Statutes, for example, PUP was required to file financial statements with OIR.  The financial statements were required to comply with Florida law and Statement of Statutory Accounting Principles as promulgated by the National Association of Insurance Commissioners (collectively, "SSAPs" or, individually, "SSAP").  At least two executive officers of PUP were required to swear to the accuracy of the financial statements.

36.    PUP also was required, among other things, to file with OIR audited financial statements (including PUP's balance sheet and statement of operations for the preceding year certified by an independent certified public accountant) prepared in accordance with SSAPs and a report prepared by a certified public accountant describing any material weaknesses in its internal control structure.  Fla. Stat. §641.26(1)(c).

37.    A purpose of these filing requirements is to allow OIR to evaluate the insurer's financial condition and, if necessary, take regulatory action.

38.    HMOs such as PUP are required to use SSAPs rather than Generally Accepted Accounting Principles ("GAAP") for purposes of filing financial statements with the State of Florida.

39.    The accuracy of the required filings is fundamental to the regulatory process.  The OIR may require an insurer to develop a plan to correct deficiencies, conduct targeted examinations of an insurer, restrict an insurer's activities, suspend or revoke an insurer's Certificate of Authority to conduct business in Florida, or refer the company to the DFS for initiation of receivership proceedings. For example, if an insurer becomes insolvent, upon Court order, DFS is appointed as receiver and assumes control of the insurer.

40.    Florida law mandates the use of the SSAPs, which, in turn, prohibit assets that are deemed "non-admitted" from being included as part of an insurer's capital and surplus for statutory accounting purposes.  Under Florida law and the SSAPs, non-admitted assets include assets that are restricted, impaired by lien, encumbrance, or collateralization, and account receivables at risk for nonpayment or otherwise not collectible under Florida law and SSAPs.

**B.    The Non-Admitted Assets and the Purported Sale/Leaseback Transactions.**

41.    On or about April 13, 2011, PacWest made a proposal to PUP relating to "non-admitted asset financing," branded by PacWest as "*ConvertaLease*."

42.    In a report dated May 2, 2011, regulators from OIR advised PUP that certain "risk sharing receivables" in the amount of $532,000 were non-admitted under SSAP No. 84 because they were not collected within 90 days of billing and thus could not be included in PUP's statutory financial statements.

43.    Thus, the OIR report specifically advised PUP that health care and other receivables are non-admitted assets if not collected within 90 days of billing, and PUP was clearly aware of OIR's concern that PUP comply with SSAP 84.

44.    ConvertaLease promotional material reads as a veritable how-to guide for cheating SSAPs and inflating the financial condition of insurance companies such as PUP. The promotional material touted ConvertaLease as "a financing product designed to strengthen your statutory balance sheet" by "transform[ing] non-admitted assets (new or existing) into admitted assets." The material acknowledged that "insurance companies face distinct regulatory pressures and challenges" and promoted PacWest as having

14

"experience and knowledge" of the insurance industry. The promotional material also included a testimonial that lauded PacWest as "a company that could deliver an off balance sheet transaction for our non-admitted assets in a very short period of time." PacWest's proposal to PUP specifically referenced non-admitted asset funding using risk receivables as collateral. *See* certain PacWest promotional material attached hereto as **Exhibit A**.

45.    PacWest designed and intended the Purported Sale/Leaseback Transactions, from their inception, as a device to artificially inflate PUP's financial condition to circumvent state regulatory requirements and hide PUP's true financial condition.

46.    On September 26, 2011 – just a few months after PUP received OIR's May 2, 2011 report advising PUP that risk sharing receivables 90-days past due were non-admitted assets – PacWest and certain of PUP's officers consummated PacWest's scheme by executing Master Lease Agreement No. MEF0979, as amended on September 25, 2012, and November 12, 2013 (collectively, the "Master Lease Agreement").

47.    The Master Lease agreement was implemented through a series of separate Purported Sale/Leaseback Transactions, generally comprised of (but not necessarily limited to)  the following documents which, together with their various exhibits and amendments, set forth the terms of the

transaction: (a) an assignment or similar device purporting to convey certain "assets" from PUP to PacWest; (b) a lease schedule setting forth the pertinent terms of the transaction, including the total cost that PacWest would pay (into a restricted account) to "buy" PUP's assets as well as the terms of the leaseback; (c) a security agreement purporting to pledge the proceeds of the sale as security for PUP's performance under the lease; and (d) a deposit control agreement prohibiting PUP from accessing or otherwise using the sale proceeds, which were funded directly into the subject account. The transactional documents relating to the Purported Sale/Leaseback Transactions, together with all attachments and amendments, are referred to collectively as the "Purported Sale/Leaseback Agreements."

48.   The Purported Sale/Leaseback Agreements evidence on their face that the purpose of the Purported Sale/Leaseback Transactions, *inter alia*, was to circumvent statutory accounting principles and hide PUP's true financial condition. Certain of the Purported Sale/Leaseback Agreements identify the property being assigned and leased back by PUP as "risk sharing receivables, as defined in SSAP No. 84, *greater than ninety (90) days in arrears* in the course of collection as referenced in Lessee's [*i.e.*, PUP's] Statutory Statement of Assets as 'Health care and other amounts

receivable.'" By definition, these risk sharing receivables were non-admitted.

49.    The Purported Sale/Leaseback Transactions in which PUP and the Defendants engaged, by reference to lease schedule, include the following:

a.    Lease Schedule No. 001, dated September 26, 2011, in the total cost amount of $500,000 and requiring 48 monthly rental payments of $12,000 plus applicable sales/use and associated property tax;

b.    Lease Schedule No. 02B, dated January 19, 2012, in the total cost amount of $2,000,000 and requiring 48 monthly rental payments of $48,880 plus applicable sales/use and associated property tax;

c.    Lease Schedule No. 003, dated November 26, 2012, in the total cost amount of $354,239 and requiring 48 monthly rental payments of $8,590 plus applicable sales/use and associated property tax;

d.    Lease Schedule No. 04B, dated November 26, 2012, in the total cost amount of $738,596 and requiring 48 monthly rental payments of $18,051 plus applicable sales/use and associated property tax;

e.    Lease Schedule No. 04D, dated May 30, 2013, in the total cost amount of $900,000 and requiring 48 monthly rental payments of $21,996 plus applicable sales/use and associated property tax;

f.      Lease Schedule No. 005, dated May 29, 2013, in the total cost amount of $1,693,706 and requiring 60 monthly rental payments of $34,433 plus applicable sales/use and associated property tax;

g.      Lease Schedule No. 06A, dated May 29, 2013, in the total cost amount of $806,293 and requiring 60 monthly rental payments of $16,391 plus applicable sales/use and associated property tax;

h.      Lease Schedule No. 06B, dated October 31, 2013, in the total cost amount of $2,249,869 and requiring 60 monthly rental payments of $45,739 plus applicable sales/use and associated property tax;

i.      Lease Schedule No. 007, dated September 17, 2013, in the total cost amount of $7,000,000 and requiring 48 monthly rental payments of $170,800 plus applicable sales/use and associated property tax;

j.      Lease Schedule No. 008, dated November 27, 2013, in the total cost amount of $5,000,000 and requiring 60 monthly rental payments of $101,650 plus applicable sales/use and associated property tax; and

k.      Lease Schedule No. 009, dated December 13, 2013, in the total cost amount of $10,000,000 and requiring 60 monthly rental payments of $203,300 plus applicable sales/use and associated property tax.

(each together with the Master Lease, a "Lease" and collectively, the "Leases").

50.    Upon information and belief, PacWest retained four of the Leases, namely, Lease Nos. 001, 005, 06A and 06B.

51.    Upon information and belief, PacWest purportedly conveyed certain other Leases (including the supposed rights to receive payment under the leases and to sweep the pledged accounts in the event of a default) to MB Financial and CBSL, either as payment or security for financing that had been provided to fund one or more of the Purported Sale/Leaseback Transactions, or in exchange for some other benefit.

52.    Upon information and belief, PacWest purportedly conveyed Lease Nos. 02B, 003, 04B, 04D, 007 and 008, along with all related "rights" under the leases, to CBSL.

53.    Upon information and belief, PacWest purportedly conveyed Lease No. 009, along with all related "rights" under the lease, to MB Financial.

54.    The Defendants not only knew of PUP's inability to meet the requirements of SSAP No. 84, but also orchestrated and specifically designed the Purported Sale/Leaseback Transactions to allow PUP to evade regulatory requirements. The structure of the Purported Sale/Leaseback

Transactions disguised PUP's true financial condition and hindered OIR's ability to take corrective regulatory action, thereby artificially prolonging PUP's existence and increasing its insolvency. The Purported Sale/Leaseback Transactions did not provide PUP with reasonably equivalent value. For example, because of the sham nature of the transactions, PUP could not access the proceeds and, at the same time, PUP assumed liabilities but nevertheless could not account for the proceeds of the transactions as admitted assets. At best, the transactions were a thinly-veiled façade designed to mask PUP's true financial condition.

## C.    The Defendants Bail Out.

55.    Upon information and belief, on or about April 11, 2014, PUP provided PacWest with its statutory financial statement for the period ending December 31, 2013.

56.    As set forth in the notices of default, that financial statement disclosed that PUP had received a regulatory order from OIR on March 14, 2013 requiring PUP to non-admit $12.5 million cash and cash equivalents given that those assets were not available for use in satisfying policyholder obligations due to those assets being used as collateral for the Purported Sale/Leaseback Transactions, that an additional $17 million was subject to being non-admitted in the future for the same reason, and that, if the OIR's

order became final, PUP's surplus would fall below the minimum capital and surplus required in the State of Florida and subject PUP to additional regulatory action if the surplus deficiency was not corrected.

57.    PacWest, aware (based on its self-professed "experience and knowledge" of the insurance industry) that regulatory action was imminent, moved quickly to bail the Defendants out of the sham structure that they had created.

58.    On or about April 16, 2014, PacWest delivered to PUP notices of default under the Purported Sale/Leaseback Agreements based on OIR's decision to non-admit the pledged funds, which PacWest described as, *inter alia*, "the occurrence of an[] adverse ruling that affects the accounting/regulatory treatment of the Lease or a material adverse change in the Lessee's [PUP's] surplus or financial condition," and therefore an event of default. In other words, PacWest exercised the Defendants' purported right to bail out of the sham transactions because OIR had given notice that (contrary to the assurances and representations that PacWest had provided) PUP could not, in fact, use Purported Sale/Leaseback Transactions to magically convert its non-admitted assets into admitted assets.

59.    The notice of default purported to terminate the Leases and notify PUP of PacWest's intent to exercise its rights against the pledged accounts.

60.    On April 29, 2014, PacWest and PUP executed a "Transfer of Title and Release" which purported to re-convey the assets that PacWest had "acquired" from PUP—*i.e.*, the non-admitted assets that PUP, in reality, had kept in its possession all along—in exchange for a purported release of "any and all claims PUP may have against [PacWest] or its Assigns with respect to the Lease, the exercise of remedies thereunder, or the Property" (the "Release Agreement").

**D.    The Monetary Transfers at Issue.**

61.    Contemporaneously with the delivery of the notice of default, on or about April 16, 2014, the Defendants each swept the pledged accounts associated with their respective Leases, causing PUP to transfer to the Defendants **$29,842,698.96**, as follows:

a.    $5,064,496.97 transferred to PacWest;

b.    $14,778,201.99 transferred to CBSL; and

c.    $10,000,000.00 transferred to MB Financial.

These transfers are referred to collectively as the "Default Transfers." These transfers were transfers of PUP's property.

62.    Additional transfers at issue in this lawsuit date back to the inception of the Purported Sale/Leaseback scheme in 2011 as follows:

a.    PUP made lease payments and the Default Transfers to the Defendants during the Four-Months prior to the Petition Date in the total amount of $31,215,775.14 (the "Four-Month Transfers");

b.    PUP made lease payments and the Default Transfers to the Defendants within six months of the Petition Date in the amount of $33,006,285.03 (the "Six-Month Transfers");

c.    PUP made lease payments and the Default Transfers to the Defendants within one year prior to the Petition Date in the amount of $34,868,448.57 (the "One-Year Transfers");

d.    PUP made lease payments and the Default Transfers to the Defendants dating back to the inception of the Purported Sale/Leaseback scheme in the amount of $36,504,946.70 (the "Four-Year Transfers").

63.    The Four-Month Transfers, Six-Month Transfers, One-Year Transfers, and Four-Year Transfers are referred to collectively as the "Transfers." These Transfers were transfers of PUP's property.

64.    Attached hereto as **Exhibit B** is a schedule of the Transfers, setting forth in detail the amounts that each Defendant received with respect to each Transfer, and other pertinent information. *See also* April 22, 2014

Letter of Defendant PacWest, a true and correct copy of which is attached hereto as **Exhibit C**.  The Transfers were transfers of PUP's property.

65.    Each of the Transfers occurred within four years of the Petition Date.

66.    At the time of each of the Transfers, and with respect to the transfers PUP made and any  obligations that PUP incurred under the Purported Sale/Leaseback Agreements and the Release Agreement, and at all material times, PUP, *inter alia*: (i) retained possession or control of transferred property, namely, the assets ostensibly "sold" in connection with the Purported Sale/Leaseback Agreements, (ii) listed the Purported Sale/Leaseback Agreements and the proceeds thereof on its statutory financial statements in a manner designed to conceal and hide them from state regulators; (iii) before entering into the Purported Sale/Leaseback Agreements, had suffered adverse regulatory action and had been threatened with further adverse regulatory action, and made the balance of the Transfers under the threat of, and as part of an effort by certain officers to avoid, such further regulatory action; (iv) at the time it engaged in the Default Transfers, was operating under threat of adverse action by both PacWest (on its own behalf and on behalf of MB Financial and CBSL) and OIR; (v) transferred a substantial amount of PUP's liquid assets under the Default Transfers; (vi)

did not receive reasonably equivalent value in exchange for the Purported Sale/Leaseback Agreements and the Transfers; for example, because of the sham nature of the transactions, PUP could not access the proceeds and, at the same time, PUP assumed liabilities but nevertheless could not account for the proceeds of the transactions as admitted assets; (vii) was insolvent or became insolvent and/or impaired shortly after the Transfers were made or the obligations were incurred; (viii) made the Transfers shortly after a substantial debt was incurred, namely, PUP's obligations under the Purported Sale/Leaseback Agreements; and (ix) such other evidence of otherwise improper conduct as may be learned through discovery in this action.

67.    The Purported Sale/Leaseback Agreements and Release Agreement purported to impose certain obligations on PUP including, but not limited to, choice of law, venue, indemnification, representations and warranties, pledges, assignment, security interests, uncontrolled discretion, events of default, remedies, waivers, fees and costs, limitations of liability, and integration clause ("Purported Sale/Leaseback Agreement Obligations"). These obligations sought to impose monetary and non-monetary burdens and restrictions on PUP and the Department that should be avoided due to the nature of the transactions and the matters set forth in this Complaint.  The

Department is entitled to avoid any monetary or non-monetary obligations that any of PUP's agreements with Defendants purportedly impose on PUP.

68.    DFS is acting in its capacity as receiver under the Receivership Order and applicable Florida law in bringing this action.

69.    DFS has retained the law firm of Genovese Joblove & Battista, P.A. to represent its interests as the receiver of PUP, its policyholders, creditors and other claimants and is required to pay a fee for its services.

70.    All conditions precedent to filing this action have been performed, occurred, waived, or otherwise have been excused.

## COUNT I
## AVOIDANCE OF PURPORTED SALE/LEASEBACK AGREEMENTS
## AS AVOIDABLE TRANSFERS
## PURSUANT TO FLA. STAT. §§ 726.105(1)(a) AND 726.108

71.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

72.    This is an action against the Defendants to avoid all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements as avoidable transfers in accordance with sections 726.105(1)(a) and 726.108, Florida Statutes.

73.    Within four years of the Petition Date, PUP entered into the Purported Sale/Leaseback Agreements to hinder or delay PUP's creditors.

74.    The transfers PUP made and Purported Sale/Leaseback Agreement Obligations PUP incurred under the Purported Sale/Leaseback Agreements are avoidable inasmuch as PUP entered into the agreements as part of a scheme to, among other things, mask non-admitted assets and/or artificially inflate the financial condition of PUP to circumvent state regulatory requirements and hinder or delay PUP's policyholders, creditors, Florida taxpayers, and other stakeholders.

75.    Accordingly, the Department may avoid all transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Purported Sale/Leaseback Agreements, under Chapter 726, Florida Statutes, and recover the value thereof for the benefit of the receivership estate.

**WHEREFORE**, the Department demands the entry of judgment against Defendants as follows: (i) determining that all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements are avoidable under Fla. Stat. § 726.105(1)(a); (ii) avoiding all of the transfers that PUP made and all of the Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements in

accordance with Fla. Stat. § 726.108; (iii) awarding a money judgment to the Department in an amount equal to all payments PUP made to Defendants under the Purported Sale/Leaseback Agreements under Fla. Stat. § 726.108; (iv) awarding pre-judgment and post judgment interest; (v) awarding costs; (vi) disallowing any claim that the Defendants may have against the receivership estate until such time as Defendants return all payments received under the Purported Sale/Leaseback Agreements; and (vii) awarding such other and further relief as the Court deems appropriate.

<div align="center">

**COUNT II**
**AVOIDANCE OF PURPORTED SALE/LEASEBACK**
**AGREEMENTS AS**
**CONSTRUCTIVE AVOIDABLE TRANSFERS**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(b), 726.106 AND 726.108**

</div>

76.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

77.    This is an action against the Defendants to avoid all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements as avoidable transfers in accordance with sections 726.105(1)(b), 726.106, and 726.108, Florida Statutes.

78.    Within four years of the Petition Date, PUP entered into the Purported Sale/Leaseback Agreements.

79.    PUP entered into the Purported Sale/Leaseback Agreements, and made transfers and incurred Purported Sale/Leaseback Agreement Obligations under the Purported Sale/Leaseback Agreements, without receiving reasonably equivalent value in exchange at a time when PUP (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business or the transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due; or (c) was insolvent, or PUP became insolvent as a result.

80.    The transfers PUP made and Purported Sale/Leaseback Agreement Obligations PUP incurred under the Purported Sale/Leaseback Agreements are avoidable inasmuch as they were part of a scheme designed to profit the Defendants at the expense of PUP, PUP's creditors, Florida's taxpayers, and other stakeholders, and to impermissibly cause the Defendants to receive a windfall.

81.    Accordingly, the Department may avoid all transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Purported Sale/Leaseback Agreements, under Chapter 726, Florida Statutes, and recover the value thereof for the benefit of the receivership estate.

**WHEREFORE**, the Receiver demands the entry of judgment against Defendants as follows: (i) determining that all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements are avoidable under Fla. Stat. §§ 726.105(1)(b) and 726.106; (ii) avoiding all of the transfers that PUP made and all of the Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements in accordance with Fla. Stat. § 726.108; (iii) awarding a money judgment to the Department in an amount equal to all payments PUP made to Defendants under the Purported Sale/Leaseback Agreements under Fla. Stat. § 726.108; (iv) awarding pre-judgment and post judgment interest; (v) awarding costs; (vii) disallowing any claim that the Defendants may have against the receivership estate until such time as Defendants return all payments received under the Purported Sale/Leaseback Agreements; and (vii) awarding such other and further relief as the Court deems appropriate.

### COUNT III
### AVOIDANCE AND RECOVERY OF FOUR-YEAR TRANSFERS AS AVOIDABLE TRANSFERS PURSUANT TO FLA. STAT. §§ 726.105(1)(a) AND 726.108

82.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

83.    This is an action against the Defendants to avoid and recover avoidable transfers in accordance with sections 726.105(1)(a) and 726.108, Florida Statutes.

84.    Within four years of the Petition Date, PUP made the Four-Year Transfers to or for the benefit of the Defendants to hinder or delay PUP's creditors.

85.    Accordingly, the Department may avoid the Four-Year Transfers and recover the value thereof from the Defendants for the benefit of the receivership estate under Chapter 726, Florida Statutes.

**WHEREFORE**, the Receiver demands judgment against the Defendants as follows: (i) determining that the Four-Year Transfers are avoidable under Fla. Stat. § 726.105(1)(a); (ii) avoiding the Four-Year Transfers under Fla. Stat. § 726.108; (iii) awarding money judgments under Fla. Stat. § 726.108 to the Department against each Defendant in an amount equal to the sum of the Four-Year Transfers that the respective Defendant received; (iv) awarding pre-judgment and post judgment interest; (v) awarding costs; (vi) disallowing any claims that the Defendants may have against the receivership estate until such time as they return the Four-Year Transfers; and (vii) awarding such other and further relief as the Court deems appropriate.

## COUNT IV
## AVOIDANCE AND RECOVERY OF FOUR-YEAR TRANSFERS AS CONSTRUCTIVE AVOIDABLE TRANSFERS PURSUANT TO FLA. STAT. §§ 726.105(1)(b), 726.106, AND 726.108

86.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

87.    This is an action against the Defendants to avoid and recover avoidable transfers in accordance with sections 726.105(1)(b), 726.106, and 726.108, Florida Statutes.

88.    Within four years of the Petition Date, PUP made the Four-Year Transfers to or for the benefit of the Defendants without receiving reasonably equivalent value in exchange, at a time when PUP (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business or the transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due; or (c) was insolvent, or PUP became insolvent as a result.

89.    Accordingly, the Department may avoid the Four- Year Transfers and recover the value thereof from the Defendants for the benefit of the receivership estate under Chapter 726, Florida Statutes.

**WHEREFORE**, the Department demands judgment against the Defendants as follows: (i) determining that the Four-Year Transfers are

32

avoidable under Fla. Stat. § 726.105(1)(b) and 726.106; (ii) avoiding the Four-Year Transfers under Fla. Stat. § 726.108; (iii) awarding money judgments under Fla. Stat. § 726.108 to the Department against each Defendant in an amount equal to the sum of the Four-Year Transfers that the respective Defendant received; (iv) awarding pre-judgment and post judgment interest; (v) awarding costs; (vi) disallowing any claims that the Defendants may have against the receivership estate until such time as they return the Four-Year Transfers; and (vii) awarding such other and further relief as the Court deems appropriate.

## COUNT V
## AVOIDANCE AND RECOVERY OF ONE-YEAR TRANSFERS AS VOIDABLE TRANSFERS PURSUANT TO FLA. STAT. § 631.262

90.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

91.    This is an action against the Defendants to avoid and recover voidable transfers in accordance with section 631.262, Florida Statutes.

92.    Within one year of the Petition Date, PUP made or suffered the One-Year Transfers to the Defendants (a) without receiving fair consideration or (b) to hinder or delay either then-existing or future creditors of PUP.

93.    The Defendants received the transfers as part of a scheme to mask PUP's non-admitted assets and artificially inflate PUP's financial condition to circumvent state regulatory requirements and hinder or delay PUP's policyholders, creditors, Florida taxpayers and other stakeholders, and therefore did not receive the One-Year Transfers in good faith.

94.    The One-Year Transfers constituted transfers of an interest in property of PUP.

95.    The Defendants are the transferees or recipients of the One-Year Transfers and accordingly are liable to disgorge such transfers.

96.    Accordingly, the Department is entitled to avoid the One-Year Transfers under section 631.262, Florida Statutes, and recover the value of the One-Year Transfers from the Defendants.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants:  (i) avoiding the One-Year Transfers; (ii) awarding a money judgment under Fla. Stat.  §631.262 to the Department in an amount equal to the amount of the One-Year Transfers that each respective Defendant received; (iii) awarding pre-judgment and post judgment interest; (iv) awarding costs; (v) disallowing any claim that the Defendants may have against PUP's estate until such time as they disgorge the One-Year Transfers; and (vi) awarding any other relief the Court deems appropriate.

## COUNT VI
## AVOIDANCE AND RECOVERY OF SIX-MONTH TRANSFERS AS PRESUMPTIVELY VOIDABLE PURSUANT TO FLA. STAT. § 631.262

97.     The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

98.     This is an action against the Defendants to avoid and recover presumptively voidable transfers in accordance with section 631.262, Florida Statutes.

99.     Within six months of the Petition Date, PUP made or suffered the Six-Month Transfers to the Defendants (a) without receiving fair consideration or (b) to hinder or delay either then-existing or future creditors of PUP, and such transfers are therefore presumed void, with the burden upon the Defendants to show otherwise.

100.    The Defendants received the transfers as part of a scheme to mask PUP's non-admitted assets and artificially inflate PUP's financial condition in order to circumvent state regulatory requirements and hinder or delay PUP's policyholders, creditors, Florida taxpayers and other stakeholders, and therefore did not receive the Six-Month Transfers in good faith.

101.    The Six-Month Transfers constituted transfers of an interest in property of PUP.

102.   The Defendants are the transferees or recipients of the Six-Month Transfers and accordingly are liable to disgorge such transfers.

103.   Accordingly, the Department is entitled to avoid the Six-Month Transfers under section 631.262, Florida Statutes, and recover the value of the Six-Month Transfers from the Defendants.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants: (i) avoiding the Six-Month Transfers; (ii) awarding a money judgment under Fla. Stat. § 631.262 to the Department in an amount equal to the amount of the Six-Month Transfers that each respective Defendant received; (iii) awarding pre-judgment and post judgment interest; (iv) awarding costs; (v) disallowing any claim that the Defendants may have against PUP's estate until such time as they disgorge the Six-Month Transfers; and (vi) awarding any other relief the Court deems appropriate.

## COUNT VII
## AVOIDANCE AND RECOVERY OF FOUR-MONTH TRANSFERS AS PREFERENTIAL TRANSFERS PURSUANT TO FLA. STAT. § 631.261

104. The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

105. This is an action against the Defendants to avoid and recover voidable preferential transfers in accordance with section 631.261, Florida Statutes.

106. Within four months of the Petition Date, PUP made the Four-Month Transfers to the Defendants.

107. At the time of the Four-Month Transfers, the Defendants were creditors of PUP, and the Four-Month Transfers gave the Defendants a preference or enabled them to obtain a greater percentage of their debts than another creditor of the same class as the Defendants.

108. Accordingly, the Department is entitled to avoid the Four-Month Transfers under section 631.261, Florida Statutes, and recover the funds that are the subject of the transfers for the benefit of PUP's receivership estate.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants: (i) avoiding the Four-Month Transfers; (ii) awarding a money judgment under Fla. Stat. § 631.261 to the Department against each

Defendant in an amount equal to the amount of the Four-Month Transfers that the respective Defendant received; (iii) awarding pre-judgment and post judgment interest; (iv) awarding costs; (v) disallowing any claim that the Defendants may have against the Receivership until such time as they disgorge the Four-Month Transfers; and (vi) awarding any other relief the Court deems appropriate.

<div align="center">

**COUNT VIII**
**AVOIDANCE OF THE RELEASE AGREEMENT**
**AS AVOIDABLE TRANSFER**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(a) AND 726.108**

</div>

109.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

110.    This is an action against the Defendants to avoid the Release Agreement and all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Release Agreement as avoidable transfers in accordance with sections 726.105(1)(a) and 726.108, Florida Statutes.

111.    Within four years of the Petition Date, PUP entered into the Release Agreement to hinder or delay PUP's creditors.

112.    The transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Release Agreement are avoidable inasmuch as PUP entered into the agreement as part of a scheme to mask non-admitted

assets and artificially inflate the financial condition of PUP to circumvent state regulatory requirements and hinder or delay PUP's policyholders, creditors, Florida taxpayers, and other stakeholders.

113. Accordingly, the Department may avoid the Release Agreement, and the transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Release Agreement, under Chapter 726, Florida Statutes, and recover the value thereof for the benefit of the receivership estate.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants as follows: (i) determining that the Release Agreement is avoidable under Fla. Stat. § 726.105(1)(a); (ii) avoiding the Release Agreement under Fla. Stat. § 726.108; (iii) awarding a money judgment under Fla. Stat. § 726.108 to the Department against each Defendant in an amount equal to the Default Transfers made by PUP to that Defendant; (iv) awarding pre-judgment interest; (v) awarding costs; (vi) disallowing any claims that the Defendants may have against the receivership estate until such time as the Defendants returns any and all payments received under the Release Agreement; and (vii) awarding any other relief the Court deems appropriate.

**COUNT IX**
**AVOIDANCE OF THE RELEASE AGREEMENT AS**
**CONSTRUCTIVE AVOIDABLE TRANSFER**
**PURSUANT TO FLA. STAT. §§ 726.105(1)(b), 726.106, AND 726.108**

114.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

115.    This is an action against the Defendants to avoid the Release Agreement and all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Release Agreement as avoidable transfers in accordance with sections 726.105(1)(b), 726.106, and 726.108, Florida Statutes.

116.    Within four years of the Petition Date, PUP entered into the Release Agreement.

117.    PUP entered into the Release Agreement, and made transfers and incurred Purported Sale/Leaseback Agreement Obligations under the Release Agreement, without receiving reasonably equivalent value in exchange, at a time when PUP (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business or the transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due; or (c) was insolvent, or PUP became insolvent as a result.

118.    The   transfers   PUP   made   and   Purported   Sale/Leaseback Agreement  Obligations  PUP  incurred  under  the  Release  Agreement  are avoidable inasmuch as they were part of a scheme designed to profit the Defendants at the expense of PUP, PUP's creditors, Florida's taxpayers and other stakeholders, and to impermissibly cause the Defendants to receive a windfall.

119.   Accordingly,   the   Department   may   avoid   the   Release Agreement,   and   the   transfers   made   and   Purported   Sale/Leaseback Agreement  Obligations  incurred  thereunder,  under  Chapter  726,  Florida Statutes, and recover the value thereof for the benefit of the receivership estate.

**WHEREFORE**,  the  Department  demands  the  entry  of  judgment against Defendants as follows: (i) determining that the Release Agreement is avoidable under Fla. Stat. §§ 726.105(1)(b) and 726.106; (ii) avoiding the Release Agreement and all of the transfers that PUP made pursuant thereto, and  of  PUP's  Purported  Sale/Leaseback  Agreement  Obligations  arising thereunder, in accordance with Fla. Stat. § 726.108; (iii) awarding a money judgment  under  Fla.  Stat.  §  726.108  to  the  Department  against  each Defendant in an amount equal to the Default Transfers made by PUP to that Defendant;  (iv)  awarding  pre-judgment  and  post judgment  interest;  (v)

awarding costs; (vi) disallowing any claim that the Defendants may have against the receivership estate until such time as Defendants return all payments received under the Release Agreement; and (vii) awarding such other and further relief as the Court deems appropriate.

**COUNT X**
**AVOIDANCE OF THE RELEASE AGREEMENT AS PRESUMPTIVELY VOIDABLE PURSUANT TO FLA. STAT. § 631.262**

120.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

121.    This is an action against the Defendants to avoid and recover presumptively voidable transfers and obligations in accordance with section 631.262, Florida Statutes.

122.    Within six months of the Petition Date, PUP entered into the Release Agreement, and made or suffered certain transfers and incurred certain obligations to the Defendants under the Release Agreement, (a) without receiving fair consideration or (b) to hinder or delay either then-existing or future creditors of PUP, and the Release Agreement and such transfers and obligations are therefore presumed void, with the burden upon the Defendants to show otherwise.

123.    The Defendants received the transfers and obligations under the Release Agreement as part of a scheme designed by Defendants to mask

PUP's non-admitted assets and artificially inflate PUP's financial condition in order to circumvent state regulatory requirements and hinder or delay PUP's policyholders, creditors, Florida taxpayers, and other stakeholders, and therefore did not receive such transfers and obligations in good faith.

124.  The transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Release Agreement constituted transfers of an interest in property of PUP.

125.  The Defendants are the transferees or recipients of the transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Release Agreement and accordingly are liable to disgorge the benefits and value thereof.

126.  Accordingly, the Department is entitled to avoid the Release Agreement, and any transfers made and Purported Sale/Leaseback Agreement Obligations incurred under the Release Agreement, under section 631.262, Florida Statutes, and recover the benefits and value thereof from the Defendants for the benefit of the receivership estate.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants: (i) avoiding the Release Agreement; (ii) awarding a money judgment under Fla. Stat. § 631.262 to the Department in an amount equal to the amount of the Default Transfers made under the Release

Agreement that each respective Defendant received; (iii) awarding pre-judgment and post judgment interest; (iv) awarding costs; (v) disallowing any claim that the Defendants may have against PUP's estate until such time as they disgorge the Default Transfers; and (vi) awarding any other relief the Court deems appropriate.

## COUNT XI
## AVOIDANCE OF THE RELEASE AGREEMENT AS A PREFERENTIAL TRANSFER PURSUANT TO FLA. STAT. § 631.261

127.   The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

128.   This is an action against the Defendants to avoid and recover voidable preferential transfers in accordance with section 631.261, Florida Statutes.

129.   Within four months of the Petition Date, PUP entered into the Release Agreement and made certain transfers under the Release Agreement to the Defendants.

130.   At the time of the Release Agreement, the Defendants were creditors of PUP, and the Release Agreement and the transfers made under the Release Agreement gave the Defendants a preference or enabled them to obtain a greater percentage of their debts than another creditor of the same class as the Defendants.

131.    Accordingly, the Department is entitled to avoid the Release Agreement and all transfers made under the Release Agreement under section 631.261, Florida Statutes, and recover the value of such transfers and the value and benefits of the Release Agreement from the Defendants for the benefit of PUP's receivership estate.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants: (i) avoiding the Release Agreement; (ii) awarding a money judgment under Fla. Stat. § 631.262 to the Department in an amount equal to the amount of the Default Transfers made under the Release Agreement that each respective Defendant received; (iii) awarding pre-judgment and post judgment interest; (iv) awarding costs; (v) disallowing any claim that the Defendants may have against PUP's estate until such time as they disgorge the Default Transfers; and (vi) awarding any other relief the Court deems appropriate.

## COUNT XII
## DECLARATORY RELIEF

132.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

133.    This is a declaratory action against the Defendants under Chapter 86, Florida Statutes, seeking a declaration that all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP

incurred under the Purported Sale/Leaseback Agreements between PUP and the Defendants, and the Release Agreement, are void, voidable, or otherwise unenforceable as improper and against public policy, along with appropriate coercive relief.

134.    The purpose, intent and enforceability of the Purported Sale/Leaseback Agreements, the Release Agreement, and any related agreements are in dispute between the Department and the Defendants, which dispute gives rise to doubt and uncertainty, and the Receiver is entitled to have such doubt removed in accordance with Chapter 86, Florida Statutes.

135.    All the parties interested in the resolution of these issues are before the Court and there is an actual case in controversy to be resolved in connection therewith.

136.    Enforcing the transfers and Purported Sale/Leaseback Agreement Obligations that PUP incurred under Purported Sale/Leaseback Agreements, the Release Agreement, and related agreements in accordance with their terms and effectuating the intent of the Defendants in respect thereof would contravene important Florida policy by rewarding the Defendants for their efforts, *inter alia*, to hide PUP's true financial condition and cheat Florida insurance statutes and regulations, and would violate

principles of equity by permitting the Defendants to retain the windfall they obtained as a result of such improper conduct.

137.    The Department, as the party appointed to bring claims against culpable parties for the benefit of PUP's policyholders and creditors, is a person interested and in doubt about the parties rights under the Purported Sale/Leaseback Agreements, the Release Agreement, and any related agreements, and whose rights will be affected by the interpretation of disputed provisions in those agreements, including any provisions that might be interpreted so as frustrate the Department's claims herein as set forth in this action, and the Department is therefore entitled to a declaration as to the parties' rights under such agreements.

**WHEREFORE**, the Department demands the entry of judgment against the Defendants: (i) declaring that all transfers that PUP made and all Purported Sale/Leaseback Agreement Obligations that PUP incurred under the Purported Sale/Leaseback Agreements, the Release Agreement, and any related agreements, are unenforceable against the Receiver as against public policy; (ii) estopping or otherwise precluding the Defendants from relying on or otherwise profiting or benefitting from any provision of such agreements in this action or otherwise to the detriment of the Receiver's action as set forth herein; (iii) awarding a money judgment against the

Defendants in an amount equal to monies they received under the Purported Sale/Leaseback Agreements, the Release Agreement and related agreements; (iv) awarding pre-judgment and post judgment interest, (v) awarding costs; (vi) such additional, supplemental and coercive relief as may be necessary to effectuate the foregoing relief; and (vii) any other relief the Court deems appropriate.

## COUNT XIII
## UNJUST ENRICHMENT

138.   The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

139.   This is an action against the Defendants for unjust enrichment.

140.   PUP conferred a benefit on the Defendants by making the Transfers that are the subject of this Complaint to the Defendants. *See, e.g.,* **Exhibits B and C**.

141.   The Defendants voluntarily accepted and retained the benefit PUP conferred.

142.   The circumstances are such that it would be inequitable and unjust for the Defendants to retain the benefit conferred by PUP without paying the Department the value thereof.

143.   The Defendants have been unjustly enriched at the expense of PUP (and, ultimately, PUP's creditors, policyholders, and other stakeholders)

144.   The Department is entitled to the return, through disgorgement or other appropriate remedy, of those amounts by which the Defendants were unjustly enriched.

**WHEREFORE,** the Department demands judgment against each of the Defendants in an amount equal to the Transfers that each respective Defendant received, together with pre-judgment and post judgment interest, costs, and for such further relief as the Court deems appropriate.

### COUNT XIV
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

145.   The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

146.   This is an action against the Defendants for aiding and abetting breach of fiduciary duty.

147.   During all times material to this action, Sandeep Bajaj ("Bajaj") was the chairman of the board of directors of PUP and, for a period of time, the co-CEO of PUP.   Upon information and belief, at all times material hereto, IDJB Investments LLC ("IDJB") was the majority shareholder of PUP.   According to IDJB, IDJB is owned by a limited partnership, whose

limited partner is a limited liability company that Bajaj owns and manages. Upon information and belief, the subject transactions improperly benefitted Bajaj, either directly or indirectly, so that he and/or entities that he controlled would not have to contribute additional capital or other funds to PUP.

148.  During all times material to this action, Imtiaz H. Sattaur ("Sattaur") was a director and the President and CEO of PUP.

149.  During all times material to this action, Aaron Henry ("Henry") was an officer and/or finance director of PUP.

150.  Henry was PacWest's point of contact at PUP and a point of contact between PUP and PUP's outside auditors, McGladrey LLP, and was one of the primary actors within PUP that caused PUP to engage in the Purported Sale/Leaseback Transactions.

151.  Sattaur and other officers executed PUP's year end 2011 and 2012 annual statements as well as other NAIC periodic statements. For example, for both of those years, in response to the question of whether PUP had entered into any "Sale-leaseback transactions," the annual statements responded: "None."

152.  Likewise, for example, for both the year end 2011 and 2012 annual statements, in response to the question of whether there had been any

"[t]ransfers of receivables reported as sales," the annual statements responded: "None."

153. Bajaj, Sattaur, and Henry (and other officers of PUP) owed PUP and its shareholders a fiduciary duty to discharge their duties as officers of PUP in good faith, with the care that an ordinarily prudent director or officer in a like position would exercise and in a manner reasonably believed to be in their best interests.

154. Additionally, when PUP became insolvent, Bajaj, Sattaur and Henry (and other officers of PUP) owed a fiduciary obligation to the company's creditors.

155. Upon information and belief, in entering into the subject Purported Sale/Leaseback Agreements, Sattaur, Henry, and others acted to benefit themselves. Such actions were at the expense of PUP.

156. As set forth above, PUP grew dramatically and its revenues nearly tripled from 2010-2013.

157. Bajaj, Sattaur, Henry, and others stood to profit handsomely from PUP's reckless growth, continued operation, and possible sale of the company.

158. Pursuant to a Stock Incentive Plan, Sattaur was given the option to purchase 575,000 shares of common stock at $2.50.

159.   Pursuant to his Employment Agreement, Sattaur was entitled to a base salary of $315,000, which was increased to $450,000, an annual bonus based on PUP's performance against established goals and objectives with a target amount of 100% of his base salary, and a "Special Incentive Bonus" if there is a "change of control."

160.   Pursuant to the Employment Agreement, the "Special Incentive Bonus shall not be less than $3,000,000 if the total proceeds to  the holders of the Company's stock and options to purchase stock in such Change of Control transaction (after discharge in full of the Surplus Notes) will not be less than $40,000,000."

161.   Upon information and belief, Henry and other officers of PUP had similar incentives and caused PUP to enter into Purported Sale/Leaseback Agreements to promote reckless growth.  Accordingly, such reckless growth would benefit Henry and others personally.

162.   Bajaj also stood to benefit, directly or indirectly, such that he or the entities that he controlled would not have to contribute additional capital or other funds to PUP. Bajaj also stood to benefit from the sale of PUP.

163.   Certain leadership of PUP, including Sattaur and Henry, imprudently made multiple calculated decisions to enter into the Purported Sale/Leaseback Agreements. Upon information and belief, Sattaur and

Henry claim that Bajaj was informed of all pertinent decisions relating to the Purported Sale/Leaseback Agreements.

164.    The actions and inactions of certain PUP leadership, such as Sattaur and Henry, carried out for their own benefit and self-interest and contrary to PUP's interests, caused reckless concealment of the non-admitted assets and true financial condition of PUP, thus allowing PUP to operate past the point PUP would be legally allowed to operate or where insurance regulators would have permitted PUP to operate as an insurance company had the true state of affairs been known, thus aggravating the insolvency of PUP.

165.    Lacking good faith, certain of PUP's leadership such as Sattaur and Henry exhibited a conscious, grossly negligent, or reckless disregard for the best interests of PUP and its creditors in relation to the facts and circumstances as set forth herein.    Certain of the former leadership of PUP knew, or, except for conscious, grossly negligent or reckless disregard of the facts, should have known, of the risk of damage that ultimately befell PUP and its creditors as a result of, among other things, entering into the Purported Sale/Leaseback Agreements.

166.    Certain of the former PUP leadership breached their respective fiduciary duties owed to PUP by, among other breaches, failing to cause the

implementation of sufficient safeguards and controls to ensure that the companies' financial statements accurately portrayed PUP's financial condition.

167.   As a direct and proximate result of the foregoing acts and omissions, PUP has suffered, among other damages, the loss or diminution of its enterprise value.

168.   The Defendants, as the promotors of the Purported Sale/Leaseback Agreements and as the parties that directly and substantially benefited from the Purported Sale/Leaseback Agreements, encouraged, actively participated in, rendered substantial assistance to and had actual knowledge or constructive knowledge and a general awareness of, breaches of fiduciary duty by certain of PUP's leadership.

169.   The Defendants, at a minimum, were aware that their dealings with certain members of PUP's leadership were part of an overall activity that was improper and that such persons were abusing their obligations to PUP.

170.   As a result, the Defendants are liable for all damages actually and proximately caused to PUP resulting from the acts and omissions of its officers, which damages include, but are not necessarily limited to: (i) a substantial increase in its liabilities; (ii) a substantial diminution of its assets,

asset values, and enterprise value; (iii) the effectuation of avoidable transfers and other improper payments to third parties, including the Transfers to the Defendants, as well as unreasonable and excessive compensation paid to insiders resulting in no benefit to PUP; (iv) the payment of substantial professional fees and costs; (v) the incurrence of substantial professional fees and expenses in the receivership estates; and (vi) other damages as may be established through discovery.

**WHEREFORE**, the Department demands judgment against the Defendants for compensatory damages, consequential damages, and special damages including, but not limited to, the increased liabilities of PUP, its decreased assets and diminished asset values, improper and excessive compensation paid to insiders, its lost enterprise value, out-of-pocket fees, costs and expenses attributable and incurred or paid by PUP and the Department, all attributable fines, penalties, attorneys' fees, costs and expenses paid or incurred by PUP pre-petition and for the value of all its claims against third parties that were not properly or timely pursued by PUP, plus pre-judgment and post-judgment interest, court costs and for such other relief this Court deems appropriate.

## COUNT XV
## <u>VIOLATION OF FLA. STAT. § 631.157(1)</u>

171.    The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

172.    This is an action against the Defendants for violation of Fla. Stat. § 631.157(1).

173.    The Defendants by advertising, soliciting, negotiating, and participating in the Purported Sale/Leaseback Transaction became involved in a transaction relating to the conduct of the affairs of PUP, an insurance business.

174.    As alleged hereinabove, the Defendants willfully obtained funds, assets, and property from PUP, i.e. the Transfers.

175.    The Transfers jeopardized the safety and soundness of PUP and were significant causes of PUP being placed in receivership.

176.    As a result, the Defendants are liable for triple the amount of the Transfers.

WHEREFORE, the Department demands judgment against each of the Defendants in an amount equal to three times the amount of the Transfers that each of the Defendants received, together with prejudgment and post judgment interest; costs; investigative and other expenses, including the Department's in-house staff and staff attorneys' expenses,

costs, and salaries, expended in the prosecution of the action; and reasonable attorneys' fees; and for such further relief as the Court deems appropriate.

## COUNT XVI
## VIOLATION OF FLA. STAT. § 631.157(2)

177. The Department repeats and re-alleges the allegations in paragraphs 1 through 70 as if fully set forth herein.

178. This is an action against the Defendants for violation of Fla. Stat. § 631.157(2).

179. The Defendants by advertising, soliciting, negotiating, and participating in the Purported Sale/Leaseback Transaction became involved in a transaction relating to the conduct of the affairs of PUP, an insurance business.

180. The Defendants knew, or had constructive knowledge, that PUP had reporting requirements to OIR and that the Purported Sale/Leaseback Transactions did not meet those requirements. The Purported Sale/Leaseback Transactions were specifically designed to allow PUP to evade regulatory reporting requirements to OIR. The Purported Sale/Leaseback Transactions disguised PUP's true financial condition and hindered OIR's review and oversight process.

181. The Defendant, through the Purported Sale/Leaseback Transactions, caused material statements in PUP's reports and financial and

other statements to OIR to be made. It was the Defendant's intent that the Purported Sale/Leaseback Transactions would artificially inflate PUP's true financial condition for the purpose of deceiving OIR.

182.   The Purported Sale/Leaseback Transactions jeopardized the safety and soundness of PUP and were significant causes of PUP being placed in receivership.

183.   As a result, the Defendants are liable for triple the full amount of the assets misreported by PUP as a result of the Purported Sale/Leaseback Transactions.

**WHEREFORE**, the Department demands judgment against the Defendants in an amount equal to three times the full amount of the assets misreported, together with pre-judgment and post judgment interest; costs; investigative and other expenses, including the Department's in-house staff and staff attorneys' expenses, costs, and salaries, expended in the prosecution of the action; and reasonable attorneys' fees; and for such further relief as the Court deems appropriate.

## <u>RESERVATION OF RIGHTS</u>

The Department reserves the right to amend this Amended Complaint, upon completion of its investigation and discovery, to assert any additional

claims for relief against the Defendants as may be warranted under the circumstances and allowed by law.

Dated this 7th day of January 2019.

GENOVESE, JOBLOVE & BATTISTA, P.A.
*Attorneys for the Plaintiff*
100 S.E. 2nd Street, Suite 4400
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310
Email: pbellas@gjb-law.com

By:   /s/ Peter W. Bellas
    Peter W. Bellas, Esq. (FBN 611387)
    John Genovese, Esq. (FBN 280852)
    Michael Friedman, Esq. (FBN 71828)

 **Marquette Equipment Finance**
*A Subsidiary of Meridian Bank, N.A.*



### Make the Most of Your Non-Admitted Assets with *ConvertaLease* SM

At Marquette Equipment Finance, we understand that insurance companies face distinct regulatory pressures and challenges. Our experience and knowledge of the industry allows us to offer you *ConvertaLease* SM – a financing product designed to strengthen your statutory balance sheet.

Strategically managing your asset quality and surplus levels can improve your Risk Based Capital Ratios, advance your AM Best Rating, and have a positive effect on your capacity to write more policies. *ConvertaLease* SM will transform your non-admitted assets (new or existing) into admitted assets. *ConvertaLease* SM is a time tested, proven finance option that has been reviewed and approved by field examiners, insurance commissioners, public accounting firms and some of the nation's largest law firms.

### *ConvertaLease* SM Eligibility

- Electronic Data Processing
- Furniture, Fixtures & Equipment
- AM Best rating of A, B, or C
- Application & Operating Software
- Telephone Systems
- Training
- Installation
- Customization Costs

Contact us at 888-254-1750 to inquire about the other unique collateral we can convert with *ConvertaLease* SM.



*"We needed a company that could deliver an off balance sheet transaction for our non-admitted assets in a very short period of time. Marquette not only had the industry knowledge necessary to structure our transaction properly, but met our funding deadline as well."*

– Grace Pan, Senior VP, Majestic Insurance Company



### The Marquette Advantage

**INDUSTRY KNOWLEDGE**
Like you, our customers have many financing sources available to them. They choose us because of our understanding of the insurance industry, our long standing banking background and our sensitivity to regulatory concerns.

**FINANCIAL STRENGTH**
Marquette Equipment Finance, a subsidiary of Meridian Bank, N.A. is part of the Marquette Financial Companies, which has assets of approximately $2 Billion and equity capital in excess of $200 Million.

**TIME-TESTED APPROACH**
As part of Meridian Bank and Marquette Financial Companies, Marquette Equipment Finance operates within the standards of a strict regulatory environment as well as the Marquette Financial Companies' high ethical standards. By partnering with us, you will receive the benefits of working with a traditional bank combined with the privileges of our time-tested service, *ConvertaLease* SM.

Contact us today to see how *ConvertaLease* SM can serve you.

www.meqf-insurance.com  ·  888-254-1750  ·  6975 Union Park Center, Suite 200; Salt Lake City, Ut 84047

**Exhibit A**



# Proposed Non-Admitted Asset Financing for Physicians United Plan, Inc.

4/13/11

**Marquette Equipment Finance**



1. Basis for Non Admitted Asset Financing

2. Selected Non Admitted Asset Fundings

3. Non-Admitted Asset Case Study

4. Non Admitted Asset Financing Success

5. Branding and Awareness

**Marquette Equipment Finance**



# Basis for Non Admitted Asset Financing

- **SSAP 22 :** "All leases shall be considered operating leases."

- **Int 01 31 :** "Insurers may enter into certain transactions that require the granting of a security interest in certain assets to another party to serve as collateral for their performance under contract. The arrangement is commonly referred to as a pledge, typically accomplished by delivery of assets to the secured party or to an independent custodian."

**Marquette Equipment Finance**



# MEF Non Admitted Asset Fundings

| State | Amount ($MM)* | Schedules | Lease Type ** | Collateral |
|-------|--------------|-----------|---------------|------------|
| NY | $4.1 | 8 | Both | EDP, FFE |
| MI | $5.5 | 5 | Capital | EDP |
| MI | $8.8 | 12 | Both | EDP |
| FL | $1.8 | 3 | Both | EDP |
| VT | $2.8 | 8 | Both | EDP, FFE |
| AL | $1.0 | 3 | Operating | EDP, FFE |
| MN | $0.4 | 2 | Operating | EDP |
| LA | $8.5 | 14 | Operating | EDP |
| IA | $13.3 | 3 | Operating | EDP |
| IL | $28.2 | 2 | Capital | EDP |
| PA | $13.0 | 1 | Capital | EDP |
| GA | $6.6 | 6 | Capital | EDP,FFE |
| NE | $3.5 | 3 | Both | EDP, FFE |
| CT | $5.0 | 3 | Operating | EDP, FFE |
| GA | $3.0 | 7 | Capital | EDP, FFE |
| IL | $1.0 | 1 | Capital | Risk Receivables |
| IL | $0.4 | 1 | Capital | Agents' Balances |

\* As of Jan. 2010 transaction capacity has increased \*\* Operating or Capital Lease
from $30MM to $200MM

 **Marquette Equipment Finance**



# Non Admitted Asset Case Study

- MEF recently funded $28.2MM of Non-Admitted Assets (EDP) for a public InsCo in Illinois

- Financing Structure: Capital Lease with a pledge

- InsCo files both Statutory and GAAP financials

- InsCo Uses KPMG

**Marquette Equipment Finance**



# Case Study:
# GAAP Documentation Summary

- **GAAP :** The transaction was reflected in InsCo's 10Q

- On the Consolidated Statement of Cash Flows under Cash Flows from Financing Activities in the line item "Proceeds from financing under capital lease obligation"

- In the Notes, as a specific Capital Lease Obligation Note. Note listed all transaction details including receipt of cash, pledge, and investment account

- Under the Liquidity and Capital Resources section of the Management Discussion and Analysis of Financial Condition and Results of Operation. This note was nearly identical to the Capital Lease Obligation Note

**Marquette Equipment Finance**



# Case Study :
# SAP Documentation Summary

- **SAP :** The transaction was reflected in InsCo's Quarterly Statutory Filing

- On the Asset page, the EDP Equipment and Software line was reduced by $28.2MM under the Non-Admitted Asset column

- In the Notes, a specific Lease Note describes the entire transaction. This is very similar to the Note disclosure on the 10Q

- A second Note referenced "Other Items Note" details events or transactions that are either unusual or infrequent that should be disclosed.

**Marquette Equipment Finance**

# Non Admitted Asset Financing Success



- "Through the course of our 7 year + relationship with Marquette, we have funded over $9.2MM of equipment including software licenses, customization, installation, and training costs. Marquette continually brings expertise, flexibility and ease to each transaction."

  *- John Parsons, Controller, Michigan Millers Insurance*

- "We needed a company that could deliver an off balance sheet transaction for our non-admitted assets in a very short period of time. Marquette not only had the industry knowledge necessary to structure our transaction properly, but met our funding deadline as well."

  *- Grace Pan, Senior VP, Majestic Insurance Company*

**Marquette Equipment Finance**

# Branding & Awareness



- Information on MEF and ConvertaLease can be found in AM Best's *Best's Review*

**Marquette Equipment Finance**

**Physicians United Plan**
Detail of Transfers
*June 6, 2010 - June 5, 2014*

*Four Months Transfers (2/5/14 - 6/5/14)*

| Vendor Name | Date | | Amount |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/28/2014 | $ | 686,538.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/20/2014 | $ | 161.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/1/2014 | $ | 686,377.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/22/2014* | $ | 5,064,496.97 |
| FIRST NATIONAL BANK OF ST. LOUIS | 4/22/2014* | $ | 14,778,201.99 |
| MB FINANCIAL BANK | 4/22/2014* | $ | 10,000,000.00 |
| | Total Four Months Transfers | $ | 31,215,775.14 |

* Per the April 22, 2014 Pacwest letter

*Six Months Transfers (12/5/13 - 6/5/14)*

| Vendor Name | Date | | Amount |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/27/2013 | $ | 203,300.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/7/2014 | $ | 854,912.95 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/13/2014 | $ | 45,739.85 |

Exhibit B

| | | | |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/3/2014 | $ | 686,557.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/28/2014 | $ | 686,538.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/20/2014 | $ | 161.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/1/2014 | $ | 686,377.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/22/2014* | $ | 5,064,496.97 |
| FIRST NATIONAL BANK OF ST. LOUIS | 4/22/2014* | $ | 14,778,201.99 |
| MB FINANCIAL BANK | 4/22/2014* | $ | 10,000,000.00 |
| Total Six Months Transfers | | $ | 33,006,285.03 |

* Per the April 22, 2014 Pacwest letter

*One Year Transfers (6/6/13 - 6/5/14)*

| Vendor Name | Date | Amount | |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 6/6/2013 | $ | 81,129.20 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 7/1/2013 | $ | 161,642.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 8/6/2013 | $ | 161,831.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 9/3/2013 | $ | 161,642.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 9/26/2013 | $ | 170,800.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/3/2013 | $ | 332,473.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/28/2013 | $ | 23,273.33 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/5/2013 | $ | 139,823.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/6/2013 | $ | 192,796.00 |

| | | | |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/3/2013 | $ | 436,751.56 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/27/2013 | $ | 203,300.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/7/2014 | $ | 854,912.95 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/13/2014 | $ | 45,739.85 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/3/2014 | $ | 686,557.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/28/2014 | $ | 686,538.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/20/2014 | $ | 161.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/1/2014 | $ | 686,377.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/22/2014* | $ | 5,064,496.97 |
| FIRST NATIONAL BANK OF ST. LOUIS | 4/22/2014* | $ | 14,778,201.99 |
| MB FINANCIAL BANK | 4/22/2014* | $ | 10,000,000.00 |
| | Total One Year Transfers | $ | 34,868,448.57 |

* Per the April 22, 2014 Pacwest letter

*Four Years Transfers (6/6/10 - 6/5/14)*

| Vendor Name | Date | Amount | |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 8/11/2011 | $ | 12,000.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/31/2011 | $ | 108,000.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/30/2011 | $ | 12,000.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/2/2011 | $ | 12,000.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/4/2012 | $ | 12,000.00 |

| | | | |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/2/2012 | $ | 12,000.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/15/2012 | $ | 171.50 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/2/2012 | $ | 52,599.34 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/3/2012 | $ | 60,880.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 5/3/2012 | $ | 61,090.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 6/1/2012 | $ | 60,880.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 7/2/2012 | $ | 60,880.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 8/2/2012 | $ | 60,880.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 9/3/2012 | $ | 60,880.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 9/27/2012 | $ | 12,220.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/2/2012 | $ | 60,880.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/4/2012 | $ | 14,556.67 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/30/2012 | $ | 12,220.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/1/2012 | $ | 60,931.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/28/2012 | $ | 44,971.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/3/2012 | $ | 73,231.50 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/6/2012 | $ | 50,822.99 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/28/2012 | $ | 109,611.29 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/2/2013 | $ | 8,590.30 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/1/2013 | $ | 118,173.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/1/2013 | $ | 118,092.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/2/2013 | $ | 118,071.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 5/2/2013 | $ | 87,521.59 |

| | | | |
|---|---|---|---|
| PACIFIC WESTERN EQUIPMENT FINANCE | 5/31/2013 | $ | 138,346.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 6/4/2013 | $ | 21,996.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 6/6/2013 | $ | 81,129.20 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 7/1/2013 | $ | 161,642.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 8/6/2013 | $ | 161,831.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 9/3/2013 | $ | 161,642.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 9/26/2013 | $ | 170,800.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/3/2013 | $ | 332,473.59 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 10/28/2013 | $ | 23,273.33 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/5/2013 | $ | 139,823.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 11/6/2013 | $ | 192,796.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/3/2013 | $ | 436,751.56 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 12/27/2013 | $ | 203,300.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/7/2014 | $ | 854,912.95 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 1/13/2014 | $ | 45,739.85 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/3/2014 | $ | 686,557.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 2/28/2014 | $ | 686,538.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 3/20/2014 | $ | 161.00 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/1/2014 | $ | 686,377.09 |
| PACIFIC WESTERN EQUIPMENT FINANCE | 4/22/2014* | $ | 5,064,496.97 |
| FIRST NATIONAL BANK OF ST. LOUIS | 4/22/2014* | $ | 14,778,201.99 |
| MB FINANCIAL BANK | 4/22/2014* | $ | 10,000,000.00 |
| | Total Four Year Transfers | $ | 36,504,946.70 |

\* Per the April 22, 2014 Pacwest letter



PACIFIC WESTERN
EQUIPMENT FINANCE

*a division of Pacific Western Bank*

**VIA FEDERAL EXPRESS and EMAIL**

April 22, 2014

Mr. Aaron Henry
Physicians United Plan, Inc.
9102 South Park Center Loop, Suite 200
Orlando, Florida 32819

*Re:    Physicians United Plan, Inc. ("Lessee" or "PUP"), Pacific Western Equipment Finance, a division of Pacific Western Bank ("Lessor" or "PWEF"), First National Bank of St. Louis as assignee of Lease Schedule No. 02B, 003, 04B, 04D, 007, and 008 of the following Lease ("FNBSL"), and MB Financial Bank, N.A. as assignee of Lease Schedule No. 009 of the following Lease ("MB Financial").*

*Lease Schedule No. 001, 02B, 003, 04B, 04D, 005, 06A, 06B, 007, 008, and 009 (collectively, the "Schedule" or "Schedules"), which Schedules incorporate by reference the terms and conditions of Master Lease Agreement No. MEF0979, dated September 26, 2011, including any and all amendments thereto (collectively, the "Master Lease"). The Schedules and the Master Lease are referred to herein collectively as the "Lease."*

*<u>All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Lease.</u>*

Dear Mr. Henry:

We are in receipt of your email dated April 18, 2014. In your email you request a final accounting of the Lease.

1) The Casualty Loss Value amounts (as per the Casualty Loss Schedules for each of the numbered schedules) as of April 16, 2014 are:

     a.  Lease Schedule No. 001     $221,087 (after 31 payments)
     b.  Lease Schedule No. 02B    $1,065,543 (after 27 payments)
     c.  Lease Schedule No. 003    $262,014(after 17 payments)
     d.  Lease Schedule No. 04B    $547,521(after 17 payments)
     e.  Lease Schedule No. 04D    $770,392 (after 11 payments)
     f.  Lease Schedule No. 005    $1,541,491 (after 11 payments)
     g.  Lease Schedule No. 06A    $733,830 (after 11 payments)
     h.  Lease Schedule No. 06B    $2,248,668 (after 4 payments)
     i.  Lease Schedule No. 007    $6,534,147 (after 7 payments)

**EXHIBIT C**

Physicians United Plan, Inc.
Page 2 of 2

_____

<div style="margin-left:2em">

j.  Lease Schedule No. 008     $4,997,330 (after 4 payments
k.  Lease Schedule No. 009     $9,994,660 (after 4 payments)

</div>

<div style="text-align:center">

TOTAL: **$28,916,683.00**

</div>

2) The Total Amount Collected from the collateral was:

<div style="margin-left:2em">

a.  PWEF collected **$5,064,496.97** from Wells Fargo Collateral Account Numbers 1157813914, 2640474462 and 5082578252.
b.  FNBSL collected **$14,778,201.99** from Deposit Account Number 002212034.
c.  MB Financial collected **$10,000,000.00** from Securities Account Number 8000582216.

</div>

<div style="text-align:center">

TOTAL: **$29,842,698.96**

</div>

3) Applicable taxes are zero.

4) MB Financial's attorneys' fees are **$2,780.00.**

Applying the Total Amount Collected from the collateral against the total amount owed under the Lease's eleven Casualty Loss Schedules plus attorneys' fees, leaves a positive balance of Nine Hundred Twenty-Six Thousand, Fifteen Dollars and 96/100 (**$923,235.96**). This balance will be refunded to PUP via wire by PWEF in the amount of **$319,420.97**, via wire by FNBSL in the amount of **$601,254.99**, and via wire by MB Financial in the amount of **$2,560.00.**

Should you have any questions, please feel free to contact Michelle Larsen at (801) 566-9201.

Sincerely,

James L. Christensen
President

# EXHIBIT  B

Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Pamela Woods (SBN 101520)
PWoods@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Jacquelyn Mohr (SBN 278337)
JMohr@PasichLLP.com
PASICH LLP
1230 Rosecrans Avenue, Suite 690
Manhattan Beach, California 90266
Telephone: (424) 313 7860
Facsimile: (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC WESTERN BANK, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation; FEDERAL INSURANCE COMPANY, an Indiana corporation; XL SPECIALTY INSURANCE COMPANY, a Delaware corporation,<br><br>Defendants. | Case No. 2:20-cv-11085-DMB-PD<br><br>Assigned to the Hon. Dolly M. Gee<br><br>**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR BREACH OF CONTRACT AND TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint filed: December 7, 2020 |

Plaintiff Pacific Western Bank ("PacWest") complains of defendants AIG

Specialty Insurance Company ("AIG"), Federal Insurance Company ("Federal"), and XL Specialty Insurance Company ("XL") (collectively, the "Insurers") and alleges as follows:

## NATURE OF THE ACTION

1.      This is a lawsuit by PacWest to collect promised insurance coverage under a Bankers Professional Liability ("BPL") policy issued to its parent corporation, PacWest Bancorp, by AIG and excess policies issued by Federal and XL.  The Insurers promised in these policies to protect PacWest Bancorp and its subsidiaries from claims alleging wrongful acts in the rendering or failure to render professional services.

2.      In May 2016, an event the policy was designed to protect against occurred:  PacWest was named as a defendant in litigation brought against it on behalf of one of its customers.  However, when PacWest turned to the Insurers for the promised protection, the Insurers denied coverage, thereby consciously depriving PacWest of the financial security and the benefits of the policies, breaching the policies, and acting in bad faith.  As a result of the Insurers' breach and bad faith, PacWest has been forced to pay millions of dollars in defense costs that the Insurers should have paid, to fund the settlement of the litigation brought against it, and to bring this lawsuit to obtain the benefits promised it under the policies.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1332(a)(1) and 2201(a).  PacWest and the Insurers are of diverse citizenship and the amount in controversy exceeds $75,000.

4.      This Court has personal jurisdiction over each Insurers pursuant to Federal Rule of Civil Procedure 4(k)(1)(A).  Each Insurer has engaged in transactions or business within this state from which this action arises.

5.      Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because all Insurers are deemed residents of this district pursuant to 28 U.S.C.A. § 1391(c)(2).

## THE PARTIES

6.      PacWest is a California corporation with its principal place of business in California.

7.      AIG is an Illinois corporation with its principal place of business in New York.  It is authorized to do business, and is doing business, as a surplus lines insurer in the State of California and the County of Los Angeles.  AIG Specialty is a member of the AIG Group of insurers, one of the largest insurance groups in the world.  On behalf of its member companies, including AIG, the AIG Group operates a website, https://www.aig.com/, conducts world-wide advertising campaigns, and makes representation about the insurance policies its members sell.  PacWest is informed and believes, and on that basis alleges, that in engaging in these activities, the AIG Group is authorized by its member companies, including AIG, to do so and is doing so on their behalf.

8.      The AIG Group has advertised that:

- It has "unsurpassed claims expertise and financial strength" and that "[n]o other insurance organization is more aggressive in pursuing the best claims results for their clients."  AIG Insurance Ad, *Business Insurance* at 11 (Feb. 2, 2004);

- "The claims-paying ability of the AIG Commercial Insurance companies is unmatched" and these companies "stand behind every product we sell, today and every day."  AIG Insurance Ad, *Business Insurance*, back cover (October 2008);

- Its insureds "can expect the same seamless claims service from AIG" and "our sophisticated tools and systems endure that your claims are

3

1    processed promptly," AIG Insurance Ad, *Risk and Insurance* at 13

2    (May 2013);

3    •    "[W]e are here to keep our promises.  So you can keep yours," AIG

4    Insurance Ad, *Risk* at 37 (2013).

5    9.    Federal is an Indiana corporation with its principal place of business in

6    New Jersey.  It is authorized to transact, and is transacting, business in the State of

7    California and the County of Los Angeles.  Federal is a member of the Chubb Group

8    of Insurance Companies.  On behalf of its member companies, including Federal,

9    the Chubb Group operates a website, https://www.chubb.com, conducts world-wide

10    advertising campaigns, and makes representation about the insurance policies its

11    members sell.  PacWest is informed and believes, and on that basis alleges, that in

12    engaging in these activities, the Chubb Group is authorized by its member

13    companies, including Federal, to do so and is doing so on their behalf.

14    10.    PacWest is informed and believes, and on that basis alleges, that

15    Federal holds itself out as an insurance company that doesn't just process its

16    insureds' claims, but "make[s] things right."  On its website, the Chubb Group of

17    insurance companies publicly states:

18    We hope you never need to file a claim with us. But if you

19    do, that's our opportunity to show you what

20    "craftsmanship" means in service to you. It means a quick

21    response when you need it most. It means Chubb people

22    working with empathy, integrity and our legendary

23    attention to detail to make you whole. It means we honor

24    the promises we've made to you. Your loved ones, your

25    employees, your home, your business reputation—these

26    things matter. These things are personal, for you and for us.

27    We're here to help.

28    https://www.chubb.com/us-en/claims/claims-difference.aspx (visited October 21,

4

PASICH

1  2021).

2      11.    Chubb also holds itself out as having "Financial Strength and

3  Exceptional Claim Service."  Chubb Ad, *Risk & Insurance* at 13 (Nov. 2014).  It

4  also represents to the public:

5      •    "If being treated fairly and paid quickly are important to your clients

6          when that have a loss, you want Chubb.  When your clients insure with

7          Chubb, they're buying **real** insurance."  Chubb Ad, *Business Insurance*

8          at 11 (Apr. 4, 2008); and

9      •    "The insurance claims process can sometimes be, well, a process.  At

10         Chubb, it's different.  That's because we're not just in the insurance

11         business, we're in the people business.  Our experienced claims

12         specialists are relentless about every detail in the most personal way

13         possible.  Whether you have a business, homeowners or auto policy, it's

14         our policy to make your life easier. . . .  If a solution is possible, we'll

15         find a way to make it happen".  https://www.chubb.com/us-en/claims/

16         (visited October 21, 2021).

17     12.    XL is a Delaware corporation with its principal place of business in

18  Connecticut.  It is authorized to transact, and is transacting, business in the State of

19  California and the County of Los Angeles.  XL is a member of the XL Group of

20  insurance companies.  On behalf of its member companies, including XL, the XL

21  Group operates a website, https://www.axaxl.com/, conducts world-wide advertising

22  campaigns, and makes representation about the insurance policies its members sell.

23  PacWest is informed and believes, and on that basis alleges, that in engaging in

24  these activities, the XL Group is authorized by its member companies, including

25  XL, to do so and is doing so on their behalf.

26     13.    The XL Group holds itself and its members out to the public as having

27  "[a] solid reputation for paying claims" XL Ad, *Risk Management* at 7 (Apr. 2009),

28

5

1  and a "reputation for fair and efficient claims handling."  XL Ad, *Business*
2  *Insurance* at 16 (July 19, 2010).

3      14.    Indeed, the XL Group describes its claims handling as:
4          Fair.  Squared.
5          When you boil it down, insurance is pretty simple—it's a
6          promise.  You pay a premium.  If you suffer a covered loss,
7          XL Group promises to settle the claim fairly.
8          That's a promise we take seriously.
9          When you experience a covered loss, we will investigate
10         and process the claim as quickly as possible.  If the loss is
11         covered, we won't hide behind policy language.  We'll
12         settle it fairly and get you back to business.
13         After all, we made a promise, right?
14 XL Group Ad, *Risk & Insurance* at 5 (Dec. 2013).

15         **THE POLICIES**

16     15.    PacWest's parent company, PacWest Bancorp, purchased from AIG
17 PortfolioSelect for Financial Institutions Policy No. 01-425-49-77, with a policy
18 period of June 30, 2015, to June 30, 2016, ("the AIG Policy").  A true and correct
19 copy of at least the relevant portions of this Policy is attached as Exhibit 1 and
20 incorporated by reference.

21     16.    The AIG Policy contains a Bankers Professional Liability section that
22 provides $10,000,000 in coverage to PacWest, subject to a $750,000 retention.  This
23 section obligates AIG to "pay the Loss of any Insured that arises from any Claim
24 first made against such Insured during the Policy Period or any applicable Discovery
25 Period, and reported to the Insurer as required by the Coverage Section, for any
26 Wrongful Act of the Insured in the rendering of or failure to render Professional
27 Services."  Ex. 1, BPL Coverage Section § 1.

28

17.     The AIG Policy defines "Insured" to include an "Organization," defined as "(1) the Named Entity; [and] (2) each Subsidiary." *Id*., Endorsement 26. PacWest Bancorp is the "Named Entity." *Id*., Declarations Item 1. "Subsidiary" includes "any for-profit entity which the Named Entity has or had Management Control on or before the Inception Date of this policy either directly or indirectly through one or more of its other Subsidiaries." *Id*., BPL Coverage Section § 12. PacWest is a Subsidiary of PacWest Bancorp because PacWest Bancorp has and had Management Control of PacWest since before the Inception Date of the AIG Policy.

18.     The AIG Policy defines "Loss" as including "damages, settlements, judgments (including pre/post judgment interest on a covered judgment) and Defense Costs." *Id*. Endorsement 25. With respect to the payment of Defense Costs, the AIG Policy states:

> Once the Insurer has received written notice of a Claim under the Coverage Section, it shall advance, excess of applicable Retention, covered Defense Costs on a current basis, but no later than ninety (90) days after the Insurer has received itemized bills for those Defense Costs.

*Id*., BPL Coverage Section § 4(b).

19.     The AIG Policy defines a "Claim" to include "(1) a written demand for monetary relief; or (2) a civil, criminal, administrative, regulatory proceeding or arbitration, mediation or other alternative dispute resolution proceeding for monetary or non-monetary relief which is commenced by:  (i) service of a complaint or similar proceeding." *Id*. Endorsement 31.

20.     The AIG Policy defines a "Wrongful Act" as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act" by PacWest. *Id*., BPL Coverage Section § 12. "Professional Services" means:

> those services of the Organization permitted by law or regulation rendered by an Insured, pursuant to an

7

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

1    agreement, as long as such service is rendered for or on

2    behalf of a customer or client of the Organization either:

3    (i) for a fee, commission of other remuneration or

4    financial consideration which inures to the benefit of the

5    Organization; or (ii) without a fee, commission or other

6    remuneration or financial consideration as long as a fee,

7    commission or other remuneration or financial

8    consideration would usually be received by the

9    Organization for such service, but for business or other

10   reasons is waived or not charged by the Organization.

11   *Id*. Endorsement 29.

12       21.    PacWest Bancorp purchased from Federal Excess Policy No. 8240-

13   8897, with a policy period of June 30, 2015, to June 30, 2016 ("the Federal Policy").

14   A true and correct copy of at least the relevant portions of this Policy is attached as

15   Exhibit 2 and incorporated by reference.

16       22.    The Federal Policy states that it provides $10,000,000 of coverage

17   excess of the AIG Policy.  It obligates Federal to

18   provide the Insureds with insurance during the Policy

19   Period excess of the Underlying Limit.  Coverage

20   hereunder shall attach only after the Underlying Insurers

21   and/or the Insureds or any other party shall have paid in

22   legal currency the full amount of the Underlying Limit for

23   such Policy Period.  Coverage hereunder shall then apply

24   in conformance with the terms of conditions of the

25   Primary Policy, except as otherwise provided herein.

26   Ex. 2, Endorsement 2.

27       23.    PacWest Bancorp purchased from XL Excess Policy No. ELU139771-

28   15, with a policy period of June 30, 2015, to June 30, 2016 ("the XL Policy").  A

8

PASICH

1  true and correct copy of at least the relevant portions of this policy is attached as

2  Exhibit 3 and incorporated by reference.

3       24.    The XL Policy provides $10,000,000 of coverage excess of underlying

4  insurance.  It obligates XL to

5                 provide the Insured with insurance coverage for claims first

6                 made against the insured during the Policy Period excess of

7                 the  Underlying  Insurance  stated  in  Item  4  of  the

8                 Declarations.  Coverage  hereunder  will  apply  in

9                 conformance with the terms, conditions, endorsements and

10                 warranties of the Primary Policy together with the terms,

11                 conditions,  and  warranties  of  any  other  Underlying

12                 Insurance.

13  *Id.* Endorsement 3.  Item 4 of the Declarations identifies the Underlying Insurance

14  as the AIG Policy, with a $10,000,000 limit of liability, and the Federal Policy, with

15  a $5,000,000 limit of liability.

16       25.    To the extent not waived or otherwise excused, PacWest Bancorp and

17  PacWest have complied with all terms and conditions precedent contained in the

18  AIG, Federal, and XL Policies (collectively, "the Policies").  Therefore, PacWest is

19  entitled to all benefits of insurance provided by the Policies.

20               **THE TRANSACTIONS BETWEEN PACWEST AND PUP**

21       26.    From 2009 through 2015, PacWest and its predecessor in interest,

22  Marquette Equipment Finance, marketed non-admitted asset financing to the

23  insurance industry.  PacWest's product, "Convertalease," was designed to assist

24  insurers by financing assets that the insurers could not show on their balance sheets

25  for regulatory reasons ("Non-Admitted Assets").  Within the industry, insurers often

26  seek to monetize those Non-Admitted Assets and replace them with assets that may

27  be shown on their balance sheets ("Admitted Assets").

28

27.     The ConvertaLease product was a potential means to replace an insurer's Non-Admitted Assets with Admitted Assets, subject to the customer's consultation with its auditing and regulatory representatives.  In order to implement such financing, PacWest would purchase Non-Admitted Assets from an insurer and lease those same assets back to the insurer (such transactions are typically referred to in financial circles as "Sale-Leaseback Transactions").  In some cases, the proceeds of the sale were pledged to PacWest to secure the payment obligations under the leases.

28.     Physicians United Plan, Inc. ("PUP") was a health maintenance organization that operated a Medicare Advantage Plan.  It was regulated by the Florida Office of Insurance Regulation, which monitored PUP's compliance with applicable statutory accounting principles and other regulations and statutes.  PUP was required to file with the Florida Office various reports and statements, including unaudited statutory financial statements and annual audited financial statements.

29.     PacWest is informed and believes, and on that basis alleges, that beginning in 2011, PUP was seeking to substantially increase the number of members of its Medicare Advantage Plan but was limited in its growth strategy by certain Non-Admitted Assets it was carrying on its books.

30.     PUP inquired of PacWest whether it would be interested in participating in a sale-leaseback of some of PUP's assets, including certain accounts receivable, specifically, its health care receivables that were 90 days in arrears.  As contemplated, PUP's payments would be secured by the proceeds of the sale, so PacWest was indifferent to the nature of the actual asset it was purchasing and leasing back to PUP.  Some of the transactions with PUP involved PacWest purchasing tangible items and leasing them back to PUP.  Others involved the sale and leaseback of the accounts receivable.  In such cases, PUP's payment obligations under the leases were secured by the sales proceeds.  The parties anticipated that the cash proceeds of the contemplated sale/leaseback transactions would be treated from

10

1    an accounting perspective as Admitted Assets, even though they were pledged to
2    PacWest or another bank.

3         31.    PacWest is informed and believes, and on that basis alleges, that PUP
4    sought the advice of its auditor, RSM USA, LLP (then known as McGladrey, LLP),
5    a national auditing and accounting firm, to confirm that the sale proceeds would be
6    treated as Admitted Assets.  PacWest is informed and believes, and on that basis
7    alleges, that RSM concluded that the sale-leaseback transactions contemplated by
8    PUP and PacWest would result in the sale proceeds being treated as Admitted
9    Assets, and so advised PUP.

10        32.    In 2011, Marquette and PUP executed a Master Lease Agreement,
11   which was the umbrella agreement for a series of sale-leaseback transactions
12   between PUP and PacWest.  Each transaction was implemented through an
13   individual lease, an assignment or sale-leaseback agreement transferring ownership
14   of the tangible property or accounts receivable, an acceptance certificate describing
15   the property sold, acknowledging the start date of the lease and authorizing the
16   distribution of the sale proceeds, a deposit account control agreement and/or security
17   agreement granting a security interest in the sale proceeds to PacWest (or its
18   assignee), and other supporting documentation.  After execution, PacWest assigned
19   some of the leases to two other banks, MB Financial and Central Bank of St. Louis
20   ("the Banks").  PUP, PacWest, and the Banks engaged in sale-leaseback transactions
21   under the terms of the Master Lease Agreement for two years.

22        33.    PacWest is informed and believes, and on that basis alleges, that in
23   March 2014, the Florida Office of Insurance Regulation notified PUP that it had
24   determined that the sale proceeds of the most recent sale-leaseback transactions
25   should be retroactively reclassified as Non-Admitted Assets.

26        34.    The leases provided that, in the event a governmental authority such as
27   the Florida Office of Insurance Regulation determined that the pledged sale
28   proceeds would treated as Non-Admitted Assets, PacWest and the Banks were

11

PASICH

1  entitled to offset any remaining payment obligations under the leases against the
2  pledged sale proceeds and return ownership of the purchased accounts receivable
3  back to PUP. On April 16, 2014, PacWest delivered notice of default to PUP and it
4  and the Banks exercised their right to offset and return ownership of the accounts
5  receivable to PUP.

6      35.    PacWest is informed and believes, and on that basis alleges, that after
7  the Florida Office of Insurance Regulation determined in March of 2014 that the
8  pledged sale proceeds should be reclassified as Non-Admitted Assets rather than
9  Admitted Assets, PUP was unable to meet the financial requirements mandated by
10 state regulations. PacWest is informed and believes, and on that basis alleges, that
11 PUP was unable to remedy the issues presented by the determination that these
12 assets were Non-Admitted, and therefore PUP consented to the appointment of a
13 receiver.

14     36.    PacWest is informed and believes, and on that basis alleges, that in
15 June 2014, the Florida Department of Financial Services was appointed as Receiver
16 for PUP.

17                          **THE *PUP* LAWSUIT**

18     37.    On May 20, 2016, the Receiver filed a lawsuit against PacWest and the
19 Banks entitled *Florida Department of Financial Services, as Receiver for*
20 *Physicians United Plan, Inc. v. Pacific Western Bank Corporation*, Case No.: 2016-
21 CA-004588-O in the Circuit Court of the Ninth Judicial Circuit in and for Orange
22 County, Florida ("the *PUP* lawsuit"). A true and correct copy of the Complaint in
23 the PUP lawsuit is attached as Exhibit 4.

24     38.    The Receiver alleged in the Complaint that the sale/leaseback
25 transactions constituted "a scheme that PacWest conceived and executed with [the
26 Banks] to hide PUP's financial condition from Florida's insurance regulators." It
27 sought to avoid any obligation of PUP to the defendants under the sale/leaseback
28 agreements, a declaration as to the "sham" nature of the transactions between PUP

12

PASICH

and PacWest, and "to recover damages that PUP suffered as a result of [PacWest's] wrongful conduct." Ex. 4 ¶ 1.

39.     The Complaint alleged facts that constitute "Wrongful Acts" under the Policies.  Among other things, the Receiver alleged:

- "The transfers were made in furtherance of a scheme that PacWest conceived and executed with [the Banks] to hide PUP's financial condition from Florida's insurance regulators," *Id*.;

- "These transactions were a sham that PacWest designed for the purpose of cheating Florida's statutory surplus requirements," *Id*. ¶ 4;

- PacWest "aided and abetted the commission of tortious acts within the State of Florida," *Id*. ¶ 25;

- PacWest "designed and intended the Sale-Leaseback Transactions, from their inception, as a device to artificially inflate PUP's financial condition to circumvent state regulatory requirements," *Id*. ¶ 45;

- PacWest "received the transfers and obligations under the Release Agreement as part of a scheme designed by Defendants to mask PUP's non-admitted assets and artificially inflate PUP's financial condition in order to circumvent state regularly requirements and hinder or delay PUP's policyholders, creditors, Florida taxpayers, and other stakeholders, and therefore did not receive such transfers and obligations in good faith," *Id*. ¶123;

- In entering into the Sale/Leaseback Agreements, certain officers and directors of PUP breached their fiduciary duties to PUP, and that PacWest "encouraged, actively participated in, rendered substantial assistance to and had actual knowledge or constructive knowledge and a general awareness of, breaches of fiduciary by PUP's officers," *Id*. ¶165;

- PacWest was, at a minimum, aware that its "dealings with certain officers of were part of an overall activity that was improper and that such persons were abusing their obligations to PUP," and that therefore PacWest was "liable for all damages actually and proximately caused to PUP resulting from the acts and omissions of its officers," including "(i) a substantial increase in its liabilities; (ii) a substantial diminution of its assets, asset values, and enterprise value; (iii) . . . unreasonable and excessive compensation paid to insiders resulting in no benefit to PUP; [and] (iv) the payment of substantial professional fees and costs . . . ." *Id*. ¶¶ 166-167.

40. Subsequently, on April 16, 2019, the Receiver filed an Amended Complaint against PacWest and the Banks. This complaint reiterated the allegations stated above. In addition, the Receiver alleged that PacWest "willfully obtained funds, assets, and property from PUP, i.e., the Transfers" that "jeopardized the safety and soundness of PUP" and that PacWest "caused material statements in PUP's reports and financial and other statements to [the Florida Office of Insurance Regulation] to me made."

41. The Receiver sought damages in excess of $100,000,000 in the *PUP* lawsuit.

42. On June 8, 2016, MB Financial Bank and Central Bank of St. Louis (the "Banks") sent PacWest a request that it, "as the party that originated the transactions which are the subject of" the *PUP* lawsuit, provide a defense to the claims asserted against the Banks and hold the Banks harmless against any loss, expense, or damage that they may incur in connection with the *PUP* lawsuit.

## THE INSURERS' BREACHES

43. Even before being served with the *PUP* lawsuit, on April 18, 2016, PacWest provided AIG with a Notice of Threatened or Potential Litigation/Claim

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

with respect to the claims that would form the basis of the *PUP* lawsuit. On June 4, 2016, PacWest provided AIG with notice of the *PUP* lawsuit.

44. On June 13, 2016, PacWest notified AIG of the indemnification request from the Banks.

45. On July 21, 2016, AIG provided a "preliminary position regarding coverage" for the *PUP* lawsuit and the Banks' indemnification requests. Instead of acknowledging its duty to pay any Loss arising from these claims, AIG took the position that "there is no coverage available" for the *PUP* lawsuit. Among other things, AIG asserted that (i) Exclusion 2(h) of the AIG Policy barred coverage; (ii) that many counts alleged in the *PUP* lawsuit did not allege Wrongful Acts, as that term is defined in the AIG Policy; and (iii) that the *PUP* lawsuit sought disgorgement of amounts by which PacWest was unjustly enriched, which was uninsurable under California law and therefore did not constitute Loss. In addition, AIG asserted that the indemnity request from the Banks did not constitute a Claim made for a Wrongful Act of the Insured in the rendering or failure to render Professional Services.

46. On or about July 28, 2016, PacWest provided XL with notice of the *PUP* lawsuit and the indemnification requests from the Banks.

47. On August 22, 2016, PacWest sent a letter to AIG pointing out the errors in AIG's "preliminary position" and asking that AIG reconsider its denial of coverage for the *PUP* lawsuit and the indemnification requests from the Banks. However, on December 5, 2016, AIG, through counsel, reiterated its denial of coverage.

48. On February 11, 2019, XL sent PacWest a letter stating that it "adopts for itself, and incorporates herein, the denial of coverage" as expressed by AIG.

49. On or about February 14, 2019, PacWest provided Federal with notice of the *PUP* lawsuit and the indemnification requests from the Banks. Federal acknowledged receipt of this notice on February 19, 2019.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

50.     On June 28, 2019, Federal sent PacWest a letter stating that it "agrees with and adopts the AIG coverage position as set forth in its July 21, 2016 correspondence and incorporates it herein by reference."  In addition, Federal reserved its right to deny coverage on the ground that it did not receive notice "as soon as practicable" of the notice given to AIG of the *PUP* lawsuit.

51.     In light of the above positions taken by the Insurers, PacWest took all reasonable steps to mitigate its damages (and the damages of the Banks) in connection with the *PUP* lawsuit.

52.     The court in the *PUP* lawsuit ordered the parties therein to mediate the case no later than March 12, 2021.  The mediation was scheduled for March 11, 2021.

53.     On February 22, 2021, PacWest advised the Insurers of the upcoming mediation.  Although each of the Insurers had denied coverage, PacWest invited the Insurers to participate in the mediation if they would confirm that they were willing to participate in a reasonable settlement of the *PUP* lawsuit.  In response to this invitation, each of the Insurers affirmed its denial of coverage.  Therefore, PacWest determined that it would participate in the mediation without the Insurers' involvement.

54.     PacWest agreed to a settlement with the Receiver at the mediation. PacWest paid the settlement amount of $12,500,000.

55.     On April 7, 2021, PacWest advised the Insurers that the parties to the *PUP* lawsuit had entered into a Settlement Agreement and that the court presiding over the PUP Receivership Proceeding had approved the settlement.  PacWest provided the Insurers with copies of the Settlement Agreement and court order approving the settlement and requested that the Insurers confirm that they would reimburse PacWest for its payment of the settlement.  None of the Insurers responded to PacWest's request or contributed any amount to the settlement of the *PUP* lawsuit.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

56.     PacWest incurred and paid more than $6,800,000 in defense costs in connection with the *PUP* lawsuit and paid $12,500,000 to settle the *PUP* lawsuit. The Insurers have not paid or agreed to pay any portion of these losses.

57.     To the extent not waived or otherwise excused, PacWest has complied with all terms and conditions precedent contained in the Policies.  Therefore, PacWest is entitled to all benefits of insurance provided by each of the Policies.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against AIG)

58.     PacWest realleges and incorporates by reference paragraphs 1 through 57 above.

59.     Under the terms of the AIG Policy, AIG was and is obligated to advance PacWest's Defense Costs incurred in connection with the *PUP* lawsuit.

60.     AIG breached its duties under the Policy by, among other things, denying the PacWest's claim for coverage for the *PUP* lawsuit and refusing to advance or indemnify it for the Defense Costs incurred in connection with the *PUP* lawsuit.

61.     As a direct and proximate result of AIG's breach of its duties under the Policy, the PacWest has been damaged in an amount in excess of $6,800,000, plus interest thereon.

## SECOND CAUSE OF ACTION

### (Breach of Contract Against All Defendants)

62.     PacWest realleges and incorporates by reference paragraphs 1 through 57 and 59 through 61, above.

63.     Each of the Insurers was and is obligated under the terms of its policy and within its policy limit to indemnify PacWest for settlement amount it was obligated to pay in connection with the *PUP* lawsuit.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

64. The Insurers breached their duties under their respective Policies by, among other things, denying PacWest's claim for coverage for the *PUP* lawsuit and refusing to pay for any part of the settlement of the *PUP* lawsuit.

65. As a direct and proximate result of the Insurers' breach of their duties under the Policy, PacWest has been damaged in an amount in excess of $12,500,000, plus interest thereon.

## THIRD CAUSE OF ACTION

### (Tortious Breach of the Duty of Good Faith and Fair Dealing
### Against All Insurers)

66. PacWest realleges and incorporates by reference paragraphs 1 through 57, 59 through 61, and 63 through 65, above.

67. Implied in each of the Policies is a covenant that the Insurer will act in good faith and deal fairly with PacWest, that the Insurer will do nothing to interfere with PacWest's right to receive the benefits of the Policy, and that the Insurer will give at least the same level of consideration to PacWest's interests as it gives its own interest.

68. The Insurers also have a duty under their policies, the law, and insurance industry custom, practice, and standards, to conduct a prompt and thorough investigation, including an investigation of all bases that might support the Insureds' claim for coverage, before asserting coverage defenses or denying coverage.

69. Instead of complying with these duties, the Insurers, and each of them, breached the implied covenant of good faith and fair dealing by, among other things:

    a. Failing to conduct a prompt and thorough investigation of the facts relating to the *PUP* lawsuit before asserting coverage defenses and denying coverage;

    b. Artificially and narrowly interpreting its policies' provisions;

    c. Asserting grounds for denying coverage that it knows are not

18

PASICH

supported by, and in fact are contrary to, the terms of the policies, the law, industry custom, practice, and standards, and the facts;

d.     Failing to fully inquire into possible bases that might support coverage for PacWest's claim and negate the Insurers' attempts to avoid their duties in connection with the *PUP* Lawsuit;

e.     Giving greater consideration to its own interests than it gave to the interests of PacWest; and

g.     Otherwise acting as alleged above.

70.     In breach of the implied covenant of good faith and fair dealing, the Insurers, and each of them, did the things and committed the acts alleged above for the purpose of consciously withholding from PacWest the rights and benefits to which it was entitled under the policies, and without considering the interests of PacWest at least to the same extent as it did its own interests.

71.     The Insurers' acts are inconsistent with the reasonable expectations of PacWest, are contrary to established insurance industry custom, practice, and standards, are contrary to legal requirements, are contrary to the express terms of the policies, and constitute bad faith.

72.     Pursuant to the holding in *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), PacWest is entitled to recover all attorneys' fees and costs that it has reasonably incurred, and continues to incur, in its efforts to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by the Insurers.

73.     The Insurers' conduct is despicable and has been done with a conscious disregard of PacWest's rights, constituting oppression, fraud, and/or malice, in that the Insurers engaged in a series of acts designed to deny the benefits due under their policies and to conceal and/or misrepresent material facts.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

74.     PacWest is informed and believes, and on that basis alleges, that each Insurer—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of the Insurer's business—performed, authorized, and/or ratified the bad faith conduct alleged above.

75.     As a direct and proximate result of the Insurers' acts, PacWest has been damaged in an amount to be determined at the time of trial, including the attorneys' fees that it has incurred, and is incurring, in its efforts to obtain the benefits the Insurers owe to them under the policies, plus interest on these amounts.

76.     In light of information, facts, and relevant law known by it or reasonably ascertainable, the Insurers, by acting as alleged above, consciously disregarded PacWest's rights and forced PacWest to incur substantial financial loss, without any assistance from it, thereby inflicting substantial financial damage on PacWest.  The Insurers consciously ignored PacWest's interests and concerns, with the requisite intent to injure within the meaning of California Civil Code section 3294.  Therefore, PacWest is entitled to recover punitive damages from the Insurers in an amount sufficient to punish and make an example of them and to deter similar conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, PacWest prays for relief as follows:

### **ON THE FIRST CAUSE OF ACTION**

1.     For damages according to proof at the time of trial, plus interest;

### **ON THE SECOND CAUSE OF ACTION**

2.     For damages according to proof at the time of trial, plus interest;

### **ON THE THIRD CAUSE OF ACTION**

3.     For damages according to proof at the time of trial, including the reasonable attorneys' fees incurred in obtaining the benefits due under the Policy, plus interest;

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

4.     For punitive damages in an amount to be determined at trial;

## **ON ALL CAUSES OF ACTION**

5.     For costs of suit herein; and

6.     For such other, further, and/or different relief as may be deemed just and proper.

DATED: December 17, 2021          Kirk Pasich
Pamela Woods
Jacquelyn Mohr
PASICH LLP

By: */s/ Pamela Woods*

Pamela Woods

Attorneys for Plaintiff

21

# **DEMAND FOR JURY TRIAL**

Plaintiff Pacific Western Bank hereby demands a trial by jury in this action.

DATED:  December 17, 2021

Kirk Pasich
Pamela Woods
Jacquelyn Mohr
PASICH LLP


By: */s/ Pamela Woods*

Pamela Woods

Attorneys for Plaintiff

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

# EXHIBIT  C

Mark A. Neubauer (73728)
mneubauer@carltonfields.com
CARLTON FIELDS, LLP
2029 Century Park East, Suite 1200
Los Angeles, CA 90067-2913
Telephone:   (310) 843-6300
Facsimile:    (310) 843-6301

Steven J. Brodie, Esq. (Admitted Pro Hac Vice)
sbrodie@carltonfields.com
CARLTON FIELDS
2 MiamiCentral
700 NW 1st Avenue, Ste. 1200
Miami, Florida 33136-4118
Telephone:   (305) 530-0050
Facsimile:    (305) 530-0055

Attorneys for Defendant AIG Specialty Insurance Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC WESTERN BANK, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation; FEDERAL INSURANCE COMPANY, an Indiana corporation; XL SPECIALTY INSURANCE COMPANY, a Delaware corporation,<br><br>Defendants. | Case No.: 2:20-cv-11085-DMG-PD<br><br>Assigned to the Hon. Dolly M. Gee<br><br>**DEFENDANT AIG SPECIALTY INSURANCE COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br><br>Complaint filed:        12/07/20<br>Pretrial Conference:   Not Set<br>Trial Date:               Not Set |

128205684.3

TO PLAINTIFF PACIFIC WESTERN BANK AND ITS ATTORNEYS OF RECORD:

Defendant AIG Specialty Insurance Company ("AIG Specialty") hereby answers the December 17, 2021 First Amended and Supplemental Complaint ("Complaint") of Plaintiff Pacific Western Bank ("Plaintiff" or "PacWest") by specifically denying each and every allegation (including titles or headings) not specifically admitted herein, by asserting the affirmative defenses set forth below, and by responding to the individually numbered paragraphs in the Complaint as follows:

## NATURE OF THE ACTION

1.    AIG Specialty denies this allegation to the extent PacWest asserts that AIG Specialty failed to honor any contractual obligations or breached any duties. AIG Specialty admits that PacWest seeks the relief described in this paragraph, but denies PacWest's entitlement to any such relief.

2.    AIG Specialty admits that PacWest was named as a defendant in a now-resolved underlying litigation that was pending in the Florida state court. Except as expressly admitted, AIG Specialty denies the remainder of the allegations of this paragraph, including that any defense or coverage was triggered, that AIG Specialty failed to honor any contractual obligations, breached any duties, committed any wrongful acts or acted in bad faith, further denies PacWest suffered any injury or was forced to do anything proximately caused by any act and/or omission by AIG Specialty.  Moreover, AIG Specialty denies that PacWest is entitled to any such relief sought.

## JURISDICTION AND VENUE

3.    The allegations in Paragraph 3 of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, AIG Specialty, upon information and belief, admits the allegations in Paragraph 3.

128205684.3

4.    The allegations in Paragraph 4 of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, AIG Specialty, upon information and belief, admits the allegations in Paragraph 4.

5.    The allegations in Paragraph 5 of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, AIG Specialty, upon information and belief, admits the allegations in Paragraph 5.

## **THE PARTIES**

6.    AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6 of the Complaint, which relate to PacWest, not AIG Specialty, and therefore denies the allegations.

7.    Admitted.

8.    AIG Group's website and marketing materials speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations.

9.    AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 9 of the Complaint, which relate to Federal Insurance Company ("Federal") and Chubb Group Insurance Companies ("Chubb"), not AIG Specialty, and therefore denies the allegations.

10.    AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 10 of the Complaint, which relate to Federal and Chubb, not AIG Specialty, and therefore denies the allegations.

11.    AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11 of the Complaint, which relate to Federal and Chubb, not AIG Specialty, and therefore denies the allegations.

3

128205684.3

12.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12 of the Complaint, which relate to XL Specialty Insurance Company ("XL"), not AIG Specialty, and therefore denies the allegations.

13.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13 of the Complaint, which relate to XL, not AIG Specialty, and therefore denies the allegations.

14.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 14 of the Complaint, which relate to XL, not AIG Specialty, and therefore denies the allegations.

**THE POLICIES**

15.     AIG Specialty alleges that Policy No. 01-425-49-77 issued by AIG Specialty to PacWest Bancorp as the Named Entity for the policy period of June 30, 2015 to June 30, 2016 (the "AIG Specialty Policy") speaks for itself and that Exhibit 1 appears to be a true and correct copy of the AIG Specialty Policy. Except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 15 of the Complaint.

16.     AIG Specialty alleges that the AIG Specialty Policy speaks for itself; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 16.

17.     AIG Specialty alleges that the AIG Specialty Policy speaks for itself; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 17.

18.     AIG Specialty alleges that the AIG Specialty Policy speaks for itself; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 18.

128205684.3

19.     AIG Specialty alleges that the AIG Specialty Policy speaks for itself; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 19.

20.     AIG Specialty alleges that the AIG Specialty Policy speaks for itself; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 20.

21.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 21 of the Complaint, which relate to Federal, not AIG Specialty, and therefore denies the allegations.

22.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22 of the Complaint, which relate to Federal, not AIG Specialty, and therefore denies the allegations.

23.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 23 of the Complaint, which relate to XL, not AIG Specialty, and therefore denies the allegations.

24.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 24 of the Complaint, which relate to XL, not AIG Specialty, and therefore denies the allegations.

25.     Denied to the extent that PacWest contends it is entitled to any relief under the AIG Specialty Policy and/or that it complied with all terms and conditions precedent under that policy. AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 25 of the Complaint, which relate to Federal and XL, not AIG Specialty, and therefore denies those allegations.

**THE ALLEGED TRANSACTIONS BETWEEN PACWEST AND PUP**

26.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 26, and therefore denies the allegations.

128205684.3

27.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 27, and therefore denies the allegations.

28.     Admitted.

29.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 29, and therefore denies the allegations.

30.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 30, and therefore denies the allegations.

31.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 31, and therefore denies the allegations.

32.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 32, and therefore denies the allegations.

33.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 33, and therefore denies the allegations.

34.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 34, and therefore denies the allegations.

35.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 35, and therefore denies the allegations.

36.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36, and therefore denies the allegations.

6

**THE *PUP* LAWSUIT**

37.     AIG Specialty admits that Exhibit 4 appears to be a true and correct copy of the Complaint in the *PUP* lawsuit and further alleges that the documents filed and served in the lawsuit captioned *Florida Department of Financial Services, as Receiver for Physicians United Plan, Inc. v. Pacific Western Bank Corporation*, Case No.: 2016-CA-004588-O in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "*PUP* lawsuit") speak for themselves. Except as expressly admitted herein, AIG Specialty denies the allegations in in Paragraph 37 of the Complaint.

38.     AIG Specialty alleges that the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 38 of the Complaint.

39.     AIG Specialty alleges that the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 39 of the Complaint.

40.     AIG Specialty alleges that the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 40 of the Complaint.

41.     AIG Specialty alleges that the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 41 of the Complaint.

42.     AIG Specialty alleges that the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations in Paragraph 42 of the Complaint.

**THE INSURERS' ALLEGED BREACHES**

43.     Admitted.

44.     Admitted.

7

45.     AIG Specialty alleges that on July 21, 2016, it provided a written preliminary position regarding the lack of coverage for the *PUP* lawsuit and that position paper speaks for itself, except as expressly admitted herein, AIG Specialty denies the remaining allegations in Paragraph 45 of the Complaint.

46.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 46, which relate to XL, not AIG Specialty, and therefore denies the allegations.

47.     AIG Specialty admits only that it reiterated its denial of coverage after receipt of the August 22, 2016 letter from PacWest and that reiteration speaks for itself. Except as expressly admitted herein, AIG Specialty denies the remaining allegations in Paragraph 47 of the Complaint.

48.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 48, which relate to XL, not AIG Specialty, and therefore denies the allegations.

49.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 49, which relate to Federal, not AIG Specialty, and therefore denies the allegations.

50.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 50, which relate to Federal, not AIG Specialty, and therefore denies the allegations.

51.     Denied to the extent PacWest contends it is entitled to any relief under the AIG Specialty Policy, that AIG Specialty violated any duty to PacWest under the AIG Specialty Policy or that PacWest took all reasonable steps to mitigate its damages or those of the Banks.

52.     AIG Specialty alleges that the documents filed and served in the now-resolved *PUP* lawsuit speak for themselves; except as expressly admitted herein, AIG Specialty denies the allegations contained in the first sentence in Paragraph 52 of the Complaint. AIG Specialty lacks knowledge or information sufficient to form

a belief as to the truth or falsity of the allegations contained in the second sentence of Paragraph 52, and therefore denies the allegations.

53.     AIG Specialty admits that PacWest advised AIG Specialty of the upcoming mediation on February 22, 2021. AIG Specialty denies the remaining allegations contained in Paragraph 53.

54.     AIG Specialty lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 54, and therefore denies the allegations.

55.     AIG Specialty admits that PacWest advised AIG Specialty that the parties to the PUP lawsuit had entered into a Settlement Agreement and that the court presiding over the PUP Receivership Proceeding had approved the settlement and provided copies of same.  AIG Specialty further admits that it did not contribute any amount towards the settlement because there is no coverage under the AIG Specialty Policy for the settlement; except as expressly admitted herein, AIG Specialty denies the remaining allegations contained in Paragraph 55 of the Complaint.

56.     AIG Specialty admits that it has not paid or agreed to pay any portion of the alleged defense costs or settlement payment given that there is no coverage under the AIG Specialty Policy. Except as expressly admitted herein, AIG Specialty denies the remaining allegations in Paragraph 56 of the Complaint.

57.     Denied.

## FIRST CAUSE OF ACTION
### (Breach of Contract against AIG)

58.     AIG Specialty incorporates by reference every allegation, admission and denial set forth in Paragraphs 1 through 57 of this Answer as though set forth herein in full.

59.     Denies all of the allegations of this paragraph.

9

60. Denies all of the allegations of this paragraph.

61. Denies all of the allegations of this paragraph. Further, AIG Specialty specifically denies that PacWest has been damaged in any amount whatsoever related to any alleged act or omission by AIG Specialty and/or that PacWest is entitled to any relief whatsoever.

## SECOND CAUSE OF ACTION

### (Breach of Contract Against All Defendants)

62. AIG Specialty incorporates by reference every allegation, admission and denial set forth in Paragraphs 1 through 61 of this Answer as though set forth herein in full.

63. Denies all of the allegations of this paragraph.

64. Denies all of the allegations of this paragraph.

65. Denies all of the allegations of this paragraph. Further, AIG Specialty specifically denies that PacWest has been damaged in any amount whatsoever related to any alleged act or omission by AIG Specialty and/or is entitled to any relief whatsoever.

## THIRD CAUSE OF ACTION

### (Tortious Breach of the Duty of Good Faith and Fair Dealing Against All Insurers)

66. AIG Specialty incorporates by reference every allegation, admission and denial set forth in Paragraphs 1 through 65 of this Answer as though set forth herein in full.

67. The allegations in Paragraph 67 of the Complaint are legal conclusions, to which no response is required; except as expressly admitted, denied.

68. The allegations in Paragraph 68 of the Complaint are legal conclusions, to which no response is required; except as expressly admitted, denied.

10

128205684.3

69. Denies all of the allegations of this paragraph.

70. Denies all of the allegations of this paragraph.

71. Denies all of the allegations of this paragraph.

72. Denies all of the allegations of this paragraph.

73. Denies all of the allegations of this paragraph.

74. Denies all of the allegations of this paragraph.

75. Denies all of the allegations of this paragraph.

76. Denies all of the allegations of this paragraph, further specifically denies that PacWest is entitled to punitive damages in any amount whatsoever.

## **PRAYER FOR RELIEF**

AIG Specialty denies that Plaintiff is entitled to any of the relief requested in the Prayer for Relief section of the Complaint, including the relief requested in each of the causes of actions.

## **AFFIRMATIVE DEFENSES**

As separate and affirmative defenses and avoidances to the First Amended and Supplemental Complaint, AIG Specialty alleges as follows; provided however, that by alleging the matters set forth in these defenses, AIG Specialty does not thereby allege or admit that it has the burden of proof or persuasion with respect to any of these matters.

### **First Affirmative Defense**
### **(Failure to State a Claim)**

AIG Specialty asserts that PacWest has failed to state a claim upon which relief may be granted.

128205684.3

**Second Affirmative Defense**

**(Reservations of Rights)**

AIG Specialty asserts that it has consistently reserved all rights and defenses that may be available at law or in equity and under the terms and provisions of the AIG Specialty Policy issued to PacWest. AIG Specialty expressly gives notice of, and reserves the right, to rely upon all terms, conditions, endorsements and exclusions of the AIG Specialty Policy to deny or limit coverage as discovery reveals.

**Third Affirmative Defense**

**(No Coverage Under Insuring Agreement)**

AIG Specialty asserts that neither the allegations of the *PUP* lawsuit nor the banks' indemnity request triggers the insuring agreement of the AIG Specialty Policy's Bankers Professional Liability Coverage Section (the "BPL Coverage Section") and does not create coverage and/or the potential for coverage.

**Fourth Affirmative Defense**

**(Insolvency Exclusion – Exclusion 2(h))**

AIG Specialty asserts that there is no coverage and/or the potential for coverage for either the *PUP* lawsuit or the banks' indemnity request based on the BPL Coverage Section's Insolvency Exclusion in the AIG Specialty Policy.

**Fifth Affirmative Defense**

**(No Loss)**

AIG Specialty asserts that any amounts sought in connection with the *PUP* lawsuit do not constitute covered Loss under the AIG Specialty Policy.

**Sixth Affirmative Defense**

**(Uninsurable Damages)**

Coverage is barred, in whole or in part, to the extent any of the damages claimed herein are uninsurable as a matter of law.

12

128205684.3

## Seventh Affirmative Defense

### (Not Insureds)

AIG Specialty asserts that there is no coverage and/or the potential for coverage for PacWest's claim in connection with the banks' indemnification request because the banks are not insureds under the AIG Specialty Policy.

## Eighth Affirmative Defense

### (Contract Liability Exclusion - Exclusion 2(v))

AIG Specialty asserts that there would be no coverage and/or the potential for coverage for PacWest's claim in connection with the banks' indemnification request based on Exclusion 2(v) of the AIG Specialty Policy.

## Ninth Affirmative Defense

### (Failure to Satisfy Conditions)

PacWest is barred from pursuing the claims set forth in its Complaint because of its and/or the Insureds' failure (and/or the failures of persons and/or entities acting on their behalf) to perform or satisfy all of the obligations, duties, and conditions precedent and subsequent set forth in the AIG Specialty Policy.

## Tenth Affirmative Defense

### (Amounts within the Retention)

PacWest's claims are barred to the extent PacWest seeks coverage for amounts that are within the applicable retention or to the extent the applicable retention has not been satisfied.

## Eleventh Affirmative Defense

### (No Coverage for Willful Acts)

AIG Specialty asserts that there is no coverage and/or the potential for coverage for the *PUP* lawsuit to the extent the allegations in the *PUP* lawsuit are based upon PacWest's willful acts.

128205684.3

**Twelfth Affirmative Defense**

**(California Insurance Code Section 533)**

There is no coverage and/or the potential for coverage under the application of Section 533 of the California Insurance Code.

**Thirteenth Affirmative Defense**

**(Prior Knowledge)**

AIG Specialty asserts that PacWest is not entitled to any relief to the extent that any insured was aware of circumstances that could give rise to a Claim prior to the policy period of the AIG Specialty Policy.

**Fourteenth Affirmative Defense**

**(No Coverage)**

AIG Specialty asserts that PacWest's claim for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing fails because there is no coverage and/or the potential for coverage for the *PUP* lawsuit or the banks' indemnity request.

**Fifteenth Affirmative Defense**

**(No Potential for Coverage)**

AIG Specialty asserts that PacWest's claim for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing fails because there was no potential for coverage for the *PUP* lawsuit or the banks' indemnity request.

**Sixteenth Affirmative Defense**

**(Genuine Dispute)**

AIG Specialty asserts that PacWest's claim for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing fails because there was a genuine dispute as to coverage and/or the potential for coverage for the *PUP* lawsuit or the banks' indemnity request.

128205684.3

**Seventeenth Affirmative Defense**

**(Good Faith Handling of PacWest's Claim)**

PacWest's claims are barred, in whole or in part, because AIG Specialty acted reasonably and in good faith in handling PacWest's claim.

**Eighteenth Affirmative Defense**

**(Unclean Hands)**

AIG Specialty asserts that PacWest is not entitled to any relief whatsoever under the doctrine of unclean hands.

**Nineteenth Affirmative Defense**

**(Unjust Enrichment)**

AIG Specialty asserts that PacWest's claims are barred by the doctrine of unjust enrichment.

**Twentieth Affirmative Defense**

**(Estoppel)**

AIG Specialty asserts that PacWest is estopped from any relief whatsoever.

**Twenty-First Affirmative Defense**

**(Reimbursement)**

PacWest's claims may be barred, in whole or in part, to the extent PacWest has received reimbursement for any loss, injury or damage for which it seeks coverage under the AIG Specialty Policy.

**Twenty-Second Affirmative Defense**

**(Release/Settlement/Accord and Satisfaction)**

PacWest's claims are barred, in whole or in part, to the extent PacWest or anyone acting on its behalf, released, settled, entered into an accord and satisfaction, or otherwise comprised its claim.

**Twenty-Third Affirmative Defense**

**(Failure to Mitigate)**

PacWest failed to take reasonable steps to mitigate any loss, injury, or damage allegedly suffered, and any recovery must be barred or diminished by reason thereof.

**Twenty-Fourth Affirmative Defense**

**(Laches)**

PacWest is not entitled to any relief under the doctrine of laches.

WHEREFORE, AIG Specialty is entitled to a judgment as follows:

1. That PacWest take nothing by its Complaint and the same be dismissed with prejudice;
2. That AIG Specialty recovers its costs of suit incurred herein;
3. For such other and further relief as the Court deems just and proper.

Dated:  January 28, 2022        CARLTON FIELDS, LLP


By:   /s/ Mark A Neubauer
        MARK A. NEUBAUER
Attorneys for Defendant AIG SPECIALTY
INSURANCE COMPANY

16

128205684.3

1

## **DEMAND FOR JURY TRIAL**

2        Defendant AIG Specialty Insurance Company hereby demands a trial by

3  jury.

4

5   Dated: January 28, 2022      CARLTON FIELDS, LLP

6

7                       By:  /s/ Mark A. Neubauer

8                          MARK A. NEUBAUER

9                    Attorneys for Defendant AIG SPECIALTY
INSURANCE COMPANY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

128205684.3

# EXHIBIT  D



www.bpbcpa.com

800.999.1CPA(1272)

## IN THE CIRCUIT COURT
## OF THE NINTH JUDICIAL CIRCUIT
## IN AND FOR ORANGE COUNTY, FLORIDA

THE FLORIDA DEPARTMENT OF
FINANCIAL SERVICES, as Receiver for
PHYSICIANS UNITED PLAN, INC.,

    Plaintiff,

    v.                        CASE NUMBER: 2016-CA-004588-0

PACIFIC WESTERN BANK CORPORATION,
CENTRAL BANK OF ST. LOUIS *f/k/a*
FIRST NATIONAL BANK OF ST. LOUIS, and
MB FINANCIAL BANK, N.A.,

    Defendants.

### EXPERT WITNESS REPORT OF SCOTT BOUCHNER

**Prepared by:**

**Scott M. Bouchner, CMA, CVA, CFE, CIRA**

**Berkowitz Pollack Brant**

**Advisors and Accountants, LLP**

**October 2, 2020**

EXHIBIT

1  BOUCHNER

## I.    QUALIFICATIONS

Scott Bouchner is a Director of Forensic and Business Valuation Services at the accounting firm of Berkowitz Pollack Brant ("BPB"). BPB was established in 1980 and today has approximately 300 employees with offices in Miami, Fort Lauderdale, Boca Raton and West Palm Beach, Florida and New York, New York. Mr. Bouchner is a Certified Management Accountant (CMA), a Certified Valuation Analyst (CVA), a Certified Fraud Examiner (CFE) and a Certified Insolvency & Restructuring Advisor (CIRA).

He has authored and/or contributed to the following publications, among others, concerning economic damages: *Calculating Lost Profits – Business Valuation and Forensic & Litigation Services Practice Aid 06-4* (American Institute of Certified Public Accountants), *Discount Rates, Risk and Uncertainty in Economic Damages Calculations* (American Institute of Certified Public Accountants), *Attaining Reasonable Certainty in Economic Damages Calculations* (American Institute of Certified Public Accountants) and *Attaining Reasonable Certainty in Economic Damages Calculations: Revenues, Costs, and Best Evidence* (American Institute of Certified Public Accountants).

A copy of the Curriculum Vitae, list of publications and articles authored and testimony experience for Scott Bouchner is included as Appendix A.

## II.    BACKGROUND

PUP entered into financial transactions with Marquette Equipment Finance, LLC ("Marquette") now known as Pacific Western Equipment Finance, a division of Pacific Western Bank (collectively, "Pac West" or "Defendants") in 2011, 2012 and 2013 that were accounted for as purported sale/leaseback transactions.

Under a Marquette product named *"ConvertaLease"*[1] PUP entered into 13 purported "sale/leaseback" transactions with Pac West designed to sell non admitted assets to Pac West and lease the assets back from Pac West.[2] The total proceeds for these 13 purported leases was $32,492,705, of which $32,302,705 was deposited into restricted PUP bank accounts in 2012 and 2013 as collateral for PUP's lease payments to Pac West.[3] PUP could not withdraw any money from the restricted accounts unless permitted by Pac West. As a result, PUP did not have full control over the disposition of funds held in the restricted accounts.

Pac West was involved in discussions with PUP's management on the accounting treatment that should be used to account for the purported sale and leaseback transactions. Additionally, in emails written by Pac West to PUP, Pac West provided substantial assistance to PUP to convince its auditors to approve the accounting treatment for the purported sale and leaseback transactions. PUP accounted for the money in

---

[1] According to Marquette marketing material, *"ConvertaLease* will transform your non-admitted assets (new or existing) into admitted assets."

[2] Two of the purported leases involving non admitted agents' balances receivable were terminated early.

[3] The first lease entered into by PUP for $500,000 on September 28, 2011 was secured by a letter of credit collateralized by a certificate of Deposit ("CD") for $500,000. The letter of credit collateral was replaced by a $310,000 restricted CD account at Wells Fargo Bank, N.A. in September 2013.

the restricted bank accounts as admitted assets in its financial statements, which purportedly had the effect of exchanging non-admitted assets for admitted assets (in the form of balances held in the restricted bank accounts) on it's the statutory financial statements filed with the Florida Office of Insurance Regulation. During the years of 2011, 2012, 2013 and 2014, PUP filed three statutory annual statements and eight quarterly statements wherein it accounted for the purported Marquette "sale/leaseback" transactions in a manner consistent with the Pac West Accounting.

On November 22, 2013 the Florida Office of Insurance Regulation ("OIR") sent a letter to the President and CEO of PUP directing PUP to non-admit approximately $16.9 million of receivables and to replace the non-admitted receivables with admissible assets within 30 days and to file an amended financial statement for the quarter ended September 30, 2013 by December 22, 2013. The letter stated that noncompliance with the directive would result in the Company filing an insolvent financial statement requiring the Office to take administrative action.

On March 14, 2014 the OIR issued an Order to PUP to non-admit $12.5 million of restricted cash that was unavailable to pay losses and claims because the cash collateralized Pac West leases. PUP was further advised that failure to replace the non-admitted assets with admitted assets would cause PUP's Surplus to be impaired as of September 30, 2013.

On April 16, 2014 the President and Chairman of PUP signed a Consent Order of Rehabilitation or Liquidation issued by the OIR. The Order requires PUP to capitalize PUP with an additional $30 million by June 3, 2014 or consent to the appointment of the Department of Financial Services, Division of Rehabilitation and Liquidation as Receiver.

Also, on April 16, 2014, Pac West, on behalf of itself and the other two Defendants, sent three notices of Default to PUP Financial Officer, Aaron Henry. The Pac West notices advised PUP that they were in default of the Master Lease and each of the remaining eleven Pac West Leases. As a result of the defaults listed in the notices Pac West notified PUP of its intention to foreclose on the PUP restricted cash accounts, terminate the leases and recover the Total Casualty Loss Value of the eleven leases totaling $28,916,683.

Prior to the Consent Order, from August 2011 through March 2014, PUP remitted payments to Defendants in connection with these purported leases totaling approximately $7,825,959.02. The restriction on the bank accounts wherein the purported sales proceeds were deposited allowed the purported lessors to draw down on the balances when PUP defaulted on the leases.

On April 22, 2014 Pac West, on behalf of itself and the other two Defendants, sent a letter to PUP providing a final accounting. The letter stated that Pac West and the other Defendants were owed a total of $28,916,683 pertaining to the lease transactions and an additional $2,780 for attorney fees. A total of $29,842,698.96 was initially taken by the Defendants from the PUP restricted bank accounts, with $923,235.96 back to PUP. As such, there were $36,745,422.02 in total payments made by PUP to the Defendants (net of the amount refunded).[4]

---

[4] $7,825,959.02 + $29,842,698.96 - $923,235.96 = $36,745,422.02

On June 5, 2014, the Florida Department of Financial Services filed a Petition for Order Appointing DFS as Receiver for Purposes of Immediate Rehabilitation and Automatic Liquidation Effective July 1, 2014, Injunction, and Notice of Automatic Stay.  On June 9, 2014 Circuit Judge Charles A. Francis in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, signed a "Consent Order Appointing the Florida Department of Financial Services as Receiver for Purposes of Immediate Rehabilitation and Automatic Liquidation Effective July 1, 2014, Injunction and Notice of Automatic Stay."

### III.    SCOPE OF ASSIGNMENT

Berkowitz Pollack Brant Advisors and Accountants, LLP ("BPB") was retained on March 8, 2017 by the Florida Department of Financial Services ("DFS" or "Receiver") as Receiver for Physicians United Plan, Inc. ("PUP"). in connection with the Receiver's Complaint against defendants Pacific Western Bank Corporation ("Pac West"), Central Bank of St. Louis ("CBSL"), and MB Financial Bank, N.A. ("MB Financial"). BPB was retained to assist the Receiver's Counsel, Genovese Joblove & Battista P.A. ("Counsel") in connection with this litigation. Counsel requested that BPB review and/or analyze the pleadings, deposition testimony, PUP financial statements, PUP accounting records and various documents produced in connection with this litigation to determine the amount of damages suffered by PUP as a result of the alleged wrongdoing of Pac West.

### IV.    DOCUMENTS CONSIDERED

In forming the opinions expressed herein, I reviewed and relied upon the documents identified in **Appendix B** hereto.

Expert Witness Report of Scott M. Bouchner, CMA, CVA, CFE, CIRA                    Page 4

## V.    EXPERT OPINIONS

As indicated above, I was asked to determine the amount of damages suffered by PUP as a result of the alleged wrongdoing of the Defendants. As discussed in greater detail in Section VI of this report, Basis for Opinions, I have reached the following opinions:

1.    Decline in Enterprise Value / Increase in Insolvency

In its Amended Complaint, the DFS included a count alleging aiding and abetting breach of fiduciary duty, claiming that Defendants are liable for all damages actually and proximately caused to PUP resulting from the acts and omissions of its officers, which damages include, among other things, a substantial increase in its liabilities and a substantial diminution of its assets, asset values and enterprise value.

After making accounting adjustments to reflect its true financial condition, contrary to financial statements filed with the Florida Office of Insurance Regulation, PUP's statutory capital balance was below statutory requirements beginning on December 31, 2011 and continuing through its court ordered liquidation effective July 1, 2014[5].

As reflected in the following chart, after making liquidation adjustments as of each quarter end, from December 31, 2011 through December 31, 2012, PUP experienced a decline in enterprise value and/or an increase in the magnitude of its insolvency through the July 1, 2014 liquidation date, ranging from a low of approximately $32.18 million to a high of $47.38 million.

| Time Periods | Statutory Capital (As filed) | Statutory Capital (BPB Adjusted) | Minimum Capital Requirement | Shortfall | Liquidation Value (High) | Liquidation Value (Low) |
|---|---|---|---|---|---|---|
| December 31, 2011 | $5,308,439 | $3,342,214 | $3,590,423 | -$248,209 | $2,136,456 | $2,136,456 |
| July 1, 2014 | | | | | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | | | | | $38,362,859 - | $44,864,732 |
| | | | | | | |
| March 31, 2012 | 7,625,508 | 3,167,694 | 5,252,116 | -$2,084,422 | $4,077,913 | $4,077,913 |
| July 1, 2014 | | | | | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | | | | | $40,304,316 - | $46,806,189 |
| | | | | | | |
| June 30, 2012 | 9,999,640 | 3,452,341 | 5,914,296 | -$2,461,955 | $4,656,217 | $4,656,217 |
| July 1, 2014 | | | | | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | | | | | $40,882,620 - | $47,384,493 |
| | | | | | | |
| September 30, 2012 | 11,794,667 | 3,991,188 | 5,152,353 | -$1,161,165 | $1,849,794 | $1,849,794 |
| July 1, 2014 | | | | | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | | | | | $38,076,197 - | $44,578,070 |
| | | | | | | |
| December 31, 2012 | 7,633,609 | -3,429,404 | 5,238,596 | -$8,668,000 | -$4,042,781 | -$4,042,781 |
| July 1, 2014 | | | | | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | | | | | $32,183,622 - | $38,685,495 |

---

[5] Florida Statute §641.225(1) requires that to maintain a Certificate of Authority to transact business in Florida, an HMO must maintain a minimum capital surplus that is the greater of $1,500,000, 10% of total liabilities or 2% of total annualized premiums.

**2.   Avoidable Transfers**

In its Amended Complaint, the DFS included counts seeking to avoid transfers made by PUP to Defendants pursuant to Florida Statutes §§ 631.261, 631.262, 726.105(1)(a), 726.105(1)(b), 726.106 and 726.108.

Transfers made by Defendants to Pac West in the four-months, six-months, one-year and four-year periods preceding the June 5, 2014 Petition Date are as follows:

| Description | Amount |
|---|---|
| Transfers Made between February 5, 2014 and June 5, 2014 (Four-Month Tranfers) | $30,292,539.18 |
| Transfers Made between December 5, 2013 and June 5, 2014 (Six-Month Tranfers) | $32,083,049.07 |
| Transfers Made between June 6, 2013 and June 5, 2014 (One-Year Tranfers) | $33,945,212.61 |
| Transfers Made between June 6, 2010 and June 5, 2014 (Four-Year Tranfers) | $36,745,422.02 |

### 3.   Statutory Damages

In its Amended Complaint, the DFS included counts seeking statutory damages allowable under Florida Statute §631.157(1), which provides for a damages award equal to triple the full amount of the transfers willfully obtained by the defendants, which is summarized in the following table:

| Description | Amount | Treble Damages |
|---|---|---|
| Transfers Made by PUP to Defendants | $36,745,422.02 | $ 110,236,266.06 |

In its Amended Complaint, the DFS included counts seeking statutory damages allowable under Florida Statute §631.157(2), which provides for a damages award equal to triple the full amount of the assets misreported by PUP as a result of the purported sale/leaseback transactions, which is summarized in the following table:

| Balance Sheet Date | Cash Reported as an Admitted Asset by PUP | Correct Amount | Overstatement | Treble Damages |
|---|---|---|---|---|
| 9/30/2011 | $32,315,613 | $31,815,613 | $500,000 | $1,500,000 |
| 12/31/2011 | 9,896,593 | 9,396,593 | 500,000 | 1,500,000 |
| 3/31/2012 | 41,023,982 | 38,523,794 | 2,500,188 | 7,500,565 |
| 6/30/2012 | 40,083,692 | 38,407,855 | 1,675,837 | 5,027,511 |
| 9/30/2012 | 30,010,942 | 27,005,551 | 3,005,391 | 9,016,172 |
| 12/31/2012 | 26,353,292 | 21,857,523 | 4,495,769 | 13,487,306 |
| 3/31/2013 | 21,384,671 | 16,886,986 | 4,497,685 | 13,493,055 |
| 6/30/2013 | 7,000,345 | 259,596 | 6,740,749 | 20,222,246 |
| 9/30/2013 | 17,681,482 | 3,629,182 | 14,052,300 | 42,156,901 |
| 12/31/2013 | 35,197,233 | 5,094,563 | 30,102,670 | 90,308,009 |
| 3/31/2014 | 33,937,534 | 4,097,729 | 29,839,805 | 89,519,416 |
|  |  |  | $97,910,393 | $293,731,179 |

**VI.    BASIS FOR OPINIONS**

1.    **Decline in Enterprise Value / Increase in Insolvency**

In calculating the decline in PUP's enterprise value and/or the increase in the magnitude of its insolvency, as a starting point, I have relied on the expert opinions of the Receiver's accounting and auditing expert Whitney Schiffer, CPA a Director of Audit and Attest Services at BPB, who issued an Expert Report on October 2, 2020 addressing PUP's accounting for the purported "sale / leaseback" transactions. According to Ms. Schiffer, PUP's statutory financial statements contained material accounting errors:

> *In connection with executing the purported lease agreements and implementing the accounting method of converting non-admitted assets into assets purported to be admitted assets, PUP's quarterly and annual statutory financial statements contained numerous accounting errors, did not comply with SSAP and were materially misstated for the reporting periods from September 30, 2011 through March 31, 2014. PUP's statutory financial statements failed to report PUP's actual operating results and financial condition in that*

> - *Statutory capital and surplus balances were materially overstated*
> - *MSO Receivables were materially overstated*
> - *Admitted assets were materially overstated*
> - *Liabilities were materially understated*
> - *Purported sale and leaseback transactions pertaining to MSO receivables and property and equipment were incorrectly accounted for under SSAP and lacked proper disclosures in the notes to the statutory financial statements*
> - *PUP's net income was materially overstated*
> - *Restricted cash funds were not properly disclosed in PUP's notes to the statutory financial statements*
> - *Credit risk associated with collectability of MSO Receivables was concealed*
> - *The accounting failed to comply with various SSAPs*
> - *PUP's non-compliance with capital and surplus requirements was concealed*
> - *PUP's deteriorating liquidity and insolvency was concealed*

> *PUP and Pac West's purported sale and lease back accounting method contributed to material accounting errors in PUP's quarterly and annual statutory financial statements for the reporting periods from September 30, 2011 through March 31, 2014. Additionally, PUP's statutory financial statements that were filed with the FOIR for the reporting period from September 30, 2011 through March 31, 2014 did not comply with SSAP.*

As a result of the above accounting errors, Ms. Schiffer adjusted and made corrections to PUP's statutory financial statements beginning with the quarterly statements ended on September 30, 2011 through March 31, 2014, which are summarized in the following chart:

Expert Witness Report of Scott M. Bouchner, CMA, CVA, CFE, CIRA     Page 8

| | | As filed by PUP | | | ADJUSTED | | |
|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 |
| Date | Description | Total Assets | Nonadmitted Assets | Net Admitted Assets (Col. 1 minus Col. 2) | Total Assets | Nonadmitted Assets | Net Admitted Assets (Col. 1 minus Col. 2) |
| December 31, 2011 | Assets | $33,822,332 | $8,595,346 | $25,226,986 | $34,310,332 | $10,588,667 | $23,721,665 |
| | Liabilities | 19,918,547 | | 19,918,547 | 20,379,451 | | 20,379,451 |
| | Surplus / Capital | $13,903,785 | $8,595,346 | $5,308,439 | $13,930,881 | $10,588,667 | $3,342,214 |
| | Required Capital | | | | | | 3,590,423 |
| | Shortfall | | | | | | -$248,209 |
| March 31, 2012 | Assets | $67,469,470 | $8,825,614 | $58,643,856 | $69,067,168 | $13,378,310 | $55,688,859 |
| | Liabilities | 51,018,348 | | 51,018,348 | 52,521,165 | | 52,521,165 |
| | Surplus / Capital | $16,451,122 | $8,825,614 | $7,625,508 | $16,546,004 | $13,378,310 | $3,167,694 |
| | Required Capital | | | | | | 5,252,116 |
| | Shortfall | | | | | | -$2,084,422 |
| June 30, 2012 | Assets | $76,584,227 | $8,854,986 | $67,729,241 | $78,181,925 | $15,586,623 | $62,595,302 |
| | Liabilities | 57,729,601 | | 57,729,601 | 59,142,961 | | 59,142,961 |
| | Surplus / Capital | $18,854,626 | $8,854,986 | $9,999,640 | $19,038,964 | $15,586,623 | $3,452,341 |
| | Required Capital | | | | | | 5,914,296 |
| | Shortfall | | | | | | -$2,461,955 |
| September 30, 2012 | Assets | $57,785,933 | $9,302,906 | $48,483,027 | $60,785,933 | $17,382,007 | $42,001,624 |
| | Liabilities | 36,688,360 | | 36,688,360 | 38,010,437 | | 38,010,437 |
| | Surplus / Capital | $21,097,573 | $9,302,906 | $11,794,667 | $22,775,496 | $17,382,007 | $3,991,188 |
| | Required Capital | | | | | | 5,152,353 |
| | Shortfall | | | | | | -$1,161,165 |
| December 31, 2012 | Assets | $60,916,178 | $9,644,447 | $51,271,731 | $63,633,353 | $21,148,792 | $42,484,560 |
| | Liabilities | 43,638,122 | | 43,638,122 | 45,913,964 | | 45,913,964 |
| | Surplus / Capital | $17,278,056 | $9,644,447 | $7,633,609 | $17,719,389 | $21,148,792 | -$3,429,404 |
| | Required Capital | | | | | | 5,238,596 |
| | Shortfall | | | | | | -$8,668,000 |

As reflected above and provided in greater detail in Schedules 1a through 1e, adjustments made by Ms. Schiffer include the following:

a) reclassification of restricted cash balances from admitted assets to non-admitted assets;

b) recording liabilities equal to amounts owed to PAC West resulting from each of the purported "sale/leaseback" transactions less amounts paid on existing purported "sale/leaseback" transactions;

c) reversal of the sale of MSO risk sharing receivables (to be treated as non-admitted assets);

d) adjustment of MSO risk sharing receivables not sold to Pac West to fair value based upon their age and the historical collection activity with each respective MSO;

e) reversal of prepaid agent commissions purportedly sold to and leased back from PacWest (to be treated as non-admitted assets);

     f)   reversal of the "sale" of furniture and equipment (to be treated as non-admitted assets), and

     g)   adjustment of the total capital and surplus resulting from the above adjustments.

After making these necessary accounting adjustments to accurately reflect PUP's true financial condition, it was apparent that there was a shortfall in the company's statutory capital no later than the year ended December 31, 2011 and continuing through the July 1, 2014 liquidation date. Throughout this period, PUP did not have sufficient capital as required by Florida Statute §641.225(1), which requires that each health maintenance organization shall have at all times maintain a minimum surplus in an amount that is the greater of $1,500,000, 10 percent of total liabilities or 2 percent of total annualized premiums.

As reflected on the above chart, in the quarters ended December 31, 2011, March 31, 2012, June 30, 2012 and September 30, 2012, PUP had a capital shortfall of -$248,209, -$2,084,422, -$2,461,955 and -$1,161,165, respectively. As of December 31, 2012, not only did PUP have insufficient capital with respect to Florida statutory requirements, but it's liabilities of $45,913,964 exceeded its admitted assets of $42,484,560, leaving PUP with negative capital of -$3,429,404. This left PUP $8,668,000 below its $5,238,596 capital requirement pursuant to Florida statutes.

In order to measure the decline in business enterprise value and/or the increase in insolvency between each of the above measurement dates and the July 1, 2014 liquidation date, it was necessary to establish the liquidation value of PUP's assets and liabilities at each date, which are summarized in the following chart:

| Date | Description | ADJUSTED | | | LIQUIDATION VALUE | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 4<br>Total Assets | 5<br>Nonadmitted Assets | 6<br>Net Admitted Assets (Col. 1 minus Col. 2) | 7<br>Net Liquidation Adjustments | 8<br>Liquidation Value |
| December 31, 2011 | Assets | $34,310,332 | $10,588,667 | $23,721,665 | -$1,205,758 | $22,515,907 |
| | Liabilities | 20,379,451 | | 20,379,451 | 0 | 20,379,451 |
| | Surplus / Capital | $13,930,881 | $10,588,667 | $3,342,214 | -$1,205,758 | $2,136,456 |
| March 31, 2012 | Assets | $69,067,168 | $13,378,310 | $55,688,859 | $910,219 | $56,599,078 |
| | Liabilities | 52,521,165 | | 52,521,165 | 0 | 52,521,165 |
| | Surplus / Capital | $16,546,004 | $13,378,310 | $3,167,694 | $910,219 | $4,077,913 |
| June 30, 2012 | Assets | $78,181,925 | $15,586,623 | $62,595,302 | $1,203,876 | $63,799,178 |
| | Liabilities | 59,142,961 | | 59,142,961 | 0 | 59,142,961 |
| | Surplus / Capital | $19,038,964 | $15,586,623 | $3,452,341 | $1,203,876 | $4,656,217 |
| September 30, 2012 | Assets | $60,785,933 | $17,382,007 | $42,001,624 | -$2,141,393 | $39,860,231 |
| | Liabilities | 38,010,437 | | 38,010,437 | 0 | 38,010,437 |
| | Surplus / Capital | $22,775,496 | $17,382,007 | $3,991,188 | -$2,141,393 | $1,849,794 |
| December 31, 2012 | Assets | $63,633,353 | $21,148,792 | $42,484,560 | -$613,377 | $41,871,183 |
| | Liabilities | 45,913,964 | | 45,913,964 | 0 | 45,913,964 |
| | Surplus / Capital | $17,719,389 | $21,148,792 | -$3,429,404 | -$613,377 | -$4,042,781 |

As reflected above and provided in greater detail in Schedules 1a through 1e, liquidation adjustments for the quarters ended December 31, 2011 through December 31, 2012 are comprised of the following:

     a)   Non-admitted cash deposited into restricted accounts has been added back to total cash

account balances, as these funds would be available to satisfy liabilities;

b)  Electronic data processing equipment and software was assumed to have no or de minimus value in liquidation and was, therefore, written down to $0.

c)  Healthcare receivables were adjusted downward with respect to the outstanding MSO risk sharing receivables, which were written down to equal the $1,008,161 actually collected from three MSOs in 2012 and 2013.

d)  Furniture and equipment, which were reflected as non-admitted assets, were assumed to have no or de minimus value in liquidation and were, therefore, left at $0.

e)  Deferred tax assets, which were reflected as non-admitted assets, were not included as these assets would have no value in liquidation;

f)  Other non-admitted assets, which consisted primarily of prepaid expenses such as prepaid agent commissions, were assumed to have no or de minimus value in liquidation and were, therefore, left at $0.

Once the liquidation values were determined for the quarters ended December 31, 2011 through December 31, 2012, it was necessary to compare the adjusted capital balances in liquidation for each of these quarters to PUP's deficit capital value at or around the time of the July 1, 2014 liquidation, the results of which are summarized the following table and shown with greater detail in Schedule 2.

| | | |
|---|---|---|
| Beginning Asset Value | | $22,691,268 |
| Receivership recoveries: Inception through June 30, 2020 | | 23,725,410 |
| Interest Earned: Inception through June 30, 2020 | | 2,618,872 |
| Cash and Investments used to pay secured claims | | -2,583,820 |
| Disbursements: Inception through June 30, 2020 (Excluding Professional Fees) | | -4,610,206 |
| Professional Fees: Inception through June 30, 2020 | | -9,657,845 |
| Amounts Available to Pay Claims | | $32,183,678 |
| | **Low Claims** | **High Claims** |
| Receivership Claims as of June 30, 2020 (Excluding Claims Still Under Dispute) | -$68,410,081 | -$68,410,081 |
| Claims Included in PUP June 30, 2020 Statement of Affairs Under Dispute | 0 | -4,584,189 |
| Claims Under Dispute Not Included in June 30, 2020 Statement of Affairs | 0 | -1,917,684 |
| | -$68,410,081 | -$74,911,954 |
| **Net Deficit at Liquidation (Adjusted for Subsequent Events)** | **-$36,226,403** | **-$42,728,276** |

As reflected in the above chart, at the commencement of the Receivership, the value of the PUP assets was $22,691,268, as reflected in the first Statement of Affairs filed by the Department of Financial Services as of September 30, 2014, an amount comprised primarily of cash and investments. As was assumed in the liquidation calculations for the prior quarters, the September 30, 2014 Statement of Affairs did not include any value for furniture and equipment, deferred tax assets, electronic equipment or prepaid assets, as these assets were either expected to have little to no

value in liquidation or had been converted to cash prior to September 30, 2014.[6] The first Statement of Affairs included healthcare related accounts receivable in the amount of $68,116,771, which were fully reserved and reflected on the Statement at a net $0. [7]

Through June 30, 2020, there have been total recoveries of $23,725,410, $17 million of which pertain to a settlement with RSM McGladrey, PUP's former auditors. Other than a $2,500,000 settlement with one of the MSOs, which is also included in the $23,725,410, there have been no other MSO related collections. In addition to these recoveries, the receivership has received interest payments of $2,618,872, resulting in total cash before disbursements of approximately $49.0 million. Over the course of what has now been a more than six-year receivership, these funds have been used, in part, to pay secured claims ($2,583,820), to pay administrative expenses other than professional fees ($4,610,206) and to pay professional fees ($9,657,845), leaving $32,183,678 available as of June 30, 2020 to pay claims.

Through June 30, 2020, of the approximately 1,393 claims that have been filed having a total initial claimed amount of $421,643,908, all but 16 claims have been resolved at a value of $68,410,081. This represents a $353,289,662 reduction from the total original claims filed and a nearly $38 million reduction in the approximately $106 million in liabilities reflected on the PUP financial statements at the time the company was placed into receivership. Of the 16 remaining claims that are still in dispute, fourteen were quantified by the claimants at a total of $6,501,873 and two were submitted with a $1 claim. As such, the low end of the range of outstanding claims is based upon the $68,410,081 of approved claims that remain outstanding, and the high end of our range includes the $68,410,081 of approved claims plus the $6,501,873 in quantified claims that remain in dispute. I expect to be able to narrow and update this range as these disputed claims are resolved.

With $32,183,678 of funds available to pay claims and a range of $68,410,081 to $74,911,954 in claims outstanding, this results in an estimated net deficit at liquidation that ranges between a deficit of -$36,226,403 (e.g. $32,183,673 - $68,410,081) and a deficit of -$42,728,276 (e.g. $32,183,673 - $68,410,081).

By relying entirely on actual results and using the benefit of hindsight to calculate the net capital deficit for PUP at or about July 1, 2014, I believe that the resulting values provide the most reasonable estimate of liquidation value, one that relies on actual claims that have been approved by the Court rather than the substantially higher liabilities that were reflected on PUP's June 30, 2014 financial statements and also give full credit to the recoveries generated over the course of the Receivership, including the $17 million settlement with RSM McGladrey.

As summarized in the following chart and shown with greater detail in Schedule 3, I have calculated the decline in enterprise value and/or or the increase in the magnitude of PUP's insolvency by comparing the range of deficit amounts that were calculated on or about July 1, 2014 to the

---

[6] The Department of Financial Services was able to generate cash of approximately $126 thousand through the sale of what was characterized as PUP personal property.

[7] Any adjustment to the MSO risk sharing receivables was subject to the receipt of a final reconciliation of the PUP Medicare Advantage contract from CMS (the Centers for Medicare & Medicaid Services), which was transmitted to the Department of Financial Services on February 22, 2017. Once this report from CMS was received, an adjustment was made to the balance of the healthcare receivables from $68,116,771 to $35,525,653, which was reflected on the March 31, 2018 PUP Statement of Affairs. This adjusted balance, however, did not take into consideration the collectability of these healthcare receivables and was calculated pursuant to the net profits or losses incurred on each of the individual MSO contracts. Given the tremendous uncertainty and nearly complete lack of historical collections of the MSO risk sharing receivables, the $35,525,653 value has remained fully reserved and is adjusted only when funds are collected.

estimated liquidation values calculated as of the December 31, 2011 through December 31, 2012 quarter ends:

| Time Periods | Liquidation Value (High) | Liquidation Value (Low) |
|---|---|---|
| December 31, 2011 | $2,136,456 | $2,136,456 |
| July 1, 2014 | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | $38,362,859    - | $44,864,732 |
| | | |
| March 31, 2012 | $4,077,913 | $4,077,913 |
| July 1, 2014 | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | $40,304,316    - | $46,806,189 |
| | | |
| June 30, 2012 | $4,656,217 | $4,656,217 |
| July 1, 2014 | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | $40,882,620    - | $47,384,493 |
| | | |
| September 30, 2012 | $1,849,794 | $1,849,794 |
| July 1, 2014 | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | $38,076,197    - | $44,578,070 |
| | | |
| December 31, 2012 | -$4,042,781 | -$4,042,781 |
| July 1, 2014 | -36,226,403 | -42,728,276 |
| Decline in Enterprise Value / Increase in Insolvency | $32,183,622    - | $38,685,495 |

From December 31, 2011 through December 31, 2012, the quarter ending June 30, 2020 had the highest starting liquidation value at $4,656,217. By subtracting the -$36,226,403 to -$42,728,276 July 1, 2014 deficit balances from this amount, the resulting damages range between $40,882,620 and $47,384,493.

The quarter ending December 31, 2012 had the lowest starting liquidation value, with a deficit balance of -$4,042,781. By subtracting the -$36,226,403 to -$42,728,276 July 1, 2014 deficit balances from this amount, the resulting damages range between $32,183,622 and $38,685,495.

2. **Avoidable Transfers**

The following table reflects the $36,745,422.02 in transfers made by PUP to Defendants between June 6, 2010 and June 5, 2014, the four-year period preceding Plaintiff's petition date, which is net of $923,235.96 refunded by Pac West to PUP on April 23, 2014.[8]

| Date | Payee | Amount |
|------|-------|--------|
| 8/11/2011 | Marquette Equipment Finance (Pac West) | $ 12,000.00 |
| 10/25/2011 | Marquette Equipment Finance (Pac West) | 5,000.00 |
| 10/31/2011 | Marquette Equipment Finance (Pac West) | 108,000.00 |
| 11/30/2011 | Marquette Equipment Finance (Pac West) | 12,000.00 |
| 12/2/2011 | Marquette Equipment Finance (Pac West) | 12,000.00 |
| 1/4/2012 | Marquette Equipment Finance (Pac West) | 12,000.00 |
| 2/2/2012 | Marquette Equipment Finance (Pac West) | 12,000.00 |
| 3/15/2012 | Marquette Equipment Finance (Pac West) | 171.50 |
| 3/2/2012 | Marquette Equipment Finance (Pac West) | 52,599.34 |
| 4/3/2012 | Marquette Equipment Finance (Pac West) | 60,880.00 |
| 5/3/2012 | Pacific Western Equipment Finance | 61,090.00 |
| 6/1/2012 | Pacific Western Equipment Finance | 60,880.00 |
| 7/2/2012 | Pacific Western Equipment Finance | 60,880.00 |
| 8/2/2012 | Pacific Western Equipment Finance | 60,880.00 |
| 9/3/2012 | Pacific Western Equipment Finance | 60,880.00 |
| 9/27/2012 | Pacific Western Equipment Finance | 12,220.00 |
| 10/2/2012 | Pacific Western Equipment Finance | 60,880.00 |
| 10/4/2012 | Pacific Western Equipment Finance | 14,556.67 |
| 10/30/2012 | Pacific Western Equipment Finance | 12,220.00 |
| 11/1/2012 | Pacific Western Equipment Finance | 60,931.00 |
| 11/28/2012 | Pacific Western Equipment Finance | 44,971.59 |
| 12/3/2012 | Pacific Western Equipment Finance | 73,231.50 |
| 12/6/2012 | Pacific Western Equipment Finance | 50,822.99 |
| 12/28/2012 | Pacific Western Equipment Finance | 109,611.29 |
| 1/2/2013 | Pacific Western Equipment Finance | 8,590.30 |
| 2/1/2013 | Pacific Western Equipment Finance | 118,173.59 |
| 3/1/2013 | Pacific Western Equipment Finance | 118,092.59 |
| 4/2/2013 | Pacific Western Equipment Finance | 118,071.59 |
| 5/1/2013 | Pacific Western Equipment Finance | 451,188.63 |
| 5/1/2013 | Pacific Western Equipment Finance | 707,522.65 |
| 5/2/2013 | Pacific Western Equipment Finance | 87,521.59 |
| 5/31/2013 | Pacific Western Equipment Finance | 138,346.59 |
| 6/4/2013 | Pacific Western Equipment Finance | 21,996.00 |
| 6/6/2013 | Pacific Western Equipment Finance | 81,129.20 |
| 7/1/2013 | Pacific Western Equipment Finance | 161,642.59 |
| 8/6/2013 | Pacific Western Equipment Finance | 161,831.59 |
| 9/3/2013 | Pacific Western Equipment Finance | 161,642.59 |
| 9/26/2013 | Pacific Western Equipment Finance | 170,800.00 |
| 10/3/2013 | Pacific Western Equipment Finance | 332,473.59 |
| 10/28/2013 | Pacific Western Equipment Finance | 23,273.33 |

---

[8] In its affirmative defenses, Defendants have claimed that the money's initially advanced to PUP represented reasonably equivalent value and that Pac West had a security interest in the proceeds, whereas Plaintiff has responded that, among other things, the transfer was not made in good faith and that Defendants should be estopped from relying on any purported contractual rights or other provisions based on the Defendants' unclean hands and lack of good faith. While this is ultimately a legal issue that is outside my area of testimony, even if Defendants prevailed with their assertion that some reasonably equivalent value was provided by Pac West to PUP, the difference between the $36,745,422.02 transferred by PUP to Pac West and the $32,492,705 of initial advances made by Pac West to PUP reflects $4,252,717 of additional amounts received by Pac West that were of no value to PUP. These amounts represent the cost of funds charged by Pac West to PUP for restricted cash that could not be used by and was of no benefit to PUP.

| Date | Payee | Amount |
|---|---|---|
| 11/5/2013 | Pacific Western Equipment Finance | 139,823.09 |
| 11/6/2013 | Pacific Western Equipment Finance | 192,796.00 |
| 12/3/2013 | Pacific Western Equipment Finance | 436,751.56 |
| 12/27/2013 | Pacific Western Equipment Finance | 203,300.00 |
| 1/7/2014 | Pacific Western Equipment Finance | 854,912.95 |
| 1/13/2014 | Pacific Western Equipment Finance | 45,739.85 |
| 2/3/2014 | Pacific Western Equipment Finance | 686,557.09 |
| 2/28/2014 | Pacific Western Equipment Finance | 686,538.09 |
| 3/1/2014 | Pacific Western Equipment Finance | 161.00 |
| 3/20/2014 | Pacific Western Equipment Finance | 686,377.09 |
| 4/22/2014 | Pacific Western Equipment Finance | 5,064,496.97 |
| 4/22/2014 | First National Bank of St Louis | 14,778,201.99 |
| 4/22/2014 | MB Financial Bank | 10,000,000.00 |
| 4/23/2014 | Refunded by PacWest | (923,235.96) |
| | **Total Four Years Transfers** | **$ 36,745,422.02** |

The following table reflects the $33,945,212.61 in transfers made by PUP to Defendants between June 6, 2013 and June 5, 2014, the one-year period preceding Plaintiff's petition date, which is net of $923,235.96 refunded by Pac West to PUP on April 23, 2014.

| Date | Payee | Amount |
|---|---|---|
| 6/6/2013 | Pacific Western Equipment Finance | $ 81,129.20 |
| 7/1/2013 | Pacific Western Equipment Finance | 161,642.59 |
| 8/6/2013 | Pacific Western Equipment Finance | 161,831.59 |
| 9/3/2013 | Pacific Western Equipment Finance | 161,642.59 |
| 9/26/2013 | Pacific Western Equipment Finance | 170,800.00 |
| 10/3/2013 | Pacific Western Equipment Finance | 332,473.59 |
| 10/28/2013 | Pacific Western Equipment Finance | 23,273.33 |
| 11/5/2013 | Pacific Western Equipment Finance | 139,823.09 |
| 11/6/2013 | Pacific Western Equipment Finance | 192,796.00 |
| 12/3/2013 | Pacific Western Equipment Finance | 436,751.56 |
| 12/27/2013 | Pacific Western Equipment Finance | 203,300.00 |
| 1/7/2014 | Pacific Western Equipment Finance | 854,912.95 |
| 1/13/2014 | Pacific Western Equipment Finance | 45,739.85 |
| 2/3/2014 | Pacific Western Equipment Finance | 686,557.09 |
| 2/28/2014 | Pacific Western Equipment Finance | 686,538.09 |
| 3/1/2014 | Pacific Western Equipment Finance | 161.00 |
| 3/20/2014 | Pacific Western Equipment Finance | 686,377.09 |
| 4/22/2014 | Pacific Western Equipment Finance | 5,064,496.97 |
| 4/22/2014 | First National Bank of St Louis | 14,778,201.99 |
| 4/22/2014 | MB Financial Bank | 10,000,000.00 |
| 4/23/2014 | Refunded by PacWest | (923,235.96) |
| | **Total One Year Transfers** | **$33,945,212.61** |

The following table reflects the $32,083,049.07 in transfers made by PUP to Defendants between December 5, 2013 and June 5, 2014, the four-year period preceding Plaintiff's petition date, which is net of $923,235.96 refunded by Pac West to PUP on April 23, 2014.

| Date | Payee | Amount |
|------|-------|--------|
| 12/27/2013 | Pacific Western Equipment Finance | $ 203,300.00 |
| 1/7/2014 | Pacific Western Equipment Finance | 854,912.95 |
| 1/13/2014 | Pacific Western Equipment Finance | 45,739.85 |
| 2/3/2014 | Pacific Western Equipment Finance | 686,557.09 |
| 2/28/2014 | Pacific Western Equipment Finance | 686,538.09 |
| 3/1/2014 | Pacific Western Equipment Finance | 161.00 |
| 3/20/2014 | Pacific Western Equipment Finance | 686,377.09 |
| 4/22/2014 | Pacific Western Equipment Finance | 5,064,496.97 |
| 4/22/2014 | First National Bank of St Louis | 14,778,201.99 |
| 4/22/2014 | MB Financial Bank | 10,000,000.00 |
| 4/23/2014 | Refunded by PacWest | (923,235.96) |
| | **Total Six Months Transfers** | **$32,083,049.07** |

The following table reflects the $36,745,422.02 in transfers made by PUP to Defendants between June 6, 2010 and June 5, 2014, the four-year period preceding Plaintiff's petition date, which is net of $923,235.96 refunded by Pac West to PUP on April 23, 2014.

| Date | Payee | Amount |
|------|-------|--------|
| 2/28/2014 | Pacific Western Equipment Finance | $ 686,538.09 |
| 3/1/2014 | Pacific Western Equipment Finance | 161.00 |
| 3/20/2014 | Pacific Western Equipment Finance | 686,377.09 |
| 4/22/2014 | Pacific Western Equipment Finance | 5,064,496.97 |
| 4/22/2014 | First National Bank of St Louis | 14,778,201.99 |
| 4/22/2014 | MB Financial Bank | 10,000,000.00 |
| 4/23/2014 | Refunded by PacWest | (923,235.96) |
| | **Total Four Months Transfers** | **$30,292,539.18** |

3. **Statutory Damages**

The Florida Statutes §631.157(1) state:

*Any person who is engaged in the business of insurance, is or acts as an officer, director, agent, or employee of any person engaged in the business of insurance, or is involved in a transaction relating to the conduct of affairs of such a business, other than as an insured or beneficiary under a policy of insurance, and who willfully obtains or uses, as defined in s. 812.012(3), any funds, assets, or property, including, but not limited to, moneys, funds, premiums, credits, or other property of an insurer, shall be liable to the department as receiver for the use and benefit of an insolvent insurer's estate, claimants, creditors, and policyholders, as follows:*

*(a)  If the funds, assets, or property obtained or used did not jeopardize the safety and soundness of an insurer and was not a significant cause of such insurer being placed in receivership, the person shall be liable only for the full amount of any funds, assets, or property obtained or used, plus prejudgment interest provided by law.*

*(b)  If the funds, assets, or property obtained or used jeopardized the safety and soundness of an insurer or was a significant cause of the insurer being placed in receivership, the person shall be liable for triple the full amount of any funds, assets, or property obtained or used, plus prejudgment interest provided by law on the original amount.*

In its Amended Complaint, the DFS included counts seeking statutory damages allowable under Florida Statute §631.157(1), which provides for a damages award equal to triple the full amount of the transfers willfully obtained by the defendants, which is summarized in the following table:

| Date | Payee | Amount | Treble |
|---|---|---|---|
| 8/11/2011 | Marquette Equipment Finance (Pac West) | $ 12,000.00 | $ 36,000.00 |
| 10/25/2011 | Marquette Equipment Finance (Pac West) | 5,000.00 | 15,000.00 |
| 10/31/2011 | Marquette Equipment Finance (Pac West) | 108,000.00 | 324,000.00 |
| 11/30/2011 | Marquette Equipment Finance (Pac West) | 12,000.00 | 36,000.00 |
| 12/2/2011 | Marquette Equipment Finance (Pac West) | 12,000.00 | 36,000.00 |
| 1/4/2012 | Marquette Equipment Finance (Pac West) | 12,000.00 | 36,000.00 |
| 2/2/2012 | Marquette Equipment Finance (Pac West) | 12,000.00 | 36,000.00 |
| 3/15/2012 | Marquette Equipment Finance (Pac West) | 171.50 | 514.50 |
| 3/2/2012 | Marquette Equipment Finance (Pac West) | 52,599.34 | 157,798.02 |
| 4/3/2012 | Marquette Equipment Finance (Pac West) | 60,880.00 | 182,640.00 |
| 5/3/2012 | Pacific Western Equipment Finance | 61,090.00 | 183,270.00 |
| 6/1/2012 | Pacific Western Equipment Finance | 60,880.00 | 182,640.00 |
| 7/2/2012 | Pacific Western Equipment Finance | 60,880.00 | 182,640.00 |
| 8/2/2012 | Pacific Western Equipment Finance | 60,880.00 | 182,640.00 |
| 9/3/2012 | Pacific Western Equipment Finance | 60,880.00 | 182,640.00 |
| 9/27/2012 | Pacific Western Equipment Finance | 12,220.00 | 36,660.00 |
| 10/2/2012 | Pacific Western Equipment Finance | 60,880.00 | 182,640.00 |
| 10/4/2012 | Pacific Western Equipment Finance | 14,556.67 | 43,670.01 |
| 10/30/2012 | Pacific Western Equipment Finance | 12,220.00 | 36,660.00 |
| 11/1/2012 | Pacific Western Equipment Finance | 60,931.00 | 182,793.00 |
| 11/28/2012 | Pacific Western Equipment Finance | 44,971.59 | 134,914.77 |

Expert Witness Report of Scott M. Bouchner, CMA, CVA, CFE, CIRA                    Page 17

| Date | Payee | Amount | Treble |
|---|---|---|---|
| 12/3/2012 | Pacific Western Equipment Finance | 73,231.50 | 219,694.50 |
| 12/6/2012 | Pacific Western Equipment Finance | 50,822.99 | 152,468.97 |
| 12/28/2012 | Pacific Western Equipment Finance | 109,611.29 | 328,833.87 |
| 1/2/2013 | Pacific Western Equipment Finance | 8,590.30 | 25,770.90 |
| 2/1/2013 | Pacific Western Equipment Finance | 118,173.59 | 354,520.77 |
| 3/1/2013 | Pacific Western Equipment Finance | 118,092.59 | 354,277.77 |
| 4/2/2013 | Pacific Western Equipment Finance | 118,071.59 | 354,214.77 |
| 5/1/2013 | Pacific Western Equipment Finance | 451,188.63 | 1,353,565.89 |
| 5/1/2013 | Pacific Western Equipment Finance | 707,522.65 | 2,122,567.95 |
| 5/2/2013 | Pacific Western Equipment Finance | 87,521.59 | 262,564.77 |
| 5/31/2013 | Pacific Western Equipment Finance | 138,346.59 | 415,039.77 |
| 6/4/2013 | Pacific Western Equipment Finance | 21,996.00 | 65,988.00 |
| 6/6/2013 | Pacific Western Equipment Finance | 81,129.20 | 243,387.60 |
| 7/1/2013 | Pacific Western Equipment Finance | 161,642.59 | 484,927.77 |
| 8/6/2013 | Pacific Western Equipment Finance | 161,831.59 | 485,494.77 |
| 9/3/2013 | Pacific Western Equipment Finance | 161,642.59 | 484,927.77 |
| 9/26/2013 | Pacific Western Equipment Finance | 170,800.00 | 512,400.00 |
| 10/3/2013 | Pacific Western Equipment Finance | 332,473.59 | 997,420.77 |
| 10/28/2013 | Pacific Western Equipment Finance | 23,273.33 | 69,819.99 |
| 11/5/2013 | Pacific Western Equipment Finance | 139,823.09 | 419,469.27 |
| 11/6/2013 | Pacific Western Equipment Finance | 192,796.00 | 578,388.00 |
| 12/3/2013 | Pacific Western Equipment Finance | 436,751.56 | 1,310,254.68 |
| 12/27/2013 | Pacific Western Equipment Finance | 203,300.00 | 609,900.00 |
| 1/7/2014 | Pacific Western Equipment Finance | 854,912.95 | 2,564,738.85 |
| 1/13/2014 | Pacific Western Equipment Finance | 45,739.85 | 137,219.55 |
| 2/3/2014 | Pacific Western Equipment Finance | 686,557.09 | 2,059,671.27 |
| 2/28/2014 | Pacific Western Equipment Finance | 686,538.09 | 2,059,614.27 |
| 3/1/2014 | Pacific Western Equipment Finance | 161.00 | 483.00 |
| 3/20/2014 | Pacific Western Equipment Finance | 686,377.09 | 2,059,131.27 |
| 4/22/2014 | Pacific Western Equipment Finance | 5,064,496.97 | 15,193,490.91 |
| 4/22/2014 | First National Bank of St Louis | 14,778,201.99 | 44,334,605.97 |
| 4/22/2014 | MB Financial Bank | 10,000,000.00 | 30,000,000.00 |
| 4/23/2014 | Refunded by PacWest | (923,235.96) | (2,769,707.88) |
| | **Total Transfers to Defendants** | **$ 36,745,422.02** | **$ 110,236,266.06** |

The Florida Statutes §631.157(2) state:

(2)(o)   Any person who:

> 1.   Is engaged in the business of insurance, is or acts as on officer, director, agent, or employee of any person engaged in the business of insurance, or is involved in a transaction relating to the conduct of affairs of such a business, other than as an insured or beneficiary under a policy of insurance;

> 2.   Has actual knowledge or such constructive knowledge as should have been obtained through reasonable inquiry by a person in that position; and

> 3.   Misreports a material fact in any book, report, or statement of an insurer

> with the intent to deceive the insurer, including any officer, employee, or agent of the insurer, the department, or any agent or examiner appointed by the department to examine the affairs of the person or insurer, concerning the financial condition or solvency of such business

*is liable to the department as receiver for the use and benefit of the insolvent insurer's estate, creditors, and policyholders, as provided in paragraph (b).*

*(b)1.    If the misreporting did not jeopardize the safety and soundness of an insurer and was not a significant cause of the insurer being placed in receivership, the person shall be liable only for the full amount of any asset misreported.*

*2.  If the misreporting jeopardized the safety and soundness of an insurer or was a significant cause of the insurer being placed in receivership, the person shall be liable for triple the full amount of any asset misreported.*

Schedules 1 through 11 of the Expert Report of Whitney Schiffer, CPA, reflect each of the adjusted balance sheets prepared by Ms. Schiffer that adjust the annual and quarterly financial statements filed by PUP to the corrected values that reflect PUP's true financial condition.  The adjustments made by Ms. Schiffer that correct admitted asset balances pertain to a) the reclassification of restricted cash from an admitted asset to a non-admitted asset, and b) adjustment of MSO receivables that were not "sold" to Pac West to their fair values.

As Pac West was involved in the incorrect accounting for restricted cash, in applying the provisions of §631.157(2)(a), the following table summarizes each of the cash adjustments made in the three annual statements and eight quarterly statements filed by PUP between September 30, 2011 and March 31, 2014, which reflects total overstated cash over the 2.5 year period of $97,910,393 and total statutory damages of $293,731,179 when trebled.

| Balance Sheet Date | Cash Reported as an Admitted Asset by PUP | Correct Amount | Overstatement | Treble Damages |
|---|---|---|---|---|
| 9/30/2011 | $32,315,613 | $31,815,613 | $500,000 | $1,500,000 |
| 12/31/2011 | 9,896,593 | 9,396,593 | 500,000 | 1,500,000 |
| 3/31/2012 | 41,023,982 | 38,523,794 | 2,500,188 | 7,500,565 |
| 6/30/2012 | 40,083,692 | 38,407,855 | 1,675,837 | 5,027,511 |
| 9/30/2012 | 30,010,942 | 27,005,551 | 3,005,391 | 9,016,172 |
| 12/31/2012 | 26,353,292 | 21,857,523 | 4,495,769 | 13,487,306 |
| 3/31/2013 | 21,384,671 | 16,886,986 | 4,497,685 | 13,493,055 |
| 6/30/2013 | 7,000,345 | 259,596 | 6,740,749 | 20,222,246 |
| 9/30/2013 | 17,681,482 | 3,629,182 | 14,052,300 | 42,156,901 |
| 12/31/2013 | 35,197,233 | 5,094,563 | 30,102,670 | 90,308,009 |
| 3/31/2014 | 33,937,534 | 4,097,729 | 29,839,805 | 89,519,416 |
| | | | $97,910,393 | $293,731,179 |

**VII.    EXPERT COMPENSATION**

I am being compensated at the rate of $365 per hour, while other members of our firm who worked on this engagement are compensated at $150 to $395 per hour.  Neither my compensation nor the compensation of the other BPB personnel who worked on this assignment is contingent on the outcome of this litigation.

**DATED** this 2nd day of October 2020.

Scott Bouchner, CMA, CVA, CFE, CIRA
Berkowitz Pollack Brant Advisors + CPAs
200 South Biscayne Boulevard, Seventh Floor
Miami, Florida 33131
Tel. (305) 960-1290
sbouchner@bpbcpa.com

Physicians United Plan, Inc.
Per Annual Statement as of December 31, 2011
Schedule 1a

| Line | Assets | As filed by PUP | | | Adjustments | | ADJUSTED | | | Liquidation | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 Assets | 2 Nonadmitted Assets | 3 Net Admitted Assets | 4 Admitted Assets | 5 Nonadmitted Assets | 6 Assets | 7 Nonadmitted Assets | 8 Net Admitted Assets | 9 Liquidation Adjustments | 10b. Liquidation Value |
| 1 | Bonds | $825,000 | | $825,000 | | | $825,000 | | $825,000 | | $825,000 |
| 5 | Cash ($5,609,603) and short-term investments ($4,286,990) | 9,896,593 | | 9,896,593 | 500,000 | | 9,896,593 | 500,000 | 9,396,593 | 500,000 | 9,896,593 |
| 12 | Subtotals, cash and invested assets | $10,721,593 | | $10,721,593 | $500,000 | | $10,721,593 | $500,000 | $10,221,593 | $500,000 | $10,721,593 |
| 14 | Investment income due and accrued | 15,402 | | 15,402 | | | 15,402 | | 15,402 | | 15,402 |
| 15.1 | Uncollected premiums and agents' balances in the course of collection | 511,243 | | 511,243 | | | 511,243 | | 511,243 | | 511,243 |
| 15.3 | Accrued retrospective premiums | 6,859,996 | | 6,859,996 | | | 6,859,996 | | 6,859,996 | | 6,859,996 |
| 16.1 | Amounts recoverable from reinsurers | 98,156 | | 98,156 | | | 98,156 | | 98,156 | | 98,156 |
| 17 | Amounts receivable relating to uninsured plans | 599,786 | | 599,786 | | | 599,786 | | 599,786 | | 599,786 |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 29,162 | | 29,162 | | | 29,162 | | 29,162 | | 29,162 |
| 18.2 | Net deferred tax asset | 7,466,702 | 7,466,702 | | | | 7,466,702 | 7,466,702 | 0 | | |
| 20 | Electronic data processing equipment and software | 256,380 | | 256,380 | | | 256,380 | | 256,380 | -256,380 | 0 |
| 21 | Furniture and equipment, including health care delivery assets | 162,954 | 162,954 | | | | 162,954 | 162,954 | 0 | | |
| 24 | Healthcare ($6,135,268) and other amounts receivable | 6,820,039 | 684,771 | 6,135,268 | 500,000 | 1,505,321 | 7,320,039 | 2,190,092 | 5,129,947 | -1,449,378 | 3,680,569 |
| 25 | Aggregate write-ins for other than invested assets | 280,919 | 280,919 | | -12,000 | -12,000 | 268,919 | 268,919 | 0 | | 0 |
| 28 | Totals | $33,822,332 | $8,595,346 | $25,226,986 | $488,000 | $1,993,321 | $34,310,332 | $10,588,667 | $23,721,665 | -$1,205,758 | $22,515,907 |

| Line | Liabilities and Capital and Surplus | as filed by PUP | Adjustments Liabilities | ADJUSTED Adjusted Balances | Liquidation Adjustments | Liquidation Value |
|---|---|---|---|---|---|---|
| 1 | Claims unpaid | $14,180,880 | | $14,180,880 | | $14,180,880 |
| 2 | Accrued medical incentive pool and bonus amounts | 2,822,529 | | 2,822,529 | | 2,822,529 |
| 3 | Unpaid claims adjustment expenses | 119,854 | | 119,854 | | 119,854 |
| 4 | Aggregate health policy reserves | 377,312 | | 377,312 | | 377,312 |
| 9 | General expenses due or accrued | 2,417,972 | | 2,417,972 | | 2,417,972 |
| | Due to PacWest | | 460,904 | 460,904 | | 460,904 |
| 24 | Total liabilities | $19,918,547 | $460,904 | $20,379,451 | | $20,379,451 |
| 33 | Total capital and surplus | $5,308,439 | -$1,966,225 | $3,342,214 | | $2,136,456 |
| 34 | Total Liabilities, capital and surplus | $25,226,986 | -$1,505,321 | $23,721,665 | | $22,515,907 |

GREATER OF:
10% of Liabilities     $2,037,945
2% of Premiums     3,590,423

**Physicians United Plan, Inc.**
**Per Annual Statement as of March 31, 2012**
**Schedule 1b**

| Line | Assets | As filed by PUP | | | Adjustments | | ADJUSTED | | | Liquidation | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 Assets | 2 Nonadmitted Assets | 3 Net Admitted Assets | 4 Admitted Assets | 5 Nonadmitted Assets | 6 Assets | 7 Nonadmitted Assets | 8 Net Admitted Assets | 9 Liquidation Adjustments | 10b. Liquidation Value |
| 1 | Bonds | $825,000 | | $825,000 | | | 5825,000 | | $825,000 | | $825,000 |
| 5 | Cash (538,392,992) and short-term investments ($2,630,990) | 41,023,982 | | 41,023,982 | | 2,500,188 | 41,023,982 | 2,500,188 | 38,523,794 | 2,500,188 | 41,023,982 |
| 12 | Subtotals, cash and invested assets | $41,848,982 | | $41,848,982 | | 2,500,188 | $41,848,982 | $2,500,188 | $39,348,794 | $2,500,188 | $41,848,982 |
| 14 | Investment income due and accrued | 25,969 | | 25,969 | | | 25,969 | | 25,969 | | 25,969 |
| 15.1 | Uncollected premiums and agents' balances in the course of | 436,546 | | 436,546 | | | 436,546 | | 436,546 | | 436,546 |
| 15.3 | Accrued retrospective premiums | 8,930,957 | | 8,930,957 | | | 8,930,957 | | 8,930,957 | | 8,930,957 |
| 16.1 | Amounts recoverable from reinsurers | 217,928 | | 217,928 | | | 217,928 | | 217,928 | | 217,928 |
| 17 | Amounts receivable relating to uninsured plans | 599,786 | | 599,786 | | | 599,786 | | 599,786 | | 599,786 |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 17,462 | | 17,462 | | | 17,462 | | 17,462 | | 17,462 |
| 18.2 | Net deferred tax asset | 7,466,702 | 7,466,702 | | | | 7,466,702 | 7,466,702 | | 0 | 0 |
| 20 | Electronic data processing equipment and software | 434,212 | 287,985 | 146,227 | | | 434,212 | 287,985 | 146,227 | -146,227 | 0 |
| 21 | Furniture and equipment | 244,745 | 244,745 | | | | 244,745 | 244,745 | | 0 | 0 |
| 24 | Healthcare ($ 6,880,499 ) and other amounts receivable | 6,880,499 | 460,500 | 6,419,999 | 1,637,511 | 954,809 | 8,518,010 | 2,552,820 | 5,965,190 | -1,443,742 | 4,521,448 |
| 25 | Aggregate write-ins for other than invested assets | 365,682 | 365,682 | 0 | -39,813 | -39,813 | 325,869 | 325,869 | 0 | | 0 |
| 28 | Totals | $67,469,470 | $8,825,614 | $58,643,856 | $1,597,698 | $3,415,185 | $69,067,168 | $13,378,310 | $55,688,859 | $910,219 | $56,599,078 |

| Line | Liabilities and Capital and Surplus | as filed by PUP | Adjustments Liabilities | | ADJUSTED | Adjusted Balances | Liquidation Adjustments | Liquidation Value |
|---|---|---|---|---|---|---|---|---|
| 1 | Claims unpaid | $23,055,653 | | | | $23,055,653 | | $23,055,653 |
| 2 | Accrued medical incentive pool and bonus amounts | 5,332,845 | | | | 5,332,845 | | 5,332,845 |
| 3 | Unpaid claims adjustment expenses | 174,224 | | | | 174,224 | | 174,224 |
| 4 | Aggregate health policy reserves | 377,312 | | | | 377,312 | | 377,312 |
| 8 | Premiums received in advance | 20,151,283 | | | | 20,151,283 | | 20,151,283 |
| 9 | General expenses due or accrued | 1,927,031 | | | | 1,927,031 | | 1,927,031 |
| | Due to PacWest | | 1,502,817 | | | 1,502,817 | | 1,502,817 |
| 24 | Total liabilities | $51,018,348 | $1,502,817 | | | $52,521,165 | | $52,521,165 |
| 33 | Total capital and surplus [Line 25 to Line 31 minus Line 32] | $7,625,508 | -$3,320,303 | | | $3,167,694 | | $4,077,913 |
| 34 | Total Liabilities, capital and surplus | $58,643,856 | -$1,817,486 | | | $55,688,859 | | $56,599,078 |

GREATER OF:
10% of Liabilities $5,252,116
2% of Premiums 1,248,730

**Physicians United Plan, Inc.**
**Per Annual Statement as of June 30, 2012**
**Schedule 1c**

| | | As filed by PUP | | | Adjustments | | ADJUSTED | | | Liquidation | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10b. |
| Line | Assets | Assets | Nonadmitted Assets | Net Admitted Assets | Admitted Assets | Nonadmitted Assets | Assets | Nonadmitted Assets | Net Admitted Assets | Liquidation Adjustments | Liquidation Value |
| 1 | Bonds | $828,011 | | $828,011 | | | $828,011 | | $828,011 | | $828,011 |
| 5 | Cash ($37,602,702 ) and short-term investments ($2,480,990) | 40,083,692 | | 40,083,692 | | 2,503,848 | 40,083,692 | 2,503,848 | 37,579,844 | 2,503,848 | 40,083,692 |
| 12 | Subtotals, cash and invested assets | $40,911,703 | | $40,911,703 | | | $40,911,703 | | $40,911,703 | | $40,911,703 |
| 14 | Investment income due and accrued | 41,090 | | 41,090 | $2,503,848 | | 41,090 | $2,503,848 | $38,407,855 | $2,503,848 | 41,090 |
| 15.1 | Uncollected premiums and agents' balances in the course of collection | 476,914 | | 476,914 | | | 476,914 | | 476,914 | | 476,914 |
| 15.3 | Accrued retrospective premiums | 15,059,260 | | 15,059,260 | | | 15,059,260 | | 15,059,260 | | 15,059,260 |
| 16.1 | Amounts recoverable from reinsurers | 459,060 | | 459,060 | | | 459,060 | | 459,060 | | 459,060 |
| 17 | Amounts receivable relating to uninsured plans | 818,901 | | 818,901 | | | 818,901 | | 818,901 | | 818,901 |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 32,462 | | 32,462 | | | 32,462 | | 32,462 | | 32,462 |
| 18.2 | Net deferred tax asset | 7,466,702 | 7,466,702 | | | | 7,466,702 | 7,466,702 | 0 | | 0 |
| 20 | Electronic data processing equipment and software | 491,304 | 346,790 | 144,514 | | | 491,304 | 346,790 | 144,514 | -144,514 | 0 |
| 21 | Furniture and equipment | 393,913 | 393,913 | | | | 393,913 | 393,913 | 0 | | 0 |
| 24 | Healthcare ($10,237,765) and other amounts receivable | 10,237,765 | 452,428 | 9,785,337 | 1,637,511 | 4,267,602 | 11,875,276 | 4,720,030 | 7,155,246 | -1,155,458 | 5,999,788 |
| 25 | Aggregate write-ins for other than invested assets | 195,153 | 195,153 | | -39,813 | -39,813 | 155,340 | 155,340 | | | 0 |
| 28 | Totals | $76,584,227 | $8,854,986 | $67,729,241 | $1,597,698 | $6,731,637 | $78,181,925 | $15,586,623 | $62,595,302 | $1,203,876 | $63,799,178 |

| Line | Liabilities and Capital and Surplus | as filed by PUP | Adjustments Liabilities | ADJUSTED Adjusted Balances | Liquidation Adjustments | Liquidation Value |
|---|---|---|---|---|---|---|
| 1 | Claims unpaid | $20,686,609 | | $20,686,609 | | $20,686,609 |
| 2 | Accrued medical incentive pool and bonus amounts | 7,584,969 | | 7,584,969 | | 7,584,969 |
| 3 | Unpaid claims adjustment expenses | 156,322 | | 156,322 | | 156,322 |
| 4 | Aggregate health policy reserves | 1,385,794 | | 1,385,794 | | 1,385,794 |
| 8 | 8.Premiums received in advance | 26,888,148 | | 26,888,148 | | 26,888,148 |
| 9 | 9.General expenses due or accrued | 1,027,759 | | 1,027,759 | | 1,027,759 |
| | Due to PacWest | | 1,413,360 | 1,413,360 | | 1,413,360 |
| 24 | 24.Total liabilities | $57,729,601 | $1,413,360 | $59,142,961 | | $59,142,961 |
| 33 | 33.Total capital and surplus(Line 25 to Line 31 minus Line 32) | $9,999,640 | -$6,547,299 | $3,452,341 | | $4,656,217 |
| 34 | 34.Total liabilities, capital and surplus | $67,729,241 | -$5,133,939 | $62,595,302 | | $63,799,178 |

GREATER OF:
10% of Liabilities    $5,914,296
2% of Premiums    2,577,731

Physicians United Plan, Inc.
Per Annual Statement as of September 30, 2012
Schedule 1d

| | | As filed by PUP | | | Adjustments | | ADJUSTED | | | Liquidation | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10b. |
| Line | Assets | Assets | Nonadmitted Assets | Net Admitted Assets | Admitted Assets | Nonadmitted Assets | Assets | Nonadmitted Assets | Net Admitted Assets | Liquidation Adjustments | Liquidation Value |
| 1 | Bonds | $754,026 | | $754,026 | | | $754,026 | | $754,026 | | $754,026 |
| 5 | Cash ($28,399,452 )and short-term investments ($1,611,490) | 30,010,942 | | 30,010,942 | | 3,005,391 | 30,010,942 | 3,005,391 | 27,005,551 | 3,005,391 | 30,010,942 |
| 12 | Subtotals, cash and invested assets | $30,764,968 | | $30,764,968 | | $3,005,391 | $30,764,968 | 3,005,391 | $27,759,577 | $3,005,391 | $30,764,968 |
| 14 | Investment income due and accrued | 18,372 | | 18,372 | | | 18,372 | | 18,372 | | 18,372 |
| 15.1 | Uncollected premiums and agents' balances in the course of collection | 1,186,632 | | 1,186,632 | | | 1,186,632 | | 1,186,632 | | 1,186,632 |
| 15.3 | Accrued retrospective premiums | 3,759,478 | | 3,759,478 | | | 3,759,478 | | 3,759,478 | | 3,759,478 |
| 16.1 | Amounts recoverable from reinsurers | 123,619 | | 123,619 | | | 123,619 | | 123,619 | | 123,619 |
| 17 | Amounts receivable relating to uninsured plans | 742,183 | | 742,183 | | | 742,183 | | 742,183 | | 742,183 |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 32,462 | | 32,462 | | | 32,462 | | 32,462 | | 32,462 |
| 18.2 | Net deferred tax asset | 7,466,702 | 7,466,702 | | | | 7,466,702 | 7,466,702 | | 0 | 0 |
| 20 | Electronic data processing equipment and software | 731,229 | 453,176 | 278,053 | | | 731,229 | 453,176 | 278,053 | -278,053 | 0 |
| 21 | Furniture and equipment | 506,239 | 506,239 | | | | 506,239 | 506,239 | | 0 | 0 |
| 24 | Healthcare ($12,032,956) and other amounts receivable | 12,032,956 | 455,696 | 11,577,260 | 1,637,511 | 5,113,523 | 13,670,467 | 5,569,219 | 8,101,248 | -4,868,731 | 3,232,517 |
| 25 | Aggregate write-ins for other than invested assets | 421,093 | 421,093 | | -39,813 | -39,813 | 381,280 | | 381,280 | 0 | 0 |
| 28 | Totals | $57,785,933 | $9,302,906 | $48,483,027 | $1,597,698 | $8,079,101 | $60,785,933 | $17,382,007 | $42,001,624 | -$2,141,393 | $39,860,231 |

| | | | Adjustments | | ADJUSTED | | Liquidation | |
|---|---|---|---|---|---|---|---|---|
| Line | Liabilities and Capital and Surplus | as filed by PUP | Liabilities | | | Adjusted Balances | Liquidation Adjustments | Liquidation Value |
| 1 | Claims unpaid | $23,628,469 | | | | $23,628,469 | | $23,628,469 |
| 2 | Accrued medical incentive pool and bonus amounts | 6,231,697 | | | | 6,231,697 | | 6,231,697 |
| 3 | Unpaid claims adjustment expenses | 187,648 | | | | 187,648 | | 187,648 |
| 8 | Aggregate health policy reserves | 3,761,941 | | | | 3,761,941 | | 3,761,941 |
| 9 | General expenses due or accrued | 2,878,605 | | | | 2,878,605 | | 2,878,605 |
| | Due to PacWest | | 1,322,077 | | | 1,322,077 | | 1,322,077 |
| 24 | Total liabilities | $36,688,360 | $1,322,077 | | | $38,010,437 | | 38,010,437 |
| 33 | Total capital and surplus (Line 25 to Line 31 minus Line 32) | $11,794,667 | -$7,803,479 | | | $3,991,188 | | $1,849,794 |
| 34 | Total Liabilities, capital and surplus | $48,483,027 | -$6,481,403 | | | $42,001,624 | | $39,860,231 |

GREATER OF:
10% of Liabilities: $3,801,044
2% of Premiums: 5,152,353

Physicians United Plan, Inc.
Per Annual Statement as of December 31, 2012
Schedule 1e

| | | As filed by PUP | | | Adjustments | | ADJUSTED | | | Liquidation | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10b. |
| Line | Assets | Assets | Nonadmitted Assets | Net Admitted Assets | Admitted Assets | Nonadmitted Assets | Assets | Nonadmitted Assets | Net Admitted Assets | Liquidation Adjustments | Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bonds | $755,043 | | $755,043 | | | $755,043 | | $755,043 | | $755,043 |
| 5 | Cash ($19,732,999) and short-term investments ($6,620,293) | 26,353,292 | | 26,353,292 | | 4,495,769 | 26,353,292 | 4,495,769 | 21,857,523 | 4,495,769 | 26,353,292 |
| 12 | Subtotals, cash and invested assets | $27,108,335 | | $27,108,335 | | 4,495,769 | $27,108,335 | 4,495,769 | $22,612,566 | 4,495,769 | $27,108,335 |
| 14 | Investment income due and accrued | 12,952 | | 12,952 | | | 12,952 | 0 | 12,952 | | 12,952 |
| 15.1 | Uncollected premiums and agents' balances in the course of collection | 656,822 | | 656,822 | | | 656,822 | | 656,822 | | 656,822 |
| 15.3 | Accrued retrospective premiums | 7,517,742 | | 7,517,742 | | | 7,517,742 | 0 | 7,517,742 | | 7,517,742 |
| 16.1 | Amounts recoverable from reinsurers | 973,618 | | 973,618 | | | 973,618 | 0 | 973,618 | | 973,618 |
| 18.2 | Net deferred tax asset | 6,678,331 | 5,498,865 | 1,179,466 | | | 6,678,331 | 5,498,865 | 1,179,466 | -1,179,466 | 0 |
| 20 | Electronic data processing equipment and software | 849,482 | 521,126 | 328,356 | | | 849,482 | 521,126 | 328,356 | -328,356 | 0 |
| 21 | Furniture and equipment | 551,683 | 551,683 | 0 | | | 905,922 | 905,922 | 0 | | 0 |
| 24 | Health care ($13,494,440) and other amounts receivable | 14,097,877 | 603,437 | 13,494,440 | 354,239 | 354,239 | 16,473,984 | 7,270,946 | 9,203,038 | -3,601,324 | 5,601,714 |
| 25 | Aggregate write-ins for other than invested assets | 2,469,336 | 2,469,336 | 0 | 2,376,107 | 6,667,509 | 2,456,165 | 2,456,165 | 0 | | 0 |
| | | | | | -13,171 | -13,171 | | | | | |
| 28 | TOTALS | $60,916,178 | $9,644,447 | $51,271,731 | $2,717,175 | $11,504,345 | $63,633,353 | $21,148,792 | $42,484,560 | -5613,377 | $41,871,183 |

| | | | Adjustments | ADJUSTED | | Liquidation | |
| Line | Liabilities and Capital and Surplus | as filed by PUP | Liabilities | | Adjusted Balances | Liquidation Adjustments | Liquidation Value |
|---|---|---|---|---|---|---|---|
| 1 | 1.Claims unpaid | $27,276,018 | | | $27,276,018 | | $27,276,018 |
| 2 | 2.Accrued medical incentive pool and bonus amounts | 6,952,541 | | | 6,952,541 | | 6,952,541 |
| 3 | 3.Unpaid claims adjustment expenses | 241,320 | | | 241,320 | | 241,320 |
| 4 | 4.Aggregate health policy reserves | 4,779,362 | | | 4,779,362 | | 4,779,362 |
| 9 | 9.General expenses due or accrued | 4,264,971 | | | 4,264,971 | | 4,264,971 |
| | Due to PacWest | | 2,275,842 | | 2,275,842 | | 2,275,842 |
| 10.1 | 10.1 Current federal and foreign income tax payable and interest thereon | 123,910 | | | 123,910 | | 123,910 |
| 24 | 24.Total liabilities (Lines 1 to 23) | $43,638,122 | $2,275,842 | | $45,913,964 | | $45,913,964 |
| 33 | 33.Total capital and surplus | $7,633,609 | -$11,063,013 | | -$3,429,404 | | -$4,042,781 |
| 34 | 34.Total Liabilities, capital and surplus | $51,271,731 | -$8,787,171 | | $42,484,560 | | $41,871,183 |

**Physicians United Plan, Inc.**
**Analysis of Damages**
**Liquidation Value at Time of Recievership**
**Schedule 2**

| | | |
|---|---|---|
| Beginning Asset Value | $22,691,268 | Per PUP September 30, 2014 Statement of Affairs |
| Receivership recoveries: Inception through June 30, 2020 | 23,725,410 | Per PUP June 30, 2020 Statement of Affairs |
| Interest Earned: Inception through June 30, 2020 | 2,618,872 | Per PUP June 30, 2020 Statement of Affairs |
| Cash and Investments used to pay secured claims | -2,583,820 | Per PUP Interim Statements of Affairs |
| Disbursements: Inception through June 30, 2020 (Excluding Professional Fees) | -4,610,206 | Per PUP June 30, 2020 Statement of Affairs |
| Professional Fees: Inception through June 30, 2020 | -9,657,845 | Per PUP June 30, 2020 Statement of Affairs |
| Amounts Available to Pay Claims | $32,183,678 | |

| | Low Claims | High Claims | |
|---|---|---|---|
| Receivership Claims as of June 30, 2020 (Excluding Claims Still Under Dispute) | -$68,410,081 | -$68,410,081 | Per PUP June 30, 2020 Statement of Affairs / Motion for Sixth Interim Claims Report |
| Claims Included in PUP June 30, 2020 Statement of Affairs Under Dispute | 0 | -4,584,189 | (Includes 12 claims - 2 of which were filed at $1.00 and may be greater) |
| Claims Under Dispute Not Included in June 30, 2020 Statement of Affairs | 0 | -1,917,684 | (Includes 4 claims totalling $1,920,825.14 and recommended at $3,141.16) |
| | -$68,410,081 | -$74,911,954 | |
| **Net Deficit at Liquidation (Adjusted for Subsequent Events)** | **-$36,226,403** | **-$42,728,276** | |

Physicians United Plan, Inc.
Analysis of Damages
Schedule 3

| Date | Description | ADJUSTED | | | LIQUIDATION VALUE | | DAMAGES | |
|---|---|---|---|---|---|---|---|---|
| | | 4 Total Assets | 5 Nonadmitted Assets | 6 Net Admitted Assets (Col. 1 minus Col. 2) | 7 Net Liquidation Adjustments | 8 Liquidation Value | 8a Increase in Involvency (Low Claims) | 8b Increase in Involvency (High Claims) |
| December 31, 2011 | Assets | $34,310,332 | $10,588,667 | $23,721,665 | -$1,205,758 | $22,515,907 | | |
| | Liabilities | 20,379,451 | | 20,379,451 | 0 | 20,379,451 | | |
| | Surplus / Capital | $13,930,881 | $10,588,667 | $3,342,214 | -$1,205,758 | $2,136,456 | $2,136,456 | |
| March 31, 2012 | Assets | $69,067,168 | $13,378,310 | $55,688,859 | $910,219 | $56,599,078 | | |
| | Liabilities | 52,521,165 | | 52,521,165 | 0 | 52,521,165 | | |
| | Surplus / Capital | $16,546,004 | $13,378,310 | $3,167,694 | $910,219 | $4,077,913 | $4,077,913 | |
| June 30, 2012 | Assets | $78,181,925 | $15,586,623 | $62,595,302 | $1,203,876 | $63,799,178 | | |
| | Liabilities | 59,142,961 | | 59,142,961 | 0 | 59,142,961 | | |
| | Surplus / Capital | $19,038,964 | $15,586,623 | $3,452,341 | $1,203,876 | $4,656,217 | $4,656,217 | |
| September 30, 2012 | Assets | $60,785,933 | $17,382,007 | $42,001,624 | -$2,141,393 | $39,860,231 | | |
| | Liabilities | 38,010,437 | | 38,010,437 | 0 | 38,010,437 | | |
| | Surplus / Capital | $22,775,496 | $17,382,007 | $3,991,188 | -$2,141,393 | $1,849,794 | $1,849,794 | |
| December 31, 2012 | Assets | $63,633,353 | $21,148,792 | $42,484,560 | -$613,377 | $41,871,183 | | |
| | Liabilities | 45,913,964 | | 45,913,964 | 0 | 45,913,964 | | |
| | Surplus / Capital | $17,719,389 | $21,148,792 | -$3,429,404 | -$613,377 | -$4,042,781 | -$4,042,781 | |

# APPENDIX A

**Berkowitz**
**Pollack**
**Brant** Advisors
+CPAs

CURRICULUM VITAE

SCOTT M. BOUCHNER

**Business Background**

**Berkowitz Pollack Brant Advisors and CPAs, LLP,** Miami and Ft. Lauderdale, FL          1999 to Present
- Partner and Director of Forensic Accounting and Business Valuation Services

**PricewaterhouseCoopers LLP,** New York, NY and Miami, FL          1990 – 1995, 1997-1999
- Manager - Financial Advisory Services Group

**KPMG Peat Marwick LLP,** New York, NY          1995-1996
- Manager - Corporate Transactions Group

**First American Bankshares,** Washington DC          1987-1988
- Credit Analyst

**Practice areas include:**

- Bankruptcy, insolvency and receivership services
- Litigation support services and expert witness testimony
- Forensic accounting investigations involving allegations of fraud / mismanagement
- Business valuations
- Due-diligence investigations in connection with merger and acquisition transactions
- Preparation of pro-forma financial information and financial forecasts
- Strategic / financial consulting and business advisory services

**Qualifications**

Certified Management Accountant (CMA)
Institute of Management Accountants (1996)

Certified Valuation Analyst (CVA)
National Association of Certified Valuation Analysts (2001)

Certified Fraud Examiner (CFE)
National Association of Certified Fraud Examiners (2007)

Certified Insolvency and Restructuring Advisor (CIRA)
The Association of Insolvency and Restructuring Advisors (2012)

- Awarded the Zolfo Cooper Silver Medal Award - 2nd highest cumulative national exam score

Honored in South Florida Legal Guide's Top CPAs and Financial Professionals in Litigation Support (2005 through 2020)

AIPCA Forensic and Litigation Services Damages Task Force (2011 - 2018)

CFF Exam Development Task Force (2012 - 2014)

Awarded AICPA's Forensic & Litigation Services Volunteer of the Year (2016)

**Educational Background**

Columbia Business School -- Masters of Business Administration, 1990, Degree in Finance / Marketing

The George Washington University -- Bachelors of Arts, 1987, Degree in English Literature

**Publications and Instruction**

**Publications:**

- Attaining Reasonable Certainty in Economic Damages Calculations – Revenues, Costs and Best Evidence, (Co-authored), Forensic & Valuation Services Practice Aid, *Association of International Certified Professional Accountants*, 2018

- Lost Profits Damages: Principles, Methods, and Applications, *Chapter 12 "Mitigation of Damages in the Lost Profits Calculation",* Valuation Products and Services, LLC, Ventnor City, New Jersey, 2017

- Attaining Reasonable Certainty in Economic Damages Calculations, (Co-authored), Forensic & Valuation Services Practice Aid, The American Institute of Certified Public Accountants, 2015

- Calculating Lost Profits – Business Valuation and Forensic & Litigation Services Practice Aid 06-4, (Co-authored), The American Institute of Certified Public Accountants, 2006

- Certified in Financial Forensics Examination, *The American Institute of Certified Public Accountants,* 2010 – Selected to participate on committee to develop test questions used on examination to award Certified in Financial Forensics (CFF) credential.

- Discount Rates, Risk, and Uncertainty in Economic Damages Calculations, (Co-authored), *The American Institute of Certified Public Accountants,* 2012

**Instruction:**

- "Economic Damages Case Law Update", The American Institute of Certified Public Accountants - 2017

- "Attacking the Plaintiff's Damage Calculation", The American Institute of Certified Public Accountants – 2017

- "Attaining Reasonable Certainty in Economic Damages Calculations", The American Institute of Certified Public Accountants - 2015

- "Causation and the Damages Expert in Florida", Florida Institute of Certified Public Accountants – 2014

- "Reasonable Certainty Round 2: An Inside Look at the Findings of the Damages Task Force" – American Institute of Certified Public Accountants – 2013

- "Attaining Reasonable Certainty in Damage Calculations" - American Institute of Certified Public Accountants – 2012

- "Discount Rates, Risk, and Uncertainty in Economic Damages Calculations" – American Institute of Certified Public Accountants - Webinar – 2012

- "Madoff, Peters and Rothstein: Fraud and Ponzi Schemes in South Florida" – Turnaround Management Association – 2010

- "Understanding, Developing & Managing Forensic Engagements" – American Institute of Certified Public Accountants – Forensic and Valuation Section - 2010

- "Understanding Discount Rates and the Time Value of Money in Calculating Economic Damages", Florida Institute of Certified Public Accountants – 2010

- Lost Profits in the Florida Courts" – Dade County Bar Association - 2009, Florida Institute of Certified Public Accountants – 2009

**List of Cases Testified**

Huberto Allegue, as Personal Representative of the Estate of Lissette Allegue v. Baptist Hospital of Miami, Inc.
State of Florida – Division of Administrative Hearings
Testimony involving lost earnings in a wrongful death matter
Testified in deposition for Defendant in 2020

Elizabeth Marquardt v. Ocean Reef Community Association and David Ritz
U.S. District Court Southern District of Florida
Testimony involving lost earnings
Testified in deposition for Plaintiff in 2020

Tech Data Corporation v. Abboud Trading Corp.
Sixth Judicial Circuit for Pinellas County, Florida
Testimony involving economic damages
Testified in deposition for Defendant in 2019

George Schaeffer, et al v. Dowling Hales, et al
Illinois State, Cook County, Circuit Court
Testimony involving valuation of an insurance company in buyout dispute
Testified for Plaintiff in 2019

Sheridan Healthcorp, Inc. v. Aetna Health Inc., Aetna Life Insurance Co., et al.
Seventeenth Judicial Circuit – Broward County, Florida
Testimony involving valuation of medical claims
Testified in depositions for Plaintiff in 2018 and 2019 and jury trial in 2019

Robert Paul Charbonneau, et al. v. Michael D. Ehrenstein v. Agentis, PLLC
Eleventh Judicial Circuit for Miami-Dade County, Florida
Testimony involving valuation of a law firm in connection with corporate dissolution
Testified in deposition and trial for Plaintiff in 2019

Steven R. Schafer, et al. v. Robert A. Dicrisci, et al.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving a shareholder dispute pertaining to the potential buyout of two of the Plaintiff's principals
Testified in deposition for Plaintiff in 2019

Wyndham Vacation Ownership Inc., et al. v. Totten Franqui Davis & Burk LLC, et al.
Southern District of Florida West Palm Beach Division
Represented Co-Defendants in case involving unjust enrichment and economic damages pertaining to
timeshare industry
Testified in deposition for Co-Defendant in 2019

Bay Parc Plaza Apartments, L.P., et al. v. Airbnb, Inc. and Airbnb Payments, Inc.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving damages pertaining to illegal short-term rental activity
Testified in deposition for Plaintiff in 2018

Tapestry Senior Housing Management, et al v. Herbert J. Sims & Co., Inc.
American Arbitration Association
Testimony involving economic damages arising from professional negligence
Testified in deposition and arbitration for Defendant in 2018

Ronald N. Dubner v. The Estate of Bradley A. Dubner, et al
Fifteenth Judicial Circuit – Palm Beach County, Florida
Testimony involving valuation issues
Testified in deposition for Defendant in 2018

Daniel S. Newman, as Receiver for Founding Partners, et al v. Ernst & Young, LLP and Mayer Brown, LLP
Seventeenth Judicial Circuit – Broward County, Florida
Testimony involving receivership accounting
Testified as 30(b)(6) witness for Berkowitz Pollack Brant Advisors and Accountants, LLP in 2018

AH Biscayne Investor, LLC v. 1st Sun Properties, LLC
U.S. District Court Southern District of Florida
Testimony involving calculation of lost profits
Testified in deposition for Plaintiff in 2017

BMO Harris Bank, N.A. v. Richert Funds, LLC, Dwight Richert and Bart Garbrecht
United States District Court for the Northern District of Georgia
Testimony involving accounting investigation pertaining to alleged fraud
Testified in deposition for Defendant in 2017

GOLTV, Inc, et al. v. Fox Sports Latin America, Ltd., et al.
United States District Court Southern District of Florida
Testified as Rule 30(b)(6) witness T&T Sports Marketing Ltd. in 2017

W. Riley Allen, Esq. vs. Dudley Q. Sharp, Jr., Esq. and Burr & Forman, LLP
Ninth Judicial Circuit – Orange County, Florida
Testimony involving damages suffered in connection with professional malpractice
Testified in deposition for Defendants in 2016

Hawaiian Airlines, Inc. v. AAR Aircraft Services, Inc. and Mankiewicz Coatings, LLC
United States District Court for the Southern District of Florida
Testimony involving damages suffered in connection with product liability
Testified in deposition for Plaintiff in 2016

In re: Miguel Angel Villaverde, Debtor
United States Bankruptcy Court for the Southern District of Florida, Miami Division
Testimony involving feasibility of Chapter 13 bankruptcy plan of reorganization
Testified in trial for creditor in 2014

Galen Francis, et al v. Metal Roofing Systems by Brian Embick Roofing, Inc., et al
Fifteenth Judicial Circuit – Palm Beach County, Florida
Testimony involving personal injury claims
Testified in deposition for Plaintiff in 2014

USA v. Steinger et al
Criminal Trial – United States District Court for the Southern District of Florida
Testimony Involving Forensic Accounting
Testified in trial for prosecution in 2013

Lawrence Weinstein, MD v. Tenet Florida Physician Services
Arbitration
Testimony involving lost earnings
Testified in deposition and arbitration for Defendant in 2013

Robert Chinick, et al. v. Armor Screen Corporation, et al.
Minority Shareholder Dispute
Court appointed neutral appraiser in 2012

Leon A. Bynoe, M.D. v. Jeffrey N. Weiss, M.D.
American Arbitration Association
Testimony involving buyout of minority shareholder
Testified in deposition as neutral expert in 2011

Lisy Corp. v. Alberico Echemendia, et al
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving post-acquisition dispute
Testified in deposition for Plaintiff in 2011

In Re: The Marriage of: Judith Berens and Fred Berens
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testified in deposition for Respondent / Former Husband in 2010

In Re: United States Sugar Corporation Litigation
United States District Court for the Southern District Of Florida
Testimony involving proceeds due ESOP participants in class action litigation
Testified in deposition for Plaintiff in 2009

Malamud v. Aristed Group, LLC
Seventeenth Judicial Circuit – Broward County, Florida
Testimony involving lost earnings in connection with personal injury claim
Testified in deposition for Plaintiff in 2008

Roberto Martinez, as Court-Appointed Receiver of Mutual Benefits Corp, et al v. Spear Safer CPAs
United States District Court for the Southern District Of Florida
Testimony involving damages suffered in connection with professional malpractice
Testified in deposition for Plaintiff in 2007

Henry Torres and Hilda Torres v. Empire Seafood Corp and Performance Food Group Co.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving post-acquisition dispute
Testified in deposition for Defendant / Counter-Plaintiff in 2007 and Trial in 2009

Topp, Inc. v. Uniden America Corporation
United States District Court for the Southern District Of Florida
Testimony involving lost net investment resulting from alleged fraud.
Testified in deposition for Plaintiff in 2006 and in Jury Trial in 2008

Florida Tire Recycling, Inc. v. Lexington Insurance Company and Webster, Inc.
Nineteenth Judicial Circuit – St. Lucie County, Florida
Testimony involving property and casualty insurance claim
Testified in deposition for Defendant in 2006

Dulce N. Rispoli v. Herbert A. Stiefel
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving valuation in closely held business
Trial testimony and deposition for Husband in 2006

Grupo Televisa, S.A. et al v. Telemundo Communications Group, Inc. et al
United States District Court for the Southern District Of Florida
Testimony involving lost profits resulting from alleged tortuous interference.
Testified in deposition for Defendant in 2005 and 2007

Bank of New York v. Bernard Jaffe, Jr.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving alleged fraudulent transfers of funds.
Testified in deposition for third party defendant in 2004

In Re: Estate of Manny Bankhalter
Eleventh Judicial Circuit – Miami-Dade County, Florida – Probate Division
Testimony involving the evaluation of two competing offers for the sale of estate assets
Testified in court hearing in 2003

Andrew Chauser & Katherine Sayet v. Sayet Assoc. Pathologist Reference Laboratory, Inc.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving reasonableness of compensation in dissident shareholder action
Testified in deposition for Defendant in 2002

Johnston Tombigbee Furniture Manufacturing Company v. Akzo Noble Coatings, Inc.
United States District Court for the Northern District of Mississippi Eastern Division
Testimony involving lost profits resulting from product liability

**Documents Considered**
**Appendix B**

1. Amended Complaint of Florida Department of Financial Services, Division of Rehabilitation and Liquidation, as Receiver for Physicians United Plan, Inc. to Avoid and Recover Avoidable Transfers, for Declaratory Judgment, for Damages, and for Related Relief

2. Receiver's Response to Defendants' Motion to Dismiss

3. Defendant Pacific Western Bank's Answer and Affirmative Defenses

4. Defendant MB Financial Bank, N.A.'s Answer and Affirmative Defenses

5. Defendant Central Bank of St. Louis's Answer and Affirmative Defenses

6. Plaintiff's Reply to Defendant's Affirmative Defenses (PacWest, MB Financial Bank, Central Bank of St. Louis)

7. Defendants' Motion to Dismiss Complaint with Incorporated Memorandum of Law

8. Order Denying Defendants' Motion to Dismiss Complaint with Incorporated Memorandum of Law

9. Physicians United Plan, Inc. ("PUP") Annual and Quarterly Financial Statements filed with the Florida Office of Insurance Regulation ("FOIR")

10. PUP general ledger and internal accounting records for all years prior to 7/1/2014

11. PUP's Audited statutory financial statements as of December 31, 2011, 2012 and 2013 and for the years then ended

12. The unaudited financial statements issued by the Receiver for the Estate of PUP for each quarter after June 30, 2014 consisting of:

    - Statement of Affairs as of the last day of each quarter.

    - Statement of Cash Receipt and Disbursements from the date of liquidation to the end of each quarter.

    - Supplemental schedules.

    - Notes to financial statements

13. Documentation pertaining to purported sale leaseback transactions and related payments / transfers from PUP to Defendants

14. Marketing materials published by PacWest for its sales product known as "Convertalease"

15. Deposition transcripts and exhibits -- IDJB Investments, LLC v. McGladrey LLP matter

16. Deposition transcripts and exhibits – Florida DFS as Receiver v. Imtiaz H. Sattaur, et al.

17. Deposition transcripts and exhibits – Florida DFS as Receiver v. RSM US LLP, f/k/a/ McGladrey, LLP

18. Deposition transcripts and exhibits – Florida DFS as Receiver v. Pacific Western Bank Corporation, Central Bank of St. Louis f/k/a First National Bank of St. Louis, And MB Financial Bank, N.A., et al

19. Statements Under Oath taken from witnesses in The Receivership of PUP in the Circuit Court of the Second Judicial Circuit in and for Leon County Florida: Case Number 2014-CA-01472

20. Florida Statutes §§ 631, 641 and 726

21. The Expert Report of Whitney Schiffer, CPA

22. Receiver's Claims Evaluation Reports

23. Receiver's liquidation balance sheet bridge spreadsheet

24. Receiver's Filed Claims Detail Report

25. Interim Claims Reports filed by Florida Department of Financial Services and Court Orders approving Interim Claims Reports

26. Correspondence between Pac West and PUP pertaining to proposed accounting for transactions and to final accounting

27. Notice of Final Reconciliation of Contract No: H5696 from Centers for Medicate a& Medicate Services

28. Correspondence between the Receiver or on behalf of Receiver and MSOs that were debtors of PUP

29. Any items referenced in the body of this expert report

30. Other documents produced in the matters known as the Receiver v. RSM, IDJB v. RSM, Receiver v. D&O and Receiver v. PacWest

# EXHIBIT  E

**Physicians United Plan, Inc.**
**Analysis of Damages**
**Schedule 3 (Updated)**

| | | As filed by PUP | | | ADJUSTED | | | LIQUIDATION VALUE | | DAMAGES | |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9a | 9b |
| Date | Description | Total Assets | Nonadmitted Assets | Net Admitted Assets (Col. 1 minus Col. 2) | Total Assets | Nonadmitted Assets | Net Admitted Assets (Col. 1 minus Col. 2) | Net Liquidation Adjustments | Liquidation Value | Increase in Involvency (Low Claims) | Increase in Involvency (High Claims) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| December 31, 2011 | Assets | $33,822,332 | $8,595,346 | $25,226,986 | $34,310,332 | $10,588,667 | $23,721,665 | -$1,205,758 | $22,515,907 | Liquidation Value | 2,136,456 | 2,136,456 |
| | Liabilities | 19,918,547 | | 19,918,547 | 20,379,451 | | 20,379,451 | 0 | 20,379,451 | Claims | -36,226,403 | -42,728,276 |
| | Surplus / Capital | $13,903,785 | $8,595,346 | $5,308,439 | $13,930,881 | $10,588,667 | $3,342,214 | -$1,205,758 | $2,136,456 | Damages | $38,362,859 | $44,864,732 |
| March 31, 2012 | Assets | $67,469,470 | $8,825,614 | $58,643,856 | $69,067,168 | $13,378,310 | $55,688,859 | $910,219 | $56,599,078 | Liquidation Value | 4,077,913 | 4,077,913 |
| | Liabilities | 51,018,348 | | 51,018,348 | 52,521,165 | | 52,521,165 | 0 | 52,521,165 | Claims | -36,226,403 | -42,728,276 |
| | Surplus / Capital | $16,451,122 | $8,825,614 | $7,625,508 | $16,546,004 | $13,378,310 | $3,167,694 | $910,219 | $4,077,913 | Damages | $40,304,316 | $46,806,189 |
| June 30, 2012 | Assets | $76,584,227 | $8,854,986 | $67,729,241 | $78,181,925 | $15,586,623 | $62,595,302 | $1,203,876 | $63,799,178 | Liquidation Value | 4,656,217 | 4,656,217 |
| | Liabilities | 57,729,601 | | 57,729,601 | 59,142,961 | | 59,142,961 | 0 | 59,142,961 | Claims | -36,226,403 | -42,728,276 |
| | Surplus / Capital | $18,854,626 | $8,854,986 | $9,999,640 | $19,038,964 | $15,586,623 | $3,452,341 | $1,203,876 | $4,656,217 | Damages | $40,882,620 | $47,384,493 |
| September 30, 2012 | Assets | $57,785,933 | $9,302,906 | $48,483,027 | $60,785,933 | $17,382,007 | $42,001,624 | -$2,141,393 | $39,860,231 | Liquidation Value | 1,849,794 | 1,849,794 |
| | Liabilities | 36,688,360 | | 36,688,360 | 38,010,437 | | 38,010,437 | 0 | 38,010,437 | Claims | -36,226,403 | -42,728,276 |
| | Surplus / Capital | $21,097,573 | $9,302,906 | $11,794,667 | $22,775,496 | $17,382,007 | $3,991,188 | -$2,141,393 | $1,849,794 | Damages | $38,076,197 | $44,578,070 |
| December 31, 2012 | Assets | $60,916,178 | $9,644,447 | $51,271,731 | $63,633,353 | $21,148,792 | $42,484,560 | -$613,377 | $41,871,183 | Liquidation Value | -4,042,781 | -4,042,781 |
| | Liabilities | 43,638,122 | | 43,638,122 | 45,913,964 | | 45,913,964 | 0 | 45,913,964 | Claims | -36,226,403 | -42,728,276 |
| | Surplus / Capital | $17,278,056 | $9,644,447 | $7,633,609 | $17,719,389 | $21,148,792 | -$3,429,404 | -$613,377 | -$4,042,781 | Damages | $32,183,622 | $38,685,495 |

EXHIBIT

2  BOUCHNER

exhibitsticker.com

# EXHIBIT  F

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 109243 | 1 | CLASS 5 | F | DARILU DEBI | 7/1/2014 | 10/27/2014 | 2,000.00 | - | - | - | 1 and 4 | | | |
| 109243 | 2 | CLASS 6 | F | DARILU DEBI | 7/1/2014 | 10/27/2014 | 10,331.72 | - | - | - | 1 and 4 | | | |
| 197558 | 1 | CLASS 2 | JCOMB | ADVANTICA ADMINISTRATIVE SERVICES INC | 7/1/2014 | 10/10/2016 | 178,516.60 | - | 178,516.60 | 178,516.60 | 6 | 10/23/2020 | P | |
| 183813 | 1 | CLASS 2 | JFFS | WINNIE PALMER HOSPITAL FOR WOMEN/BABIES | 7/1/2014 | 10/5/2016 | 3,571,854.20 | - | 3,571,854.20 | - | 6 | | | ORHS related claim |
| 184896 | 1 | CLASS 2 | JFFS | ST CLOUD PHYSICIAN MANAGEMENT LLC | 7/1/2014 | 10/25/2016 | 29,291.19 | - | 29,291.19 | - | 6 | | | ORHS related claim |
| 186427 | 1 | CLASS 2 | JFFS | SOUTH LAKE HOSPITAL | 7/1/2014 | 10/5/2016 | 190,228.00 | - | 190,228.00 | - | 6 | | | ORHS related claim |
| 190296 | 1 | CLASS 2 | JFFS | ORLANDO HEALTH PHYSICIAN PARTNERS INC | 7/1/2014 | 9/15/2016 | 875.00 | - | 875.00 | - | 6 | | | ORHS related claim |
| 190319 | 1 | CLASS 2 | JFFS | ORLANDO CANCER CENTER INC | 7/1/2014 | 9/15/2016 | 83,956.00 | - | 83,956.00 | - | 6 | | | ORHS related claim |
| 190439 | 1 | CLASS 2 | JFFS | WEST ORANGE PHYSICIANS GROUP LLC | 7/1/2014 | 9/15/2016 | 4,589.00 | - | 4,589.00 | - | 6 | | | ORHS related claim |
| 191836 | 1 | CLASS 2 | JFFS | ORLANDO HEALTH PHYSICIAN GROUP | 7/1/2014 | 9/15/2016 | 497,630.04 | - | 497,630.04 | - | 6 | | | ORHS related claim |
| 191837 | 1 | CLASS 2 | JFFS | ORLANDO REGIONAL HEALTHCARE SYSTEM INC | 7/1/2014 | 9/15/2016 | 288.00 | - | 288.00 | - | 6 | | | ORHS related claim |
| 200256 | 1 | CLASS 2 | JFFS | ORLANDO HEALTH PHYSICIAN GROUP INC | 7/1/2014 | 9/15/2016 | 26,959.00 | - | 26,959.00 | - | 6 | | | ORHS related claim |
| 109507 | 1 | CLASS 2 | JMSO | PREMIER MEDICAL ASSOCIATE | 7/1/2014 | 5/26/2015 | 1.00 | - | 1.00 | - | 6 | | | |
| 109512 | 1 | CLASS 2 | JMSO | PHYSICIAN PARTNERS LLC & C PHILLIP CAMPBELL JR | 7/1/2014 | 6/4/2015 | 1.00 | - | 1.00 | 1,394,930.00 | 6 | 10/26/2020 | P | |
| 109490 | 1 | CLASS 2 | JMSO | EXCEL PHYSICIANS ALLIANCE And IURATO LAW FIRM PL | 7/1/2014 | 10/31/2016 | 838,752.00 | 838,752.00 | 838,752.00 | 838,752.00 | 5 | | | |
| 109506 | 1 | CLASS 2 | JMSO | PRECISION HEALTHCARE SVCS LLC And IURATO LAW FIRM PL | 7/1/2014 | 10/31/2016 | 457,717.00 | 457,717.00 | 457,717.00 | 457,717.00 | 5 | | | |
| 179817 | 1 | CLASS 2 | K | ELLEN BESHEARS | 7/1/2014 | 7/7/2014 | 125.00 | - | - | - | 5 | | | |
| 100108 | 1 | CLASS 6 | C | MILLIMAN | 7/1/2014 | 9/10/2014 | 313,992.75 | 313,992.75 | 313,992.75 | 313,992.75 | 4 | | | |
| 196194 | 1 | CLASS 2 | JCAP | SAAD MIRZA | 7/1/2014 | 10/31/2016 | 450.00 | - | - | - | 4 | | | |
| 185638 | 1 | CLASS 8 | JFFS | PROFESSIONAL THERAPEUTIC HEALTH CARE INC | 7/1/2014 | 9/17/2018 | 40,213.00 | 16,464.04 | 16,464.04 | 16,464.04 | 4 | | | |
| 185672 | 2 | CLASS 8 | JFFS | HEALTH SOUTH REHABILITATION HOSPITAL And JORGE M ABRIL PA | 7/1/2014 | 7/12/2018 | 15,705.81 | 3,141.16 | 3,141.16 | 3,141.16 | 4 | 5/16/2019 | P | 05/16/19 objection - dispute over Medicare allowable rate expected value: $13,843.05 |
| 193201 | 1 | CLASS 8 | JFFS | WORLD WIDE MEDICAL SERVICES | 7/1/2014 | 7/2/2018 | 1,240.00 | 992.00 | 992.00 | 992.00 | 4 | | | |

**EXHIBIT**

**780**

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200093 | 1 | CLASS 2 | JFFS | HEALTHY WOMEN OF FLORIDA | 7/1/2014 | 9/15/2016 | 1,207.00 | 410.59 | 410.59 | 410.59 | 4 | | | ORHS related claim |
| 200439 | 1 | CLASS 8 | JFFS | SCOTT HANNUM | 7/1/2014 | 8/3/2018 | 409,004.28 | 219,660.07 | 219,660.07 | 219,660.07 | 4 | | | |
| 109540 | 1 | CLASS 2 | JPBM | CVS CAREMARK CORPORATION | 7/1/2014 | 6/9/2015 | 515,967.90 | - | - | | 4 | 6/7/2019 | P | |
| 198768 | 1 | CLASS 2 | JPBM | PUBLIX SUPERMARKETS INC And STEPHANIE LIEB AT TRENAM LAW | 7/1/2014 | 6/9/2015 | 294,978.42 | - | - | | 4 | 6/10/2019 | P | |
| 198774 | 1 | CLASS 2 | JPBM | WALMART PHARMACY And CAVAZOS HENDRICKS PC | 7/1/2014 | 10/31/2016 | 600,838.92 | - | - | | 4 | | | |
| 198821 | 1 | CLASS 2 | JPBM | MEDIMPACT HEALTHCARE SYSTEMS INC | 7/1/2014 | 10/31/2016 | 1,094,173.01 | - | - | | 4 | 6/7/2019 | P | |
| 100153 | 1 | CLASS 11 | U | DARILU DEBI | 7/1/2014 | 9/26/2014 | 12,331.72 | 12,331.73 | 12,331.73 | 12,331.73 | 4 | | | |
| 100001 | 1 | CLASS 6 | C | CANON FINANCIAL SERVICES INC And SOLOVE LAW FIRM PA | 7/1/2014 | 5/29/2015 | 480,292.11 | - | - | | 3 | | | |
| 100083 | 1 | CLASS 6 | C | DYNAMIC HEALTHCARE SYSTEMS INC And FINLAYSON TOFFER ROOSEVELT & LILLY LLP | 7/1/2014 | 12/24/2014 | 2,659,195.00 | - | - | | 3 | | | |
| 100116 | 1 | CLASS 6 | C | RM AT INDIAN OFFICE LLC | 7/1/2014 | 9/26/2014 | 193,022.37 | - | - | - | 3 | | | |
| 100148 | 1 | CLASS 6 | C | BANCORP LEASING & FLEET MGMT | 7/1/2014 | 1/20/2015 | 484,301.64 | - | - | - | 3 | | | |
| 109483 | 1 | CLASS 6 | C | FDG SOUTHPARK CENTER I LLC | 7/1/2014 | 5/26/2015 | 9,034,605.08 | - | - | | 3 | | | |
| 109534 | 1 | CLASS 6 | C | E4E HEALTHCARE LLC | 7/1/2014 | 4/29/2015 | 134,522.00 | 134,522.00 | 134,522.00 | 134,522.00 | 3 | | | |
| 109554 | 1 | CLASS 6 | C | CANON SOLUTIONS AMERICA INC And SOLOVE LAW FIRM PA | 7/1/2014 | 5/29/2015 | 872,171.94 | 203,557.31 | 203,557.31 | 203,557.31 | 3 | | | |
| 181040 | 1 | CLASS 8 | JFFS | BAYSIDE AMBULATORY CENTER In Care Of ASHLEY TREHAN | 7/1/2014 | 12/13/2017 | 32,115.71 | 4,446.19 | 4,446.19 | 4,446.19 | 3 | | | |
| 181604 | 2 | CLASS 8 | JFFS | BOSTON DIAGNOSTIC IMAGING ORLANDO | 7/1/2014 | 9/25/2017 | 25,202.37 | 5,508.72 | 5,508.72 | 5,508.72 | 3 | | | |
| 182098 | 2 | CLASS 8 | JFFS | BOSTON DIAGNOSTIC IMAGING | 7/1/2014 | 9/25/2017 | 142,894.53 | 30,648.10 | 30,648.10 | 30,648.10 | 3 | | | |
| 182107 | 1 | CLASS 8 | JFFS | ATLANTIC PULMONARY CRITICAL CARE ASSOCIATES | 7/1/2014 | 4/8/2018 | 930.00 | 635.80 | 635.80 | 635.80 | 3 | | | |
| 182897 | 1 | CLASS 8 | JFFS | SURGERY CENTER AT CORAL SPRINGS In Care Of ASHLEY TREHAN | 7/1/2014 | 12/13/2017 | 29,151.16 | 2,653.26 | 2,653.26 | 2,653.26 | 3 | | | |
| 182899 | 1 | CLASS 8 | JFFS | NORTH COUNTY SURGICENTER In Care Of ASHLEY TREHAN | 7/1/2014 | 12/13/2017 | 141,118.00 | 18,106.52 | 18,106.52 | 18,106.52 | 3 | | | |
| 183367 | 2 | CLASS 8 | JFFS | OPEN MRI OF SANFORD | 7/1/2014 | 9/25/2017 | 6,556.07 | 603.28 | 603.28 | 603.28 | 3 | | | |
| 187875 | 1 | CLASS 8 | JFFS | OUTPATIENT SURGICAL SERVICES In Care Of ASHLEY TREHAN | 7/1/2014 | 12/13/2017 | 37,750.32 | 4,435.04 | 4,435.04 | 4,435.04 | 3 | | | |
| 189448 | 1 | CLASS 8 | JFFS | COUNTRYSIDE SURGERY CENTER In Care Of ASHLEY TREHAN | 7/1/2014 | 12/13/2016 | 10,584.00 | 833.16 | 833.16 | 833.16 | 3 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191137 | 1 | CLASS 8 | JFFS | AMBULATORY SURGERY CENTER In Care Of ASHLEY TREHAN | 7/1/2014 | 12/13/2017 | 4,420.00 | 137.98 | 137.98 | 137.98 | 3 | | | |
| 191168 | 1 | CLASS 8 | JFFS | KATARZYNA OSTRZENSKA | 7/1/2014 | 1/11/2018 | 2,530.00 | 1,136.19 | 1,136.19 | 1,136.19 | 3 | | | |
| 194067 | 1 | CLASS 8 | JFFS | EASTERN MAINE MED CENTER | 7/1/2014 | 1/24/2018 | 55,873.91 | 8,761.99 | 8,761.99 | 8,761.99 | 3 | | | |
| 200437 | 1 | CLASS 8 | JFFS | MIAMI DADE CARDIOLOGY CONSULTANTS LLC | 7/1/2014 | 12/27/2017 | 10,399.00 | 4,319.90 | 4,319.90 | 4,319.90 | 3 | | | |
| 200438 | 1 | CLASS 8 | JFFS | ZIAD MICHEL MARJIEH MD PA | 7/1/2014 | 2/8/2018 | 32.00 | 16.86 | 16.86 | 16.86 | 3 | | | |
| 198815 | 1 | CLASS 2 | JMSO | PHYSICIAN SERVICES LLC And IURATO LAW FIRM PL | 7/1/2014 | 10/31/2016 | 40,536.00 | - | - | - | 3 | | | |
| 109517 | 1 | CLASS 9 | SN | IDJB INVESTMENTS LLC | 7/1/2014 | 6/22/2015 | 27,452,843.00 | - | - | - | 3 | | | 4/29/20 notice of claim withdrawal filed with the court - $26,083,899 |
| 100150 | 1 | CLASS 11 | T | MARTHA AGRAMONTE | 7/1/2014 | 3/9/2015 | 3,759.12 | - | - | - | 3 | | | |
| 100162 | 1 | CLASS 11 | T | EMILIO A NOBLE | 7/1/2014 | 10/14/2014 | 23,600.00 | - | - | - | 3 | | | |
| 100164 | 1 | CLASS 11 | T | BOB TRINH | 7/1/2014 | 9/26/2014 | 13,531.64 | - | - | - | 3 | | | |
| 109517 | 2 | CLASS 11 | T | IDJB INVESTMENTS LLC | 7/1/2014 | 7/1/2015 | 4,000,000.00 | - | - | - | 3 | | | 4/29/20 notice of claim withdrawal filed with the court |
| 109522 | 1 | CLASS 11 | T | JORGE CAMBO And HOLLAND & KNIGHT LLP | 7/1/2014 | 5/18/2015 | 250,000.00 | - | - | - | 3 | 2/20/2019 | W-E/U | |
| 200436 | 1 | CLASS 3 | B | FRANCIS PATRYAS | 6/9/2014 | 7/1/2014 | 9.20 | 9.20 | 9.20 | 9.20 | 2 | | | |
| 200401 | 1 | CLASS 6 | C | 1510 BOYNTON LLC | 7/1/2014 | 7/1/2014 | 424.00 | 424.00 | 424.00 | 424.00 | 2 | | | |
| 200402 | 1 | CLASS 6 | C | AJ SEABRA SUPERMARKET XI | 7/1/2014 | 7/1/2014 | 40.00 | 40.00 | 40.00 | 40.00 | 2 | | | |
| 200403 | 1 | CLASS 6 | C | ABIGAIL ROCHE | 7/1/2014 | 7/1/2014 | 90.00 | 90.00 | 90.00 | 90.00 | 2 | | | |
| 200404 | 1 | CLASS 6 | C | CARIBBEAN GROCERIES | 7/1/2014 | 7/1/2014 | 300.00 | 300.00 | 300.00 | 300.00 | 2 | | | |
| 200405 | 1 | CLASS 6 | C | CITY OF BOYNTON BEACH | 7/1/2014 | 7/1/2014 | 400.00 | 400.00 | 400.00 | 400.00 | 2 | | | |
| 200406 | 1 | CLASS 6 | C | CITY OF HAINES CITY | 7/1/2014 | 7/1/2014 | 50.00 | 50.00 | 50.00 | 50.00 | 2 | | | |
| 200407 | 1 | CLASS 6 | C | COCONUT CREEK COMMUNITY CENTER | 7/1/2014 | 7/1/2014 | 55.00 | 55.00 | 55.00 | 55.00 | 2 | | | |
| 200408 | 1 | CLASS 6 | C | CREATIVE ALTERNATIVES INS INC | 7/1/2014 | 7/1/2014 | 144.00 | 144.00 | 144.00 | 144.00 | 2 | | | |
| 200409 | 1 | CLASS 6 | C | CRYSTAL SPRINGS | 7/1/2014 | 7/1/2014 | 245.03 | 245.03 | 245.03 | 245.03 | 2 | | | |
| 200410 | 1 | CLASS 6 | C | DR HOKE HAN | 7/1/2014 | 7/1/2014 | 250.00 | 250.00 | 250.00 | 250.00 | 2 | | | |
| 200411 | 1 | CLASS 6 | C | FLORIDA INSURANCE GROUP | 7/1/2014 | 7/1/2014 | 742.96 | 742.96 | 742.96 | 742.96 | 2 | | | |
| 200412 | 1 | CLASS 6 | C | FRIENDS OF THE COUNTY PARK | 7/1/2014 | 7/1/2014 | 500.00 | 500.00 | 500.00 | 500.00 | 2 | | | |
| 200413 | 1 | CLASS 6 | C | GREGORY MCDOWELL | 7/1/2014 | 7/1/2014 | 116.75 | 116.75 | 116.75 | 116.75 | 2 | | | |
| 200414 | 1 | CLASS 6 | C | HEALTHCARE SUPPORT STAFFING | 7/1/2014 | 7/1/2014 | 2,731.21 | 2,731.21 | 2,731.21 | 2,731.21 | 2 | | | |
| 200415 | 1 | CLASS 6 | C | HUFFS PROMOTIONS INC | 7/1/2014 | 7/1/2014 | 30.88 | 30.88 | 30.88 | 30.88 | 2 | | | |
| 200416 | 1 | CLASS 6 | C | JAMES MARTIN | 7/1/2014 | 7/1/2014 | 24.99 | 24.99 | 24.99 | 24.99 | 2 | | | |
| 200417 | 1 | CLASS 6 | C | JOSE GUNDIN | 7/1/2014 | 7/1/2014 | 33.32 | 33.32 | 33.32 | 33.32 | 2 | | | |
| 200418 | 1 | CLASS 6 | C | JULIO ECHEVERRIA | 7/1/2014 | 7/1/2014 | 30.00 | 30.00 | 30.00 | 30.00 | 2 | | | |
| 200419 | 1 | CLASS 6 | C | KB HOME ORLANDO LLC | 7/1/2014 | 7/1/2014 | 36,138.94 | 36,138.94 | 36,138.94 | 36,138.94 | 2 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200420 | 1 | CLASS 6 | C | LILLIAM SANTOS | 7/1/2014 | 7/1/2014 | 300.00 | 300.00 | 300.00 | 300.00 | 2 | | | |
| 200421 | 1 | CLASS 6 | C | MANUEL FERRER | 7/1/2014 | 7/1/2014 | 5.00 | 5.00 | 5.00 | 5.00 | 2 | | | |
| 200422 | 1 | CLASS 6 | C | MELANY PARKS | 7/1/2014 | 7/1/2014 | 20.00 | 20.00 | 20.00 | 20.00 | 2 | | | |
| 200423 | 1 | CLASS 6 | C | MELLESSA OTTE | 7/1/2014 | 7/1/2014 | 83.35 | 83.35 | 83.35 | 83.35 | 2 | | | |
| 200424 | 1 | CLASS 6 | C | NORTHWEST FOCAL POINT SENIOR | 7/1/2014 | 7/1/2014 | 100.00 | 100.00 | 100.00 | 100.00 | 2 | | | |
| 200425 | 1 | CLASS 6 | C | OCALA RECREATION & PARKS | 7/1/2014 | 7/1/2014 | 238.60 | 238.60 | 238.60 | 238.60 | 2 | | | |
| 200426 | 1 | CLASS 6 | C | PAUL WORTHMAN | 7/1/2014 | 7/1/2014 | 10.00 | 10.00 | 10.00 | 10.00 | 2 | | | |
| 200427 | 1 | CLASS 6 | C | PRESIDENTE SUPERMARKET | 7/1/2014 | 7/1/2014 | 600.00 | 600.00 | 600.00 | 600.00 | 2 | | | |
| 200428 | 1 | CLASS 6 | C | ROJELIO MORALES | 7/1/2014 | 7/1/2014 | 177.50 | 177.50 | 177.50 | 177.50 | 2 | | | |
| 200429 | 1 | CLASS 6 | C | SANDRA MORALES | 7/1/2014 | 7/1/2014 | 50.00 | 50.00 | 50.00 | 50.00 | 2 | | | |
| 200430 | 1 | CLASS 6 | C | SEDANOS | 7/1/2014 | 7/1/2014 | 3,250.00 | 3,250.00 | 3,250.00 | 3,250.00 | 2 | | | |
| 200431 | 1 | CLASS 6 | C | SENIOR SELECT CHOICE | 7/1/2014 | 7/1/2014 | 12.00 | 12.00 | 12.00 | 12.00 | 2 | | | |
| 200432 | 1 | CLASS 6 | C | SHANA REED | 7/1/2014 | 7/1/2014 | 20.00 | 20.00 | 20.00 | 20.00 | 2 | | | |
| 200433 | 1 | CLASS 6 | C | SUNSHINE HOLDINGS LLC | 7/1/2014 | 7/1/2014 | 742.00 | 742.00 | 742.00 | 742.00 | 2 | | | |
| 200434 | 1 | CLASS 6 | C | THE SALVATION ARMY | 7/1/2014 | 7/1/2014 | 50.00 | 50.00 | 50.00 | 50.00 | 2 | | | |
| 200435 | 1 | CLASS 6 | C | WORKERS COMPENSATON ADMINISTRATION | 7/1/2014 | 7/1/2014 | 100.00 | 100.00 | 100.00 | 100.00 | 2 | | | |
| 181604 | 1 | CLASS 8 | JFFS | BOSTON DIAGNOSTIC IMAGING ORLANDO | 7/1/2014 | 9/25/2017 | 2,379.08 | - | - | - | 2 | | | |
| 182098 | 1 | CLASS 8 | JFFS | BOSTON DIAGNOSTIC IMAGING | 7/1/2014 | 9/25/2017 | 11,131.48 | - | - | - | 2 | | | |
| 183367 | 1 | CLASS 8 | JFFS | OPEN MRI OF SANFORD | 7/1/2014 | 9/25/2017 | 1,731.86 | - | - | - | 2 | | | |
| 190149 | 1 | CLASS 8 | JFFS | NUVISTA CARE AT HILLSBOROUGH LAKES | 7/1/2014 | 8/12/2017 | 31,744.00 | 13,800.02 | 13,800.02 | 13,800.02 | 2 | | | |
| 195423 | 2 | CLASS 8 | JFFS | 21ST CENTURY ONCOLOGY | 7/1/2014 | 7/21/2017 | 5,505.28 | 1,765.44 | 1,765.44 | 1,765.44 | 2 | | | |
| 198612 | 1 | CLASS 8 | JFFS | DAVID CATALANO | 7/1/2014 | 8/16/2017 | 29,843.00 | 3,761.03 | 3,761.03 | 3,761.03 | 2 | | | |
| 200299 | 2 | CLASS 8 | JFFS | CLINICAL PET OF OCALA | 7/1/2014 | 8/28/2017 | 680.00 | 140.12 | 140.12 | 140.12 | 2 | | | |
| 200398 | 2 | CLASS 8 | JFFS | JOSE TORRES | 7/1/2017 | 5/17/2017 | 1,596.00 | 398.53 | 398.53 | 398.53 | 2 | | | |
| 120441 | 1 | CLASS 2 | K | ANIANO RODRIGUEZ | 7/1/2014 | 7/1/2014 | 3.10 | 3.10 | 3.10 | 3.10 | 2 | | | |
| 120967 | 1 | CLASS 2 | K | SUSANNA AINSWORTH | 7/1/2014 | 7/1/2014 | 3.70 | 3.70 | 3.70 | 3.70 | 2 | | | |
| 136381 | 1 | CLASS 2 | K | JEANETTE PHILOGENE | 7/1/2014 | 7/1/2014 | 2.80 | 2.80 | 2.80 | 2.80 | 2 | | | |
| 140194 | 1 | CLASS 2 | K | ALBERT WILSON | 7/1/2014 | 7/1/2014 | 9.90 | 9.90 | 9.90 | 9.90 | 2 | | | |
| 157491 | 1 | CLASS 2 | K | STEVEN BRYAN | 7/1/2014 | 7/1/2014 | 2.60 | 2.60 | 2.60 | 2.60 | 2 | | | |
| 178527 | 1 | CLASS 2 | K | VIRGINIA TRIPOLI | 7/1/2014 | 7/1/2014 | 2.20 | 2.20 | 2.20 | 2.20 | 2 | | | |
| 100079 | 1 | CLASS 6 | N | DLA PIPER | 7/1/2014 | 12/21/2014 | 541,497.43 | 539,156.68 | 539,156.68 | 539,156.68 | 2 | | | |
| 100015 | 1 | CLASS 4 | Q | DEPARTMENT OF THE TREASURY | 7/1/2014 | 10/10/2014 | 4,991,673.33 | 4,991,673.33 | 4,991,673.33 | 4,991,673.33 | 2 | | | |
| 100019 | 1 | CLASS 4 | Q | CENTERS FOR MEDICARE & MEDICAID And AUDREY WILLIAMS ASSISTANT REGIONAL COUNSEL | 7/1/2014 | 6/9/2015 | 5,090,694.35 | 5,090,694.35 | 5,090,694.35 | 5,090,694.35 | 2 | | | |
| 109519 | 1 | CLASS 3 | B | LARRY KEABLES | 7/1/2014 | 1/16/2015 | 90.00 | - | - | - | 1 | | | |
| 109548 | 1 | CLASS 3 | B | JOHN FORBES SR | 7/1/2014 | 8/3/2015 | 1,800.00 | - | - | - | 1 | | | |
| 111718 | 1 | CLASS 3 | B | BRENDA GENTRY | 7/1/2014 | 7/1/2014 | 12.90 | 12.90 | 12.90 | 12.90 | 1 | | | |
| 111719 | 1 | CLASS 3 | B | BERNARD RUSSELL | 7/1/2014 | 7/1/2014 | 84.00 | 84.00 | 84.00 | 84.00 | 1 | | | |
| 111720 | 1 | CLASS 3 | B | LEDY PEREZ | 7/1/2014 | 7/1/2014 | 7.80 | 7.80 | 7.80 | 7.80 | 1 | | | |
| 111721 | 1 | CLASS 3 | B | KEE THAO | 7/1/2014 | 7/1/2014 | 11.70 | 11.70 | 11.70 | 11.70 | 1 | | | |
| 111722 | 1 | CLASS 3 | B | RALPH WILLIAMS JR | 7/1/2014 | 7/1/2014 | 12.20 | 12.20 | 12.20 | 12.20 | 1 | | | |
| 111723 | 1 | CLASS 3 | B | DELORES RUSSELL | 7/1/2014 | 7/1/2014 | 12.82 | 12.82 | 12.82 | 12.82 | 1 | | | |
| 111724 | 1 | CLASS 3 | B | WILLIAM SANDERS | 7/1/2014 | 7/1/2014 | 43.80 | 43.80 | 43.80 | 43.80 | 1 | | | |
| 111725 | 1 | CLASS 3 | B | JAMES BARKER | 7/1/2014 | 7/1/2014 | 56.70 | 56.70 | 56.70 | 56.70 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111726 | 1 | CLASS 3 | B | ELAINE PORST | 7/1/2014 | 7/1/2014 | 32.50 | 32.50 | 32.50 | 32.50 | 1 | | | |
| 111727 | 1 | CLASS 3 | B | JAMES GRUBER | 7/1/2014 | 7/1/2014 | 3.00 | 3.00 | 3.00 | 3.00 | 1 | | | |
| 111728 | 1 | CLASS 3 | B | NAZIH SHAMI | 7/1/2014 | 7/1/2014 | 77.90 | 77.90 | 77.90 | 77.90 | 1 | | | |
| 111729 | 1 | CLASS 3 | B | SARAH SLOCUM | 7/1/2014 | 7/1/2014 | 11.00 | 11.00 | 11.00 | 11.00 | 1 | | | |
| 111730 | 1 | CLASS 3 | B | DIANNA EVANS | 7/1/2014 | 7/1/2014 | 6.60 | 6.60 | 6.60 | 6.60 | 1 | | | |
| 111731 | 1 | CLASS 3 | B | BETTY JOHNSON | 7/1/2014 | 7/1/2014 | 4.90 | 4.90 | 4.90 | 4.90 | 1 | | | |
| 111732 | 1 | CLASS 3 | B | NORMA TIESSOZ | 7/1/2014 | 7/1/2014 | 0.30 | 0.30 | 0.30 | 0.30 | 1 | | | |
| 111733 | 1 | CLASS 3 | B | BERDE CASIMIR | 7/1/2014 | 7/1/2014 | 58.20 | 58.20 | 58.20 | 58.20 | 1 | | | |
| 111734 | 1 | CLASS 3 | B | DAVID ATKINSON | 7/1/2014 | 7/1/2014 | 2.00 | 2.00 | 2.00 | 2.00 | 1 | | | |
| 111735 | 1 | CLASS 3 | B | VIRGILIO SANTIAGO | 7/1/2014 | 7/1/2014 | 4.40 | 4.40 | 4.40 | 4.40 | 1 | | | |
| 111736 | 1 | CLASS 3 | B | FANNY FULKERSON | 7/1/2014 | 7/1/2014 | 25.40 | 25.40 | 25.40 | 25.40 | 1 | | | |
| 111737 | 1 | CLASS 3 | B | ELLEN PERKINS | 7/1/2014 | 7/1/2014 | 10.10 | 10.10 | 10.10 | 10.10 | 1 | | | |
| 111738 | 1 | CLASS 3 | B | CANDIDA TRIPLETT | 7/1/2014 | 7/1/2014 | 6.40 | 6.40 | 6.40 | 6.40 | 1 | | | |
| 111739 | 1 | CLASS 3 | B | PERRY MARTIN | 7/1/2014 | 7/1/2014 | 11.60 | 11.60 | 11.60 | 11.60 | 1 | | | |
| 111740 | 1 | CLASS 3 | B | CRUZ BELARDO | 7/1/2014 | 7/1/2014 | 0.20 | 0.20 | 0.20 | 0.20 | 1 | | | |
| 111741 | 1 | CLASS 3 | B | ROBERT DREIFORT | 7/1/2014 | 7/1/2014 | 2.30 | 2.30 | 2.30 | 2.30 | 1 | | | |
| 111742 | 1 | CLASS 3 | B | JEANINE LEEMANS | 7/1/2014 | 7/1/2014 | 8.00 | 8.00 | 8.00 | 8.00 | 1 | | | |
| 111743 | 1 | CLASS 3 | B | LLOYD MOORE | 7/1/2014 | 7/1/2014 | 93.50 | 93.50 | 93.50 | 93.50 | 1 | | | |
| 111744 | 1 | CLASS 3 | B | PATRICK ROONEY | 7/1/2014 | 7/1/2014 | 12.50 | 12.50 | 12.50 | 12.50 | 1 | | | |
| 111745 | 1 | CLASS 3 | B | RUTH GILLIGAN | 7/1/2014 | 7/1/2014 | 4.80 | 4.80 | 4.80 | 4.80 | 1 | | | |
| 111746 | 1 | CLASS 3 | B | ROY ROGERS | 7/1/2014 | 7/1/2014 | 35.60 | 35.60 | 35.60 | 35.60 | 1 | | | |
| 111747 | 1 | CLASS 3 | B | JEANNETTE MARTIN | 7/1/2014 | 7/1/2014 | 1.60 | 1.60 | 1.60 | 1.60 | 1 | | | |
| 111748 | 1 | CLASS 3 | B | EARL CHILCOTE | 7/1/2014 | 7/1/2014 | 6.40 | 6.40 | 6.40 | 6.40 | 1 | | | |
| 111749 | 1 | CLASS 3 | B | GEOFFREY OMO | 7/1/2014 | 7/1/2014 | 8.00 | 8.00 | 8.00 | 8.00 | 1 | | | |
| 111750 | 1 | CLASS 3 | B | SONDRA MARTIN | 7/1/2014 | 7/1/2014 | 2.00 | 2.00 | 2.00 | 2.00 | 1 | | | |
| 111751 | 1 | CLASS 3 | B | ALYCE AULT | 7/1/2014 | 7/1/2014 | 56.10 | 56.10 | 56.10 | 56.10 | 1 | | | |
| 111752 | 1 | CLASS 3 | B | ROBERT ANDREWS | 7/1/2014 | 7/1/2014 | 8.20 | 8.20 | 8.20 | 8.20 | 1 | | | |
| 111753 | 1 | CLASS 3 | B | JAMES WEBB JR | 7/1/2014 | 7/1/2014 | 21.20 | 21.20 | 21.20 | 21.20 | 1 | | | |
| 111754 | 1 | CLASS 3 | B | CLAUDE SIMMONS | 7/1/2014 | 7/1/2014 | 83.50 | 83.50 | 83.50 | 83.50 | 1 | | | |
| 111755 | 1 | CLASS 3 | B | PHILIP CLARK | 7/1/2014 | 7/1/2014 | 7.80 | 7.80 | 7.80 | 7.80 | 1 | | | |
| 111756 | 1 | CLASS 3 | B | EDUARDO VERDESOTO | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111757 | 1 | CLASS 3 | B | FATEMEH LAMEEI | 7/1/2014 | 7/1/2014 | 5.70 | 5.70 | 5.70 | 5.70 | 1 | | | |
| 111758 | 1 | CLASS 3 | B | FELICITA BREGLIA | 7/1/2014 | 7/1/2014 | 3.20 | 3.20 | 3.20 | 3.20 | 1 | | | |
| 111759 | 1 | CLASS 3 | B | JEFFREY HEIDER | 7/1/2014 | 7/1/2014 | 129.60 | 129.60 | 129.60 | 129.60 | 1 | | | |
| 111760 | 1 | CLASS 3 | B | ANNA CARBIA | 7/1/2014 | 7/1/2014 | 37.20 | 37.20 | 37.20 | 37.20 | 1 | | | |
| 111761 | 1 | CLASS 3 | B | EVA MORAN | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111762 | 1 | CLASS 3 | B | GEORGE SPAETH | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111763 | 1 | CLASS 3 | B | MYRA LAMONT | 7/1/2014 | 7/1/2014 | 2.60 | 2.60 | 2.60 | 2.60 | 1 | | | |
| 111764 | 1 | CLASS 3 | B | CAROLYN VELBIS | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111765 | 1 | CLASS 3 | B | NARANJO PATINO | 7/1/2014 | 7/1/2014 | 7.80 | 7.80 | 7.80 | 7.80 | 1 | | | |
| 111766 | 1 | CLASS 3 | B | WILLIAM DENNIS | 7/1/2014 | 7/1/2014 | 42.60 | 42.60 | 42.60 | 42.60 | 1 | | | |
| 111767 | 1 | CLASS 3 | B | ROBERT MCFARLING | 7/1/2014 | 7/1/2014 | 19.20 | 19.20 | 19.20 | 19.20 | 1 | | | |
| 111768 | 1 | CLASS 3 | B | IGNACE BONIT | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111769 | 1 | CLASS 3 | B | JOHN CONLEY | 7/1/2014 | 7/1/2014 | 84.50 | 84.50 | 84.50 | 84.50 | 1 | | | |
| 111770 | 1 | CLASS 3 | B | MONICA RODRIGUEZ | 7/1/2014 | 7/1/2014 | 29.00 | 29.00 | 29.00 | 29.00 | 1 | | | |
| 111771 | 1 | CLASS 3 | B | SANDRA HERNDON | 7/1/2014 | 7/1/2014 | 0.10 | 0.10 | 0.10 | 0.10 | 1 | | | |
| 111772 | 1 | CLASS 3 | B | RALPH FREDERICKSEN | 7/1/2014 | 7/1/2014 | 31.20 | 31.20 | 31.20 | 31.20 | 1 | | | |
| 111773 | 1 | CLASS 3 | B | ALAN RODRIGUEZ | 7/1/2014 | 7/1/2014 | 27.50 | 27.50 | 27.50 | 27.50 | 1 | | | |
| 111774 | 1 | CLASS 3 | B | LUC GERMAIN | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111775 | 1 | CLASS 3 | B | HELEN BALMES | 7/1/2014 | 7/1/2014 | 11.40 | 11.40 | 11.40 | 11.40 | 1 | | | |
| 111776 | 1 | CLASS 3 | B | SARA SLADEN | 7/1/2014 | 7/1/2014 | 11.40 | 11.40 | 11.40 | 11.40 | 1 | | | |
| 111777 | 1 | CLASS 3 | B | LINDA MOORE | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111778 | 1 | CLASS 3 | B | BELMA ROMERO | 7/1/2014 | 7/1/2014 | 32.00 | 32.00 | 32.00 | 32.00 | 1 | | | |
| 111779 | 1 | CLASS 3 | B | VICTOR SCAMMON | 7/1/2014 | 7/1/2014 | 12.40 | 12.40 | 12.40 | 12.40 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111780 | 1 | CLASS 3 | B | OLIVE WHITE | 7/1/2014 | 7/1/2014 | 7.80 | 7.80 | 7.80 | 7.80 | 1 | | | |
| 111781 | 1 | CLASS 3 | B | PHILIP WHITE | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111782 | 1 | CLASS 3 | B | MARC FISHER | 7/1/2014 | 7/1/2014 | 13.00 | 13.00 | 13.00 | 13.00 | 1 | | | |
| 111783 | 1 | CLASS 3 | B | STEPHEN HASTINGS | 7/1/2014 | 7/1/2014 | 177.00 | 177.00 | 177.00 | 177.00 | 1 | | | |
| 111784 | 1 | CLASS 3 | B | ROBERTA DACEY | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111785 | 1 | CLASS 3 | B | RONALD VORHEES | 7/1/2014 | 7/1/2014 | 16.00 | 16.00 | 16.00 | 16.00 | 1 | | | |
| 111786 | 1 | CLASS 3 | B | RUTH CARACCIOLA | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111787 | 1 | CLASS 3 | B | JAMES BRADY | 7/1/2014 | 7/1/2014 | 33.00 | 33.00 | 33.00 | 33.00 | 1 | | | |
| 111788 | 1 | CLASS 3 | B | IRENA HALE | 7/1/2014 | 7/1/2014 | 33.00 | 33.00 | 33.00 | 33.00 | 1 | | | |
| 111789 | 1 | CLASS 3 | B | IVAN RENTA | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111790 | 1 | CLASS 3 | B | NETTIE LEMON | 7/1/2014 | 7/1/2014 | 7.40 | 7.40 | 7.40 | 7.40 | 1 | | | |
| 111791 | 1 | CLASS 3 | B | RONNIE GRIFFIS SR | 7/1/2014 | 7/1/2014 | 6.50 | 6.50 | 6.50 | 6.50 | 1 | | | |
| 111792 | 1 | CLASS 3 | B | BERNICE CRESSWELL | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111793 | 1 | CLASS 3 | B | THELMA POWELL | 7/1/2014 | 7/1/2014 | 10.10 | 10.10 | 10.10 | 10.10 | 1 | | | |
| 111794 | 1 | CLASS 3 | B | DIANE WARNER | 7/1/2014 | 7/1/2014 | 37.20 | 37.20 | 37.20 | 37.20 | 1 | | | |
| 111795 | 1 | CLASS 3 | B | MONICA CLASP | 7/1/2014 | 7/1/2014 | 6.40 | 6.40 | 6.40 | 6.40 | 1 | | | |
| 111796 | 1 | CLASS 3 | B | JOHN BEATTY | 7/1/2014 | 7/1/2014 | 11.50 | 11.50 | 11.50 | 11.50 | 1 | | | |
| 111797 | 1 | CLASS 3 | B | DIANA RODRIGUEZ | 7/1/2014 | 7/1/2014 | 29.40 | 29.40 | 29.40 | 29.40 | 1 | | | |
| 111798 | 1 | CLASS 3 | B | FELICITA SANTIAGO | 7/1/2014 | 7/1/2014 | 19.20 | 19.20 | 19.20 | 19.20 | 1 | | | |
| 111799 | 1 | CLASS 3 | B | SHIRLEY DAVIS | 7/1/2014 | 7/1/2014 | 70.20 | 70.20 | 70.20 | 70.20 | 1 | | | |
| 111800 | 1 | CLASS 3 | B | DIANE B DAWSON | 7/1/2014 | 7/1/2014 | 21.60 | 21.60 | 21.60 | 21.60 | 1 | | | |
| 111801 | 1 | CLASS 3 | B | LORETA MCARDLE | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111802 | 1 | CLASS 3 | B | CARL SHEERIN | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111803 | 1 | CLASS 3 | B | BHAGVANJIB PATEL | 7/1/2014 | 7/1/2014 | 21.60 | 21.60 | 21.60 | 21.60 | 1 | | | |
| 111804 | 1 | CLASS 3 | B | SAUNDRA FAULKNER | 7/1/2014 | 7/1/2014 | 17.40 | 17.40 | 17.40 | 17.40 | 1 | | | |
| 111805 | 1 | CLASS 3 | B | ROGER SCOTT | 7/1/2014 | 7/1/2014 | 5.00 | 5.00 | 5.00 | 5.00 | 1 | | | |
| 111806 | 1 | CLASS 3 | B | FRED MASTERSON | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111807 | 1 | CLASS 3 | B | SANDRA BAILLIE | 7/1/2014 | 7/1/2014 | 39.00 | 39.00 | 39.00 | 39.00 | 1 | | | |
| 111808 | 1 | CLASS 3 | B | SUE ELLEN CANTWELL | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111809 | 1 | CLASS 3 | B | JOSE MEJIAS | 7/1/2014 | 7/1/2014 | 0.40 | 0.40 | 0.40 | 0.40 | 1 | | | |
| 111810 | 1 | CLASS 3 | B | DAVID COBURN | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111811 | 1 | CLASS 3 | B | LINDA KEITH | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111812 | 1 | CLASS 3 | B | CRUCITA CARRASQUILLO | 7/1/2014 | 7/1/2014 | 87.38 | 87.38 | 87.38 | 87.38 | 1 | | | |
| 111813 | 1 | CLASS 3 | B | JAMES BORGAL | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111814 | 1 | CLASS 3 | B | KENNETH MATTHEW | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111815 | 1 | CLASS 3 | B | VIRGINIA MASON | 7/1/2014 | 7/1/2014 | 117.00 | 117.00 | 117.00 | 117.00 | 1 | | | |
| 111816 | 1 | CLASS 3 | B | ROBERT KULP | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111817 | 1 | CLASS 3 | B | LESTER ROCKWELL | 7/1/2014 | 7/1/2014 | 37.20 | 37.20 | 37.20 | 37.20 | 1 | | | |
| 111818 | 1 | CLASS 3 | B | MARIO BRANA | 7/1/2014 | 7/1/2014 | 17.40 | 17.40 | 17.40 | 17.40 | 1 | | | |
| 111819 | 1 | CLASS 3 | B | ROBERT EARLE | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111820 | 1 | CLASS 3 | B | ELIZABETH READ | 7/1/2014 | 7/1/2014 | 26.10 | 26.10 | 26.10 | 26.10 | 1 | | | |
| 111821 | 1 | CLASS 3 | B | JUANA LOZANO | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111822 | 1 | CLASS 3 | B | JOHN HALECKI | 7/1/2014 | 7/1/2014 | 25.20 | 25.20 | 25.20 | 25.20 | 1 | | | |
| 111823 | 1 | CLASS 3 | B | DONNA CARROLL | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111824 | 1 | CLASS 3 | B | HELEN PETERS | 7/1/2014 | 7/1/2014 | 37.20 | 37.20 | 37.20 | 37.20 | 1 | | | |
| 111825 | 1 | CLASS 3 | B | EMMA FUQUA | 7/1/2014 | 7/1/2014 | 18.00 | 18.00 | 18.00 | 18.00 | 1 | | | |
| 111826 | 1 | CLASS 3 | B | TIRLOCHAN CHEHAL | 7/1/2014 | 7/1/2014 | 39.00 | 39.00 | 39.00 | 39.00 | 1 | | | |
| 111827 | 1 | CLASS 3 | B | ROSANNA SNIDER | 7/1/2014 | 7/1/2014 | 4.20 | 4.20 | 4.20 | 4.20 | 1 | | | |
| 111828 | 1 | CLASS 3 | B | VIRGINIA TIMPANELLI | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111829 | 1 | CLASS 3 | B | GLADYS RUIZ | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111830 | 1 | CLASS 3 | B | JENSEY HUBBARD | 7/1/2014 | 7/1/2014 | 2.60 | 2.60 | 2.60 | 2.60 | 1 | | | |
| 111831 | 1 | CLASS 3 | B | REBECCA TUBALADO | 7/1/2014 | 7/1/2014 | 8.00 | 8.00 | 8.00 | 8.00 | 1 | | | |
| 111832 | 1 | CLASS 3 | B | NOEL PETERSON | 7/1/2014 | 7/1/2014 | 11.40 | 11.40 | 11.40 | 11.40 | 1 | | | |
| 111833 | 1 | CLASS 3 | B | THEODORE LITTLE | 7/1/2014 | 7/1/2014 | 37.50 | 37.50 | 37.50 | 37.50 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111834 | 1 | CLASS 3 | B | MARLYSE MERCADO | 7/1/2014 | 7/1/2014 | 34.80 | 34.80 | 34.80 | 34.80 | 1 | | | |
| 111835 | 1 | CLASS 3 | B | GLORIA MOORE | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111836 | 1 | CLASS 3 | B | BARBARA HOLLIDAY | 7/1/2014 | 7/1/2014 | 28.80 | 28.80 | 28.80 | 28.80 | 1 | | | |
| 111837 | 1 | CLASS 3 | B | JOSEPH HAWKINS | 7/1/2014 | 7/1/2014 | 21.60 | 21.60 | 21.60 | 21.60 | 1 | | | |
| 111838 | 1 | CLASS 3 | B | MARIA ARIAS | 7/1/2014 | 7/1/2014 | 56.50 | 56.50 | 56.50 | 56.50 | 1 | | | |
| 111839 | 1 | CLASS 3 | B | CHRISTIANE FENNINGER | 7/1/2014 | 7/1/2014 | 136.20 | 136.20 | 136.20 | 136.20 | 1 | | | |
| 111840 | 1 | CLASS 3 | B | STUART PALL | 7/1/2014 | 7/1/2014 | 9.50 | 9.50 | 9.50 | 9.50 | 1 | | | |
| 111841 | 1 | CLASS 3 | B | VALERYE GARRATT | 7/1/2014 | 7/1/2014 | 29.50 | 29.50 | 29.50 | 29.50 | 1 | | | |
| 111842 | 1 | CLASS 3 | B | LINDA SEEFELDT | 7/1/2014 | 7/1/2014 | 22.40 | 22.40 | 22.40 | 22.40 | 1 | | | |
| 111843 | 1 | CLASS 3 | B | MICHAEL GILLISPIE | 7/1/2014 | 7/1/2014 | 25.20 | 25.20 | 25.20 | 25.20 | 1 | | | |
| 111844 | 1 | CLASS 3 | B | IRWIN KATZ | 7/1/2014 | 7/1/2014 | 99.00 | 99.00 | 99.00 | 99.00 | 1 | | | |
| 111845 | 1 | CLASS 3 | B | RAFAEL CEPEDA | 7/1/2014 | 7/1/2014 | 34.80 | 34.80 | 34.80 | 34.80 | 1 | | | |
| 111846 | 1 | CLASS 3 | B | DOROTHY DIEHL | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111847 | 1 | CLASS 3 | B | FRIEDA KATZ | 7/1/2014 | 7/1/2014 | 27.00 | 27.00 | 27.00 | 27.00 | 1 | | | |
| 111848 | 1 | CLASS 3 | B | DOUGLAS KUCKLICK | 7/1/2014 | 7/1/2014 | 5.20 | 5.20 | 5.20 | 5.20 | 1 | | | |
| 111849 | 1 | CLASS 3 | B | KENNETH LOMBARD0 | 7/1/2014 | 7/1/2014 | 33.00 | 33.00 | 33.00 | 33.00 | 1 | | | |
| 111850 | 1 | CLASS 3 | B | DIXIE PEEK | 7/1/2014 | 7/1/2014 | 42.60 | 42.60 | 42.60 | 42.60 | 1 | | | |
| 111851 | 1 | CLASS 3 | B | SUE STRYKUL | 7/1/2014 | 7/1/2014 | 46.80 | 46.80 | 46.80 | 46.80 | 1 | | | |
| 111852 | 1 | CLASS 3 | B | JOHN BLODGETT | 7/1/2014 | 7/1/2014 | 15.80 | 15.80 | 15.80 | 15.80 | 1 | | | |
| 111853 | 1 | CLASS 3 | B | CLAUDE OUELLETTE | 7/1/2014 | 7/1/2014 | 108.50 | 108.50 | 108.50 | 108.50 | 1 | | | |
| 111854 | 1 | CLASS 3 | B | JEAN PERRIN | 7/1/2014 | 7/1/2014 | 36.40 | 36.40 | 36.40 | 36.40 | 1 | | | |
| 111855 | 1 | CLASS 3 | B | SUSAN CUMBERLAND | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111856 | 1 | CLASS 3 | B | SANEH CLOUSE | 7/1/2014 | 7/1/2014 | 1.00 | 1.00 | 1.00 | 1.00 | 1 | | | |
| 111857 | 1 | CLASS 3 | B | MARGARET ROBERTS | 7/1/2014 | 7/1/2014 | 21.00 | 21.00 | 21.00 | 21.00 | 1 | | | |
| 111858 | 1 | CLASS 3 | B | PATRICIA KLINE | 7/1/2014 | 7/1/2014 | 18.00 | 18.00 | 18.00 | 18.00 | 1 | | | |
| 111859 | 1 | CLASS 3 | B | LINDA SAGE | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111860 | 1 | CLASS 3 | B | CHRISTINE MILLER | 7/1/2014 | 7/1/2014 | 2.60 | 2.60 | 2.60 | 2.60 | 1 | | | |
| 111861 | 1 | CLASS 3 | B | JOSEPH FRY | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111862 | 1 | CLASS 3 | B | SAM INDANO | 7/1/2014 | 7/1/2014 | 57.60 | 57.60 | 57.60 | 57.60 | 1 | | | |
| 111863 | 1 | CLASS 3 | B | ROBERTA CHRZANOWSKI | 7/1/2014 | 7/1/2014 | 6.40 | 6.40 | 6.40 | 6.40 | 1 | | | |
| 111864 | 1 | CLASS 3 | B | ARTHUR AZENZER | 7/1/2014 | 7/1/2014 | 13.80 | 13.80 | 13.80 | 13.80 | 1 | | | |
| 111865 | 1 | CLASS 3 | B | CORA HULLENDER | 7/1/2014 | 7/1/2014 | 31.20 | 31.20 | 31.20 | 31.20 | 1 | | | |
| 111866 | 1 | CLASS 3 | B | WILLIAM MORAN | 7/1/2014 | 7/1/2014 | 19.20 | 19.20 | 19.20 | 19.20 | 1 | | | |
| 111867 | 1 | CLASS 3 | B | BARBARA VALENTA | 7/1/2014 | 7/1/2014 | 12.80 | 12.80 | 12.80 | 12.80 | 1 | | | |
| 111868 | 1 | CLASS 3 | B | GRACE HICKMAN | 7/1/2014 | 7/1/2014 | 78.00 | 78.00 | 78.00 | 78.00 | 1 | | | |
| 111869 | 1 | CLASS 3 | B | LYNDA SMITH | 7/1/2014 | 7/1/2014 | 5.70 | 5.70 | 5.70 | 5.70 | 1 | | | |
| 111870 | 1 | CLASS 3 | B | PRUDENZA CRIVELLI | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111871 | 1 | CLASS 3 | B | LAWRENCE CRIVELLI | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111872 | 1 | CLASS 3 | B | JULIETA GARITA | 7/1/2014 | 7/1/2014 | 66.80 | 66.80 | 66.80 | 66.80 | 1 | | | |
| 111873 | 1 | CLASS 3 | B | FREDERICK VANLEUVEN | 7/1/2014 | 7/1/2014 | 9.50 | 9.50 | 9.50 | 9.50 | 1 | | | |
| 111874 | 1 | CLASS 3 | B | LINDA RARICK | 7/1/2014 | 7/1/2014 | 7.80 | 7.80 | 7.80 | 7.80 | 1 | | | |
| 111875 | 1 | CLASS 3 | B | JACK KONDOR | 7/1/2014 | 7/1/2014 | 11.50 | 11.50 | 11.50 | 11.50 | 1 | | | |
| 111876 | 1 | CLASS 3 | B | ANA SANCHEZ TORRES | 7/1/2014 | 7/1/2014 | 27.00 | 27.00 | 27.00 | 27.00 | 1 | | | |
| 111877 | 1 | CLASS 3 | B | THOMAS WILLIAMS | 7/1/2014 | 7/1/2014 | 21.60 | 21.60 | 21.60 | 21.60 | 1 | | | |
| 111878 | 1 | CLASS 3 | B | JUDY DASHNER | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111879 | 1 | CLASS 3 | B | HAGEO ROJAS | 7/1/2014 | 7/1/2014 | 21.60 | 21.60 | 21.60 | 21.60 | 1 | | | |
| 111880 | 1 | CLASS 3 | B | MARCIA JOHNSON | 7/1/2014 | 7/1/2014 | 44.80 | 44.80 | 44.80 | 44.80 | 1 | | | |
| 111881 | 1 | CLASS 3 | B | JEANNI WILSON | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111882 | 1 | CLASS 3 | B | WILLIAM RADOVICH | 7/1/2014 | 7/1/2014 | 130.20 | 130.20 | 130.20 | 130.20 | 1 | | | |
| 111883 | 1 | CLASS 3 | B | EMMA RADOVICH | 7/1/2014 | 7/1/2014 | 130.20 | 130.20 | 130.20 | 130.20 | 1 | | | |
| 111884 | 1 | CLASS 3 | B | DANIEL POWERS | 7/1/2014 | 7/1/2014 | 6.00 | 6.00 | 6.00 | 6.00 | 1 | | | |
| 111885 | 1 | CLASS 3 | B | ALPHONSO CASTILLO | 7/1/2014 | 7/1/2014 | 7.80 | 7.80 | 7.80 | 7.80 | 1 | | | |
| 111886 | 1 | CLASS 3 | B | ROGER BLACK | 7/1/2014 | 7/1/2014 | 15.60 | 15.60 | 15.60 | 15.60 | 1 | | | |
| 111887 | 1 | CLASS 3 | B | SOON BLAKE | 7/1/2014 | 7/1/2014 | 35.20 | 35.20 | 35.20 | 35.20 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111888 | 1 | CLASS 3 | B | PATRICIA QUILLING | 7/1/2014 | 7/1/2014 | 41.40 | 41.40 | 41.40 | 41.40 | 1 | | | |
| 111889 | 1 | CLASS 3 | B | BEATRIZ MORENO | 7/1/2014 | 7/1/2014 | 46.80 | 46.80 | 46.80 | 46.80 | 1 | | | |
| 111890 | 1 | CLASS 3 | B | ROSEMARIE SOONG | 7/1/2014 | 7/1/2014 | 60.40 | 60.40 | 60.40 | 60.40 | 1 | | | |
| 111891 | 1 | CLASS 3 | B | ELIZABETH LOUGHLIN | 7/1/2014 | 7/1/2014 | 23.40 | 23.40 | 23.40 | 23.40 | 1 | | | |
| 111892 | 1 | CLASS 3 | B | JOSEPHINE SONSINI | 7/1/2014 | 7/1/2014 | 2.60 | 2.60 | 2.60 | 2.60 | 1 | | | |
| 111893 | 1 | CLASS 3 | B | TIMOTHY VOSLER | 7/1/2014 | 7/1/2014 | 42.80 | 42.80 | 42.80 | 42.80 | 1 | | | |
| 111894 | 1 | CLASS 3 | B | NANCY GASTON | 7/1/2014 | 7/1/2014 | 9.60 | 9.60 | 9.60 | 9.60 | 1 | | | |
| 111895 | 1 | CLASS 3 | B | WILLIE BREWER JR | 7/1/2014 | 7/1/2014 | 5.20 | 5.20 | 5.20 | 5.20 | 1 | | | |
| 111896 | 1 | CLASS 3 | B | JOSEPH ESQUINALDO | 7/1/2014 | 7/1/2014 | 21.60 | 21.60 | 21.60 | 21.60 | 1 | | | |
| 111897 | 1 | CLASS 3 | B | STEPHEN DECUBELLIS | 7/1/2014 | 7/1/2014 | 12.60 | 12.60 | 12.60 | 12.60 | 1 | | | |
| 111898 | 1 | CLASS 3 | B | JACK MANGUM | 7/1/2014 | 7/1/2014 | 11.60 | 11.60 | 11.60 | 11.60 | 1 | | | |
| 100055 | 1 | CLASS 6 | C | AKERMAN LLP | 7/1/2014 | 5/15/2015 | 11,389.00 | - | - | - | 1 | | | |
| 100058 | 1 | CLASS 6 | C | ASSURED LANGUAGE SOLUTIONS | 7/1/2014 | 1/26/2015 | 416.34 | 416.34 | 416.34 | 416.34 | 1 | | | |
| 100062 | 1 | CLASS 6 | C | BLACKBELT PARTNERS | 7/1/2014 | 6/8/2015 | 66,881.75 | 45,961.75 | 45,961.75 | 45,961.75 | 1 | | | |
| 100067 | 1 | CLASS 6 | C | PABLO CARRAU | 7/1/2014 | 8/22/2014 | 1,950.00 | 1,950.00 | 1,950.00 | 1,950.00 | 1 | | | |
| 100072 | 1 | CLASS 6 | C | CITY OF WINTER HAVEN UTILITIES | 7/1/2014 | 12/18/2014 | 668.54 | 323.70 | 323.70 | 323.70 | 1 | | | |
| 100075 | 1 | CLASS 6 | C | CROWN SHREDDING | 7/1/2014 | 9/2/2014 | 575.00 | 575.00 | 575.00 | 575.00 | 1 | | | |
| 100082 | 1 | CLASS 6 | C | DTS GROUP | 7/1/2014 | 8/21/2014 | 18,550.00 | 18,550.00 | 18,550.00 | 18,550.00 | 1 | | | |
| 100086 | 1 | CLASS 6 | C | ECHO | 7/1/2014 | 3/30/2015 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 1 | | | |
| 100090 | 1 | CLASS 6 | C | FIELDTEX PRODUCTIONS | 7/1/2014 | 1/21/2015 | 72,582.55 | 72,582.55 | 72,582.55 | 72,582.55 | 1 | | | |
| 100094 | 1 | CLASS 6 | C | HULETT ENVIRONMENTAL | 7/1/2014 | 8/20/2014 | 106.00 | 106.00 | 106.00 | 106.00 | 1 | | | |
| 100098 | 1 | CLASS 6 | C | INTERNATIONAL PRESS | 7/1/2014 | 8/19/2014 | 2,062.63 | 2,062.63 | 2,062.63 | 2,062.63 | 1 | | | |
| 100100 | 1 | CLASS 6 | C | LEXISNEXIS | 7/1/2014 | 5/13/2015 | 3,500.00 | 700.00 | 700.00 | 700.00 | 1 | | | |
| 100107 | 1 | CLASS 6 | C | MERRILL COMMUNICATIONS LLC | 7/1/2014 | 9/29/2014 | 19,089.30 | - | - | - | 1 | | | |
| 100119 | 1 | CLASS 6 | C | VOLT DELTA RESOURCES LLC | 7/1/2014 | 9/11/2014 | 34,455.85 | 34,455.85 | 34,455.85 | 34,455.85 | 1 | | | |
| 100130 | 1 | CLASS 6 | C | SOFTCHOICE | 7/1/2014 | 10/9/2014 | 1,748.80 | 1,748.80 | 1,748.80 | 1,748.80 | 1 | | | |
| 100133 | 1 | CLASS 6 | C | STRATAGEN SYSTEMS INC And SHEENA MITCHELL GENERAL COUNSEL | 7/1/2014 | 6/9/2015 | 59,771.30 | 48,970.30 | 48,970.30 | 48,970.30 | 1 | | | |
| 100136 | 1 | CLASS 6 | C | TINT BY MASTERS INC | 7/1/2014 | 5/29/2015 | 3,576.92 | - | - | - | 1 | | | |
| 100140 | 1 | CLASS 6 | C | ULTIMATE BUSINESS SERVICES | 7/1/2014 | 9/19/2014 | 4,470.27 | 4,207.95 | 4,207.95 | 4,207.95 | 1 | | | |
| 100142 | 1 | CLASS 6 | C | WAKELY CONSULTING GROUP | 7/1/2014 | 8/21/2014 | 2,100.00 | - | - | - | 1 | | | |
| 100146 | 1 | CLASS 6 | C | MORSE COMMUNICATIONS INC | 7/1/2014 | 10/22/2014 | 302.76 | 302.76 | 302.76 | 302.76 | 1 | | | |
| 100147 | 1 | CLASS 6 | C | CAPITAL OFFICE PRODUCTS | 7/1/2014 | 8/29/2014 | 3,400.89 | 3,356.15 | 3,356.15 | 3,356.15 | 1 | | | |
| 100149 | 1 | CLASS 6 | C | ATLANTIC PERSONNEL & TENANT SCREENING | 7/1/2014 | 8/14/2014 | 1,851.80 | 1,851.80 | 1,851.80 | 1,851.80 | 1 | | | |
| 100179 | 1 | CLASS 6 | C | UNIFIED DISPATCH LLC | 7/1/2014 | 6/8/2014 | 20,650.00 | 20,650.00 | 20,650.00 | 20,650.00 | 1 | | | |
| 100187 | 1 | CLASS 6 | C | AETNA INC | 7/1/2014 | 9/26/2014 | 612.72 | 612.72 | 612.72 | 612.72 | 1 | | | |
| 100190 | 1 | CLASS 6 | C | BENETRAC | 7/1/2014 | 1/5/2015 | 1,121.25 | - | - | - | 1 | | | |
| 109518 | 1 | CLASS 6 | C | CIS ON BEHALF OF LUNDBECK, LLC | 7/1/2014 | 3/4/2015 | 2,394.87 | - | - | - | 1 | | | |
| 109523 | 1 | CLASS 6 | C | CYNTHIA TORRES | 7/1/2014 | 6/4/2015 | 1,443.75 | - | - | - | 1 | | | |
| 109525 | 1 | CLASS 6 | C | COMDATA INC | 7/1/2014 | 4/23/2015 | 28,096.53 | 28,096.53 | 28,096.53 | 28,096.53 | 1 | | | |
| 109528 | 1 | CLASS 6 | C | AMTRUST NORTH AMERICA And BUCKLEY KING | 7/1/2014 | 3/30/2015 | 7,279.00 | 7,279.00 | 7,279.00 | 7,279.00 | 1 | | | |
| 109529 | 1 | CLASS 6 | C | INFOPIA AMERICA LLC | 7/1/2014 | 4/8/2015 | 88,364.40 | - | - | - | 1 | | | |
| 109532 | 1 | CLASS 6 | C | ACTAVIS INC | 7/1/2014 | 3/27/2015 | 66.53 | 66.53 | 66.53 | 66.53 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 198981 | 1 | CLASS 6 | C | PAYCHEX INC | 7/1/2014 | 1/5/2014 | 280.00 | | - | - | 1 | | | |
| 324 | 1 | CLASS 6 | D | CRAIG SAFFIOTI | 7/1/2014 | 12/21/2014 | 4,200.00 | - | - | - | 1 | | | |
| 335 | 1 | CLASS 6 | D | ROY SHELLHAMMER | 7/1/2014 | 4/24/2015 | 987.48 | - | - | - | 1 | | | |
| 338 | 1 | CLASS 6 | D | JOAN SISTO | 7/1/2014 | 6/9/2015 | 7,642.00 | - | - | - | 1 | | | |
| 405 | 1 | CLASS 6 | D | PHYLLIS ANDREW | 7/1/2014 | 4/30/2015 | 34,086.00 | - | - | - | 1 | | | |
| 622 | 1 | CLASS 6 | D | HARRIET NOEL | 7/1/2014 | 4/5/2015 | 14,256.12 | - | - | - | 1 | | | |
| 1014 | 1 | CLASS 6 | D | GRACE RODRIGUEZ | 7/1/2014 | 5/12/2015 | 549.25 | - | - | - | 1 | | | |
| 1042 | 1 | CLASS 6 | D | SANDRA LEE | 7/1/2014 | 1/23/2015 | 1.00 | - | - | - | 1 | | | |
| 1113 | 1 | CLASS 6 | D | WILLIAM RIEGER | 7/1/2014 | 4/6/2015 | 318.00 | - | - | - | 1 | | | |
| 1162 | 1 | CLASS 6 | D | EMERITO BENITEZ JR | 7/1/2014 | 2/20/2015 | 2,233.14 | - | - | - | 1 | | | |
| 1211 | 1 | CLASS 6 | D | PAUL GUNN | 7/1/2014 | 12/24/2014 | 1.00 | - | - | - | 1 | | | |
| 1422 | 1 | CLASS 6 | D | REGAL FINANCIAL OF LAKELAND INC | 7/1/2014 | 12/29/2014 | 1.00 | - | - | - | 1 | | | |
| 109539 | 1 | CLASS 6 | D | NATIONAL FINANCIAL HEALTH GROUP LLC | 7/1/2014 | 6/8/2015 | 28,000.00 | 4,872.90 | 4,872.90 | 4,872.90 | 1 | | | |
| 109187 | 1 | CLASS 5 | F | ESTER AGRAMONTE | 7/1/2014 | 3/18/2015 | 610.80 | 405.28 | 405.28 | 405.28 | 1 | | | |
| 109188 | 1 | CLASS 5 | F | MARTHA AGRAMONTE | 7/1/2014 | 3/9/2015 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109188 | 2 | CLASS 6 | F | MARTHA AGRAMONTE | 7/1/2014 | 3/9/2015 | 1,759.12 | 193.57 | 193.57 | 193.57 | 1 | | | |
| 109192 | 1 | CLASS 5 | F | MARCELO ALVES | 7/1/2014 | 10/17/2014 | 1,151.00 | 1,151.18 | 1,151.18 | 1,151.18 | 1 | | | |
| 109196 | 1 | CLASS 5 | F | TIFFANY ARROYO | 7/1/2014 | 11/3/2014 | 1.00 | 1,072.86 | 1,072.86 | 1,072.86 | 1 | | | |
| 109205 | 1 | CLASS 5 | F | JOSEPH BIGHAM | 7/1/2014 | 10/23/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109205 | 2 | CLASS 6 | F | JOSEPH BIGHAM | 7/1/2014 | 10/23/2014 | 1,554.97 | 1,035.97 | 1,035.97 | 1,035.97 | 1 | | | |
| 109207 | 1 | CLASS 5 | F | THERESA BISSONNETTE | 7/1/2014 | 12/8/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109207 | 2 | CLASS 6 | F | THERESA BISSONNETTE | 7/1/2014 | 12/8/2014 | 1,414.13 | 1,213.08 | 1,213.08 | 1,213.08 | 1 | | | |
| 109219 | 1 | CLASS 5 | F | BRENDALYS CARDONA | 7/1/2014 | 2/2/2015 | 925.00 | 1,102.92 | 1,102.92 | 1,102.92 | 1 | | | |
| 109226 | 1 | CLASS 5 | F | FRANCISCO CIRILO | 7/1/2014 | 10/22/2014 | 2,000.00 | 1,226.36 | 1,226.36 | 1,226.36 | 1 | | | |
| 109226 | 2 | CLASS 6 | F | FRANCISCO CIRILO | 7/1/2014 | 10/22/2014 | 1,823.06 | - | - | - | 1 | | | |
| 109227 | 1 | CLASS 5 | F | ANGELA COLLADO | 7/1/2014 | 1/30/2015 | 817.89 | 816.11 | 816.11 | 816.11 | 1 | | | |
| 109231 | 1 | CLASS 5 | F | MARGARETH COMENALE | 7/1/2014 | 10/20/2014 | 660.00 | 663.00 | 663.00 | 663.00 | 1 | | | |
| 109236 | 1 | CLASS 5 | F | KIMBERLY CRESPO | 7/1/2014 | 3/17/2015 | 1,148.48 | 981.05 | 981.05 | 981.05 | 1 | | | |
| 109237 | 1 | CLASS 5 | F | SHARON CRIBBS | 7/1/2014 | 2/26/2015 | 1,384.00 | 1,005.58 | 1,005.58 | 1,005.58 | 1 | | | |
| 109240 | 1 | CLASS 5 | F | LILLIE CURTHS | 7/1/2014 | 10/14/2014 | 911.71 | 840.10 | 840.10 | 840.10 | 1 | | | |
| 109248 | 1 | CLASS 5 | F | SUZANNE DEMARCO | 7/1/2014 | 10/24/2014 | 799.69 | 799.69 | 799.69 | 799.69 | 1 | | | |
| 109250 | 1 | CLASS 5 | F | ARNALDO DIAZ | 7/1/2014 | 5/28/2015 | 700.00 | 779.08 | 779.08 | 779.08 | 1 | | | |
| 109263 | 1 | CLASS 5 | F | JEFFREY FREEMAN | 7/1/2014 | 10/22/2014 | 911.71 | 840.10 | 840.10 | 840.10 | 1 | | | |
| 109267 | 1 | CLASS 5 | F | ANGEL GARCIA | 7/1/2014 | 10/20/2014 | 884.50 | 1,153.85 | 1,153.85 | 1,153.85 | 1 | | | |
| 109271 | 1 | CLASS 5 | F | LANA GAULT | 7/1/2014 | 11/10/2014 | 601.17 | 552.09 | 552.09 | 552.09 | 1 | | | |
| 109272 | 1 | CLASS 5 | F | DAVID GAY | 7/1/2014 | 6/9/2015 | 1,373.53 | 1,373.53 | 1,373.53 | 1,373.53 | 1 | | | |
| 109276 | 1 | CLASS 5 | F | DENISE GOBOURNE | 7/1/2014 | 11/5/2014 | 1.00 | 537.55 | 537.55 | 537.55 | 1 | | | |
| 109279 | 1 | CLASS 5 | F | JUAN GONZALEZ | 7/1/2014 | 10/20/2014 | 891.20 | 891.20 | 891.20 | 891.20 | 1 | | | |
| 109288 | 1 | CLASS 5 | F | LAUREN HALVORSON | 7/1/2014 | 4/24/2014 | 1.00 | 1,265.22 | 1,265.22 | 1,265.22 | 1 | | | |
| 109291 | 1 | CLASS 5 | F | BRYSON HAYES | 7/1/2014 | 10/20/2014 | 1.00 | 73.10 | 73.10 | 73.10 | 1 | | | |
| 109295 | 1 | CLASS 5 | F | GIOVANNA HENRY | 7/1/2014 | 6/9/2015 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109295 | 2 | CLASS 6 | F | GIOVANNA HENRY | 7/1/2014 | 6/9/2015 | 2,132.53 | 2,145.39 | 2,145.39 | 2,145.39 | 1 | | | |
| 109298 | 1 | CLASS 5 | F | OLIVIA HILLICK | 7/1/2014 | 10/27/2014 | 631.95 | 631.95 | 631.95 | 631.95 | 1 | | | |
| 109301 | 1 | CLASS 5 | F | LISA HOLTZCLAW | 7/1/2014 | 10/20/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109301 | 2 | CLASS 6 | F | LISA HOLTZCLAW | 7/1/2014 | 10/20/2014 | 583.57 | 435.67 | 435.67 | 435.67 | 1 | | | |
| 109302 | 1 | CLASS 5 | F | FRANCES IRIZARRY | 7/1/2014 | 6/1/2015 | 1.00 | 1,483.23 | 1,483.23 | 1,483.23 | 1 | | | |
| 109305 | 1 | CLASS 5 | F | TAMMY JACKSON | 7/1/2014 | 10/23/2014 | 1,176.00 | 1,060.51 | 1,060.51 | 1,060.51 | 1 | | | |
| 109311 | 1 | CLASS 5 | F | AGNES JN BAPTISTE | 7/1/2014 | 11/17/2014 | 1,220.00 | 1,111.79 | 1,111.79 | 1,111.79 | 1 | | | |
| 109312 | 1 | CLASS 5 | F | LUCIANA JOHNSON | 7/1/2014 | 11/19/2014 | 881.28 | 807.36 | 807.36 | 807.36 | 1 | | | |
| 109313 | 1 | CLASS 5 | F | MATTHEW JOHNSON | 7/1/2014 | 11/19/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109313 | 2 | CLASS 6 | F | MATTHEW JOHNSON | 7/1/2014 | 11/19/2014 | 1,592.40 | 1,191.67 | 1,191.67 | 1,191.67 | 1 | | | |
| 109314 | 1 | CLASS 5 | F | REGINA JOHNSON | 7/1/2014 | 12/15/2014 | 448.00 | 477.97 | 477.97 | 477.97 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 109315 | 1 | CLASS 5 | F | SUSAN KERRIGAN | 7/1/2014 | 11/12/2014 | 1,089.83 | 1,089.85 | 1,089.85 | 1,089.85 | 1 | | | |
| 109316 | 1 | CLASS 5 | F | AMANDA KING | 7/1/2014 | 4/24/2015 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109316 | 2 | CLASS 6 | F | AMANDA KING | 7/1/2014 | 4/24/2015 | 800.00 | 781.15 | 781.15 | 781.15 | 1 | | | |
| 109321 | 1 | CLASS 5 | F | SUSAN LAWRENCE | 7/1/2014 | 12/3/2014 | 282.49 | 363.90 | 363.90 | 363.90 | 1 | | | |
| 109322 | 1 | CLASS 5 | F | GWEN FAY LEE | 7/1/2014 | 10/23/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109322 | 2 | CLASS 6 | F | GWEN FAY LEE | 7/1/2014 | 10/23/2014 | 1,212.34 | 1,212.35 | 1,212.35 | 1,212.35 | 1 | | | |
| 109324 | 1 | CLASS 5 | F | CARISA LEWIS | 7/1/2014 | 2/9/2015 | 1,215.13 | 1,140.97 | 1,140.97 | 1,140.97 | 1 | | | |
| 109326 | 1 | CLASS 5 | F | SHARON LINCOLN | 7/1/2014 | 10/20/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109326 | 2 | CLASS 6 | F | SHARON LINCOLN | 7/1/2014 | 10/20/2014 | 301.00 | 322.75 | 322.75 | 322.75 | 1 | | | |
| 109327 | 1 | CLASS 5 | F | JACINTA LITTLE | 7/1/2014 | 10/23/2014 | 1.00 | 710.07 | 710.07 | 710.07 | 1 | | | |
| 109338 | 1 | CLASS 5 | F | CHARLES MARSHALL | 7/1/2014 | 10/20/2014 | 1,334.00 | 1,334.00 | 1,334.00 | 1,334.00 | 1 | | | |
| 109349 | 1 | CLASS 5 | F | LORI MCDONALD | 7/1/2014 | 11/12/2014 | 1,795.02 | 1,502.20 | 1,502.20 | 1,502.20 | 1 | | | |
| 109353 | 1 | CLASS 5 | F | NATALIE MEDINA NAEIM | 7/1/2014 | 11/14/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109353 | 2 | CLASS 6 | F | NATALIE MEDINA NAEIM | 7/1/2014 | 11/14/2014 | 3,053.41 | 2,739.16 | 2,739.16 | 2,739.16 | 1 | | | |
| 109358 | 1 | CLASS 5 | F | KEVIN MOHAMED | 7/1/2014 | 10/22/2014 | 1.00 | 716.10 | 716.10 | 716.10 | 1 | | | |
| 109362 | 1 | CLASS 5 | F | LAKESIA MOSLEY | 7/1/2014 | 11/10/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109362 | 2 | CLASS 6 | F | LAKESIA MOSLEY | 7/1/2014 | 11/10/2014 | 2,588.79 | 3,468.27 | 3,468.27 | 3,468.27 | 1 | | | |
| 109363 | 1 | CLASS 5 | F | TERRY MURRAY | 7/1/2014 | 10/22/2014 | 840.10 | 911.71 | 911.71 | 911.71 | 1 | | | |
| 109364 | 1 | CLASS 5 | F | DIANE MYERS THEVENAU | 7/1/2014 | 10/16/2014 | 1.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109364 | 2 | CLASS 6 | F | DIANE MYERS THEVENAU | 7/1/2014 | 10/16/2014 | 1.00 | 4,492.64 | 4,492.64 | 4,492.64 | 1 | | | |
| 109366 | 1 | CLASS 5 | F | EMILIO NOBLE | 7/1/2014 | 10/14/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109366 | 2 | CLASS 6 | F | EMILIO NOBLE | 7/1/2014 | 10/14/2014 | 3,500.17 | 3,500.00 | 3,500.00 | 3,500.00 | 1 | | | |
| 109369 | 1 | CLASS 5 | F | TINA OWENS | 7/1/2014 | 11/24/2014 | 470.38 | 470.38 | 470.38 | 470.38 | 1 | | | |
| 109372 | 1 | CLASS 5 | F | CHERYL PAPERNY | 7/1/2014 | 10/27/2014 | 457.76 | 457.76 | 457.76 | 457.76 | 1 | | | |
| 109374 | 1 | CLASS 5 | F | EVELYNN PASSINO | 7/1/2014 | 10/29/2014 | 1,336.44 | 1,184.57 | 1,184.57 | 1,184.57 | 1 | | | |
| 109384 | 1 | CLASS 5 | F | ERIN POPOFF | 7/1/2014 | 3/16/2015 | 1,131.60 | 1,131.60 | 1,131.60 | 1,131.60 | 1 | | | |
| 109386 | 1 | CLASS 5 | F | VASHAUN PRABHUDIAL | 7/1/2014 | 12/4/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109386 | 2 | CLASS 6 | F | VASHAUN PRABHUDIAL | 7/1/2014 | 12/4/2014 | 1,492.77 | 1,493.13 | 1,493.13 | 1,493.13 | 1 | | | |
| 109389 | 1 | CLASS 5 | F | MARISOL QUINONES | 7/1/2014 | 10/16/2014 | 644.00 | 646.80 | 646.80 | 646.80 | 1 | | | |
| 109390 | 1 | CLASS 5 | F | JOSHUA RACZKOWSKI | 7/1/2014 | 10/16/2014 | 1.00 | 1,131.85 | 1,131.85 | 1,131.85 | 1 | | | |
| 109398 | 1 | CLASS 5 | F | JOANNE RIVERA | 7/1/2014 | 10/22/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109398 | 2 | CLASS 6 | F | JOANNE RIVERA | 7/1/2014 | 10/22/2014 | 708.29 | 584.07 | 584.07 | 584.07 | 1 | | | |
| 109399 | 1 | CLASS 5 | F | MICHELLE RIVERA | 7/1/2014 | 12/12/2014 | 1,259.70 | 1,185.85 | 1,185.85 | 1,185.85 | 1 | | | |
| 109404 | 1 | CLASS 5 | F | ELIZABETH RODRIGUEZ | 7/1/2014 | 10/27/2014 | 1,490.10 | 1,472.03 | 1,472.03 | 1,472.03 | 1 | | | |
| 109416 | 1 | CLASS 5 | F | ASSUNTA ROSSI | 7/1/2014 | 10/31/2014 | 1.00 | 1,796.00 | 1,796.00 | 1,796.00 | 1 | | | |
| 109417 | 1 | CLASS 5 | F | NICHOLAS ROURKE | 7/1/2014 | 12/10/2014 | 1.00 | 1,149.38 | 1,149.38 | 1,149.38 | 1 | | | |
| 109420 | 1 | CLASS 5 | F | SHAUNDA SAMPSON | 7/1/2014 | 12/15/2014 | 1.00 | 656.58 | 656.58 | 656.58 | 1 | | | |
| 109423 | 1 | CLASS 5 | F | MADELINE SANTIAGO | 7/1/2014 | 6/1/2015 | 2,000.00 | 1,761.94 | 1,761.94 | 1,761.94 | 1 | | | |
| 109423 | 2 | CLASS 6 | F | MADELINE SANTIAGO | 7/1/2014 | 6/1/2015 | 186.39 | - | - | - | 1 | | | |
| 109426 | 1 | CLASS 8 | F | TANYA SCOTT | 7/1/2014 | 6/22/2015 | 800.00 | 115.38 | 115.38 | 115.38 | 1 | | | |
| 109429 | 1 | CLASS 5 | F | REBECCA SERGIO | 7/1/2014 | 10/20/2014 | 1,427.33 | 1,427.23 | 1,427.23 | 1,427.23 | 1 | | | |
| 109433 | 1 | CLASS 5 | F | JOYCE SHUPSKY | 7/1/2014 | 10/21/2014 | 1,272.93 | 1,272.94 | 1,272.94 | 1,272.94 | 1 | | | |
| 109440 | 1 | CLASS 5 | F | DONNA SKIPPER | 7/1/2014 | 6/8/2015 | 1,372.92 | 1,402.09 | 1,402.09 | 1,402.09 | 1 | | | |
| 109442 | 1 | CLASS 5 | F | CYNTHIA SPANGLO | 7/1/2014 | 10/16/2014 | 1,693.38 | 1,767.54 | 1,767.54 | 1,767.54 | 1 | | | |
| 109445 | 1 | CLASS 5 | F | LANCE SWEAT | 7/1/2014 | 1/5/2015 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109445 | 2 | CLASS 6 | F | LANCE SWEAT | 7/1/2014 | 1/5/2015 | 84.91 | 84.90 | 84.90 | 84.90 | 1 | | | |
| 109446 | 1 | CLASS 5 | F | JACQUELINE TALAVERA | 7/1/2014 | 12/5/2014 | 793.61 | 815.19 | 815.19 | 815.19 | 1 | | | |
| 109453 | 1 | CLASS 5 | F | JOHNNY THOMPSON | 7/1/2014 | 11/21/2014 | 860.00 | 1,046.18 | 1,046.18 | 1,046.18 | 1 | | | |
| 109459 | 1 | CLASS 5 | F | BOBBY TRINH | 7/1/2014 | 9/26/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109459 | 2 | CLASS 6 | F | BOB TRINH | 7/1/2014 | 9/26/2014 | 11,531.64 | 11,531.63 | 11,531.63 | 11,531.63 | 1 | | | |
| 109460 | 1 | CLASS 5 | F | RULA TSETELOPOULOS | 7/1/2014 | 11/19/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109460 | 2 | CLASS 6 | F | RULA TSETELOPOULOS | 7/1/2014 | 11/19/2014 | 538.40 | 665.38 | 665.38 | 665.38 | 1 | | | |
| 109462 | 1 | CLASS 5 | F | RAUL URIBE | 7/1/2014 | 11/5/2014 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109462 | 2 | CLASS 6 | F | RAUL URIBE | 7/1/2014 | 11/5/2014 | 665.39 | 919.23 | 919.23 | 919.23 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 109463 | 1 | CLASS 5 | F | FAUSTINO VALENTIN | 7/1/2014 | 10/20/2014 | 803.20 | 803.20 | 803.20 | 803.20 | 1 | | | |
| 109466 | 1 | CLASS 5 | F | SHERI VARASDI | 7/1/2014 | 6/8/2015 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1 | | | |
| 109466 | 2 | CLASS 6 | F | SHERI VARASDI | 7/1/2014 | 6/8/2015 | 642.87 | 415.68 | 415.68 | 415.68 | 1 | | | |
| 109468 | 1 | CLASS 5 | F | EDWARD WAGNER | 7/1/2014 | 10/14/2014 | 1,483.23 | 483.23 | 483.23 | 483.23 | 1 | | | |
| 109471 | 1 | CLASS 5 | F | JENNIFER WALLACE | 7/1/2014 | 1/27/2015 | 1.00 | 470.93 | 470.93 | 470.93 | 1 | | | |
| 109481 | 1 | CLASS 5 | F | BARBARA ZATORSKI | 7/1/2014 | 1/12/2015 | 1.00 | 1,141.15 | 1,141.15 | 1,141.15 | 1 | | | |
| 109521 | 1 | CLASS 5 | F | SHAQUANA HALL And WENZEL FENTON CABASSA PA | 7/1/2014 | 6/4/2015 | 2,000.00 | - | - | - | 1 | | | |
| 109521 | 2 | CLASS 6 | F | SHAQUANA HALL And | 7/1/2014 | 6/4/2015 | 36,120.40 | - | - | - | 1 | | | |
| 100034 | 1 | CLASS 6 | I | MUNICH HEALTH NORTH AMERICA MANAGED CARE | 6/9/2014 | 5/18/2015 | 2,000.24 | - | - | - | 1 | | | |
| 100181 | 1 | CLASS 2 | JFFS | WARRINGTON & HALTON NHS | 7/1/2014 | 10/10/2014 | 4,063.38 | - | - | - | 1 | | | |
| 100185 | 1 | CLASS 2 | JFFS | MICHAEL YANUCK MD PA | 7/1/2014 | 10/22/2014 | 5,000.00 | - | - | - | 1 | | | |
| 180699 | 1 | CLASS 2 | JFFS | TOWN OF DAVIE | 7/1/2014 | 10/4/2016 | 2,416.64 | 1,156.74 | 1,156.74 | 1,156.74 | 1 | | | |
| 180713 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/26/2016 | 657,399.34 | 65,528.37 | 65,528.37 | 65,528.37 | 1 | | | |
| 180715 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/29/2016 | 55,840.00 | 7,724.72 | 7,724.72 | 7,724.72 | 1 | | | |
| 180790 | 1 | CLASS 2 | JFFS | CITY OF OAKLAND PARK FR | 7/1/2014 | 10/4/2016 | 854.00 | 287.95 | 287.95 | 287.95 | 1 | | | |
| 180819 | 1 | CLASS 2 | JFFS | PALM BEACH HEART CLINIC PA | 7/1/2014 | 9/21/2016 | 30.00 | 8.43 | 8.43 | 8.43 | 1 | | | |
| 180841 | 1 | CLASS 2 | JFFS | POSITIVE MOBILITY | 7/1/2014 | 9/30/2016 | 5,750.80 | 1,146.79 | 1,146.79 | 1,146.79 | 1 | | | |
| 180951 | 1 | CLASS 2 | JFFS | PINELLAS EKG | 7/1/2014 | 10/26/2016 | 1,180.00 | 372.54 | 372.54 | 372.54 | 1 | | | |
| 180968 | 1 | CLASS 2 | JFFS | OAK HILL HOSPITAL In Care Of | 7/1/2014 | 10/5/2016 | 132,922.20 | 25,709.43 | 25,709.43 | 25,709.43 | 1 | | | |
| 181010 | 1 | CLASS 2 | JFFS | PINNACLE HEALTH GROUP | 7/1/2014 | 10/13/2016 | 821.00 | 209.80 | 209.80 | 209.80 | 1 | | | |
| 181031 | 1 | CLASS 2 | JFFS | JEROME KOSER DO PA | 7/1/2014 | 10/26/2016 | 1,627.00 | 1,207.75 | 1,207.75 | 1,207.75 | 1 | | | |
| 181150 | 1 | CLASS 2 | JFFS | ADVANCED UROLOGY | 7/1/2014 | 1/27/2016 | 189,079.49 | 66,091.86 | 66,091.86 | 66,091.86 | 1 | | | |
| 181226 | 1 | CLASS 2 | JFFS | KIDNEY AND DIALYSIS | 7/1/2014 | 9/1/2016 | 1,016.24 | 975.00 | 975.00 | 975.00 | 1 | | | |
| 181235 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/26/2016 | 619,305.83 | 238,939.47 | 238,939.47 | 238,939.47 | 1 | | | |
| 181248 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/29/2016 | 13,885.56 | 2,658.14 | 2,658.14 | 2,658.14 | 1 | | | |
| 181270 | 1 | CLASS 2 | JFFS | ORANGE COUNTY FIRE | 7/1/2014 | 10/4/2016 | 431,070.00 | 190,818.93 | 190,818.93 | 190,818.93 | 1 | | | |
| 181289 | 1 | CLASS 2 | JFFS | CITY OF SUNRISE FIRE | 7/1/2014 | 10/4/2016 | 5,586.00 | 2,438.07 | 2,438.07 | 2,438.07 | 1 | | | |
| 181294 | 1 | CLASS 8 | JFFS | NEUROSURGERY & SPINE | 7/1/2014 | 12/9/2016 | 7,890.00 | 679.78 | 679.78 | 679.78 | 1 | | | |
| 181329 | 1 | CLASS 2 | JFFS | ORLANDO HEALTH CENTRAL | 7/1/2014 | 10/7/2016 | 2,864,673.18 | 557,341.83 | 557,341.83 | 557,341.83 | 1 | | | |
| 181363 | 1 | CLASS 2 | JFFS | INTERMOUNTAIN MED CENTER | 7/1/2014 | 10/20/2016 | 16,422.27 | 2,909.45 | 2,909.45 | 2,909.45 | 1 | | | |
| 181439 | 1 | CLASS 2 | JFFS | CELEBRATION DIALYSIS | 7/1/2014 | 10/26/2016 | 85,131.25 | 5,101.04 | 5,101.04 | 5,101.04 | 1 | | | |
| 181526 | 1 | CLASS 2 | JFFS | LOURDES MED CTR OF | 7/1/2014 | 9/23/2016 | 4,901.40 | 729.28 | 729.28 | 729.28 | 1 | | | |
| 181584 | 1 | CLASS 2 | JFFS | CENTERS HOME DIALYSIS | 7/1/2014 | 10/26/2016 | 1,163,337.70 | 2,073.89 | 2,073.89 | 2,073.89 | 1 | | | |
| 181669 | 1 | CLASS 2 | JFFS | SEACREST MRI OF BOYNTON | 7/1/2014 | 10/12/2016 | 6,534.17 | 3,650.85 | 3,650.85 | 3,650.85 | 1 | | | |
| 181675 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/28/2016 | 68,623.00 | 22,753.95 | 22,753.95 | 22,753.95 | 1 | | | |
| 181686 | 1 | CLASS 2 | JFFS | RADIOLOGY ASSOCIATES OF OCALA PA | 7/1/2014 | 9/16/2016 | 123,947.60 | 31,570.29 | 31,570.29 | 31,570.29 | 1 | | | |
| 181688 | 1 | CLASS 2 | JFFS | NSI MERRITT ISLAND | 7/1/2014 | 9/11/2016 | 17,078.50 | 2,289.52 | 2,289.52 | 2,289.52 | 1 | | | |
| 181743 | 1 | CLASS 2 | JFFS | OSPREY EMERGENCY PHYSICIANS | 7/1/2014 | 10/12/2016 | 1,200,397.00 | 107,588.60 | 107,588.60 | 107,588.60 | 1 | | | |
| 181745 | 1 | CLASS 2 | JFFS | FLORIDA CLINICAL PRACTICE ASSOCIATION | 7/1/2014 | 10/13/2016 | 769,341.18 | 253,085.73 | 253,085.73 | 253,085.73 | 1 | | | |
| 181750 | 1 | CLASS 2 | JFFS | NORTHWEST MEDICAL CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 2,186,799.37 | 369,440.54 | 369,440.54 | 369,440.54 | 1 | | | |
| 181751 | 1 | CLASS 2 | JFFS | SHORE HEART GROUP PA | 7/1/2014 | 9/11/2016 | 630.00 | 227.65 | 227.65 | 227.65 | 1 | | | |
| 181886 | 1 | CLASS 2 | JFFS | AMERICARE AMBULANCE | 7/1/2014 | 10/26/2016 | 9,046.56 | 3,850.77 | 3,850.77 | 3,850.77 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 181890 | 1 | CLASS 2 | JFFS | NEOGENOMICS | 7/1/2014 | 10/19/2016 | 32,328.00 | 10,699.95 | 10,699.95 | 10,699.95 | 1 | | | |
| 181900 | 1 | CLASS 2 | JFFS | INPHYNET CONTRACTING | 7/1/2014 | 10/26/2016 | 232,337.00 | 20,906.11 | 20,906.11 | 20,906.11 | 1 | | | |
| 181907 | 1 | CLASS 2 | JFFS | ADVENTIST HEALTH SYSTEM | 7/1/2014 | 9/29/2016 | 119,722.00 | 33,486.51 | 33,486.51 | 33,486.51 | 1 | | | |
| 181924 | 1 | CLASS 2 | JFFS | LAKE REGIONAL URGENT CARE | 7/1/2014 | 9/28/2016 | 15,558.54 | 13,056.58 | 13,056.58 | 13,056.58 | 1 | | | |
| 181926 | 1 | CLASS 2 | JFFS | LAKELAND DIALYSIS | 7/1/2014 | 10/26/2016 | 713,182.40 | 47,270.28 | 47,270.28 | 47,270.28 | 1 | | | |
| 181929 | 1 | CLASS 2 | JFFS | TEMPLE TERRACE DIALYSIS | 7/1/2014 | 10/26/2016 | 461,352.50 | 2,447.90 | 2,447.90 | 2,447.90 | 1 | | | |
| 181956 | 1 | CLASS 2 | JFFS | TRANSCARE MEDICAL TRANSPORT | 7/1/2014 | 10/17/2016 | 11,083.20 | 5,109.41 | 5,109.41 | 5,109.41 | 1 | | | |
| 181989 | 1 | CLASS 2 | JFFS | MINUTECLINIC DIAGNOSTIC | 7/1/2014 | 10/19/2016 | 129.00 | 71.86 | 71.86 | 71.86 | 1 | | | |
| 182004 | 1 | CLASS 2 | JFFS | ALL AMERICAN FAMILY AND GERIATRIC CARE PLLC | 7/1/2014 | 10/26/2016 | 2,078.00 | 1,032.60 | 1,032.60 | 1,032.60 | 1 | | | |
| 182007 | 1 | CLASS 2 | JFFS | FLORIDA EM I MEDICAL | 7/1/2014 | 10/12/2016 | 85,747.00 | 7,396.34 | 7,396.34 | 7,396.34 | 1 | | | |
| 182071 | 1 | CLASS 2 | JFFS | UNITY HOSPITAL | 7/1/2014 | 10/21/2016 | 27,541.55 | 5,383.31 | 5,383.31 | 5,383.31 | 1 | | | |
| 182115 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/16/2016 | 97,706.78 | 51,192.85 | 51,192.85 | 51,192.85 | 1 | | | |
| 182139 | 1 | CLASS 2 | JFFS | VENTURE AMBULATORY SURGERY CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/20/2016 | 14,276.72 | 2,241.48 | 2,241.48 | 2,241.48 | 1 | | | |
| 182172 | 1 | CLASS 2 | JFFS | CARDIAC AND VASCULAR | 7/1/2014 | 9/14/2016 | 392,869.72 | 182,597.90 | 182,597.90 | 182,597.90 | 1 | | | |
| 182179 | 1 | CLASS 2 | JFFS | OCALA HEALTH TRAUMA LLC | 7/1/2014 | 9/28/2016 | 101,116.00 | 31,994.13 | 31,994.13 | 31,994.13 | 1 | | | |
| 182206 | 1 | CLASS 2 | JFFS | URGENT CARE USA LLC | 7/1/2014 | 9/20/2016 | 291.72 | 255.88 | 255.88 | 255.88 | 1 | | | |
| 182239 | 1 | CLASS 2 | JFFS | KANUMURI MEDICAL GROUP | 7/1/2014 | 10/19/2016 | 33,264.00 | 10,995.39 | 10,995.39 | 10,995.39 | 1 | | | |
| 182359 | 1 | CLASS 2 | JFFS | THE HEALTH CENTER OF | 7/1/2014 | 10/12/2016 | 18,200.00 | 15,600.00 | 15,600.00 | 15,600.00 | 1 | | | |
| 182433 | 1 | CLASS 2 | JFFS | HOSPITAL SAN CARLOS BORROMEO | 7/1/2014 | 9/19/2016 | 894.18 | 5.08 | 5.08 | 5.08 | 1 | | | |
| 182471 | 1 | CLASS 2 | JFFS | DARWIN CLARK | 7/1/2014 | 9/29/2016 | 10,981.00 | 2,357.71 | 2,357.71 | 2,357.71 | 1 | | | |
| 182482 | 1 | CLASS 2 | JFFS | MELBOURNE DIALYSIS | 7/1/2014 | 10/26/2016 | 100,256.95 | 5,460.00 | 5,460.00 | 5,460.00 | 1 | | | |
| 182547 | 1 | CLASS 2 | JFFS | CORAL RIDGE OUTPATIENT | 7/1/2014 | 10/17/2016 | 18,105.00 | 4,906.38 | 4,906.38 | 4,906.38 | 1 | | | |
| 182551 | 1 | CLASS 2 | JFFS | GULF COAST INTERNIST LLC | 7/1/2014 | 10/13/2016 | 5,346.05 | 4,127.97 | 4,127.97 | 4,127.97 | 1 | | | |
| 182576 | 1 | CLASS 2 | JFFS | MPM CARDIOLOGY SERVICES LLC | 7/1/2014 | 9/29/2016 | 7,915.00 | 2,399.55 | 2,399.55 | 2,399.55 | 1 | | | |
| 182648 | 1 | CLASS 2 | JFFS | CORAL SPRINGS SURGICAL CENTER | 7/1/2014 | 9/11/2016 | 9,749.03 | 1,067.64 | 1,067.64 | 1,067.64 | 1 | | | |
| 182650 | 1 | CLASS 2 | JFFS | BRANDON SURGERY CENTER | 7/1/2014 | 9/11/2016 | 90,754.00 | 10,045.34 | 10,045.34 | 10,045.34 | 1 | | | |
| 182662 | 1 | CLASS 2 | JFFS | HEALTH SOUTH | 7/1/2014 | 10/17/2016 | 29,504.70 | 5,900.94 | 5,900.94 | 5,900.94 | 1 | | | |
| 182679 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/14/2016 | 30,537.93 | 9,270.92 | 9,270.92 | 9,270.92 | 1 | | | |
| 182773 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/12/2016 | 21,115.00 | 3,046.99 | 3,046.99 | 3,046.99 | 1 | | | |
| 182817 | 1 | CLASS 2 | JFFS | MEMORIAL HOSPITAL WEST | 7/1/2014 | 10/18/2016 | 457,142.00 | 48,842.40 | 48,842.40 | 48,842.40 | 1 | | | |
| 182827 | 1 | CLASS 2 | JFFS | CITY OF SANFORD FIRE DEPT | 7/1/2014 | 10/4/2016 | 31,960.00 | 19,157.35 | 19,157.35 | 19,157.35 | 1 | | | |
| 182836 | 1 | CLASS 2 | JFFS | PASCO COUNTY FIRE | 7/1/2014 | 9/19/2016 | 72,796.00 | 452.13 | 452.13 | 452.13 | 1 | | | |
| 182862 | 1 | CLASS 2 | JFFS | WATERS EDGE | 7/1/2014 | 10/1/2016 | 52,462.05 | 27,517.43 | 27,517.43 | 27,517.43 | 1 | | | |
| 182904 | 1 | CLASS 2 | JFFS | THE CENTER FOR FOOT AND | 7/1/2014 | 9/14/2016 | 37,230.00 | 24,046.88 | 24,046.88 | 24,046.88 | 1 | | | |
| 182934 | 1 | CLASS 2 | JFFS | TOWN OF HENNIKER RESCUE | 7/1/2014 | 9/11/2016 | 1,790.00 | - | - | - | 1 | | | |
| 182983 | 1 | CLASS 2 | JFFS | BAY COUNTY EMERGENCY | 7/1/2014 | 10/4/2016 | 1,522.95 | 365.79 | 365.79 | 365.79 | 1 | | | |
| 182986 | 1 | CLASS 2 | JFFS | CABBAGE PALM INPATIENT SERVICES | 7/1/2014 | 10/12/2016 | 5,110.00 | 1,432.42 | 1,432.42 | 1,432.42 | 1 | | | |
| 183005 | 1 | CLASS 2 | JFFS | LAD IMAGING INC In Care Of | 7/1/2014 | 10/8/2016 | 101,494.78 | 22,817.56 | 22,817.56 | 22,817.56 | 1 | | | |
| 183038 | 1 | CLASS 2 | JFFS | LAKELAND REGIONAL | 7/1/2014 | 10/28/2016 | 25,800,991.00 | 4,905,340.19 | 4,905,340.19 | 4,905,340.19 | 1 | | | |
| 183072 | 1 | CLASS 2 | JFFS | PLANTATION GENERAL HOSP | 7/1/2014 | 10/5/2016 | 277,933.22 | 54,956.65 | 54,956.65 | 54,956.65 | 1 | | | |
| 183081 | 1 | CLASS 2 | JFFS | CITY CIRCLE ER SVS | 7/1/2014 | 10/12/2016 | 3,086.00 | 270.44 | 270.44 | 270.44 | 1 | | | |
| 183101 | 1 | CLASS 2 | JFFS | BRANDON EAST DIALYSIS | 7/1/2014 | 10/26/2016 | 254,553.80 | 15,589.36 | 15,589.36 | 15,589.36 | 1 | | | |
| 183102 | 1 | CLASS 2 | JFFS | WINTER HAVEN DIALYSIS | 7/1/2014 | 10/26/2016 | 2,161,702.00 | 54,832.25 | 54,832.25 | 54,832.25 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 183114 | 1 | CLASS 2 | JFFS | ADVANCED KIDNEY CARE MD PA | 7/1/2014 | 10/26/2016 | 8,790.00 | 4,144.66 | 4,144.66 | 4,144.66 | 1 | | | |
| 183283 | 1 | CLASS 2 | JFFS | GESSLER CLINIC | 7/1/2014 | 9/11/2016 | 93,141.00 | 40,394.30 | 40,394.30 | 40,394.30 | 1 | | | |
| 183285 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/24/2016 | 811,478.01 | 159,560.33 | 159,560.33 | 159,560.33 | 1 | | | |
| 183307 | 1 | CLASS 2 | JFFS | HOHMAN REHAB & SPORTS THERAPY LLC | 7/1/2014 | 9/19/2016 | 23,053.91 | 14,562.76 | 14,562.76 | 14,562.76 | 1 | | | |
| 183321 | 1 | CLASS 2 | JFFS | ELADIO J DIEGUEZ MD | 7/1/2014 | 10/12/2016 | 5,654.00 | 3,504.67 | 3,504.67 | 3,504.67 | 1 | | | |
| 183343 | 1 | CLASS 2 | JFFS | INFECTIOUS DISEASES | 7/1/2014 | 10/13/2016 | 144,643.00 | 34,045.26 | 34,045.26 | 34,045.26 | 1 | | | |
| 183345 | 1 | CLASS 2 | JFFS | FMC URGENT CARE | 7/1/2014 | 9/20/2016 | 1,765.00 | | | | 1 | | | |
| 183403 | 1 | CLASS 2 | JFFS | LIFE CARE CENTERS OF | 7/1/2014 | 10/7/2016 | 93,879.18 | 77,527.92 | 77,527.92 | 77,527.92 | 1 | | | |
| 183438 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/27/2016 | 1,300,748.19 | 251,352.22 | 251,352.22 | 251,352.22 | 1 | | | |
| 183585 | 1 | CLASS 2 | JFFS | CORAL SPRINGS MEDICAL | 7/1/2014 | 9/30/2016 | 57,087.01 | 10,244.64 | 10,244.64 | 10,244.64 | 1 | | | |
| 183610 | 1 | CLASS 2 | JFFS | NORTH FLORIDA REG MED | 7/1/2014 | 10/7/2016 | 943,649.46 | 104,513.58 | 104,513.58 | 104,513.58 | 1 | | | |
| 183619 | 1 | CLASS 2 | JFFS | BELLEAIR SURGERY CENTER | 7/1/2014 | 9/13/2016 | 29,468.00 | 1,898.50 | 1,898.50 | 1,898.50 | 1 | | | |
| 183628 | 1 | CLASS 2 | JFFS | BARTOW DIALYSIS | 7/1/2014 | 10/26/2016 | 763,671.35 | 47,553.94 | 47,553.94 | 47,553.94 | 1 | | | |
| 183690 | 1 | CLASS 2 | JFFS | PREMIER URGENT CARE | 7/1/2014 | 9/3/2016 | 3,016.00 | 1,602.27 | 1,602.27 | 1,602.27 | 1 | | | |
| 183698 | 1 | CLASS 2 | JFFS | GRASSY WATERS INPATIENT | 7/1/2014 | 10/12/2016 | 14,843.00 | 3,232.38 | 3,232.38 | 3,232.38 | 1 | | | |
| 183700 | 1 | CLASS 2 | JFFS | THE TERRACE OF ST CLOUD | 7/1/2014 | 9/30/2016 | 44,446.78 | 14,125.20 | 14,125.20 | 14,125.20 | 1 | | | |
| 183765 | 1 | CLASS 2 | JFFS | WEST PALM HOSPITAL In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/7/2016 | 677,404.29 | 107,831.80 | 107,831.80 | 107,831.80 | 1 | | | |
| 183858 | 1 | CLASS 2 | JFFS | MARIA NINA CONCEPCION MD PA | 7/1/2014 | 10/13/2016 | 39,768.58 | 15,216.33 | 15,216.33 | 15,216.33 | 1 | | | |
| 183910 | 1 | CLASS 2 | JFFS | MOBILITY SPECIALISTS | 7/1/2014 | 10/13/2016 | 83,483.39 | 36,965.36 | 36,965.36 | 36,965.36 | 1 | | | |
| 183926 | 1 | CLASS 2 | JFFS | RIVIERA BEACH FIRE | 7/1/2014 | 10/4/2016 | 3,020.00 | 1,235.84 | 1,235.84 | 1,235.84 | 1 | | | |
| 183968 | 1 | CLASS 2 | JFFS | MANGESH B PATEL MD | 7/1/2014 | 9/21/2016 | 791.82 | 724.59 | 724.59 | 724.59 | 1 | | | |
| 183983 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 7/29/2016 | 4,670.00 | 1,833.94 | 1,833.94 | 1,833.94 | 1 | | | |
| 183996 | 1 | CLASS 2 | JFFS | BREVARD COUNTY BOARD | 7/1/2014 | 10/4/2016 | 33,207.72 | 17,718.11 | 17,718.11 | 17,718.11 | 1 | | | |
| 184035 | 1 | CLASS 2 | JFFS | PIEDMONT PATHOLOGY | 7/1/2014 | 9/11/2016 | 13,853.00 | - | - | - | 1 | | | |
| 184057 | 1 | CLASS 2 | JFFS | ATLANTIC ISLES INPATIENT | 7/1/2014 | 10/12/2016 | 13,692.00 | 3,693.59 | 3,693.59 | 3,693.59 | 1 | | | |
| 184071 | 1 | CLASS 2 | JFFS | THE VILLAGES | 7/1/2014 | 9/28/2016 | 169,714.66 | 80,114.80 | 80,114.80 | 80,114.80 | 1 | | | |
| 184231 | 1 | CLASS 2 | JFFS | LEON COUNTY EMS | 7/1/2014 | 10/4/2016 | 2,288.32 | 754.26 | 754.26 | 754.26 | 1 | | | |
| 184239 | 1 | CLASS 2 | JFFS | CITY OF WEST PALM BEACH | 7/1/2014 | 10/4/2016 | 20,472.00 | 8,892.52 | 8,892.52 | 8,892.52 | 1 | | | |
| 184271 | 1 | CLASS 2 | JFFS | SURGICAL SPECIALISTS OF OCALA PA | 7/1/2014 | 9/11/2016 | 404,313.19 | 207,777.94 | 207,777.94 | 207,777.94 | 1 | | | |
| 184287 | 1 | CLASS 2 | JFFS | WINTER PARK HEMO | 7/1/2014 | 10/26/2016 | 2,276,595.00 | 102,222.94 | 102,222.94 | 102,222.94 | 1 | | | |
| 184290 | 1 | CLASS 2 | JFFS | REHABILITATION CENTER OF | 7/1/2014 | 10/13/2016 | 11,525.00 | 8,700.00 | 8,700.00 | 8,700.00 | 1 | | | |
| 184410 | 1 | CLASS 2 | JFFS | CLEVELAND CLINIC FLORIDA | 7/1/2014 | 9/1/2016 | 3,759.00 | 842.11 | 842.11 | 842.11 | 1 | | | |
| 184466 | 1 | CLASS 2 | JFFS | CITY OF PLANTATION | 7/1/2014 | 10/4/2016 | 1,072.40 | 475.76 | 475.76 | 475.76 | 1 | | | |
| 184504 | 1 | CLASS 2 | JFFS | PARAGON CONTRACTING | 7/1/2014 | 10/26/2016 | 317,621.00 | 27,188.79 | 27,188.79 | 27,188.79 | 1 | | | |
| 184518 | 1 | CLASS 2 | JFFS | OCALA HEALTH AND REHABILITATION | 7/1/2014 | 10/10/2016 | 46,222.76 | 25,800.23 | 25,800.23 | 25,800.23 | 1 | | | |
| 184541 | 1 | CLASS 2 | JFFS | MARUTI CORPORATION | 7/1/2014 | 10/22/2016 | 1,627.00 | 1,109.26 | 1,109.26 | 1,109.26 | 1 | | | |
| 184547 | 1 | CLASS 2 | JFFS | CITY OF LAKE MARY FLORIDA | 7/1/2014 | 10/4/2016 | 4,120.31 | 3,352.34 | 3,352.34 | 3,352.34 | 1 | | | |
| 184566 | 1 | CLASS 2 | JFFS | THE MEDICAL GROUP OF SOUTH FLORIDA INC | 7/1/2014 | 10/18/2016 | 29,667.22 | 10,192.08 | 10,192.08 | 10,192.08 | 1 | | | |
| 184699 | 1 | CLASS 2 | JFFS | TAMPA GENERAL HOSPITAL | 7/1/2014 | 10/27/2016 | 3,374,032.26 | 653,854.52 | 653,854.52 | 653,854.52 | 1 | | | |
| 184730 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA | 7/1/2014 | 10/19/2016 | 200,700.00 | 37,780.00 | 37,780.00 | 37,780.00 | 1 | | | |
| 184741 | 1 | CLASS 2 | JFFS | ORACLE HEALTH SYSTEMS | 7/1/2014 | 10/1/2016 | 260.00 | 52.25 | 52.25 | 52.25 | 1 | | | |
| 184758 | 1 | CLASS 2 | JFFS | PALM BEACH GENERAL | 7/1/2014 | 9/22/2016 | 130,593.00 | 41,763.33 | 41,763.33 | 41,763.33 | 1 | | | |
| 184785 | 1 | CLASS 2 | JFFS | CHARLES R SCHALLOP MD | 7/1/2014 | 6/19/2016 | 4,520.00 | 2,916.40 | 2,916.40 | 2,916.40 | 1 | | | |
| 184830 | 1 | CLASS 2 | JFFS | LEESBURG REGIONAL MEDICAL CENTER | 7/1/2014 | 9/23/2016 | 6,916,633.59 | 1,272,416.88 | 1,272,416.88 | 1,272,416.88 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 184934 | 1 | CLASS 2 | JFFS | ST CLOUD DIALYSIS (DAVITA) | 7/1/2014 | 10/26/2016 | 3,515,523.60 | 161,233.40 | 161,233.40 | 161,233.40 | 1 | | | |
| 184955 | 1 | CLASS 2 | JFFS | ACCESS HEALTH CARE | 7/1/2014 | 10/25/2016 | 6,015.00 | 2,755.04 | 2,755.04 | 2,755.04 | 1 | | | |
| 184958 | 1 | CLASS 2 | JFFS | ASTORIA HEALTH & | 7/1/2014 | 10/26/2016 | 184,809.70 | 74,102.46 | 74,102.46 | 74,102.46 | 1 | | | |
| 185006 | 1 | CLASS 2 | JFFS | VASCULAR CENTERS OF | 7/1/2014 | 10/5/2016 | 641,824.00 | 394,301.83 | 394,301.83 | 394,301.83 | 1 | | | |
| 185059 | 1 | CLASS 2 | JFFS | GRANT MEDICAL CENTER | 7/1/2014 | 10/31/2016 | 85,720.50 | 17,144.10 | 17,144.10 | 17,144.10 | 1 | | | |
| 185085 | 1 | CLASS 2 | JFFS | SHANDS LIVE OAK | 7/1/2014 | 10/27/2016 | 1,836.37 | 367.28 | 367.28 | 367.28 | 1 | | | |
| 185139 | 1 | CLASS 8 | JFFS | ESFANDIAR SHAFII MD PLLC | 7/1/2014 | 11/8/2016 | 2,450.00 | 869.56 | 869.56 | 869.56 | 1 | | | |
| 185195 | 1 | CLASS 2 | JFFS | A FITTING EXPERIENCE | 7/1/2014 | 10/12/2016 | 970.00 | 662.00 | 662.00 | 662.00 | 1 | | | |
| 185197 | 1 | CLASS 2 | JFFS | KENOSHA COMMUNITY HEALTH CENTER INC | 7/1/2014 | 10/28/2016 | 770.00 | 18.00 | 18.00 | 18.00 | 1 | | | |
| 185207 | 1 | CLASS 8 | JFFS | RODRIGO BALTODANO INC | 7/1/2014 | 2/8/2017 | 2,332.00 | 1,640.05 | 1,640.05 | 1,640.05 | 1 | | | |
| 185210 | 1 | CLASS 2 | JFFS | ALEXANDER MEDICAL GROUP | 7/1/2014 | 9/22/2016 | 34,743.04 | 6,384.48 | 6,384.48 | 6,384.48 | 1 | | | |
| 185215 | 1 | CLASS 2 | JFFS | IMPERIAL POINT MEDICAL | 7/1/2014 | 9/30/2016 | 178,473.49 | 34,498.09 | 34,498.09 | 34,498.09 | 1 | | | |
| 185303 | 1 | CLASS 2 | JFFS | GERIMED 2000 LLC | 7/1/2014 | 9/26/2016 | 2,544.50 | 1,471.29 | 1,471.29 | 1,471.29 | 1 | | | |
| 185321 | 1 | CLASS 2 | JFFS | ADVANCED PHYSICAL THERAPY OF CENTRAL FLORIDA | 7/1/2014 | 10/4/2016 | 88,472.12 | 46,868.08 | 46,868.08 | 46,868.08 | 1 | | | |
| 185486 | 1 | CLASS 2 | JFFS | CENTRAL ORLANDO DIALYSIS | 7/1/2014 | 10/26/2016 | 886,712.50 | 63,664.00 | 63,664.00 | 63,664.00 | 1 | | | |
| 185549 | 1 | CLASS 8 | JFFS | SOUTH PALM AMBULATORY SURGERY CENTER LLC | 7/1/2014 | 12/14/2016 | 18,008.00 | 3,520.16 | 3,520.16 | 3,520.16 | 1 | | | |
| 185564 | 1 | CLASS 2 | JFFS | BROWARD GENERAL MEDICAL CENTER | 7/1/2014 | 9/17/2016 | 851,341.96 | 154,306.37 | 154,306.37 | 154,306.37 | 1 | | | |
| 185588 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA | 7/1/2014 | 10/7/2016 | 8,564,752.93 | 1,217,048.15 | 1,217,048.15 | 1,217,048.15 | 1 | | | |
| 185617 | 1 | CLASS 2 | JFFS | JACOBO N LAMA | 7/1/2014 | 10/18/2016 | 1,143.00 | 545.61 | 545.61 | 545.61 | 1 | | | |
| 185672 | 1 | CLASS 2 | JFFS | HEALTH SOUTH | 7/1/2014 | 10/17/2016 | 138,565.93 | 27,713.18 | 27,713.18 | 27,713.18 | 1 | | | |
| 185673 | 1 | CLASS 2 | JFFS | LAKE VISTA DIALYSIS | 7/1/2014 | 10/26/2016 | 805,193.80 | 51,592.24 | 51,592.24 | 51,592.24 | 1 | | | |
| 185835 | 1 | CLASS 2 | JFFS | HOWARD DIAMOND | 7/1/2014 | 9/23/2016 | 3,485.00 | 2,637.35 | 2,637.35 | 2,637.35 | 1 | | | |
| 185865 | 1 | CLASS 2 | JFFS | GOLFCREST HEALTHCARE CENTER | 7/1/2014 | 10/12/2016 | 21,170.00 | 17,400.00 | 17,400.00 | 17,400.00 | 1 | | | |
| 185881 | 1 | CLASS 2 | JFFS | OCALA REGIONAL KIDNEY CENTER NORTH | 7/1/2014 | 10/26/2016 | 424,818.70 | 27,615.30 | 27,615.30 | 27,615.30 | 1 | | | |
| 185884 | 1 | CLASS 8 | JFFS | NORTH BROWARD | 7/1/2014 | 5/1/2017 | 53.00 | - | - | - | 1 | | | |
| 186001 | 1 | CLASS 2 | JFFS | PALM BEACH FOOT AND ANKLE INC | 7/1/2014 | 10/6/2016 | 7,813.00 | 3,322.36 | 3,322.36 | 3,322.36 | 1 | | | |
| 186039 | 1 | CLASS 2 | JFFS | CARILLON SURGERY CENTER | 7/1/2014 | 9/20/2016 | 11,881.00 | 4,815.12 | 4,815.12 | 4,815.12 | 1 | | | |
| 186046 | 1 | CLASS 2 | JFFS | DOCTORS NEUROLOGICAL | 7/1/2014 | 10/12/2016 | 8,040.00 | 664.11 | 664.11 | 664.11 | 1 | | | |
| 186060 | 1 | CLASS 2 | JFFS | LONG WATER EMERGENCY | 7/1/2014 | 10/12/2016 | 324,646.00 | 30,020.54 | 30,020.54 | 30,020.54 | 1 | | | |
| 186063 | 1 | CLASS 2 | JFFS | MERCY HOSPITAL In Care Of | 7/1/2014 | 10/21/2016 | 114,540.09 | 22,283.02 | 22,283.02 | 22,283.02 | 1 | 12/15/2017 | W-E/U | |
| 186098 | 1 | CLASS 2 | JFFS | WATSON CLINIC LLP | 7/1/2014 | 10/6/2016 | 498,418.00 | 208,289.34 | 208,289.34 | 208,289.34 | 1 | | | |
| 186111 | 1 | CLASS 2 | JFFS | SELECT SPECIALTY | 7/1/2014 | 10/18/2016 | 890,994.63 | 102,355.03 | 102,355.03 | 102,355.03 | 1 | | | |
| 186139 | 1 | CLASS 8 | JFFS | ARGO PARTNERS | 7/1/2014 | 5/9/2017 | 34,347.00 | 17,692.10 | 17,692.10 | 17,692.10 | 1 | | | |
| 186150 | 1 | CLASS 2 | JFFS | SEBRING HMA PHYSICIAN | 7/1/2014 | 10/25/2016 | 407.13 | 80.15 | 80.15 | 80.15 | 1 | | | |
| 186178 | 1 | CLASS 2 | JFFS | SOUTH BROWARD HOSPITAL DISTRICT | 7/1/2014 | 10/18/2016 | 101,966.00 | 15,359.20 | 15,359.20 | 15,359.20 | 1 | | | |
| 186179 | 1 | CLASS 2 | JFFS | UNIVERSITY DIAGNOSTIC | 7/1/2014 | 9/20/2016 | 4,971.20 | 2,024.34 | 2,024.34 | 2,024.34 | 1 | | | |
| 186189 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/30/2016 | 656,525.00 | 81,877.15 | 81,877.15 | 81,877.15 | 1 | | | |
| 186225 | 1 | CLASS 2 | JFFS | JFK MEDICAL CENTER In Care | 7/1/2014 | 10/7/2016 | 11,454,805.31 | 1,562,711.98 | 1,562,711.98 | 1,562,711.98 | 1 | 12/15/2017 | W-E/U | |
| 186262 | 1 | CLASS 2 | JFFS | TORIBIO MEDICAL | 7/1/2014 | 9/15/2016 | 263.00 | 176.37 | 176.37 | 176.37 | 1 | | | |
| 186306 | 1 | CLASS 2 | JFFS | WAGUIH EL MASRY MD | 7/1/2014 | 10/6/2016 | 1,082.00 | 561.57 | 561.57 | 561.57 | 1 | | | |
| 186408 | 1 | CLASS 8 | JFFS | MUBEEN H CHIDA MD | 7/1/2014 | 11/15/2016 | 3,026.00 | 2,285.05 | 2,285.05 | 2,285.05 | 1 | | | |
| 186416 | 1 | CLASS 2 | JFFS | ANTHONY P JOSEPH MD PA | 7/1/2014 | 9/23/2016 | 2,830.00 | 2,063.16 | 2,063.16 | 2,063.16 | 1 | | | |
| 186490 | 1 | CLASS 2 | JFFS | DIGESTIVE CENTER OF THE | 7/1/2014 | 10/12/2016 | 4,360.00 | 2,462.71 | 2,462.71 | 2,462.71 | 1 | | | |
| 186506 | 1 | CLASS 2 | JFFS | SKIN CANCER CENTER OF | 7/1/2014 | 10/12/2016 | 18,550.00 | 14,422.93 | 14,422.93 | 14,422.93 | 1 | | | |
| 186517 | 1 | CLASS 2 | JFFS | FIRST RESPONSE ORTHO | 7/1/2014 | 9/15/2016 | 10,923.00 | 9,554.45 | 9,554.45 | 9,554.45 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 186541 | 1 | CLASS 2 | JFFS | NEUROCARE INSTITUTE | 7/1/2014 | 9/20/2016 | 35,935.00 | 15,001.44 | 15,001.44 | 15,001.44 | 1 | | | |
| 186554 | 1 | CLASS 2 | JFFS | SMS IMAGING INC | 7/1/2014 | 10/17/2016 | 220.00 | 51.05 | 51.05 | 51.05 | 1 | | | |
| 186588 | 1 | CLASS 2 | JFFS | WINTER HAVEN | 7/1/2014 | 8/31/2016 | 32,048.00 | 19,563.00 | 19,563.00 | 19,563.00 | 1 | | | |
| 186604 | 1 | CLASS 2 | JFFS | NEPHROLOGY ASSOCIATES OF CENTRAL FLORIDA | 7/1/2014 | 9/28/2016 | 415,872.50 | 143,646.09 | 143,646.09 | 143,646.09 | 1 | | | |
| 186644 | 1 | CLASS 2 | JFFS | APOPKA WELLNESS CENTER | 7/1/2014 | 9/14/2016 | 250.00 | 171.98 | 171.98 | 171.98 | 1 | | | |
| 186662 | 1 | CLASS 2 | JFFS | ST JOSEPHS WOMENS HOSPITAL | 7/1/2014 | 10/12/2016 | 29,005.28 | 5,663.23 | 5,663.23 | 5,663.23 | 1 | | | |
| 186695 | 1 | CLASS 2 | JFFS | ORLANDO DIALYSIS | 7/1/2014 | 10/26/2016 | 1,192,495.30 | 91,258.47 | 91,258.47 | 91,258.47 | 1 | | | |
| 186713 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/28/2016 | 17,141.00 | 8,897.77 | 8,897.77 | 8,897.77 | 1 | | | |
| 186807 | 1 | CLASS 2 | JFFS | SHORE ACRES | 7/1/2014 | 9/27/2016 | 3,811.54 | 609.84 | 609.84 | 609.84 | 1 | | | |
| 186821 | 1 | CLASS 2 | JFFS | ENDO SURGICAL CENTER OF FL | 7/1/2014 | 9/14/2016 | 92,820.00 | 29,926.14 | 29,926.14 | 29,926.14 | 1 | | | |
| 186898 | 1 | CLASS 8 | JFFS | JAY E OLSSON DO PA | 7/1/2014 | 11/8/2016 | 12,680.00 | 4,504.86 | 4,504.86 | 4,504.86 | 1 | | | |
| 186956 | 1 | CLASS 2 | JFFS | ALLINA HEALTH SYSTEM | 7/1/2014 | 10/27/2016 | 17,692.00 | - | - | - | 1 | | | |
| 186984 | 1 | CLASS 2 | JFFS | ANESTHESIA PHYSICIAN | 7/1/2014 | 10/27/2016 | 11,726.00 | 11,726.00 | 11,726.00 | 11,726.00 | 1 | | | |
| 186997 | 1 | CLASS 2 | JFFS | TAMPA BAY RADIATION ONCOLOGY PA | 7/1/2014 | 9/21/2016 | 825.00 | 263.21 | 263.21 | 263.21 | 1 | | | |
| 186999 | 1 | CLASS 2 | JFFS | INDIAN RIVER MEDICAL | 7/1/2014 | 9/23/2016 | 5,294.25 | 994.00 | 994.00 | 994.00 | 1 | | | |
| 187024 | 1 | CLASS 2 | JFFS | MORTON PLANT HOSPITAL | 7/1/2014 | 10/12/2016 | 668,946.78 | 128,541.39 | 128,541.39 | 128,541.39 | 1 | | | |
| 187066 | 1 | CLASS 2 | JFFS | NORTH BROWARD MEDICAL | 7/1/2014 | 9/28/2016 | 781,014.82 | 149,118.68 | 149,118.68 | 149,118.68 | 1 | | | |
| 187139 | 1 | CLASS 2 | JFFS | PAIN MEDICINE INC | 7/1/2014 | 10/7/2016 | 210,435.00 | 63,533.84 | 63,533.84 | 63,533.84 | 1 | | | |
| 187146 | 1 | CLASS 2 | JFFS | WINTER PARK DIALYSIS | 7/1/2014 | 10/26/2016 | 2,109,613.35 | 165,553.27 | 165,553.27 | 165,553.27 | 1 | | | |
| 187169 | 1 | CLASS 2 | JFFS | HEALTH CENTER OF | 7/1/2014 | 10/13/2016 | 5,600.00 | 4,800.00 | 4,800.00 | 4,800.00 | 1 | | | |
| 187182 | 1 | CLASS 2 | JFFS | SUN TRAIL INPATIENT | 7/1/2014 | 10/12/2016 | 19,503.00 | 5,110.53 | 5,110.53 | 5,110.53 | 1 | | | |
| 187346 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/25/2016 | 80,124.00 | 28,252.94 | 28,252.94 | 28,252.94 | 1 | | | |
| 187384 | 1 | CLASS 2 | JFFS | KOLLAGUNTA | 7/1/2014 | 10/22/2016 | 203,529.10 | 122,843.32 | 122,843.32 | 122,843.32 | 1 | | | |
| 187448 | 1 | CLASS 2 | JFFS | ADVANCED THERAPY | 7/1/2014 | 9/28/2016 | 12,050.37 | 4,266.84 | 4,266.84 | 4,266.84 | 1 | | | |
| 187501 | 1 | CLASS 2 | JFFS | ELLIOT ELLIS | 7/1/2014 | 9/29/2016 | 4,650.00 | 1,278.64 | 1,278.64 | 1,278.64 | 1 | | | |
| 187528 | 1 | CLASS 2 | JFFS | AUGUSTINE JOSEPH MD PA | 7/1/2014 | 9/28/2016 | 10,210.00 | 5,132.90 | 5,132.90 | 5,132.90 | 1 | | | |
| 187546 | 1 | CLASS 2 | JFFS | ALLERGY DIAGNOSTICS OF | 7/1/2014 | 10/26/2016 | 9,692.00 | 8,288.36 | 8,288.36 | 8,288.36 | 1 | | | |
| 187572 | 1 | CLASS 2 | JFFS | ROBERT MARTINEZ MD PA | 7/1/2014 | 9/13/2016 | 500.00 | 197.62 | 197.62 | 197.62 | 1 | | | |
| 187579 | 1 | CLASS 2 | JFFS | AVENTURA HOSPITAL In Care | 7/1/2014 | 10/5/2016 | 722,566.40 | 135,202.87 | 135,202.87 | 135,202.87 | 1 | 12/15/2017 | W-E/C | |
| 187585 | 1 | CLASS 2 | JFFS | NORTHWESTERN MEDICAL | 7/1/2014 | 8/30/2016 | 315.00 | 0.03 | 0.03 | 0.03 | 1 | | | |
| 187610 | 1 | CLASS 8 | JFFS | MCKENZIE REGIONAL HOSPITAL | 7/1/2014 | 2/7/2017 | 71,135.20 | 14,227.01 | 14,227.01 | 14,227.01 | 1 | | | |
| 187646 | 1 | CLASS 2 | JFFS | ROCKY MOUNTAIN HOLDING | 7/1/2014 | 10/5/2016 | 173,876.35 | - | - | - | 1 | | | |
| 187678 | 1 | CLASS 2 | JFFS | DR DAVID C MARTIN DPM PL | 7/1/2014 | 10/31/2016 | 620.00 | 516.96 | 516.96 | 516.96 | 1 | | | |
| 187693 | 1 | CLASS 2 | JFFS | CHARLOTTE COUNTY FIRE AND EMS | 7/1/2014 | 10/4/2016 | 175.00 | - | - | - | 1 | | | |
| 187715 | 1 | CLASS 2 | JFFS | SURGICAL LICENSED WARD | 7/1/2014 | 9/2/2016 | 25,105.00 | 3,863.90 | 3,863.90 | 3,863.90 | 1 | | | |
| 187716 | 1 | CLASS 2 | JFFS | LONGWOOD FIRE | 7/1/2014 | 10/4/2016 | 10,519.59 | 2,923.69 | 2,923.69 | 2,923.69 | 1 | | | |
| 187760 | 1 | CLASS 2 | JFFS | CHIRAG PATEL MD PA | 7/1/2014 | 10/13/2016 | 11,459.00 | 5,359.56 | 5,359.56 | 5,359.56 | 1 | | | |
| 187771 | 1 | CLASS 2 | JFFS | UNIVERSITY DIAGNOSTIC | 7/1/2014 | 10/31/2016 | 76,693.78 | 12,065.27 | 12,065.27 | 12,065.27 | 1 | | | |
| 187843 | 1 | CLASS 2 | JFFS | LIFE CARE CENTER OF OCALA | 7/1/2014 | 10/7/2016 | 26,460.00 | 22,800.00 | 22,800.00 | 22,800.00 | 1 | | | |
| 187860 | 1 | CLASS 2 | JFFS | DELRAY AMBULATORY | 7/1/2014 | 9/27/2016 | 12,000.00 | - | - | - | 1 | | | |
| 187883 | 1 | CLASS 2 | JFFS | SKIN AND CANCER | 7/1/2014 | 10/26/2016 | 80,265.00 | 40,693.39 | 40,693.39 | 40,693.39 | 1 | | | |
| 187889 | 1 | CLASS 2 | JFFS | ST ANTHONYS HOSPITAL INC | 7/1/2014 | 10/14/2016 | 1,634,287.80 | 313,246.86 | 313,246.86 | 313,246.86 | 1 | | | |
| 187891 | 1 | CLASS 8 | JFFS | SOUTHEASTERN REGIONAL | 7/1/2014 | 11/22/2016 | 8,464.73 | 1,204.50 | 1,204.50 | 1,204.50 | 1 | | | |
| 187927 | 1 | CLASS 2 | JFFS | RADIOLOGY IMAGING SPECIALISTS | 7/1/2014 | 10/31/2016 | 44.00 | - | - | - | 1 | | | |
| 187984 | 1 | CLASS 2 | JFFS | COLLETON COUNTY FIRE | 7/1/2014 | 10/4/2016 | 3,165.00 | 827.38 | 827.38 | 827.38 | 1 | | | |
| 188044 | 1 | CLASS 2 | JFFS | SAME DAY SURGICENTER OF | 7/1/2014 | 9/13/2016 | 270,038.18 | 21,893.44 | 21,893.44 | 21,893.44 | 1 | 12/15/2017 | W-E/U | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 188069 | 1 | CLASS 2 | JFFS | MORTON PLANT NORTHBAY | 7/1/2014 | 10/14/2016 | 844,336.35 | 155,636.53 | 155,636.53 | 155,636.53 | 1 | | | |
| 188108 | 1 | CLASS 2 | JFFS | PROFESSIONAL IMAGING CENTERS | 7/1/2014 | 9/13/2016 | 258,243.67 | 58,707.10 | 58,707.10 | 58,707.10 | 1 | | | |
| 188109 | 1 | CLASS 2 | JFFS | PROFESSIONAL IMAGING | 7/1/2014 | 9/13/2016 | 544.75 | 86.77 | 86.77 | 86.77 | 1 | | | |
| 188124 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/13/2016 | 24,450.00 | 3,980.09 | 3,980.09 | 3,980.09 | 1 | | | |
| 188152 | 1 | CLASS 2 | JFFS | BROWARD SHERIFFS FIRE | 7/1/2014 | 10/4/2016 | 7,099.68 | 2,178.79 | 2,178.79 | 2,178.79 | 1 | | | |
| 188196 | 1 | CLASS 2 | JFFS | APOPKA DIALYSIS | 7/1/2014 | 10/26/2016 | 25,006.55 | 1,442.75 | 1,442.75 | 1,442.75 | 1 | | | |
| 188208 | 1 | CLASS 2 | JFFS | PALMS OF PASADENA | 7/1/2014 | 10/5/2016 | 322,063.74 | 64,127.76 | 64,127.76 | 64,127.76 | 1 | | | |
| 188214 | 1 | CLASS 2 | JFFS | MEMORIAL HOSPITAL | 7/1/2014 | 10/12/2016 | 18,291.00 | 3,418.20 | 3,418.20 | 3,418.20 | 1 | | | |
| 188227 | 1 | CLASS 2 | JFFS | LANDMARK PRIMARY CARE | 7/1/2014 | 10/28/2016 | 4,890.00 | 3,752.78 | 3,752.78 | 3,752.78 | 1 | | | |
| 188334 | 1 | CLASS 2 | JFFS | WINTER PARK FIRE RESCUE | 7/1/2014 | 10/4/2016 | 16,287.50 | 5,369.03 | 5,369.03 | 5,369.03 | 1 | | | |
| 188342 | 1 | CLASS 2 | JFFS | MALINI A YELAMANCHI | 7/1/2014 | 10/3/2016 | 11,285.00 | 7,392.26 | 7,392.26 | 7,392.26 | 1 | | | |
| 188346 | 1 | CLASS 2 | JFFS | LRB MEDICAL SERVICES INC | 7/1/2014 | 9/28/2016 | 2,580.00 | 1,640.86 | 1,640.86 | 1,640.86 | 1 | | | |
| 188357 | 1 | CLASS 2 | JFFS | FT LAUDERDALE HEALTH & REHAB | 7/1/2014 | 10/12/2016 | 54,600.00 | 46,800.00 | 46,800.00 | 46,800.00 | 1 | | | |
| 188401 | 1 | CLASS 2 | JFFS | CARDIAC CLINIC | 7/1/2014 | 10/4/2016 | 222,611.07 | 112,012.37 | 112,012.37 | 112,012.37 | 1 | | | |
| 188417 | 1 | CLASS 2 | JFFS | ORLANDO SOUTHWEST | 7/1/2014 | 10/26/2016 | 508,473.50 | 41,268.22 | 41,268.22 | 41,268.22 | 1 | | | |
| 188418 | 1 | CLASS 2 | JFFS | ST PETERSBURG DIALYSIS | 7/1/2014 | 10/26/2016 | 26,771.55 | 1,649.11 | 1,649.11 | 1,649.11 | 1 | | | |
| 188439 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/20/2016 | 239,805.00 | 91,521.03 | 91,521.03 | 91,521.03 | 1 | | | |
| 188441 | 1 | CLASS 2 | JFFS | THE SURGERY CENTER OF | 7/1/2014 | 9/11/2016 | 303,776.00 | 26,385.84 | 26,385.84 | 26,385.84 | 1 | | | |
| 188464 | 1 | CLASS 2 | JFFS | BAY AREA HOSPITALISTS PA | 7/1/2014 | 10/19/2016 | 35,207.00 | 17,504.75 | 17,504.75 | 17,504.75 | 1 | | | |
| 188474 | 1 | CLASS 2 | JFFS | ANESTHESIA CARE TEAM INC | 7/1/2014 | 10/17/2016 | 25,354.00 | 25,353.99 | 25,353.99 | 25,353.99 | 1 | | | |
| 188489 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA ORTHOPAEDIC SURG | 7/1/2014 | 10/28/2016 | 41,194.99 | 11,185.02 | 11,185.02 | 11,185.02 | 1 | | | |
| 188510 | 1 | CLASS 2 | JFFS | TREASURE COAST HOSPITALIST PL | 7/1/2014 | 10/25/2016 | 5,145.00 | 4,234.61 | 4,234.61 | 4,234.61 | 1 | | | |
| 188540 | 1 | CLASS 2 | JFFS | BROWARD HEALTH URGENT CARE | 7/1/2014 | 10/20/2016 | 231.00 | 93.37 | 93.37 | 93.37 | 1 | | | |
| 188611 | 1 | CLASS 2 | JFFS | HIGHLANDS OCCUPATIONAL | 7/1/2014 | 9/23/2016 | 11,399.43 | 8,019.79 | 8,019.79 | 8,019.79 | 1 | | | |
| 188717 | 1 | CLASS 2 | JFFS | TRADEWINDS PARK INPAT | 7/1/2014 | 10/12/2016 | 1,187.00 | 260.68 | 260.68 | 260.68 | 1 | | | |
| 188722 | 1 | CLASS 2 | JFFS | RADHA MEDICAL PA | 7/1/2014 | 9/14/2016 | 7,545.00 | 5,400.01 | 5,400.01 | 5,400.01 | 1 | | | |
| 188728 | 1 | CLASS 2 | JFFS | PALMS WEST SURGICENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/21/2016 | 193,046.00 | 16,329.12 | 16,329.12 | 16,329.12 | 1 | 12/15/2017 | W-E/C | |
| 188797 | 1 | CLASS 2 | JFFS | WINTER HAVEN HOSPITAL | 7/1/2014 | 10/28/2016 | 24,349,373.71 | 2,538,169.86 | 2,538,169.86 | 2,538,169.86 | 1 | | | |
| 188814 | 1 | CLASS 2 | JFFS | PHYSICIAN ASSOCIATES LLC | 7/1/2014 | 10/17/2016 | 149,110.00 | 63,177.54 | 63,177.54 | 63,177.54 | 1 | | | |
| 188830 | 1 | CLASS 2 | JFFS | SIGNATURE HEALTHCARE OF | 7/1/2014 | 10/26/2016 | 20,800.00 | 19,200.00 | 19,200.00 | 19,200.00 | 1 | | | |
| 188899 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/13/2016 | 17,500.00 | 15,000.00 | 15,000.00 | 15,000.00 | 1 | | | |
| 188955 | 1 | CLASS 2 | JFFS | SHERIDAN RADIOLOGY | 7/1/2014 | 10/5/2016 | 2,122,620.21 | 158,815.81 | 158,815.81 | 158,815.81 | 1 | | | |
| 188968 | 1 | CLASS 2 | JFFS | SEMINOLE COUNTY FIRE/RESCUE | 7/1/2014 | 10/4/2016 | 62,935.14 | 35,292.27 | 35,292.27 | 35,292.27 | 1 | | | |
| 188975 | 1 | CLASS 2 | JFFS | CAPE CORAL HOSPITAL | 7/1/2014 | 10/10/2016 | 10,538.38 | 1,869.44 | 1,869.44 | 1,869.44 | 1 | | | |
| 188980 | 1 | CLASS 2 | JFFS | INPATIENT MEDICINE | 7/1/2014 | 9/21/2016 | 28,831.00 | 23,899.80 | 23,899.80 | 23,899.80 | 1 | | | |
| 189008 | 1 | CLASS 2 | JFFS | BAYCARE OUTPATIENT IMAGING | 7/1/2014 | 10/14/2016 | 2,147.00 | 805.86 | 805.86 | 805.86 | 1 | | | |
| 189013 | 1 | CLASS 8 | JFFS | NUVISTA CARE AT | 7/1/2014 | 12/16/2016 | 6,570.00 | 5,400.00 | 5,400.00 | 5,400.00 | 1 | | | |
| 189019 | 1 | CLASS 2 | JFFS | LAKE EMERGENCY MEDICAL SERVICES INC | 7/1/2014 | 9/11/2016 | 88,088.50 | 45,818.28 | 45,818.28 | 45,818.28 | 1 | | | |
| 189057 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/13/2016 | 23,458.00 | 11,422.41 | 11,422.41 | 11,422.41 | 1 | | | |
| 189099 | 1 | CLASS 2 | JFFS | LIFE CARE CENTER OF PORT ST LUCIE | 7/1/2014 | 10/7/2016 | 20,160.00 | 16,800.00 | 16,800.00 | 16,800.00 | 1 | | | |
| 189129 | 1 | CLASS 2 | JFFS | FLORIDA RADIOLOGY | 7/1/2014 | 9/14/2016 | 3,160.00 | 519.86 | 519.86 | 519.86 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 189144 | 1 | CLASS 2 | JFFS | HIMANSHU CHANDARANA MD PA | 7/1/2014 | 10/26/2016 | 1,396.00 | 904.93 | 904.93 | 904.93 | 1 | | | |
| 189190 | 1 | CLASS 2 | JFFS | OCALA BEHAVIORAL HEALTH | 7/1/2014 | 9/17/2016 | 51,464.15 | 8,324.84 | 8,324.84 | 8,324.84 | 1 | | | |
| 189219 | 1 | CLASS 2 | JFFS | CITY OF ORLANDO | 7/1/2014 | 10/4/2016 | 142,959.76 | 46,945.70 | 46,945.70 | 46,945.70 | 1 | | | |
| 189224 | 1 | CLASS 2 | JFFS | TOWN AND COUNTRY | 7/1/2014 | 10/5/2016 | 595,919.60 | 118,402.76 | 118,402.76 | 118,402.76 | 1 | | | |
| 189283 | 1 | CLASS 2 | JFFS | TITUSVILLE REHABILITATION | 7/1/2014 | 10/27/2016 | 1,125.00 | 900.00 | 900.00 | 900.00 | 1 | | | |
| 189289 | 1 | CLASS 2 | JFFS | CARDIOVASCULAR | 7/1/2014 | 10/4/2016 | 203,575.00 | 78,839.98 | 78,839.98 | 78,839.98 | 1 | | | |
| 189360 | 1 | CLASS 2 | JFFS | PEDRO Y CHAN R PH DO PA | 7/1/2014 | 10/21/2016 | 748.01 | 495.73 | 495.73 | 495.73 | 1 | | | |
| 189371 | 1 | CLASS 2 | JFFS | COASTAL CAROLINA | 7/1/2014 | 9/29/2016 | 17,467.00 | - | - | - | 1 | | | |
| 189406 | 1 | CLASS 2 | JFFS | PREMIER INFECTIOUS | 7/1/2014 | 10/6/2016 | 13,100.00 | 5,489.82 | 5,489.82 | 5,489.82 | 1 | | | |
| 189417 | 1 | CLASS 2 | JFFS | DIXIE HIGHWAY INPATIENT | 7/1/2014 | 10/12/2016 | 12,243.00 | 2,766.84 | 2,766.84 | 2,766.84 | 1 | | | |
| 189419 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/25/2016 | 341,157.36 | 126,216.06 | 126,216.06 | 126,216.06 | 1 | | | |
| 189535 | 1 | CLASS 2 | JFFS | PALMS WEST HOSPITAL In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/7/2016 | 1,723,488.33 | 225,427.28 | 225,427.28 | 225,427.28 | 1 | | | |
| 189561 | 1 | CLASS 2 | JFFS | TAMARAC ARTIFICIAL KIDNEY | 7/1/2014 | 10/26/2016 | 3,581.70 | 0.80 | 0.80 | 0.80 | 1 | | | |
| 189613 | 1 | CLASS 2 | JFFS | NORTH BROWARD HOSPITAL | 7/1/2014 | 10/18/2016 | 15,163.00 | 7,108.12 | 7,108.12 | 7,108.12 | 1 | | | |
| 189614 | 1 | CLASS 8 | JFFS | LEAVITT MEDICAL ASSOCIATES OF FLORIDA | 7/1/2014 | 12/29/2016 | 80.00 | 47.18 | 47.18 | 47.18 | 1 | | | |
| 189619 | 1 | CLASS 2 | JFFS | BRYAN FREDRICK | 7/1/2014 | 10/8/2016 | 621.00 | 221.20 | 221.20 | 221.20 | 1 | | | |
| 189623 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/12/2016 | 116,406.46 | 25,742.89 | 25,742.89 | 25,742.89 | 1 | | | |
| 189645 | 1 | CLASS 2 | JFFS | SHERIDAN EMERGENCY PHYSICIANS INC And VER PLOEG & LUMPKIN PA | 7/1/2014 | 10/27/2016 | 71,496.00 | 7,907.61 | 7,907.61 | 7,907.61 | 1 | | | |
| 189655 | 1 | CLASS 2 | JFFS | NEUROLOGY SERVICES OF | 7/1/2014 | 9/29/2016 | 1,763.00 | 257.97 | 257.97 | 257.97 | 1 | | | |
| 189668 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/26/2016 | 8,962.00 | 3,364.39 | 3,364.39 | 3,364.39 | 1 | | | |
| 189672 | 1 | CLASS 2 | JFFS | SOUTH FLORIDA ANES PAIN | 7/1/2014 | 10/26/2016 | 27,631.00 | 17,565.00 | 17,565.00 | 17,565.00 | 1 | | | |
| 189677 | 1 | CLASS 2 | JFFS | BRANDON REGIONAL HOSPITAL In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 7,063.57 | 1,012.71 | 1,012.71 | 1,012.71 | 1 | | | |
| 189740 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 2,090.00 | 1,000.92 | 1,000.92 | 1,000.92 | 1 | | | |
| 189780 | 1 | CLASS 2 | JFFS | CARDIAC CARE SERVICES PA | 7/1/2014 | 10/5/2016 | 4,390.00 | 1,538.35 | 1,538.35 | 1,538.35 | 1 | | | |
| 189793 | 1 | CLASS 2 | JFFS | ORLANDO PARK DIALYSIS | 7/1/2014 | 10/26/2016 | 412,040.65 | 31,616.68 | 31,616.68 | 31,616.68 | 1 | | | |
| 189827 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 9/2/2016 | 1,292,652.29 | 51,220.00 | 51,220.00 | 51,220.00 | 1 | | | |
| 189828 | 1 | CLASS 2 | JFFS | POINCIANA DIALYSIS | 7/1/2014 | 10/26/2016 | 1,869,590.25 | 123,828.23 | 123,828.23 | 123,828.23 | 1 | | | |
| 189838 | 1 | CLASS 2 | JFFS | SOUTH FLORIDA BAPTIST HOSP | 7/1/2014 | 10/14/2016 | 1,750,445.13 | 298,899.75 | 298,899.75 | 298,899.75 | 1 | | | |
| 189899 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/28/2016 | 9,797,905.87 | 1,855,354.92 | 1,855,354.92 | 1,855,354.92 | 1 | | | |
| 189926 | 1 | CLASS 2 | JFFS | POLK COUNTY BOCC EMS | 7/1/2014 | 10/4/2016 | 576,068.90 | 283,431.75 | 283,431.75 | 283,431.75 | 1 | | | |
| 190006 | 1 | CLASS 2 | JFFS | LEE MEMORIAL HOSPITAL | 7/1/2014 | 10/10/2016 | 107,348.07 | 21,279.11 | 21,279.11 | 21,279.11 | 1 | | | |
| 190075 | 1 | CLASS 2 | JFFS | CITY OF MARGATE | 7/1/2014 | 10/4/2016 | 6,264.00 | 1,428.61 | 1,428.61 | 1,428.61 | 1 | | | |
| 190079 | 1 | CLASS 2 | JFFS | WOLVERINE ANESTHESIA CONSULTS MD PA | 7/1/2014 | 10/22/2016 | 426,353.00 | 44,586.64 | 44,586.64 | 44,586.64 | 1 | | | |
| 190080 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA HOSPITALIST PARTNERS | 7/1/2014 | 9/15/2016 | 544.00 | 197.62 | 197.62 | 197.62 | 1 | | | |
| 190092 | 1 | CLASS 2 | JFFS | NAVNIT U PATEL MD PA | 7/1/2014 | 9/2/2016 | 555.00 | 458.10 | 458.10 | 458.10 | 1 | | | |
| 190132 | 1 | CLASS 2 | JFFS | ATLANTIS OUTPATIENT | 7/1/2014 | 9/27/2016 | 3,854.52 | 375.86 | 375.86 | 375.86 | 1 | | | |
| 190137 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/11/2016 | 47,403.00 | 6,583.62 | 6,583.62 | 6,583.62 | 1 | | | |
| 190165 | 1 | CLASS 2 | JFFS | LAWNWOOD MEDICAL | 7/1/2014 | 10/7/2016 | 1,055,109.95 | 202,662.46 | 202,662.46 | 202,662.46 | 1 | | | |
| 190177 | 1 | CLASS 2 | JFFS | COLUMBIA HOSPITAL | 7/1/2014 | 10/13/2016 | 35,032.28 | 6,381.46 | 6,381.46 | 6,381.46 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 190183 | 1 | CLASS 8 | JFFS | LIFE CARE CENTER OF | 7/1/2014 | 5/5/2017 | 18,700.74 | 3,150.13 | 3,150.13 | 3,150.13 | 1 | | | |
| 190239 | 1 | CLASS 2 | JFFS | IMPERIAL | 7/1/2014 | 9/30/2016 | 17,781.23 | 2,595.00 | 2,595.00 | 2,595.00 | 1 | | | |
| 190284 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA | 7/1/2014 | 10/17/2016 | 37,015.00 | 21,549.78 | 21,549.78 | 21,549.78 | 1 | | | |
| 190316 | 1 | CLASS 2 | JFFS | CLERMONT AMBULATORY | 7/1/2014 | 9/28/2016 | 276,630.96 | 33,533.43 | 33,533.43 | 33,533.43 | 1 | | | |
| 190324 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/26/2016 | 19,305,339.59 | 2,588,494.43 | 2,588,494.43 | 2,588,494.43 | 1 | | | |
| 190372 | 1 | CLASS 2 | JFFS | JEFFERSON REGIONAL MED | 7/1/2014 | 10/27/2016 | 5,637.95 | 923.79 | 923.79 | 923.79 | 1 | | | |
| 190425 | 1 | CLASS 2 | JFFS | OSCEOLA SURGICAL | 7/1/2014 | 9/22/2016 | 230,367.00 | 61,589.11 | 61,589.11 | 61,589.11 | 1 | | | |
| 190428 | 1 | CLASS 2 | JFFS | LARGO PHYSICIAN GROUP | 7/1/2014 | 9/28/2016 | 2,652.00 | 1,103.57 | 1,103.57 | 1,103.57 | 1 | | | |
| 190436 | 1 | CLASS 2 | JFFS | CORINTH INPATIENT SERVICES | 7/1/2014 | 10/12/2016 | 1,995.00 | 301.20 | 301.20 | 301.20 | 1 | | | |
| 190483 | 1 | CLASS 2 | JFFS | BROWARD PET IMAGING CENTER | 7/1/2014 | 10/12/2016 | 12,333.57 | 3,379.78 | 3,379.78 | 3,379.78 | 1 | | | |
| 190546 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/26/2016 | 28,522.96 | 5,704.59 | 5,704.59 | 5,704.59 | 1 | | | |
| 190571 | 1 | CLASS 2 | JFFS | MIAMI DADE COUNTY FIRE | 7/1/2014 | 10/4/2016 | 21,210.00 | 9,927.20 | 9,927.20 | 9,927.20 | 1 | | | |
| 190582 | 1 | CLASS 2 | JFFS | ROYAL MANOR | 7/1/2014 | 9/13/2016 | 2,190.00 | 1,800.00 | 1,800.00 | 1,800.00 | 1 | | | |
| 190612 | 1 | CLASS 2 | JFFS | DME TENNESSEE LLC | 7/1/2014 | 9/15/2016 | 9,063.80 | 7,521.03 | 7,521.03 | 7,521.03 | 1 | | | |
| 190672 | 1 | CLASS 2 | JFFS | SHERIDAN EMERGENCY PHYSICIANS And VER PLOEG & LUMPKIN PA | 7/1/2014 | 10/27/2016 | 463,808.00 | 48,567.17 | 48,567.17 | 48,567.17 | 1 | | | |
| 190749 | 1 | CLASS 2 | JFFS | BAYCARE SURGERY CENTER | 7/1/2014 | 10/19/2016 | 4,600.00 | 756.84 | 756.84 | 756.84 | 1 | | | |
| 190762 | 1 | CLASS 2 | JFFS | NOAH M BLUM DPM PA | 7/1/2014 | 8/31/2016 | 3,204.00 | 2,055.78 | 2,055.78 | 2,055.78 | 1 | | | |
| 190777 | 1 | CLASS 2 | JFFS | ABU AZIZULLAH MD PA | 7/1/2014 | 8/31/2016 | 4,878.16 | 607.84 | 607.84 | 607.84 | 1 | | | |
| 190780 | 1 | CLASS 2 | JFFS | PINELLAS PARK CARE & | 7/1/2014 | 10/26/2016 | 3,150.00 | 2,700.00 | 2,700.00 | 2,700.00 | 1 | | | |
| 190836 | 1 | CLASS 2 | JFFS | KISSIMMEE DIALYSIS | 7/1/2014 | 10/26/2016 | 1,188,944.80 | 92,978.50 | 92,978.50 | 92,978.50 | 1 | | | |
| 190839 | 1 | CLASS 2 | JFFS | GULF BREEZE DIALYSIS | 7/1/2014 | 10/26/2016 | 487,606.07 | 32,436.30 | 32,436.30 | 32,436.30 | 1 | | | |
| 190934 | 1 | CLASS 2 | JFFS | OUTPATIENT SURGERY | 7/1/2014 | 10/28/2016 | 2,600.00 | 520.00 | 520.00 | 520.00 | 1 | | | |
| 191024 | 1 | CLASS 8 | JFFS | EAST ORANGE GENERAL HOSPITAL | 7/1/2014 | 1/27/2017 | 34,894.20 | 6,978.84 | 6,978.84 | 6,978.84 | 1 | | | |
| 191056 | 1 | CLASS 2 | JFFS | MICHELE LIBMAN | 7/1/2014 | 10/5/2016 | 24,909.28 | 12,188.22 | 12,188.22 | 12,188.22 | 1 | | | |
| 191068 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO | 7/1/2014 | 10/27/2016 | 2,623,524.52 | 494,592.13 | 494,592.13 | 494,592.13 | 1 | | | |
| 191084 | 1 | CLASS 2 | JFFS | FLORIDA UROLOGY PA | 7/1/2014 | 9/11/2016 | 108,116.00 | 43,980.64 | 43,980.64 | 43,980.64 | 1 | | | |
| 191138 | 1 | CLASS 2 | JFFS | OSCEOLA CANCER CENTER | 7/1/2014 | 9/11/2016 | 194,268.13 | 46,948.11 | 46,948.11 | 46,948.11 | 1 | | | |
| 191211 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/28/2016 | 53,327.00 | 21,030.56 | 21,030.56 | 21,030.56 | 1 | | | |
| 191243 | 1 | CLASS 2 | JFFS | CFP CARE TEAM LLC | 7/1/2014 | 9/21/2016 | 25,308.00 | 19,025.59 | 19,025.59 | 19,025.59 | 1 | | | |
| 191258 | 1 | CLASS 2 | JFFS | PHYSICIANS IMAGING  MT | 7/1/2014 | 9/23/2016 | 81,083.00 | 4,088.43 | 4,088.43 | 4,088.43 | 1 | | | |
| 191305 | 1 | CLASS 2 | JFFS | OCOEE DIALYSIS | 7/1/2014 | 10/26/2016 | 552,263.95 | 45,010.99 | 45,010.99 | 45,010.99 | 1 | | | |
| 191307 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 1,890.00 | 829.13 | 829.13 | 829.13 | 1 | | | |
| 191345 | 1 | CLASS 2 | JFFS | THE LUNG CLINIC PA | 7/1/2014 | 9/11/2016 | 16,550.00 | 8,092.99 | 8,092.99 | 8,092.99 | 1 | | | |
| 191348 | 1 | CLASS 2 | JFFS | HOLLY CROSS HOSPITAL | 7/1/2014 | 10/29/2016 | 126,758.83 | 24,920.14 | 24,920.14 | 24,920.14 | 1 | | | |
| 191364 | 1 | CLASS 2 | JFFS | FORT PIERCE ORTHOPAEDICS LLC In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/28/2016 | 2,952.00 | 907.41 | 907.41 | 907.41 | 1 | | | |
| 191446 | 1 | CLASS 2 | JFFS | THE NEUROHEALTH | 7/1/2014 | 9/28/2016 | 38,356.00 | 12,719.63 | 12,719.63 | 12,719.63 | 1 | | | |
| 191498 | 1 | CLASS 8 | JFFS | ADVANCE FAMILY PRACTICE LLC | 7/1/2014 | 11/7/2016 | 6,030.00 | 4,215.23 | 4,215.23 | 4,215.23 | 1 | | | |
| 191499 | 1 | CLASS 2 | JFFS | DERMATOLOGY ASSOC PA OF THE PALM BEACHES | 7/1/2014 | 10/22/2016 | 184,897.03 | 87,609.85 | 87,609.85 | 87,609.85 | 1 | | | |
| 191530 | 1 | CLASS 2 | JFFS | CITY OF FT LAUDERDALE | 7/1/2014 | 10/4/2016 | 6,905.55 | 2,612.65 | 2,612.65 | 2,612.65 | 1 | | | |
| 191580 | 1 | CLASS 2 | JFFS | EXPRESS CARE OF OCALA | 7/1/2014 | 10/22/2016 | 19,860.00 | 10,316.73 | 10,316.73 | 10,316.73 | 1 | | | |
| 191596 | 1 | CLASS 2 | JFFS | LAWNWOOD HEALTHCARE | 7/1/2014 | 9/28/2016 | 29,644.00 | 4,832.85 | 4,832.85 | 4,832.85 | 1 | | | |
| 191608 | 1 | CLASS 2 | JFFS | PULMONARY DISEASE | 7/1/2014 | 10/12/2016 | 323,125.40 | 144,328.15 | 144,328.15 | 144,328.15 | 1 | | | |
| 191615 | 1 | CLASS 2 | JFFS | GREAR HOPE INPATIENT | 7/1/2014 | 10/12/2016 | 3,839.00 | 1,322.55 | 1,322.55 | 1,322.55 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191634 | 1 | CLASS 2 | JFFS | OCALA CARDIOVASCULAR | 7/1/2014 | 8/31/2016 | 70,744.00 | 40,768.08 | 40,768.08 | 40,768.08 | 1 | | | |
| 191650 | 1 | CLASS 2 | JFFS | BAYCARE LIFE MANAGEMENT | 7/1/2014 | 10/14/2016 | 770.00 | 280.08 | 280.08 | 280.08 | 1 | | | |
| 191677 | 1 | CLASS 2 | JFFS | GASTROENTEROLOGY | 7/1/2014 | 9/29/2016 | 3,570.00 | 1,528.69 | 1,528.69 | 1,528.69 | 1 | | | |
| 191726 | 1 | CLASS 2 | JFFS | CLEARWATER CARDIO & INTERVENTIONAL CONS | 7/1/2014 | 10/17/2016 | 11,914.00 | 5,511.54 | 5,511.54 | 5,511.54 | 1 | | | |
| 191733 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/24/2016 | 201,791.57 | 72,038.59 | 72,038.59 | 72,038.59 | 1 | | | |
| 191755 | 1 | CLASS 2 | JFFS | ARLETTA MARUNOWSKA | 7/1/2014 | 9/11/2016 | 5,541.72 | 1,396.03 | 1,396.03 | 1,396.03 | 1 | | | |
| 191759 | 1 | CLASS 2 | JFFS | WEST COAST INFECTIOUS | 7/1/2014 | 9/21/2016 | 16,082.00 | 6,338.88 | 6,338.88 | 6,338.88 | 1 | | | |
| 191779 | 1 | CLASS 2 | JFFS | OCALA HEALTH SURGICAL | 7/1/2014 | 9/28/2016 | 43,512.00 | 12,219.62 | 12,219.62 | 12,219.62 | 1 | 12/15/2017 | W-E/C | |
| 191782 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/10/2016 | 30,860.00 | 9,992.19 | 9,992.19 | 9,992.19 | 1 | | | |
| 191805 | 1 | CLASS 2 | JFFS | ESOTERIX GENETIC LABS LLC | 7/1/2014 | 10/25/2016 | 623.48 | 623.48 | 623.48 | 623.48 | 1 | | | |
| 191858 | 1 | CLASS 2 | JFFS | DAVENPORT DIALYSIS CENTER | 7/1/2014 | 10/26/2016 | 1,095,416.95 | 84,151.82 | 84,151.82 | 84,151.82 | 1 | | | |
| 191891 | 1 | CLASS 2 | JFFS | SUNRISE MEDICAL GROUP I | 7/1/2014 | 9/24/2016 | 24,277.00 | 9,597.73 | 9,597.73 | 9,597.73 | 1 | | | |
| 191896 | 1 | CLASS 2 | JFFS | THE WOMENS IMAGING CENTER | 7/1/2014 | 9/19/2016 | 1,548.00 | 394.42 | 394.42 | 394.42 | 1 | | | |
| 191955 | 1 | CLASS 2 | JFFS | URBAN CARDIOLOGY LLC | 7/1/2014 | 10/22/2016 | 216,391.89 | 70,647.06 | 70,647.06 | 70,647.06 | 1 | | | |
| 191990 | 1 | CLASS 2 | JFFS | SHIP PORT PSYCH SERVICES | 7/1/2014 | 10/12/2016 | 2,484.00 | 775.81 | 775.81 | 775.81 | 1 | | | |
| 192021 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY HOLDINGS INC | 7/1/2014 | 9/11/2016 | 250.00 | 122.99 | 122.99 | 122.99 | 1 | | | |
| 192045 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/11/2016 | 174,233.81 | 25,774.47 | 25,774.47 | 25,774.47 | 1 | | | |
| 192121 | 1 | CLASS 2 | JFFS | INPATIENT CARE | 7/1/2014 | 10/12/2016 | 3,744.00 | 2,446.53 | 2,446.53 | 2,446.53 | 1 | | | |
| 192156 | 1 | CLASS 2 | JFFS | OSCEOLA REGIONAL MEDICAL CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/7/2016 | 49,583,039.51 | 4,695,191.70 | 4,695,191.70 | 4,695,191.70 | 1 | 12/15/2017 | W-E/U | |
| 192193 | 1 | CLASS 2 | JFFS | HARBOUR HEALTH CENTER | 7/1/2014 | 10/13/2016 | 10,850.00 | 9,300.00 | 9,300.00 | 9,300.00 | 1 | | | |
| 192212 | 1 | CLASS 2 | JFFS | QUALITY HEALTH OF ORANGE COUNTY | 7/1/2014 | 10/12/2016 | 14,235.00 | 11,700.00 | 11,700.00 | 11,700.00 | 1 | | | |
| 192223 | 1 | CLASS 2 | JFFS | SAAD MIRZA MD | 7/1/2014 | 10/31/2016 | 1,605.00 | 1,046.67 | 1,046.67 | 1,046.67 | 1 | | | |
| 192244 | 1 | CLASS 2 | JFFS | ORLANDO FAMILY PRACTICE | 7/1/2014 | 10/1/2016 | 5,543.44 | 3,377.79 | 3,377.79 | 3,377.79 | 1 | | | |
| 192259 | 1 | CLASS 2 | JFFS | CUMBERLAND COUNTY  EMS | 7/1/2014 | 10/5/2016 | 888.50 | - | - | - | 1 | | | |
| 192282 | 1 | CLASS 2 | JFFS | BAY AREA INTERNIST INC | 7/1/2014 | 10/31/2016 | 890.00 | 552.07 | 552.07 | 552.07 | 1 | | | |
| 192321 | 1 | CLASS 2 | JFFS | STUART B STRIKOWSKY DO | 7/1/2014 | 10/17/2016 | 1,760.00 | 1,300.48 | 1,300.48 | 1,300.48 | 1 | | | |
| 192373 | 1 | CLASS 2 | JFFS | ANESCO NORTH BROWARD LLC | 7/1/2014 | 10/10/2016 | 48,838.85 | 42,773.40 | 42,773.40 | 42,773.40 | 1 | | | |
| 192472 | 1 | CLASS 2 | JFFS | MARION COUNTY FIRE | 7/1/2014 | 9/17/2016 | 238,539.04 | 134,122.35 | 134,122.35 | 134,122.35 | 1 | | | |
| 192566 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/11/2016 | 50,659.50 | 13,117.94 | 13,117.94 | 13,117.94 | 1 | | | |
| 192591 | 1 | CLASS 2 | JFFS | WESTON OUTPATIENT SURGI | 7/1/2014 | 9/11/2016 | 22,684.75 | 2,316.72 | 2,316.72 | 2,316.72 | 1 | | | |
| 192629 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/20/2016 | 185,240.94 | 81,508.12 | 81,508.12 | 81,508.12 | 1 | | | |
| 192756 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/14/2016 | 13,483.40 | 5,927.47 | 5,927.47 | 5,927.47 | 1 | | | |
| 192806 | 1 | CLASS 2 | JFFS | EMERGENCY SPECIALISTS | 7/1/2014 | 10/7/2016 | 21,841.00 | 3,331.98 | 3,331.98 | 3,331.98 | 1 | | | |
| 192824 | 1 | CLASS 2 | JFFS | BAYONET POINT HUDSON KIDNEY CENTER | 7/1/2014 | 10/26/2016 | 29,718.50 | 1,647.75 | 1,647.75 | 1,647.75 | 1 | | | |
| 192837 | 1 | CLASS 2 | JFFS | WEST ORANGE HEALTHCARE INC | 7/1/2014 | 9/30/2016 | 123,912.00 | 17,371.30 | 17,371.30 | 17,371.30 | 1 | | | |
| 192850 | 1 | CLASS 2 | JFFS | HAWTHORNE HEALTH AND | 7/1/2014 | 10/12/2016 | 542,570.00 | 468,000.00 | 468,000.00 | 468,000.00 | 1 | | | |
| 192867 | 1 | CLASS 2 | JFFS | VALENCIA HILLS HEALTH & REHAB | 7/1/2014 | 10/26/2016 | 183,431.27 | 82,801.38 | 82,801.38 | 82,801.38 | 1 | | | |
| 192932 | 1 | CLASS 2 | JFFS | BAYFRONT HMA MEDICAL CENTER LLC | 7/1/2014 | 10/25/2016 | 11,460.86 | 3,291.78 | 3,291.78 | 3,291.78 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 193060 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 9/30/2016 | 8,485.00 | 4,057.98 | 4,057.98 | 4,057.98 | 1 | | | |
| 193098 | 1 | CLASS 2 | JFFS | WINTER PARK CARE & | 7/1/2014 | 10/12/2016 | 80,390.00 | 66,600.00 | 66,600.00 | 66,600.00 | 1 | | | |
| 193111 | 1 | CLASS 2 | JFFS | THE CROSSINGS | 7/1/2014 | 10/28/2016 | 5,600.00 | 4,800.00 | 4,800.00 | 4,800.00 | 1 | | | |
| 193112 | 1 | CLASS 2 | JFFS | THE CROSSINGS | 7/1/2014 | 10/28/2016 | 575.00 | 300.00 | 300.00 | 300.00 | 1 | | | |
| 193127 | 1 | CLASS 2 | JFFS | BAYCARE SURGERY CENTER | 7/1/2014 | 9/20/2016 | 6,489.00 | 1,503.62 | 1,503.62 | 1,503.62 | 1 | | | |
| 193224 | 1 | CLASS 2 | JFFS | LAKE HARRIS HEALTH | 7/1/2014 | 9/29/2016 | 234,409.44 | 151,982.91 | 151,982.91 | 151,982.91 | 1 | | | |
| 193285 | 1 | CLASS 2 | JFFS | LAKE BENNETT HEALTH AND REHAB | 7/1/2014 | 10/12/2016 | 281,575.00 | 146,400.00 | 146,400.00 | 146,400.00 | 1 | | | |
| 193349 | 1 | CLASS 2 | JFFS | LAKE WALES DIALYSIS | 7/1/2014 | 10/26/2016 | 735,489.75 | 49,516.77 | 49,516.77 | 49,516.77 | 1 | | | |
| 193444 | 1 | CLASS 8 | JFFS | OAKS OF KISSIMMEE | 7/1/2014 | 12/13/2016 | 13,545.34 | 10,200.02 | 10,200.02 | 10,200.02 | 1 | | | |
| 193455 | 1 | CLASS 2 | JFFS | HEALTH FIRST MEDICAL GRP | 7/1/2014 | 10/25/2016 | 30,437.00 | 10,532.45 | 10,532.45 | 10,532.45 | 1 | | | |
| 193459 | 1 | CLASS 8 | JFFS | MED TRANS CORPORATION | 7/1/2014 | 12/28/2016 | 162,343.96 | 12,383.80 | 12,383.80 | 12,383.80 | 1 | | | |
| 193544 | 1 | CLASS 2 | JFFS | JOHN KNOX VILLAGE MED CENTER | 7/1/2014 | 10/21/2016 | 23,194.78 | 3,711.16 | 3,711.16 | 3,711.16 | 1 | | | |
| 193559 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/11/2016 | 7,583.00 | 5,726.22 | 5,726.22 | 5,726.22 | 1 | | | |
| 193584 | 1 | CLASS 2 | JFFS | AMERICARE ALS | 7/1/2014 | 10/26/2016 | 52,162.36 | 17,333.82 | 17,333.82 | 17,333.82 | 1 | | | |
| 193595 | 1 | CLASS 2 | JFFS | PUTNAM COMMUNITY | 7/1/2014 | 10/7/2016 | 1,794.75 | 358.95 | 358.95 | 358.95 | 1 | | | |
| 193632 | 1 | CLASS 2 | JFFS | PARKVIEW MEDICAL GROUP | 7/1/2014 | 9/30/2016 | 432,106.08 | 168,088.72 | 168,088.72 | 168,088.72 | 1 | | | |
| 193635 | 1 | CLASS 2 | JFFS | CARLISLE IMAGING CENTER | 7/1/2014 | 10/14/2016 | 9,394.06 | 2,119.30 | 2,119.30 | 2,119.30 | 1 | | | |
| 193689 | 1 | CLASS 2 | JFFS | AROUND AND ABOUT  INC | 7/1/2014 | 10/19/2016 | 1,143.62 | 943.46 | 943.46 | 943.46 | 1 | | | |
| 193701 | 1 | CLASS 2 | JFFS | ORLANDO NORTH DIALYSIS | 7/1/2014 | 10/26/2016 | 613,717.60 | 42,271.46 | 42,271.46 | 42,271.46 | 1 | | | |
| 193789 | 1 | CLASS 2 | JFFS | ARBOR VILLAGE NURSING | 7/1/2014 | 9/27/2016 | 21,749.20 | 13,800.07 | 13,800.07 | 13,800.07 | 1 | | | |
| 193806 | 1 | CLASS 2 | JFFS | KEY VACA EMERGENCY | 7/1/2014 | 10/12/2016 | 717.00 | 52.25 | 52.25 | 52.25 | 1 | | | |
| 193841 | 1 | CLASS 2 | JFFS | ORTHOPAEDIC CARE | 7/1/2014 | 10/17/2016 | 5,262.20 | 480.27 | 480.27 | 480.27 | 1 | | | |
| 193845 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC And GAIL F ROBINSON ESQ | 7/1/2014 | 10/26/2016 | 34,678.36 | 15,168.86 | 15,168.86 | 15,168.86 | 1 | | | |
| 193863 | 1 | CLASS 2 | JFFS | MEMORIAL REGIONAL | 7/1/2014 | 10/18/2016 | 348,629.85 | 37,454.12 | 37,454.12 | 37,454.12 | 1 | | | |
| 193911 | 1 | CLASS 2 | JFFS | FMC SANFORD | 7/1/2014 | 10/7/2016 | 196,645.32 | 10,725.92 | 10,725.92 | 10,725.92 | 1 | | | |
| 193956 | 1 | CLASS 2 | JFFS | BON SECOURS ST MARYS | 7/1/2014 | 10/19/2016 | 1,217.00 | 399.80 | 399.80 | 399.80 | 1 | | | |
| 193990 | 1 | CLASS 2 | JFFS | BARBARA M BUNSTER DPM | 7/1/2014 | 10/3/2016 | 152.00 | - | - | - | 1 | | | |
| 193999 | 1 | CLASS 2 | JFFS | LIFE CARE CENTER OF ALTAMONTE SPRINGS | 7/1/2014 | 10/7/2016 | 17,365.00 | 11,700.01 | 11,700.01 | 11,700.01 | 1 | | | |
| 194031 | 1 | CLASS 2 | JFFS | BAY BREEZE DIALYSIS | 7/1/2014 | 10/26/2016 | 273,064.80 | 15,686.16 | 15,686.16 | 15,686.16 | 1 | | | |
| 194166 | 1 | CLASS 2 | JFFS | THE TERRACE OF KISSIMMEE | 7/1/2014 | 9/23/2016 | 346,275.52 | 104,901.28 | 104,901.28 | 104,901.28 | 1 | | | |
| 194191 | 1 | CLASS 2 | JFFS | GASTROCARE LLP | 7/1/2014 | 9/12/2016 | 105,369.94 | 23,851.92 | 23,851.92 | 23,851.92 | 1 | | | |
| 194227 | 1 | CLASS 2 | JFFS | HUNTERS CREEK DIALYSIS | 7/1/2014 | 10/26/2016 | 1,721,558.15 | 119,373.36 | 119,373.36 | 119,373.36 | 1 | | | |
| 194274 | 1 | CLASS 2 | JFFS | TRINITY SURGERY CENTER | 7/1/2014 | 9/20/2016 | 28,251.00 | 5,255.14 | 5,255.14 | 5,255.14 | 1 | | | |
| 194294 | 1 | CLASS 2 | JFFS | FIRST CARE WINTER HAVEN | 7/1/2014 | 10/16/2016 | 5,625.00 | - | - | - | 1 | | | |
| 194304 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/17/2016 | 77,987.00 | 26,838.06 | 26,838.06 | 26,838.06 | 1 | | | |
| 194372 | 1 | CLASS 2 | JFFS | RALPH A DEMATTEIS MD PA | 7/1/2014 | 9/21/2016 | 4,502.00 | 2,208.81 | 2,208.81 | 2,208.81 | 1 | | | |
| 194451 | 1 | CLASS 2 | JFFS | FL EMERGENCY PHYSICIANS KANG & ASSOC | 7/1/2014 | 10/1/2016 | 498,557.00 | 62,512.56 | 62,512.56 | 62,512.56 | 1 | | | |
| 194503 | 1 | CLASS 2 | JFFS | SAND LAKE CANCER CENTER | 7/1/2014 | 9/12/2016 | 441,531.48 | 92,314.56 | 92,314.56 | 92,314.56 | 1 | | | |
| 194524 | 1 | CLASS 2 | JFFS | FLORIDA MEDICAL CLINIC  PA | 7/1/2014 | 9/17/2016 | 2,558.00 | 677.49 | 677.49 | 677.49 | 1 | | | |
| 194525 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/17/2016 | 89,429.59 | 37,916.00 | 37,916.00 | 37,916.00 | 1 | | | |
| 194533 | 1 | CLASS 2 | JFFS | SHERIDAN HEALTHCORP INC And VER PLOEG & LUMPKIN PA | 7/1/2014 | 10/27/2016 | 830,752.00 | 514,687.73 | 514,687.73 | 514,687.73 | 1 | | | |
| 194563 | 1 | CLASS 2 | JFFS | CITY OF TAMPA | 7/1/2014 | 10/4/2016 | 13,660.00 | 5,524.98 | 5,524.98 | 5,524.98 | 1 | | | |
| 194634 | 1 | CLASS 2 | JFFS | THE HEALTH CENTER OF | 7/1/2014 | 10/13/2016 | 53,900.00 | 46,200.00 | 46,200.00 | 46,200.00 | 1 | | | |
| 194701 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA KIDNEY CENTERS VINELAND | 7/1/2014 | 9/30/2016 | 102,151.90 | 30,831.72 | 30,831.72 | 30,831.72 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 194703 | 1 | CLASS 2 | JFFS | SEACREST MRI OF | 7/1/2014 | 10/12/2016 | 807.17 | - | - | - | 1 | | | |
| 194744 | 1 | CLASS 2 | JFFS | OCALA ORTHOPAEDIC CARE | 7/1/2014 | 10/14/2016 | 127,370.62 | 33,966.35 | 33,966.35 | 33,966.35 | 1 | | | |
| 194789 | 1 | CLASS 2 | JFFS | NW BROWARD ARTIFICIAL KI | 7/1/2014 | 10/7/2016 | 235,227.52 | 13,520.00 | 13,520.00 | 13,520.00 | 1 | | | |
| 194795 | 1 | CLASS 2 | JFFS | PAUL A DOWDY MD | 7/1/2014 | 9/19/2016 | 110,223.84 | 35,876.95 | 35,876.95 | 35,876.95 | 1 | | | |
| 194831 | 1 | CLASS 2 | JFFS | SOUTH FLORIDA | 7/1/2014 | 9/19/2016 | 1,883.00 | 567.72 | 567.72 | 567.72 | 1 | | | |
| 194846 | 1 | CLASS 2 | JFFS | OCALA REGION KIDNEY CTR | 7/1/2014 | 10/26/2016 | 494,306.00 | 32,503.84 | 32,503.84 | 32,503.84 | 1 | | | |
| 194866 | 1 | CLASS 2 | JFFS | NORTHPOINT SURGERY AND | 7/1/2014 | 9/11/2016 | 118,263.45 | 13,832.24 | 13,832.24 | 13,832.24 | 1 | | | |
| 194901 | 1 | CLASS 2 | JFFS | TOWN & COUNTRY MEDICAL | 7/1/2014 | 9/21/2016 | 27,573.00 | 2,107.60 | 2,107.60 | 2,107.60 | 1 | | | |
| 194913 | 1 | CLASS 2 | JFFS | SANFORD DIALYSIS | 7/1/2014 | 10/26/2016 | 1,685,684.55 | 7,449.59 | 7,449.59 | 7,449.59 | 1 | | | |
| 194985 | 1 | CLASS 2 | JFFS | FLORIDA INSTITUTE OF HEALTH | 7/1/2014 | 9/29/2016 | 1,574.50 | 863.10 | 863.10 | 863.10 | 1 | | | |
| 195003 | 1 | CLASS 2 | JFFS | PINELLAS INTERNAL | 7/1/2014 | 10/17/2016 | 2,195.00 | 1,384.22 | 1,384.22 | 1,384.22 | 1 | | | |
| 195025 | 1 | CLASS 2 | JFFS | PINELLAS SURGICAL | 7/1/2014 | 9/29/2016 | 12,477.58 | 6,631.22 | 6,631.22 | 6,631.22 | 1 | | | |
| 195067 | 1 | CLASS 2 | JFFS | CITY OF OVIEDO FIRE RESCUE | 7/1/2014 | 10/4/2016 | 12,938.00 | 5,352.84 | 5,352.84 | 5,352.84 | 1 | | | |
| 195118 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/27/2016 | 49,385.00 | 30,773.99 | 30,773.99 | 30,773.99 | 1 | | | |
| 195154 | 1 | CLASS 2 | JFFS | HEALTHSOUTH ORLANDO | 7/1/2014 | 9/14/2016 | 57,241.00 | 4,783.68 | 4,783.68 | 4,783.68 | 1 | | | |
| 195203 | 1 | CLASS 2 | JFFS | DOCTORS PAIN | 7/1/2014 | 9/26/2016 | 788,402.92 | 130,623.58 | 130,623.58 | 130,623.58 | 1 | | | |
| 195239 | 1 | CLASS 2 | JFFS | SOUTH FLORIDA MEDICINE | 7/1/2014 | 10/6/2016 | 151,968.41 | 36,552.56 | 36,552.56 | 36,552.56 | 1 | | | |
| 195249 | 1 | CLASS 2 | JFFS | MARGATE HEALTH CARE | 7/1/2014 | 9/20/2016 | 12,410.00 | 10,200.00 | 10,200.00 | 10,200.00 | 1 | | | |
| 195292 | 1 | CLASS 2 | JFFS | HANA J CLEMENTS | 7/1/2014 | 9/1/2016 | 4,037.00 | 1,636.92 | 1,636.92 | 1,636.92 | 1 | | | |
| 195298 | 1 | CLASS 2 | JFFS | INPHYNET SOUTH BROWARD INC | 7/1/2014 | 10/26/2016 | 48,625.00 | 5,190.78 | 5,190.78 | 5,190.78 | 1 | | | |
| 195316 | 1 | CLASS 2 | JFFS | TAMPA PAIN RELIEF CENTER | 7/1/2014 | 9/20/2016 | 812,518.06 | 64,522.41 | 64,522.41 | 64,522.41 | 1 | | | |
| 195330 | 1 | CLASS 2 | JFFS | ST LUCIE SURGERY CENTER | 7/1/2014 | 9/17/2016 | 154,075.00 | 16,391.90 | 16,391.90 | 16,391.90 | 1 | | | |
| 195333 | 1 | CLASS 2 | JFFS | ORLANDO HOME TRAINING | 7/1/2014 | 10/26/2016 | 1,152,719.60 | 3,483.07 | 3,483.07 | 3,483.07 | 1 | | | |
| 195340 | 1 | CLASS 2 | JFFS | SOUTHEASTERN | 7/1/2014 | 10/19/2016 | 9,586.01 | 6,417.02 | 6,417.02 | 6,417.02 | 1 | | | |
| 195363 | 1 | CLASS 2 | JFFS | OCALA FAMILY MEDICAL | 7/1/2014 | 10/26/2016 | 6,170.07 | 2,643.04 | 2,643.04 | 2,643.04 | 1 | | | |
| 195401 | 1 | CLASS 2 | JFFS | LEESBURG REGIONAL MEDICAL CENTER | 7/1/2014 | 9/23/2016 | 81,084.35 | 10,434.43 | 10,434.43 | 10,434.43 | 1 | | | |
| 195423 | 1 | CLASS 2 | JFFS | 21ST CENTURY ONCOLOGY | 7/1/2014 | 9/29/2016 | 77,233.65 | 19,911.41 | 19,911.41 | 19,911.41 | 1 | | | |
| 195436 | 1 | CLASS 2 | JFFS | TOTAL IMAGING PARSONS | 7/1/2014 | 10/8/2016 | 61,467.43 | 13,101.62 | 13,101.62 | 13,101.62 | 1 | | | |
| 195456 | 1 | CLASS 2 | JFFS | MEMORIAL HOSPITAL In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 108,951.00 | 19,574.92 | 19,574.92 | 19,574.92 | 1 | | | |
| 195473 | 1 | CLASS 2 | JFFS | LIFE CARE CENTER AT INVERRARY | 7/1/2014 | 10/19/2016 | 4,680.00 | 0.01 | 0.01 | 0.01 | 1 | | | |
| 195483 | 1 | CLASS 2 | JFFS | ST JOSEPHS HOSPITAL | 7/1/2014 | 10/12/2016 | 1,533,797.96 | 293,742.20 | 293,742.20 | 293,742.20 | 1 | | | |
| 195493 | 1 | CLASS 2 | JFFS | PROFESSIONAL HEALTH CARE OF PINELLAS INC | 7/1/2014 | 10/14/2016 | 129,855.00 | 65,489.71 | 65,489.71 | 65,489.71 | 1 | | | |
| 195542 | 1 | CLASS 8 | JFFS | CENTRAL IMAGING OPEN MRI | 7/1/2014 | 6/28/2017 | 3,047.80 | 359.22 | 359.22 | 359.22 | 1 | | | |
| 195616 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/12/2016 | 56,807.00 | 25,059.22 | 25,059.22 | 25,059.22 | 1 | | | |
| 195665 | 1 | CLASS 2 | JFFS | CLOVER EMERGENCY | 7/1/2014 | 10/12/2016 | 10,323.00 | 903.95 | 903.95 | 903.95 | 1 | | | |
| 195708 | 1 | CLASS 2 | JFFS | CITY OF POMPANO BEACH | 7/1/2014 | 10/4/2016 | 7,190.00 | 2,369.23 | 2,369.23 | 2,369.23 | 1 | | | |
| 195739 | 1 | CLASS 2 | JFFS | KISSIMMEE FIRE | 7/1/2014 | 10/4/2016 | 96,900.00 | 50,236.50 | 50,236.50 | 50,236.50 | 1 | | | |
| 195790 | 1 | CLASS 2 | JFFS | CENTER FOR DIGESTIVE | 7/1/2014 | 10/5/2016 | 187,500.00 | 30,300.34 | 30,300.34 | 30,300.34 | 1 | | | |
| 195799 | 1 | CLASS 2 | JFFS | COMMUNITY HOSPITAL | 7/1/2014 | 9/28/2016 | 16,001.00 | 3,377.42 | 3,377.42 | 3,377.42 | 1 | 12/15/2017 | W-E/U | |
| 195821 | 1 | CLASS 2 | JFFS | LIFESTREAM BEHAVIORAL CENTER | 7/1/2014 | 10/12/2016 | 85,323.36 | 9,501.84 | 9,501.84 | 9,501.84 | 1 | | | |
| 195856 | 1 | CLASS 2 | JFFS | CITY OF CASSELBERRY FIRE DEPARTMENT/AMB | 7/1/2014 | 10/4/2016 | 13,440.00 | 7,546.87 | 7,546.87 | 7,546.87 | 1 | | | |
| 195924 | 1 | CLASS 2 | JFFS | MCLAREN REGIONAL MEDICAL CENTER | 7/1/2014 | 9/21/2016 | 28,952.95 | 5,190.59 | 5,190.59 | 5,190.59 | 1 | | | |
| 195974 | 1 | CLASS 2 | JFFS | RICHARD A NELSON DO | 7/1/2014 | 10/20/2016 | 13,353.33 | 12,545.33 | 12,545.33 | 12,545.33 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 196038 | 1 | CLASS 2 | JFFS | SYLVAN HEALTH CENTER | 7/1/2014 | 10/13/2016 | 9,450.00 | 8,100.00 | 8,100.00 | 8,100.00 | 1 | | | |
| 196082 | 1 | CLASS 2 | JFFS | JAYADEVAN | 7/1/2014 | 10/5/2016 | 1,338.00 | 915.28 | 915.28 | 915.28 | 1 | | | |
| 196132 | 1 | CLASS 2 | JFFS | CITY OF NORTH | 7/1/2014 | 10/4/2016 | 757.81 | 430.86 | 430.86 | 430.86 | 1 | | | |
| 196186 | 1 | CLASS 2 | JFFS | BRANDON OPEN MRI | 7/1/2014 | 9/1/2016 | 4,400.00 | 167.30 | 167.30 | 167.30 | 1 | | | |
| 196247 | 1 | CLASS 8 | JFFS | SAFE PASSAGE | 7/1/2014 | 1/20/2017 | 21,450.00 | 746.76 | 746.76 | 746.76 | 1 | | | |
| 196255 | 1 | CLASS 2 | JFFS | BOYNTON HEALTH CARE | 7/1/2014 | 10/20/2016 | 17,757.12 | 9,000.07 | 9,000.07 | 9,000.07 | 1 | | | |
| 196289 | 1 | CLASS 2 | JFFS | PADDOCK PARK SURGERY | 7/1/2014 | 10/19/2016 | 30,690.86 | 7,324.56 | 7,324.56 | 7,324.56 | 1 | | | |
| 196322 | 1 | CLASS 2 | JFFS | VISUAL HEALTH AND SURGICAL CENTER INC | 7/1/2014 | 10/17/2016 | 2,000.00 | 14.40 | 14.40 | 14.40 | 1 | | | |
| 196352 | 1 | CLASS 2 | JFFS | WRIGHTS NURSING & REHAB CENTER | 7/1/2014 | 9/26/2016 | 15,330.00 | 12,600.00 | 12,600.00 | 12,600.00 | 1 | | | |
| 196406 | 1 | CLASS 2 | JFFS | SPRUCE CREEK PODIATRY | 7/1/2014 | 10/17/2014 | 17,695.01 | 10,808.86 | 10,808.86 | 10,808.86 | 1 | | | |
| 196421 | 1 | CLASS 2 | JFFS | ROBERT K LAW DO PA | 7/1/2014 | 9/22/2016 | 23,602.98 | 13,864.91 | 13,864.91 | 13,864.91 | 1 | | | |
| 196527 | 1 | CLASS 2 | JFFS | POMPANO BEACH ARTIFICIAL KIDNEY CENTER | 7/1/2014 | 10/26/2016 | 854,406.05 | 63,548.76 | 63,548.76 | 63,548.76 | 1 | | | |
| 196550 | 1 | CLASS 2 | JFFS | CITY OF MAITLAND FIRE DEPT | 7/1/2014 | 10/4/2016 | 4,790.65 | 2,084.40 | 2,084.40 | 2,084.40 | 1 | | | |
| 196675 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO LIQUIDITY SOLUITIONS INC | 7/1/2014 | 10/26/2016 | 12,151.59 | 2,094.66 | 2,094.66 | 2,094.66 | 1 | | | |
| 196680 | 1 | CLASS 2 | JFFS | LEESBURG CARDIOVASCULAR ASSOCIATES LLC | 7/1/2014 | 8/31/2014 | 73,421.00 | 29,314.83 | 29,314.83 | 29,314.83 | 1 | | | |
| 196776 | 1 | CLASS 8 | JFFS | MONTEFIORE MEDICAL CENTER | 7/1/2014 | 2/8/2017 | 106,986.59 | 21,397.31 | 21,397.31 | 21,397.31 | 1 | | | |
| 196790 | 1 | CLASS 2 | JFFS | CESAR R GAMERO MD LLC | 7/1/2014 | 10/20/2016 | 10,609.79 | 7,902.21 | 7,902.21 | 7,902.21 | 1 | | | |
| 196811 | 1 | CLASS 2 | JFFS | THE HEALTH CENTER OF | 7/1/2014 | 10/12/2016 | 392,382.65 | 322,200.01 | 322,200.01 | 322,200.01 | 1 | | | |
| 196841 | 1 | CLASS 2 | JFFS | PALM BEACH COUNTY FIRE | 7/1/2014 | 10/4/2016 | 84,462.40 | 41,154.32 | 41,154.32 | 41,154.32 | 1 | | | |
| 196843 | 1 | CLASS 2 | JFFS | CITY OF TAMARAC | 7/1/2014 | 10/4/2016 | 1,360.00 | 711.72 | 711.72 | 711.72 | 1 | | | |
| 196888 | 1 | CLASS 2 | JFFS | ORLANDO EAST DIALYSIS | 7/1/2014 | 10/26/2016 | 1,130,928.00 | 72,141.93 | 72,141.93 | 72,141.93 | 1 | | | |
| 196889 | 1 | CLASS 2 | JFFS | NEW PORT RICHEY KIDNEY | 7/1/2014 | 10/26/2016 | 428,650.30 | 26,008.23 | 26,008.23 | 26,008.23 | 1 | | | |
| 196902 | 1 | CLASS 2 | JFFS | DIANON SYSTEMS INC | 7/1/2014 | 10/28/2016 | 6,283.96 | 6,283.96 | 6,283.96 | 6,283.96 | 1 | | | |
| 196913 | 1 | CLASS 2 | JFFS | WUESTHOFF MEDICAL CENTER MELBOURNE | 7/1/2014 | 10/26/2016 | 2,164,015.03 | 408,772.69 | 408,772.69 | 408,772.69 | 1 | 12/13/2017 | W-E/C | |
| 196924 | 1 | CLASS 2 | JFFS | SALVATORE SENZATIMORE | 7/1/2014 | 9/29/2016 | 6,300.00 | 1,610.33 | 1,610.33 | 1,610.33 | 1 | | | |
| 196965 | 1 | CLASS 2 | JFFS | WINTER PARK HOME PD | 7/1/2014 | 10/26/2016 | 1,055,705.15 | 1,433.68 | 1,433.68 | 1,433.68 | 1 | | | |
| 196974 | 1 | CLASS 2 | JFFS | BEST CARE EMERGENCY | 7/1/2014 | 10/12/2016 | 626,106.00 | 55,823.35 | 55,823.35 | 55,823.35 | 1 | | | |
| 196983 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO LIQUIDITY SOLUITIONS INC | 7/1/2014 | 10/25/2016 | 57,682.00 | 19,927.49 | 19,927.49 | 19,927.49 | 1 | | | |
| 197045 | 1 | CLASS 2 | JFFS | FLORIDA MEDICAL CENTER LLC | 7/1/2014 | 10/4/2016 | 12,825.00 | - | - | - | 1 | | | |
| 197092 | 1 | CLASS 2 | JFFS | JOHNSON CITY MEDICAL | 7/1/2014 | 10/19/2016 | 3,109.00 | 396.80 | 396.80 | 396.80 | 1 | | | |
| 197120 | 1 | CLASS 2 | JFFS | TAMPA OBSTETRICS PA | 7/1/2014 | 9/11/2016 | 11,335.96 | 6,871.65 | 6,871.65 | 6,871.65 | 1 | | | |
| 197141 | 1 | CLASS 2 | JFFS | WINTER GARDEN DIALYSIS | 7/1/2014 | 10/26/2016 | 290,300.25 | 16,846.00 | 16,846.00 | 16,846.00 | 1 | | | |
| 197165 | 1 | CLASS 2 | JFFS | ALEXANDER C MBAKWEM | 7/1/2014 | 9/1/2016 | 10,059.06 | 4,265.41 | 4,265.41 | 4,265.41 | 1 | | | |
| 197222 | 1 | CLASS 2 | JFFS | GULF COAST MEDICAL | 7/1/2014 | 10/10/2016 | 20,200.35 | 4,034.27 | 4,034.27 | 4,034.27 | 1 | | | |
| 197231 | 1 | CLASS 2 | JFFS | LEESBURG DIALYSIS CENTER | 7/1/2014 | 10/26/2016 | 951,528.90 | 30,651.89 | 30,651.89 | 30,651.89 | 1 | | | |
| 197318 | 1 | CLASS 2 | JFFS | SHERIDAN RADIOLOGY SERVICES OF S FL And VER PLOEG & LUMPKIN PA | 7/1/2014 | 10/5/2016 | 2,103.00 | 402.81 | 402.81 | 402.81 | 1 | | | |
| 197346 | 1 | CLASS 2 | JFFS | KISSIMMEE HOME TRAINING PD | 7/1/2014 | 10/26/2016 | 539,216.70 | 1,872.34 | 1,872.34 | 1,872.34 | 1 | | | |
| 197358 | 1 | CLASS 2 | JFFS | FLORIDA JOINT & SPINE INSTITUTE PA | 7/1/2014 | 9/23/2016 | 121,979.00 | 30,224.37 | 30,224.37 | 30,224.37 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 197393 | 1 | CLASS 2 | JFFS | WINTER HAVEN CARDIOVASCULAR ASSOCIATES | 7/1/2014 | 8/31/2016 | 73,905.00 | 26,005.85 | 26,005.85 | 26,005.85 | 1 | | | |
| 197471 | 1 | CLASS 2 | JFFS | SELECT SPECIALTY HOSPITAL GAINESVILLE | 7/1/2014 | 10/18/2016 | 117,675.64 | 23,535.13 | 23,535.13 | 23,535.13 | 1 | | | |
| 197498 | 1 | CLASS 2 | JFFS | SELECT SPECIALTY | 7/1/2014 | 10/18/2016 | 86,753.68 | 16,475.74 | 16,475.74 | 16,475.74 | 1 | | | |
| 198069 | 1 | CLASS 2 | JFFS | ANTHONY ROGERS | 7/1/2014 | 9/29/2016 | 16,392.00 | 5,484.22 | 5,484.22 | 5,484.22 | 1 | | | |
| 198571 | 1 | CLASS 2 | JFFS | RICHARD BERKOWITZ | 7/1/2014 | 10/31/2016 | 4,870.00 | 2,509.74 | 2,509.74 | 2,509.74 | 1 | | | |
| 198692 | 1 | CLASS 2 | JFFS | DAYLENE RIPLEY | 7/1/2014 | 9/28/2016 | 1,405.00 | 517.16 | 517.16 | 517.16 | 1 | | | |
| 198852 | 1 | CLASS 2 | JFFS | LORIE LOREMAN | 7/1/2014 | 9/19/2016 | 715.00 | 512.20 | 512.20 | 512.20 | 1 | | | |
| 198864 | 1 | CLASS 2 | JFFS | ISAAC MITCHELL | 7/1/2014 | 9/15/2016 | 410.00 | 55.86 | 55.86 | 55.86 | 1 | | | |
| 198870 | 1 | CLASS 2 | JFFS | GREGORY NEDURIAN | 7/1/2014 | 9/11/2016 | 345,160.00 | 161,629.71 | 161,629.71 | 161,629.71 | 1 | | | |
| 198878 | 1 | CLASS 2 | JFFS | BRIAN PORVIN | 7/1/2014 | 9/19/2016 | 240.00 | 196.94 | 196.94 | 196.94 | 1 | | | |
| 198888 | 1 | CLASS 2 | JFFS | ALFRED COOK | 7/1/2014 | 9/15/2016 | 4,964.00 | 1,356.92 | 1,356.92 | 1,356.92 | 1 | | | |
| 198912 | 1 | CLASS 2 | JFFS | MICHELE COFIELD | 7/1/2014 | 9/28/2016 | 3,418.00 | 999.11 | 999.11 | 999.11 | 1 | | | |
| 198918 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 650.00 | 281.76 | 281.76 | 281.76 | 1 | | | |
| 198919 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 1,035.00 | 535.35 | 535.35 | 535.35 | 1 | | | |
| 198930 | 1 | CLASS 2 | JFFS | CEDRIC TANKSON | 7/1/2014 | 9/15/2016 | 5,258.00 | 1,568.00 | 1,568.00 | 1,568.00 | 1 | | | |
| 199983 | 1 | CLASS 2 | JFFS | IMTIAZ H MEMON | 7/1/2014 | 10/12/2016 | 1,065.00 | 92.63 | 92.63 | 92.63 | 1 | | | |
| 199984 | 1 | CLASS 2 | JFFS | CRESTSIDE EMERG PHYSIC | 7/1/2014 | 10/12/2016 | 1,478.00 | 135.22 | 135.22 | 135.22 | 1 | | | |
| 199985 | 1 | CLASS 2 | JFFS | MARTINEZ CRUZ MEDICAL | 7/1/2014 | 10/12/2016 | 2,021.00 | 947.57 | 947.57 | 947.57 | 1 | | | |
| 199986 | 1 | CLASS 2 | JFFS | WILLIAM WONG | 7/1/2014 | 10/7/2016 | 101,398.28 | 56,477.68 | 56,477.68 | 56,477.68 | 1 | | | |
| 199987 | 1 | CLASS 2 | JFFS | ENDOCRINOLOGY AND | 7/1/2014 | 10/20/2016 | 1,790.00 | 1,292.24 | 1,292.24 | 1,292.24 | 1 | | | |
| 199988 | 1 | CLASS 2 | JFFS | AMERICAN RADIATION | 7/1/2014 | 9/23/2016 | 1,264.00 | 570.15 | 570.15 | 570.15 | 1 | | | |
| 199989 | 1 | CLASS 2 | JFFS | OCALA REGIONAL PT CENTER | 7/1/2014 | 10/14/2016 | 8,372.18 | 2,236.54 | 2,236.54 | 2,236.54 | 1 | | | |
| 199990 | 1 | CLASS 2 | JFFS | MARSHA E CLINE | 7/1/2014 | 10/14/2016 | 4,622.00 | 1,333.55 | 1,333.55 | 1,333.55 | 1 | | | |
| 199991 | 1 | CLASS 8 | JFFS | MONT CARTWRIGHT | 7/1/2014 | 12/14/2016 | 2,146.00 | - | - | - | 1 | | | |
| 199992 | 1 | CLASS 2 | JFFS | NEW YORK CITY HEALTH AND HOSPITALS | 7/1/2014 | 1/13/2017 | 13,945.43 | 2,789.09 | 2,789.09 | 2,789.09 | 1 | | | |
| 199993 | 1 | CLASS 2 | JFFS | PATRICK T MANGONON In | 7/1/2014 | 9/22/2016 | 12,574.00 | 3,602.44 | 3,602.44 | 3,602.44 | 1 | | | |
| 199994 | 1 | CLASS 2 | JFFS | ELENA YAMAGUCHI MD PA | 7/1/2014 | 9/28/2016 | 2,324.00 | 1,320.69 | 1,320.69 | 1,320.69 | 1 | | | |
| 199995 | 1 | CLASS 2 | JFFS | TBIM HOSPITALISTS LLC | 7/1/2014 | 10/22/2016 | 3,206.00 | 1,543.54 | 1,543.54 | 1,543.54 | 1 | | | |
| 199996 | 1 | CLASS 2 | JFFS | ADVANCED LUNG AND SLEEP DISORDERS CONSUL | 7/1/2014 | 10/12/2016 | 3,112.15 | 1,552.18 | 1,552.18 | 1,552.18 | 1 | | | |
| 199997 | 1 | CLASS 2 | JFFS | JFK MEDICAL CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/7/2016 | 92,896.00 | 9,189.60 | 9,189.60 | 9,189.60 | 1 | | | |
| 199998 | 1 | CLASS 2 | JFFS | ROCKLEDGE HMA LLC | 7/1/2014 | 10/27/2016 | 6,834.85 | - | - | - | 1 | | | |
| 199999 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/29/2016 | 22,624.24 | 7,411.33 | 7,411.33 | 7,411.33 | 1 | | | |
| 200000 | 1 | CLASS 2 | JFFS | LABCORP RTP | 7/1/2014 | 10/28/2016 | 15,549.40 | - | - | - | 1 | | | |
| 200001 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/26/2016 | 105,051.68 | 40,661.71 | 40,661.71 | 40,661.71 | 1 | | | |
| 200002 | 1 | CLASS 2 | JFFS | VINCENT PALMIRE | 7/1/2014 | 8/31/2016 | 11,010.00 | 7,334.96 | 7,334.96 | 7,334.96 | 1 | | | |
| 200003 | 1 | CLASS 2 | JFFS | STERTHAUS ER SVCS | 7/1/2014 | 10/12/2016 | 8,691.00 | 678.73 | 678.73 | 678.73 | 1 | | | |
| 200004 | 1 | CLASS 2 | JFFS | CYPRESS PODIATRY | 7/1/2014 | 9/26/2016 | 26,938.04 | 16,548.55 | 16,548.55 | 16,548.55 | 1 | | | |
| 200005 | 1 | CLASS 2 | JFFS | BMA APOPKA | 7/1/2014 | 10/7/2016 | 145,810.91 | 167.60 | 167.60 | 167.60 | 1 | | | |
| 200006 | 1 | CLASS 2 | JFFS | BIOTHERANOSTICS INC | 7/1/2014 | 10/31/2016 | 3,500.00 | - | - | - | 1 | | | |
| 200007 | 1 | CLASS 2 | JFFS | ST LUCIE MEDICAL CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/13/2016 | 13,914.00 | 1,177.58 | 1,177.58 | 1,177.58 | 1 | | | |
| 200008 | 1 | CLASS 2 | JFFS | FL REGIONAL EMERGENCY | 7/1/2014 | 10/1/2016 | 758.00 | 135.22 | 135.22 | 135.22 | 1 | | | |
| 200009 | 1 | CLASS 2 | JFFS | MOVING FORWARD | 7/1/2014 | 10/12/2016 | 38,903.18 | 24,919.98 | 24,919.98 | 24,919.98 | 1 | | | |
| 200010 | 1 | CLASS 2 | JFFS | UROLOGY CARE OF CENTRAL | 7/1/2014 | 10/7/2016 | 1,004.00 | 266.69 | 266.69 | 266.69 | 1 | | | |
| 200011 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/7/2016 | 576,438.04 | 231,110.56 | 231,110.56 | 231,110.56 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200012 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/17/2016 | 836,221.86 | 82,441.79 | 82,441.79 | 82,441.79 | 1 | | | |
| 200013 | 1 | CLASS 2 | JFFS | WESTSIDE REGIONAL | 7/1/2014 | 10/5/2016 | 452,782.26 | 87,226.25 | 87,226.25 | 87,226.25 | 1 | | | |
| 200014 | 1 | CLASS 2 | JFFS | MEMORIAL HOSPITAL | 7/1/2014 | 10/18/2016 | 254,946.00 | 32,261.80 | 32,261.80 | 32,261.80 | 1 | | | |
| 200015 | 1 | CLASS 2 | JFFS | LABCORP RARITAN | 7/1/2014 | 10/28/2016 | 67.39 | 67.39 | 67.39 | 67.39 | 1 | | | |
| 200016 | 1 | CLASS 2 | JFFS | HAMPTON PINES | 7/1/2014 | 10/12/2016 | 13,416.00 | 1,222.64 | 1,222.64 | 1,222.64 | 1 | | | |
| 200017 | 1 | CLASS 2 | JFFS | ORLANDO ARTHRITIS | 7/1/2014 | 9/11/2016 | 34,940.00 | 20,981.58 | 20,981.58 | 20,981.58 | 1 | | | |
| 200018 | 1 | CLASS 2 | JFFS | CLEVELAND CLINIC FLORIDA And DREYFUSS WILLIAMS | 7/1/2014 | 9/30/2016 | 116,874.66 | 7,321.68 | 7,321.68 | 7,321.68 | 1 | | | |
| 200019 | 1 | CLASS 2 | JFFS | NEUROLOGY ASSOCIATES | 7/1/2014 | 10/5/2016 | 886.00 | 433.18 | 433.18 | 433.18 | 1 | | | |
| 200020 | 1 | CLASS 2 | JFFS | FL DERMATOLOGY & SKIN | 7/1/2014 | 10/20/2016 | 20,531.03 | 9,409.10 | 9,409.10 | 9,409.10 | 1 | | | |
| 200021 | 1 | CLASS 2 | JFFS | CALAIS REGIONAL HOSPITAL HOME HEALTH AGENCY | 7/1/2014 | 10/3/2016 | 2,900.06 | 464.01 | 464.01 | 464.01 | 1 | | | |
| 200022 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/22/2016 | 41,189.00 | 19,645.19 | 19,645.19 | 19,645.19 | 1 | | | |
| 200023 | 1 | CLASS 2 | JFFS | COMPREHENSIVE PAIN CARE OF SOUTH FLORIDA | 7/1/2014 | 8/28/2016 | 132,273.30 | 18,843.26 | 18,843.26 | 18,843.26 | 1 | | | |
| 200024 | 1 | CLASS 2 | JFFS | QUALITY DRIVE EMERG | 7/1/2014 | 10/12/2016 | 4,818.00 | 428.62 | 428.62 | 428.62 | 1 | | | |
| 200025 | 1 | CLASS 2 | JFFS | MAIRAJ UDDIN PLLC | 7/1/2014 | 10/26/2016 | 503.00 | 251.09 | 251.09 | 251.09 | 1 | | | |
| 200026 | 1 | CLASS 2 | JFFS | ANESTHESIA PHYSICIAN SOLUTIONS | 7/1/2014 | 10/27/2016 | 115,133.00 | 109,453.98 | 109,453.98 | 109,453.98 | 1 | | | |
| 200027 | 1 | CLASS 2 | JFFS | AESTHETIC CNTR FOR COSMETIC & RECON SURG | 7/1/2014 | 10/19/2016 | 34,196.19 | 11,803.12 | 11,803.12 | 11,803.12 | 1 | | | |
| 200028 | 1 | CLASS 2 | JFFS | KEVIN SANDERS | 7/1/2014 | 10/19/2016 | 5,374.00 | 1,882.73 | 1,882.73 | 1,882.73 | 1 | | | |
| 200029 | 1 | CLASS 2 | JFFS | CITY OF LAUDERHILL | 7/1/2014 | 10/4/2016 | 1,824.00 | 1,039.12 | 1,039.12 | 1,039.12 | 1 | | | |
| 200030 | 1 | CLASS 2 | JFFS | LCO GROUP PA | 7/1/2014 | 10/19/2016 | 64,118.00 | 30,101.24 | 30,101.24 | 30,101.24 | 1 | | | |
| 200031 | 1 | CLASS 2 | JFFS | PDT OF OCALA FL INC | 7/1/2014 | 10/12/2016 | 49.00 | 24.08 | 24.08 | 24.08 | 1 | | | |
| 200032 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA CANCER | 7/1/2014 | 10/8/2016 | 34,426.00 | 14,777.15 | 14,777.15 | 14,777.15 | 1 | | | |
| 200033 | 1 | CLASS 2 | JFFS | BREVARD FAMILY WALK IN CLINIC | 7/1/2014 | 9/27/2016 | 101,874.00 | 53,187.19 | 53,187.19 | 53,187.19 | 1 | | | |
| 200034 | 1 | CLASS 2 | JFFS | SHARMA INSTITUTE OF PAIN MEDICINE | 7/1/2014 | 10/4/2016 | 8,784.00 | 4,182.98 | 4,182.98 | 4,182.98 | 1 | | | |
| 200035 | 1 | CLASS 2 | JFFS | FL EMI MEDICAL SERVICES | 7/1/2014 | 10/12/2016 | 32,106.00 | 2,706.29 | 2,706.29 | 2,706.29 | 1 | | | |
| 200036 | 1 | CLASS 2 | JFFS | EMERGENCY PHYSICIAN | 7/1/2014 | 10/27/2016 | 127,090.00 | 14,387.82 | 14,387.82 | 14,387.82 | 1 | | | |
| 200037 | 1 | CLASS 2 | JFFS | J VILLE EMERGENCY | 7/1/2014 | 10/12/2016 | 654.00 | 18.15 | 18.15 | 18.15 | 1 | | | |
| 200038 | 1 | CLASS 2 | JFFS | UNIVERSITY HOSPITAL In | 7/1/2014 | 10/5/2016 | 1,126,196.36 | 213,193.66 | 213,193.66 | 213,193.66 | 1 | | | |
| 200039 | 1 | CLASS 2 | JFFS | LARGO MEDICAL CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 2,569,326.22 | 471,661.50 | 471,661.50 | 471,661.50 | 1 | 12/15/2017 | W-E/C | |
| 200040 | 1 | CLASS 8 | JFFS | DAVID BLUM | 7/1/2014 | 11/18/2016 | 1,226.00 | - | - | - | 1 | | | |
| 200041 | 1 | CLASS 2 | JFFS | PRESERVATION PARK ER | 7/1/2014 | 10/12/2016 | 55,426.00 | 4,981.49 | 4,981.49 | 4,981.49 | 1 | | | |
| 200042 | 1 | CLASS 2 | JFFS | MUNROE REGIONAL MEDICAL | 7/1/2014 | 10/22/2016 | 9,476,317.26 | 1,614,033.76 | 1,614,033.76 | 1,614,033.76 | 1 | | | |
| 200043 | 1 | CLASS 2 | JFFS | HAINES CITY HEALTHCARE CENTER | 7/1/2014 | 10/12/2016 | 65,280.00 | 30,000.00 | 30,000.00 | 30,000.00 | 1 | | | |
| 200044 | 1 | CLASS 2 | JFFS | IFITKHAR RASUL | 7/1/2014 | 10/19/2016 | 13,760.00 | 6,898.41 | 6,898.41 | 6,898.41 | 1 | | | |
| 200045 | 1 | CLASS 2 | JFFS | DRS IZSAK AND LAMPORT MD PA | 7/1/2014 | 10/27/2016 | 40,900.00 | 14,560.48 | 14,560.48 | 14,560.48 | 1 | | | |
| 200046 | 1 | CLASS 2 | JFFS | DOCKYARD EMERGENCY | 7/1/2014 | 10/12/2016 | 55,520.00 | 5,388.52 | 5,388.52 | 5,388.52 | 1 | | | |
| 200047 | 1 | CLASS 2 | JFFS | MARSHLAND EMERGENCY | 7/1/2014 | 10/12/2016 | 21,049.00 | 1,943.14 | 1,943.14 | 1,943.14 | 1 | | | |
| 200048 | 1 | CLASS 2 | JFFS | LIFE CARE CENTERS OF | 7/1/2014 | 10/7/2016 | 5,600.00 | 4,800.00 | 4,800.00 | 4,800.00 | 1 | | | |
| 200049 | 1 | CLASS 2 | JFFS | MAGNOLIA EMERGENCY PHYSICIANS | 7/1/2014 | 10/12/2016 | 518,979.00 | 46,118.79 | 46,118.79 | 46,118.79 | 1 | | | |
| 200050 | 1 | CLASS 2 | JFFS | SOUTH BAY HOSPITAL In Care | 7/1/2014 | 10/5/2016 | 788,207.19 | 115,758.58 | 115,758.58 | 115,758.58 | 1 | | | |
| 200051 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/17/2016 | 2,018,982.74 | 200,273.27 | 200,273.27 | 200,273.27 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200052 | 1 | CLASS 2 | JFFS | GAINESVILLE EMERGENCY MEDICAL ASSOCIATES | 7/1/2014 | 10/12/2016 | 3,897.00 | 216.94 | 216.94 | 216.94 | 1 | | | |
| 200053 | 1 | CLASS 2 | JFFS | TOTAL PATIENT CARE OF | 7/1/2014 | 10/13/2016 | 1,332.00 | 429.94 | 429.94 | 429.94 | 1 | | | |
| 200054 | 1 | CLASS 2 | JFFS | STAND UP MRI OF ORLANDO | 7/1/2014 | 9/2/2016 | 24,505.00 | 4,478.91 | 4,478.91 | 4,478.91 | 1 | | | |
| 200055 | 1 | CLASS 2 | JFFS | DRS BERGHASH & LANZA PL | 7/1/2014 | 10/14/2016 | 3,205.00 | 1,980.38 | 1,980.38 | 1,980.38 | 1 | | | |
| 200056 | 1 | CLASS 2 | JFFS | ORLANDO ENT | 7/1/2014 | 9/24/2016 | 58,475.00 | 26,828.59 | 26,828.59 | 26,828.59 | 1 | | | |
| 200057 | 1 | CLASS 2 | JFFS | TERRA CEIA EMERGENCY | 7/1/2014 | 10/12/2016 | 11,824.00 | 1,081.76 | 1,081.76 | 1,081.76 | 1 | | | |
| 200058 | 1 | CLASS 2 | JFFS | PAUL DREYER | 7/1/2014 | 9/28/2016 | 2,565.00 | 903.82 | 903.82 | 903.82 | 1 | | | |
| 200059 | 1 | CLASS 2 | JFFS | ALLINA HEALTH SYSTEM | 7/1/2014 | 10/27/2016 | 592.00 | - | - | - | 1 | | | |
| 200060 | 1 | CLASS 2 | JFFS | ALLIN PHYSICAL THERAPY | 7/1/2014 | 10/6/2016 | 10,740.00 | 6,107.09 | 6,107.09 | 6,107.09 | 1 | | | |
| 200061 | 1 | CLASS 2 | JFFS | SRA VENTURES WESTCOAST | 7/1/2014 | 9/28/2016 | 50,830.05 | 16,455.76 | 16,455.76 | 16,455.76 | 1 | | | |
| 200062 | 1 | CLASS 2 | JFFS | DEBBIE L BURTON | 7/1/2014 | 10/19/2016 | 4,650.00 | 2,043.60 | 2,043.60 | 2,043.60 | 1 | | | |
| 200063 | 1 | CLASS 2 | JFFS | TAMPA BAY HEART | 7/1/2014 | 10/5/2016 | 2,305,356.30 | 442,119.51 | 442,119.51 | 442,119.51 | 1 | 12/15/2017 | W-E/C | |
| 200064 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/14/2016 | 75,786.00 | 15,387.60 | 15,387.60 | 15,387.60 | 1 | | | |
| 200065 | 1 | CLASS 2 | JFFS | CARROLLWOOD SURGICAL | 7/1/2014 | 10/25/2016 | 3,182.00 | 1,038.17 | 1,038.17 | 1,038.17 | 1 | | | |
| 200066 | 1 | CLASS 2 | JFFS | PHYSICIANS SERVICES LLC | 7/1/2014 | 10/26/2016 | 12,617.07 | 1,249.73 | 1,249.73 | 1,249.73 | 1 | | | |
| 200067 | 1 | CLASS 2 | JFFS | FL EMI MEDICAL SERVICES | 7/1/2014 | 10/12/2016 | 112,451.00 | 9,533.64 | 9,533.64 | 9,533.64 | 1 | | | |
| 200068 | 1 | CLASS 2 | JFFS | EMERGENCY SERVICES OF OKLAHOMA PC | 7/1/2014 | 10/28/2016 | 1,035.00 | - | - | - | 1 | | | |
| 200069 | 1 | CLASS 2 | JFFS | KIDNEY & HYPERTENSION | 7/1/2014 | 10/20/2016 | 12,111.00 | 8,269.66 | 8,269.66 | 8,269.66 | 1 | | | |
| 200070 | 1 | CLASS 2 | JFFS | FL EMI MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 717.00 | 18.15 | 18.15 | 18.15 | 1 | | | |
| 200071 | 1 | CLASS 2 | JFFS | DELRAY OPEN IMAGING CTR In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/8/2016 | 56,482.00 | 11,771.79 | 11,771.79 | 11,771.79 | 1 | | | |
| 200072 | 1 | CLASS 2 | JFFS | CORA HEALTH SERVICES | 7/1/2014 | 10/22/2016 | 1,117,610.92 | 1,902.61 | 1,902.61 | 1,902.61 | 1 | | | |
| 200073 | 1 | CLASS 2 | JFFS | CORA HEALTH SERVICES INC | 7/1/2014 | 10/26/2016 | 1,289.08 | 461.98 | 461.98 | 461.98 | 1 | | | |
| 200074 | 1 | CLASS 2 | JFFS | FLORIDA PHYSICAN | 7/1/2014 | 9/20/2016 | 19,903.58 | 13,104.55 | 13,104.55 | 13,104.55 | 1 | | | |
| 200075 | 1 | CLASS 2 | JFFS | NEOGENOMICS | 7/1/2014 | 10/19/2016 | 2,850.00 | 28.34 | 28.34 | 28.34 | 1 | | | |
| 200076 | 1 | CLASS 2 | JFFS | LUNG AND SLEEP CARE INC | 7/1/2014 | 10/31/2016 | 8,350.00 | 2,987.98 | 2,987.98 | 2,987.98 | 1 | | | |
| 200077 | 1 | CLASS 2 | JFFS | LONGWOOD MEDICAL GROUP PA | 7/1/2014 | 10/17/2016 | 27,156.33 | 9,404.92 | 9,404.92 | 9,404.92 | 1 | | | |
| 200078 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/13/2016 | 58,357.00 | 26,108.63 | 26,108.63 | 26,108.63 | 1 | | | |
| 200079 | 1 | CLASS 2 | JFFS | MOUNT SINAI HOSPITAL | 7/1/2014 | 10/27/2016 | 1,149.04 | - | - | - | 1 | | | |
| 200080 | 1 | CLASS 2 | JFFS | RUSSELL EMERGENCY PHYSICIANS | 7/1/2014 | 10/12/2016 | 26,702.00 | 2,353.46 | 2,353.46 | 2,353.46 | 1 | | | |
| 200081 | 1 | CLASS 2 | JFFS | FIVEMILE CREEK EMERG PHYS  LLC | 7/1/2014 | 10/12/2016 | 37,071.00 | 3,690.62 | 3,690.62 | 3,690.62 | 1 | | | |
| 200082 | 1 | CLASS 2 | JFFS | RDC OF VOLUSIA LLC | 7/1/2014 | 8/27/2016 | 501.00 | 268.20 | 268.20 | 268.20 | 1 | | | |
| 200083 | 1 | CLASS 2 | JFFS | ADVANCED INTERVENTIONAL | 7/1/2014 | 9/21/2016 | 8,108.40 | 4,536.84 | 4,536.84 | 4,536.84 | 1 | | | |
| 200084 | 1 | CLASS 2 | JFFS | KENDALL ANESTHESIA ASSOCIATES | 7/1/2014 | 10/27/2016 | 6,146.00 | 388.67 | 388.67 | 388.67 | 1 | | | |
| 200085 | 1 | CLASS 2 | JFFS | LABCORP TAMPA | 7/1/2014 | 10/28/2016 | 200,056.26 | 198,924.85 | 198,924.85 | 198,924.85 | 1 | | | |
| 200086 | 1 | CLASS 2 | JFFS | OCEANWIND ER SVCS PARTNERSHIP LLC | 7/1/2014 | 10/12/2016 | 2,511.00 | 227.85 | 227.85 | 227.85 | 1 | | | |
| 200087 | 1 | CLASS 2 | JFFS | TREASURE COAST URGENT | 7/1/2014 | 10/12/2016 | 4,416.50 | 1,763.10 | 1,763.10 | 1,763.10 | 1 | | | |
| 200088 | 1 | CLASS 2 | JFFS | BAYCARE OUTPATIENT | 7/1/2014 | 10/14/2016 | 12,235.40 | 2,268.70 | 2,268.70 | 2,268.70 | 1 | | | |
| 200089 | 1 | CLASS 2 | JFFS | OLETA RIVER EMERGENCY PHYSICIANS LLC | 7/1/2014 | 10/12/2016 | 6,339.00 | 673.28 | 673.28 | 673.28 | 1 | | | |
| 200090 | 1 | CLASS 2 | JFFS | SUNDAR REDDY S PASEM MD P A | 7/1/2014 | 10/12/2016 | 3,647.00 | 2,373.37 | 2,373.37 | 2,373.37 | 1 | | | |
| 200091 | 1 | CLASS 2 | JFFS | MEASE COUNTRYSIDE | 7/1/2014 | 10/12/2016 | 369,647.69 | 69,923.12 | 69,923.12 | 69,923.12 | 1 | | | |
| 200092 | 1 | CLASS 2 | JFFS | COLUMBIA PRIMARY CARE | 7/1/2014 | 9/28/2016 | 13,033.00 | 4,469.54 | 4,469.54 | 4,469.54 | 1 | 12/15/2017 | W-E/C | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200094 | 1 | CLASS 2 | JFFS | EMERGENCY SERVICES OF ZEPHYRHILLS PA | 7/1/2016 | 10/26/2016 | 4,597.00 | 356.55 | 356.55 | 356.55 | 1 | | | |
| 200095 | 1 | CLASS 2 | JFFS | THE CROSSROADS | 7/1/2016 | 10/28/2016 | 14,685.00 | 12,300.00 | 12,300.00 | 12,300.00 | 1 | | | |
| 200096 | 1 | CLASS 2 | JFFS | JAIME P LLOBET In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2016 | 9/28/2016 | 292.00 | 129.85 | 129.85 | 129.85 | 1 | | | |
| 200097 | 1 | CLASS 2 | JFFS | HILLSBOROUGH COUNTY | 7/1/2014 | 10/4/2016 | 9,702.30 | 7,116.72 | 7,116.72 | 7,116.72 | 1 | | | |
| 200098 | 1 | CLASS 2 | JFFS | EQUITY TRUST CO FBO LIQUIDITY SOLUITIONS INC | 7/1/2014 | 10/25/2016 | 17,964.30 | 7,240.43 | 7,240.43 | 7,240.43 | 1 | | | |
| 200099 | 1 | CLASS 2 | JFFS | HAINES CITY HMA URGENT CARE LLC | 7/1/2014 | 10/25/2016 | 21,460.00 | 226.31 | 226.31 | 226.31 | 1 | | | |
| 200100 | 1 | CLASS 2 | JFFS | FL 1 MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 1,473.00 | 147.22 | 147.22 | 147.22 | 1 | | | |
| 200101 | 1 | CLASS 2 | JFFS | CARROLLWOOD DIALYSIS | 7/1/2014 | 10/26/2016 | 203,848.10 | 13,005.44 | 13,005.44 | 13,005.44 | 1 | | | |
| 200102 | 1 | CLASS 2 | JFFS | SPRING CREEK EMERG PHYS PLLC | 7/1/2014 | 10/12/2016 | 1,334.00 | 95.43 | 95.43 | 95.43 | 1 | | | |
| 200103 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/1/2016 | 123,499.15 | 50,867.64 | 50,867.64 | 50,867.64 | 1 | | | |
| 200104 | 1 | CLASS 2 | JFFS | PCCC OF VOLUSIA LLC | 7/1/2014 | 8/27/2016 | 2,552.00 | 1,244.07 | 1,244.07 | 1,244.07 | 1 | | | |
| 200105 | 1 | CLASS 2 | JFFS | HEALTH ASSOCIATES OF TAMPA BAY | 7/1/2014 | 10/4/2016 | 3,368.00 | 2,152.40 | 2,152.40 | 2,152.40 | 1 | | | |
| 200106 | 1 | CLASS 2 | JFFS | ALLINA HEALTH SYSTEM | 7/1/2014 | 10/27/2016 | 24.00 | - | - | - | 1 | | | |
| 200107 | 1 | CLASS 2 | JFFS | FLORIDA CARDIOLOGY | 7/1/2014 | 10/14/2016 | 146,867.00 | 40,615.02 | 40,615.02 | 40,615.02 | 1 | | | |
| 200108 | 1 | CLASS 2 | JFFS | REDNER EMERGENCY | 7/1/2014 | 10/12/2016 | 4,753.00 | 402.66 | 402.66 | 402.66 | 1 | | | |
| 200109 | 1 | CLASS 2 | JFFS | LABCORP BIRMINGHAM CYTO HISTO | 7/1/2014 | 10/28/2016 | 1,213.02 | 1,135.62 | 1,135.62 | 1,135.62 | 1 | | | |
| 200110 | 1 | CLASS 2 | JFFS | DAVID SHAPIRO | 7/1/2014 | 9/11/2016 | 1,025.00 | 690.56 | 690.56 | 690.56 | 1 | | | |
| 200111 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/17/2016 | 993,525.80 | 99,352.58 | 99,352.58 | 99,352.58 | 1 | | | |
| 200112 | 1 | CLASS 2 | JFFS | MICHAEL ARONOVICH MD PA | 7/1/2014 | 9/28/2016 | 400.00 | 208.80 | 208.80 | 208.80 | 1 | | | |
| 200113 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/1/2016 | 158,620.00 | 35,719.84 | 35,719.84 | 35,719.84 | 1 | | | |
| 200114 | 1 | CLASS 2 | JFFS | TANANARIEVE P BROWN | 7/1/2014 | 10/19/2016 | 2,060.00 | 888.30 | 888.30 | 888.30 | 1 | | | |
| 200115 | 1 | CLASS 2 | JFFS | FL EMI MEDICAL SERVICES | 7/1/2014 | 10/12/2016 | 1,478.00 | 135.22 | 135.22 | 135.22 | 1 | | | |
| 200116 | 1 | CLASS 2 | JFFS | STAND UP MRI OF BOCA RATON PA | 7/1/2014 | 9/2/2016 | 15,750.00 | 2,650.82 | 2,650.82 | 2,650.82 | 1 | | | |
| 200117 | 1 | CLASS 2 | JFFS | HAL BASHEIN | 7/1/2014 | 10/17/2016 | 7,528.00 | 2,203.41 | 2,203.41 | 2,203.41 | 1 | | | |
| 200118 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 9/1/2016 | 1,241,685.74 | 298,654.94 | 298,654.94 | 298,654.94 | 1 | | | |
| 200119 | 1 | CLASS 2 | JFFS | OCALA HAND CENTER LLC | 7/1/2014 | 10/14/2016 | 279,440.00 | 111,274.04 | 111,274.04 | 111,274.04 | 1 | | | |
| 200120 | 1 | CLASS 2 | JFFS | PELICAN COAST | 7/1/2014 | 10/12/2016 | 1,065.00 | 96.46 | 96.46 | 96.46 | 1 | | | |
| 200121 | 1 | CLASS 8 | JFFS | ALBERTO CASARETTO MD PLC | 7/1/2014 | 11/14/2016 | 11,204.00 | 3,358.73 | 3,358.73 | 3,358.73 | 1 | | | |
| 200122 | 1 | CLASS 2 | JFFS | PIERRE GIRARD MD PA | 7/1/2014 | 10/14/2016 | 10,629.00 | 3,465.96 | 3,465.96 | 3,465.96 | 1 | | | |
| 200123 | 1 | CLASS 2 | JFFS | WINTER HAVEN HOSPITAL | 7/1/2014 | 10/28/2016 | 167,826.00 | 33,565.20 | 33,565.20 | 33,565.20 | 1 | | | |
| 200124 | 1 | CLASS 2 | JFFS | BAYONET POINT SURGERY AND ENDOSCOPY CENT In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2016 | 9/11/2016 | 73,220.00 | 4,600.52 | 4,600.52 | 4,600.52 | 1 | 12/15/2017 | W-E/U | |
| 200125 | 1 | CLASS 2 | JFFS | MAREK ZALEWSKI In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2016 | 9/28/2016 | 2,670.00 | 894.80 | 894.80 | 894.80 | 1 | | | |
| 200126 | 1 | CLASS 2 | JFFS | DEMETRIOS GONIS INC | 7/1/2014 | 10/31/2016 | 415.00 | 232.38 | 232.38 | 232.38 | 1 | | | |
| 200127 | 1 | CLASS 8 | JFFS | ASSOCIATES IN DERMATOLOGY INC | 7/1/2014 | 12/9/2016 | 398,756.49 | 244,107.54 | 244,107.54 | 244,107.54 | 1 | | | |
| 200128 | 1 | CLASS 2 | JFFS | TERESA M BOLAND | 7/1/2014 | 10/19/2016 | 1,475.00 | 692.96 | 692.96 | 692.96 | 1 | | | |
| 200129 | 1 | CLASS 2 | JFFS | BIO MEDICAL APPLICATIONS | 7/1/2014 | 10/7/2016 | 107,591.77 | 4,342.55 | 4,342.55 | 4,342.55 | 1 | | | |
| 200130 | 1 | CLASS 2 | JFFS | CHRISTINA L CLARK | 7/1/2014 | 10/12/2016 | 2,260.00 | 183.37 | 183.37 | 183.37 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200131 | 1 | CLASS 2 | JFFS | DEBRA HOGAN | 7/1/2014 | 10/19/2016 | 6,163.00 | 1,883.33 | 1,883.33 | 1,883.33 | 1 | | | |
| 200132 | 1 | CLASS 2 | JFFS | MEASE DUNEDIN HOSPITAL | 7/1/2014 | 10/12/2016 | 255,823.71 | 36,458.24 | 36,458.24 | 36,458.24 | 1 | | | |
| 200133 | 1 | CLASS 2 | JFFS | PHYSICIAN ASSOCIATES LLC | 7/1/2014 | 10/19/2016 | 25,475.00 | 12,842.40 | 12,842.40 | 12,842.40 | 1 | | | |
| 200134 | 1 | CLASS 2 | JFFS | GEORGE S SIDHOM MD PA | 7/1/2014 | 10/28/2016 | 10,205.00 | 4,769.09 | 4,769.09 | 4,769.09 | 1 | | | |
| 200135 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/14/2016 | 289,350.00 | 29,806.92 | 29,806.92 | 29,806.92 | 1 | | | |
| 200136 | 1 | CLASS 2 | JFFS | SMS DO PA | 7/1/2014 | 10/17/2016 | 93,151.00 | 42,757.11 | 42,757.11 | 42,757.11 | 1 | | | |
| 200137 | 1 | CLASS 2 | JFFS | RCG CLERMONT | 7/1/2014 | 10/7/2016 | 376,513.11 | 520.00 | 520.00 | 520.00 | 1 | | | |
| 200138 | 1 | CLASS 2 | JFFS | FLORIDA UNITED RADIOLOGY | 7/1/2014 | 10/5/2016 | 236,537.00 | 19,869.80 | 19,869.80 | 19,869.80 | 1 | | | |
| 200139 | 1 | CLASS 2 | JFFS | SHERIDAN RADIOLOGY SERVICES OF CTRL FL | 7/1/2014 | 10/5/2016 | 392,852.00 | 32,584.42 | 32,584.42 | 32,584.42 | 1 | | | |
| 200140 | 1 | CLASS 2 | JFFS | ADVANCED WOMENS OB/GYN ASSOCIATES In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/28/2016 | 12,091.00 | 4,187.87 | 4,187.87 | 4,187.87 | 1 | | | |
| 200141 | 1 | CLASS 2 | JFFS | CHANDRA LLC | 7/1/2014 | 10/31/2016 | 916.86 | 421.45 | 421.45 | 421.45 | 1 | | | |
| 200142 | 1 | CLASS 2 | JFFS | RADIOLOGY PHYSICIAN | 7/1/2014 | 10/5/2016 | 11,055.00 | 1,606.47 | 1,606.47 | 1,606.47 | 1 | | | |
| 200143 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY HOLDINGS INC | 7/1/2014 | 9/11/2016 | 1,600.00 | 797.17 | 797.17 | 797.17 | 1 | | | |
| 200144 | 1 | CLASS 2 | JFFS | EBI LLC | 7/1/2014 | 10/12/2016 | 34,100.00 | 18,432.56 | 18,432.56 | 18,432.56 | 1 | | | |
| 200145 | 1 | CLASS 2 | JFFS | WEST PASCO PULMONARY | 7/1/2014 | 9/13/2016 | 2,376.00 | 1,035.71 | 1,035.71 | 1,035.71 | 1 | | | |
| 200146 | 1 | CLASS 2 | JFFS | BROWARD | 7/1/2014 | 9/22/2016 | 12,842.00 | 3,746.00 | 3,746.00 | 3,746.00 | 1 | | | |
| 200147 | 1 | CLASS 2 | JFFS | SJMH MEDICAL PRACTICE | 7/1/2014 | 9/11/2016 | 270.00 | 16.36 | 16.36 | 16.36 | 1 | | | |
| 200148 | 1 | CLASS 2 | JFFS | FL I MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 5,615.00 | 455.30 | 455.30 | 455.30 | 1 | | | |
| 200149 | 1 | CLASS 2 | JFFS | COLUMBIA EYE & SPECIALTY | 7/1/2014 | 9/11/2016 | 6,296.00 | 1,337.62 | 1,337.62 | 1,337.62 | 1 | | | |
| 200150 | 1 | CLASS 2 | JFFS | PAIN MEDICINE INC | 7/1/2014 | 10/13/2016 | 23,300.00 | 142.94 | 142.94 | 142.94 | 1 | | | |
| 200151 | 1 | CLASS 2 | JFFS | WEST BOYNTON BEACH | 7/1/2014 | 10/8/2016 | 78,439.59 | 16,141.17 | 16,141.17 | 16,141.17 | 1 | | | |
| 200152 | 1 | CLASS 2 | JFFS | LAWNWOOD REG MED | 7/1/2014 | 10/13/2016 | 49,953.00 | 9,990.60 | 9,990.60 | 9,990.60 | 1 | | | |
| 200153 | 1 | CLASS 2 | JFFS | FLI MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 5,448.00 | 517.96 | 517.96 | 517.96 | 1 | | | |
| 200154 | 1 | CLASS 2 | JFFS | GASTROENTEROLOGY CONSULTANTS CFL PA | 7/1/2014 | 10/12/2016 | 20,689.00 | 6,789.15 | 6,789.15 | 6,789.15 | 1 | | | |
| 200155 | 1 | CLASS 2 | JFFS | TAMPA BAY HOSPITALISTS | 7/1/2014 | 10/25/2016 | 526.00 | 209.88 | 209.88 | 209.88 | 1 | | | |
| 200156 | 1 | CLASS 2 | JFFS | SUMMA HEALTH SYSTEM | 7/1/2014 | 9/30/2016 | 22,999.50 | 4,408.43 | 4,408.43 | 4,408.43 | 1 | | | |
| 200157 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/28/2016 | 18,949.00 | 8,811.65 | 8,811.65 | 8,811.65 | 1 | | | |
| 200158 | 1 | CLASS 2 | JFFS | SUNSHINE STATE | 7/1/2014 | 10/28/2016 | 300.00 | - | - | - | 1 | | | |
| 200159 | 1 | CLASS 2 | JFFS | INFECTIONS MANAGED INC | 7/1/2014 | 10/26/2016 | 230.00 | - | - | - | 1 | | | |
| 200160 | 1 | CLASS 2 | JFFS | LAL BHAGCHANDANI MD PA | 7/1/2014 | 10/5/2016 | 7,320.00 | 5,296.53 | 5,296.53 | 5,296.53 | 1 | | | |
| 200161 | 1 | CLASS 2 | JFFS | GULF COAST HMA PHYSICIAN | 7/1/2014 | 10/25/2016 | 290.85 | 100.37 | 100.37 | 100.37 | 1 | | | |
| 200162 | 1 | CLASS 2 | JFFS | FLORIDA UNITED RADIOLOGY | 7/1/2014 | 10/5/2016 | 52,391.00 | 5,262.30 | 5,262.30 | 5,262.30 | 1 | | | |
| 200163 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 8,305.04 | 2,947.93 | 2,947.93 | 2,947.93 | 1 | | | |
| 200164 | 1 | CLASS 2 | JFFS | INFECTIOUS DISEASE | 7/1/2014 | 9/30/2016 | 54,075.00 | 32,325.82 | 32,325.82 | 32,325.82 | 1 | | | |
| 200165 | 1 | CLASS 2 | JFFS | OCALA REGIONAL PT CENTER | 7/1/2014 | 10/14/2016 | 5,070.12 | 2,179.46 | 2,179.46 | 2,179.46 | 1 | | | |
| 200166 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 6,673.04 | 2,984.92 | 2,984.92 | 2,984.92 | 1 | | | |
| 200167 | 1 | CLASS 2 | JFFS | INTERNAL MEDICINE & | 7/1/2014 | 10/25/2016 | 4,396.00 | 2,388.67 | 2,388.67 | 2,388.67 | 1 | | | |
| 200168 | 1 | CLASS 2 | JFFS | HOLY CROSS EMERGENCY | 7/1/2014 | 10/1/2016 | 2,251.00 | 482.96 | 482.96 | 482.96 | 1 | | | |
| 200169 | 1 | CLASS 2 | JFFS | REHABCLINICS SPT INC | 7/1/2014 | 10/31/2016 | 381.02 | 117.68 | 117.68 | 117.68 | 1 | | | |
| 200170 | 1 | CLASS 8 | JFFS | LINCOLN MEDICAL MENTAL HEALTH | 7/1/2014 | 1/20/2017 | 105,091.82 | 21,018.36 | 21,018.36 | 21,018.36 | 1 | | | |
| 200171 | 1 | CLASS 2 | JFFS | KIRK JOBE | 7/1/2014 | 10/19/2016 | 745.00 | 336.68 | 336.68 | 336.68 | 1 | | | |
| 200172 | 1 | CLASS 2 | JFFS | SPHINX WELLNESS INC | 7/1/2014 | 10/12/2016 | 965.00 | 528.92 | 528.92 | 528.92 | 1 | | | |
| 200173 | 1 | CLASS 8 | JFFS | MUKHERJEE AND MUKAYED | 7/1/2014 | 12/22/2016 | 258.00 | 134.89 | 134.89 | 134.89 | 1 | | | |
| 200174 | 1 | CLASS 2 | JFFS | FLORIDA INSTITUTE OF | 7/1/2014 | 10/1/2016 | 3,025.00 | 930.88 | 930.88 | 930.88 | 1 | | | |
| 200175 | 1 | CLASS 2 | JFFS | FOCUS ORTHOPEDICS INC | 7/1/2014 | 9/23/2016 | 17,578.84 | 10,816.88 | 10,816.88 | 10,816.88 | 1 | | | |
| 200176 | 1 | CLASS 2 | JFFS | MELISSA C VERDE DPM PA | 7/1/2014 | 10/31/2016 | 2,155.00 | 1,003.26 | 1,003.26 | 1,003.26 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200177 | 1 | CLASS 2 | JFFS | NEOGENOMICS | 7/1/2014 | 10/19/2016 | 12,268.00 | 2,271.57 | 2,271.57 | 2,271.57 | 1 | | | |
| 200178 | 1 | CLASS 2 | JFFS | FLORIDA EMI MEDICAL | 7/1/2014 | 10/12/2016 | 717.00 | 48.15 | 48.15 | 48.15 | 1 | | | |
| 200179 | 1 | CLASS 2 | JFFS | ANESTHESIOLOGISTS OF | 7/1/2014 | 10/27/2016 | 194,148.50 | 26,687.37 | 26,687.37 | 26,687.37 | 1 | | | |
| 200180 | 1 | CLASS 2 | JFFS | CENTER FOR BONE & JOINT | 7/1/2014 | 10/12/2016 | 217,346.46 | 46,936.28 | 46,936.28 | 46,936.28 | 1 | | | |
| 200181 | 1 | CLASS 2 | JFFS | EAST FLORIDA | 7/1/2014 | 9/28/2016 | 28,861.00 | 7,688.57 | 7,688.57 | 7,688.57 | 1 | 12/15/2017 | W-E/C | |
| 200182 | 1 | CLASS 2 | JFFS | RAVI SHARMA MD PA | 7/1/2014 | 9/30/2016 | 36,102.99 | 10,826.93 | 10,826.93 | 10,826.93 | 1 | | | |
| 200183 | 1 | CLASS 2 | JFFS | OAKFIELD DRIVE EMERG PHYSICIAN | 7/1/2014 | 10/12/2016 | 44,497.00 | 3,806.73 | 3,806.73 | 3,806.73 | 1 | | | |
| 200184 | 1 | CLASS 2 | JFFS | MCLAREN REGIONAL | 7/1/2014 | 9/21/2016 | 92.00 | - | - | - | 1 | | | |
| 200185 | 1 | CLASS 2 | JFFS | BRODRICK ER SVCS | 7/1/2014 | 10/12/2016 | 23,500.00 | 2,052.94 | 2,052.94 | 2,052.94 | 1 | | | |
| 200186 | 1 | CLASS 2 | JFFS | SAI MEDICAL CENTER LLC | 7/1/2014 | 10/25/2016 | 268.00 | 139.06 | 139.06 | 139.06 | 1 | | | |
| 200187 | 1 | CLASS 2 | JFFS | JFK INTERNAL MEDICINE FACULTY PRACTICE LLC In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/28/2016 | 4,185.00 | 2,280.68 | 2,280.68 | 2,280.68 | 1 | | | |
| 200188 | 1 | CLASS 2 | JFFS | LAWNWOOD MEDICAL CENTER INC In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/7/2016 | 109,487.02 | 21,897.40 | 21,897.40 | 21,897.40 | 1 | | | |
| 200189 | 1 | CLASS 2 | JFFS | WINTER HAVEN HOSPITAL | 7/1/2014 | 10/19/2016 | 5,040.00 | 2,247.48 | 2,247.48 | 2,247.48 | 1 | | | |
| 200190 | 1 | CLASS 2 | JFFS | WINTER HAVEN HOSPITAL INC | 7/1/2014 | 10/19/2016 | 37,139.00 | 13,088.59 | 13,088.59 | 13,088.59 | 1 | | | |
| 200191 | 1 | CLASS 2 | JFFS | AFZAL CHOUDHRY MD PA | 7/1/2014 | 9/14/2016 | 10,443.10 | 5,458.76 | 5,458.76 | 5,458.76 | 1 | | | |
| 200192 | 1 | CLASS 2 | JFFS | SHERIDAN RADIOLOGY SERVICES CFL | 7/1/2014 | 10/12/2016 | 55.00 | - | - | - | 1 | | | |
| 200193 | 1 | CLASS 2 | JFFS | FLORIDA ANESTHESIA AND PAIN MGMT ASSOCIATES | 7/1/2014 | 9/21/2016 | 130,898.00 | 53,540.95 | 53,540.95 | 53,540.95 | 1 | | | |
| 200194 | 1 | CLASS 2 | JFFS | CYPRESS ORTHOPEDICS | 7/1/2014 | 9/19/2016 | 9,298.00 | 1,723.37 | 1,723.37 | 1,723.37 | 1 | | | |
| 200195 | 1 | CLASS 2 | JFFS | WASHINGTON CABEZAS In | 7/1/2014 | 9/28/2016 | 10,411.00 | 2,398.29 | 2,398.29 | 2,398.29 | 1 | | | |
| 200196 | 1 | CLASS 2 | JFFS | BAYCARE BEHAVIORAL HEALTH INC | 7/1/2014 | 10/14/2016 | 3,232.00 | 793.64 | 793.64 | 793.64 | 1 | | | |
| 200197 | 1 | CLASS 2 | JFFS | DAVID J VARGAS | 7/1/2014 | 10/31/2016 | 17,695.75 | 10,985.59 | 10,985.59 | 10,985.59 | 1 | | | |
| 200198 | 1 | CLASS 2 | JFFS | SUMMA WESTERN RESERVE | 7/1/2014 | 9/30/2016 | 60,577.00 | 11,990.40 | 11,990.40 | 11,990.40 | 1 | | | |
| 200199 | 1 | CLASS 2 | JFFS | COCONUT CREEK | 7/1/2014 | 10/12/2016 | 21,120.00 | 1,889.20 | 1,889.20 | 1,889.20 | 1 | | | |
| 200200 | 1 | CLASS 2 | JFFS | ST PETERSBURG GENERAL HOSPITAL In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 618,565.42 | 116,219.42 | 116,219.42 | 116,219.42 | 1 | 12/15/2017 | W-E/C | |
| 200201 | 1 | CLASS 2 | JFFS | HAVEN EMERGENCY | 7/1/2014 | 10/12/2016 | 8,853.00 | 543.97 | 543.97 | 543.97 | 1 | | | |
| 200202 | 1 | CLASS 2 | JFFS | JOHN HOFFMAN | 7/1/2014 | 10/31/2016 | 123.00 | 58.67 | 58.67 | 58.67 | 1 | | | |
| 200203 | 1 | CLASS 2 | JFFS | WOMENS HEALTH ASSOCIATES | 7/1/2014 | 8/30/2016 | 40,735.00 | 17,585.31 | 17,585.31 | 17,585.31 | 1 | | | |
| 200204 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/22/2016 | 195,273.00 | 86,192.60 | 86,192.60 | 86,192.60 | 1 | | | |
| 200205 | 1 | CLASS 2 | JFFS | NEUROSURGICAL ASSOC OF | 7/1/2014 | 10/28/2016 | 1,490.00 | 673.36 | 673.36 | 673.36 | 1 | | | |
| 200206 | 1 | CLASS 2 | JFFS | BAYCARE OUTPATIENT | 7/1/2014 | 10/14/2016 | 26,038.40 | 6,906.85 | 6,906.85 | 6,906.85 | 1 | | | |
| 200207 | 1 | CLASS 2 | JFFS | HEALTH IMAGING SERVICES | 7/1/2014 | 10/12/2016 | 832.00 | 167.72 | 167.72 | 167.72 | 1 | | | |
| 200208 | 1 | CLASS 2 | JFFS | AVENTURA HEALTHCARE | 7/1/2014 | 9/28/2016 | 232.00 | 117.42 | 117.42 | 117.42 | 1 | | | |
| 200209 | 1 | CLASS 2 | JFFS | WINTER HAVEN | 7/1/2014 | 9/29/2016 | 35,625.00 | 25,299.51 | 25,299.51 | 25,299.51 | 1 | | | |
| 200210 | 1 | CLASS 2 | JFFS | RAPHA VASCULAR SPECIALISTS | 7/1/2014 | 9/29/2016 | 6,027.36 | 3,365.05 | 3,365.05 | 3,365.05 | 1 | | | |
| 200211 | 1 | CLASS 2 | JFFS | ST LUCIE MEDICAL CENTER | 7/1/2014 | 10/7/2016 | 2,005,903.57 | 332,714.28 | 332,714.28 | 332,714.28 | 1 | | | |
| 200212 | 1 | CLASS 2 | JFFS | BAXLEY EMERGENCY | 7/1/2014 | 10/12/2016 | 19,505.00 | 1,764.84 | 1,764.84 | 1,764.84 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200213 | 1 | CLASS 2 | JFFS | KISSIMMEE SURGICARE LTD In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2016 | 9/13/2016 | 1,231,224.60 | 84,738.43 | 84,738.43 | 84,738.43 | 1 | | | |
| 200214 | 1 | CLASS 2 | JFFS | LABCORP BURLINGTON | 7/1/2014 | 10/28/2016 | 727.03 | - | - | - | 1 | | | |
| 200215 | 1 | CLASS 2 | JFFS | LUIS J LOPEZ MD PA | 7/1/2014 | 10/22/2016 | 500.00 | 326.60 | 326.60 | 326.60 | 1 | | | |
| 200216 | 1 | CLASS 2 | JFFS | EAST FLORIDA BEHAVIORAL | 7/1/2014 | 9/28/2016 | 3,006.00 | 1,023.90 | 1,023.90 | 1,023.90 | 1 | 12/15/2017 | W-E/C | |
| 200217 | 1 | CLASS 2 | JFFS | BAYCARE OUTPATIENT IMAGING | 7/1/2014 | 10/14/2016 | 17,006.00 | 4,135.57 | 4,135.57 | 4,135.57 | 1 | | | |
| 200218 | 1 | CLASS 2 | JFFS | SOUTH CENTRAL EMERGENCY SERVICES P | 7/1/2014 | 10/26/2016 | 1,180.00 | - | - | - | 1 | | | |
| 200219 | 1 | CLASS 2 | JFFS | CHRISTY VANBUREN | 7/1/2014 | 10/12/2016 | 2,260.00 | 183.37 | 183.37 | 183.37 | 1 | | | |
| 200220 | 1 | CLASS 2 | JFFS | REZA SAFFARI | 7/1/2014 | 9/28/2016 | 2,466.00 | 1,192.94 | 1,192.94 | 1,192.94 | 1 | | | |
| 200221 | 1 | CLASS 2 | JFFS | THE VILLAGES HOSPITAL | 7/1/2014 | 9/28/2016 | 1,536.70 | 314.07 | 314.07 | 314.07 | 1 | | | |
| 200222 | 1 | CLASS 2 | JFFS | BASSAM SAYEGH MD PA | 7/1/2014 | 10/1/2016 | 10,368.00 | 6,221.00 | 6,221.00 | 6,221.00 | 1 | | | |
| 200223 | 1 | CLASS 2 | JFFS | LASZLO J MATE MD | 7/1/2014 | 9/20/2016 | 2,100.00 | 921.43 | 921.43 | 921.43 | 1 | | | |
| 200224 | 1 | CLASS 2 | JFFS | CELESTINO VEGA | 7/1/2014 | 10/28/2016 | 406.00 | - | - | - | 1 | | | |
| 200225 | 1 | CLASS 2 | JFFS | HEINEN ALFRED | 7/1/2014 | 9/22/2016 | 11,545.00 | 439.53 | 439.53 | 439.53 | 1 | | | |
| 200226 | 1 | CLASS 2 | JFFS | HIGHLANDS COUNTY BOARD | 7/1/2014 | 10/4/2016 | 1,967.00 | 1,511.53 | 1,511.53 | 1,511.53 | 1 | | | |
| 200227 | 1 | CLASS 2 | JFFS | BAYFRONT HMA PHYSICIAN | 7/1/2014 | 10/25/2016 | 2,101.00 | 1,014.71 | 1,014.71 | 1,014.71 | 1 | | | |
| 200228 | 1 | CLASS 2 | JFFS | FLI MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 5,972.00 | 570.64 | 570.64 | 570.64 | 1 | | | |
| 200229 | 1 | CLASS 2 | JFFS | INMED DIAGNOSTIC | 7/1/2014 | 9/19/2016 | 103,438.00 | 838.85 | 838.85 | 838.85 | 1 | | | |
| 200230 | 1 | CLASS 2 | JFFS | BAY SOUND INPATIENT | 7/1/2014 | 10/12/2016 | 1,246.00 | 395.24 | 395.24 | 395.24 | 1 | | | |
| 200231 | 1 | CLASS 2 | JFFS | HEART AND VASCULAR | 7/1/2014 | 10/12/2016 | 294,571.00 | 167,464.51 | 167,464.51 | 167,464.51 | 1 | | | |
| 200232 | 1 | CLASS 2 | JFFS | SIDNEY SCHLEIN | 7/1/2014 | 10/12/2016 | 1,229.00 | 655.24 | 655.24 | 655.24 | 1 | | | |
| 200233 | 1 | CLASS 2 | JFFS | LRMC URGENT CARE | 7/1/2014 | 9/30/2016 | 1,829.90 | 475.64 | 475.64 | 475.64 | 1 | | | |
| 200234 | 1 | CLASS 2 | JFFS | UROLOGY CONSULTANTS | 7/1/2014 | 10/31/2016 | 11,630.60 | 4,502.81 | 4,502.81 | 4,502.81 | 1 | | | |
| 200235 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/14/2016 | 9,345.18 | 3,831.14 | 3,831.14 | 3,831.14 | 1 | | | |
| 200236 | 1 | CLASS 2 | JFFS | SARASOTA COUNTY FIRE | 7/1/2014 | 10/4/2016 | 647.00 | 287.91 | 287.91 | 287.91 | 1 | | | |
| 200237 | 1 | CLASS 2 | JFFS | IPN EMERGENCY | 7/1/2014 | 10/26/2016 | 3,182.00 | 283.44 | 283.44 | 283.44 | 1 | | | |
| 200238 | 1 | CLASS 2 | JFFS | WILLIAM DANDY SCHOOL | 7/1/2014 | 10/20/2016 | 226.00 | 90.59 | 90.59 | 90.59 | 1 | | | |
| 200239 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 34,515.06 | 17,375.14 | 17,375.14 | 17,375.14 | 1 | | | |
| 200240 | 1 | CLASS 2 | JFFS | FPMG DBA ORLANDO NEUROSURGERY | 7/1/2014 | 10/16/2016 | 114,178.00 | 21,877.96 | 21,877.96 | 21,877.96 | 1 | | | |
| 200241 | 1 | CLASS 2 | JFFS | INTERMOUNTAIN MEDICAL | 7/1/2014 | 10/22/2016 | 672.99 | 174.36 | 174.36 | 174.36 | 1 | | | |
| 200242 | 1 | CLASS 2 | JFFS | JOSE A SANTANA | 7/1/2014 | 10/12/2016 | 1,515.00 | 141.72 | 141.72 | 141.72 | 1 | | | |
| 200243 | 1 | CLASS 2 | JFFS | FT WALTON BCH MED CT In | 7/1/2014 | 10/14/2016 | 1,666.00 | 253.40 | 253.40 | 253.40 | 1 | | | |
| 200244 | 1 | CLASS 2 | JFFS | PALM GARDENS OIC In Care | 7/1/2014 | 10/8/2016 | 99,771.00 | 21,289.95 | 21,289.95 | 21,289.95 | 1 | | | |
| 200245 | 1 | CLASS 2 | JFFS | WENDELL J COURTNEY | 7/1/2014 | 10/17/2016 | 175.00 | 143.30 | 143.30 | 143.30 | 1 | | | |
| 200246 | 1 | CLASS 2 | JFFS | AMERICAN DIAGNOSTIC SVCS | 7/1/2014 | 10/12/2016 | 17,032.00 | 6,134.49 | 6,134.49 | 6,134.49 | 1 | | | |
| 200247 | 1 | CLASS 2 | JFFS | MICHAEL LALIBERTE | 7/1/2014 | 10/31/2016 | 21,326.00 | 14,190.77 | 14,190.77 | 14,190.77 | 1 | | | |
| 200248 | 1 | CLASS 2 | JFFS | PINELLAS PRIMARY CARE INC | 7/1/2014 | 10/29/2016 | 942.00 | 598.94 | 598.94 | 598.94 | 1 | | | |
| 200249 | 1 | CLASS 2 | JFFS | OSCEOLA COUNTY EMS | 7/1/2014 | 10/4/2016 | 147,787.89 | 89,221.89 | 89,221.89 | 89,221.89 | 1 | | | |
| 200250 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 9/29/2016 | 440,632.23 | 123,628.44 | 123,628.44 | 123,628.44 | 1 | | | |
| 200251 | 1 | CLASS 2 | JFFS | MERY J LOSSADA MD PA | 7/1/2014 | 10/12/2016 | 870.00 | 592.86 | 592.86 | 592.86 | 1 | | | |
| 200252 | 1 | CLASS 2 | JFFS | ESOTERIX GENETIC LABORATIES | 7/1/2014 | 10/25/2016 | 1,248.00 | 309.02 | 309.02 | 309.02 | 1 | | | |
| 200253 | 1 | CLASS 2 | JFFS | CITY OF PALM BEACH | 7/1/2014 | 10/4/2016 | 7,832.80 | 3,257.51 | 3,257.51 | 3,257.51 | 1 | | | |
| 200254 | 1 | CLASS 8 | JFFS | STEVEN PANGBORN DPM | 7/1/2014 | 12/14/2016 | 815.00 | 648.02 | 648.02 | 648.02 | 1 | | | |
| 200255 | 1 | CLASS 2 | JFFS | BRANDON REGIONAL | 7/1/2014 | 10/5/2016 | 452,126.05 | 81,620.40 | 81,620.40 | 81,620.40 | 1 | | | |
| 200257 | 1 | CLASS 2 | JFFS | ANESTHESIA & PAIN | 7/1/2014 | 10/19/2016 | 3,150.00 | 1,650.00 | 1,650.00 | 1,650.00 | 1 | | | |
| 200258 | 1 | CLASS 2 | JFFS | TIMBERRIDGE IMAGING | 7/1/2014 | 9/16/2016 | 42,813.00 | 8,742.99 | 8,742.99 | 8,742.99 | 1 | | | |
| 200259 | 1 | CLASS 2 | JFFS | LOZANO INTERNAL MEDICINE | 7/1/2014 | 10/26/2016 | 2,036.00 | 973.22 | 973.22 | 973.22 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200260 | 1 | CLASS 2 | JFFS | ORLANDO PHYSICIANS SPECIALISTS LLC | 7/1/2014 | 9/11/2016 | 1,422,593.42 | 101,552.26 | 101,552.26 | 101,552.26 | 1 | | | |
| 200261 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY HOLDINGS | 7/1/2014 | 9/11/2016 | 1,520.00 | 652.46 | 652.46 | 652.46 | 1 | | | |
| 200262 | 1 | CLASS 2 | JFFS | CARDIOVASCULAR | 7/1/2014 | 9/30/2016 | 929,864.87 | 417,178.47 | 417,178.47 | 417,178.47 | 1 | | | |
| 200263 | 1 | CLASS 2 | JFFS | LAKE MONROE EMERGENCY | 7/1/2014 | 10/12/2016 | 231,318.00 | 19,307.47 | 19,307.47 | 19,307.47 | 1 | | | |
| 200264 | 1 | CLASS 2 | JFFS | NATIONAL MEDICAL SERVICES INC | 7/1/2014 | 9/24/2016 | 78,887.80 | 26,933.98 | 26,933.98 | 26,933.98 | 1 | | | |
| 200265 | 1 | CLASS 2 | JFFS | INDEPENDENT EKG | 7/1/2014 | 9/30/2016 | 6,636.00 | 1,277.92 | 1,277.92 | 1,277.92 | 1 | | | |
| 200266 | 1 | CLASS 2 | JFFS | FLORIDA SURGERY CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/11/2016 | 108,759.00 | 6,755.88 | 6,755.88 | 6,755.88 | 1 | 12/15/2017 | W-E/U | |
| 200267 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/21/2016 | 12,111.50 | 8,977.65 | 8,977.65 | 8,977.65 | 1 | | | |
| 200268 | 1 | CLASS 2 | JFFS | MEMORIAL HEALTH UNIVERSITY And THE GIBSON FIRM | 7/1/2014 | 9/26/2016 | 225,609.15 | 16,807.81 | 16,807.81 | 16,807.81 | 1 | | | |
| 200269 | 1 | CLASS 8 | JFFS | SURGICAL ASSOCIATES OF CENTRAL FLORIDA | 7/1/2014 | 3/22/2017 | 75,167.00 | 25,154.44 | 25,154.44 | 25,154.44 | 1 | | | |
| 200270 | 1 | CLASS 2 | JFFS | BAYCARE OUTPATIENT IMAGING | 7/1/2014 | 10/14/2016 | 719.00 | 197.54 | 197.54 | 197.54 | 1 | | | |
| 200271 | 1 | CLASS 2 | JFFS | PREMIER CARDIOLOGY & VASCULAR ASSOCIATES | 7/1/2014 | 9/10/2016 | 96,927.98 | 45,254.08 | 45,254.08 | 45,254.08 | 1 | | | |
| 200272 | 1 | CLASS 2 | JFFS | ORANGE CITY DIALYSIS | 7/1/2014 | 10/26/2016 | 297,696.65 | 20,918.31 | 20,918.31 | 20,918.31 | 1 | | | |
| 200273 | 1 | CLASS 2 | JFFS | SELECT PHYSICAL THERAPY | 7/1/2014 | 9/11/2016 | 1,495.00 | 843.68 | 843.68 | 843.68 | 1 | | | |
| 200274 | 1 | CLASS 2 | JFFS | PET CT CENTER | 7/1/2014 | 10/14/2016 | 4,770.00 | 840.09 | 840.09 | 840.09 | 1 | | | |
| 200275 | 1 | CLASS 2 | JFFS | BOYNTON BEACH EFL IMAGING CENTER LLC In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/27/2016 | 4,803.00 | - | - | - | 1 | | | |
| 200276 | 1 | CLASS 2 | JFFS | WYCKOFF MEDICAL CENTER | 7/1/2014 | 10/27/2016 | 124,009.33 | 24,801.86 | 24,801.86 | 24,801.86 | 1 | | | |
| 200277 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/17/2016 | 4,961,447.11 | 497,428.05 | 497,428.05 | 497,428.05 | 1 | | | |
| 200278 | 1 | CLASS 2 | JFFS | SUN CITY IMAGING LLC | 7/1/2014 | 10/8/2016 | 4,709.89 | 917.21 | 917.21 | 917.21 | 1 | | | |
| 200279 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/19/2016 | 55,654.47 | 21,098.03 | 21,098.03 | 21,098.03 | 1 | | | |
| 200280 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA PODIATRY | 7/1/2014 | 10/31/2016 | 4,975.00 | 3,790.33 | 3,790.33 | 3,790.33 | 1 | | | |
| 200281 | 1 | CLASS 2 | JFFS | PHYSICIAN PROVIDERS | 7/1/2014 | 9/29/2016 | 22,693.00 | 8,416.65 | 8,416.65 | 8,416.65 | 1 | | | |
| 200282 | 1 | CLASS 2 | JFFS | FRANCIS X CONIDI DO MS PA | 7/1/2014 | 10/20/2016 | 14,712.00 | 4,345.66 | 4,345.66 | 4,345.66 | 1 | | | |
| 200283 | 1 | CLASS 2 | JFFS | OCALA HEALTH PRIMARY | 7/1/2014 | 10/7/2016 | 199.00 | 81.65 | 81.65 | 81.65 | 1 | | | |
| 200284 | 1 | CLASS 2 | JFFS | ANIL RAIKER MD PLC | 7/1/2014 | 10/8/2016 | 2,498.00 | 1,178.05 | 1,178.05 | 1,178.05 | 1 | | | |
| 200285 | 1 | CLASS 2 | JFFS | NICHOLAS G BAGNOLI DO PA | 7/1/2014 | 9/27/2016 | 7,050.00 | 5,069.27 | 5,069.27 | 5,069.27 | 1 | | | |
| 200286 | 1 | CLASS 2 | JFFS | ORCHID CITY EMERGENCY | 7/1/2014 | 10/12/2016 | 26,438.00 | 2,438.76 | 2,438.76 | 2,438.76 | 1 | | | |
| 200287 | 1 | CLASS 2 | JFFS | SUSAN CHEEK NEEDLER | 7/1/2014 | 10/14/2016 | 11,131.00 | 3,626.61 | 3,626.61 | 3,626.61 | 1 | | | |
| 200288 | 1 | CLASS 2 | JFFS | QUINCY CREEK EMERGENCY PHYSICIANS LLC | 7/1/2014 | 10/12/2016 | 2,762.00 | 231.52 | 231.52 | 231.52 | 1 | | | |
| 200289 | 1 | CLASS 2 | JFFS | THE VILLAGES REGIONAL | 7/1/2014 | 9/23/2016 | 5,691,482.52 | 1,044,525.30 | 1,044,525.30 | 1,044,525.30 | 1 | 12/15/2017 | W-E/C | |
| 200290 | 1 | CLASS 2 | JFFS | TERENCE P DOWNING In Care | 7/1/2014 | 9/28/2016 | 521.00 | 245.90 | 245.90 | 245.90 | 1 | | | |
| 200291 | 1 | CLASS 2 | JFFS | DIA FOOT | 7/1/2014 | 8/31/2016 | 2,500.00 | 1,925.80 | 1,925.80 | 1,925.80 | 1 | | | |
| 200292 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/26/2016 | 185,328.69 | 68,059.36 | 68,059.36 | 68,059.36 | 1 | | | |
| 200293 | 1 | CLASS 2 | JFFS | GASTROENTEROLOGY ASSOC OF CENTRAL FL | 7/1/2014 | 10/6/2016 | 80,506.62 | 34,083.20 | 34,083.20 | 34,083.20 | 1 | | | |
| 200294 | 1 | CLASS 2 | JFFS | MARITIME ER SVCS PARTNERSHIP | 7/1/2014 | 10/12/2016 | 1,543.00 | 135.22 | 135.22 | 135.22 | 1 | | | |
| 200295 | 1 | CLASS 2 | JFFS | LABCORP | 7/1/2014 | 10/28/2016 | 26,314.94 | - | - | - | 1 | | | |
| 200296 | 1 | CLASS 2 | JFFS | STEPHEN J CLIFFORD MD INC | 7/1/2014 | 10/28/2016 | 625.00 | 233.02 | 233.02 | 233.02 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200297 | 1 | CLASS 2 | JFFS | FL I MEDICAL SERVICES LLC | 7/1/2014 | 10/12/2016 | 681.00 | 50.00 | 50.00 | 50.00 | 1 | | | |
| 200298 | 1 | CLASS 2 | JFFS | WOMENS HEALTH CENTER OF WEST FLORIDA In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/28/2016 | 2,974.00 | 858.89 | 858.89 | 858.89 | 1 | 12/15/2017 | W-E/U | |
| 200299 | 1 | CLASS 8 | JFFS | CLINICAL PET OF OCALA | 7/1/2014 | 1/20/2017 | 12,027.00 | 2,593.63 | 2,593.63 | 2,593.63 | 1 | | | |
| 200300 | 1 | CLASS 2 | JFFS | SAND LAKE IMAGING LLLP | 7/1/2014 | 10/12/2016 | 598,743.50 | 103,351.94 | 103,351.94 | 103,351.94 | 1 | | | |
| 200301 | 1 | CLASS 2 | JFFS | COASTLINE IMAGING INC | 7/1/2014 | 9/13/2016 | 3,635.70 | 595.57 | 595.57 | 595.57 | 1 | | | |
| 200302 | 1 | CLASS 2 | JFFS | INTERNAL MEDICINE | 7/1/2014 | 9/15/2016 | 124,417.87 | 41,288.05 | 41,288.05 | 41,288.05 | 1 | | | |
| 200303 | 1 | CLASS 2 | JFFS | FLORIDA | 7/1/2014 | 9/14/2016 | 16,649.00 | 5,593.74 | 5,593.74 | 5,593.74 | 1 | | | |
| 200304 | 1 | CLASS 2 | JFFS | OSCEOLA HEALTH CARE | 7/1/2014 | 10/12/2016 | 63,700.00 | 49,500.00 | 49,500.00 | 49,500.00 | 1 | | | |
| 200305 | 1 | CLASS 2 | JFFS | CYNTHIA QUINTON | 7/1/2014 | 10/19/2016 | 9,066.00 | 3,598.34 | 3,598.34 | 3,598.34 | 1 | | | |
| 200306 | 1 | CLASS 2 | JFFS | GLIDDEN PARK INPAT SRVCS LLC | 7/1/2014 | 10/12/2016 | 13,562.00 | 3,722.63 | 3,722.63 | 3,722.63 | 1 | | | |
| 200307 | 1 | CLASS 2 | JFFS | TRINITY OUTPATIENT CENTER | 7/1/2014 | 10/14/2016 | 2,077.00 | 264.28 | 264.28 | 264.28 | 1 | | | |
| 200308 | 1 | CLASS 2 | JFFS | BOCA ANESTHESIA SERVICE | 7/1/2014 | 10/27/2016 | 38,712.00 | 34,812.00 | 34,812.00 | 34,812.00 | 1 | | | |
| 200309 | 1 | CLASS 2 | JFFS | NEWMAN PLASTIC SURGERY | 7/1/2014 | 9/1/2016 | 5,795.00 | 1,705.17 | 1,705.17 | 1,705.17 | 1 | | | |
| 200310 | 1 | CLASS 2 | JFFS | BH URGENT CARE | 7/1/2014 | 10/20/2016 | 295.00 | 108.37 | 108.37 | 108.37 | 1 | | | |
| 200311 | 1 | CLASS 2 | JFFS | BAYCARE OUTPATIENT IMAGING | 7/1/2014 | 10/14/2016 | 6,261.99 | 750.97 | 750.97 | 750.97 | 1 | | | |
| 200312 | 1 | CLASS 2 | JFFS | FLORIDA ENDOCRINOLOGY | 7/1/2014 | 10/26/2016 | 1,225.00 | 600.31 | 600.31 | 600.31 | 1 | | | |
| 200313 | 1 | CLASS 2 | JFFS | CAPITAL REGIONAL MEDICAL CENTER In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/13/2016 | 817.00 | 98.40 | 98.40 | 98.40 | 1 | | | |
| 200314 | 1 | CLASS 2 | JFFS | HEART OF FLORIDA OBGYN | 7/1/2014 | 10/4/2016 | 24,083.00 | 10,247.48 | 10,247.48 | 10,247.48 | 1 | | | |
| 200315 | 1 | CLASS 2 | JFFS | BETHESDA ANESTHESIA ASSOC | 7/1/2014 | 10/27/2016 | 6,084.00 | 3,900.00 | 3,900.00 | 3,900.00 | 1 | | | |
| 200316 | 1 | CLASS 2 | JFFS | CROSS TERRACE | 7/1/2014 | 10/28/2016 | 1,825.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1 | | | |
| 200317 | 1 | CLASS 2 | JFFS | PALM HARBOR EMERG PHYSICIANS | 7/1/2014 | 10/12/2016 | 51,674.00 | 4,558.21 | 4,558.21 | 4,558.21 | 1 | | | |
| 200318 | 1 | CLASS 2 | JFFS | HECHTMAN SURGICAL LLC | 7/1/2014 | 9/16/2016 | 1,328.25 | 1,188.24 | 1,188.24 | 1,188.24 | 1 | | | |
| 200319 | 1 | CLASS 2 | JFFS | PALM BEACH MENTAL | 7/1/2014 | 9/28/2016 | 570.00 | 282.32 | 282.32 | 282.32 | 1 | | | |
| 200320 | 1 | CLASS 2 | JFFS | TIMUCUA EMERGENCY | 7/1/2014 | 10/12/2016 | 65,352.00 | 5,221.01 | 5,221.01 | 5,221.01 | 1 | | | |
| 200321 | 1 | CLASS 2 | JFFS | JOSEPH LESTER In Care Of | 7/1/2014 | 9/22/2016 | 21,784.00 | 6,149.90 | 6,149.90 | 6,149.90 | 1 | | | |
| 200322 | 1 | CLASS 2 | JFFS | PEACE RIVER CENTER | 7/1/2014 | 10/1/2016 | 8,175.00 | 3,122.74 | 3,122.74 | 3,122.74 | 1 | | | |
| 200323 | 1 | CLASS 2 | JFFS | PEACE RIVER CENTER | 7/1/2014 | 9/30/2016 | 15,327.50 | 5,887.76 | 5,887.76 | 5,887.76 | 1 | | | |
| 200324 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/5/2016 | 157,256.57 | 53,423.05 | 53,423.05 | 53,423.05 | 1 | | | |
| 200325 | 1 | CLASS 2 | JFFS | 21ST CENTURY ONCOLOGY | 7/1/2014 | 9/29/2016 | 30,371.06 | 6,126.80 | 6,126.80 | 6,126.80 | 1 | | | |
| 200326 | 1 | CLASS 2 | JFFS | MESSIEH ORTHOPEDIC CLINIC PA | 7/1/2014 | 10/5/2016 | 24,249.87 | 8,042.81 | 8,042.81 | 8,042.81 | 1 | | | |
| 200327 | 1 | CLASS 2 | JFFS | HENRY WEISS | 7/1/2014 | 10/31/2016 | 11,513.00 | 7,493.61 | 7,493.61 | 7,493.61 | 1 | | | |
| 200328 | 1 | CLASS 2 | JFFS | TOTAL FOOT CARE PA | 7/1/2014 | 9/1/2016 | 638.00 | 396.50 | 396.50 | 396.50 | 1 | | | |
| 200329 | 1 | CLASS 2 | JFFS | TAMIAMI CANAL EMERGENCY PHYSICIANS LLC | 7/1/2014 | 10/12/2016 | 1,401.00 | 154.20 | 154.20 | 154.20 | 1 | | | |
| 200330 | 1 | CLASS 2 | JFFS | OCALA REGIONAL MEDICAL | 7/1/2014 | 10/7/2016 | 19,995,221.36 | 2,604,908.23 | 2,604,908.23 | 2,604,908.23 | 1 | 12/15/2017 | W-E/U | |
| 200331 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA KIDNEY | 7/1/2014 | 9/30/2016 | 81,441.30 | 18,408.48 | 18,408.48 | 18,408.48 | 1 | | | |
| 200332 | 1 | CLASS 2 | JFFS | OCALA ORTHOPAEDIC | 7/1/2014 | 10/19/2016 | 60,377.00 | 17,565.45 | 17,565.45 | 17,565.45 | 1 | | | |
| 200333 | 1 | CLASS 2 | JFFS | FLAMINGO ANESTHESIA | 7/1/2014 | 10/27/2016 | 3,609.00 | 3,609.00 | 3,609.00 | 3,609.00 | 1 | | | |
| 200334 | 1 | CLASS 2 | JFFS | GASTROENTEROLOGY | 7/1/2014 | 8/31/2016 | 20,181.00 | 6,372.44 | 6,372.44 | 6,372.44 | 1 | | | |
| 200335 | 1 | CLASS 2 | JFFS | MID FL CARDIOVASCULAR | 7/1/2014 | 8/31/2016 | 34,531.00 | 24,013.73 | 24,013.73 | 24,013.73 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200336 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/17/2016 | 608,254.36 | 60,825.44 | 60,825.44 | 60,825.44 | 1 | | | |
| 200337 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 10/27/2016 | 60,169.00 | 33,662.48 | 33,662.48 | 33,662.48 | 1 | | | |
| 200338 | 1 | CLASS 2 | JFFS | MELONIE DURKIN In Care Of | 7/1/2014 | 9/22/2016 | 10,042.00 | 2,247.96 | 2,247.96 | 2,247.96 | 1 | | | |
| 200339 | 1 | CLASS 2 | JFFS | ARGO PARTNERS | 7/1/2014 | 10/19/2016 | 119,094.22 | 41,585.68 | 41,585.68 | 41,585.68 | 1 | | | |
| 200340 | 1 | CLASS 2 | JFFS | DOLPHIN EMERGENCY | 7/1/2014 | 10/12/2016 | 98,945.00 | 8,273.84 | 8,273.84 | 8,273.84 | 1 | | | |
| 200341 | 1 | CLASS 2 | JFFS | FLORIDA CARDIOLOGY PA | 7/1/2014 | 9/15/2016 | 814,894.00 | 261,839.17 | 261,839.17 | 261,839.17 | 1 | | | |
| 200342 | 1 | CLASS 2 | JFFS | JUPITER OPEN IMAGING CTR In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/8/2016 | 12,200.00 | 2,601.83 | 2,601.83 | 2,601.83 | 1 | | | |
| 200343 | 1 | CLASS 2 | JFFS | ACCUPATH DIAGNOSTIC LAB | 7/1/2014 | 10/28/2016 | 10,350.99 | 6,057.55 | 6,057.55 | 6,057.55 | 1 | | | |
| 200344 | 1 | CLASS 2 | JFFS | FC EMERGENCY PHYSICIANS | 7/1/2014 | 10/12/2016 | 3,086.00 | 240.44 | 240.44 | 240.44 | 1 | | | |
| 200345 | 1 | CLASS 2 | JFFS | SEABORN M HUNT III MD PA | 7/1/2014 | 10/17/2016 | 2,041.98 | 1,797.93 | 1,797.93 | 1,797.93 | 1 | | | |
| 200346 | 1 | CLASS 2 | JFFS | EDWARD WHITE HOSPITAL In | 7/1/2014 | 10/5/2016 | 537,323.06 | 106,839.66 | 106,839.66 | 106,839.66 | 1 | 12/15/2017 | W-E/C | |
| 200347 | 1 | CLASS 2 | JFFS | CHRISTOPHER SWINNEY | 7/1/2014 | 8/31/2016 | 865.00 | 785.50 | 785.50 | 785.50 | 1 | | | |
| 200348 | 1 | CLASS 2 | JFFS | FL 1 MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 1,659.00 | 147.24 | 147.24 | 147.24 | 1 | | | |
| 200349 | 1 | CLASS 2 | JFFS | MEDICAL CENTER OF TRINITY In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 2,428,370.59 | 440,806.85 | 440,806.85 | 440,806.85 | 1 | 12/15/2017 | W-E/U | |
| 200350 | 1 | CLASS 2 | JFFS | COASTLINE EMERGENCY PHYSICIANS | 7/1/2014 | 10/12/2016 | 38,671.00 | 3,536.58 | 3,536.58 | 3,536.58 | 1 | | | |
| 200351 | 1 | CLASS 2 | JFFS | CONCEPT OPEN IMAGING CTR In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/8/2016 | 121,090.20 | 27,790.54 | 27,790.54 | 27,790.54 | 1 | | | |
| 200352 | 1 | CLASS 2 | JFFS | CONCEPT EFL IMAGING CENTER LLC In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/27/2016 | 106.00 | 17.79 | 17.79 | 17.79 | 1 | | | |
| 200353 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA KIDNEY | 7/1/2014 | 9/30/2016 | 126,976.40 | 17,810.01 | 17,810.01 | 17,810.01 | 1 | | | |
| 200354 | 1 | CLASS 2 | JFFS | WEST FLORIDA TRAUMA NETWORK LLC In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/28/2016 | 38,664.00 | 15,245.11 | 15,245.11 | 15,245.11 | 1 | 12/15/2017 | W-E/U | |
| 200355 | 1 | CLASS 2 | JFFS | UNIVERSITY ORTHOPEDICS | 7/1/2014 | 10/31/2016 | 3,068.00 | 1,361.37 | 1,361.37 | 1,361.37 | 1 | | | |
| 200356 | 1 | CLASS 2 | JFFS | PHILIP AVERBUCH | 7/1/2014 | 10/31/2016 | 3,539.00 | 1,625.15 | 1,625.15 | 1,625.15 | 1 | | | |
| 200357 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA KIDNEY CENTERS LONGWOOD | 7/1/2014 | 9/30/2016 | 217,959.20 | 38,351.17 | 38,351.17 | 38,351.17 | 1 | | | |
| 200358 | 1 | CLASS 2 | JFFS | MEDICAL CENTER | 7/1/2014 | 9/29/2016 | 256,445.00 | 57,412.40 | 57,412.40 | 57,412.40 | 1 | | | |
| 200359 | 1 | CLASS 2 | JFFS | TLC REHAB | 7/1/2014 | 10/18/2016 | 87,523.83 | 45,861.12 | 45,861.12 | 45,861.12 | 1 | | | |
| 200360 | 1 | CLASS 2 | JFFS | PARAGON EMERGENCY | 7/1/2014 | 10/26/2016 | 2,739.00 | 196.85 | 196.85 | 196.85 | 1 | | | |
| 200361 | 1 | CLASS 2 | JFFS | POINCIANA MEDICAL CENTER | 7/1/2014 | 10/7/2016 | 10,156,899.94 | 874,187.44 | 874,187.44 | 874,187.44 | 1 | 12/15/2017 | W-E/U | |
| 200362 | 1 | CLASS 2 | JFFS | TENET FLORIDA PHYSICIAN SERVICES II LLC | 7/1/2014 | 9/23/2016 | 686.00 | 113.37 | 113.37 | 113.37 | 1 | | | |
| 200363 | 1 | CLASS 2 | JFFS | HOFFMAN PARK EMERG PHYS LLC | 7/1/2014 | 10/12/2016 | 5,761.00 | 525.26 | 525.26 | 525.26 | 1 | | | |
| 200364 | 1 | CLASS 2 | JFFS | LEALMAN INPATIENT | 7/1/2014 | 10/12/2016 | 6,568.00 | 1,728.05 | 1,728.05 | 1,728.05 | 1 | | | |
| 200365 | 1 | CLASS 2 | JFFS | NORMAN H ANDERSON MD PA | 7/1/2014 | 10/17/2014 | 292,302.00 | 156,965.89 | 156,965.89 | 156,965.89 | 1 | | | |
| 200366 | 1 | CLASS 2 | JFFS | DIANON SYSTEMS INC | 7/1/2014 | 10/28/2016 | 11,857.24 | - | | | 1 | | | |
| 200367 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA SPINE | 7/1/2014 | 10/30/2016 | 373,209.00 | 80,981.56 | 80,981.56 | 80,981.56 | 1 | | | |
| 200368 | 1 | CLASS 2 | JFFS | ENDOSCOPIC ANESTHESIA GROUP PA | 7/1/2014 | 10/5/2016 | 25,280.00 | 25,280.00 | 25,280.00 | 25,280.00 | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200369 | 1 | CLASS 2 | JFFS | SPORTS & ORTHOPEDIC REHABILITATION SERVICES INC | 7/1/2014 | 9/11/2016 | 48,566.00 | 22,420.29 | 22,420.29 | 22,420.29 | 1 | | | |
| 200370 | 1 | CLASS 2 | JFFS | PAIN MANAGEMENT CENTER OF WEST ORANGE | 7/1/2014 | 9/16/2016 | 71,547.00 | 26,731.52 | 26,731.52 | 26,731.52 | 1 | | | |
| 200371 | 1 | CLASS 2 | JFFS | CENTRAL FL PHYSICIANS NETWORK In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 9/28/2016 | 35,572.00 | 12,449.95 | 12,449.95 | 12,449.95 | 1 | | | |
| 200372 | 1 | CLASS 2 | JFFS | GEORGE WINNY | 7/1/2014 | 10/28/2016 | 372.00 | 107.91 | 107.91 | 107.91 | 1 | | | |
| 200373 | 1 | CLASS 2 | JFFS | ASHTABULA COUNTY | 7/1/2014 | 10/31/2016 | 2,847.00 | - | - | - | 1 | | | |
| 200374 | 1 | CLASS 2 | JFFS | EMILIA PACARIEM | 7/1/2014 | 10/12/2016 | 5,787.00 | 3,701.22 | 3,701.22 | 3,701.22 | 1 | | | |
| 200375 | 1 | CLASS 2 | JFFS | CENTRAL FLORIDA KIDNEY | 7/1/2014 | 10/1/2016 | 146,156.15 | 16,569.08 | 16,569.08 | 16,569.08 | 1 | | | |
| 200376 | 1 | CLASS 2 | JFFS | INTEGRATED REG LAB PATH | 7/1/2014 | 10/28/2016 | 66,518.00 | 11,262.66 | 11,262.66 | 11,262.66 | 1 | | | |
| 200377 | 1 | CLASS 2 | JFFS | DOUGLAS HALL | 7/1/2014 | 10/13/2016 | 146.00 | 41.47 | 41.47 | 41.47 | 1 | | | |
| 200378 | 1 | CLASS 2 | JFFS | GWINNETT MEDICAL CENTER | 7/1/2014 | 10/27/2016 | 459.00 | 26.80 | 26.80 | 26.80 | 1 | | | |
| 200379 | 1 | CLASS 2 | JFFS | DIANON SYSTEM INC | 7/1/2014 | 10/28/2016 | 142,249.84 | 140,204.94 | 140,204.94 | 140,204.94 | 1 | | | |
| 200380 | 1 | CLASS 2 | JFFS | LIQUIDITY SOLUTIONS INC | 7/1/2014 | 9/2/2016 | 200,490.31 | 88,231.06 | 88,231.06 | 88,231.06 | 1 | | | |
| 200381 | 1 | CLASS 2 | JFFS | OCALA CANCER INSTITUTE | 7/1/2014 | 9/21/2016 | 13,241.00 | 8,500.71 | 8,500.71 | 8,500.71 | 1 | | | |
| 200382 | 1 | CLASS 2 | JFFS | SIDDHARTH H SHAH MD PA | 7/1/2014 | 10/31/2016 | 3,000.00 | 1,069.65 | 1,069.65 | 1,069.65 | 1 | | | |
| 200383 | 1 | CLASS 2 | JFFS | RAUL CARRILLO MD PA | 7/1/2014 | 10/26/2016 | 18,165.00 | 13,399.63 | 13,399.63 | 13,399.63 | 1 | | | |
| 200384 | 1 | CLASS 2 | JFFS | HOLLYWOOD FIRE RESCUE | 7/1/2014 | 10/4/2016 | 3,978.00 | 1,294.71 | 1,294.71 | 1,294.71 | 1 | | | |
| 200385 | 1 | CLASS 2 | JFFS | ALLINA HEALTH SYSTEM | 7/1/2014 | 10/27/2016 | 1,035.00 | - | - | - | 1 | | | |
| 200386 | 1 | CLASS 2 | JFFS | MESSIEH ORTHOPEDIC CLINIC PA | 7/1/2014 | 10/5/2016 | 5,415.35 | 552.53 | 552.53 | 552.53 | 1 | | | |
| 200387 | 1 | CLASS 2 | JFFS | ANIBAL CUEVAS MD PA | 7/1/2014 | 10/22/2016 | 893.00 | 437.35 | 437.35 | 437.35 | 1 | | | |
| 200388 | 1 | CLASS 2 | JFFS | FLORIDA EMI MEDICAL SERVICES PA | 7/1/2014 | 10/12/2016 | 975.00 | 92.63 | 92.63 | 92.63 | 1 | | | |
| 200389 | 1 | CLASS 8 | JFFS | IRA SCHLESINGER MD PA | 7/1/2014 | 12/22/2016 | 22,960.00 | 14,720.43 | 14,720.43 | 14,720.43 | 1 | | | |
| 200390 | 1 | CLASS 2 | JFFS | TRI COUNTY ORTHOPEDICS PA | 7/1/2014 | 9/20/2016 | 3,515.00 | 2,261.04 | 2,261.04 | 2,261.04 | 1 | | | |
| 200391 | 1 | CLASS 2 | JFFS | TALLAHASSEE NEUROLOGICAL CLINIC | 7/1/2014 | 10/7/2016 | 256.00 | - | - | - | 1 | | | |
| 200392 | 1 | CLASS 2 | JFFS | JASON MORRIS | 7/1/2014 | 10/12/2016 | 1,478.00 | 140.50 | 140.50 | 140.50 | 1 | | | |
| 200393 | 1 | CLASS 2 | JFFS | MARCUS J DILORENZA | 7/1/2014 | 10/12/2016 | 7,307.00 | 4,835.31 | 4,835.31 | 4,835.31 | 1 | | | |
| 200394 | 1 | CLASS 2 | JFFS | RMC BAYONET POINT In Care Of BUCHANAN INGERSOLL & ROONEY PC | 7/1/2014 | 10/5/2016 | 4,254,353.22 | 825,883.91 | 825,883.91 | 825,883.91 | 1 | 12/15/2017 | W-E/C | |
| 200395 | 1 | CLASS 2 | JFFS | NEW LUNG ASSOCIATES PA | 7/1/2014 | 9/11/2016 | 3,379.00 | 1,099.79 | 1,099.79 | 1,099.79 | 1 | | | |
| 200396 | 1 | CLASS 2 | JFFS | TAMPA BAY INPATIENT MEDICINE | 7/1/2014 | 10/22/2016 | 334.00 | - | - | - | 1 | | | |
| 200397 | 1 | CLASS 8 | JFFS | CARDIOLOGY PHYSICIANS MEMORIAL LLC | 7/1/2014 | 5/16/2017 | 7,134.02 | 2,372.13 | 2,372.13 | 2,372.13 | 1 | | | |
| 200398 | 1 | CLASS 8 | JFFS | JOSE TORRES | 7/1/2017 | 4/3/2017 | 31,421.00 | 9,549.00 | 9,549.00 | 9,549.00 | 1 | | | |
| 200399 | 1 | CLASS 8 | JFFS | JEFFREY LEVENSON | 7/1/2014 | 5/16/2017 | 1,113.00 | 846.26 | 846.26 | 846.26 | 1 | | | |
| 200400 | 1 | CLASS 8 | JFFS | DAVID A HENDERSON | 7/1/2014 | 5/16/2017 | 2,387.96 | 1,097.35 | 1,097.35 | 1,097.35 | 1 | | | |
| 1123 | 1 | CLASS 2 | K | CHAMP SMITH | 7/1/2014 | 12/21/2014 | 248.97 | | | | 1 | | | |
| 2001 | 1 | CLASS 2 | K | GLORIA ACUNA | 7/1/2014 | 5/12/2015 | 914.46 | - | - | - | 1 | | | |
| 2002 | 1 | CLASS 2 | K | VIVIAN ALICEA | 7/1/2014 | 5/14/2015 | 1.00 | - | - | - | 1 | | | |
| 2004 | 1 | CLASS 2 | K | CARMEN APONTE DURAN | 7/1/2014 | 5/13/2015 | 1,368.61 | - | - | - | 1 | | | |
| 2007 | 1 | CLASS 2 | K | JULIUS BENNETT | 7/1/2014 | 5/20/2015 | 684.27 | - | - | - | 1 | | | |
| 2017 | 1 | CLASS 2 | K | GERALDINE CALLAN | 7/1/2014 | 5/11/2015 | 1.00 | - | - | - | 1 | | | |
| 2021 | 1 | CLASS 2 | K | DONALD CERNECEARL | 7/1/2014 | 5/20/2015 | 1.00 | - | - | - | 1 | | | |
| 2056 | 1 | CLASS 8 | K | SHUJAAT HUSSAIN | 7/1/2014 | 7/13/2015 | 116.00 | - | - | - | 1 | | | |

| IDNbr | Suffix | Claimant Class | Claimant Type | Involved People/Full Name | Claim Loss Date | POC Date Filed | Amount Claimed | Amount Due Claimant | DFS Statement of Affairs as of 12/31/20 | Claim Reserve 3/4/21 | Interim Claims Report | OBJDate Filed | OBJResolution | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2057 | 1 | CLASS 2 | K | CHARLES HYNES | 7/1/2014 | 5/14/2015 | 5,306.44 | - | - | - | 1 | | | |
| 2067 | 1 | CLASS 2 | K | RAYMOND LAMMERS | 7/1/2014 | 5/18/2015 | 666.04 | - | - | - | 1 | | | |
| 2068 | 1 | CLASS 2 | K | GEORGE LEBRUN | 7/1/2014 | 5/26/2015 | 587.88 | - | - | - | 1 | | | |
| 2079 | 1 | CLASS 2 | K | NORMAN OSTROV | 7/1/2014 | 5/26/2015 | 618.00 | - | - | - | 1 | | | |
| 2087 | 1 | CLASS 2 | K | JEWEL REUSCHER | 7/1/2014 | 6/4/2015 | 930.00 | - | - | - | 1 | | | |
| 2095 | 1 | CLASS 2 | K | PATRICIA ROCH | 7/1/2014 | 6/5/2015 | 45.43 | - | - | - | 1 | | | |
| 2102 | 1 | CLASS 2 | K | CHIFFONE SANDBERG | 7/1/2014 | 5/12/2015 | 482.00 | - | - | - | 1 | | | |
| 2103 | 1 | CLASS 2 | K | CARMEN SCIORTINO | 7/1/2014 | 5/13/2015 | 1,100.00 | - | - | - | 1 | | | |
| 2112 | 1 | CLASS 2 | K | BETTY SWAN | 7/1/2014 | 5/13/2015 | 721.00 | - | - | - | 1 | | | |
| 109533 | 1 | CLASS 2 | K | ANTONIO LUGO | 7/1/2014 | 4/15/2015 | 11,928.63 | - | - | - | 1 | | | |
| 109536 | 1 | CLASS 2 | K | JAMES HIGH JR  PRUGH & | 7/1/2014 | 6/9/2015 | 283,302.91 | - | - | - | 1 | | | |
| 109543 | 1 | CLASS 8 | K | WESLEY GRANDEZ | 7/1/2014 | 12/14/2015 | 451.00 | - | - | - | 1 | | | |
| 109546 | 1 | CLASS 8 | K | THEODORE MOORE | 7/1/2014 | 7/8/2015 | 72.00 | 72.00 | 72.00 | 72.00 | 1 | | | |
| 109551 | 1 | CLASS 8 | K | RAUL OLIVARES | 7/1/2014 | 9/16/2015 | 16,843.70 | - | - | - | 1 | | | |
| 109555 | 1 | CLASS 8 | K | MARY STURDEVANT | 7/1/2014 | 10/5/2015 | 459.42 | - | - | - | 1 | | | |
| 111909 | 1 | CLASS 8 | K | JUAN MARQUEZ | 7/1/2014 | 11/2/2015 | 2,169.00 | - | - | - | 1 | | | |
| 100121 | 1 | CLASS 6 | N | OGLETREE DEAKINS NASH | 6/9/2014 | 3/16/2015 | 9,710.50 | 9,710.50 | 9,710.50 | 9,710.50 | 1 | | | |
| 100122 | 1 | CLASS 6 | N | GRAY ROBINSON | 6/9/2014 | 9/14/2014 | 19,486.16 | 19,486.16 | 19,486.16 | 19,486.16 | 1 | | | |
| | | | | | | | 421,643,908.32 | 68,382,163.69 | 72,966,352.72 | 69,955,610.29 | | | | |
| | | | | | | | 353,261,744.63 | | | | | | | |

# EXHIBIT  G

# IN THE CIRCUIT COURT
## OF THE NINTH JUDICIAL CIRCUIT
## IN AND FOR ORANGE COUNTY, FLORIDA

The FLORIDA DEPARTMENT OF
FINANCIAL SERVICES, as Receiver for          Case No. 2016-CA-004588-O
PHYSICIANS UNITED PLAN, INC.,

    Plaintiff,                                 Judge John E. Jordan
                                              COMPLEX BUSINESS
                                              LITIGATION COURT
PACIFIC WESTERN BANK
CORPORATION, *et al.*,

    Defendants.

_____/

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT-BANKS' OCTOBER 15, 2020 MOTION FOR SUMMARY JUDGMENT

GENOVESE, JOBLOVE & BATTISTA, P.A.
Peter W. Bellas (FBN 611387)
John Genovese (FBN 280852)
Michael A. Friedman (FBN 0071828)
100 S.E. 2nd Street, 44th Flr.
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310

*Attorneys for the Florida Department of
Financial Services, as Receiver for
Physicians United Plan, Inc.*

Plaintiff, the Florida Department of Financial Services, Division of Rehabilitation and Liquidation, as Receiver for Physicians United Plan, Inc. (the "Department"), respectfully submits its Opposition to the October 15, 2020 Motion for Summary Judgment on Count 14 ("Motion") of Defendants Pacific Western Bank ("PacWest"), Central Bank of St. Louis f/k/a First National Bank of St. Louis ("CBSL"), and MB Financial Bank, N.A. (together, the "Banks"), and states:

## INTRODUCTION

The Motion seeks summary judgment on Count 14 of the Department's Amended Complaint, which asserts that the Banks aided and abetted breaches of fiduciary duty by certain members of PUP's former management team, namely, PUP's President Imtiaz Sattaur, Vice President Aaron Henry, Vice President James Kollefrath, and Vice President Bobby Trinh (together, the "Officers"). In short, the Department claims that the Banks sold, and the Officers readily used, a financial product designed and intended to disguise PUP's failing financial health from the regulators charged with ensuring PUP's health and protecting Florida consumers from financially unsound insurers. The Officers' conduct amounts to "cooking the books," and was motivated by their "own greed [and] to hide their financial mismanagement," according to one of PUP's own directors. [Att. F at 805, 815, Ex. 180].[1] The Banks colluded with the Officers to hide their bad acts. The evidence

---

[1] Citations to the record are as follows: Att. [attachment] at [page number] and/or at Ex. [exhibit].

establishes classic fiduciary breaches by PUP's Officers, aided and abetted by the Banks. In the Motion, the Banks try to sidestep responsibility for their conduct under doctrines that do not apply as a matter of law and fact. The Motion should be denied.

## STATEMENT OF FACTS

### A. PUP's Officers Disregarded PUP's Inadequate Capital and Schemed with the Banks to Disguise PUP's Financial Condition.

PUP began operating in 2006, servicing one county. From 2007 to 2013, PUP ballooned to approximately 50,000 policyholders across seventeen Florida counties. [Att. F at 853-54]. The Officers had personal incentivizes to pursue this explosive growth because their compensation packages rewarded them for it. For example, PUP's President, Imtiaz Sattaur ("Sattaur"), doubled his salary and made over a million dollars annually because of these incentives. [Att. F at 847-48, 938-45, Ex. 249]. Sattaur stood to receive a "massive" bonus (not less than $3 million) if PUP was sold in a change of control transaction. [*Id.* 943, Ex. 237]. The other Officers had stock options and incentive bonuses that likewise created incentives to make PUP grow. [*Id.* 742-43, 825-26, 847-48; Att. B at 614].

Under Florida law, an insurance company must maintain a minimum capital surplus set by section 641.225(1), Florida Statutes. To ensure compliance with this statutory requirement, Florida law requires an insurance company, such as PUP, to submit sworn, audited financial statements reporting a "full and true statements of its financial condition" to the Florida Office of Insurance Regulation ("OIR"). §

2

624.424, Fla. Stat. The OIR relies upon the financial statements to evaluate insurers' financial health, so the submission of accurate financial statements is fundamental to the regulatory process. [Att. F at 385, 738-39]. The Officers colluded with the Banks to undermine that process for their own financial benefit by creating financial statements that inflated PUP's capital surplus.

To increase PUP's number of policyholders, the Officers delayed collecting "risk sharing" receivables owed by management service organizations ("MSOs"),[2] hoping that this would entice the MSOs to continue doing business with PUP. [Att. F at 907-10]. Under the Statement of Statutory Accounting Principles ("SSAP"), which are the accounting rules that apply to insurers under Florida law, an asset must be "available for the payment of losses and claims" to be "admitted," that is, counted toward the insurer's capital surplus.[3] [Att. A at 358, 514-15, 610, 762-63; Att. B at 589]. A risk sharing receivable is "non-admitted" under SSAP—meaning that it cannot be counted towards the capital surplus—if it is not collected within 90 days of billing. [Att. A at 367, 523-24, 718]. This ensures that only receivables likely to be collected—and thus "available for the payment of losses and claims"—are counted as admitted assets in an insurer's financial statements.

---

[2] MSOs are groups of providers who manage the care of patients for insurers. If the expenses associated with an insured exceeded an amount pre-negotiated between PUP and the MSO, then the MSO owed the deficit to PUP, known as a "risk-sharing receivables." [Att. F at 120-22].

[3] § 641.35(1)(h), Fla. Stat.

### *PUP's Officers Ignore the OIR's Directives and*
### *Collude with PacWest to Conceal PUP's Financial Condition*

On May 2, 2011, the OIR issued a report deeming a $532,000 risk sharing receivable non-admitted because PUP had not collected it within 90 days. The Officers tried to convince the OIR that the receivable was admitted because it was secured by a letter of credit. [Att. D, Ex. 490; Att. C at 390-95, Ex. 445]. The OIR rejected that argument and told the Officers: "in future statements, filed with the Office," PUP should "**comply with SSAP No. 84**." [Att. D, Ex. 490].

Rather than complying with the regulators' unequivocal instruction, PUP's Officers colluded with PacWest to hide PUP's growing amount of stale risk-sharing receivables and deteriorating financial condition. Just two days after the OIR issued its May 2, 2011 report, PacWest presented Aaron Henry ("Henry"), a PUP Officer, with promotional material for a financial product called "ConvertaLease℠." The written promotional material states that PacWest understood the "distinct regulatory pressures and challenges" that insurance companies face based on its "experience and knowledge of the industry," and claimed that *ConvertaLease* would "strengthen [PUP's] statutory balance sheet" by transforming "non-admitted assets (new and existing) into admitted assets." [Att. D at 51, 548-54, Exs. 467, 482].

PUP's Officers and the Banks understood that *ConvertaLease* was designed to hide PUP's undercapitalized financial condition. Before the first transaction, PUP's point of contact with PacWest, Henry, provided PacWest with the May 2,

2011 report showing that the OIR had instructed PUP to non-admit stale risk sharing receivables. [Att. D, Ex. 490; Att. C at 390-95, Ex. 445]. Henry, after explaining that the OIR had rejected management's attempt to use a letter of credit to avoid complying with SSAP No. 84, told PacWest: "**I hope the irony isn't lost on you as this is the exact type of asset we are looking to [PacWest] to relieve from being non-admissible [☺].**" *Id.* (emphasis added, smiley face in original). PacWest knew that the Officers did not intend to disclose the transactions to the OIR, because Henry told PacWest as part of the foregoing email exchange, "we do not anticipate the OIR even looking at the arrangement until the next time they audit us, which is 2-3 years away." [Att. C, Ex. 444; Att. D, Ex. 527].

Despite knowing that the Officers intended to hide the transactions from the OIR, PacWest helped the Officers "fight" to use them. [Att. C at 90-91, 346-51, Ex. 438; Att. D at 603-04, Ex. 526]. In anticipation of the first transaction, PacWest gave Henry key wording and guidance to convince PUP's auditors to approve PacWest's interpretation of the SSAPs and its accounting treatment. [Att. B, Exs. 93, 97]. When the auditors questioned whether PUP's liability under the leases should be reported under SSAP, Henry told PacWest: "I want to make sure that *the position you are helping to fight for is that it qualifies as a LEASE*, and that no liability would need [be] recorded." [Att. B, Ex. 98] (emphasis added). PacWest provided an analysis of SSAP that Henry forwarded to the auditors to convince them that PacWest's

accounting treatment was correct, and it worked: PUP accounted for the transactions using the treatment that PacWest had devised, provided, and "fought for." [Att. B, Exs. 98, 99; Att. C, Exs. 415, 416; Att. D, Exs. 487, 488, 526].

### The PacWest Transactions are a Sham with No Purpose Beyond Duping the Regulators

In a typical transaction, PacWest purportedly "purchased" PUP's non-admitted assets and then "leased" the same assets back to PUP for periodic so-called lease payments. [Att. E at 3-4]. PUP's obligations under the lease were secured by the "sale" proceeds, which were deposited into restricted accounts that PUP did not control. *Id.* According to an accounting treatment that PacWest devised, PUP could record the sale proceeds as admitted assets even though they were not available to pay policyholder claims, and did not have to record the lease obligations as liabilities even though PUP was very much obligated to pay them. *Id.* The Officers were eager to accept the accounting treatment despite knowing that an asset must be available to pay policyholder claims to be admitted under SSAP, and despite knowing that the "sale" proceeds would be pledged to secure the leases and thus *not* available to pay policyholder claims. [Att. B at 589, 626].

The transactions were a sham with no substance or purpose beyond concealing PUP's financial condition, and the actions of the Banks and Officers underscore the subterfuge. For example, PacWest never bothered to do any of the things that happen in a legitimate "sale" of receivables, such as identify what receivables were being

"sold," or appraise them, or test their collectability. [Att. D, Exs. 468, 469, 472, 474, 478-480; Att. E at 8-12]. Other transactions involved assets such as "architectural design," "build-out," "drywall demolition," "elevator doors," "leasehold improvements," and similar non-admitted assets that PacWest patently did not really purchase and take control of because they were attached to PUP's leased office building. [Att. E at 12-18; Att. D, Exs. 470, 475-477].

The transactions were a financing agreement and should have been treated as such, not as a sale/leaseback. [Att. E at 7-20]. There can be little dispute that PacWest was fully aware that these were financing transactions. A PacWest credit analyst internally questioned whether the transactions were really a sale as opposed to a loan. [Att. D, Ex. 535]. According to its CFO, PacWest internally treated the transactions "as a financing" for purposes of determining whether additional taxes needed to be collected. [*Id.* Ex. 557]. When PacWest sought to involve another bank to finance a deal with PUP, it told PacWest: "Sorry we can't help you with this LOAN ... this is not a lease ... no one here has ever heard of 'leasing a receivable.'" [*Id* Ex. 528]. Despite its knowledge, PacWest sold *ConvertaLease* as a "sale/leaseback" to achieve the desired effect of inflating PUP's balance sheet. [Att. E at 9].

PacWest's co-defendant, CBSL, likewise knew that the transactions were a sham. Internal emails among CBSL officers called *ConvertaLease* "too good to be

true" and wondered: "What is the catch?" [Att. I, Ex. A]. CBSL's president said the transaction "doesn't make sense to me ... and rarely does that work." [*Id.* Ex. B]. CBSL decided to make sure their "collateral [was] buttoned up" so that "**if this structure turns out to be illegal**, we can draw on the L/C." *Id.* (emphasis added). CBSL insisted on a provision that would allow them to call a default if the structure was "deemed not valid"—which is what occurred. [Att. D, Ex. 568 at 2].

### *The Officers Conceal the Transactions and Use* ConvertaLease *to Grow PUP Without Adequate Capital Until PUP's Collapse*

The Officers colluded with PUP's auditors to draft "plain vanilla" language for PUP's audited financial statements that would camouflage the PacWest transactions so they did "not stick out." [Att. J at 165-69, Ex. 29]. The Officers and auditors worked together to draft an opaque description that did not disclose the true nature of the transactions, and certainly did not disclose that PUP was trying to "convert" non-admitted assets into admitted assets. [Att. B at 602, Ex. 3]. PUP's year-end financial statements falsely represented that it categorized assets that could not be "used to fulfill policyholder obligations . . . as non-admitted assets." *Id.* In reality, the financial statement reported proceeds from the PacWest transactions as "admitted" even though they could *not* be used to fulfill policyholder obligations, because they were pledged to secure the leases. [Att. H, Ex. 3; Att. G, Exs. 677, 678, 684; Att. B at 588]. PUP's periodic financial statements reported "<u>none</u>" in response to a question about whether PUP had entered in any sale/leaseback transactions, even

though the premise of PacWest's accounting treatment was that *ConvertaLease* supposedly was a sale-leaseback. [Att. D, Ex. 533].

PacWest knew from its emails with Henry that PUP's Officers intended to hide the transactions, and it received confirmation when it saw PUP's financial statements with the foregoing misrepresentations.[4] PacWest continued with the transactions anyway, providing millions of dollars of false sale "proceeds" intended to inflate PUP's capital surplus. [Att. B at 626, 642; Att. C at 233, 425, 432, Ex. 454; Att. D at 635, 654, 673-75, 704-05, Exs. 533, 542; Att. H, Ex. 29]. PacWest came to realize that if it did more deals, it "would be in control of almost all of [PUP's] Surplus" and would "put[ PUP] out of business" if it took the pledged funds, which PacWest saw "as a big liability." [Att. D at 725-31, Exs. 498, 561]. Undeterred, PacWest *continued* to engage in transactions with PUP, and simply syndicated certain of the deals with the other Banks to spread out the risk of PUP's failure. *Id.*

### *PUP's Board of Directors Claims to Lack Any Knowledge of the PacWest Transactions and Accuses the Officers of "Cooking the Books"*

In March 2014, the Officers finally came clean and confessed the substance of the PacWest transactions to the OIR. [Att. B, Ex. 134; Att. A, Ex. 332]. On April 16, 2014, PUP executed a Consent Order admitting that grounds existed to appoint

---

[4] The Department submitted additional evidence under a Notice of Filing Affidavit of Peter W. Bellas, filed in this case on November 16, 2020, showing that the other Banks received the financial statements. The Banks do not dispute receiving the financial statements.

the Department as Receiver unless PUP received a capital infusion of $30 million—almost exactly the amount of the *ConvertaLease* proceeds. [Att. D at 523-24, Ex. 512]. Upon learning about this, PacWest, on behalf of itself and the other two Banks, exercised the provision that they had negotiated in case the transactions were "illegal" and swept approximately $30 million from PUP's accounts.[5]

On April 22, 2014, PUP's Board of Directors held a meeting to discuss what had happened. According to the Chairman of the Board, Sandeep Bajaj ("Bajaj"): "It was a blow from the blue. We had no idea. We were blindsided." [Att. F at 255, 784]. He testified that he and the Board had no idea that PUP was failing to collect its risk sharing receivables or that PUP had entered into the transactions, and had believed based on PUP's financial statements—the same ones that were submitted to the OIR—that PUP was solvent. *Id.* at 762-63, 766-67, 830, 834.

According to the April 22, 2014 Board meeting minutes, members of the Board asked PUP's President, Sattaur, "why the [Board] was never made aware of the financial status of the receivables and the PacWest lease of $30 million," and "why the [Board] had been consistently told that the plan was profitable" when it

---

[5] [Att. B, Ex. 140; Att. D, Exs. 512, 513]. The other Banks admit that PacWest was their agent. For example, they admit that PacWest sent the default letters on their behalf. [CBSL Answer at ¶¶58, 62; MB Answer at ¶¶58, 62]. One of PacWest's April 16, 2014 letters refers to itself as the "servicing agent" for MB. [Att. D, Ex. 512]. PacWest's corporate representative testified that PacWest "service[d]" the ConvertaLease transactions that PacWest syndicated to the other two Banks on their behalf. [Att. D at 793]. PUP's Henry testified that most communications PUP had with MB and CBSL were through PacWest. [Att. B at 586].

was insolvent. [Att. F at 783, 804, Ex. 180]. One Board member was particularly blunt: she accused Sattaur of "***cooking the books***," of "providing false information," and being "dishonest and fiscally irresponsible," and accused the Officers of "selling PUP out for their own greed [and] to hide their financial mismanagement." *Id.* (emphasis added). The meeting minutes expressly state the Board's view "that the management failed in its fiduciary responsibilities." *Id.*

The meeting minutes state that, if the Board members had known what the Officers were up to, "they would have taken corrective actions to shore up capital and surplus to save PUP and ensure its continuing operation as a profitable Medicare Advantage plan." [*Id.* 780, Ex. 180]. Bajaj claims that he "absolutely" would have "made different decisions about the growth of the company if [he] had been told" what was happening: "In retrospect, it grew too fast, based on ***false financial records*** . . . ***based on the PacWest transactions.***" [*Id.* at 807, 866] (emphasis added).

## <u>LEGAL STANDARD</u>

To obtain summary judgment, the Banks must "prove conclusively the nonexistence of any genuine issue of material fact." *Kaplan v. Morse*, 870 So. 2d 934, 936 (Fla. 5th DCA 2004). The Court must consider the record in the "light most favorable to the non-moving party, and if the slightest doubt exists," deny summary judgment. *Id.* (citing *Krol v. City of Orlando*, 778 So. 2d 490 (Fla. 5th DCA 2001)); *State Farm Mut. Auto. Ins. Co. v. Ferranti*, 256 So. 3d 238, 240 (Fla. 5th DCA 2018)

11

(summary judgment "must be exercised with restraint; any doubts must be resolved in favor of the nonmoving party.").

## ARGUMENT

I.    **Substantial Record Evidence Shows that the Banks Aided and Abetted Breaches of Fiduciary Duties by PUP's Officers.**

The Banks challenge the last three elements of Count 14, the Department's claim for aiding and abetting breach of fiduciary duty: (1) breach, (2) knowledge, and (3) substantial assistance. Mot. pp.12-18. The record contains compelling evidence establishing each of these elements.

### A. The Officers Breached their Fiduciary Duties to PUP.

Corporate officers in Florida owe duties of care and loyalty. Mot. p.12 n.6. "The fiduciary duty of loyalty describes corporate officers' and directors' obligation to avoid fraud [and] bad faith" misconduct. *FDIC v. Dodson*, 2014 WL 11511068, at *6-7 (N.D. Fla. Feb. 27, 2014) (citing *FDIC v. Gonzalez-Gorrondona*, 833 F. Supp. 1545, 1549 (S.D. Fla. 1993)). This includes a "duty to disclose material information." *Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, 2008 WL 926509, at *7 (S.D. Fla. Mar. 31, 2008). Failure to disclose material information constitutes a breach of the duty of loyalty. *Cf. Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (director liable for breach of the duty

of loyalty for failing to "fulfill his obligation to be candid to his fellow directors").[6]

In this case, the Officers caused PUP to enter into the transactions so that they could avoid complying with the mandated capital requirements, in violation of Florida law, to enrich themselves at the expense of PUP and its stakeholders. That conduct led to PUP's collapse, proving its recklessness. The Officers acted out of "their own greed [and] to hide their financial mismanagement." [Att. F at 805-06, 815]. This is a "classic" example of disloyal conduct. *Dodson*, 2014 WL 11511068, at *6-7 (citing *In re TOUSA, Inc.*, 437 B.R. 447, 460-61 (Bankr. S.D. Fla. 2010)).[7] The Officers' efforts to conceal PUP's financial condition, and to conceal the transactions, also plainly breach the duty of loyalty. The Board minutes also show the PUP Board's conclusion "that the management failed in its fiduciary responsibilities." [Att. F at 810-11, Ex. 180].

The Banks argue that there was no breach because there is no evidence that the Officers "received additional compensation or bonuses" under their employment agreements. Mot. pp.12-13. That is just wrong. Sattaur doubled his salary, making over a million dollars a year due to PUP's reckless operations. The Banks focus on a Stock Incentive Plan that Sattaur never exercised, but the fact that PUP collapsed

---

[6] "Florida courts . . . regularly consult Delaware cases on matters of corporate law." *Dodson*, 2014 WL 11511068 (citing *Williams v. Stanford*, 977 So. 2d 722, 727-28 (Fla. 1st DCA 2008)).

[7] Self-dealing is a classic example of a breach of the duty of loyalty, though it "is not a necessary component of a breach of loyalty claim under Florida law." *Dodson*, 014 WL 11511068, at *6-7.

before Sattaur could fully capitalize on its reckless growth says nothing about Sattaur's motivation at the time. The Banks' argument about the Officers' "motivation" presents fact issues that cannot be resolved on summary judgment. *Cf. Hubbard v. City of Boca Raton*, 839 So. 2d 747, 748 (Fla. 4th DCA 2003).

The Banks also argue there was no breach because the Officers disclosed the transactions to the OIR in PUP's 2011 and 2012 audited financial statements. Mot. p.13. Incredibly, the Banks rely on the same disclosure that the Officers and auditors drafted to be "plain vanilla" and not "stick out." That purposefully misleading "disclosure" does not exonerate the Officers. Henry admits that PUP never sought or obtained OIR approval of the accounting treatment or any of the subject transactions. [Att. B at 611-13].

The Banks argue that the Officers' misconduct is protected by the business judgment rule. Mot. pp.12-14. That is wrong for numerous reasons. First, as a matter of law, the business judgment rule is a "personal" defense that cannot be raised by corporate outsiders like the Banks. *Badger v. S. Farm Bureau Life Ins. Co.*, 2009 WL 10664202, at *3 (M.D. Fla. Mar. 6, 2009) (the "Florida Business Judgment Rule was meant to be a defense personal to a corporation's directors.").

Second, by statute the Florida business judgment rule is available only to directors, not corporate officers. *Dodson*, 2014 WL 11511068, at *2 (business judgment rule is inapplicable to officers because the "relevant portion of Florida's

business judgment rule only refers to 'directors,' not 'officers and directors.'")
(citing § 607.0831(1), Fla. Stat.). The business judgment rule does not apply to the
Officers' fiduciary breaches, so it cannot help the Banks.[8]

Third, the business judgment only protects good faith breaches of the duty of
care, not the duty of loyalty. *Dodson*, 2014 WL 11511068, at *7 ("if a director
breaches the fiduciary duty of loyalty, the business judgment rule affords no
protection." (citing *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719,
725 (7th Cir. 2013)). The Officers entered into the transactions to conceal PUP's
financial condition so they could grow PUP for their own profit. The business
judgment rule does not protect that conduct.

Fourth, the business judgment rule does not protect conduct to the extent it
amounts to "a violation of the criminal law." § 607.0831(1)(b), Fla. Stat. An officer
of an insurance company in Florida commits a third degree felony if they "permit
the insurer to solicit or accept new or renewal insurance risks" when they
"reasonably should have known, that the insurer was insolvent or impaired." §
626.9541, Fla. Stat.[9] The Officers permitted PUP to solicit and accept new and
renewal polices despite knowing that PUP's capital surplus was comprised of

---

[8] The Department's claims involve the Officers' conduct in their capacity as officers. Am. Compl.
¶¶ 147, 151, 161-63, 165-67.

[9] The Officers also violated the provisions of the Florida Insurance Code requiring them to submit
sworn financial statements reflecting a "full and true statements of [the insurer's] financial
condition" to the OIR. Fla. Stat. § 624.424(1)(a); Fla. Admin. Code. R. 69O-137.001(2).

fictitious "proceeds" from the transactions, meaning that PUP was impaired, if not insolvent. The business judgment rule does not apply to that type of conduct.

Fifth, contrary to the Banks' argument, the business judgment rules does not apply merely because the Officers "consulted" (really, colluded) with the auditors. Mot. at 14. The Banks cite *In re Munford, Inc.*, 98 F.3d 604 (11th Cir. 1996). *Id.* A later Eleventh Circuit decision, *TSG Water Resources, Inc. v. D'Alba & Donovan CPAs, P.C.*, 260 F. App'x 191 (11th Cir. 2007), explains why *Munford* does not apply here. *TSG* is nearly on all fours with this case. A corporate officer applied an incorrect accounting treatment to financial data presented to the board of directors, and failed to report the error to the board. *Id.* at 198-99. The district court, citing *Munford*, granted summary judgment, concluding that the business judgment rule protected the officer's "discretionary decisions regarding the accounting treatment," and citing his reliance on "outside accounting experts." *Id.* at 198.

The appellate court reversed. The court explained, "consulting with outside experts alone is not enough to satisfy the requirements of the business judgment rule," which requires consideration of fact-intensive issues like good faith. *Id.* at 191. In *TSG*, evidence showed that the officer knew that the report to the board was inaccurate because of the accounting treatment and failed to disclose that fact, and there was evidence of **"collusion"** between the officer and accountants, and evidence "that [the officer] had much to gain from misrepresenting the financial health of the

company." *Id.* at 198-99 (emphasis added). That evidence made summary judgment in favor of the officer on the business judgment rule improper. *Id.*

The record in this case contains the same evidence as *TSG*. The Officers knew that the financial statements misrepresented PUP's financial condition (that was the point of the transactions). According to the Board, the Officers never disclosed the transactions and misrepresented to the Board that PUP was solvent and profitable. [Att. F at 783, 804]. There is strong evidence of "collusion" between the Officers and auditors to conceal the transactions. The evidence shows that the Officers "had much to gain from misrepresenting the financial health of the company" because of their employment agreements. *TSG*, 260 F. App'x at 198-99. On these facts, the business judgment rule is no defense to the Department's claim.[10]

## B. The Banks had Knowledge of, and Substantially Assisted, the Officer Defendants' Breaches of Fiduciary Duty.

The Banks claim that they lacked actual knowledge of the Officers' fiduciary breaches, despite encouraging that very conduct for their own pecuniary benefit. Mot. pp.14-16. As the Court recently explained to the Banks: "summary judgment rarely [is] proper when [the] issue turns on 'circumstantial evidence of intent and

---

[10] If the Bank's business judgment rule argument does not fail as a matter of law, it presents fact-sensitive issues that cannot be resolved against the Department on summary judgment. The Banks' *own case law* cited in the Motion holds that the "question of reasonableness under the business judgment rule is an issue of fact" that cannot be resolved on summary judgment. *Royal Harbour Yacht Club Marina Condo. Ass'n, Inc. v. Maresma*, 2020 WL 1281089, at *2 (Fla. 3d DCA Mar. 18, 2020) (reversing summary judgment on business judgment rule defense).

knowledge.'" Nov. 30, 2020 Order Denying Mot. for Summary Judgment on Count 16, p.3 (citing *Gimenez v. Napoles*, 928 So. 2d 506, 507 (Fla. 3d DCA 2006)). This case does not present the "extraordinarily rare" circumstances where a defendant's knowledge may be resolved against the plaintiff on summary judgment. *Coastal Inv. Props., Ltd. v. Weber Holdings, LLC*, 930 So. 2d 833, 834 (Fla. 4th DCA 2006).

The Banks focus on their professed lack of knowledge about the growth incentives in the Officers' employment agreements. Mot. p.15. This erroneously focuses on knowledge about the Officer's motivations. A cause of action for aiding and abetting breach of fiduciary duty merely requires "knowledge of the breach," *id.* at 10, not knowledge of the underlying motivation in an Officer's heart of hearts.[11] Indeed, "exactly [the] level [of knowledge] necessary for [aiding and abetting] liability [is] flexible and must be decided on a case-by-case basis." *Perlman v. Bank of Am., N.A.,* 2011 WL 13108060, at *6 (S.D. Fla. Dec. 22, 2011).

In this case, the Banks entered into the transactions despite knowing that: (i) the OIR had told PUP to comply with SSAP with respect to its stale risk sharing receivables; (ii) "this [was] the exact type of asset" PUP's Officers wanted to "relieve" from PUP's balance sheet (Henry made sure that this "irony" was not lost

---

[11] The Banks argue that they had "no obligation to look behind the authorized actions of PUP" to determine whether the Officers had an "ulterior motivation." Mot. p.15. This argument is based on inapposite cases stating that a bank does not need to scrutinize an agent's withdrawals from a corporate bank account if the agent is authorized to use the account. This case involves transactions intended to inflate PUP's balance sheet, not mere withdrawals from a corporate bank account.

on PacWest); and (iii) PUP's Officers intended to hide the transactions from the OIR at least until the next audit, in 2-3 years. Further, PacWest's credit file for PUP (which describes *ConvertaLease* as "a non-admitted to admitted asset play") shows that PacWest knew that PUP's "surplus level [was] an important measurement that state regulators look at to ensure [its] financial health," and knew that "risk sharing receivables not collected within 90 days of billing," the subject of most of the transactions, were supposed to be "classified as non-admitted." [Att. D, Ex. 492]. In short, the Banks knew that the Officers were scheming to hide PUP's financial condition—which is exactly what PacWest designed *ConvertaLease* to do.[12]

As to substantial assistance, PacWest sold an inherently misleading financial product, *ConvertaLease*, designed to hide PUP's true financial condition, and successfully "fought" to help PUP implement it. The fiduciary breaches at issue would not have occurred but for the Banks' assistance.

Moreover, "the knowledge element is really the crux of aiding and abetting liability." *Perlman,* 2011 WL 13108060, at *6. Even "ordinary business transactions for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew" it was assisting a tort. *Chang v. JPMorgan Chase Bank, N.A.,* 845 F.3d 1087, 1098 (11th Cir. 2017) (applying Florida law). Thus, the

---

[12] PacWest's knowledge is imputed to the other Banks, even if PacWest never communicated its knowledge to them. *See, e.g., Hardy v. Am. S. Life Ins. Co.*, 211 So. 2d 559, 560-61 (Fla. 1968).

Banks' claim that *ConvertaLease* supposedly is "a straightforward commercial transaction"—a proposition for which the Banks cite nothing—even if true, is no defense to the Department's aiding and abetting claim. Mot. p.18

## II.    *In Pari Delicto* does not Apply as a Matter of Law and Fact.

*In pari delicto* does not apply to the Department's claims. Under this doctrine, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Earth Trades, Inc. v. T & G Corp.*, 108 So. 3d 580, 583 (Fla. 2013). "The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* at 583. The defense "is not woodenly applied in every case where illegality appears somewhere in the transaction; since the principle is founded on public policy, it may give way to a supervening public policy." *Id.* at 584. As the Florida Supreme Court said in its seminal case on *in pari delicto*, *Earth Trades*: "where to allow the *in pari delicto* defense to prevail would be to defeat some legislatively declared policy, the defense will not prevail." *Id.*

The "legislatively declared policy" behind Chapter 631 is clear: "Maximize recovery of assets for the benefit of the insurer's estate; policyholders, creditors, and other claimants; and the public." § 631.001(3)(h), Fla. Stat. The Florida legislature has declared that purpose an "integral element[] of the regulation of the business of

insurance [that is] of vital public interest and concern," and has instructed Chapter 631 to be "liberally construed to effect" it. *Id.* Because "to allow the *in pari delicto* defense to prevail would be to defeat [the] legislatively declared policy" of Chapter 631, PacWest's Motion should be denied. *Earth Trades*, 108 So. 3d at 584.

The Florida legislature removed any doubt that the policy of maximizing recovery of assets supersedes *in pari delicto* by enacting section 631.1521, which states that the wrongful conduct of an insurer's management "may not be asserted as a defense to a claim by the receiver" under any theory. § 631.1521, Fla. Stat. The Banks argues that section 631.1521 was enacted after the conduct at issue occurred, and should not be applied retroactively to eliminate a "previously available defense." Mot. pp.21-22. The Banks, however, cite nothing to support that *in pari delicto* ever was "previously available" to them in the circumstances of this case: they fail to cite *any case* applying *in pari delicto* to dismiss an insurer receiver's claims. Courts applying insurance codes similar to Florida's have held that *in pari delicto* does *not* apply in insurance receiverships, citing the significant public interests at stake, and the fact that any recoveries will benefit innocent creditors and policyholders, not wrongdoers.[13] *See, e.g.*, *Wooley v. Lucksinger*, 61 So. 3d 507, 606 (La. 2011) ("While [the insurer] and its officers and directors might be precluded from recovery

---

[13] Chapter 631 is Florida's version of a uniform law, so decisions construing other states' versions of the law are persuasive authority. *See, e.g., Nova Ins. Grp., Inc. v. Fla. Dep't of Ins.*, 606 So. 2d 429, 433 (Fla. 1st DCA 1992) (considering decision construing New York's insurance law).

under the doctrine of *in pari delicto*," the receiver was not because he was "acting to protect the interests of innocent policyholders and creditors.").[14]

The policy considerations that have led courts in other states to refuse to apply *in pari delicto* against insurer receivers apply here. By statute, the Department acts on behalf of "policyholders, creditors, and other claimants," and any recoveries against the Banks will benefit those innocent stakeholders, not the wrongdoers that colluded with the Banks. §§ 631.001(3)(h), 631.3915, Fla. Stat. Thus, applying *in pari delicto* against the Department would both fail to achieve the policy underlying the doctrine, and frustrate the express legislative policy of Chapter 631. In sum, *in pari delicto* does not apply as a matter of important state policy, even if the legislature had never enacted section 631.1521.

Moreover, even if *in pari delicto* could apply to the Department as Receiver, it does not apply on the facts of this case. "Where the defense of *in pari delicto* is asserted against a corporate entity based on the misconduct of the corporation's agents, it must be determined whether the misconduct of those agents is properly

---

[14] *See also McRaith v. BDO Seidman, LLP,* 909 N.E.2d 310, 336 (Ill. App. 2009) (*in pari delicto* did not apply because "by statutory definition, [an insurance liquidator] is not the wrongdoer" but "serves to protect the insurance industry and the public interest by ensuring the victims of the misconduct can recover monies"); *Arthur Andersen v. Superior Court*, 67 Cal. App. 4th 1481, 1494-95 (1998) ("an *ordinary receiver* is generally subject to the same defenses as the entity for whom the receiver acts [but] the Insurance Commissioner acts not in the interests of the equity owners of the insurance company, but rather in the interests of policyholders"); *English Freight Co. v. Knox*, 180 S.W.2d 633, 640 (Tex. Civ. App. 1944) (rejecting *in pari delicto* defense for the same reasons identified in *McRaith* and *Arthur Andersen*, *supra*).

imputed to the corporation." *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044-45 (Fla. 2d DCA 2007). "[T]he presence of ***any innocent decision-maker*** in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation." *Id.* (emphasis added). Thus, in *O'Halloran*, the court reversed the trial court's dismissal based on the *in pari delicto* defense, citing evidence that the company's president would have prevented the company from engaging in the conduct at issue if he had been given the chance, "which seriously undermine[d] the *in pari delicto* defense." *Id.* at 1047.

Here, *Bajaj* testified that the Board had no idea that the Officers were delaying collection of PUP's risk sharing receivables; no idea that PUP had entered into the PacWest transactions; and "would have taken corrective actions to shore up capital and surplus to save PUP and ensure its continuing operation" if it had known. [Att. F at 255, 762-67, 784, 830, 834, Ex. 180]. Bajaj asserts that he would have "made different decisions about the growth of the company," and would have prevented the Officers from entering into the PacWest transactions if he had known about them. *Id.* at 210-12, 244, 264, 807, 837-38, 866. On this record, the *in pari delicto* doctrine does not apply. *O'Halloran*, 969 So. 2d at 1044-45.

### III.    The Banks' Standing Arguments are Inapplicable to this Case.

Finally, the Banks cite *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543

(Fla. 2d DCA 2003), and *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020), to argue that the Department lacks standing to assert an aiding and abetting claim on behalf of PUP. Those cases are utterly inapposite. Both involved "a sham corporation created as the centerpiece of a Ponzi scheme" that was "wholly dominated by persons engaged in wrongdoing," "devoid" of "any legitimate activities," and lacking **even "one** honest member of the board of directors or an innocent stockholder." *Isaiah*, 960 F.3d at 1307 (citing *Freeman*, 865 So. 2d at 552-52) (emphasis added). On those facts, *Freeman* and *Isaiah* held that the "sham corporations" could not have been injured from their own fraudulent schemes, so the corporations' receivers (who were not appointed under Chapter 631) lacked standing to assert tort claims against third parties for aiding and abetting the schemes.

To state the obvious, the record in this case does not support that PUP was "a sham corporation created as the centerpiece of a Ponzi scheme" without "any legitimate activities" and without even a single honest Board member. *Isaiah*, 960 F.3d at 1307 (citing *Freeman*, 865 So. 2d at 551). PUP was a legitimate HMO with 450 employees that served over 50,000 members in seventeen counties. [Att. F at 48, 214, 853-54; Att. B at 534]. According to the Board minutes, PUP had multiple honest members of the Board who disavow any knowledge of the Officers' scheme, and who claim that they would have put a stop to the PacWest transactions if they had known they were occurring. This case is the veritable opposite of *Freeman* and

*Isaiah*. The Banks' reliance on those cases is misplaced.

In addition, the Department has standing to "assert all rights belonging" to creditors and other stakeholders. § 631.141, Fla. Stat. The Officers owed fiduciary duties to those stakeholders. Mot. pp.22-23. Under section 631.141, the Department has standing to assert claims against the Banks for aiding and abetting the Officers' breach of those fiduciary duties. Contrary to the Banks' argument at page 24 of the Motion, there is nothing "personal and unique" about those claims that would preclude the Department from asserting them. *See, e.g., In re Icarus Holding, LLC*, 391 F.3d 1315, 1321 (11th Cir. 2004) (claim was not "personal [or] unique" because same claim could be asserted by "all creditors;" "that each creditor would demand a different amount" was irrelevant). The Officers' collusion with the Banks led to PUP's collapse, which is the type of "general" harm that is *not* "personal" to any one stakeholder. For this independent reason, the Banks' standing argument fails.

## CONCLUSION

The Banks colluded with the Officers to hide PUP's financial condition from the insurance regulators. The arguments in the Motion are divorced from the facts in the record, and fail as a matter of law and fact. The Motion should be denied.

Respectfully Submitted on December 14, 2020

GENOVESE, JOBLOVE & BATTISTA, P.A.
*Attorneys for Plaintiff*
100 S.E. 2nd Street, 44th Flr.
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310
Email: pbellas@gjb-law.com


 /s/ Peter W. Bellas
Peter W. Bellas; Fla. Bar No. 611387
Email: pbellas@gjb-law.com
John Genovese; Fla. Bar. No. 280852
Email: jgenovese@gjb-law.com
Michael A. Friedman; Fla. Bar No. 0071828
Email: mfriedman@gjb-law.com

*and*

/s/ Miriam Victorian
Miriam Victorian, Chief Attorney
Florida Department of Financial Services
Division of Rehabilitation and Liquidation
325 John Knox Road, Suite 101
Tallahassee, Florida 32303
Email: Miriam.Victorian@myfloridacfo.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 14, 2020, a true and correct copy of the foregoing was filed with the Clerk of Court via the Florida Court's E-filing Portal System, which will generate an electronic notification to all interested parties registered to receive electronic notifications on this matter (which is incorporated herein by reference).


 /s/ Peter W. Bellas
Peter W. Bellas

26

# EXHIBIT  H

**IN THE CIRCUIT COURT**
**OF THE NINTH JUDICIAL CIRCUIT**
**IN AND FOR ORANGE COUNTY, FLORIDA**

The FLORIDA DEPARTMENT OF
FINANCIAL SERVICES, as Receiver for          Case No. 2016-CA-004588-O
PHYSICIANS UNITED PLAN, INC.,

      Plaintiff,

Judge John E. Jordan
      COMPLEX BUSINESS
      LITIGATION COURT

PACIFIC WESTERN BANK
CORPORATION, *et al*.,

      Defendants.
_____/

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**AUGUST 25, 2020 MOTION FOR SUMMARY JUDGMENT**

Plaintiff, the Florida Department of Financial Services, Division of Rehabilitation and Liquidation, as Receiver for Physicians United Plan, Inc. ("Receiver") respectfully submits its opposition to the Motion for Summary Judgment on Count XVI ("Motion") of Defendants Pacific Western Bank ("PacWest"), Central Bank of St. Louis f/k/a First National Bank of St. Louis ("CBSL"), and MB Financial Bank, N.A. ("MB") (collectively, the "Banks").

**<u>INTRODUCTION</u>**

The record amply demonstrates that Section 631.157(2) clearly applies to the circumstances of this case. PacWest was intimately involved and inextricably intertwined in the misreporting to PUP's examiners. PacWest devised a structure to

disguise approximately $30 million collateralized financing as illusory free "cash." When the scheme unraveled, Defendants grabbed the funds, which never truly had been available to pay PUP's policyholder obligations, leaving policyholders and creditors holding the bag. Defendants' Motion in this non-jury case is without merit.

## OVERVIEW OF THE CASE

### A. Regulatory Background

To operate in the State of Florida, HMOs are required to maintain a minimum capital surplus set by Florida law.[1] Insurers are required to submit sworn, audited financial statements reflecting a "full and true statements of [their] financial condition" to the Florida Office of Insurance Regulation ("OIR"), the agency charged with monitoring insurers' financial condition.[2] The OIR relies on the information in the financial statements to determine whether the insurer has satisfied their capital surplus requirement. [Att. A at 385].[3] Thus, the submission of financial statements that accurately reflect an insurer's financial condition is fundamental to the regulatory process. *Id.* at 738 – 739.

Florida law requires financial statements to be prepared in accordance with the Statement of Statutory Accounting Principles ("SSAP"). Under Florida law and

---

[1] *See* Fla. Stat. § 641.225(1).

[2] Fla. Stat. § 624.424; Fla. Admin. Code. R. 69O-137.001.

[3] Citations to the record herein are in the following format: Att. [attachment] at [page number] and/or at Ex. [exhibit number].

[11381-003/3267432/1]                                    2

SSAP, an asset must be "available for the payment of losses and claims" to be "admitted," meaning that it can be counted toward the insurer's capital surplus.[4] An asset that is not available to pay policyholder claims is "non-admitted" and cannot be counted toward an insurer's surplus. [Att. A at 762-63]. Thus, an insurer may not record assets that are unavailable to pay policyholder claims, such as encumbered assets and restricted funds, as admitted assets on their financial statements. *Id.* at 358, 514 – 15.

## B. The PacWest transactions: *ConvertaLease*

PacWest cold-called PUP's Vice President of Finance, Aaron Henry ("Henry"), to convince PUP to enter into the "ConvertaLease" transactions designed to artificially inflate PUP's statutory balance sheet. [Att. B at 585; Att. C at 242]. PacWest presented promotional material that stated PacWest understood the "distinct regulatory pressures and challenges" insurance companies face and touted PacWest's "experience and knowledge of the industry," and advertised ConvertaLease as "a financing product designed to strengthen your statutory balance sheet." [Att. D at 51, 548-54, Exs. 467, 482]. PacWest claimed "ConvertaLease℠ [would] transform [PUP's] non-admitted assets (new and existing) into admitted assets" and allow PUP to "make the most of [its] non-admitted assets." *Id.*

---

[4] Fla. Stat. § 641.35(1)(h); Att. A at 610; Att. B at 589.

ConvertaLease involved PacWest purportedly purchasing non-admitted assets from PUP, mostly MSO receivables outstanding more than 90 days. [Att. E at 3-4].[5] PacWest then leased the same non-admitted assets back to PUP, and PUP pledged the "sale" proceeds to secure its obligations under the lease. *Id.* Additionally, the proceeds of the sale were deposited into restricted accounts that PUP did not control. *Id.* Under an accounting treatment that PacWest gave PUP and claimed would purportedly convert non admitted assets into admitted assets, the sale proceeds were recorded as admitted assets even though they were not available to pay policyholder claims, and PUP's obligations under the lease were not recorded as a liability. *Id.*

PacWest helped PUP's management "fight for" this accounting treatment. [Att. C at 90-91, 346-51, Ex. 438; Att. D at 603-04, Ex. 526].[6] In emails exchanged before the first transaction, PacWest provided key wording and guidance about the accounting treatment to convince PUP's auditors to approve the accounting treatment. [Att. B at Exs. 93, 97]. When the auditors questioned whether PUP's liability under the leases would need to be recorded under SSAP, Henry told PacWest: "I want to make sure that the position you are helping to <u>fight for</u> is that it qualifies as a LEASE, and that no liability would need [be] recorded." [Att. B at Ex.

---

[5] *See also* Att. A at 518, 524.

[6] Certain members of the Board of Directors reportedly were innocent and not aware of the transactions until 2014. [Att. F at 457-58; Ex. 180; Ex. 181; Att. G at 660, 718, 743-47, 757-73, 811].

98 (emphasis added)]. PacWest provided a response that Henry then forwarded to the auditors to convince them that PacWest's accounting treatment was correct.[7] PUP used PacWest's accounting treatment to record the transactions on its financial statements submitted to the OIR. This caused PUP's financial statements to materially overstate PUP's admitted assets and materially understate PUP's liabilities, concealing PUP's failure to comply with the capital surplus requirement and masking PUP's deteriorating financial condition from the OIR. [Att. E at 5-6].

## C. The Transactions were Intended to Deceive the Regulators

Consistent with PacWest's advertisement that ConvertaLease was "*designed to strengthen [PUP's] statutory balance sheet*," PacWest intended ConvertaLease to deceive the regulators about PUP's financial condition. PacWest's internal file for PUP (which describes *ConvertaLease* as "a non-admitted to admitted asset play") confirms that before entering into the transactions, PacWest knew that an insurer's "surplus level is an important measurement that state regulators look at to ensure the financial health of an insurance company," and that if "surplus levels are too low, regulators could step in and take action against the Company." [Att. D at Ex. 492]. PacWest further knew that "risk sharing receivables not collected within 90 days of billing"—the subject of most of the transactions—"are classified as non-admitted" under SSAP No. 84. *Id.*

---

[7] Att. B at Ex. 98, 99; Att. C at Ex. 415, 416; Att. D at Exs. 487, 488, 526.

PacWest knew both before and after it entered into the first transaction with PUP that the OIR was the regulatory agency responsible for examining the affairs of PUP.  [Att. C at 381-84, 389-90, 402, 410-12, Ex. 444, 445, 446, 451; Att. D at 620-21, 617-19, Ex. 490, Ex. 527; Att. H at 110-12, 124, 164; Att. B at 203-06, Ex. 101]. PUP provided PacWest with a report showing that the OIR already had instructed PUP to non-admit MSO receivables over 90 days due even though they reportedly were secured by a letter of credit [Att. D at Ex. 490; Att. C at 390-95, Ex. 445]. Shortly before the first ConvertaLease transaction, the OIR issued a report that deemed a $532,000 MSO receivable to be non-admitted because PUP had failed to collect it within 90 days of invoicing. *Id.* Henry provided PacWest a copy of the report and explained that PUP's position had been that the receivable was admitted because it was secured by a letter of credit. *Id.* He also told PacWest that the OIR had rejected that position and told PUP: "in future statements, filed with the Office" PUP should "comply with SSAP No. 84." [Att. D at Ex. 490]. When Henry explained this to PacWest, he told them: "I hope the irony isn't lost on you as **this is the exact type of asset we are looking to [PacWest] to relieve from being nonadmissible** [☺]." [*Id.*; Att. C at 390-95] (emphasis added). PacWest also knew that PUP's managers did not intend to timely disclose the ConvertaLease transactions to the OIR, since Henry told PacWest as part of the foregoing exchange: "we do not

anticipate the OIR even looking at the arrangement until the next time they audit us, which is 2-3 years away." [Att. C at Ex. 444; Att. D at Ex. 527].[8]

Moreover, the transactions were a sham with no substance or purpose beyond deceiving the OIR. For example, the transaction documents relating to the MSO receivables did not bother to identify what property purportedly was "sold" to PacWest: the definition of "property" did not set forth which MSO receivables constituted the property "sold" or even the MSOs from which the receivables were due, or in what amounts; nor did PacWest ever bother to appraise the receivables or test their collectability. [Att. D at Ex. 468, 469, 472, 474, 478, 479, 480; Att. E at 8-12; Att. E at 8-12]. Further, PUP maintained responsibility to collect the receivables, and when PUP did collect, it retained the cash. *Id.* In other transactions, PacWest purported to purchase items such as "architectural design," "build-out," "drywall demolition," "elevator doors," "leasehold improvements," and "office remodeling," and similar non-admitted "assets" that PacWest patently did not actually purchase

---

[8] Later, PacWest also knew that PUP's management had made efforts to conceal the transactions and their accounting treatment from the OIR. PacWest was provided copies of PUP's audited financial statement and periodic NAIC statements. [Att. D at. 673-75; 704-05, Ex. 533, 542; Att. C at 233, 425, 432, Ex. 454] The year-end audited financial statements did not disclose, *inter alia*, that PacWest and PUP had entered into transactions in attempt to convert non-admitted assets into admitted assets. PUP's periodic NAIC statements, for example, reported to PUP's examiners that PUP had *not* entered into any sale-leaseback transactions. Additionally, PUP's year-end 2011 and 2012 audited financial statements represented in Note 2 that PUP only included assets that were available to pay policyholder claims as admitted assets. [Att. I at Ex. 3; Att. H at Ex. 677, 678, 684; Att. B at 588]. They did so even though the proceeds of the subject transactions were restricted and *not* available to pay policyholder claims. [Att. J at Ex. 29; Att. D at 635, 654; Att B at 626, 642]. PacWest continued to enter into all of the transactions despite knowing that PUP's management was trying to hide the transactions from the OIR.

and take control of given that they were attached to PUP's leased office building. [Att. E at 12-18; Att. D at Ex. 470, 475, 476, 477]. Indeed, the property that PacWest supposedly "purchased" reverted back to PUP at the conclusion of the lease or in the event of a default. [Att. E at 16-18; Att. D at Ex. 468, 469, 470, 472, 474, 475, 477, 478, 479, 480].

Given the foregoing, none of the transactions constituted a "sale" or a "lease" under SSAP, and should have been treated as financing. [Att. E at 7-20]. PacWest knew that the transactions in substance were really financing transactions, not sale/leasebacks. A PacWest credit analyst internally questioned whether the transactions were really a sale as opposed to a loan and whether PacWest would be collecting the receivables. [Att. D at Ex. 535]. According to its CFO, PacWest internally treated the transactions "as a financing" for purposes of determining whether additional taxes needed to be collected. *Id.* at Ex. 557. When PacWest sought to syndicate the deal with PUP, another bank told PacWest: "Sorry we can't help you with this LOAN ... this is not a lease ... no one here has ever heard of 'leasing a receivable.'" *Id at* Ex. 528. Despite its knowledge, PacWest never told PUP and sold ConvertaLease as a "sale/leaseback" transaction to attempt to artificially inflate PUP's balance sheet. Also, if the transactions were treated as financing, PUP's liability to PacWest would need to be reported, which would

hamper the transactions' intended effect of hiding PUP's financial condition from the OIR. [Att. E at 9].

PacWest's co-defendant CBSL likewise saw that the transactions were a sham. Internal emails among CBSL officers who were considering PacWest's invitation to fund transactions with PUP called ConvertaLease "too good to be true" and wondered: "What is the catch?" [Att. K at Ex. A]. CBSL's president said the transaction "doesn't make sense to me ... and rarely does that work." [Att. K at Ex. B]. Other officers responded to this concern by agreeing to make sure that they had their "collateral buttoned up" so that "**if this structure turns out to be illegal**, we can draw on the L/C." *Id.* (emphasis added). Before agreeing to finance a transaction, CBSL insisted on adding a provision that would allow them to call a default if the structure was "deemed not valid," which is what occurred. [Att. D at Ex. 568 at 2].

### D. PUP's liquidation as a result of the transactions

Because of PacWest's accounting treatment, PUP's financial statements reflected millions of dollars in "admitted assets" that actually were non-admitted because they were pledged to secure PUP's "lease" obligations. PacWest came to realize it "would be in control of almost all of [PUP's] Surplus" and would "put[ PUP] out of business" if it took the pledged funds, which PacWest saw "as a big liability." [Att. D at 725-31, Ex. 498, 561]. Yet, PacWest *still* continued to engage

in transactions with PUP, simply syndicating certain of the deals with Defendants to spread the risk of PUP's failure across multiple banks. *Id.*

On March 11, 2014, PUP finally came clean and explained the PacWest transactions to the OIR. [Att. B at Ex. 134; Att. A at Ex. 332]. PUP's examiners ordered PUP to non-admit $12,500,000 in proceeds from the transactions, and anticipated non-admitting an additional $17,000,000 that were reported as admitted based on PacWest's accounting treatment. [Att. B at Ex. 136]. On April 16, 2014, PacWest, on behalf of itself and the other two Defendants, sent multiple default letters to PUP. [Att. D at 523-24, Ex. 512]. On the same day, PUP executed a Consent to Order of Rehabilitation or Liquidation whereby PUP admitted that grounds existed for the appointment of the Department as Receiver unless a capital infusion of $30,000,000—almost exactly the amount of the ConvertaLease proceeds reported as admitted assets on PUP's financial statements—was contributed to PUP's surplus. [Att. B at Ex. 140]. Upon learning about the regulatory action, PacWest, on behalf of itself and the other two Defendants,[9] exercised the provision that they had negotiated in case the "structure turn[ed] out to be illegal" and swept

---

[9] The Defendants have admitted that PacWest acted as their agent. For example, Defendants admitted that PacWest sent the default letters on behalf of PacWest and the other two Defendants. [CBSL Answer at ¶58; MB Answer at ¶58; *see also* CBSL Answer at ¶62; MB Answer at ¶62]. Indeed, one of PacWest's April 16, 2014 letters refers to itself as the "servicing agent" for Defendant MB Financial. [Att. D at Ex. 512]. Moreover, PacWest's corporate representative testified, with respect to the ConvertaLease transactions that PacWest syndicated to the other two Defendants, PacWest "service[d]" them on their behalf. [Att. D at 793]. PUP's Henry testified that most communications PUP had with MB and CBSL were through PW. [Att B at 586].

approximately $30,000,000 from PUP's accounts [Att. D at Exs. 512, Ex. 513]. The Receiver filed its Petition for Order Appointing it as Receiver for PUP on June 5, 2014, and the Receivership Court appointed the Department as Receiver on June 9, 2014 with its liquidation effective on July 1, 2014—as PacWest had predicted. Consistent with PacWest's prediction, PUP's Board of Directors and auditors independently blamed PUP's demise on the ConvertaLease transactions: "Hey, shitty news on PUP, huh? They never should have done those 'lease' deals." [Att. L at 323-24, Ex. 54; Att. F at Exs. 180,181].

## LEGAL STANDARD

Defendants have the "'burden to prove conclusively the nonexistence of any genuine issue of material fact.'" *Kaplan v. Morse*, 870 So. 2d 934, 936 (Fla. 5th DCA 2004) (quoting *City of Coca v. Leffler*, 762 So. 2d 1052, 1055 (Fla. 5th DCA 2000)). The record, including supporting affidavits, must be considered in the "light most favorable to the non-moving party, and if the slightest doubt exists, summary judgment must be" denied. *Id.* (citing *Krol v. City of Orlando*, 778 So. 2d 490 (Fla. 5th DCA 2001)); *State Farm Mut. Auto. Ins. Co. v. Ferranti*, 256 So. 3d 238, 240 (Fla. 5th DCA 2018) (summary judgment deprives party of right to trial; "must be exercised with restraint; any doubts must be resolved in favor of the nonmoving party."). In ruling on a summary judgment motion, the trial court "may not weigh the evidence." *Penton Bus. Media Holdings, LLC v. Orange Cty.,* 236 So. 3d 495,

497 (Fla. 5th DCA 2018) (citations omitted). Conflicting inference from the record about intent are "not appropriate for summary judgment." *Bruno v. Destiny Transp. Inc.*, 921 So. 2d 836, 844 (Fla. 2d DCA 2006); *Gimenez v. Napoles*, 928 So. 2d 506, 507 (Fla. 3d DCA 2006) (summary judgment rarely proper when issue turns on "circumstantial evidence of intent and knowledge.").

## **ARGUMENT**

I.  **Defendants Are Not Entitled to Summary Judgment on Count 16 of the Amended Complaint because the Transactions Misreported PUP's financial condition**

Count 16 of the Amended Complaint asserts a claim under Section 631.157(2) of the Florida Statutes. Section 631.157(2) provides:

(2)(a) Any person who:

1. Is engaged in the business of insurance, is or acts as an officer, director, agent, or employee of any person engaged in the business of insurance, <u>or is involved in a transaction relating to the conduct of affairs of such a business,</u> other than as an insured or beneficiary under a policy of insurance;

2. Has <u>actual knowledge or such constructive knowledge</u> as should have been obtained through reasonable inquiry by a person in that position; and

3. <u>Misreports</u> a material fact in any book, report, or statement of an insurer with the <u>intent to deceive the insurer</u>, including any officer, employee, or agent of the insurer, the <u>department</u>, or <u>any agent or examiner appointed by the department to examine the affairs of the person or insurer</u>, concerning the <u>financial condition or solvency of such business</u> is liable to the department as receiver for the use and benefit of the insolvent insurer's estate, creditors, and policyholders, as provided in paragraph (b).

(b) 1. If the misreporting did not jeopardize the safety and soundness of an insurer and was not a significant cause of the insurer being placed in

receivership, the person shall be liable only for the full amount of any asset misreported.

2. If the <u>misreporting</u> jeopardized the <u>safety and soundness of an insurer</u> or was a <u>significant cause of the insurer being placed in receivership</u>, the person shall be liable for triple the full amount of any asset misreported.

Fla. Stat. Ann. § 631.157(2) (emphasis added).

Section 631.157(2) clearly was enacted to address situations, such as this, where Defendants engaged in a transaction designed to misreport PUP's "financial condition" to the OIR, the agency charged with examining PUP's financial statements. Contrary to Defendants' Motion for Summary Judgment, Section 631.157(2) applies here given the circumstances of this matter:

- The Defendants engaged in transactions (the "ConvertaLease" transactions) relating to the conduct of affairs of PUP;

- PacWest had actual or constructive knowledge of the misreporting and, indeed, was intimately involved and inextricably intertwined in the misreporting to PUP's examiners;

- PacWest admittedly "designed" the subject "ConvertaLease" transactions to purportedly "strengthen [PUP's] statutory balance sheet" due to "regulatory pressures and challenges" – in other words, reporting to PUP's examiners (the OIR);

- PacWest did so with intent to deceive PUP's examiners.[10] PacWest's accounting treatment was inherently deceptive given that PacWest designed it to report assets as admitted that were unavailable to pay policyholder claims; and to omit a liability on PUP's financial statements that PUP was very much obligated to pay. Further, PacWest knew full well that Henry did not intend to timely disclose the transactions to the examiners given that he did not anticipate "the OIR even looking at the arrangement until the next time they audit [PUP], which [was] 2-3 years away." [Att. D at Ex. 527]. In fact, PacWest continued to enter into each of the transactions after March 2011 even though PacWest had copies of PUP's year-end audited financial statements[11] and PUP's periodic NAIC financial statements, which falsely represented that PUP was only including assets available to pay policyholder obligations as admitted assets and further represented "none" in response to questions about whether PUP had entered into any sale/leaseback transactions even though PUP accounted for the subject transactions as such.

- The misreporting jeopardized the safety and soundness of PUP or, at a minimum, was a significant cause of the insurer being placed in receivership. [*See supra* at 10-11; Att. L at 323-24, Ex. 54; Att. F at Exs. 180,181]. This

---

[10] Certain of PUP's directors also state they were deceived. [Att. F at 457-58; Ex. 180; Ex. 181; Att. G at. 660, 718, 743-47, 757-73, 811].

[11] *See* note 10 *supra*.

clearly is demonstrated by the fact that the OIR non-admitted the assets and PUP was placed into receivership when it could not come up with $30,000,000 in replacement surplus.

In their shotgun motion to dismiss, Defendants previously argued that the Department as Receiver does not have a cause of action against them under Section 631.157(2). There, Defendants argued for dismissal of Count 16 because "only PUP had the duty to report, and only PUP allegedly misreported." Am. Mtn. to Dismiss at 38. This Court, however, already rejected these arguments "given the liberal construction afforded to maximize a receiver's claim and the unique facts of this case," and the Court found "that the complaint sets forth a legally sufficient cause of action in Count 16." March 24, 2020 Order Denying Mtn. to Dismiss at 5. The Court should reject the same argument here for the same reasons.

## II. Section 631.157(2) regulates misreporting to the OIR and is not unconstitutionally vague

In addition to raising the same arguments that this Court previously rejected, Defendants now raise a new argument that, frankly, they do not even believe given that they did not include it in their 39-page shotgun motion to dismiss. Defendants claim that the word "examiner" in Section 631.157(2) somehow does not apply to the OIR—the agency charged by Florida law to "examine the affairs, transactions,

accounts, records, and assets of each authorized insurer" operating in the State[12]—because the state the legislature defined "Department" to mean the Department of Financial Services when it amended another Chapter within the Florida Insurance Code after Section 631.157(2) was enacted. This argument ignores the history of Section 631.157(2), the legislative intent behind it, and the division of responsibility between the Department and the OIR.

Section 631.157(2) became effective on July 1, 2002. At that time, the "Department of Insurance" was responsible for examining the financial affairs of HMOs.[13] Also at that time, Section 624.05 defined "Department" as the "Department of Insurance of this state." Thus, the reference to "department" in Chapter 631.157(2) refers to the Department of Insurance that existed when the statute was enacted. The Department of Financial Services and Office of Insurance Regulation ("OIR") were not created until the following year, on June 26, 2003.  Fla. Stat. §20.121. Pursuant to Section 20.121(2)(g), "[t]here is created a Department of Financial Services," which "shall consist of" various divisions including the

---

[12] Fla. Stat. § 624.316.

[13] The legislative history to Section 631.157 provides: "Under current law, the <u>Department of Insurance</u> has specified procedures when it determines through financial reports, examinations, or other sources that an insurance company has failed certain solvency tests or is otherwise in unsound financial condition. The department may place certain insurers of 'unsound condition' under administrative supervision. Such supervision allows the department, with the consent of a financially troubled insurance company, to supervise the management of the insurance company in an attempt to cure the company's troubles rather than close it down."  Florida Staff Analysis, S.B. 432, 3/1/2002 (emphasis added).

Division of Rehabilitation and Liquidation. The Florida legislature also created the Financial Services Commission "*within* the Department of Financial Services." Fla. Stat. §20.121(3) (emphasis added). The OIR is a "major structural unit" of the Financial Services Commission. Fla. Stat. §20.121(3)(a)(1).

The OIR is the successor to the Department of Insurance for examination purposes. As the Fifth DCA has observed, the "Office of Insurance Regulation ('OIR')" is the "<u>former</u> Department of Insurance." *State Farm Mut. Auto. v. Gibbons*, 860 So. 2d 1050, 1051 (Fla. 5th DCA 2003) (emphasis added). After its creation, the OIR, rather than the former Department of Insurance, became the examiner of HMOs such as PUP charged to "examine the affairs, transactions, accounts, records, and assets of each authorized insurer." Fla. Stat. § 624.316. Indeed, Section 624.424 requires that authorized insurers "shall file with the office [OIR] full and true statements of its financial condition" as well as audited financial statements. Fla. Stat. §624.424(1)(a) and (8)(a). Thus, Section 637.157(2) plainly regulates misreporting to OIR, notwithstanding the errant reference to the "Department" in the statute, which the legislature apparently neglected to update when it created the Department of Financial Services and changed the definition of "Department" in Chapter 624.

As shown above, the OIR is the agency charged with examining the financial condition of Florida insurers. Thus, construing Section 631.157(2) as regulating only

reporting to the Department of Financial Services would effectively tear Section 631.157(2) out of the Florida Statutes. Moreover, accepting Defendants argument[14] would lead to an absurd result that would allow misreporting to the OIR with impunity, gutting the policy and purpose of Section 631.157(2). There is no evidence that the legislature intended to tear Section 631.157(2) out of the Florida Statutes or render it a nullity as Defendants would have this Court do.[15]

Courts are required to interpret statutes in accordance with the legislative intent and policy of the statute. *Byrd v. Richardson-Greenshields Secs., Inc.*, 552 So.2d 1099, 1102 (Fla. 1989) (courts' "obligation is to honor the obvious legislative intent and policy behind enactment."); *Tampa-Hillsborough Cnty Expressway Auth. v. K.E. Morris Alignment Serv.*, 444 So.2d 926, 929 (Fla. 1984) ("Statutes should be construed in light of the manifest purpose to be achieved by the legislation."); *Tyson v. Lanier*, 156 So.2d 833, 836 (Fla. 1963) (same). Thus, this Court "must honor the legislative intent and policy behind" Section 631.157(2) "*even where* that intent requires an interpretation that exceeds the literal language of the statute." *Byrd*, 552 So. 2d at 1102 (emphasis added). In fact, "a literal interpretation of the language of

---

[14] Defendants argue that, because the legislature defined "Department" to mean the Department of Financial Services when the Department of Financial Services and the OIR were created as of June 26, 2003, Section 631.157(2) somehow no longer applies to misreporting to an insurer's examiners and that the intent and public policy it serves are a nullity.

[15] If Defendants want to be technical, Section 624.05 defines "Department" as the "Department of Financial Services" "[a]s used in the Insurance Code." Section Chapter 631 is part of the "Florida Insurance Code" Code."  Fla. Stat. §624.01.

a statute need not be given when to do so would lead to an unreasonable or ridiculous conclusion," as Defendants seek here. *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984); *George v. State*, 203 So. 2d 173, 176 (Fla. 2d DCA 1967) ("manifest intent of the legislature will prevail over any literal import of words used by it; and no literal interpretation leading to an unreasonable conclusion or purpose not intended by the law should be given"). Even where confronted with a "penal statute," courts must be guided by the "intention of the legislature" and the "absurdity doctrine may be used to justify departures from the general rule that courts will apply a statute's plain language." *Owens v. State*, No. 1D20-540, 2020 WL 5001817, at *3 (Fla. 3d DCA Aug. 25, 2020); *see also Tampa-Hillsborough Cnty Expressway Auth.,* 444 So. 2d at 929 ("[I]t is axiomatic that courts should endeavor to avoid giving it an interpretation that will lead to an absurd result"). Even penal statutes "are not to be construed so strictly as to emasculate the statutes and defeat the obvious intention of the legislature. In other words, such strict construction is subordinate to the rule that the intention of the lawmakers shall be given effect." *George*, 203 So.2d at 176.[16]

---

[16] Defendants cite to cases that provide courts should interpret statutes strictly in favor of "citizens" typically in the criminal context. Mtn. pp.16-17. The policy of these cases is inapposite given the nature of this matter and the intent of Section 631.157(2). First, it is the Receiver who represents the interests of the citizens. Fla. Stat. § 631.3915 (actions on behalf of "insurer's estate and the insurer's policyholders, creditors, and other claimants"). Second, contrary to their argument, the legislature has directed that Section 631.157(2) "*shall be* liberally construed to effect" its purpose: "maximize recovery of assets for the benefit of an insurer's estate; policyholders, creditors, and other claimants; and the public." Fla. Stat. § 631.001(2)-(3) (emphasis added).

Clearly, the OIR is the examiner referred to in Section 631.157(2) given that, as a successor to the former Department of Insurance, it is charged with examining the financial affairs of insurers such as PUP.[17] The Florida legislature did not repeal Section 631.157(2), and the OIR is and has been the examiner of the financial condition and solvency of insurers since the OIR's creation. PacWest *knew* that the OIR was PUP's examiner prior to entering into any of the subject transactions.[18] Not only did Defendants know that the OIR was PUP's examiner, Defendants also are presumed to know the history of Section 631.157(2), the subsequent creation of the OIR, and that the OIR was the examiner of PUP rather than the "former Department of Insurance." *Guemes v. Biscayne Auto Rentals, Inc.*, 414 So. 2d 216, 218 n.4 (Fla. 3d DCA 1982) ("Everyone is presumed to know the law"); *Fla. Bar v. Dubow*, 636 So. 2d 1287, 1288 (Fla. 1994) ("Ignorance of the law is not an excuse").

PacWest's undisputed knowledge that the OIR was PUP's examiners defeats Defendants' contrived argument that Section 631.157(2) is unconstitutionally vague. According to Defendants' own authority, "[i]n determining whether a statutory

---

[17] Section 631.157(2) is "in pari materia" with other provisions of the statutes relating to the OIR's role as the examiners of insurers such as PUP and "should be construed together" to not "defeat the obvious intention of the Legislature." *State v. Moss*, 206 So.2d 692, 697 (Fla. 2d DCA 1968).

[18] PacWest's intimate knowledge of and involvement in the misreporting is imputed to both of the other Defendants. *Hardy v. Am. S. Life Ins. Co.*, 211 So.2d 559, 560-61 (Fla. 1968) (knowledge of agent imputed to principal); *Davies v. Owens-Illinois, Inc.* 632 So.2d 1065, 1066 (Fla. 3d DCA 1994) (same). This is true *even if* PacWest *never* communicated its knowledge to the other two Defendants. *Hardy*, 211 So.2d at 560-61; *Johnson v. Life Inc. Co.*, 52 So.2d 813, 815 (Fla. 1951). Notwithstanding this knowledge, each Defendant entered into the subject transactions to artificially inflate PUP's balance sheet. Accordingly, they are just as responsible as PacWest.

provision is so vague," courts "must consider whether the provision is so vague that men of common intelligence must necessarily guess at it meaning. The test is . . . whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practice." *State v. Hagan*, 387 So.2d 943, 945 (Fla. 1980). PacWest knew both before and after it entered into any of the transactions that the OIR was responsible for examining the financial affairs of PUP, and that PUP reported to it. [Att. C at 381-84, 389-90, 402, 410-12, Ex. 444, 445, 446, 451; Att. D at 620-21, 617-19, Ex. 490, Ex. 527; Att. H at 110-12, 124, 164; Att. B at 203-06, Ex. 101]. Defendants clearly understood this, which is why they did not include this argument in their voluminous motion to dismiss. PacWest's own actions and words, at the time of the transactions and in this litigation, belie any argument that the statute is so vague that PacWest could not understand it. The acceptance of Defendants' argument would lead to an "absurd result" and undermine the policy behind Section 631.157(2).

### III.    The Department is not asserting an aiding and abetting claim, so Defendants' arguments about aiding and abetting are inapposite.

Defendants cite *Freeman v. First Union National Bank*, 865 So. 2d 1272 (Fla. 2004) to argue that the Court should reconsider its prior correct ruling that the Department states a case of action against Defendants for misreporting. *Freeman* held that the Florida Uniform Fraudulent Transfer Act (FUFTA) does not provide a cause of action for aiding and abetting a fraudulent transfer. The Receiver is not

asserting an aiding and abetting claim in Count 16, so Defendants' reliance on *Freeman* is misplaced.[19] Beyond that, the court in *Freeman* expressly "confined [its decision] to the context of FUFTA." *Id.* at 1275 n.4. That is because *Freeman* was based on "the narrow focus of the FUFTA" to set aside fraudulent transfers, and the plain language of FUFTA which "is strictly limited to relief against a 'transferee'" of such transfers, precluding relief against a non-transferee.[20] *Id.* at 1275-77.

In this case, permitting relief against Defendants will not expand Section 631.157(2) beyond its plain language, which targets "[a]ny person who [m]isreports a material fact in any book, report, or statement of an insurer" with intent to deceive the insurance regulators. Fla. Stat. § 631.157(2)(a). Further, as the Court previously ruled, permitting relief under the statute is consistent with the statute's purpose, which is to "maximize recovery of assets for the benefit of an insurer's estate; policyholders, creditors, and other claimants; and the public." Fla. Stat. §

---

[19] For the same reason, Defendants' reliance on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), is misplaced. Defendants cite *Central Bank* as the Supreme Court's "definitive precedent on aiding and abetting liability," Mtn. p.20, but the Receiver is not asserting a claim for aiding and abetting violations of Section 631.157. Further, in *Central Bank* the Court was construing federal security laws, which are subject to strict interpretation. *Id.* at 511 U.S. 169-70 ("strictly interpret[] the federal securities laws."). Section 631.157(2), however, is subject to the opposite construction: it "*shall be* liberally construed to effect" its purpose, which is to "maximize recovery of assets for the benefit of an insurer's estate; policyholders, creditors, and other claimants; and the public." Fla. Stat. § 631.001(2)-(3) (emphasis added). Also, even if Count 16 were a claim for aiding and abetting (as Defendants characterize it), Florida recognizes claims for aiding and abetting fraud, which is akin to misreporting. *Gilison v. Flagler Bank*, No. 4D19-3379, 2020 WL 5033316, at *2 (Fla. 4th DCA Aug. 26, 2020).

[20] Defendants' authorities do not apply here on any level, because Defendants plainly are "transferees" given the millions of dollars that Defendants swept and were paid.

631.001(2)-(3). That purpose is an "integral elements of the regulation of the business of insurance and [is] of vital public interest and concern," and thus Section 631.157(2) "shall be liberally construed to effect" its purpose. The liberal construction afforded to Section 631.157 makes it unlike FUFTA or any of the other statutes that Defendants cite at pages 21-22 of their Motion; none of those statues is subject to a liberal construction intended to maximize recoveries, like Section 631.157(2). Indeed, the statutes cited by Defendants impose criminal penalties, including imprisonment, making them subject to a strict interpretation, the opposite of Section 631.157(2). As this Court already has ruled, under the unique facts of this case and given the liberal construction required of the statute, the Court should decline Defendants' invitation to reconsider its prior ruling.

## IV. Entering summary judgment on the fact-bound issues of causation and intent would be improper.

Defendants move for summary judgment as to causation and intent, but the Receiver clearly has shown more than enough to defeat a motion for summary judgment on these fact-bound issues. As to causation, it is "improper" to grant summary judgment "'based on a finding that the plaintiff has not come forward with any evidence of causation' as such a finding 'improperly shifts the burden to the non-movant to establish causation.'" *LeBlanc v. Acevedo,* 258 So. 3d 555, 558 (Fla. 5th DCA 2018) (quoting *Pitcher v. Zappitell*, 160 So.3d 145, 148 (Fla. 4th DCA 2015)); *O'Malley v. Ranger Constr. Indus.*, 133 So. 3d 1053, 1056 (Fla. 4th DCA

2014) ("Summary judgment should not be granted based on a non-movant's failure to meet its burden of proof on the issue of causation."). Rather, a summary judgment movant must "conclusively establish that, even with every reasonable inference from the evidence drawn in favor of the" plaintiff, the plaintiff "would be unable to prove" that the acts of the defendant "more likely tha[n] not caused" the harm at issue. *LeBlanc*, 258 So. 3d at 558-59. The Fifth DCA has admonished trial courts to exercise "caution" when considering causation on summary judgment because "causation is so fact-specific." *Petruska v. SmartParks-Silver Springs, Inc.*, 914 So.2d 502, 505 (Fla. 5th DCA 2005) ("Proximate cause questions generally must be resolved by the trier of fact based on all the facts and circumstances presented;" the "circumstances under which a court may resolve the question of proximate cause as a matter of law are extremely limited.")(citation omitted).

Likewise, "conflicting inference from the record about intent" – such as inferences that might be drawn about whether Defendants acted with "intent to deceive," thus triggering liability under Section 631.157(2) – are "not appropriate for summary judgment." *Bruno v. Destiny Transp. Inc.*, 921 So. 2d 836, 844 (Fla. 2d DCA 2006). Indeed, "summary judgment is rarely proper" in cases that turn on "circumstantial evidence of intent and knowledge." *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. 4th DCA 2003); *cf. Props., Ltd. v. Weber Holdings, LLC*, 930 So. 2d 833, 834 (Fla. 4th DCA 2006) (only in "extraordinarily rare"

circumstance may knowledge be resolved on summary judgment); *Gimenez v. Napoles*, 928 So. 2d 506, 507 (Fla. 3d DCA 2006) (summary judgment rarely proper on issue of "intent and knowledge."); *Casamassina v. U.S. Life Ins. Co.*, 958 So. 2d 1093, 1100-01 (Fla. 4th DCA 2007) ("conflicting inferences from the record about intent" are "not appropriate for summary judgment.").

Here, Defendants' Motion comes nowhere close to establishing that this is one of the "extremely limited" and "extraordinarily rare" circumstances where causation and intent may be resolved on summary judgment. The record evidence shows that PacWest designed and intended the ConvertaLease accounting treatment to deceive the OIR about PUP's admitted assets, liabilities, and financial condition. In this regard, ConvertaLease was an unmitigated "success," allowing PUP to continue to write insurance policies despite PUP's failure to comply with the capital surplus requirement designed to protect Florida citizens from financially unsound insurers until PUP came clean to the OIR, precisely as PacWest intended.

## CONCLUSION

Defendants wholly have failed to meet their burden to obtain summary judgment. The Receiver respectfully requests that this Court deny the Defendants' Motion and decline their invitation to subvert the intent and policy underlying Section 631.157(2) and, thereby, render it meaningless.

Respectfully Submitted on October 26, 2020

GENOVESE, JOBLOVE & BATTISTA, P.A.
*Attorneys for Plaintiff*
100 S.E. 2nd Street, 44th Flr.
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310
Email: pbellas@gjb-law.com

  /s/ Peter W. Bellas
Peter W. Bellas; Fla. Bar No. 611387
Email:  pbellas@gjb-law.com
John Genovese; Fla. Bar. No. 280852
Email:  jgenovese@gjb-law.com
Michael A. Friedman; Fla. Bar No. 0071828
Email:  mfriedman@gjb-law.com

*And*

/s/ Miriam Victorian
Miriam Victorian, Chief Attorney
Florida Department of Financial Services
Division of Rehabilitation and Liquidation
325 John Knox Road, Suite 101
Tallahassee, Florida 32303
Email: Miriam.Victorian@myfloridacfo.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 26, 2020, a true and correct copy of the foregoing was filed with the Clerk of Court via the Florida Court's E-filing Portal System, which will generate an electronic notification to all interested parties registered to receive electronic notifications on this matter.

  /s/ Peter W. Bellas
Peter W. Bellas;

[11381-003/3267432/1]                26

# EXHIBIT  I

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

Case No.: 2016-CA-004588-O
Judge: Patricia L. Strowbridge

The FLORIDA DEPARTMENT
OF FINANCIAL SERVICES, Receiver for
PHYSICIANS UNITED PLAN, INC.,

        Plaintiff,

v.

PACIFIC WESTERN BANK CORP.,
CENTRAL BANK OF ST. LOUIS, and
MB FINANCIAL BANK, N.A.,

        Defendants.

_____/

### THE FLORIDA DEPARTMENT OF FINANCIAL SERVICES' RESPONSE TO DEFENDANTS' AMENDED MOTION TO DISMISS

Plaintiff, the Florida Department of Financial Services (the "Department"), as the Court-appointed Receiver for Physicians United Plan, Inc. ("PUP"), files this Response in Opposition to the Amended Motion to Dismiss[1] filed by Defendants (1) Pacific Western Bank Corp. ("PacWest"), (2) Central Bank of St. Louis, and (3) MB Financial Bank, N.A. ("Defendants").

### SUMMARY

Defendants' Amended Motion to Dismiss should be denied. First, Defendants seek to dismiss claims that this Court already held are properly stated. Second, Defendants' arguments for dismissal of the two additional counts in the Amended Complaint ignore Florida law as well as the vital public interest at stake and the egregious nature of Defendants' actions.

_____

[1] Defendants filed their Amended Motion to Dismiss on September 27, 2019, four months after filing their May 17, 2019 Motion to Dismiss Amended Complaint, adding new arguments after this hearing had been noticed.

1

The Department filed this action on May 20, 2016, alleging that the Defendants engaged in a series of transactions with PUP that PacWest designed to circumvent Florida law and hide PUP's financial condition from Florida insurance regulators. The initial Complaint sought, *inter alia*: (i) a declaratory judgment deeming the sham PacWest transactions void as against public policy (Count 12); (ii) to recover under Chapter 631 and 726 of the Florida Statutes over $36.5 million that PUP transferred to the Defendants in connection with the transactions, most of it on the eve of PUP's receivership (Counts 1-11); and (iii) damages against Defendants for unjust enrichment and aiding and abetting certain PUP officers' breach of fiduciary duties to PUP (Counts 13-14). Defendants filed a 21-page motion to dismiss arguing for dismissal with prejudice of the entire Complaint. This Court rejected all of Defendant's arguments in a 17-page Memorandum Order entered on November 14, 2016. Defendants then filed a motion to reconsider, which this Court denied on December 15, 2016.

Discovery has proceeded in this case, in part, in conjunction with three other lawsuits pending in this Court, each of which involves the very same PacWest transactions that are at issue in this case.[2] Discovery has confirmed that the transactions and their accounting treatment in financial disclosures to Florida regulators were improper, and that the transactions were used to artificially inflate PUP's financial condition.

On January 7, 2019, the Department filed its Amended Complaint to add two claims under Section 631.157, Florida Statutes, which imposes liability on parties "involved in a transaction relating to the conduct of affairs" of an insurance business, and imposes treble damages when the transaction "jeopardized the safety and soundness of an insurer or was a significant cause of the insurer being placed in receivership." The Amended Complaint also re-

---

[2] The Department has sued PUP's auditors, RSM US LLP *f/k/a* McGladrey LLP ("RSM"), and certain former PUP officers and directors. PUP's majority shareholder also has sued RSM.

asserts the exact claims that were in the initial Complaint, with respect to which this Court already denied Defendants' prior motion to dismiss.

On May 17, 2019, after agreeing to the Department's motion to amend, Defendants filed a 26-page Motion to Dismiss. Four months later, on September 27, 2019, Defendants filed their instant 30-page Amended Motion to Dismiss, which mostly re-argues the same arguments that this Court already rejected in its well-reasoned Memorandum Order and subsequent order denying reconsideration. In addition to many rehashed arguments, Defendants argue that the Department's two additional claims under Section 631.157 should be dismissed with prejudice because, according to Defendants, that statute somehow does not apply to banks. Defendants' arguments, however, ignore the unambiguous language of Section 631.157 and the vital public policy purposes driving Chapter 631, all of which support the conclusion that the Department's Section 631.157 claims are viable.

## ALLEGATIONS OF THE AMENDED COMPLAINT

### A. The Regulatory Process under the Florida Insurance Code

PUP was a health maintenance organization ("HMO") operating in the State of Florida. Under the Florida Insurance Code, Title 37 of the Florida Statutes, PUP and all Florida HMOs were required to maintain a minimum capital surplus set by law to legally operate in the State of Florida. ¶¶2, 29-32.[3] To ensure compliance with the capital surplus requirement, Florida insurers are subject to strict financial reporting obligations, including the submission of sworn, audited financial statements and periodic NAIC financial statements[4] to the Florida Office of Insurance Regulation ("OIR"). The audited and NAIC statements are critical to Florida's regulatory process

---

[3] Citations to "¶__" are to the numbered paragraphs of the Amended Complaint.
[4] National Association of Insurance Commissioners ("NAIC").

3

and to determining whether regulatory action is appropriate. A fundamental purpose of this regulatory scheme is to protect Florida citizens from financially unsound insurers. ¶¶33-37.

Under Florida law, audited financial statements submitted to OIR must comply with Florida law and the Statement of Statutory Accounting Principles or "SSAP." Under SSAP, the distinction between "admitted" assets and "non-admitted" assets is critical to determining whether an HMO is financially sound. An asset that is not available to fulfill policyholder obligations is "non-admitted," meaning it cannot be included on the insurer's financial statement or counted towards their statutory capital surplus. Pertinent here, under SSAP, receivables not collected within 90 days of billing are deemed non-admitted. ¶¶3, 35-40.

### B.  The PacWest transactions: *Convertalease*

The purpose of the PacWest transactions was to artificially inflate PUP's admitted assets by circumventing SSAP and Florida law. PacWest and PUP's executives were well aware of the requirements of Florida law and SSAP. For example, in May 2011 OIR notified PUP that $532,000 in past-due receivables listed as admitted assets on PUP's financial statement were deemed non-admitted under SSAP 84. Around this time, PacWest pitched to PUP a "non-admitted asset financing" product dubbed *Convertalease*. In the course of discussing *Convertalease* with PUP, PacWest learned that the OIR had non-admitted PUP's past due receivables in May 2011. Remarkably, PacWest worked with certain PUP executives to move forward with the improper *Convertalease* transactions anyway. ¶¶41-46, 54.

In connection with its *Convertalease* pitch, PacWest gave PUP promotional material that reads as a veritable how-to guide for circumventing Florida law and SSAP. The material references that "insurance companies face distinct regulatory pressures and challenges" and touts *Convertalease* as "a financing product designed to strengthen your statutory balance sheet" by

"transform[ing] non-admitted assets (new or existing) into admitted assets." The promotional material advertises PacWest's "experience and knowledge" of the insurance industry, and includes a testimonial lauding PacWest as "a company that could deliver an off balance sheet transaction for our non-admitted assets in a very short period of time." *See* ¶¶44-46 and Am. Compl. Ex. A.

Starting in September 2011, the Defendants entered into a number of purported "sale/leaseback" transactions with PUP, *i.e.*, the *Convertalease* transactions. On paper, the transactions generally consisted of PUP purportedly "selling" past-due receivables to PacWest and "leasing" them back at a premium. PUP then removed the non-admitted, past-due receivables from its balance sheet and included the "sale" proceeds as admitted assets in its financial disclosure to OIR. All of this was done with PacWest's encouragement. ¶¶45-54.

In reality, all so-called proceeds from the transactions were restricted. The proceeds were never available to satisfy PUP's obligations to policyholders or any obligations other than the lease payments, making the proceeds non-admitted. Further, the past-due receivables (that in reality PUP kept all along) automatically reverted to PUP upon expiration of the lease. Thus, the transactions left PUP with the same non-admitted assets and actually worsened PUP's financial condition by creating new obligations to pay substantial "lease" payments to the Defendants, among other things. *Id.*

Most significantly, the PacWest transactions had the intended effect of masking PUP's true financial condition from Florida regulators. This enabled PUP to continue operating and growing past the point of financial soundness and sell insurance policies to Florida citizens beyond what Florida law would otherwise permit, among other consequences. The Defendants were paid handsomely for this service under the guise of so-called lease payments. *Id.*, ¶164.

### C.  Florida Regulators Discover the *Convertalease* Scheme and Defendants Bail Out.

OIR discovered the *Convertalease* scheme and disallowed the transactions. In April 2014, PUP advised PacWest that PUP had received a regulatory order from OIR requiring PUP to non-admit $12.5 million in cash and cash equivalents that was pledged as collateral for the PacWest transactions. Another $17 million in proceeds was subject to being non-admitted for the same reason. Without being able to include the so-called proceeds of these transactions as admitted assets, PUP's surplus did not meet minimum statutory requirements. ¶¶55-60.

In response, PacWest—knowing that regulatory action was imminent—moved quickly to bail itself and the other bank Defendants out of the improper arrangement at the expense of PUP's policyholders and other creditors. PacWest generated a notice of default based on OIR's notice that PUP could not magically convert non-admitted assets into admitted assets despite PacWest's assurances to the contrary. Contemporaneously with delivery of the default notice, Defendants swept the pledged accounts, causing PUP to transfer nearly $30 million to Defendants on the eve of PUP's receivership. This was in addition to millions of dollars in "lease" payments that PUP made to Defendants, *i.e.*, the fees Defendants charged in exchange for its assistance in hiding PUP's true financial condition from insurance regulators. All told, PUP transferred over $36.5 million to Defendants on account of *Convertalease*. ¶¶55-67.

### D.  Amended Complaint and the Motion to Dismiss

As discussed above, the parties previously litigated whether the foregoing allegations state valid causes of action against Defendants and this Court held that they do, rejecting Defendants' numerous arguments for dismissal. The Department's Amended Complaint adds two claims under Section 631.157, Florida Statutes. Defendants argue for dismissal of these claims

based on inapposite authority and legislative staff analyses that are irrelevant because the statute plainly applies to the facts of this case.

**MEMORANDUM OF LAW**

**A.  The Amended Complaint states claims under Section 631.157.**

    **(i)  The plain language and express legislative purpose of the statute confirm that it applies to the facts of this case.**

Chapter 631 creates statutory causes of action intended to "maximize recovery of assets for the benefit of the insurer's estate," which is one of the primary purposes of Chapter 631. Fla. Stat. § 631.001(3). This includes the cause of action created under Section 631.157, captioned "Civil Action by the Receiver." The Department's additional Count 15 asserts a claim under Section 631.157(1), which states:

> (1) Any person who is engaged in the business of insurance, is or acts as an officer, director, agent, or employee of any person engaged in the business of insurance, or is involved in a transaction relating to the conduct of affairs of such a business, other than as an insured or beneficiary under a policy of insurance, and who willfully obtains or uses, as defined in s. 812.012(3), any funds, assets, or property, including, but not limited to, moneys, funds, premiums, credits, or other property of an insurer, shall be liable to the department as receiver for the use and benefit of an insolvent insurer's estate, claimants, creditors, and policyholders, as follows:

>                           \*\*\*

> (b) If the funds, assets, or property obtained or used jeopardized the safety and soundness of an insurer or was a significant cause of the insurer being placed in receivership, the person shall be liable for triple the full amount of any funds, assets, or property obtained or used, plus prejudgment interest provided by law on the original amount. Fla. Stat. § 631.157(1) (emphases added).

>                           \*\*\*

> (3) If the asset or property that has been obtained or used was reported to the department as being available to the insurer as an admitted asset and such asset is unavailable to the receiver for payment of the obligations of the insurer at the time a receivership proceeding is instituted, the obtaining or using shall be presumed to have jeopardized the safety and soundness of the insurer and to have been a significant cause of the insurer's being placed in conservation, rehabilitation, or liquidation, with the burden of proof on the defendants to show otherwise.

Fla. Stat. § 631.157(1) (emphases added).

Additionally, the Department's additional Count 16 asserts a claim under Section 631.157(2), which states:

(2)(a) <u>Any person</u> who:

1. Is engaged in the business of insurance, is or acts as an officer, director, agent, or employee of any person engaged in the business of insurance, <u>or is involved in a transaction relating to the conduct of affairs of such a business</u>, other than as an insured or beneficiary under a policy of insurance;

2. Has actual knowledge or such constructive knowledge as should have been obtained through reasonable inquiry by a person in that position; and

3. Misreports a material fact in any book, report, or statement of an insurer

<u>with the intent to deceive</u> the insurer, including any officer, employee, or agent of the insurer, <u>the department</u>, or any agent or examiner appointed by the department to examine the affairs of the person or insurer, <u>concerning the financial condition or solvency of such business is liable to the department as receiver</u> for the use and benefit of the insolvent insurer's estate, creditors, and policyholders, as provided in paragraph (b).

(b) 1. If the misreporting did not jeopardize the safety and soundness of an insurer and was not a significant cause of the insurer being placed in receivership, the person shall be liable only for the full amount of any asset misreported.

2. If the misreporting jeopardized the safety and soundness of an insurer or was a significant cause of the insurer being placed in receivership, the person shall be liable for triple the full amount of any asset misreported.

Fla. Stat. § 631.157(2) (emphases added).

This statutory language is tailor-made for this case. Section 631.157(1) applies to any defendant who obtains an insurer's funds, as Defendants did, "in a transaction relating to the conduct of affairs" of an insurance business; and the statute specifically targets transactions involving funds that were "reported to the department as being available to the insurer as an admitted asset" but were "unavailable to the receiver for payment of the obligations of the insurer at the time a receivership proceeding is instituted." Fla. Stat. § 631.157(3). That is precisely what occurred here: the very purpose of the *Convertalease* transactions was to conjure

8

up funds that could be reported to the regulators as being "available to the insurer as an admitted asset," but the funds were "unavailable to the receiver for payment of obligations."

Likewise, Section 631.157(2) seems practically drafted with the facts of this case in mind. The statute targets any party "involved in a transaction relating to the conduct of affairs of such a business" who "[m]isreports a material fact in any book, report, or statement of an insurer … with the intent to deceive … the department … concerning the financial condition or solvency of such business." The specific purpose of the *Convertalease* transactions was to misreport that PUP had millions of dollars in admitted assets that Defendants <u>knew</u> were not actually available to pay policyholder or any other claims. This misreporting went to the heart of PUP's "financial condition or solvency," so the statute applies.

Defendants argue that Section 631.157 does not apply to them because they did not engage in transactions "relating to the conduct of affairs" of a "business of insurance," arguing that holding them liable would translate to liability under Section 631.157 for "any person who was a party to a transaction with an insurance business at any time prior to the liquidation order … from its lender, to its landlord, to last week's lunch caterer." (Am. Mot. pp.18-21). Defendants surely know that this case is not about last week's lunch or any ordinary transaction with any ordinary vendor or lender—far from it. Defendants promoted *Convertalease* as a vehicle to artificially inflate a regulated insurance company's financial condition by doctoring mandatory financial disclosures and circumventing the statutory capital surplus requirements designed to protect Florida citizens from unsound insurers. These are existential matters for any Florida HMO, including PUP, which could not legally operate in the State of Florida without complying with the capital surplus and financial disclosures requirements. Thus, unlike last week's lunch

order, the *Convertalease* transactions most certainly are transactions "relating to the conduct of affairs" of an insurance business.

Defendants attempt to evade the plain meaning of Section 631.157 by arguing that *Convertalease* was unrelated to any insurance business, citing federal cases construing the phrase "business of insurance" under the McCarran-Feguson Act. These federal cases have nothing to do with Section 631.157 or any of the issues before this Court. McCarran-Feguson exempts the "business of insurance" from federal antitrust laws, and the federal cases cited by Defendants construe the phrase narrowly because "exemptions from the antitrust laws are to be narrowly construed." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979).

By contrast, Section 631.157 is subject to the opposite construction: Section 631.157, like the rest of Chapter 631, "shall be liberally construed to effect" its purpose, which is to "maximize recovery of assets for the benefit of an insurer's estate; policyholders, creditors, and other claimants; and the public." Fla. Stat. § 631.001(2)-(3) (emphasis added). Cases decided under an unrelated, narrowly-applied federal statute have no relevance to Section 631.157, a remedial statute that the Florida legislature has instructed shall be "liberally construed" to maximize the recovery of assets by the Department as receiver.[5]

Even cases applying McCarran-Ferguson recognize that some "activities of insurance companies relate so closely to their status as reliable insurers that they too must" relate to the "business of insurance." *Royal Drug Co.*, 440 U.S. at 216. Clearly, engaging in transactions intended to cheat Florida's capital surplus requirement and the regulatory scheme built around enforcing that requirement "relate closely" to an insurer's "status as a reliable insurer."

---

[5] It is bizarre for Defendants to rely on federal cases applying McCarran-Ferguson when the very purpose of that federal statute is to ensure that the business of insurance is regulated by state law and not federal law. For this reason, too, cases construing McCarran-Ferguson are inapplicable.

Defendants also cite legislative staff analyses and various rules of statutory construction to depart from the plain meaning of the statute in arguing that Section 631.157 cannot apply to banks. None of these arguments is relevant because Section 631.157 applies on its face, and "when the language of the statute under interpretation is unambiguous and has a plain and ordinary meaning, the plain meaning should be given effect*." Osorio v. Bd. of Prof'l Surveyors & Mappers*, 898 So. 2d 188, 190 (Fla. 5th DCA 2005). "In other words, if the language of the statute is clear and unambiguous, a court must derive legislative intent from the words used without involving rules of construction or speculating as to what the legislature intended." *Chase v. Walgreen Co.*, 750 So. 2d 93, 96 (Fla. 5th DCA 1999); *Quarantello v. Leroy*, 977 So. 2d 648, 651 (Fla. 5th DCA 2008) (if provisions are clear "we proceed no further and apply the provisions as written"). The plain meaning of a statute controls and is dispositive of any exercise in statutory interpretation "unless it can be said with absolute confidence that no reasonable legislature would have intended for the statute to carry its plain meaning ... the absurdity doctrine exception to the plain meaning rule should not be used to avoid an unintended result, only an absurd or patently unreasonable one." *Mesen v. State*, 271 So. 3d 164, 169 (Fla. 2d DCA 2019).

Applying Section 631.157 to the facts of this case most certainly does not yield an "absurd or patently unreasonable result." The express purpose of Chapter 631 is to "maximize recovery of assets for the benefit of the insurer's estate," and the Florida legislature has deemed that goal an "integral element[] of the regulation of the business of insurance" in Florida and "of vital public interest and concern." Fla. Stat. § 631.001(3). Indeed, the provisions of Chapter 631, including Section 631.157, are to "be liberally construed" to further that purpose. Fla. Stat. § 631.001(2). In light of these clear legislative directives, it is far from "absurd" to apply the statute to hold these Defendants liable for pulling $30 million out of PUP's restricted accounts on

11

the eve of PUP's receivership, particularly when PacWest promoted that PUP could include those funds as "admitted assets" in mandatory financial disclosures to OIR. In light of Chapter 631's express legislative purpose, holding Defendants responsible for this conduct clearly is not a "patently unreasonable" result.

> **(ii)    Defendants' statutory construction arguments incorrectly apply the maxims upon which Defendants rely, torture the statute's plain language, and contradict the statute's express legislative purpose.**

Even if the Court accepted Defendants' invitation to look past the plain meaning and express legislative purpose of Section 631.157 (which would be error), Defendants' statutory construction arguments strain the plain language of the statute and incorrectly apply the very maxims of statutory interpretation upon which Defendants rely. Defendants incorrectly cite the maxim of *ejusdem generis* to argue that Section 631.157 applies only to parties engaged in the business of insurance because the first two categories of defendants identified in the statute are those "engaged in the business of insurance" and their agents, employees, etc. (Am. Mot. p.22). This analysis is seriously flawed. First, *ejusdem generis* applies only when "there is a list of specific items in a series" followed by an ambiguous general "catch-all phrase," like "other" or "otherwise." *State v. Hobbs*, 974 So. 2d 1119, 1122 (Fla. 5th DCA), *approved*, 999 So. 2d 1025 (Fla. 2008). "For example, [if a] statute stated that the 'confession may be used when the victim is incapacitated, disabled, under the age of twelve <u>or otherwise unavailable to testify</u>,' this might be an appropriate case for the application of the maxim to discern what is meant by the catch-all phrase, 'otherwise unavailable to testify.'" *Id.* at 1122 (emphasis added).

"There is no catch-all term or phrase to construe" in Section 631.157, so *ejusdem generis* does not apply. *Hobbs*, 974 So. 2d at 1122 (holding *ejusdem generis* inapplicable).[6] Beyond that, Defendants' reading of the statute as applying only to parties "engaged in the business of insurance" ignores that the statute expressly applies to parties "<u>involved in a transaction relating to the conduct of affairs</u>" of an insurance business, like Defendants. If the statute applies *only* to parties "engaged in the business of insurance"—a category expressly identified in the statute— then the statute's reference to other parties "involved in transactions relating to the conduct of affairs of such a business" adds nothing, and such a "construction which would leave without effect any part of the language used should be rejected." *Leroy*, 977 So. 2d at 652.

Defendants also argue that holding them liable under Section 631.157 would render "superfluous" other provisions of Chapter 631 (Am. Mot. p.22). That is wrong. For example, a supposedly "superfluous" provision that Defendants cite, Section 631.261, permits the Department to avoid transfers made to a creditor or an insider within specified timeframes from the insurer's liquidation date. Section 631.157, by contrast, applies irrespective of when the transfer was made and irrespective of the defendant's identity, so long as the defendant received the transfer because they were "involved in a transaction relating to the conduct of affairs" of an

---

[6] *See also Ergas v. Universal Prop. & Cas. Ins. Co.*, 114 So. 3d 286, 290 (Fla. 4th DCA 2013) (*ejusdem generis* inapplicable when "there are no general terms or general words" to interpret); *Beach Towing Servs., Inc. v. Sunset Land Assocs.*, 2019 WL 4047627, at *4 (Fla. 3d DCA Aug. 28, 2019) ("*ejusdem generis* canon does not apply … because here there is no 'catchall' phrase at the end of the list") (citing A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 31, at 199 (2012)). Relatedly, Defendants cite the "canon of *noscitur a sociis*, which means … words that are grouped in a list should be given related meanings … for example, if a phrase reads 'tacks, staples, nails, brads, screws, and fasteners,' it is clear from the words with which they are associated that the word <u>nails</u> does not denote fingernails and that <u>staples</u> does not mean reliable and customary food items." *Beach Towing*, 2019 WL 4047627, at *3 (citing *Reading Law* § 31, at 95-96). As with *ejusdem generis,* even a cursory reading of Section 631.157 makes plain that this maxim has no application to Section 631.157, because there are no words "grouped in a list" to which the maxim could apply.

insurance business. Thus, Section 631.157 complements the other provisions of Chapter 631, which work in conjunction to cast a broad net and "maximize recovery of assets for the benefit of the insurer's estate," precisely as the Florida legislature intended. Fla. Stat. § 631.001(3).[7]

Next, Defendants argue that relief under Section 631.157 is unavailable because Section 679.625, Florida Statutes, provides for certain relief against secured creditors who violate Article 9 of the Florida Uniform Commercial Code; so, Defendants' argument goes, applying Section 631.157 "would improperly expand the Receiver's remedies outside of the relief already provided by the Legislature." (Am. Mot. p.24). This argument yet again recasts this case as one involving a mere commercial dispute between lender and borrower (in which Chapter 679 of the Florida Statutes might apply), rather than an action seeking to vindicate the vital state interest in enforcing the insurance laws that Defendants schemed to cheat (in which Chapter 631 clearly does apply). Moreover, this argument is virtually cut-and-paste from an argument that this Court rejected when Defendants moved to dismiss the initial Complaint. There, Defendants argued for dismissal of the Department's Chapter 726 claims because similar relief is available under certain provisions of Chapter 631. This Court correctly rejected that argument:

> Although Chapter 631 does not expressly authorize the Receiver to bring a claim under Chapter 726, Chapter 631 does not expressly exclude the Receiver from pursuing such claims either; rather, Chapter 631, which is to be liberally construed, permits the Receiver to "assert all rights" to "maximize recovery of assets."

Mem. Order p.10 (citing Fla. Stat. §§ 631.001, 631.141). Likewise, no authority anywhere supports Defendants' argument that relief under Section 631.157 is unavailable merely because relief might also be available under a different statute. Defendants' attempts to artificially restrict the relief available to the Department in this case ignores that Chapter 631 "is to be liberally

---

[7] To borrow Defendants' example, Section 631.261 would permit recovery from "last week's lunch caterer," while Section 631.157 targets those, such as Defendants here, that entered into a transaction "relating to the conduct of affairs" of an insurance business.

construed [and] permits the Receiver to 'assert all rights' to 'maximize recover of assets.'"
(Mem. Order p.10).

### (iii) Arguments about Defendants' intent and the Department's damages raise fact-bound issues that cannot be resolved at the pleading stage.

Defendants argue that they did not "willfully obtain or use" PUP's property within the meaning of Section 631.157(1) because the "banks did not take, but instead received payments to which it [sic] was entitled under the Leases and which PUP willfully made," and "PUP's inferior interest in the collateral was simply extinguished in favor of PacWest's superior interest" when Defendants' swept $30 million from PUP's restricted accounts on the eve of the receivership. (Am. Mot. p.26). Defendants also argue without citation to any authority that Section 631.157(1) requires proof of criminal intent to take property "inconsistent with ownership," *i.e.*, civil theft.

Yet again, these arguments pretend that this case involves a commercial dispute between a borrower and secured lender, ignoring the nature of this case along with the express language of Section 631.157(1). That PUP voluntarily made so-called "lease" payments to Defendants does not preclude liability because Section 631.157(1) broadly targets anyone who willfully "exercise control over" an insurer's property, not just someone who "takes" an insurer's property. *See* Fla. Stat. § 812.012(3)(a) (incorporated by reference into Fla. Stat. § 631.157(1)).

As to Defendants' "inconsistent with ownership" argument, when the Florida legislature intends to require criminal intent to impose civil liability, it says so: the civil theft statute is titled "Civil remedy <u>for theft or exploitation</u>" and expressly requires proof "by clear and convincing evidence" of an injury caused by the modes of "theft" codified by statute (Fla. §§ Stat. 812.014-812.037, 825.103). *See* Fla. Stat. § 772.11 (emphasis added). By contrast, Section 631.157(1) is titled "Civil action by the receiver" without reference to theft or criminal conduct. Further, unlike Section 772.11, "clear and convincing" proof is not required, and none of the statutory forms of

15

theft incorporated into Section 772.11 are mentioned anywhere in Section 631.157(1). These distinctions support that criminal conduct is not required to establish liability under Section 631.157; only "willful" conduct needs to be shown, precisely as the statute says.[8]

Finally with respect to Section 631.157, Defendants argue that "even if § 631.157(1) provides for an action against the Banks, applicable damages are zero." (Am. Mot. p.27). "But the amount of damages is not at issue at the motion to dismiss stage of the proceedings," so a complaint is "not subject to dismissal with prejudice on grounds that no damages can be shown." *Salcedo v. Wells Fargo Bank, N.A.*, 223 So. 3d 1099, 1105 (Fla. 3d DCA 2017) (citing *Shands Teaching Hosp. v. Beech St. Corp.*, 899 So.2d 1222, 1229 (Fla. 1st DCA 2005)); *Nottage v. Am. Exp. Co.*, 452 So. 2d 1066, 1068 (Fla. 3d DCA 1984) (whether "plaintiff is unable to show legal damages" is "in the nature of [a] defense" and cannot be resolved on motion to dismiss); *Cooper v. IBI Sec. Serv. of Fla., Inc.*, 281 So. 2d 524, 526 n.1 (Fla. 3d DCA 1973) ("Where a complaint states facts upon which relief can be granted, it is not vulnerable to a motion to dismiss for insufficiency" as to damages).[9]

In sum, the plain language of Section 631.157 applies to the facts of this case to produce a result perfectly consistent with the statute's express legislative purpose. Defendants' attempt to

---

[8] Willful means "'intentional', that is, 'on purpose[.]'" *Jackson v. Edwards*, 197 So. 833, 835 (Fla. 1940). Defendants' state of mind is, of course, a matter that cannot be resolved on a motion to dismiss. *See, e.g.*, 55 Fla. Jur 2d Trial § 147 ("The intent or motive of a person, when material, is ordinarily a question of fact to be determined by the jury from the evidence adduced upon that issue"); *Baggett v. Clark*, 161 So. 3d 491, 493 (Fla. 5th DCA 2014) (issue of fact as to intent precluded summary judgment); *Webb v. Blancett*, 473 So. 2d 1376, 1378 (Fla. 5th DCA 1985) ("when the issue of mental intent is involved in a legal action, it is up to the trier of fact to determine whether the words or conduct of a party demonstrates the requisite intent").

[9] *Cf. Nicholas v. Miami Burglar Alarm Co.*, 266 So. 2d 64, 66 (Fla. 3d DCA 1972) ("Where the allegations of a complaint show the invasion of a legal right, the plaintiff may recover at least nominal damages, and a motion to dismiss by the defendant should be denied.").

hide from the language and purpose of the statute behind inapplicable legislative analyses and misapplications of statutory construction maxims should be rejected.

### B. The Court correctly rejected in the Memorandum Order Defendants' fact-intensive "reasonably equivalent value" argument.

Defendants seek dismissal of the Department's claims under Section 726.105(1)(b), Florida Statutes (Counts II, IV, IX), which seek to recover transfers PUP made to Defendants in connection with the PacWest transactions as "constructive" fraudulent transfers, *i.e.*, transfers for which PUP did not receive "reasonably equivalent value" in exchange. Defendants argue that PUP did, in fact, receive reasonably equivalent value in connection with the transactions—contradicting the Amended Complaint's allegations—but this Court previously rejected the exact same arguments when Defendants moved to dismiss the same constructive fraudulent transfer claims in the initial Complaint. In the Memorandum Order, the Court correctly ruled that the Department "sufficiently alleged that PUP did not receive reasonably equivalent value in exchange for the transfers" and that the Defendants' arguments concerning value would require the Court to "determine fact issues," which cannot be done on a motion to dismiss (Mem. Order p.8). Nothing has changed since the Court last rejected Defendants' arguments concerning reasonably equivalent value, which continue to present fact-sensitive issues that cannot be resolved at the pleading stage: it "has long been established that whether fair consideration has been given for a transfer is largely a question of fact[.]" *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012) (analyzing fraudulent transfer claim); *see also Welch v. Synovus Bank*, 517 B.R. 269, 283 (M.D. Fla. 2014) (whether bank failed to exchange reasonably equivalent value for the relevant transfers constitutes an issue to be resolved after the close of discovery).

Defendants' "reasonably equivalent value" arguments, like their Section 631.157 arguments, yet again are based on the incorrect premise that Defendants were ordinary creditors

in a ho-hum secured transaction, and not engaged in purely paper transactions intended to dupe Florida insurance regulators and artificially inflate PUP's financial condition. This is not a case like those cited by Defendants involving a lender that actually funded a loan to a debtor and then received payments on a legitimate, secured debt (Am. Mot. pp.9-10). Rather, PUP was paying Defendants to place money into an account that PUP could not possibly hope to use to fulfill policyholder obligations; the money was only "available" to pad PUP's financial statements. The Department is asserting—and this Court has said that the Department states—a claim to deem these transactions <u>void</u> as against public policy. The Court cannot decide on a motion to dismiss that PUP received reasonably equivalent value when it paid for transactions that are void for violating vital state policy—if this issue can be decided as a matter of law, it should be decided <u>against</u> Defendants. *Cf. In re Capitol Invests., Inc.*, 473 B.R. 838 (Bankr. S.D. Fla. 2012) (payments made to satisfy unenforceable debt not "reasonably equivalent value" as a matter of law). Similarly, the Department is asserting, and Defendants have not moved to dismiss, claims under Section 726.105(1)(a) and Chapter 631 to avoid any security interest or other obligations that PUP incurred in connection with the sham transactions.[10] In light of these pending claims, the Court cannot accept Defendants' characterization that millions of dollars that PUP transferred to Defendants simply were "payments … to the Banks as secured creditors." (Am. Mot. p.10). Likewise, the Court cannot accept as true Defendants' naked proclamation that PUP received reasonably equivalent value when Defendants got $30 million from PUP's accounts (as well as

---

[10] Defendants argue throughout the Motion that to challenge a security interest, the Department must show that Defendants' security was "inadequate." That makes no sense and is wrong. The cases cited by Defendants deal with the situation where a debtor makes a payment to an undersecured creditor (i.e., "inadequately" secured creditor). In that context, as opposed to a case involving a fully-secured creditor, payments can be avoided because the undersecured portion of the debt is unsecured. That concept has no application here, where the Department is challenging the liens themselves (not just payments made to a secured creditor) under Chapter 631, Section 726.105(1)(a), and as against public policy.

18

the purported lease payments) and PUP got the same stale, non-admitted receivables that, in reality, PUP had all along. In sum, Defendants' "value" arguments are detached from the reality of what occurred and what is alleged in the Amended Complaint, and should be rejected.

**C. The Court correctly rejected in the Memorandum Order Defendants' argument that the Department lacks standing to assert Chapter 726 claims.**

Defendants challenge the Department's standing to assert Chapter 726 claims, arguing that the Department needs to identify a specific creditor in whose shoes the receiver stands to assert Chapter 726 claims (Am. Mot. p.13). But the Department's standing was thoroughly briefed when Defendants first raised this argument in connection with the initial Complaint, and this Court already decided the issue in the Department's favor (*see* Mem. Order pp.9-14).

Like the last time Defendants made this argument, Defendants' redux standing argument is based solely on non-Chapter 631 law, namely *Newman v. William L. Gunlicks Irrevocable Trust*, 897 F. Supp. 2d 1270 (M.D. Fla. 2012), which involved a federal receiver appointed in an SEC enforcement action. Unlike the federal receiver in *Newman*, though, the Department in a Chapter 631 receivership enjoys an express grant of statutory authority to "assert all rights belonging to third parties, including, but not limited to, policyholders, creditors and other claimants." Fla. Stat. § 631.141(8) (emphasis added). The Department does not need to specifically identify a "prejudiced creditor" to state a claim to recover avoidable transfers. *See Dep't of Ins. v. Blackburn*, 633 So. 2d 521, 524 (Fla. 2d DCA 1994) (reversing trial court's dismissal of avoidance claims that sought recovery "without establishing or identifying a prejudiced creditor," finding this unnecessary to withstand a motion to dismiss).

Even assuming arguendo that Defendants' arguments were correct, at most, the failure to identify a specific creditor might support a dismissal <u>without</u> prejudice and leave to identify a

triggering creditor.[11] *Id.* That was the result in *Newman*, the sole case cited by Defendants. *See Newman*, 897 F. Supp. 2d at 1277 (dismissing with leave to amend). Dismissal even without prejudice, though, would elevate form over substance in this case. PUP's extensive creditor body is the subject of claim reports publicly-filed in PUP's receivership case, of which this Court may take judicial notice. *See* Fla. Stat. § 90.202 (permitting judicial notice of state court records); *cf. In re Bolon*, 538 B.R. 391, 407 (Bankr. S.D. Ohio 2015) ("The Court may take judicial notice of claims filed in the bankruptcy in order to identify a triggering creditor" into whose shoes the trustee could step to assert fraudulent transfer claims). Defendants are well aware of these filings as they have in discovery in this case been provided the claims reports as well as many of the underlying documents submitted by PUP's creditors in support of the claims against PUP's receivership estate. In short, Defendants' "no creditor, no standing" argument is a form-over-substance time-waster that should be rejected.

### D. The Court correctly rejected in the Memorandum Order Defendants' fact-intensive arguments as to the aiding and abetting claims.

Finally, Defendants argue that the Receiver has not sufficiently alleged an aiding and abetting claim. This Court emphatically rejected this exact same argument when Defendants last made it, ruling that the Department "sufficiently alleged ultimate facts that Defendants encouraged, actively participated in, rendered substantial assistance to and had actual knowledge or constructive knowledge and a general awareness of the fiduciary breaches and that PUP's officers breached their fiduciary duties to withstand a motion to dismiss." (Mem. Order p.16, collecting case law). Despite that ruling, Defendants take the exact tact they took last time they lost this issue, namely, focusing on isolated paragraphs within the aiding and abetting count

---

[11] Defendants assert that the Department must identify "each and every creditor on whose behalf it asserts a claim and … each and every claim held by those creditors," but there is no authority anywhere for that argument, *i.e.*, that "every" creditor as opposed to one creditor must be named.

(Count 14) and completely ignoring the 70 paragraphs of factual allegations that are incorporated into the count (as well as Exhibit A to the Amended Complaint). Those allegations of ultimate fact establish that Defendants engineered and promoted *Convertalease* specifically to cheat PUP's regulatory obligations to the State of Florida, and received substantial payments from PUP in exchange for that "service" before bailing out of the arrangement—taking with them the $30 million that Defendants had told PUP's executives to falsely disclose as admitted assets on its statutory financial disclosure (in addition to the purported lease payments).

Defendants also ignore, and would have this Court ignore, the Receiver's detailed allegations of ultimate fact describing the underlying breaches of fiduciary duty committed by PUP officers Imtiaz Sattaur (PUP's President and CEO) and Aaron Henry, as well as the allegations explaining how Defendants knowingly lent substantial assistance to those breaches. ¶¶146-167. Those allegations explain that Sattaur and Henry caused PUP to engage in the subject transactions out of concern for their own selfish interests: to keep PUP alive and grow the company long past the point when it should have ceased operating so they could continue receiving large salaries and bonuses and remain eligible for highly-lucrative incentives. ¶¶146-161. Defendants aided and abetted Sattaur and Henry (and others) by helping conceal PUP's true financial condition, thus permitting PUP to circumvent regulatory requirements and operate beyond the point that it should have. ¶161. And, the Department alleges that Defendants solicited PUP to engage in the transactions even though Defendants knew that the entire arrangement was an improper scheme to circumvent Florida's insurance regulations, including SSAP 84, which the Defendants actually knew was of specific concern to OIR in relation to PUP. ¶¶44, 165-166. These allegations unquestionably state a claim for aiding and abetting breach of fiduciary duty. The allegations, if proven, will support a finding that Sattaur, Henry, and others breached their

fiduciary duties to PUP. Indeed, Defendants not only knew it—they solicited, initiated, encouraged, and profited from it from start to disastrous finish.

In sum, the well-pled allegations of the Complaint show that Defendants (1) knew that PUP was required by Florida law to disclose past-due receivables as non-admitted assets because OIR had specifically said so; and (2) solicited and encouraged PUP's executives to engage in transactions that PacWest specifically designed to circumvent that very requirement. These allegations are sufficient to state an aiding and abetting claim.

## CONCLUSION

This is not a case involving an ordinary secured creditor or other party to a legitimate transaction with an insurance company. Rather, this case involves Defendants that specifically sought to engage in and profit from transactions designed to conceal PUP's financial condition from Florida regulators, circumventing critical components of a regulator scheme that is of "vital public interest" to the State of Florida. These facts make this case unlike any of the authority cited in Defendants' Amended Motion to Dismiss, which is why this Court already rejected Defendants' arguments in its well-reasoned Memorandum Order. The Court should reach the same conclusion again, deny the Motion, and order Defendants to answer the Amended Complaint without further delay.

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a true and correct copy of the foregoing Response was electronically filed with the Clerk of Court and E-mailed to counsel of record listed below via the Florida E-Portal system this 15th day of October, 2019.

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Plaintiff
100 S.E. 2nd Street, Suite 4400
Miami, FL 33131
Tel.: 305-349-2330 / Fax: 305-349-2310

By:___s/ Peter W. Bellas_____
Peter W. Bellas (FBN 611387)
pbellas@gjb-law.com
Michael Friedman (FBN 0071828)
mfriedman@gjb-law.com
John H. Genovese (FBN 280852)
jgenovese@gjb-law.com

-AND-

Miriam O. Victorian, Chief Attorney
FLORIDA DEPARTMENT OF FINANCIAL
   SERVICES
Division of Rehabilitation & Liquidation
2020 Capital Circle, S.E., Suite 310
Tallahassee, FL 32301
Tel: (850) 413-4408
Miriam.Victorian@myfloridacfo.com

Yami Benitez-Torviso, Senior Attorney
FLORIDA DEPARTMENT OF FINANCIAL
   SERVICES
Division of Rehabilitation & Liquidation
8240 N.W. 52nd Terrace, Suite 102
Miami, FL 33166
Tel: (786) 336-1382
Yami.Benitez-Torviso@myfloridacfo.com

Suzanne Gilbert, Esq.; Suzanne.gilbert@hklaw.com; dawn.spurlock@hklaw.com
Robert Davis, Jr., Esq.; Robert.davis@hklaw.com; Linda.young@hklaw.com
Brian McDowell, Esq.; brian.mcdowell@hklaw.com
Kristin Royal, Esq.; Kristin.royal@hklaw.com

23

# EXHIBIT  J

Page 1

```
 1                           IN THE CIRCUIT COURT, NINTH
                             JUDICIAL CIRCUIT, IN AND FOR
 2                           ORANGE COUNTY, FLORIDA
 3                           CASE NO.:  2016-CA-004588-O
 4    FLORIDA DEPARTMENT OF
      FINANCIAL SERVICES, as Receiver
 5    for PHYSICIANS UNITED PLAN,
      INC.,
 6
          Plaintiff,
 7
      vs.
 8
      PACIFIC WESTERN BANK CORPORATION,
 9    a/k/a PACIFIC WESTER BANK,
      CENTRAL BANK OF ST. LOUIS f/k/a
10    FIRST NATIONAL BANK OF ST. LOUIS,
      and MB FINANCIAL BANK, N.A.,
11
          Defendants.
12    _____/
      ZOOM VIDEOTAPED
13    DEPOSITION OF:     SCOTT MICHAEL BOUCHNER
14    DATE:             TUESDAY, MARCH 9, 2021
15    TIME:             10:31 A.M. - 11:31 A.M.
16    PLACE:            VIA ZOOM
17    STENOGRAPHICALLY
      REPORTED BY:       SANDRA NARUP
18                       REGISTERED PROFESSIONAL REPORTER,
                         REALTIME SYSTEMS ADMINISTRATOR &
19                       FLORIDA PROFESSIONAL REPORTER
20
21
22
23
24
25
```

Page 2

```
 1   A P P E A R A N C E S:
 2   PETER W. BELLAS, ESQUIRE, (VIA ZOOM)
     JOHN H. GENOVESE, (VIA ZOOM)
 3   OF: Genovese, Joblove & Battista, P.A.
         100 SE 2nd Street
 4       Floor 44
         Miami, Florida 33131
 5       305-349-2330, FAX-305-349-2310
         Pbellas@gjb-law.com
 6       Jgenovese@gjb-law.com
         APPEARING ON BEHALF OF FLORIDA DEPARTMENT OF
 7       FINANCIAL SERVICES AS RECEIVER FOR PHYSICIANS
         UNITED PLAN, INC.
 8
     MICHAEL A. FRIEDMAN, ESQUIRE, (VIA ZOOM)
 9   OF: Genovese, Joblove & Battista, P.A.
         100 N. Tampa Street
10       Suite 2600
         Tampa, Florida 33602
11       813-439-3100, FAX-305-349-2310
         Mfriedman@gjb-law.com
12       APPEARING ON BEHALF OF FLORIDA DEPARTMENT OF
         FINANCIAL SERVICES AS RECEIVER FOR PHYSICIANS
13       UNITED PLAN, INC.
14   DAVID L. HALLER, ESQUIRE, (VIA ZOOM)
     OF: Holland & Knight LLP
15       800 17th Street N.W.
         Washington, District of Columbia 20006
16       202-469-5430, FAX-202-955-5564
         David.haller@hklaw.com
17
     AND
18
     BRIAN A. MCDOWELL, ESQUIRE, (VIA ZOOM)
19   SUZANNE E. GILBERT, ESQUIRE, (VIA ZOOM)
     OF: Holland & Knight, LLP
20       200 South Orange Avenue
         Suite 2600
21       Orlando, Florida 32801
         407-425-8500, FAX-407-244-5288
22       Brian.mcdowell@hklaw.com
         Suzanne.gilbert@hklaw.com
23       APPEARING ON BEHALF OF PACWEST
24
25
```

Page 3

1   MIRIAM O. VICTORIAN, ESQUIRE
    OF: Department of Financial Services
2       325 John Knox Road
        Suite 101
3       Tallahassee, Florida 32303-4113
        850-413-4408
4       Miriam.victorian@myfloridacfo.com
        APPEARING ON BEHALF OF DEPARTMENT OF FINANCIAL
5       SERVICES
6   ALSO PRESENT:
7   MATT FERNANDEZ, VIDEOGRAPHER, (VIA ZOOM)
    JEFF GODDARD, PACWEST REPRESENTATIVE, (VIA ZOOM)
8   CJ BLAGG, ESQUIRE, PACIFIC WESTERN BANK, (VIA ZOOM)
    MARY JEAN KUNTZ, (VIA ZOOM)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                        I N D E X

2

3    TESTIMONY OF SCOTT MICHAEL BOUCHNER, CORPORATE

4    REPRESENTATIVE

5        DIRECT EXAMINATION BY MR. MCDOWELL              6

6        CROSS-EXAMINATION BY MR. BELLAS               33

7    CERTIFICATE OF OATH                               39

8    CERTIFICATE OF DEPOSITION TRANSCRIPT              40

9    ERRATA SHEET                                      41

10   NOTIFICATION LETTER                               42

11

12                    INDEX OF EXHIBITS

13   PLAINTIFF'S EXHIBITS

14   EXHIBIT 780    FILED CLAIMS DETAIL                14

15

16

17                      ------

18              S T I P U L A T I O N S

19       It is hereby stipulated and agreed by and between

20   the counsel for the respective parties and the deponent

21   that the reading and signing of the deposition

22   transcript be reserved.

23                      ------

24

25

1                    P R O C E E D I N G S

2                         *********

3          THE VIDEOGRAPHER:  Today is March 9th, 2021.

4     This will be the videotaped deposition, taken via

5     Zoom, of Scott Bouchner as the corporate

6     representative for the Florida Department of

7     Financial Services.

8          This deposition is taking place in the matter

9     of the Florida Department of Financial Services, as

10    the receiver for Physicians United Plan,

11    Incorporated, versus Pacific Western Bank, Central

12    Bank of St. Louis and MB Financial Bank, NA.  Case

13    number is 2016-CA-4588-O.

14         The time is approximately 10:31 a.m.

15         We are on the record, and our witness may be

16    sworn.

17         THE CERTIFIED STENOGRAPHER:  Great.  The

18    attorneys participating in this deposition

19    acknowledge that I, the certified stenographer, am

20    not present with the witness and that I will be

21    reporting the proceedings and administering the oath

22    remotely.  This arrangement is pursuant to the

23    Florida Supreme Court Administrative Order

24    No. AOSC-20-16 (and extended by AOSC-20-32).  The

25    parties and their counsel consent to this

1    arrangement and waive any objections to this manner

2    of reporting.

3        Please indicate your agreement by stating your

4    name and your agreement on the record.

5        MR. BELLAS:  On behalf of the department, we

6    agree.

7        MR. MCDOWELL:  This is Brian McDowell for the

8    bank defendants.  We agree.

9        THE CERTIFIED STENOGRAPHER:  Great.

10       And, Mr. Bouchner, do you solemnly swear or

11   affirm the testimony you're about to give in this

12   cause will be the truth, the whole truth and nothing

13   but the truth, so help you?

14       THE WITNESS:  Yes, I do.

15       THE CERTIFIED STENOGRAPHER:  Thank you.

16   THEREUPON

17                   SCOTT MICHAEL BOUCHNER

18   Was called as a witness and, having first been duly

19   sworn, testified as follows:

20                   DIRECT EXAMINATION

21   BY MR. MCDOWELL:

22     Q.   Good morning, Mr. Bouchner.  Good to see you

23   again.

24     A.   Good morning, Mr. McDowell.

25     Q.   You have been deposed before in this case.  Is

```
1    that correct?
2        A.   That is correct.
3        Q.   I'm going to try not to repeat myself from the
4    prior deposition.  And if there's -- if you feel like I
5    am, would you point it out and tell me or let me know
6    that I'm covering ground that we don't need to re-cover?
7        A.   I will.
8        Q.   Okay.  Please state your full name.
9        A.   Scott Michael Bouchner.
10       Q.   How are you presently employed?
11       A.   I am a director at Berkowitz, Pollack and
12   Brant.
13       Q.   We went through your background in more detail
14   in your earlier deposition.
15            Are there any changes or additions you'd like
16   to make to your background from your prior deposition?
17       A.   No, nothing in the last few months.
18       Q.   Okay.  You have been offered up today as a
19   corporate representative of Department of Financial
20   Services.  Is that right?
21       A.   That's correct.
22       Q.   How did that come to pass?
23       A.   I received a call from counsel asking if I can
24   serve in that capacity with respect to the issues that
25   were identified at the time.
```

1    Q.   And what were you asked to do as corporate

2    representative?

3    A.    There was a notice of -- a notice sent to me

4    that identified certain topics under the category of

5    damages and some that may overlap under the category of

6    claims, and I was asked if I would be able to provide

7    testimony with respect to how those topics would have

8    been considered as part of my damage calculations, to

9    the extent that they were not already asked in my prior

10   deposition.

11   Q.    Identify, please, which topics or subjects you

12   are here as a corporate representative on.

13        MR. BELLAS:  Object to the form of the

14        question.  And this is a matter of agreement between

15        the parties, as -- as set forth in communications

16        between Mike Friedman and your folks.

17        MR. MCDOWELL:  Fair enough.  I need to make a

18        record of it, though.

19        MR. BELLAS:  I'm sorry?

20        MR. MCDOWELL:  I need to make a record, Peter.

21        MR. BELLAS:  Yeah, I'm just -- I'm just saying,

22        you know, there are communications that we don't --

23        if you want to rehash the whole thing, there were

24        communications that I wasn't a part of, that Mike

25        was part of with you and Dave.

Page 9

```
 1            MR. MCDOWELL:  Well, let me --
 2            MR. BELLAS:  There was an agreement --
 3            MR. MCDOWELL:  Excuse me.  Let me interrupt you
 4       just a second, Peter.
 5            Is the witness able to answer that question?
 6            MR. BELLAS:  Well, I mean, I presume so.  But
 7       what I'm saying is that -- is that, for example, you
 8       guys added some things that he wasn't asked to
 9       testify about.  And then there was a subject --
10       there were communications again with Mike and David
11       Haller, and I think that was all resolved, but --
12            MR. MCDOWELL:  Okay.  And that's fine.  I --
13            MR. BELLAS:  -- to the extent -- I just want to
14       incorporate those discussions and agreements as to
15       what is what.
16  BY MR. MCDOWELL:
17       Q.   Okay.  So I'll ask the question again subject
18  to recognition that, yes, there's been discussions about
19  this.
20            Mr. Bouchner, what subjects or topics are you
21  here as a corporate representative on?
22       A.   So I was specifically addressing two areas in
23  the area of damages.  If it's okay, I'm looking at the
24  notice.
25       Q.   Yeah.  Yeah, please tell me.
```

Page 10

1       A.    Yeah.   So I'm looking at Schedule A, Topics for

2   Examination, on my computer on Defendant's Amended

3   Notice of Taking Videotaped Deposition.

4       Q.    Okay.

5       A.    And when I was asked to serve in this capacity,

6   I believe Topics A and B were the two areas under

7   damages that I was specifically asked to testify.

8       Q.    Okay.

9       A.    The receiver -- should I read them, or is that

10  sufficient?

11      Q.    Yeah, if you would -- if you would, please.

12      A.    A was, the receiver's damages model and all

13  information used to generate any of the receiver's

14  estimated damages or the amounts of any alleged

15  avoidable transfers.

16      Q.    Okay.

17      A.    Topic B was, all information relating to when

18  PUP was and was not insolvent from the time of PUP's

19  formation -- sorry -- until the commencement of the

20  receivership.  And then -- yeah, and then there may be

21  some overlap under the claims against the estate, to the

22  extent that certain claims information were incorporated

23  within the damages that I had previously testified to.

24      Q.    Okay.  And can you identify on the notice which

25  categories you're referring to with respect to the

Page 11

1  overlap?

2         MR. BELLAS:  Object to the form of the

3     question.

4         THE WITNESS:  Well, the identity of the

5     claimants for any claims asserted against PUP since

6     the commencement of the receivership, I believe it

7     incorporated within --

8  BY MR. MCDOWELL:

9     Q.   Go ahead.  I'm sorry.

10    A.   Okay.  I'm sorry.  I got some feedback.

11         A would have been an issue that would have been

12  incorporated in the document that I believe was just

13  sent and that I can speak to.

14    Q.   Any others?

15    A.   I'm just reviewing this one more time.

16         So the claims against PUP, Item C, upon which

17  the receiver is relying to pursue any of the receiver's

18  currently pending litigation.

19    Q.   That's damages, Category C.  Right?

20    A.   No.  I'm looking at claims against the estate.

21         MR. BELLAS:  1C.

22         THE WITNESS:  1C.  There may be some overlap.

23  BY MR. MCDOWELL:

24    Q.   All right.

25    A.   I believe that there is -- Ms. Kuntz is going

Page 12

1    to be discussing claims more specifically.  But to the

2    extent that they have to do with damages, they -- that

3    would be part of my testimony.

4        Q.   Okay.  So what steps did you take to prepare

5    yourself to give the testimony you're here to give

6    today?

7        A.   I reviewed documentation that was provided in

8    connection with the damages that were calculated that I

9    testified to previously.  And I believe that much of

10   what may be covered today could have already been

11   covered.  But since I'm not asking the questions, if

12   there are additional questions that would be relevant to

13   these areas that were not asked, I'm here to respond to

14   those.

15       But in answer to your question, I reviewed my

16   work papers, I reviewed documents that were considered

17   as part of the damage calculation previously.

18       Q.   Okay.  And did you review any documents that

19   you had not previously reviewed in connection with your

20   expert testimony?

21       A.   I really relied on a document that was -- that

22   preceded the date of my deposition.  I did see an

23   updated version of that document that had minimal

24   changes to it.  It was the claims filed report that I

25   believe you were sent.

Page 13

1      Q.    Okay.

2      A.    And that really would have been it.  There were

3   no additional documents.  It would have been reviewing

4   documents that I had previously been aware of.

5      Q.    Okay.  So would it be fair to conclude that any

6   new evaluation you've made is limited to this claims

7   report?

8      A.    And I would say yes if that were the case.  But

9   the differences were very, very minor.  There were

10  claims that were being submitted to the Court that at

11  the time were identified as to be submitted, and now

12  they were submitted, but they were still in the numbers.

13  So it really didn't have any material change on anything

14  that --

15     Q.    So other than the timing of the claims report,

16  did you consider any new information from your earlier

17  expert testimony?

18     A.    No, I did not.

19     Q.    Okay.  So if I were to examine you on all the

20  other documents that we talked about in your deposition,

21  would that be completely repetitive of your expert

22  testimony?

23     A.    I believe it would be.

24     Q.    Okay.  I appreciate that, because I am trying

25  to save the collective time here.

1          So in connection with the claims report, did

2    you speak to anyone about it?

3         A.   Yes.  This would have been prior to the

4    drafting of my report.  I had received a document that

5    identified all of the claims and just basically

6    looked -- looked through it and understood what it was.

7         Q.   Okay.

8              MR. MCDOWELL:  So -- so that we have an ease of

9         reference, David, if we can show Mr. Bouchner the

10        report and have Sandy mark it as the next exhibit,

11        that would probably expedite things.

12   BY MR. MCDOWELL:

13        Q.   I'll show you what's marked as --

14             MR. MCDOWELL:  Sandy, I have no idea.

15             THE CERTIFIED STENOGRAPHER:  The next one is

16        780.

17   (Exhibit No. 780 was marked for identification.)

18   BY MR. MCDOWELL:

19        Q.   I'll show you what we've marked as Exhibit 780

20   and ask you if you can identify this document.

21        A.   Yes.  This is the updated version of the filed

22   claims report that I had seen in a slightly earlier

23   version at the time I wrote my report.

24        Q.   Okay.  Did you review 780 or the document

25   that's prior in time?

Page 15

1    A.   I have since reviewed the document that's in

2    front of me right now, 780.  And I have also reviewed a

3    version that was nearly identical with -- I believe you

4    see in Column L, there are some 6s there which identify

5    that it was -- these items were filed as part of this

6    interim claims report.

7    Q.   Okay.

8    A.   And the earlier version, those same were there

9    as to be filed rather than having a 6 there.  But that

10   was one of the few differences in the report.

11   Q.   Okay.  And who sent this document to you?

12   A.   I would have received it from counsel.

13   Q.   Okay.  Who prepared this document?

14   A.   I believe that this is a document that's

15   maintained by the department.  I don't know the specific

16   individual at the department, but it's -- I think it's

17   an evolving document that has existed over the entire

18   claims process.

19   Q.   Do you know how this document was prepared?

20   A.   I know generally that the items that are in

21   Columns A through H are prepared based on submitting

22   claims.  And as those claims were resolved, the

23   additional columns to the right of Column H would be

24   updated based on what was approved or what was reserved

25   against or what the claims report it was filed under

1   were or there's some additional comments at the very --

2   at the very right.

3          So it was prepared by a third-party

4   administrator, at least with the input of a third-party

5   administrator who would have been administering the

6   claims.

7      Q.   What third-party administrator are you

8   referring to?

9      A.   I don't recall the name.

10     Q.   Okay.

11     A.   It may have been in three --

12          MR. BELLAS:  Brian, if I may interject.  This

13      is probably where the overlap would be, and I think

14      the other witness will probably -- I presume the

15      other witness --

16          MR. MCDOWELL:  Okay.

17          MR. BELLAS:  -- will be able to respond to

18      these questions.

19          MR. MCDOWELL:  Okay.  Fair enough.

20          MR. BELLAS:  That's why we -- that's why we

21      made it a point to indicate that there is overlap

22      between these two.

23          MR. MCDOWELL:  Fair enough.

24          THE WITNESS:  I think it's fair to say that I

25      would have taken this and used this as a document

Page 17

1    that was an important part of my report.  But how it

2    all came together I think is clearly outside of what

3    I would be here to testify to.

4  BY MR. MCDOWELL:

5    Q.   All right.  Referring still to Exhibit 780,

6  let's go from Column A to the right.

7       Tell me what each of these columns indicate.

8    A.   Okay.  Column A is just a unique number that

9  was assigned to each claim.

10      I don't know what the suffix pertains to,

11  because it wasn't relevant to what I was using it for.

12      The claimant class, as I'm sure you're aware,

13  is that each claimant is put into a category.  And if

14  you look at the statement of financial affairs that is

15  released by the department every quarter, it groups the

16  claims by category.

17    Q.   Okay.

18    A.   And those categories are identified for each

19  claimant in Column C.

20    Q.   Okay.

21    A.   D, claimant type, I think would be a question

22  better for your next deponent.

23      The individuals are, as implied by the name,

24  the names of the claimants of the case.

25    Q.   All right.

Page 18

```
 1      A.   The claim loss date would be as of the
 2   liquidation date.
 3           The POC date filed is the proof of claim date
 4   filed when --
 5      Q.   Hang on a second.
 6           So you say claim loss date is the petition date
 7   for the receivership?
 8           MR. BELLAS:  Object to the form of the
 9      question.
10           THE WITNESS:  Yeah, if it's okay, I have a copy
11      of this document.  I'd just like to bring it up on
12      my screen separately just so I can --
13   BY MR. MCDOWELL:
14      Q.   Take your time.
15      A.   -- properly examine it.
16      Q.   Sure.
17      A.   Yes, with the exception of two claims, and I'm
18   not sure why those two claims were identified as
19   7-1-2017.  It may be a scrivener's error.
20      Q.   Okay.  We got --
21      A.   -- with the exception of two have the July 1st,
22   2014.
23      Q.   Okay.  And is that -- is that the date the
24   receiver takes the position that the claim loss
25   occurred?
```

1          MR. BELLAS:  Object to the form of the
2      question.
3          THE WITNESS:  I'm not sure that there's any
4      position being taken here.  I think it's just the
5      date that was identified on this document.  But if
6      there is something greater implied by that, it's not
7      something that I would be aware of.
8  BY MR. MCDOWELL:
9      Q.   How did claim loss date factor into your
10  analysis?
11         MR. BELLAS:  Object to the form of the
12     question.
13         THE WITNESS:  As we discussed in my prior
14     deposition, I included the actual claims that have
15     been approved by the Court rather than the
16     liabilities that were identified at the date of the
17     liquidation of the -- of PUP.
18         The liabilities that were on the company's
19     balance sheet were considerably higher, roughly
20     $30 million higher than what was identified in the
21     claims report so far.  So I don't believe that that
22     loss date had any particular relevance to what I was
23     doing other than it was the date that was just used
24     to identify all of the claims.
25  BY MR. MCDOWELL:

Page 20

1      Q.   Okay.  I'm sorry.  Go ahead.  You were at

2  Column G, I think.

3      A.   Yep.

4           The proof of claim date is the date that the

5  proof of claim was filed as part of the claims process.

6      Q.   Okay.

7      A.   The amount claimed was the amount that was

8  actually identified on the proof of claim form.

9           And if we were to scroll down to the bottom of

10  these items, you'd see that there were in excess of

11  $421 million of claims that were initially filed.

12           The amount due claimant is the amount that, as

13  of the date that this report was run, is the amount that

14  is specifically identified as having been owed.  That

15  amount now is $68,382,163.69.

16      Q.   Okay.

17      A.   A very negligible change from what was used in

18  my report.

19      Q.   Who made the determination as to what the

20  claimant was due?

21           MR. BELLAS:  Object to the form of the

22      question.

23           THE WITNESS:  Yeah, I would probably defer to

24      the other deponent on the process --

25  BY MR. MCDOWELL:

Page 21

1    Q.   Okay.

2    A.   -- that was done.  I know there was a

3 third-party administrator and that there was a process

4 that was put in place to review each claim and come up

5 with a determination.  But the specifics with respect to

6 each of the individual claim is beyond my knowledge.

7    Q.   Okay.

8    A.   The DFS statement of affairs as of 12/31/20

9 is -- there are some claims that are identified on the

10 statement of affairs that have not yet been approved as

11 amounts due.  And that difference is approximately $4.6

12 million.

13        And those claims -- and those primarily relate,

14 as you see -- looking at the screen right now, you can

15 see that the Interim Claims Report 6 does not have a

16 corresponding value and amount due claimant because, as

17 of the date of this, they had not been approved, but

18 they have been identified.

19    Q.   Go ahead.  Let's finish looking at the document

20 first.  Go ahead.

21    A.   No.  I'm fine.  I'm good.

22    Q.   I think you were at Column K.

23    A.   Yeah.  There is a claim reserve amount, which,

24 in most cases, is identical to the amount due.  There is

25 a small difference between those two.  I'm not -- the

Page 22

1   actual claim reserve amount is 69,955,610.  So it's
2   approximately $1.5 million more.  But, specifically, I
3   don't have knowledge of that, why that difference exists
4   and what is relevant to the damages that were
5   calculated.
6       Q.   Okay.
7       A.   The -- I'm sorry.  Go ahead.  I keep cutting
8   you off.
9       Q.   No, I'm sorry.  Go ahead.  I just muttered
10  under my breath.  Go ahead.
11      A.   The interim claims report just identifies which
12  claims report it was filed under.
13      Q.   Okay.
14      A.   And if we keep going, the OBG [sic] date filed,
15  there are 32 claims that have an OBJ date filed again.
16  These were issues that came up with certain claims along
17  the way but did not have any relevance to the damage
18  calculation.
19          So I think that would be another question that
20  would be better served with the next deponent.
21      Q.   Fair enough.
22      A.   And the OBG resolution, this was relevant, in
23  that there is a drop-down menu that if the Item P is
24  selected, there are specific claims that I broke out
25  separately on my damage report.  There were four of them

Page 23

1  in the old report.  There are now six of them right in
2  the current version.  But if I were to go to my analysis
3  in my damages report, those four claims were identified
4  as contingent claims that had not yet been approved.
5  And that's where I had gotten that information from,
6  from this column.
7      Q.   Tell me again.  P indicates what?
8      A.   There were four claims that were identified as
9  having been objected to but not actually included in the
10  damages in the claim.
11     Q.   Uh-huh.
12     A.   If you recall, I gave a range, a low to a high,
13  and there were two categories of 12 claims and 4 claims.
14  The 12 claims were the claims that were filed under
15  Interim Claims Report Number 6, and the four claims came
16  from the items that were identified with a P.  Two of
17  those items that are part of the 12 are also part of the
18  P in this new report.
19          But we're still dealing with a total of 16
20  claims that resulted in the low-to-high range that I
21  gave and talked about in my last deposition.
22     Q.   Okay.  And so tell me what dollar amount of
23  claims you used in determining damages.
24     A.   So for purposes of what I was looking at, it
25  would have basically been -- I'd have to pull my report,

Page 24

1   which I do have.  So I'm going to take a look at that

2   now.

3           So the claims that -- on the low end were

4   $68,410,081.  There was one claim that changed slightly

5   that was a couple hundred dollars from then to now.  So

6   there's really no material difference in the low claims.

7       Q.   Okay.

8       A.   The high claims also include those 16 items

9   that I was just alluding to.  And that would have

10  resulted in $74,911,954 on the high side.

11      Q.   And how would I find that number on

12  Exhibit 780?

13      A.   Bear with me one minute, please.

14          So you would need to go to the very bottom of

15  Column I.

16          MR. MCDOWELL:  David, can you move this to the

17      bottom of Column I, please?

18          Okay.

19          THE WITNESS:  Okay.  And do you see the first

20      piece is the 68,382 --

21  BY MR. MCDOWELL:

22      Q.   Right.

23      A.   -- 163?

24          Now, if you hit control home, go back up to the

25  top and you click on Column L, there's a drop-down.  And

Page 25

1   if you deselect all so it's all blank and then click on

2   6, you will see 12 claims.

3       Q.   Okay.

4       A.   4,584,189.

5       Q.   Okay.

6       A.   Now, if you go back to up to Column L and now

7   say select all and then now then go to the OBJ

8   resolution in Column N and you deselect all and hit the

9   Column P, or the Item P, you'll see 6 items there.  The

10  2 that are in red actually overlap with the 12 that we

11  were just looking at that were filed with Claim 6.

12      Q.   Okay.

13      A.   And if you take the amount claimed in Lines 28,

14  32, 33 and 35, those would be the 4 additional claims

15  that make up the other 6 -- the other remaining 4 of the

16  16.

17      Q.   Okay.

18      A.   Only $3,141.16 is already included.  So it

19  would be those 4 claims at the bottom less the 3,141.16,

20  which was already included.

21      Q.   Okay.

22      A.   So if you take these three pieces and add them

23  together, you would get essentially the high end of my

24  range with a difference of a couple hundred dollars

25  because of some interest that was accrued on the secured

1  claim.

2      Q.    Okay.  So that sets the low and high that you

3  testified about in your prior deposition.  Right?

4      A.    Yes.

5            I do need to make one correction.

6      Q.    Okay.  Go ahead.

7      A.    The secured claim is not on here.  It's

8  20-some-odd thousand dollars.  And so if you do exactly

9  what I just told you, I believe you would still be off

10  by about $27,000.  So my numbers include the secured

11  claim, which is also on the statement of affairs.

12      Q.    Okay.  So to be clear, you did not do any

13  evaluation of the individual claims.  Right?

14      A.    That's right.  I left that to those that took

15  on that responsibility to the Court for approval.

16      Q.    You didn't make any effort to determine when

17  the claims arose individually.  Right?

18      A.    No.  Not specifically.

19      Q.    Generally, did you?

20      A.    No.  Fair enough.  No, I did not do any

21  analysis to identify when the claims arose.  It would

22  have been at some point prior to the filing for when

23  they were put into liquidation.

24      Q.    Good.  Okay.

25            These are all claims that were filed -- filed

Page 27

1   against the receivership estate.  Right?

2       A.    That's correct.

3       Q.    They would have been obligations of PUP prior

4   to the receivership.  Right?

5           MR. BELLAS:  Object to the form of the

6       question.

7           THE WITNESS:  Well, to the extent that the

8       amount due claimant was accepted.

9   BY MR. MCDOWELL:

10      Q.    Let me ask a different -- let me ask a

11  different question.

12          These would have been claims against PUP prior

13  to the receivership.  Right?

14      A.    Well, they would have been asserted claims

15  against PUP prior to the receivership.  And the process

16  that was put in place was to identify which were

17  legitimate claims.

18      Q.    Okay.  And you made no effort to determine the

19  legitimacy of these claims.  Right?

20          MR. BELLAS:  Object to the form of the

21      question.

22  BY MR. MCDOWELL:

23      Q.    Go ahead.

24      A.    I have not done any independent review separate

25  and apart from the process that was put in place and

1    approved by the (audio interference).

2        Q.    Would it be a fair assessment of your scope of

3    testimony to say that you're here to identify the claims

4    that you based your damages report on as they were

5    presented to you through these reports?

6            MR. BELLAS:  Object to the form of the

7        question.

8            MR. MCDOWELL:  I'm referring to 780 and the

9        predecessors.

10            MR. BELLAS:  Object to the form of the

11        question.

12            THE WITNESS:  Yes.  I think generally, the

13        purpose of my being here today was to provide the

14        detail of the numbers that were disclosed in my

15        report and what the claims were that comprised those

16        amounts.

17    BY MR. MCDOWELL:

18        Q.    And from your perspective, the origin of the

19    numbers in your report is as you presented them today

20    through 780.  Is that fair?

21            MR. BELLAS:  Object to the form of the

22        question.

23            THE WITNESS:  Or the predecessor version, yes.

24    BY MR. MCDOWELL:

25        Q.    Or the predecessor versions.  Is that fair?

Page 29

1     A.    That's fair.

2           MR. BELLAS:   Object to the form of the

3     question.

4  BY MR. MCDOWELL:

5     Q.    All right.  In that respect, have you made any

6  evaluation of the claims or damages that you've not

7  testified to in one or other of your depositions?

8     A.    Can you repeat that one more time?

9     Q.    I'll try.  Let me -- why don't I just start

10 over.

11          Have you made any evaluation of claims or

12 damages other than those to which you have already

13 testified either today or in your prior deposition?

14    A.    To the extent that we're talking specifically

15 about the claims that I incorporated in my damage

16 calculation, I have not performed any additional work on

17 those claims other than what we've already discussed in

18 either deposition.

19    Q.    Have you made any additional analysis of

20 damages since the time of your last deposition?

21    A.    Other than looking to see whether this document

22 would have had an impact.  And as I said, there was

23 essentially no impact other than a couple hundred

24 dollars.

25          And I've also since followed the department as

Page 30

```
 1   they release updated financial statements, statements of

 2   affairs, to see if those would have any impact on

 3   damages.  And while there's some activity month to

 4   month, nothing I would say would be material in any

 5   respect.

 6        Q.   And what amount do you determine to be

 7   material?

 8        A.   Well, as there are recoveries or there are

 9   amounts to administer the estate, that would be part of

10   my damage calculation.  So I don't have -- to answer

11   your question, I don't have a dollar amount in mind as

12   to what is material.  But relative to the millions of

13   dollars of damages that were calculated, the 30-some-odd

14   million dollars of damages that were calculated, the

15   amounts that are changing each month are in the 10s of

16   thousands.  So I just generally say that that's not

17   material.

18        Q.   And have you analyzed what party suffered the

19   damages that you've described?

20             MR. BELLAS:  Object to the form of the

21        question.

22   BY MR. MCDOWELL:

23        Q.   Go ahead.

24        A.   Well, I think that is a question that can be

25   interpreted in different ways.  The department,
```

Page 31

1    according to the statute, has the responsibility of

2    pursuing claims on behalf of various stakeholders.  That

3    would include the claimants.  So -- and I believe we

4    discussed that in my last deposition, may have even read

5    from the statutes directly.  So to the extent that they

6    are serving in that capacity, it would be the estate,

7    because they have that responsibility to pursue those

8    claims.

9        Q.   Have you made any analysis of damages that may

10   have been suffered uniquely by PUP prior to the

11   appointment of a receiver?

12            MR. BELLAS:  Object to the form of the

13       question.

14            THE WITNESS:  Well, I have three categories of

15       damages in my report.  The first was based on the

16       increased insolvency as a result of continuing on.

17       And we discussed that at length in my last

18       deposition.

19   BY MR. MCDOWELL:

20       Q.   Right.

21       A.   That would be -- primarily be driven based on

22   the excess of liabilities over assets, having taken into

23   consideration all of these claims compared to what would

24   have likely been the case at various points in time that

25   preceded the liquidation.

Page 32

1          I also have a damage calculation that was based

2   on a fraudulent conveyance avoidable transfer theory of

3   damages, and those amounts were not specifically based

4   on any individual claimant, but monies that were paid to

5   the banks as a result of what's been asserted as

6   fraudulent conveyances.

7          And then there is a statutory measure of

8   damages based on --

9       Q.   Okay.

10      A.   -- some of the company's financial statements.

11      Q.   And you've seen Exhibit 780 before today?

12      A.   I did.

13      Q.   Is that a true and accurate copy of what was

14  sent to you?

15      A.   Well, I'm -- I've got a version on my screen

16  that I've been filtering as I've been giving

17  instructions on how to use it, and it is identical.

18      Q.   Okay.  All right.

19          MR. MCDOWELL:  Peter, I'd like to take five

20      minutes to confer.  We may be able to short-circuit

21      this something considerable.

22          MR. BELLAS:  Okay.  Great.

23          MR. MCDOWELL:  Let's take ten.

24          THE VIDEOGRAPHER:  We are off the record at

25      11:08.

```
 1   (Thereupon, at 11:08 a.m., a recess was taken in the
 2   proceedings, after which, at 11:22 a.m., the proceedings
 3   were reconvened and the following proceedings were had:)
 4          THE VIDEOGRAPHER:  We'll go back on the record
 5       at 11:22.
 6          MR. MCDOWELL:  No further questions.
 7                   CROSS-EXAMINATION
 8   BY MR. BELLAS:
 9       Q.   Mr. Bouchner, I just have a couple of questions
10   for you.
11          In terms of the amount of the claims, you were
12   asked about legitimacy.
13          Did -- was it your understanding that the
14   receivership court determined the legitimacy of the
15   claims upon which you relied in your report and
16   opinions?
17       A.   Yes.
18       Q.   Given that, did you feel that you needed to do
19   any independent analysis as to the legitimacy of the
20   claims?
21       A.   No.
22       Q.   Okay.  In terms of when the --
23          MR. BELLAS:  David, if you could -- if you're
24       still there, if you could pull up the exhibit that
25       you displayed for Mr. Bouchner earlier when Brian
```

 1      was asking questions.

 2    BY MR. BELLAS:

 3      Q.    Okay.  The -- you were asked about the claim

 4    loss date.

 5            Do you recall that?

 6      A.    Yes.

 7      Q.    And July 1, 2014, I think you initially

 8    answered that that was the liquidation date?  That was

 9    your understanding?

10      A.    I think that's what I said.

11      Q.    Yeah.  That -- if the petition for the

12    receivership predated July 1, 2014, would it have been

13    your understanding that the claims that are set forth

14    here were incurred while PUP was in existence?

15      A.    My understanding is, is that all of these

16    claims were incurred while PUP was in existence.

17      Q.    And there's a claims process under Florida

18    Statutes by which people who have claims are able to

19    make claims against the estate.

20            Is that your understanding?

21      A.    That's correct.

22      Q.    Okay.  And that's what's reflected in terms of,

23    for example, the interim claims reports and when the

24    amounts were approved by the receivership court?

25      A.    Yes, that's correct.

Page 35

1    Q.   Okay.  Now, in doing your analysis, you were

2    able to, if I recall correctly, determine dates upon

3    which PUP was impaired.

4         Do you recall that?

5    A.   I do.

6    Q.   Okay.  And did those amounts, the amount of

7    impairment and/or insolvency, increase over time?

8    A.   It did.

9         MR. MCDOWELL:  Peter, I'm going to object.

10   This is beyond the scope of 30(b)(6).

11        MR. BELLAS:  Well, I don't think so, because I

12        think -- I mean, go ahead and object, and I'll --

13        and I'll ask the question, but --

14   BY MR. BELLAS:

15   Q.   Mr. Bouchner, in making those determinations in

16   terms of the date of impairment and insolvency and the

17   amounts thereof over time, what did you review?

18   A.   Well, I began with Ms. Schiffer's report,

19   because she would have looked at the accounting for PUP

20   at each quarter end from 2012 all the way through March

21   of 2014.  And that would have identified, from a

22   statutory basis, what the assets were -- the admitted

23   assets and the admitted liabilities were.  That would

24   have established, on a statutory basis, whether PUP was

25   either impaired or insolvent and what the amount of that

Page 36

```
 1    impairment and insolvency was.
 2            So I think that that answers your question.
 3        Q.   Well, as part of that, would there have been a
 4    review of the financial statements of PUP over time?
 5        A.   Yes.  That absolutely was part of it.  That was
 6    the starting point for each calculation.  Subsequent
 7    adjustments were made based on Ms. Schiffer's work.  The
 8    starting point was always the financial statements that
 9    were filed with the state.
10        Q.   Okay.  Now, you -- in making a determination as
11    to what claims to include, I think you mentioned a
12    $30 million difference.
13            Do you recall that?
14        A.   That was very approximate, yes.
15        Q.   Okay.  And the $30 million that you referred
16    to, was that included in your damages model?
17        A.   No, it's not.  I only included those claims
18    that were approved by the Court.
19        Q.   Okay.  And did your approach, in essence, then
20    give the benefit of the doubt to the defendants in this
21    case?
22        A.   I believe so.  I stated that much in my report.
23        Q.   You also mentioned avoidance claims.
24            To the extent that there's a recovery relating
25    to the avoidance claims, would the -- or any other
```

1    claim, is it your understanding that those amounts would

2    benefit those who made claims against the estate?

3            MR. MCDOWELL:  Objection to form.

4            THE WITNESS:  Well, an asset recovery by the

5        estate would be used to satisfy obligations of the

6        estate.

7    BY MR. BELLAS:

8        Q.    Regardless of whether it was an avoidance claim

9    or any other claim?

10           MR. MCDOWELL:  Objection to form.

11           THE WITNESS:  That's correct.

12           MR. BELLAS:  Can we have five minutes?

13           MR. MCDOWELL:  Sure.

14           MR. BELLAS:  Okay.

15           THE VIDEOGRAPHER:  Go off the record at 11:28.

16    (Thereupon, at 11:28 a.m., a recess was taken in the

17    proceedings, after which, at 11:30 a.m., the proceedings

18    were reconvened and the following proceedings were had:)

19           THE VIDEOGRAPHER:  We'll go back on the record

20        at 11:30.

21           MR. BELLAS:  Subject to any further questions

22        that Mr. McDowell may have, I have no further

23        questions at this time.

24           MR. MCDOWELL:  All done.

25           THE VIDEOGRAPHER:  Do we want to get a read or

Page 38

```
 1      waive on the record?
 2           MR. BELLAS:  Yeah.
 3           Mr. Bouchner, you have the opportunity to read
 4      or waive the reading of your deposition.  If you
 5      elect to read, the court reporter, Ms. Narup, can
 6      provide you with a copy of the transcript for you to
 7      review and provide any errata sheet.
 8           THE WITNESS:  I'll read.
 9           MR. MCDOWELL:  Cool.
10           Peter, if you'll give me two -- unless you guys
11      want to take a more extensive break, I need two
12      minutes and we can start with the next one.
13           MR. BELLAS:  Let me find out what the witness's
14      preference is.
15           THE CERTIFIED STENOGRAPHER:  Would like to go
16      off the record for this deposition first?
17           MR. BELLAS:  Yeah.
18           MR. MCDOWELL:  Yeah.  Oh, I'm sorry.  Yeah.
19           THE VIDEOGRAPHER:  Yeah, I stopped at 11:31,
20      just didn't get a chance to --
21           MR. MCDOWELL:  Okay.  Sorry.
22    (Thereupon the deposition was concluded at 11:31 a.m.)
23
24
25
```

Page 39

1                    CERTIFICATE OF OATH
2                 (VIDEOCONFERENCE PROCEEDINGS)
3    STATE OF FLORIDA:
4    COUNTY OF ORANGE:
5
6        I, Sandra Narup, Registered Professional Reporter,
7    Realtime Systems Administrator and Florida Professional
8    Reporter, Notary Public, State of Florida, do hereby
9    certify that SCOTT MICHAEL BOUCHNER remotely, via
10   videoconference, appeared before me on March 9, 2021 and
11   was duly sworn and produced Florida driver's license as
12   identification.
13       Signed this 18th day of March, 2021.
14
15
16
17
18
                _____
19              Sandra Narup
                Registered Professional Reporter,
20              Realtime Systems Administrator
                and Florida Professional Reporter
21
                Notary Public, State of Florida
22              My Commission No.: GG 143504
                Expires:  January 15, 2022
23
24
25

Page 40

```
 1                   CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA:
 3   COUNTY OF ORANGE:
 4
 5       I, SANDRA NARUP, Registered Professional Reporter,
 6   Realtime Systems Administrator, Florida Professional
 7   Reporter, Notary Public, State of Florida, certify that
 8   I was authorized to and did stenographically report the
 9   deposition of SCOTT MICHAEL BOUCHNER; that a review of
10   the transcript was requested; and that the foregoing
11   transcript, page 6 through 38, is a true and accurate
12   record of my stenographic notes.
13       I further certify that I am not a relative,
14   employee, or attorney, or counsel of any of the parties,
15   nor am I a relative or employee of any of the parties'
16   attorneys or counsel connected with the action, nor am I
17   financially interested in the action.
18
19       DATED this 18th day of March, 2021.
20
21
22
     _____
23          SANDRA NARUP
            Registered Professional Reporter,
24          Realtime Systems Administrator &
            Florida Professional Reporter
25
```

Page 41

```
 1                        ERRATA SHEET
 2           DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE
 3              IN RE:     FLORIDA DEPARTMENT OF FINANCIAL
                           SERVICES VS. PACIFIC
 4                         WESTERN/SATTAUR, ET AL
                CASE NO:   2016-CA-004588 & 2018-CA-006106
 5              DATE:      FEBRUARY 18, 2021
                DEPONENT:  SCOTT MICHAEL BOUCHNER
 6
 7      PAGE NO. LINE NO.  CORRECTION & REASON
 8      _____  _____    _____
 9      _____  _____    _____
10      _____  _____    _____
11      _____  _____    _____
12      _____  _____    _____
13      _____  _____    _____
14      _____  _____    _____
15      _____  _____    _____
16      _____  _____    _____
17      _____  _____    _____
18      _____  _____    _____
19      _____  _____    _____
20      _____  _____    _____
21      _____  _____    _____
22      Under penalties of perjury, I declare that I have read
        the foregoing document and that the facts stated in it
23      are true."
24
        _____
25      DATE                         SCOTT MICHAEL BOUCHNER
```

Page 42

1    March 24, 2021
2
     PETER W. BELLAS, ESQUIRE
3    OF: Genovese, Joblove & Battista, P.A.
     Pbellas@gjb-law.com
4
5    In Re:  February 18, 2021, Deposition of SCOTT MICHAEL
     BOUCHNER
6
     Dear Mr. Bellas:
7
         This letter is to advise that the transcript for the
8    above-referenced deposition has been completed and is
     available for review.  Please contact our office at
9    (800)275-7991 to make arrangements for read and sign or
     sign below to waive review of this transcript.
10
         It is suggested that the review of this transcript
11   be completed within 30 days of your receipt of this
     letter, as considered reasonable under Federal Rules*;
12   however, there is no Florida Statute to this regard.
13       The original of this transcript has been forwarded
     to the ordering party and your errata, once received,
14   will be forwarded to all ordering parties for inclusion
     in the transcript.
15
                                 Sincerely,
16
17                               Sandy Narup, RPR, FPR
                                 Veritext Legal Solutions
18
     cc:  BRIAN A. MCDOWELL, Esquire
19
     Waiver:
20
     I,_____, hereby waive the reading and signing
21   of my deposition transcript.
22   _____    _____
     Deponent Signature          Date
23
24   *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)

**&**

**&** 1:18 2:3,9,14,19
40:24 41:4,7 42:3

**0**

**004588** 1:3 41:4
**006106** 41:4

**1**

**1** 34:7,12
**1.310** 42:25
**1.5** 22:2
**100** 2:3,9
**101** 3:2
**10:31** 1:15 5:14
**10s** 30:15
**11:08** 32:25 33:1
**11:22** 33:2,5
**11:28** 37:15,16
**11:30** 37:17,20
**11:31** 1:15 38:19,22
**12** 23:13,14,17 25:2
25:10
**12/31/20** 21:8
**14** 4:14
**143504** 39:22
**15** 39:22
**16** 23:19 24:8 25:16
**163** 24:23
**17th** 2:15
**18** 41:5 42:5
**18th** 39:13 40:19
**1c** 11:21,22
**1st** 18:21

**2**

**2** 25:10
**20** 26:8
**20-16** 5:24
**20-32** 5:24
**200** 2:20
**20006** 2:15

**2012** 35:20
**2014** 18:22 34:7,12
35:21
**2016** 1:3 5:13 41:4
**2018** 41:4
**202-469-5430** 2:16
**202-955-5564** 2:16
**2021** 1:14 5:3 39:10
39:13 40:19 41:5
42:1,5
**2022** 39:22
**22677** 39:18 40:22
**24** 42:1
**2600** 2:10,20
**27,000** 26:10
**275-7991** 42:9
**28** 25:13
**2nd** 2:3

**3**

**3,141.16** 25:18,19
**30** 19:20 30:13
35:10 36:12,15
42:11,24
**305-349-2310** 2:5
2:11
**305-349-2330** 2:5
**32** 22:15 25:14
**32303-4113** 3:3
**325** 3:2
**32801** 2:21
**33** 4:6 25:14
**33131** 2:4
**33602** 2:10
**35** 25:14
**38** 40:11
**39** 4:7

**4**

**4** 23:13 25:14,15,19
**4,584,189** 25:4

**4.6** 21:11
**40** 4:8
**407-244-5288** 2:21
**407-425-8500** 2:21
**41** 4:9
**42** 4:10
**421** 20:11
**44** 2:4
**4588** 5:13

**6**

**6** 4:5 15:9 21:15
23:15 25:2,9,11,15
35:10 40:11
**68,382** 24:20
**68,382,163.69.**
20:15
**68,410,081** 24:4
**69,955,610** 22:1
**6s** 15:4

**7**

**7-1-2017** 18:19
**74,911,954** 24:10
**780** 4:14 14:16,17
14:19,24 15:2 17:5
24:12 28:8,20
32:11

**8**

**800** 2:15 42:9
**813-439-3100** 2:11
**850-413-4408** 3:3

**9**

**9** 1:14 39:10
**9th** 5:3

**a**

**a.m.** 1:15,15 5:14
33:1,2 37:16,17
38:22
**able** 8:6 9:5 16:17
32:20 34:18 35:2

**absolutely** 36:5
**accepted** 27:8
**accounting** 35:19
**accrued** 25:25
**accurate** 32:13
40:11
**acknowledge** 5:19
**action** 40:16,17
**activity** 30:3
**actual** 19:14 22:1
**add** 25:22
**added** 9:8
**additional** 12:12
13:3 15:23 16:1
25:14 29:16,19
**additions** 7:15
**addressing** 9:22
**adjustments** 36:7
**administer** 30:9
**administering** 5:21
16:5
**administrative**
5:23
**administrator** 1:18
16:4,5,7 21:3 39:7
39:20 40:6,24
**admitted** 35:22,23
**advise** 42:7
**affairs** 17:14 21:8
21:10 26:11 30:2
**affirm** 6:11
**agree** 6:6,8
**agreed** 4:19
**agreement** 6:3,4
8:14 9:2
**agreements** 9:14
**ahead** 11:9 20:1
21:19,20 22:7,9,10
26:6 27:23 30:23
35:12

**al** 41:4
**alleged** 10:14
**alluding** 24:9
**amended** 10:2
**amount** 20:7,7,12
  20:12,13,15 21:16
  21:23,24 22:1
  23:22 25:13 27:8
  30:6,11 33:11 35:6
  35:25
**amounts** 10:14
  21:11 28:16 30:9
  30:15 32:3 34:24
  35:6,17 37:1
**analysis** 19:10 23:2
  26:21 29:19 31:9
  33:19 35:1
**analyzed** 30:18
**answer** 9:5 12:15
  30:10
**answered** 34:8
**answers** 36:2
**aosc** 5:24,24
**apart** 27:25
**appeared** 39:10
**appearing** 2:6,12
  2:23 3:4
**appointment** 31:11
**appreciate** 13:24
**approach** 36:19
**approval** 26:15
**approved** 15:24
  19:15 21:10,17
  23:4 28:1 34:24
  36:18
**approximate** 36:14
**approximately**
  5:14 21:11 22:2
**area** 9:23
**areas** 9:22 10:6
  12:13

**arose** 26:17,21
**arrangement** 5:22
  6:1
**arrangements** 42:9
**asked** 8:1,6,9 9:8
  10:5,7 12:13 33:12
  34:3
**asking** 7:23 12:11
  34:1
**asserted** 11:5 27:14
  32:5
**assessment** 28:2
**asset** 37:4
**assets** 31:22 35:22
  35:23
**assigned** 17:9
**attorney** 40:14
**attorneys** 5:18
  40:16
**audio** 28:1
**authorized** 40:8
**available** 42:8
**avenue** 2:20
**avoidable** 10:15
  32:2
**avoidance** 36:23,25
  37:8
**aware** 13:4 17:12
  19:7

**b**

**b** 10:6,17 35:10
**back** 24:24 25:6
  33:4 37:19
**background** 7:13
  7:16
**balance** 19:19
**bank** 1:8,9,9,10,10
  3:8 5:11,12,12 6:8
**banks** 32:5
**based** 15:21,24
  28:4 31:15,21 32:1

32:3,8 36:7
**basically** 14:5
  23:25
**basis** 35:22,24
**battista** 2:3,9 42:3
**bear** 24:13
**began** 35:18
**behalf** 2:6,12,23
  3:4 6:5 31:2
**believe** 10:6 11:6
  11:12,25 12:9,25
  13:23 15:3,14
  19:21 26:9 31:3
  36:22
**bellas** 2:2 4:6 6:5
  8:13,19,21 9:2,6,13
  11:2,21 16:12,17
  16:20 18:8 19:1,11
  20:21 27:5,20 28:6
  28:10,21 29:2
  30:20 31:12 32:22
  33:8,23 34:2 35:11
  35:14 37:7,12,14
  37:21 38:2,13,17
  42:2,6
**benefit** 36:20 37:2
**berkowitz** 7:11
**better** 17:22 22:20
**beyond** 21:6 35:10
**blagg** 3:8
**blank** 25:1
**bottom** 20:9 24:14
  24:17 25:19
**bouchner** 1:13 4:3
  5:5 6:10,17,22 7:9
  9:20 14:9 33:9,25
  35:15 38:3 39:9
  40:9 41:5,25 42:5
**brant** 7:12
**break** 38:11

**breath** 22:10
**brian** 2:18 6:7
  16:12 33:25 42:18
**brian.mcdowell**
  2:22
**bring** 18:11
**broke** 22:24

**c**

**c** 2:1 5:1 11:16,19
  17:19
**ca** 1:3 5:13 41:4,4
**calculated** 12:8
  22:5 30:13,14
**calculation** 12:17
  22:18 29:16 30:10
  32:1 36:6
**calculations** 8:8
**call** 7:23
**called** 6:18
**capacity** 7:24 10:5
  31:6
**case** 1:3 5:12 6:25
  13:8 17:24 31:24
  36:21 41:4
**cases** 21:24
**categories** 10:25
  17:18 23:13 31:14
**category** 8:4,5
  11:19 17:13,16
**cause** 6:12
**cc** 42:18
**central** 1:9 5:11
**certain** 8:4 10:22
  22:16
**certificate** 4:7,8
  39:1 40:1
**certified** 5:17,19
  6:9,15 14:15 38:15
**certify** 39:9 40:7,13
**chance** 38:20

**change**  13:13 20:17
**changed**  24:4
**changes**  7:15 12:24 41:2
**changing**  30:15
**circuit**  1:1,1 32:20
**civil**  42:24,24
**cj**  3:8
**claim**  17:9 18:1,3,6 18:24 19:9 20:4,5,8 21:4,6,23 22:1 23:10 24:4 25:11 26:1,7,11 34:3 37:1 37:8,9
**claimant**  17:12,13 17:19,21 20:12,20 21:16 27:8 32:4
**claimants**  11:5 17:24 31:3
**claimed**  20:7 25:13
**claims**  4:14 8:6 10:21,22 11:5,16 11:20 12:1,24 13:6 13:10,15 14:1,5,22 15:6,18,22,22,25 16:6 17:16 18:17 18:18 19:14,21,24 20:5,11 21:9,13,15 22:11,12,15,16,24 23:3,4,8,13,13,14 23:14,15,15,20,23 24:3,6,8 25:2,14,19 26:13,17,21,25 27:12,14,17,19 28:3,15 29:6,11,15 29:17 31:2,8,23 33:11,15,20 34:13 34:16,17,18,19,23 36:11,17,23,25 37:2

**class**  17:12
**clear**  26:12
**clearly**  17:2
**click**  24:25 25:1
**collective**  13:25
**columbia**  2:15
**column**  15:4,23 17:6,8,19 20:2 21:22 23:6 24:15 24:17,25 25:6,8,9
**columns**  15:21,23 17:7
**come**  7:22 21:4
**commencement**  10:19 11:6
**comments**  16:1
**commission**  39:22
**communications**  8:15,22,24 9:10
**company's**  19:18 32:10
**compared**  31:23
**completed**  42:8,11
**completely**  13:21
**comprised**  28:15
**computer**  10:2
**conclude**  13:5
**concluded**  38:22
**confer**  32:20
**connected**  40:16
**connection**  12:8,19 14:1
**consent**  5:25
**consider**  13:16
**considerable**  32:21
**considerably**  19:19
**consideration**  31:23
**considered**  8:8 12:16 42:11

**contact**  42:8
**contingent**  23:4
**continuing**  31:16
**control**  24:24
**conveyance**  32:2
**conveyances**  32:6
**cool**  38:9
**copy**  18:10 32:13 38:6
**corporate**  4:3 5:5 7:19 8:1,12 9:21
**corporation**  1:8
**correct**  7:1,2,21 27:2 34:21,25 37:11
**correction**  26:5 41:7
**correctly**  35:2
**corresponding**  21:16
**counsel**  4:20 5:25 7:23 15:12 40:14 40:16
**county**  1:2 39:4 40:3
**couple**  24:5 25:24 29:23 33:9
**court**  1:1 5:23 13:10 19:15 26:15 33:14 34:24 36:18 38:5
**cover**  7:6
**covered**  12:10,11
**covering**  7:6
**cross**  4:6 33:7
**current**  23:2
**currently**  11:18
**cutting**  22:7

**d**

**d**  4:1 5:1 17:21
**damage**  8:8 12:17 22:17,25 29:15 30:10 32:1
**damages**  8:5 9:23 10:7,12,14,23 11:19 12:2,8 22:4 23:3,10,23 28:4 29:6,12,20 30:3,13 30:14,19 31:9,15 32:3,8 36:16
**date**  1:14 12:22 18:1,2,3,3,6,6,23 19:5,9,16,22,23 20:4,4,13 21:17 22:14,15 34:4,8 35:16 41:5,25 42:22
**dated**  40:19
**dates**  35:2
**dave**  8:25
**david**  2:14 9:10 14:9 24:16 33:23
**david.haller**  2:16
**day**  39:13 40:19
**days**  42:11
**dealing**  23:19
**dear**  42:6
**declare**  41:22
**defendant's**  10:2
**defendants**  1:11 6:8 36:20
**defer**  20:23
**department**  1:4 2:6 2:12 3:1,4 5:6,9 6:5 7:19 15:15,16 17:15 29:25 30:25 41:3
**deponent**  4:20 17:22 20:24 22:20

41:5 42:22
**deposed** 6:25
**deposition** 1:13 4:8
4:21 5:4,8,18 7:4
7:14,16 8:10 10:3
12:22 13:20 19:14
23:21 26:3 29:13
29:18,20 31:4,18
38:4,16,22 40:9
42:5,8,21
**depositions** 29:7
**described** 30:19
**deselect** 25:1,8
**detail** 4:14 7:13
28:14
**determination**
20:19 21:5 36:10
**determinations**
35:15
**determine** 26:16
27:18 30:6 35:2
**determined** 33:14
**determining** 23:23
**dfs** 21:8
**difference** 21:11,25
22:3 24:6 25:24
36:12
**differences** 13:9
15:10
**different** 27:10,11
30:25
**direct** 4:5 6:20
**directly** 31:5
**director** 7:11
**disclosed** 28:14
**discussed** 19:13
29:17 31:4,17
**discussing** 12:1
**discussions** 9:14,18
**displayed** 33:25

**district** 2:15
**document** 11:12
12:21,23 14:4,20
14:24 15:1,11,13
15:14,17,19 16:25
18:11 19:5 21:19
29:21 41:22
**documentation**
12:7
**documents** 12:16
12:18 13:3,4,20
**doing** 19:23 35:1
**dollar** 23:22 30:11
**dollars** 24:5 25:24
26:8 29:24 30:13
30:14
**doubt** 36:20
**drafting** 14:4
**driven** 31:21
**driver's** 39:11
**drop** 22:23 24:25
**due** 20:12,20 21:11
21:16,24 27:8
**duly** 6:18 39:11

### e

**e** 2:1,1,19 4:1 5:1,1
42:24,25
**earlier** 7:14 13:16
14:22 15:8 33:25
**ease** 14:8
**effort** 26:16 27:18
**either** 29:13,18
35:25
**elect** 38:5
**employed** 7:10
**employee** 40:14,15
**enter** 41:2
**entire** 15:17
**errata** 4:9 38:7
41:1 42:13

**error** 18:19
**esquire** 2:2,8,14,18
2:19 3:1,8 42:2,18
**essence** 36:19
**essentially** 25:23
29:23
**established** 35:24
**estate** 10:21 11:20
27:1 30:9 31:6
34:19 37:2,5,6
**estimated** 10:14
**et** 41:4
**evaluation** 13:6
26:13 29:6,11
**evolving** 15:17
**exactly** 26:8
**examination** 4:5,6
6:20 10:2 33:7
**examine** 13:19
18:15
**example** 9:7 34:23
**exception** 18:17,21
**excess** 20:10 31:22
**excuse** 9:3
**exhibit** 4:14 14:10
14:17,19 17:5
24:12 32:11 33:24
**exhibits** 4:12,13
**existed** 15:17
**existence** 34:14,16
**exists** 22:3
**expedite** 14:11
**expert** 12:20 13:17
13:21
**expires** 39:22
**extended** 5:24
**extensive** 38:11
**extent** 8:9 9:13
10:22 12:2 27:7
29:14 31:5 36:24

### f

**f** 1:9
**factor** 19:9
**facts** 41:22
**fair** 8:17 13:5 16:19
16:23,24 22:21
26:20 28:2,20,25
29:1
**far** 19:21
**fax** 2:5,11,16,21
**february** 41:5 42:5
**federal** 42:11,24
**feedback** 11:10
**feel** 7:4 33:18
**fernandez** 3:7
**filed** 4:14 12:24
14:21 15:5,9,25
18:3,4 20:5,11
22:12,14,15 23:14
25:11 26:25,25
36:9
**filing** 26:22
**filtering** 32:16
**financial** 1:4,10 2:7
2:12 3:1,4 5:7,9,12
7:19 17:14 30:1
32:10 36:4,8 41:3
**financially** 40:17
**find** 24:11 38:13
**fine** 9:12 21:21
**finish** 21:19
**first** 1:10 6:18
21:20 24:19 31:15
38:16
**five** 32:19 37:12
**floor** 2:4
**florida** 1:2,4,19 2:4
2:6,10,12,21 3:3
5:6,9,23 34:17 39:3
39:7,8,11,20,21
40:2,6,7,24 41:3

42:12,24
**folks** 8:16
**followed** 29:25
**following** 33:3
37:18
**follows** 6:19
**foregoing** 40:10
41:22
**form** 8:13 11:2
18:8 19:1,11 20:8
20:21 27:5,20 28:6
28:10,21 29:2
30:20 31:12 37:3
37:10
**formation** 10:19
**forth** 8:15 34:13
**forwarded** 42:13
42:14
**four** 22:25 23:3,8
23:15
**fpr** 42:17
**fraudulent** 32:2,6
**friedman** 2:8 8:16
**front** 15:2
**full** 7:8
**further** 33:6 37:21
37:22 40:13

**g**

**g** 5:1 20:2
**generally** 15:20
26:19 28:12 30:16
**generate** 10:13
**genovese** 2:2,3,9
42:3
**gg** 39:22
**gilbert** 2:19
**give** 6:11 12:5,5
36:20 38:10
**given** 33:18
**giving** 32:16

**gjb** 2:5,6,11 42:3
**go** 11:9 17:6 20:1
21:19,20 22:7,9,10
23:2 24:14,24 25:6
25:7 26:6 27:23
30:23 33:4 35:12
37:15,19 38:15
**goddard** 3:7
**going** 7:3 11:25
22:14 24:1 35:9
**good** 6:22,22,24
21:21 26:24
**gotten** 23:5
**great** 5:17 6:9
32:22
**greater** 19:6
**ground** 7:6
**groups** 17:15
**guys** 9:8 38:10

**h**

**h** 2:2 15:21,23
**haller** 2:14 9:11
**hang** 18:5
**help** 6:13
**high** 23:12,20 24:8
24:10 25:23 26:2
**higher** 19:19,20
**hit** 24:24 25:8
**hklaw.com** 2:16,22
2:22
**holland** 2:14,19
**home** 24:24
**huh** 23:11
**hundred** 24:5
25:24 29:23

**i**

**idea** 14:14
**identical** 15:3
21:24 32:17

**identification**
14:17 39:12
**identified** 7:25 8:4
13:11 14:5 17:18
18:18 19:5,16,20
20:8,14 21:9,18
23:3,8,16 35:21
**identifies** 22:11
**identify** 8:11 10:24
14:20 15:4 19:24
26:21 27:16 28:3
**identity** 11:4
**impact** 29:22,23
30:2
**impaired** 35:3,25
**impairment** 35:7
35:16 36:1
**implied** 17:23 19:6
**important** 17:1
**include** 24:8 26:10
31:3 36:11
**included** 19:14
23:9 25:18,20
36:16,17
**inclusion** 42:14
**incorporate** 9:14
**incorporated** 5:11
10:22 11:7,12
29:15
**increase** 35:7
**increased** 31:16
**incurred** 34:14,16
**independent** 27:24
33:19
**index** 4:12
**indicate** 6:3 16:21
17:7
**indicates** 23:7
**individual** 15:16
21:6 26:13 32:4

**individually** 26:17
**individuals** 17:23
**information** 10:13
10:17,22 13:16
23:5
**initially** 20:11 34:7
**input** 16:4
**insolvency** 31:16
35:7,16 36:1
**insolvent** 10:18
35:25
**instructions** 32:17
**interest** 25:25
**interested** 40:17
**interference** 28:1
**interim** 15:6 21:15
22:11 23:15 34:23
**interject** 16:12
**interpreted** 30:25
**interrupt** 9:3
**issue** 11:11
**issues** 7:24 22:16
**item** 11:16 22:23
25:9
**items** 15:5,20 20:10
23:16,17 24:8 25:9

**j**

**january** 39:22
**jean** 3:8
**jeff** 3:7
**jgenovese** 2:6
**joblove** 2:3,9 42:3
**john** 2:2 3:2
**judicial** 1:1
**july** 18:21 34:7,12

**k**

**k** 1:9,9 21:22
**keep** 22:7,14
**knight** 2:14,19

**know** 7:5 8:22
  15:15,19,20 17:10
  21:2
**knowledge** 21:6
  22:3
**knox** 3:2
**kuntz** 3:8 11:25

**l**

**l** 2:14 4:18 15:4
  24:25 25:6
**law.com** 2:5,6,11
  42:3
**left** 26:14
**legal** 42:17
**legitimacy** 27:19
  33:12,14,19
**legitimate** 27:17
**length** 31:17
**letter** 4:10 42:7,11
**liabilities** 19:16,18
  31:22 35:23
**license** 39:11
**limited** 13:6
**line** 41:7
**lines** 25:13
**liquidation** 18:2
  19:17 26:23 31:25
  34:8
**litigation** 11:18
**llp** 2:14,19
**look** 17:14 24:1
**looked** 14:6,6 35:19
**looking** 9:23 10:1
  11:20 21:14,19
  23:24 25:11 29:21
**loss** 18:1,6,24 19:9
  19:22 34:4
**louis** 1:9,10 5:12
**low** 23:12,20 24:3,6
  26:2

**m**

**maintained** 15:15
**making** 35:15
  36:10
**manner** 6:1
**march** 1:14 5:3
  35:20 39:10,13
  40:19 42:1
**mark** 14:10
**marked** 14:13,17
  14:19
**mary** 3:8
**material** 13:13 24:6
  30:4,7,12,17
**matt** 3:7
**matter** 5:8 8:14
**mb** 1:10 5:12
**mcdowell** 2:18 4:5
  6:7,7,21,24 8:17,20
  9:1,3,12,16 11:8,23
  14:8,12,14,18
  16:16,19,23 17:4
  18:13 19:8,25
  20:25 24:16,21
  27:9,22 28:8,17,24
  29:4 30:22 31:19
  32:19,23 33:6 35:9
  37:3,10,13,22,24
  38:9,18,21 42:18
**mean** 9:6 35:12
**measure** 32:7
**mentioned** 36:11
  36:23
**menu** 22:23
**mfriedman** 2:11
**miami** 2:4
**michael** 1:13 2:8
  4:3 6:17 7:9 39:9
  40:9 41:5,25 42:5
**mike** 8:16,24 9:10

**million** 19:20 20:11
  21:12 22:2 30:14
  36:12,15
**millions** 30:12
**mind** 30:11
**minimal** 12:23
**minor** 13:9
**minute** 24:13
**minutes** 32:20
  37:12 38:12
**miriam** 3:1
**miriam.victorian**
  3:4
**model** 10:12 36:16
**monies** 32:4
**month** 30:3,4,15
**months** 5:17
**morning** 6:22,24
**move** 24:16
**muttered** 22:9
**myfloridacfo.com**
  3:4

**n**

**n** 2:1,9 4:1,18 5:1
  25:8
**n.a.** 1:10
**n.w.** 2:15
**name** 6:4 7:8 16:9
  17:23
**names** 17:24
**narup** 1:17 38:5
  39:6,19 40:5,23
  42:17
**national** 1:10
**nearly** 15:3
**need** 7:6 8:17,20
  24:14 26:5 38:11
**needed** 33:18
**negligible** 20:17
**new** 13:6,16 23:18

**ninth** 1:1
**notary** 39:8,21 40:7
**notes** 40:12
**notice** 8:3,3 9:24
  10:3,24
**notification** 4:10
**number** 5:13 17:8
  23:15 24:11
**numbers** 13:12
  26:10 28:14,19

**o**

**o** 1:3 3:1 4:18 5:1
  5:13
**oath** 4:7 5:21 39:1
**obg** 22:14,22
**obj** 22:15 25:7
**object** 8:13 11:2
  18:8 19:1,11 20:21
  27:5,20 28:6,10,21
  29:2 30:20 31:12
  35:9,12
**objected** 23:9
**objection** 37:3,10
**objections** 6:1
**obligations** 27:3
  37:5
**occurred** 18:25
**odd** 26:8 30:13
**offered** 7:18
**office** 42:8
**oh** 38:18
**okay** 7:8,18 9:12,17
  9:23 10:4,8,16,24
  11:10 12:4,18 13:1
  13:5,19,24 14:7,24
  15:7,11,13 16:10
  16:16,19 17:8,17
  17:20 18:10,20,23
  20:1,6,16 21:1,7
  22:6,13 23:22 24:7
  24:18,19 25:3,5,12

25:17,21 26:2,6,12
26:24 27:18 32:9
32:18,22 33:22
34:3,22 35:1,6
36:10,15,19 37:14
38:21
**old** 23:1
**once** 42:13
**opinions** 33:16
**opportunity** 38:3
**orange** 1:2 2:20
39:4 40:3
**order** 5:23
**ordering** 42:13,14
**origin** 28:18
**original** 42:13
**orlando** 2:21
**outside** 17:2
**overlap** 8:5 10:21
11:1,22 16:13,21
25:10
**owed** 20:14

**p**

**p** 2:1,1 4:18 5:1
22:23 23:7,16,18
25:9,9
**p.a.** 2:3,9 42:3
**pacific** 1:8,9 3:8
5:11 41:3
**pacwest** 2:23 3:7
**page** 40:11 41:7
**paid** 32:4
**papers** 12:16
**part** 8:8,24,25 12:3
12:17 15:5 17:1
20:5 23:17,17 30:9
36:3,5
**participating** 5:18
**particular** 19:22
**parties** 4:20 5:25
8:15 40:14,15

42:14
**party** 16:3,4,7 21:3
30:18 42:13
**pass** 7:22
**pbellas** 2:5 42:3
**penalties** 41:22
**pending** 11:18
**people** 34:18
**performed** 29:16
**perjury** 41:22
**perspective** 28:18
**pertains** 17:10
**peter** 2:2 8:20 9:4
32:19 35:9 38:10
42:2
**petition** 18:6 34:11
**physicians** 1:5 2:7
2:12 5:10
**piece** 24:20
**pieces** 25:22
**place** 1:16 5:8 21:4
27:16,25
**plaintiff** 1:6
**plaintiff's** 4:13
**plan** 1:5 2:7,13
5:10
**please** 6:3 7:8 8:11
9:25 10:11 24:13
24:17 42:8
**poc** 18:3
**point** 7:5 16:21
26:22 36:6,8
**points** 31:24
**pollack** 7:11
**position** 18:24 19:4
**preceded** 12:22
31:25
**predated** 34:12
**predecessor** 28:23
28:25

**predecessors** 28:9
**preference** 38:14
**prepare** 12:4
**prepared** 15:13,19
15:21 16:3
**present** 3:6 5:20
**presented** 28:5,19
**presently** 7:10
**presume** 9:6 16:14
**previously** 10:23
12:9,17,19 13:4
**primarily** 21:13
31:21
**prior** 7:4,16 8:9
14:3,25 19:13 26:3
26:22 27:3,12,15
29:13 31:10
**probably** 14:11
16:13,14 20:23
**procedure** 42:24
42:25
**proceedings** 5:21
33:2,2,3 37:17,17
37:18 39:2
**process** 15:18 20:5
20:24 21:3 27:15
27:25 34:17
**produced** 39:11
**professional** 1:18
1:19 39:6,7,19,20
40:5,6,23,24
**proof** 18:3 20:4,5,8
**properly** 18:15
**provide** 8:6 28:13
38:6,7
**provided** 12:7
**public** 39:8,21 40:7
**pull** 23:25 33:24
**pup** 10:18 11:5,16
19:17 27:3,12,15
31:10 34:14,16

35:3,19,24 36:4
**pup's** 10:18
**purpose** 28:13
**purposes** 23:24
**pursuant** 5:22
**pursue** 11:17 31:7
**pursuing** 31:2
**put** 17:13 21:4
26:23 27:16,25

**q**

**quarter** 17:15
35:20
**question** 8:14 9:5
9:17 11:3 12:15
17:21 18:9 19:2,12
20:22 22:19 27:6
27:11,21 28:7,11
28:22 29:3 30:11
30:21,24 31:13
35:13 36:2
**questions** 12:11,12
16:18 33:6,9 34:1
37:21,23

**r**

**r** 2:1 5:1
**range** 23:12,20
25:24
**read** 10:9 31:4
37:25 38:3,5,8
41:22 42:9
**reading** 4:21 38:4
42:20
**really** 12:21 13:2
13:13 24:6
**realtime** 1:18 39:7
39:20 40:6,24
**reason** 41:7
**reasonable** 42:11
**recall** 16:9 23:12
34:5 35:2,4 36:13

receipt 42:11
received 7:23 14:4
  15:12 42:13
receiver 1:4 2:7,12
  5:10 10:9 11:17
  18:24 31:11
receiver's 10:12,13
  11:17
receivership 10:20
  11:6 18:7 27:1,4,13
  27:15 33:14 34:12
  34:24
recess 33:1 37:16
recognition 9:18
reconvened 33:3
  37:18
record 5:15 6:4
  8:18,20 32:24 33:4
  37:15,19 38:1,16
  40:12
recoveries 30:8
recovery 36:24
  37:4
red 25:10
reference 14:9
referenced 42:8
referred 36:15
referring 10:25
  16:8 17:5 28:8
reflected 34:22
regard 42:12
regardless 37:8
registered 1:18
  39:6,19 40:5,23
rehash 8:23
relate 21:13
relating 10:17
  36:24
relative 30:12
  40:13,15

release 30:1
released 17:15
relevance 19:22
  22:17
relevant 12:12
  17:11 22:4,22
relied 12:21 33:15
relying 11:17
remaining 25:15
remotely 5:22 39:9
repeat 7:3 29:8
repetitive 13:21
report 12:24 13:7
  13:15 14:1,4,10,22
  14:23 15:6,10,25
  17:1 19:21 20:13
  20:18 21:15 22:11
  22:12,25 23:1,3,15
  23:18,25 28:4,15
  28:19 31:15 33:15
  35:18 36:22 40:8
reported 1:17
reporter 1:18,19
  38:5 39:6,8,19,20
  40:1,5,7,23,24
reporting 5:21 6:2
reports 28:5 34:23
representative 3:7
  4:4 5:6 7:19 8:2,12
  9:21
requested 40:10
reserve 21:23 22:1
reserved 4:22
  15:24
resolution 22:22
  25:8
resolved 9:11 15:22
respect 7:24 8:7
  10:25 21:5 29:5
  30:5

respective 4:20
respond 12:13
  16:17
responsibility
  26:15 31:1,7
result 31:16 32:5
resulted 23:20
  24:10
review 12:18 14:24
  21:4 27:24 35:17
  36:4 38:7 40:9 42:8
  42:9,10
reviewed 12:7,15
  12:16,19 15:1,2
reviewing 11:15
  13:3
right 7:20 11:19,24
  15:2,23 16:2 17:5,6
  17:25 21:14 23:1
  24:22 26:3,13,14
  26:17 27:1,4,13,19
  29:5 31:20 32:18
road 3:2
roughly 19:19
rpr 42:17
rule 42:24,25
rules 42:11
run 20:13

**s**

s 2:1 4:18,18 5:1
sandra 1:17 39:6
  39:19 40:5,23
sandy 14:10,14
  42:17
satisfy 37:5
sattaur 41:4
save 13:25
saying 8:21 9:7
schedule 10:1
schiffer's 35:18
  36:7

scope 28:2 35:10
scott 1:13 4:3 5:5
  6:17 7:9 39:9 40:9
  41:5,25 42:5
screen 18:12 21:14
  32:15
scrivener's 18:19
scroll 20:9
se 2:3
second 9:4 18:5
secured 25:25 26:7
  26:10
see 6:22 12:22 15:4
  20:10 21:14,15
  24:19 25:2,9 29:21
  30:2
seen 14:22 32:11
select 25:7
selected 22:24
sent 8:3 11:13
  12:25 15:11 32:14
separate 27:24
separately 18:12
  22:25
serve 7:24 10:5
served 22:20
services 1:4 2:7,12
  3:1,5 5:7,9 7:20
  41:3
serving 31:6
set 8:15 34:13
sets 26:2
sheet 4:9 19:19
  38:7 41:1
short 32:20
show 14:9,13,19
sic 22:14
side 24:10
sign 42:9,9
signature 39:18
  40:22 42:22

signed 39:13
signing 4:21 42:20
sincerely 42:15
six 23:1
slightly 14:22 24:4
small 21:25
solemnly 6:10
solutions 42:17
sorry 8:19 10:19
  11:9,10 20:1 22:7,9
  38:18,21
south 2:20
speak 11:13 14:2
specific 15:15
  22:24
specifically 9:22
  10:7 12:1 20:14
  22:2 26:18 29:14
  32:3
specifics 21:5
st 1:9,10 5:12
stakeholders 31:2
start 29:9 38:12
starting 36:6,8
state 7:8 36:9 39:3
  39:8,21 40:2,7
stated 36:22 41:22
statement 17:14
  21:8,10 26:11
statements 30:1,1
  32:10 36:4,8
stating 6:3
statute 31:1 42:12
statutes 31:5 34:18
statutory 32:7
  35:22,24
stenographer 5:17
  5:19 6:9,15 14:15
  38:15
stenographic 40:12

stenographically
  1:17 40:8
steps 12:4
stipulated 4:19
stopped 38:19
street 2:3,9,15
subject 9:9,17
  37:21
subjects 8:11 9:20
submitted 13:10,11
  13:12
submitting 15:21
subsequent 36:6
suffered 30:18
  31:10
sufficient 10:10
suffix 17:10
suggested 42:10
suite 2:10,20 3:2
supreme 5:23
sure 17:12 18:16,18
  19:3 37:13
suzanne 2:19
suzanne.gilbert
  2:22
swear 6:10
sworn 5:16 6:19
  39:11
systems 1:18 39:7
  39:20 40:6,24

**t**

t 4:18,18
take 12:4 18:14
  24:1 25:13,22
  32:19,23 38:11
taken 5:4 16:25
  19:4 31:22 33:1
  37:16
takes 18:24
talked 13:20 23:21

talking 29:14
tallahassee 3:3
tampa 2:9,10
tell 7:5 9:25 17:7
  23:7,22
ten 32:23
terms 33:11,22
  34:22 35:16
testified 6:19 10:23
  12:9 26:3 29:7,13
testify 9:9 10:7
  17:3
testimony 4:3 6:11
  8:7 12:3,5,20 13:17
  13:22 28:3
thank 6:15
theory 32:2
thereof 35:17
thing 8:23
things 9:8 14:11
think 9:11 15:16
  16:13,24 17:2,21
  19:4 20:2 21:22
  22:19 28:12 30:24
  34:7,10 35:11,12
  36:2,11
third 16:3,4,7 21:3
thousand 26:8
thousands 30:16
three 16:11 25:22
  31:14
time 1:15 5:14 7:25
  10:18 11:15 13:11
  13:25 14:23,25
  18:14 29:8,20
  31:24 35:7,17 36:4
  37:23
timing 13:15
today 5:3 7:18 12:6
  12:10 28:13,19
  29:13 32:11

told 26:9
top 24:25
topic 10:17
topics 8:4,7,11 9:20
  10:1,6
total 23:19
transcript 4:8,22
  38:6 40:10,11 41:2
  42:7,9,10,13,14,21
transfer 32:2
transfers 10:15
true 32:13 40:11
  41:23
truth 6:12,12,13
try 7:3 29:9
trying 13:24
tuesday 1:14
two 9:22 10:6 16:22
  18:17,18,21 21:25
  23:13,16 38:10,11
type 17:21

**u**

u 4:18
uh 23:11
understanding
  33:13 34:9,13,15
  34:20 37:1
understood 14:6
unique 17:8
uniquely 31:10
united 1:5 2:7,13
  5:10
updated 12:23
  14:21 15:24 30:1
use 32:17

**v**

value 21:16
various 31:2,24
veritext 42:17

**version** 12:23
  14:21,23 15:3,8
  23:2 28:23 32:15
**versions** 28:25
**versus** 5:11
**victorian** 3:1
**videoconference**
  39:2,10
**videographer** 3:7
  5:3 32:24 33:4
  37:15,19,25 38:19
**videotaped** 1:12
  5:4 10:3
**vs** 1:7 41:3

**w**

**w** 2:2 42:2
**waive** 6:1 38:1,4
  42:9,20
**waiver** 42:19
**want** 8:23 9:13
  37:25 38:11
**washington** 2:15
**way** 22:17 35:20
**ways** 30:25
**we've** 14:19 29:17
**went** 7:13
**wester** 1:9
**western** 1:8 3:8
  5:11 41:4
**witness** 5:15,20
  6:14,18 9:5 11:4,22
  16:14,15,24 18:10
  19:3,13 20:23
  24:19 27:7 28:12
  28:23 31:14 37:4
  37:11 38:8
**witness's** 38:13
**work** 12:16 29:16
  36:7
**write** 41:2

**wrote** 14:23

**x**

**x** 4:1

**y**

**yeah** 8:21 9:25,25
  10:1,11,20 18:10
  20:23 21:23 34:11
  38:2,17,18,18,19
**yep** 20:3

**z**

**zoom** 1:12,16 2:2,2
  2:8,14,18,19 3:7,7
  3:8,8 5:5

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT  K

Page 1

1     IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
            IN AND FOR ORANGE COUNTY, FLORIDA

2
             CASE NO. 2016-CA-4588-0

3

4  THE FLORIDA DEPARTMENT OF FINANCIAL
    SERVICES, as Receiver for PHYSICIANS

5  UNITED PLAN, INC.,

6            Plaintiff,

7  vs.

8  PACIFIC WESTERN BANK CORPORATION,
    a/k/a PACIFIC WESTERN BANK, CENTRAL

9  BANK OF ST. LOUIS, f/k/a FIRST NATIONAL
    BANK OF ST. LOUIS, and MB FINANCIAL

10  BANK, N.A.,

11           Defendants.
   _____

12

13               VIDEOTAPED

14        VIDEOCONFERENCE DEPOSITION OF

15          SCOTT M. BOUCHNER

16

17    DATE TAKEN:     Friday, October 30, 2020
    TIME:          10:28 a.m. - 2:39 p.m. (EST)

18    LOCATION:      All participants attending
                 remotely

19

20

21    Taken on behalf of the Defendants by

22  Fanny R. Kerbel, Shorthand Reporter and Notary Public in

23  and for the State of Florida at Large, appearing

24  remotely.

25

Page 2

```
 1                    REMOTE APPEARANCES
 2
 3    On behalf of the Plaintiff:
 4            GENOVESE JOBLOVE & BATTISTA, P.A.
              100 N. Tampa Street, Suite 2600
 5            Tampa, Florida  33602-5810
              BY:  MICHAEL A. FRIEDMAN, ESQUIRE
 6                 E-mail:  mfriedman@gjb-law.com
 7            GENOVESE JOBLOVE & BATTISTA, PA
              100 Southeast 2nd Street, 44th Floor
 8            Miami, Florida  33131-2100
              By:  JOHN H. GENOVESE, ESQUIRE
 9                 E-mail:  jgenovese@gjb-law.com
                   PETER WILLIAM BELLAS, ESQUIRE
10                 E-mail:  pbellas@gjb-law.com
11
      On behalf of the Defendants:
12
              HOLLAND & KNIGHT, LLP
13            200 S. Orange Avenue, Suite 2600
              Orlando, Florida  32801-3461
14            BY:  BRIAN A. McDOWELL, ESQUIRE
                   E-mail:  brian.mcdowell@hklaw.com
15                 SUZANNE E. GILBERT, ESQUIRE
                   E-mail:  suzanne.gilbert@hklaw.com
16
              HOLLAND & KNIGHT, LLP
17            800 17th Street N.W., Suite 1100
              Washington, D.C.  20006
18            BY:  DAVID L. HALLER, ESQUIRE
                   E-mail:  david.haller@hklaw.com
19
              JOSEPH CATMULL, ESQUIRE
20            Pacific Western Bank
              Associate General Counsel
21            444 South Flower Street, 14th Floor
              Los Angeles, California  90071
22
23    Also present remotely:
24            Jeffrey Goddard
              Nolan Church, videographer
25
```

Page 3

```
1
2                        I N D E X
3

    VIDEOCONFERENCE DEPOSITION
4   OF SCOTT BOUCHNER                        PAGE NO.
5   Exhibit Index                              3
    Direct Examination by Mr. McDowell         5
6   Cross-Examination by Mr. Friedman         79
    Witness Signature Page                    95
7   Errata Sheet                              96
    Certificate of Oath of Witness            97
8   Certificate of Reporter                   98
    Letter to Witness Re: Reading             99
9
10
11
12                   EXHIBIT INDEX
13
14   Number            Description            Page No.
15
16   Exhibit 1      Expert Witness Report        9
                    of Scott Bouchner
17
     Exhibit 2      Updated Schedule 3          82
18
19
20
21
22
23
     Reporter's Note:  All exhibits were provided
24   electronically to the reporter.
25
```

1          THE VIDEOGRAPHER:   We are now on the record.

2     Today's date is October 30, 2020.  The time is

3     10:28 a.m.

4          This is the video recorded deposition of Scott

5     Bouchner, taken by counsel for the defendant in the

6     matter of The Florida Department of Financial

7     Services versus Pacific Western Bank Corporation.

8          This deposition is being held at 9644 Savona

9     Winds Drive, in Delray Beach, Florida.

10          My name is Nolan Church.  I am the

11     videographer.  The court reporter is Fanny Kerbel.

12     We are both with Veritext, Florida.

13          Will attorneys please -- I'm sorry.  Will the

14     court reporter please have her stipulation.

15          THE COURT REPORTER:  Good morning.  Due to the

16     need for this deposition to take place remotely due

17     to COVID-19 restrictions, the parties will

18     stipulate that the court reporter may swear in the

19     witness remotely via videoconference and that the

20     witness has presented his government-issued

21     identification by holding it up to the camera,

22     verifying that he is in fact Scott Bouchner.

23          Do you so stipulate, Counsel?

24          MR. McDOWELL:  Yes.  This is Brian McDowell.

25          MR. FRIEDMAN:  Go ahead, Brian.

1          MR. McDOWELL:  This is Brian McDowell, Suzanne

2      Gilbert and David Haller from Holland & Knight.  We

3      represent the defendant and we agree.

4          MR. FRIEDMAN:  This is Michael Friedman and

5      Peter Bellas and John Genovese from Genovese

6      Joblove and Batista on behalf of the plaintiff, and

7      we agree.

8          THE COURT REPORTER:  Sir, please raise your

9      right hand to be sworn.

10         Do you swear or affirm the testimony you are

11     about to give is the truth, the whole truth, and

12     nothing but the truth?

13         THE WITNESS:  Yes.

14         THE COURT REPORTER:  Thank you.

15 Thereupon:

16                  SCOTT BOUCHNER,

17 was called as a witness and, having been first duly

18 sworn remotely, was examined and testified as follows:

19                DIRECT EXAMINATION

20 BY MR. McDOWELL:

21     Q.   Good morning, Mr. Bouchner.  How are you?

22     A.   I am well.  How are you?

23     Q.   So far so good.  My name is Brian McDowell.  I

24 am a lawyer with the Holland and Knight firm here in

25 Orlando.  I represent the bank defendants.

1         I am not going to ask you any trick questions,

2     at least not intentionally, so if you don't understand

3     my questions, will you tell me?

4         A.   I will.

5         Q.   Please state your full name.

6         A.   Scott Michael Bouchner.

7         Q.   What is your residence address?

8         A.   9644 Savona Winds Drive, in Delray Beach,

9     Florida.

10        Q.   And what is your business address?

11        A.   200 South Biscayne Boulevard, Seventh Floor,

12    Miami, Florida.

13        Q.   I am going to go through a few background

14    questions.  I don't intend to belabor it because your

15    background is set out in your report, but just for the

16    record, what degrees do you hold?

17        A.   I have a bachelor's of arts degree and I have

18    a master's in business administration degree.

19        Q.   When did you obtain your bachelor's?

20        A.   The bachelor's was in 1987.

21        Q.   From what university?

22        A.   George Washington University, in Washington,

23    D.C.

24        Q.   And your master's, when did you obtain that?

25        A.   That was in 1990 from Columbia Business

Page 7

1    School.

2         Q.    What professional certifications do you hold?

3         A.    I am a certified management accountant, I am a

4    certified fraud examiner, I am a certified valuation

5    analyst, and I am a certified insolvency and

6    restructuring advisor.

7         Q.    Are you a CPA?

8         A.    I am not.

9         Q.    Have you ever been a CPA?

10        A.    No.

11        Q.    If you could briefly summarize your

12   professional work history.

13        A.    Sure.  After I graduated from George

14   Washington University, I took a job at a bank in

15   Washington, D.C., First American Bankshares, which owned

16   banks in the tri-geographic areas of Washington, D.C.,

17   Virginia, and Maryland.  I was there for about a year

18   and a half or so before I went back to business school.

19             After business school, I joined Price

20   Waterhouse.  I was there for approximately six years

21   working in their forensic area.  They called it dispute

22   analysis and corporate recovery.  I did -- actually, I

23   was at Price Waterhouse for four years.  I then went to

24   KPMG for two years, and then back to Price Waterhouse

25   for two years.  So it was a total of six years at Price

Page 8

1    Waterhouse.  Shortly before I left, they became part of

2    Coopers & Lybrand and merged to PricewaterhouseCoopers.

3            In about 1999, I joined my present firm,

4    Berkowitz Pollack Brant, where I have continued to

5    practice through today.

6        Q.    Can you describe, in general terms, your

7    practice since 1999.

8        A.    Since 1999, I am part of our forensic advisory

9    services group.  That covers a broad range of areas,

10   including forensic accounting engagements.  That could

11   be fraud examinations.  It could be expert witness

12   testimony, calculation of economic damages.  I do

13   business valuation work.  I also do other types of

14   economic consulting or financial consulting for our

15   clients.  So across those areas.

16       Q.    And has that been the nature of your practice

17   continuously since 1999?

18       A.    Yes.

19       Q.    You have prepared a report in connection with

20   this case; is that right?

21       A.    I have.

22       Q.    Do we have a copy there for you to identify?

23       A.    I have a copy of the report that you had -- I

24   had my own copy, as well as the copy that you had

25   forwarded to me this morning.

Page 9

1         Q.   If you could find your report, I would like to

2    ask the court reporter to mark that as Exhibit 1, and I

3    will ask you if that is a true and accurate copy of your

4    report.

5         A.   It is a true and accurate copy of the report

6    that I produced.

7              (Thereupon, Expert Witness Report of Scott

8    Bouchner was remotely introduced as Exhibit 1 for

9    Identification.)

10   BY MR. McDOWELL:

11        Q.   I'll just ask you if, within your report, is

12   there a full and complete description of your

13   background, qualifications, and certifications?

14        A.   Yes.  There was a copy of my curriculum vitae

15   that was attached as Appendix A to the report.

16        Q.   Is that complete?

17        A.   Well, it's complete in that it provides an

18   overview of my background and experience.  I don't think

19   that there are any major omissions, but, obviously, it

20   covers since the 1980s, so --

21        Q.   I was trying to save a few minutes rather than

22   go through every line of it.

23             MR. FRIEDMAN:  Object to form.

24             THE WITNESS:  Sure.

25   BY MR. McDOWELL:

Page 10

1     Q.   In the course of your professional career,

2  have you represented insurance companies?

3     A.   Yes.

4     Q.   On how many occasions?

5     A.   I can think of three.  There may be others,

6  but there are three in addition to this one.  Well,

7  okay.  Yes, there are three that I could think of.

8     Q.   What were the nature of those engagements?

9     A.   One of them -- they were valuation

10  engagements.

11     Q.   Valuation of what?

12     A.   Of the insurance company.

13     Q.   Were any of those insurers insolvent?

14     A.   No.

15     Q.   So those are straight-up business valuation

16  consulting-type arrangements?

17     A.   One of them was in litigation.  One of them --

18  and two of them were just normal -- I think two of them

19  were estate planning.  And I was involved in another

20  matter in which there was an insolvency.  I wasn't

21  necessarily representing the insurance company, but it

22  was working with The Department of Financial Services in

23  a matter involving an insurance company that was in

24  liquidation.

25     Q.   What was the nature of that engagement?

Page 11

1      A.   It was similar to this one, in that there was

2  a case that was brought against various parties as a

3  result of the insolvency, and our firm had done some

4  consulting work for The Department of Financial

5  Services.

6      Q.   Did you testify in that matter?

7      A.   No, I did not.

8      Q.   What insurance company was the subject of the

9  receivership proceeding?

10     A.   POE.

11     Q.   Say again.

12     A.   POE.

13     Q.   Oh, P-O-E?  Okay.

14     A.   Yes.

15     Q.   Was that pending in Florida?

16     A.   Yes, it was.

17     Q.   Have you ever testified in connection with the

18  valuation of an insurance company?

19     A.   Yes.

20     Q.   In what case?

21     A.   It was a case involving People's Trust

22  Insurance.

23     Q.   Is this the litigation matter you mentioned a

24  moment ago?

25     A.   Yes, it is.

Page 12

1     Q.   What was the nature of that dispute?

2     A.   There were two partners of the insurance

3  company.  One had provided most of the financing and the

4  other one was primarily providing what would be referred

5  to as the sweat equity.  The individual who had provided

6  the sweat equity passed away and there was a dispute

7  with his widow over a buy-out of the insurance company

8  and whether the buy-out was at the right price and

9  things of that nature.

10    Q.   None of your testimony in any of those matters

11 involved an insolvent insurance company?

12    A.   No, it did not.

13    Q.   Other than the one or the two you mentioned a

14 moment ago, on how many occasions have you represented

15 insurance regulators?

16    A.   Well, I have not represented insurance

17 regulators, unless you consider The Department of

18 Financial Services to be a regulator.  But there was the

19 POE case and there was another case that I had done some

20 work on earlier on when I joined the firm that also was

21 for The Department of Financial Services.

22    Q.   Okay.  In connection with your practice, are

23 you familiar with sale/leaseback transactions?

24    A.   Generally.

25    Q.   What is your general understanding of

Page 13

1   sale/leaseback transactions?

2       A.   Prior to this case, most of the situations

3   where I have encountered sale/leaseback transactions

4   were to assist with liquidity.  A company may own a

5   building.  They would sell it for the proceeds, and then

6   enter into a leasing agreement where they would be able

7   to get the upfront cash, use that cash for whatever

8   purposes they wanted to use it for, and they would then

9   have the obligation of making the monthly payments.

10  That would be more typical.

11          I have seen some situations where there are

12  sale/leasebacks in order to clean up a balance sheet,

13  you know, to be able to remove the liability from the

14  balance sheet.

15      Q.   Would you agree with me that one of the

16  benefits of the sale/leaseback transaction is to improve

17  the balance sheet?

18      A.   That can be an objective.

19      Q.   And such transactions are done commercially

20  not infrequently, right?

21          MR. FRIEDMAN:  Form.

22          THE WITNESS:  Most of the time that I have

23      seen it, it was more for the liquidity issue.  I am

24      sure that there are -- and I have seen instances

25      where there was an effort to improve a balance

1          sheet.  I hadn't seen the situation where the funds

2          are then put into a restricted account like we do

3          here, but I have seen those circumstances.

4     BY MR. McDOWELL:

5          Q.    In your experience, is it common or uncommon

6     for insurers to enter into transactions with the purpose

7     of increasing surplus?

8              MR. FRIEDMAN:  Form.

9              THE WITNESS:  I mean, the transactions that

10          I've seen involving increasing surplus tend to be

11          equity contributions, capital contributions, or

12          surplus notes.  This was something that I had not

13          been familiar with this particular circumstance

14          with the sale/leaseback until this case.

15    BY MR. McDOWELL:

16         Q.    Are you familiar with statutory accounting

17    principles?

18         A.    In a very general way.

19         Q.    What do you mean by that?

20         A.    I have been involved in matters where I have

21    read and understood statutory -- statutorily prepared

22    financial statements.  But I wouldn't say that I am an

23    expert in applying statutory accounting.  That, I leave

24    to my colleague, Whitney Schiffer, who you deposed two

25    days ago.

1      Q.   So you are not being offered here on any of

2   the elements of statutory accounting.  Is that fair?

3      A.   I think that's fair.  Certainly, I am relying

4   off aspects of Ms. Schiffer's testimony which would have

5   applied her expertise in that area.  But I am not giving

6   those opinions, no.

7      Q.   I am just making that boundary line clear.  To

8   the extent that any part of your testimony involves the

9   application of statutory accounting principles, you are

10  relying on Ms. Schiffer's report, right?

11     A.   Yes.  I would say that's fair.  Certainly, I

12  understood what she had done and spoke with her and read

13  her reports.  But those are her opinions, not mine.

14     Q.   I can see from your report that you have been

15  accepted as an expert witness on a number of occasions.

16  Have you ever been disqualified as an expert or had your

17  testimony excluded for Frye or Daubert reasons?

18     A.   I had one instance where I was excluded.

19     Q.   What was that?

20     A.   The Televisa-Telemundo matter.

21     Q.   What happened there?

22     A.   That was a situation where the opposing expert

23  was excluded under Daubert for, what I would say, an

24  improper methodology.  As a result, the defendant in the

25  case -- I'm sorry.  The plaintiff in the case put up

Page 16

1    their -- I think it was a CFO as a lay expert, and I

2    [Zoom audio distortion] the report identifying issues

3    with the simplistic analysis that he had provided.  I

4    challenged in that the opinions that I was giving were

5    being asserted as not requiring an expert to provide

6    those opinions; that they were within the understanding

7    of a jury.  And the judge agreed that we didn't need an

8    expert to provide those opinions.

9         So for those grounds I was excluded in a case,

10   but not for anything that I was actually testifying to.

11        Q.    Okay.  In this case, what were you engaged to

12   do?

13        A.    There were various counts that were in the

14   complaint that was filed against Pac West or Marquette.

15        Q.    Okay.

16        A.    And I was asked to quantify the damages that

17   would result under each of those counts.

18        Q.    What did you do to prepare yourself for this

19   assignment?

20        A.    How are you defining "this assignment?"  Just

21   the entire --

22        Q.    Well, let me ask it this way.

23        A.    Yes.

24        Q.    Do you have any opinions in this matter?

25        A.    Yes.  They are reflected in my report.

1      Q.    What did you do to arrive at those opinions?

2      A.    I spent time going through documentation that

3   was produced in the case that would have included --

4   well, all of the information, if you don't mind, I would

5   flip to the list of documents that were considered, and

6   I provided a pretty lengthy list of information that I

7   considered in Appendix B of my report.

8      Q.    Okay.

9      A.    The last two pages of the PDF.  So I can go

10   through and I can read through all of these, but --

11      Q.    You don't need to read them into the record

12   if you can identify that Exhibit B is a complete list of

13   the things that you reviewed.

14      A.    Yes.  I mean, it's a complete list.  To the

15   extent that there are certain categories of documents

16   that are there, it doesn't have every individual

17   document, but it's, I think, a complete list of -- that

18   encapsulates everything that I looked at.

19      Q.    Okay.  Did you do anything else?

20      A.    Well, I would have also -- now I have the

21   expert report with Ms. Schiffer on here.  Yes, I would

22   have also had conversations with Ms. Schiffer as well

23   over the course of our work on this case.  Well, and

24   having -- once I read through all of these documents,

25   looked through them, analyzed them, I would have put

1    together schedules and a report that is reflected in the

2    expert report that we are looking at right now.

3        Q.   How did you select your methodology?

4        A.   It was based on the counts that were asserted

5    in the complaint and where -- in each section of the

6    report, I would identify what the account was, what was

7    being asserted, and then I think the damages are a

8    natural outflow of what those categories are.

9        Q.   Okay.  So your opinions in this case are

10   limited to the computation of damages.  Is that fair?

11       A.   I would say generally, so.  I mean, whatever

12   is in my report would be -- well, I shouldn't say that.

13   There is background information in my report that I have

14   summarized in the beginning and there is also an excerpt

15   from Ms. Schiffer's report that I was relying on.  But

16   generally, I would say that the calculation of damages

17   is the essence of my opinions.

18       Q.   You are not offering any opinions on insurance

19   practice or procedure, regulatory environment, or

20   anything to do with the insurance aspects of this case,

21   right?

22       A.   I think that is fair.  Yes.  Yes, you are

23   correct.  No, I am not going to be offering those

24   opinions.

25       Q.   Okay.  You said you had opinions.  In general,

Page 19

1  tell me what your opinions are.

2       A.    I did a calculation that identified the

3  difference between the proceeds that would be available

4  to stakeholders as a result of the liquidation and I

5  have compared that to what that would have been at

6  various dates in time.  So if we compare -- and I think

7  that would be best evidenced on page 12 of my report

8  which identifies five dates in time, the quarter ending

9  December 31, 2011, through December 31, 2012.  And I

10  have a range of damages for each day, and it is

11  calculated by taking the difference between what the

12  liquidation value of the company would have been at each

13  of those quarter ends and comparing that to what

14  ultimately happened at the time of the liquidation that

15  did happen.

16        I also did a calculation reviewing and

17  identifying all of what has been asserted as avoidable

18  transfers.  That would be in the -- that would be the

19  second opinion that I gave.

20        And the third would be looking at the

21  statutory damages that are identified in the Florida

22  statutes, and I provided computations involving those

23  aspects of the case.

24       Q.    I want to talk about each of those in turn, as

25  you would expect.  Let's talk about your first opinion.

Page 20

1    It appears to me that if I start on page 7, that's the

2    rationale for most of your calculations; is that right?

3         A.    That is the beginning of it, yes.

4         Q.    It begins on page 7 and runs through several

5    pages, it looks like.  Through the end of page 12.  Is

6    that where it's contained?

7         A.    Yes.

8         Q.    If you could, describe your methodology for

9    this opinion.

10        A.    Okay.  All right.  So I am going to make

11   reference to various pages within my report as I explain

12   it.

13        Q.    Please.

14        A.    That would be more helpful.

15        Q.    Please.

16        A.    The page 8 is a summary of calculations that

17   were included in my colleague Whitney Schiffer's report.

18        Q.    Okay.

19        A.    And we see a chart on page 8 that identifies

20   the total assets, the non-admitted assets, and the net

21   admitted assets that were included in the filings by PUP

22   from December of 2011 through December of 2012, and

23   you've got a calculation for each of the five quarters.

24        Q.    Okay.

25        A.    As a result of the work that was done by

Page 21

1    Ms. Schiffer, as testified in her deposition on

2    Wednesday, she made certain adjustments to those

3    calculated values.  And the adjusted columns to the

4    right on page 8 reflect what the adjusted values would

5    be had they been prepared in accordance with the SSAP

6    requirements as reflected in her report.

7         Q.   So let's walk through one because I want to

8    make sure that I understand the mechanics of this

9    calculation.  The first three columns taken together are

10   as filed by PUP, right?

11        A.   Yes.  Yes.

12        Q.   So column two would have been the non-admitted

13   assets reported by PUP, right?

14        A.   That's correct.

15        Q.   And in the third column, it's just the

16   difference.

17        A.   That's right.  That's right.  No change in

18   liabilities, but the assets change when you subtract the

19   non-admitted assets from the total assets.

20        Q.   Right.  And that's what PUP calculated at the

21   end of each of these quarters, right?

22        A.   Yes.  That is consistent with what they filed

23   with the state.

24        Q.   Then columns 4, 5 and 6 reflect adjustments

25   made by Ms. Schiffer, right?

Page 22

1        A.    That's correct.

2        Q.    And the item identified as shortfall, that is

3   just the difference between the required capital and the

4   net as adjusted.  Is that right?

5        A.    That's correct.  Yes.

6        Q.    Who computed the required capital?

7        A.    That would have been something that was

8   included in Ms. Schiffer's report, but it was based on

9   the statutory requirements of what the minimum capital

10  is for an HMO.

11       Q.    Okay.  So this chart reflects the adjustments.

12       A.    That's correct.

13       Q.    All right.

14       A.    And I identify, generally, what those

15  adjustments were.  They are in more detail in her report

16  and they are also in more detail in schedules 1a through

17  1e of my report.

18       Q.    Schedules 1a through 1e are providing more

19  detail for these computations, right?

20       A.    Yes.  So on this page, we have total assets,

21  total liabilities.  If you go to 1a through 1e, you will

22  see the full balance sheet and you will see exactly

23  which asset categories or liability categories those

24  adjustment are being made.

25       Q.    So looking back at page 8, you have identified

Page 23

1   the shortfall at various points in time.  How does that

2   correlate to a computation of damages?

3        A.    So that would be the starting point for that

4   computation.  The next step would be to estimate the

5   liquidation value at each of those points in time, and

6   those were reflected in the chart on page 9 of my

7   report.  There were liquidation adjustments that were

8   made, and I tried to be consistent in the types of

9   liquidation adjustments that I made at each of those

10  five dates to the way I looked at the liquidation value

11  of the company as a result of having gone into

12  liquidation in 2014.

13       I describe the nature of those adjustments in

14  items a through f at the bottom of page 9 and into 10.

15  So if you look at each of those descriptions, and we can

16  go through them if you would like --

17       Q.    Yes.

18       A.    -- those are the adjustments that were made to

19  get to the totals that you see in column 7 on page 9 of

20  my report.

21       Q.    Okay.  Again, staying on page 9 for a second,

22  columns 7 and 8 are the liquidation adjustments that you

23  are referring to now, right?

24       A.    Correct.

25       Q.    Okay.  So let's look at the chart on the

Page 24

1    bottom of page 9.  Column 7 is headed net liquidation

2    adjustments.  Explain that column to me.

3         A.    Okay.  Well, the explanation would be in items

4    a through f at the bottom of 9 and into 10.  Those are

5    the types of adjustments that are reflected in my

6    calculations.

7              And again, similar to the adjustments that

8    were made by Ms. Schiffer, you will also see the

9    liquidation adjustments on schedules 1a through 1f as

10   well.

11        Q.    Let's take an example.  Let's look at the

12   first set of adjustments dated December 31, 2011.  How

13   did you get to $1,205,758?

14        A.    Okay.  So if you look at schedule 1a --

15        Q.    Got it.

16        A.    -- there were three adjustments that I made.

17        Q.    Okay.

18        A.    The first one would have been adding back the

19   non-admitted cash.  In Ms. Schiffer's analysis under

20   SSAP, that $500,000 should be non-admitted, even though

21   it would be a non-admitted asset in liquidation that

22   cash would be available to satisfy liabilities.  So I

23   added it back because --

24        Q.    Okay.

25        A.    -- from an economic standpoint, that cash

Page 25

1  would be value.

2          The next adjustment was what is identified as

3  line 21, and those numbers are out of the NAIC

4  statements.  So the -- I'm sorry, 20, electronic data

5  processing equipment and software.  I assumed that there

6  would be no liquidation value to the EDP assets, and

7  that was consistent, generally, with what happened in

8  reality when the company did liquidate.

9          And similarly, I adjusted the health care

10  receivables and other amounts receivable to reflect the

11  values that were actually collected on those receivables

12  subsequent to this date.  So we have net admitted assets

13  on line 24, column 8, of $5,129,947.  If I looked to see

14  what actually happened with those receivables, there

15  would have been collections of approximately

16  $3.68 million.

17          So the liquidation adjustment looked at what

18  would have likely happened had there been a liquidation

19  at that time.  If you add up those three amounts, you

20  come to your $1,205,758 number.

21      Q.   If I add up which amounts?

22      A.   I'm sorry?

23      Q.   If I add up which amounts?

24      A.   The $500,000, the negative two fifty-six, and

25  the negative fourteen forty-nine.

Page 26

1        Q.   So that's --

2        (Zoom audio distortion; reporter interruption.)

3        Q.   I get it.  So the sum of all three of those is

4    a negative 1.2 million and change.

5        A.   That's correct.

6        Q.   Is it the case that your method of computation

7    was the same for all of the succeeding periods?

8        A.   Yes.

9        Q.   How did you determine how much of the

10   receivables had actually paid?

11       A.   Well, we had information -- there were two

12   different types of receivables.  There were the MSO

13   receivables and then there were other receivables that

14   pertained to either contracts with providers or

15   pharmaceutical, and there was nothing that I saw that

16   would suggest that the pharmaceutical or the Tenet

17   receivables were not collectable.  They would turn over

18   every month.  There would be monies coming in and going

19   out, coming in and going out.  So there was always a

20   balance, so I accepted those as being realizable.

21            With respect to the MSO receivables, I looked

22   at the subsequent activity to see what actually happened

23   with each of the MSOs in the ensuing years.

24            So in 2011, I would have looked at what

25   happened in 2012 and '13.  And to the extent that there

Page 27

1    actually were payments made against those receivables,

2    and there were not very many, but there were -- certain

3    MSOs had actually did make some payments, and that would

4    have been included as a -- as part of what I was looking

5    at.  Whatever was not collected I took off as a

6    liquidation adjustment.

7        Q.   And what records did you review to determine

8    which MSO receivables had actually paid?

9        A.   There were lag reports and other financial

10    documents that were produced in this case.

11        Q.   What reports?

12        A.   They would have been contemporaneous reports

13    prepared by the company.

14        Q.   By PUP?

15        A.   By PUP, yes.

16        Q.   Okay.

17        A.   I believe they also had some record of those

18    payments in the McGladrey RSM work papers.

19        Q.   Why did you select the end of those quarters

20    to be measuring points?

21        A.   Well, the first instance that we saw of having

22    a shortfall was in December of 2011.  That would have

23    been after the initial transaction with Pac West.

24    Marquette was done in September of 2011.  And by

25    December of 2012, based on the adjustments that were by

1    Ms. Schiffer, there would have been an excess of

2    liabilities over assets.  So it was no longer just a

3    shortfall and required capital, but it actually was

4    balance sheet insolvent.

5              So that was a range.  That was my stakes in

6    the ground, if you will, and I just looked at each of

7    the quarters to show how it changed from quarter to

8    quarter.

9         Q.   So in conjunction with that analysis, when did

10   PUP become balance sheet insolvent?

11        A.   The first record -- we didn't do it day-by-day

12   or month-by-month.  But looking at it

13   quarter-by-quarter, it would have been December of 2012

14   where we saw a balance sheet insolvency.

15        Q.   I would like to -- is it the case that you

16   used the same process, quarter-by-quarter, for the

17   corresponding schedules as you have described to me,

18   December 31, 2011?  In other words, you followed the

19   same process, right?

20        A.   Yes.  The process was the same.  The numbers

21   would have changed based on, obviously, what was on the

22   financial statements at each respective quarter.

23        Q.   Help me understand the chart that is on page

24   12 then.

25        A.   Well, I can go to page 12 if you would like or

1    I can explain what feeds into page 12, which would be

2    looking at the chart on the bottom of page 10.  Whatever

3    your preference.

4         Q.   Well, I would like to understand it.  So

5    however is most convenient for you to explain it to me,

6    I would appreciate it.

7         A.   Okay.

8         Q.   How did you get to page 12 then?

9         A.   All right.  So I would say that the numbers on

10   page 12 are, in part, predicated on what we see on the

11   bottom of page 10.  So I think in order to explain

12   page 12, I need to talk about that chart.

13        Q.   Okay.  Go ahead.

14        A.   So if we look at the bottom half of page 10,

15   there is a chart there.

16        Q.   Okay.

17        A.   That looks at what has happened to PUP since

18   they went into liquidation, all the way up through the

19   last financial statement that was filed by the DFS, The

20   Department of Financial Services, in June of 2020.  I am

21   not sure if the September report has come out yet, but

22   at this point there is not, generally, a lot of activity

23   from quarter to quarter.

24        Q.   Mm-hmm.

25        A.   But what we see there, and I'll just walk you

Page 30

1    through the chart, we started with $22.7 million,

2    approximately.  When the receivership began, that was

3    the value of the assets that were identified by the

4    Department as part of what they took on once the company

5    went into receivership.

6         Over the course of the receivership, there had

7    been recoveries of $23.7 million.  There was also

8    interest earned of an additional 2.6 million, which I am

9    giving credit to in my calculation.  But there was also

10   some monies that were used to pay down secured claims

11   that was approximately 2.6 million.  And then there were

12   additional disbursements made over the course of the

13   receivership, of which I was able to determine

14   4.6 million were normal operating expenses, and then

15   there was approximately 9.7 to date incurred in

16   professional fees.

17        I would point out that the 23.7 million

18   includes the entirety of the settlement that was reached

19   with RSM and the professional fees also include any

20   amounts that would have been paid as a result of that.

21        So when you look at all of those together,

22   that means that as of right now there is approximately

23   $32 million, give or take, that would be available to

24   pay claims.  I compared that $32 million number to the

25   claims that we know and, through today, I would say

Page 31

1    that, you know, they are 98, 99 percent done with the
2    claims process.
3              As I talked about on page 11, there were
4    $421 million in claims that were submitted in connection
5    with this receivership.  That number has been reduced to
6    a range of between 68- and $75 million.  That is
7    reflected on page 10.  So rather than using the total
8    claims, I used -- I have taken the benefit of hindsight
9    and reduced it by roughly $353 million to what is
10   actually -- the claims that are in place right now.
11             And similarly, when they inherited PUP, there
12   was approximately $106 million of liabilities on the
13   balance sheet.  But once again, I am using the 68- to
14   $75 million as the total claims outstanding, rather than
15   the higher values that were reflected on the company's
16   own balance sheets.
17             So as a result, when you compare the
18   $32 million that is available to pay claims to the 68-
19   to $75 million, you are left with a deficit right now
20   ranging between 36 and $43 million.
21        Q.   Let me ask you a couple of questions about
22   that.
23        A.   Sure.
24        Q.   How does the net deficit now relate to damages
25   that you claim to have accrued between 2011 and 2013?

Page 32

1        A.    All right.  So what I have done is I have --
2    if I just stopped at 2013 or 2014 when they went into
3    liquidation, my number would have been much, much higher
4    because I wouldn't have known what the recoveries are, I
5    wouldn't have known what the ultimate liabilities were.
6    The liabilities would have been much, much greater or
7    the amounts available to pay those liabilities would
8    have been much less.
9            So I think I have given every benefit of the
10   doubt in this case to the defendant because the smaller
11   the deficit is -- so for example -- let me just stop
12   myself.  There was $106 million of liabilities on the
13   balance sheet.  If I use that number, and let's say I
14   used the 32 million, instead of having a difference of
15   36- to $42 million, I would have a difference of about
16   $70 million.
17           So I am giving credit for everything good that
18   has happened over the course of the receivership.  So my
19   damages are calculated by doing a similar liquidation
20   analysis, like we just went through earlier on page 9.
21   And I am comparing the liquidation value of what it
22   would have been at that time, and I am comparing it to
23   the 36- to $42 million range that we see through today.
24       Q.    Explain that one more time.
25       A.    Okay.  We have got a shortfall right now based

1    on the liquidation that happened in 2014.  And we don't

2    know exactly what that shortfall is because there are

3    still claims that need to be resolved.  But if there are

4    no more claims that are added to the estate from where

5    it is today, because some of them are in dispute, we

6    would have a shortfall of $36 million.

7            And what I am doing is I am comparing the

8    $68.4 million in the chart on page 10 to the

9    $32.1 million.  That leaves me a $36.2 million

10   shortfall.  If I include the claims that are still in

11   dispute, which is approximately an additional

12   $6.6 million, that raises the shortfall from 36.2 to

13   42.7.  Do you see that?

14       Q.   Mm-hmm.

15       A.   Okay.  So that is my shortfall.  Giving credit

16   for all of the recoveries, giving credit for the

17   reduction in the liabilities, that is the shortfall.  I

18   compare that to the numbers that you see in column 8 on

19   page 9.

20       Q.   Okay.

21       A.   What I am saying is, let's look at

22   December 2001 [sic].  If we compare the $2 million

23   surplus that would have been there in liquidation in

24   December of 2011, that would result not in a -- well,

25   let's now go to page 12.

Page 34

1      Q.    Okay.

2      A.    So you see I have on December 31, 2011, the

3   liquidation value is 2-million-136.

4      Q.    Okay.

5      A.    If you look at the -- and that would have been

6   a positive number.  We wouldn't have a deficit like we

7   have right now of 36.2 to 42.7.  So the difference

8   between the $2.1 million that would have been available

9   in a liquidation after paying off all outstanding

10  liabilities, that would be -- that would result in a

11  $38.4 million difference.

12          What I am doing is I am comparing the positive

13  2-million-136 to the negative 36-million-226.  The

14  difference there is 38-million-362.

15     Q.    Okay.

16     A.    If the company had ceased to operate when they

17  no longer had sufficient capital, they would have had

18  enough to pay off all of their liabilities rather than

19  being short by 36- to $43 million.

20     Q.    Okay.

21     A.    And I do that same calculation in each of the

22  five quarters from 2011 in December to December of 2012,

23  and we see the ranges for each quarter based on the same

24  type of calculation that I just went through for the

25  first quarter.

1       Q.    Okay.  Then if I understand it, you're making

2    an assumption in each of those points, in each of those

3    quarters, that that's what would have been if the

4    company had stopped operating then, right?

5       A.    Yes.  Correct.  They would have had

6    insufficient capital to operate according to the

7    statute, the Florida statutes.  And if they did indeed

8    stop then rather than continuing on, there would have

9    been this savings, if you will.

10                 (Court reporter clarification.)

11      A.    This savings or difference.

12      Q.    How does your methodology take into

13   consideration possible alternate sources for capital to

14   PUP?

15      A.    Well, if there were -- I do not have a

16   calculation that says that the monies that were creating

17   these deficits as a result of the MSOs would have

18   required additional capital contributions.  Not just

19   when it got caught in 2014, but all along the way.

20   Presumably, at every step there was a shortfall in the

21   surplus, there would have needed to be -- it ultimately

22   would have been $30 million that would have needed to

23   come in to cover these shortfalls.

24                 So I have not performed an alternative

25   analysis of what if they got these additional capital

1    contributions that would have allowed them to continue

2    to operate.  But to the extent that no money was put in,

3    even if there was additional funds put in, because the

4    money wasn't actually there, that wouldn't count.  That

5    would be, you know, an amount that would have needed to

6    be there that isn't there now or never was put in.

7         Q.   And if I look back at page 10, it appears to

8    me that your -- as I understand your testimony, that you

9    are giving maximum credit for future recoveries, but it

10   also appears to me that you're charging against that

11   obligations that were incurred after the business was

12   stopped, right?

13        A.   No.  No.  These are the resolution of the

14   claims.  As I said, if you look at their balance sheet

15   in June of 2014, there was in excess of $100 million of

16   liabilities.  I didn't use the -- and that would have

17   been liabilities that were incurred up to the date of

18   liquidation.  I reduced that 100-plus-million-dollar

19   number down to the 68- to $74 million that was allowed

20   and adjudicated to some extent by the courts as part of

21   the receivership process.

22        Q.   You have deducted from amounts available to

23   pay claims administrative expenses of the receivership,

24   right?

25        A.   Well, I have included those administrative

1   expenses because I included the nearly $27 million of

2   monies that were -- that was generated.  Without

3   incurring those costs, there wouldn't have been the

4   recoveries.  There wouldn't have been the -- you know,

5   well, the recoveries wouldn't have been there if there

6   wasn't somebody administering the estate in order to

7   generate them.

8        Q.   How do you know that?

9        A.   Well, the biggest number is the RSM recovery.

10  If everybody just stopped, then that $17 million

11  settlement would not be in that number.

12       Q.   I want to be clear.  You are deducting

13  administrative costs from the amount available to pay

14  claims, right?

15       A.   And giving full credit for every dollar of

16  recovery that has been generated by keeping the estate

17  open.

18       Q.   RSM damages would have accrued prior to the

19  receivership, right?

20            MR. FRIEDMAN:  Form.

21            THE WITNESS:  I'm sorry.  I didn't hear that.

22  You broke up a little.

23  BY MR. McDOWELL:

24       Q.   The RSM damages would have accrued prior to

25  the receivership, right?

```
 1          MR. FRIEDMAN:  Object to form.
 2          THE WITNESS:  Well, yes.  The damages would
 3      have been incurred prior to the receivership, but
 4      if there was nobody to pursue the claim, there
 5      would have been no recovery.
 6  BY MR. McDOWELL:
 7      Q.   Now, in constructing your analysis, did you
 8  make any evaluation of who you thought was responsible
 9  for the damages?
10      A.   I had not apportioned responsibility, if
11  that's responsive to your question.
12      Q.   Okay.  What you have done is looked at the
13  total decline in value without allocating fault to any
14  particular party.  Is that fair?
15      A.   I believe it's fair because there were -- I
16  believe that Pac West was a responsible party.  RSM was
17  a responsible party.  The company was a responsible
18  party.  All three needed to act as they acted in order
19  to be able for this to continue on as long as it did.
20  That led to the continuation of the company beyond which
21  point it was statutorily insufficient capital.  And for
22  me to attempt to apportion that responsibility I think
23  is beyond my role as an expert.  I think that is
24  ultimately a determination that will have to be decided
25  by the trier of fact.
```

1      Q.   I just want to be clear.  You didn't attempt
2   to do it.
3      A.   I did not.
4      Q.   Okay.  All right.  In looking at this initial
5   opinion, you will acknowledge that there are items that
6   were adjusted that didn't have anything to do with PUP,
7   right?  Like for example --
8           MR. FRIEDMAN:  Form.
9   BY MR. McDOWELL:
10     Q.   -- outstanding health care -- outstanding MSO
11  receivables that were still admitted on the balance
12  sheet of PUP, right?
13          MR. FRIEDMAN:  Object to form.
14          THE WITNESS:  You said didn't have anything to
15     do with PUP?
16  BY MR. McDOWELL:
17     Q.   I'm sorry.  You're quite correct.  Let me try
18  a whole new question.
19          You will acknowledge that there were MSO risk
20  sharing receivables that were adjusted as part of your
21  evaluation, correct?
22     A.   Yes.
23     Q.   And that you adjusted admitted MSO
24  receivables, right?
25     A.   Yes.

Page 40

```
 1              MR. McDOWELL:  Okay.  Would it be okay with
 2         you guys if we took five minutes?
 3              THE WITNESS:  Sure.
 4              MR. FRIEDMAN:  It's okay with me.
 5              THE VIDEOGRAPHER:  Going off the record.  The
 6         time is 11:24.
 7              (Recess taken in the proceedings from 11:24
 8    a.m. to 11:41 a.m., after which the following
 9    proceedings were had:)
10              THE VIDEOGRAPHER:  We are back on the video
11         record.  The time is 11:41.
12    BY MR. McDOWELL:
13         Q.   Mr. Bouchner, you had mentioned to me prior to
14    the break that you -- while you did not allocate fault,
15    you considered three parties to be at fault for those
16    losses:  The company itself, Pac West, and RSM.  How did
17    you determine that Pac West had caused any damages at
18    all?
19         A.   There were different --
20              MR. FRIEDMAN:  Object to form.
21              THE WITNESS:  There were different factors
22         that I considered.
23    BY MR. McDOWELL:
24         Q.   Tell me what they were.
25         A.   The first would have been initiating the whole
```

Page 41

1    process and introducing the concept of what they were

2    referring to as sale/leaseback transactions that could

3    be used to convert non-admitted assets to admitted

4    assets.

5        Q.   Okay.

6        A.   The second would have been the -- their

7    involvement in terms of the proposal of the accounting

8    treatment that was ultimately used in order to be able

9    to treat them as -- the cash as admitted assets, in

10   spite of the incorrect treatment as testified to by

11   Ms. Schiffer.

12           They were aware of and received copies of the

13   financial statements, both the audited statements as

14   well as the regulatory statements, as well, so they

15   would have been aware of this over time as best as I can

16   see.  And I think equally, if not most important --

17   well, maybe not most important because I had not really

18   ranked them, but certainly very important is that as a

19   result of their continued funding of all of these

20   obligations, it allowed the company to continue until it

21   dug itself into as deep a hole as it did.  By funding in

22   '11 and '12 and '13, and continuing to do it, it really

23   created a situation that really created the deep

24   insolvency that they found themselves in by the end.

25       Q.   Now, to what -- in forming that conclusion,

Page 42

```
1    what significance did the testimony of representatives
2    of PUP have to the effect that they did not rely on Pac
3    West to determine the accounting treatment?
4              MR. FRIEDMAN:  Form.
5              THE WITNESS:  I mean, I saw the same
6         communications while they -- and if you look at the
7         proposed treatment and the ultimate treatment and
8         you look at the advice that was given, I mean, it
9         is not for me to determine specifically whose -- I
10        don't want to say telling the truth or not telling
11        the truth or how things are being characterized,
12        but, certainly, there was a clear trail of the
13        initial suggested treatment to what ultimately was
14        done, and I think that that is indicative.
15        Ultimately, that's not a professional opinion, but
16        I certainly see that connection that I have made
17        and I think it seems to be an important one.
18   BY MR. McDOWELL:
19        Q.   To what significance, in your mind, does it
20   have that representatives of PUP testified that they
21   wouldn't have done this transaction if RSM hadn't sign
22   off it?
23             MR. FRIEDMAN:  Form.
24             THE WITNESS:  As I said before, I have not
25        apportioned responsibility.  I think that there was
```

Page 43

1      collective responsibility there.  And to what

2      extent PUP is responsible, you know, that is not

3      going to be my opinion.

4           They were a crucial factor in this whole thing

5      and, you know, I calculated what the overall

6      damages were.  But I can't apportion them with any

7      reasonable certainty.

8    BY MR. McDOWELL:

9      Q.   You do not contend that the damages shown in

10   your report are 100 percent allocable to Pac West,

11   right?

12     A.   Well, that's --

13          MR. FRIEDMAN:  Form.

14          THE WITNESS:  That's ultimately a legal

15     decision.  I mean, I'm not an attorney.  I am aware

16     of terms like joint and several liability.  But I

17     am not calculating it and I am not saying that they

18     are the only entity that has anything to do with

19     this, so I can't really answer it any better than

20     that.

21          MR. FRIEDMAN:  Can you guys hear me?  I'm

22     sorry for interrupting.

23          THE WITNESS:  Yes.

24          MR. McDOWELL:  I can hear you.

25          MR. FRIEDMAN:  Okay.  Great.  Thank you.

Page 44

1          THE COURT REPORTER:  I think we lost
2      Mr. Genovese a couple seconds ago.  I don't know if
3      we need to wait for him.
4          MR. FRIEDMAN:  I think we can probably proceed
5      and he will join back in midstream.  I think it's
6      okay if we proceed.
7  BY MR. McDOWELL:
8      Q.   Are you familiar with the terms "reasonable
9  certainty" and "causation"?
10      A.   Generally, yes.
11      Q.   What do those terms mean?
12          MR. FRIEDMAN:  Form.
13          THE WITNESS:  Well, reasonable certainty is
14      whatever the court believes is required in order to
15      establish that, as it relates to damages, that
16      there is enough information to be able to conclude
17      that the damages -- it's hard to define the term
18      without using the term in its definition, you know,
19      but that there is a high enough level of certainty
20      that you could award damages based on the
21      information that is available.
22          It can't be speculative.  I would say
23      reasonable certainty would be the opposite of
24      purely speculative.
25  BY MR. McDOWELL:

1      Q.    Is establishing reasonable certainty important

2    to calculating damages?

3              MR. FRIEDMAN:  Form.

4              THE WITNESS:  I think, generally, most of the

5         case law would suggest that damages need to be

6         established with reasonable certainty, yes.

7    BY MR. McDOWELL:

8      Q.    Reasonable certainty as to a particular party?

9              MR. FRIEDMAN:  Form.

10             THE WITNESS:  I mean, ultimately, when you

11        have issues like we were just talking about, I am

12        not sure that -- I mean, it's ultimately a decision

13        by the trier of fact in many cases how to apportion

14        responsibility.  I have been involved in many cases

15        where there are Fabre-type evaluations at the end

16        where, after an award is made, there is additional

17        proceedings to be able to establish relative

18        responsibility.  That is not part of my opinions,

19        but it's a factor.

20   BY MR. McDOWELL:

21     Q.    It's not part of your opinions for purposes of

22   this case.

23     A.    Certainly not at this point.  At this point, I

24   have not done anything, as I said, to apportion

25   responsibility.

Page 46

1       Q.   All right.  Now, right after the break you
2   told me the facts that you looked at to determine or to
3   at least form a belief that Pac West bore some measure
4   of responsibility.  Did you consider any other facts?
5              MR. FRIEDMAN:  Form.
6              THE WITNESS:  I mean, that's a tough question.
7         I mean, I have read lots of depositions.  I have
8         read lots of documents.  I mean, a lot -- you know,
9         I have an overall knowledge of what I have gained
10        by being involved in this case, so I am not sure
11        how to answer that question.  If you can be more
12        specific.
13  BY MR. McDOWELL:
14      Q.   I'm just trying to make sure I have got a
15  complete list of your considerations.
16      A.   Well, I discuss the accounting treatment.  I
17  discuss the initial involvement.  I have discussed the
18  awareness of other financial information and I discussed
19  the continued funding.  I think those would be the
20  primary things that I would look to.
21            But certainly, there was a lot of testimony by
22  the Pac West witnesses, and I am sure that if I went
23  through it I might be able to tick off other minor
24  points as well.  I have given you the best I can at the
25  moment.

Page 47

1          Q.    Fair enough.  I want to look back at the

2     schedules for just a second.  We can use Schedule 1a as

3     the exemplar.

4               On the liability portion of the balance sheet,

5     you included a line item due to Pac West.  Can you

6     explain that line item to me?

7          A.    Yes.  That would be the amount that would be

8     owed as a result of the transactions that are the

9     primary subject of this litigation.  So the $460,904

10    would be the amount that would be owed to Pac West that

11    would be recorded on the balance sheet if it was

12    recorded not as an operating lease, but as a financing

13    transaction.

14         Q.    Okay.  And that would have been the then

15    amortized balance as of December 31, 2011?

16         A.    Yes.  I believe the methodology that was used

17    by Ms. Schiffer was that she would have looked at what

18    the amount would have been without any future interest

19    costs.  So that would be the principal balance if it

20    were a finance transaction.

21         Q.    Okay.  I understand.  All right.  Let's talk

22    about your second opinion related to avoidable

23    transfers.  Explain to me how these tables were

24    constructed.

25         A.    If you look to the complaint, there are

Page 48

1    various periods of which the claim is being made that

2    the monies that were remitted by PUP to Pac West were

3    avoidable transfers.  So this is a relatively

4    straightforward series of schedules that look at each

5    area.  Four years, one year, four months.  And let me

6    see again.  So we have the four-year period which was

7    the chart on pages 13 and 14.

8            That would have included essentially all

9    remittances from PUP to Pac West from August of 2011

10   through April 22nd of 2014, less the amount that was

11   refunded back to Pac West.  So the net proceeds that

12   went to Pac West totaled 36,745,422.  If the court were

13   to find that all of those transfers were avoidable, that

14   would be the total.

15       Q.   That's just an arithmetic tally of the

16   transfers, right?

17       A.   Yes.  It was going to the information and

18   identifying in their general ledgers and other records

19   how much was paid and tallying them up.  Yes.  That's

20   what it was.

21       Q.   You are not offering an opinion on whether the

22   transfers were or were not avoidable, right?

23       A.   No.  I am not giving that opinion.

24       Q.   On page 13, I would like to direct your

25   attention to footnote 8.

Page 49

```
 1        A.   Yes.
 2        Q.   If I understand this footnote, you're looking
 3   at the net of the transfers by PUP to Pac West,
 4   comparing them to the advances made by Pac West to PUP,
 5   right?
 6             MR. FRIEDMAN:  Form.
 7             THE WITNESS:  I don't know if I would call
 8        them advances, but I would say payments against
 9        those advances.
10   BY MR. McDOWELL:
11        Q.   Okay.  I use the word "advances" because that
12   is what it says in footnote 8.  Explain footnote 8 to
13   me.
14        A.   I mean, I think it's fairly self-explanatory.
15   But in general, what I was doing was acknowledging that
16   there was 36,745,422 of total transfers made by PUP to
17   Pac West.  And if you look at the total amount that Pac
18   West gave to PUP, that would be the 32,492,705, and that
19   the difference between the two would have been the
20   additional monies received by Pac West, 4,252,717 above
21   and beyond what PUP had received.  Just a point of
22   information to the extent that it would be of any
23   relevance.
24        Q.   Does that number, $4.2 million and change,
25   reflect any funds that were released from restricted
```

Page 50

1    accounts to PUP prior to the time of the sweeps?

2              MR. FRIEDMAN:  Form.

3              THE WITNESS:  Well, I think it is simply the

4         difference between all funds that were contributed

5         into PUP versus all monies that were remitted back

6         to PUP -- to Pac West, I'm sorry -- and the monies

7         that were remitted back to Pac West would have been

8         rental payments.  There were a few leases that were

9         canceled, so it would reflect the cancellation of

10        those leases.  Those were the agent balances.  It

11        would also deal with the CD that was replaced by a

12        cash balance as well.

13             So it really reflects the total activity and

14        just calculates the difference.  And my assumption

15        is that that difference is essentially like mostly

16        interest.

17   BY MR. McDOWELL:

18        Q.   My question goes to the computation.  Did you

19   consider any funds that were released prior to mid-2014

20   out of restricted accounts to PUP?

21        A.   I think it's inherent within these

22   calculations.

23        Q.   What does that mean?

24        A.   Well, if I include every dollar that was put

25   into those accounts, even if the funds were released and

Page 51

1   they went from the restricted account into an operating

2   account, it's almost irrelevant to the calculation

3   because I am looking at everything that went back to Pac

4   West.

5           So I am not sure that what you are -- maybe

6   the answer is no because it doesn't need to be in there.

7       Q.    Okay.  Let's talk about your third opinion.

8       A.    Okay.

9       Q.    Similar to the first two, I would like you to

10  explain your methodology to me.  I am starting at

11  page 16 of your report.

12      A.    Okay.

13      Q.    If I should start somewhere else, tell me.

14      A.    No, that's fine.

15          So the third opinion is statutory damages.

16  The Florida Statutes, 631.157(1), lay out circumstances

17  in which there are damages that would be allowed for

18  various types of activities.  The Department, as

19  plaintiff, is claiming that there were violations by

20  Pac West that would be, you know, subject to those

21  statutes.

22          I broke it up into two groups.  The first

23  group deals with the excerpt from the statutes that's on

24  page 16.  And I don't know if you want me to read

25  through that into record.

Page 52

1      Q.    No.

2      A.    It basically talks about taking -- I would say

3   the important part would be any funds, assets, or

4   property, including, but not limited to, monies, funds,

5   premiums, credits or other property of an insurer, shall

6   be liable to the Department as receiver for the use and

7   benefit of an insolvent insurer's estate.  You know, if

8   the funds that were taken would jeopardize the safety

9   and soundness of the insurer.

10              If the transfers are found to have been

11   improper, then, clearly, taking $36 million of funds out

12   of the insurance company would jeopardize the safety and

13   soundness of the company.

14              So that's what would be included in the

15   schedule on pages 16 and 17.  It presumes that there

16   would be a finding that that would be a violation of the

17   statutes and provides the information to be able to show

18   what is included in that.

19      Q.    So you have no opinion on whether or not the

20   transfers were improper.

21      A.    Well, I think that's more of a legal question

22   than it is an economic question.

23      Q.    You are not offering an opinion about that

24   today.

25              MR. FRIEDMAN:  Object to form on that last one

Page 53

1          and this one as well.

2               THE WITNESS:  Right.  I am providing the

3          calculation under the assumption that the court

4          finds that these indeed were fraudulent transfers.

5     BY MR. McDOWELL:

6          Q.    And you are not offering an opinion as to

7     whether they were or they weren't, right?

8          A.    No, I am not.

9               MR. FRIEDMAN:  Form.

10    BY MR. McDOWELL:

11         Q.    So with respect to the chart that begins on

12    the bottom of page 16 and ends on the middle of page 17,

13    is your methodology there simply to tally all of the

14    transfers?

15         A.    Right.  And provide the total amount and the

16    trebled amount, which is multiplying it by 3 based on

17    whether provision A above or B would apply.

18         Q.    And you are not opining on whether A or B

19    apply; you're simply saying what the transfers were.

20         A.    Well, to the extent that the transfers were

21    improper, the taking of that money would jeopardize the

22    safety and soundness.  So it would be reasonable to

23    conclude that A would be more applicable than B if the

24    statutes apply in this case.

25               MR. FRIEDMAN:  Object to form on that last

1     question.

2             THE WITNESS:  I provided both.

3     BY MR. McDOWELL:

4        Q.    I didn't understand your last answer.

5        A.    Okay.  I think I may have misspoken anyway.

6        Q.    Okay.

7        A.    A basically says that if the funds that

8     were -- if the transfers did not jeopardize the safety,

9     it would be the amount of the transfer.  If the funds

10    did jeopardize the safety and soundness, it would be

11    treble damages.  To the extent that the court were to

12    find that those transfers were improper, it would be

13    hard to argue that taking of $36 million over the course

14    of three years did not jeopardize the safety and health

15    of the company.  So I would think -- well, I am not

16    giving an opinion, I believe that if that were true, B

17    would be more applicable than A because there was a harm

18    to the company by taking it.

19            Where I am not giving an opinion is whether

20    those fraudulent transfers -- whether they were indeed

21    fraudulent transfers or not.

22        Q.    Other than providing a tally of the transfers

23    and a trebling of the transfers, are you here today

24    offering an opinion as to whether A or B apply?

25        A.    I think I have answered that, which is that --

 1            MR. FRIEDMAN:  Form.

 2            THE WITNESS:  -- if the court were to find

 3       that these were fraudulent transfers that were

 4       improper, that the taking of $36 million would be

 5       jeopardizing the safety and soundness of the

 6       insurer.  So it would be B.

 7  BY MR. McDOWELL:

 8       Q.   Where is that articulated in your report?

 9       A.   It's not.  You just asked me the question, so

10  I am giving you my answer.

11       Q.   You are not being offered here as an expert on

12  whether it did or did not jeopardize the safety and

13  soundness of the insurer.

14            MR. FRIEDMAN:  Form.

15  BY MR. McDOWELL:

16       Q.   Right?

17       A.   Well, the Department had said that if the

18  company had put in a $30 million contribution, they

19  would have been allowed to continue to operate without

20  going at that point in time into liquidation.  So if

21  they had not taken $36 million, that presumably would

22  not have been necessary, at least at that point in time.

23            So it's hard to not reach the conclusion that

24  if those funds that were taken were improper, that it

25  didn't somehow jeopardize the health and safety of the

 1    company.

 2         Q.   Do you consider other items which OIR had

 3    disallowed in reaching that conclusion?

 4              MR. FRIEDMAN:  Form.

 5              THE WITNESS:  I don't think it's necessary to

 6         consider those other items.  I am just looking at

 7         the fact that this 30 million -- 36 million would

 8         have been more than sufficient to deal with that

 9         problem at that point in time.

10    BY MR. McDOWELL:

11         Q.   Did you consider the disallowance of MSO

12    receivables that was made at the same time by OIR?

13              MR. FRIEDMAN:  Form.

14              THE WITNESS:  Right.  So if I reduce that,

15         then this $36 million really does not change that.

16         Even if the $30 million -- let's hypothetically say

17         that the $30 million only needed to be 20 million

18         if you exclude that.  That doesn't change the fact

19         that this is $36 million that is at issue, and that

20         would have been more than enough to satisfy either

21         30- or 20- in my hypothetical.

22    BY MR. McDOWELL:

23         Q.   How did you reach the conclusion concerning

24    safety and soundness?  What did you do to arrive at that

25    opinion?

1           MR. FRIEDMAN:  Form.

2           THE WITNESS:  It is simply making the -- I

3       mean, it's making the observation that there would

4       have at least been an opportunity to continue.

5           Now, I am not sure -- I can't say what would

6       have happened after the liquidation, but the

7       company would have been able to at least continue

8       under the initial terms of the agreement, the

9       consent agreement, in June of 2014.

10          So the removal of $36 million was a

11      significant event, a series of events, that would

12      have impacted the company's ability to continue to

13      operate.  So looking at the solvency of the

14      company, looking at the statutory capital of the

15      company, looking at the cash flow of the company, I

16      think looking at all of those factors, this would

17      -- had that money not been taken, that would have

18      been available for all of those other purposes and

19      the magnitude is enough to be able to conclude on

20      its face that it would impact the safety and

21      soundness of the company.

22   BY MR. McDOWELL:

23      Q.   And you would agree with me that that's not

24   contained in your report anywhere.

25      A.   No, it's not.

Page 58

1      Q.   The transfers that you have listed on the

2  bottom of page 16, running through the middle of 17, did

3  you consider the amount of any secured claims against

4  those funds?

5            MR. FRIEDMAN:  Form.

6            THE WITNESS:  No, I did not.

7  BY MR. McDOWELL:

8      Q.   Why not?

9      A.   I am presenting this under the assumption that

10  the court finds that the transfers themselves were

11  fraudulent conveyances, or avoidable transfers, I should

12  say.

13            MR. FRIEDMAN:  Object to form on that last

14      question, please.

15  BY MR. McDOWELL:

16      Q.   On page 16, you say:  "In its amended

17  complaint, the DFS included counts seeking statutory

18  damages allowable under Florida Statute 631.157(1),

19  which provides for a damages award equal to triple the

20  full amount of the transfers willfully obtained by the

21  defendants," which you then summarize.  What does

22  "willfully obtained" mean?

23            MR. FRIEDMAN:  Form.

24            THE WITNESS:  I don't have a recollection

25      right now why I used that specific language.  I am

1          not sure if that was just -- it may have been

2          language in the complaint, but that's my -- that

3          would be my best guess.  I can go to the complaint

4          to look, but it probably is language that was

5          reflected in the complaint.  I don't recall for

6          sure.

7     BY MR. McDOWELL:

8          Q.   What would the result have likely been if

9     those transfers had not been made?

10              MR. FRIEDMAN:  Form.

11              THE WITNESS:  The company would have had

12         insufficient capital back in 2011 and there would

13         have needed to be some other way of dealing with

14         that issue.

15    BY MR. McDOWELL:

16         Q.   For example, if the funds that you have

17    tallied on page 16 and page 17 had remained within PUP,

18    they would have still been subject to a secured claim,

19    right?

20              MR. FRIEDMAN:  Object to form.

21              THE WITNESS:  It would have still been

22         subject -- so you are saying if the transfers were

23         made initially and there was no payments that were

24         made to cover the rental payments that were on the

25         leases, that they still were secured and could

1          not -- it still would be restricted.  I think -- is

2          that what you're asking me?

3     BY MR. McDOWELL:

4          Q.    Yes.

5          A.    Yes, they would be restricted.

6          Q.    And that would also be true for the

7     transactions in 2014, right?

8               MR. FRIEDMAN:  Object to form.

9               THE WITNESS:  Yes.  And at that point, there

10          would be funds that would be with the company that

11          would -- could be adjudicated as to whether or not

12          those funds belonged with the company or whether

13          they can go back to the defendants.

14     BY MR. McDOWELL:

15          Q.    You're suggesting it would require an -- for

16     it to stay with the company, it would require an

17     adjudication that there was no security interest?

18          A.    Well, right now there is a dispute --

19               MR. FRIEDMAN:  Object to form.

20               THE WITNESS:  I'm sorry.

21               Right now there is a dispute whether or not

22          those transfers should be avoided.  The alternative

23          would be that the monies were never paid or the

24          funds were never swept, and then there would be a

25          similar dispute whether or not -- you know, who was

 1          entitled to those funds, is what I would gather.

 2              Either way, there is going to be an argument

 3          over whether those funds should go back to the

 4          company.  And, you know, that is not really within

 5          my opinions.  I am just trying to kind of answer

 6          your questions.

 7      BY MR. McDOWELL:

 8          Q.   Okay.  So let's talk about the chart at the

 9      bottom of page 18.

10          A.   Okay.  So like the section of the statutes

11      that we were talking about, this is the same general

12      provision, 631.157.  This is subparagraph 2 rather than

13      subparagraph 1, and this deals with the misstatement of

14      financial results.

15              So what is reflected on the chart on page 18

16      would be all instances in which there were filings with

17      the state, beginning with 9-30-2011, the first quarter

18      after the initial transfer, all the way through

19      3-31-2014, which would have been the last filing with

20      the state that was filed.  And there were a number of

21      adjustments that were made on Ms. Schiffer's schedules.

22          Q.   Okay.

23          A.   I have limited the adjustments at issue here

24      to only those involving cash.  So for example, to the

25      extent that there was an adjustment that was made

Page 62

1    pertaining to a write-down of the admitted receivables,
2    that's not on here.  This is only the restricted cash
3    being identified as an admitted asset rather than a
4    non-admitted asset.
5              So it calculates what the cash flow was that
6    was reported, what the correct amount should have been,
7    the overstatement, and then the trebling of that
8    overstatement.
9         Q.   So let's take, for example, the line item for
10   9-30-2011.  If I understand what you just said, you're
11   identifying what you suggest is an overstatement of
12   $500,000, which would be cash reported as admitted,
13   which the receiver contends shouldn't have been
14   admitted, right?
15        A.   Correct.
16        Q.   And then you trebled it.  And that's what the
17   final column is, the number trebled, right?
18        A.   Yes.
19        Q.   Let's look at 12-31-2011.  It's says
20   overstatement of $500,000, trebled to one-million-five.
21   Isn't that the same $500,000?
22        A.   Yes.
23             MR. FRIEDMAN:  Form.
24             THE WITNESS:  There were two misstatements.
25   BY MR. McDOWELL:

1     Q.   What you're saying is, it's the same

2  misstatement made twice.

3           MR. FRIEDMAN:  Form.

4           THE WITNESS:  Yes.

5  BY MR. McDOWELL:

6     Q.   Is it fair to say that for each overstatement

7  you have identified in that column, you're carrying

8  through misstatements from prior periods?

9           MR. FRIEDMAN:  Form.

10         THE WITNESS:  That is correct.

11  BY MR. McDOWELL:

12     Q.   Why?

13         MR. FRIEDMAN:  Form.

14         THE WITNESS:  Why?  Because the statute is

15       fairly clear, in that it says that if there is a

16       misstatement, it would either be subject to single

17       or treble damages.  It does not state that there is

18       a credit that you get for prior misstatements.  So

19       I have presented each statement as an individual

20       item and I have totaled it.

21  BY MR. McDOWELL:

22     Q.   Did you consider who made the statement?

23         MR. FRIEDMAN:  Form.

24         THE WITNESS:  I considered who made the

25       statement, in that it kind of goes to the same

1    conversation that we had before.  There were

2    multiple parties involved in all aspects of this,

3    and Pac West was certainly a party to that, but I

4    haven't apportioned responsibility amongst each of

5    the parties.

6    BY MR. McDOWELL:

7    Q.    And what misreporting did Pac West make?

8         MR. FRIEDMAN:  Object to form.

9         THE WITNESS:  They were providing the initial

10   concept that ultimately led to the presentation in

11   the financials of these non-admitted assets as

12   being admitted.

13   BY MR. McDOWELL:

14   Q.    So the presentation of the concept is what

15   you -- what you considered to be the misreporting in

16   this case.

17   A.    That would be --

18        MR. FRIEDMAN:  Object to form.

19        THE WITNESS:  Sorry.

20        That would be a part of it, yes.

21   BY MR. McDOWELL:

22   Q.    What is the rest of it?

23   A.    Well, as I have said, and I think we keep

24   going over, there was responsibility that -- there were

25   PUP's financials, they were audited by RSM, and the

1    presentation was conceived of and sold and profited by

2    Pac West.  All of those things led to the statements as

3    they are in each of the filed documents that were

4    submitted to the state.

5                MR. McDOWELL:  All right.  I would like to

6          take a lunch break right now.  Is that okay, guys?

7                THE WITNESS:  Sure.

8                MR. FRIEDMAN:  Sure.

9                THE VIDEOGRAPHER:  Going off the record.  The

10          time is 12:19.

11                (Luncheon recess taken in the proceedings from

12    12:19 p.m. to 1:18 p.m., after which the following

13    proceedings were had:)

14                THE VIDEOGRAPHER:  We are back on the video

15          record.  The time is 1:18.

16    BY MR. McDOWELL:

17          Q.    I would like to return to page 16 of your

18    report.  If I understand what you did, you tallied the

19    transfers arithmetically and then in the second column

20    trebled them.  Have you ever used that particular method

21    to determine damages in any other case before?

22          A.    No.

23                MR. FRIEDMAN:  Form.

24                THE WITNESS:  Because this was in response to

25          specific statutes that applied presumably to this

Page 66

1        case, which is why I did it.  And I don't know --

2        during the break, I did want to clarify something.

3        I went back and looked.

4    BY MR. McDOWELL:

5        Q.    Go ahead.

6        A.    So I went back and I remembered -- you asked

7    me about the health and safety, and I thought I

8    remembered something about that in the statute.

9        Q.    Okay.

10        A.    So I just pulled it up.  And in 631.157(3), I

11    would like to just read into the record how the state

12    defines that issue.

13        It says:  "If the asset or property that has

14    been obtained or was used was reported to the department

15    as being available to the insurer as an admitted asset

16    and such asset is unavailable to the receiver for

17    payment of the obligations of the insurer at the time a

18    receivership proceeding is instituted, the obtaining or

19    using shall be presumed to have jeopardized the safety

20    and soundness of the insurer and to have been a

21    significant cause of the insurer's being placed in

22    conservation, rehabilitation, or liquidation, with the

23    burden of proof on the defendants to show otherwise."

24        So while this wasn't specifically included in

25    my report, in response to your question I did go back to

Page 67

```
 1   refresh my memory.
 2        Q.   So are you opining on the applicability of
 3   that statute?
 4        A.   My opinions are reflected in my report.
 5             MR. FRIEDMAN:  Form.
 6             THE WITNESS:  So I did not intend to opine and
 7        even discuss this until you asked the question.  I
 8        think that's the best I can answer it right now.
 9        But I can read the statute.  I can read what it
10        says.  And, you know, I'm not sure if that is an
11        opinion as much as it is an observation or a
12        recitation of the statute.
13   BY MR. McDOWELL:
14        Q.   Your opinions are what's in your report,
15   right?
16        A.   That is correct.
17             MR. FRIEDMAN:  Form.
18   BY MR. McDOWELL:
19        Q.   Now, in accumulating the damages on pages 16,
20   17, and 18, you did not give any credit for any amounts
21   Pac West may have paid to PUP, right?
22             MR. FRIEDMAN:  Form.
23             THE WITNESS:  No.  I mean, yes, that's
24        correct.
25   BY MR. McDOWELL:
```

1      Q.   And earlier, when you were discussing safety

2   and soundness, it wasn't clear to me whether you were

3   making an observation or opining on something.  Can you

4   clarify that for me?

5      A.   I was --

6           MR. FRIEDMAN:  Form.

7           THE WITNESS:  I was not intending it to be an

8      opinion.  Like I was just alluding to before, I was

9      responding to your question.  So my opinions are

10     what is in my report.

11  BY MR. McDOWELL:

12     Q.   You had made the observation that the

13  transfers that you have identified on 16, 17, and 18,

14  because of their amount, if found to be avoidable, would

15  have affected the safety and soundness of the insurer.

16  Did particular transfers jeopardize the safety and

17  soundness of the insurer?

18          MR. FRIEDMAN:  Form.

19          THE WITNESS:  I have no opinions with respect

20     to specific transfers.  And I think as I

21     supplemented in reading how the state views safety

22     and soundness, I would rely on that, and my other

23     observations were just color.

24  BY MR. McDOWELL:

25     Q.   On pages 16 and 17 is a list of the transfers

Page 69

1  you are tallying.  Were all of those transfers transfers

2  of admitted assets?

3              MR. FRIEDMAN:  Form.

4              THE WITNESS:  The source of the transfers

5         would have come either from admitted assets or

6         from -- well, they were all admitted assets as they

7         were identified on the financial statements.  They

8         came from the cash accounts.  The cash accounts

9         were all admitted on the statements of PUP.

10  BY MR. McDOWELL:

11       Q.   To your knowledge, were these transfers made

12  of admitted assets at the time they were made?

13              MR. FRIEDMAN:  Object to form.

14              THE WITNESS:  Well, again, these were all cash

15         accounts.  So as they were reflected on the

16         financials, cash was always identified as admitted.

17         It was in Ms. Schiffer's report where the

18         restricted cash should have been non-admitted.

19              I am not sure how to answer your question.

20         Based on how -- go ahead.

21  BY MR. McDOWELL:

22       Q.   Would it affect your opinion if individual

23  transfers were made from non-admitted assets?

24              MR. FRIEDMAN:  Form.

25              THE WITNESS:  I think I would need to

1      understand specifically what you are referring to.

2  BY MR. McDOWELL:

3      Q.   Hypothetically, if one or more of these

4  transfers were made of non-admitted assets, how would

5  that affect your calculation?

6           MR. FRIEDMAN:  Form.

7           THE WITNESS:  I am not sure that it would.

8       But I don't think that that's the situation here,

9       at least as it was identified on the face of the

10      financials by PUP.

11 BY MR. McDOWELL:

12     Q.   Well, let's talk about that for a second

13 because if -- are you saying that it wouldn't have any

14 effect on your opinion if it were shown that certain of

15 these transfers were made of non-admitted assets?

16          MR. FRIEDMAN:  Form.

17          THE WITNESS:  Again, I am having a hard time

18      trying to differentiate between what should have

19      been admitted or not admitted versus what was.

20      When I -- my recollection was that if you look at

21      each of the financial statements that were filed

22      with the state, the cash accounts were always

23      identified as an admitted asset.

24 BY MR. McDOWELL:

25     Q.   Well --

1      A.    Therefore, any payments out of those cash

2   accounts would have been payments out of what was

3   identified by PUP as an admitted asset.

4      Q.    And would it make a difference if the asset

5   was admitted or non-admitted?

6           MR. FRIEDMAN:  Form.

7           THE WITNESS:  I don't know the answer to that

8      question.  I need to contemplate what the

9      ramifications are.  I am not sure I am

10     understanding it.

11  BY MR. McDOWELL:

12     Q.    I want to be clear that your analysis assumes

13  that the assets were -- that the cash that was

14  transferred was admitted cash.

15          MR. FRIEDMAN:  Object to form.

16          THE WITNESS:  I am not sure that it makes that

17     assumption because I don't believe that that's part

18     of what is reflected here.  It merely recognizes

19     the amount of the transfer that went from PUP to

20     Pac West without really taking into consideration

21     whether it was admitted or not admitted.  It

22     really -- that was not a factor in this analysis.

23  BY MR. McDOWELL:

24     Q.    So is it your testimony that it wouldn't

25  matter whether it was admitted or non-admitted?

1    A.    No.   What I'm --

2          MR. FRIEDMAN:   Object to form.

3          THE WITNESS:   I'm sorry.

4          What I'm saying, I would need to -- I don't

5    have an answer for that question right now.   I am

6    not appreciating the significance of your question

7    and why it would have an impact.   So I am not

8    saying it wouldn't, but I am also not saying that

9    it would.

10   BY MR. McDOWELL:

11   Q.    Okay.   So is it fair to say that if it were

12   shown that some of the cash that was transferred was

13   non-admitted, you are not sure what your opinion would

14   be.

15         MR. FRIEDMAN:   Form.

16         THE WITNESS:   This -- yes, I am not sure what

17   my opinion would be.   I would need to research it.

18   Because this opinion was not contemplating whether

19   it was admitted or not.   It was just identifying

20   what has been asserted to be a fraudulent

21   conveyance.   And if that was a fraudulent -- when I

22   say "fraudulent conveyance," an avoidable transfer.

23   I am using those terms somewhat synonymously.

24         But I have captured that information in this

25   chart, and I don't believe whether it was admitted

Page 73

```
1        or non-admitted would necessarily have an impact.
2        But it's something that I'm not prepared to
3        conclude on right now.
4   BY MR. McDOWELL:
5        Q.   Fair enough.  And in connection with the chart
6   on page 18, what specific facts did you conclude were
7   misstated for each of the line items on page 18?
8            MR. FRIEDMAN:  Object to form.
9   BY MR. McDOWELL:
10       Q.   Let me correct that question.  He is right.
11       What specific facts do you claim were
12  misreported?
13           MR. FRIEDMAN:  Object to form.
14           THE WITNESS:  The cash that was reported as an
15       admitted asset by PUP.
16  BY MR. McDOWELL:
17       Q.   In every instance?
18       A.   In every instance.
19       Q.   And who misreported what to whom?
20           MR. FRIEDMAN:  Object to form.
21           THE WITNESS:  The amounts that were reported
22       as admitted assets on the financial statements that
23       were reported to the state are the assets that were
24       misreported.
25  BY MR. McDOWELL:
```

```
 1        Q.   And did you make any --

 2             MR. FRIEDMAN:  I'm sorry.  Did you hear my

 3        form objection, Madam Court Reporter, to that last

 4        question?

 5             THE COURT REPORTER:  Yes, I did.

 6             MR. FRIEDMAN:  Thank you.

 7             Sorry, Brian.  Go ahead.

 8   BY MR. McDOWELL:

 9        Q.   Who misreported what to whom, was my question.

10   I don't think we got to the answer.

11             MR. FRIEDMAN:  Same objection.

12   BY MR. McDOWELL:

13        Q.   Go ahead.

14        A.   So it was the PUP statements that were filed

15   with the state that were misreported.  Who played a part

16   in that, I think we have talked about the multiple roles

17   played by Pac West, McGladrey, RSM, and PUP, the company

18   itself, that all led to the filing of those financial

19   statements as they were.

20        Q.   Did you find the RSM settlement to be

21   significant in any way?

22             MR. FRIEDMAN:  Form.

23             THE WITNESS:  My Zoom phone just rang.  Can

24        you repeat that question once more?

25   BY MR. McDOWELL:
```

1      Q.    Certainly.  Did you find the settlement
2  between the receiver and RSM to be significant?
3           MR. FRIEDMAN:  Object to form.
4           THE WITNESS:  Well, it was a $17 million
5        settlement, so I'll let the dollar amount speak for
6        itself.
7  BY MR. McDOWELL:
8      Q.    Did you attribute any other significance to
9  it?
10          MR. FRIEDMAN:  Form.
11          THE WITNESS:  I don't know the specifics of
12       the settlement with respect to any admissions of
13       liability or not, but it was not something that I
14       took other than on its face.
15 BY MR. McDOWELL:
16     Q.    Did you consider, in arriving at any of your
17 analyses, what affect it would have had, had OIR acted
18 sooner?
19          MR. FRIEDMAN:  Object to form.
20          THE WITNESS:  No.  That was not -- I mean, I
21       read through lots of depositions, and in almost
22       every deposition that I read there were -- there
23       was back-and-forth with the OIR about what was
24       asserted to be -- whether they had responsibility,
25       what that responsibility was, what it wasn't.  I am

Page 76

1          not reaching any opinions as to that, but I know

2          that it is a point of contention among the parties.

3     BY MR. McDOWELL:

4          Q.   You told me earlier that you had evaluated

5     that three parties bore some responsibility.  Did you

6     make a determination that OIR did not bear any

7     responsibility?

8               MR. FRIEDMAN:  Object to form.

9               THE WITNESS:  I mean, I'll answer it as

10          straight as I can.  I see breadcrumbs that were

11          produced, but not a whole loaf.  So when I look at

12          what is being argued, nobody came to the OIR and

13          explained exactly what was going on.  And the

14          argument seems to be were certain lease agreements

15          that were sent enough for them to be able to play

16          detective and unravel and figure the whole thing

17          out.  And ultimately, I don't have enough of an

18          understanding of the inner workings of the OIR and

19          exactly what their responsibilities are or aren't

20          to reach any conclusions.

21               But as I said, every deposition that I read

22          devoted significant time to what that issue was.

23     BY MR. McDOWELL:

24          Q.   If it could be shown that OIR had sufficient

25     information to fully understand the transaction within

1    its possession, would that affect your opinion?

2            MR. FRIEDMAN:  Object to form.

3            THE WITNESS:  It wouldn't affect my opinion,

4        but I assume that that information would be

5        presented to the court, and then the court would be

6        left to reach some decision as to whether there was

7        any liability there.  But that is not something

8        that I have factored in any more than I did

9        apportion the responsibility among the other

10       parties.

11           MR. McDOWELL:  Okay.  Let me take five minutes

12       and talk to Ms. Gilbert.  We may be close to

13       wrapping this up.  Give me five minutes, if you

14       would, please.

15           THE VIDEOGRAPHER:  Going off the record.  The

16       time is 1:35.

17           (Recess taken in the proceedings from 1:35 p.m.

18   to 1:48 p.m., after which the following proceedings were

19   had:)

20           THE VIDEOGRAPHER:  We are back on the video

21       record at the time of 1:48.

22   BY MR. McDOWELL:

23       Q.   I told this lie a bunch of times, but I think

24   I've just got one more question.

25           Mr. Bouchner, tell me, in your view, which

1  party suffered the damages that are outlined in your

2  report.

3          MR. FRIEDMAN:  Object to form.

4  BY MR. McDOWELL:

5      Q.   Did you --

6      A.   Yes, I'm thinking how to answer that question.

7          I know that there are certain rights and

8  obligations under the statutes that are afforded to the

9  receiver.  It's not -- I think a simple answer:

10 Certainly, the company had suffered.  Their inability to

11 pay claims or liabilities had some residual effects on

12 other parties.  So there are multiple entities that are

13 impacted as a result of, you know, what transpired in

14 this -- that led to the receivership.  So I think that's

15 the best that I can do in answering that question.

16     Q.   Is the answer it may be any number of

17 different parties?

18          MR. FRIEDMAN:  Form.

19          THE WITNESS:  Well, it would be the company.

20     It would also be the insureds.  It could be

21     providers.  Well, maybe not the insureds as much,

22     but it would be providers.  It would be other claim

23     holders.  It would be the company itself.

24 BY MR. McDOWELL:

25     Q.   Creditors?

1        A.   Creditors to -- certainly, creditors were

2    impacted by it.  And because of the unique powers of the

3    receivership as afforded under the statutes, it's -- you

4    know, I think it's a different circumstance than maybe

5    it would be in maybe other types of litigation.

6        Q.   So you didn't make any attempt to allocate

7    those damages across parties who may have suffered the

8    damages.

9             MR. FRIEDMAN:  Object to form.

10            THE WITNESS:  No.  No apportionment was done.

11    I think my report contains my opinions.

12            MR. McDOWELL:  Nothing further.

13            MR. FRIEDMAN:  Can everybody hear me okay?

14            MR. McDOWELL:  Yes.

15            MR. FRIEDMAN:  Great.

16                        CROSS-EXAMINATION

17    BY MR. FRIEDMAN:

18        Q.   Okay, Mr. Bouchner.  I have a few questions

19    for you.

20             To the extent you didn't already testify about

21    them during your direct examination today, are your

22    opinions set forth in your report?

23        A.   They are.

24        Q.   And is the data that you relied upon in

25    forming your opinions identified in your report?

1         A.    Yes, in Appendix B, I believe.

2         Q.    I am going to screen share something and ask

3    that we mark it as an exhibit.  Can you see that?

4         A.    I can.

5         Q.    So this document is an updated -- what is

6    identified as an Updated Schedule 3.  Do you recognize

7    this document?

8         A.    I do.

9         Q.    Can you please tell me what it is.

10        A.    When I was going through my report this

11   morning, I realized that the wrong -- the Schedule 3

12   that was attached to my report was a printout of a tab

13   that was never completed.  And this one was right next

14   to it, so I have produced this.  There is nothing new on

15   here that's not in my report.  The difference is that

16   columns 1, 2 and 3 were hidden in the version that was

17   produced, and now they are unhidden but they are the

18   same -- it contains the same information that is

19   reflected in the body of the report.

20             And similarly, the section identified as

21   damages, that the schedule that were produced did not

22   contain these values, and these are the same values that

23   are identified in my report on page 12 that we went over

24   today.  So there is nothing new here, but I did realize

25   that the wrong tab was printed and attached to my

1  report, which I hadn't seen until I started to look at

2  it.

3      Q.   So to the extent your report refers to

4  information in Schedule 3 -- to the extent the body, the

5  substance and body of your report refers to information

6  in Schedule 3, it was referring to this document, this

7  Updated Schedule 3 that we are looking at; is that

8  correct?

9      A.   Yes.  This should have been the tab that was

10  printed out, but when it was put together it was --

11  there was an inadvertent error in printing out the wrong

12  tab.  That was only partially complete.

13      Q.   And this document is the document that you

14  were actually looking at and referring to when you were

15  preparing your report.

16      A.   Yes, it was.

17      Q.   And everything in your report is accurate,

18  notwithstanding that this is a corrected Schedule 3.

19      A.   That's correct.

20          MR. FRIEDMAN:  Can you look at page 13 of your

21      report.

22          Should we mark this or identify it on the

23      record, by the way, as maybe Bouchner Exhibit 1.

24          MR. McDOWELL:  We've got a 1.  It would be 2.

25          (Court reporter clarification.)

1          (Thereupon, Updated Schedule 3 was remotely

2     introduced as Exhibit 2 for Identification.)

3     BY MR. FRIEDMAN:

4          Q.   You were asked some questions this morning

5     about -- to the extent you have an opinion about

6     apportionment of liability.  Do you generally recall

7     that?

8          A.   I do.

9          Q.   Now, what we are looking at here on page 13

10    and 14 and 15 of your report, this is your schedule of

11    avoidable transfers to the banks, correct?

12         A.   Correct.

13         Q.   So here, you are only identifying transfers

14    that went to the bank defendants, right?

15         A.   That's correct.

16         Q.   These would not be subject to an

17    apportionment, right?

18              MR. McDOWELL:  Objection to form.

19              THE WITNESS:  I don't believe so because this

20         is different than the other analyses that we've

21         discussed earlier.

22    BY MR. FRIEDMAN:

23         Q.   It's only identifying money that actually went

24    to the banks, correct?

25         A.   That's correct.  These are transfers.  These

Page 83

1    are avoidable transfers.  So by definition, you would be

2    avoiding the transfers that went to Pac West.

3        Q.    Take a look at page 16 of your report, please.

4        A.    Yes.

5        Q.    My understanding is here in this schedule,

6    this chart on page 16, continuing to page 17, you are

7    identifying property that was obtained by the bank

8    defendants, correct?

9        A.    Yes.  That's correct.

10        Q.    So similar to transfers that were made to the

11    defendants, this is only identifying money that the bank

12    defendants obtained and would not be subject to

13    apportionment.  Do you agree?

14        A.    I believe so, yes.  That's correct.

15        Q.    Okay.  Take a look at page 18 of your report.

16        A.    Yes.

17        Q.    All right.  And this is a schedule of

18    misreported assets, correct?

19        A.    That's correct.

20        Q.    And you recall this morning you were asked a

21    series of questions about whether you were giving any

22    opinion about the misreporting of these assets

23    jeopardizing the safety or soundness of the insurer.  Do

24    you generally recall that?

25        A.    I am not sure.  I mean, I know we were talking

Page 84

1    about safety and soundness with respect to the prior

2    section on pages 16 and 17.  I don't know if it extended

3    to this, but it may have.  I am not -- that wasn't my

4    understanding.

5         Q.   Okay.  Fair enough.  I will try to ask the

6    question in a more general way.  If you flip back to

7    page 8 of your report.

8         A.   Okay.  I am there.

9         Q.   In here, you are identifying that PUP was in a

10   shortfall of its capital surplus at various points in

11   time, correct?

12        A.   That's correct.

13        Q.   Among other information that you're

14   identifying in the chart.  Is it fair to say that -- and

15   so looking at your chart on page 8, am I correct in

16   understanding that PUP was in a capital surplus

17   shortfall no later than December 2011?  I'm sorry,

18   December 2011.

19             MR. McDOWELL:  Objection to form.

20             THE WITNESS:  Yes.  We identified a $248,000

21        surplus, approximately, as of December 31, 2011.

22   BY MR. FRIEDMAN:

23        Q.   Okay.  Is it fair to say that because of the

24   Pac West transactions, PUP was able to continue

25   operating notwithstanding its capital surplus shortfall?

Page 85

1          MR. McDOWELL:  Objection to form.

2          THE WITNESS:  Well, certainly not without

3       taking other more extraordinary measures.

4   BY MR. FRIEDMAN:

5       Q.   And it was able to continue to grow,

6   notwithstanding its capital surplus because of the Pac

7   West transactions, right?

8          MR. McDOWELL:  Object to form.

9          THE WITNESS:  If you mean grow by adding

10      members, yes, that's true.

11  BY MR. FRIEDMAN:

12      Q.   That is what I meant.  Thank you for

13  clarifying that in your answer.

14          Would continuing to operate, notwithstanding a

15  shortfall in your capital surplus as a regulated

16  insurer, jeopardize the safety and soundness of the

17  insurer?

18          MR. McDOWELL:  Objection to form.

19          THE WITNESS:  My understanding is that the

20      capital surplus requirements are there to ensure

21      the safety of -- and the ability to satisfy

22      obligations due to the insureds.  So yes, if it's

23      growing without maintaining those surpluses, it

24      would defeat those statutes and why they are there.

25          (Court reporter clarification.)

Page 86

1   BY MR. FRIEDMAN:

2       Q.   Thank you.

3            As part of your report, you analyzed the

4   payments that PUP made to the bank defendants, correct?

5       A.   Yes.

6       Q.   So from September 26th, from the time of the

7   first transaction in 2011, PUP made interest payments to

8   the banks, correct?

9            MR. McDOWELL:  Objection to form.

10           THE WITNESS:  Yes.  They made rent payments,

11      which would have had an interest component to it.

12  BY MR. FRIEDMAN:

13      Q.   And have you calculated, as part of your

14  report, the total amount of those rent or interest

15  payments?

16      A.   Well, they would effectively be -- if we turn

17  to pages 13 and 14, up to the point where I would say

18  through March 20, 2014, on page 14, those reflected all

19  of the rent payments that would have been to pay down

20  those leases, a portion of which would have been

21  depreciation and a portion would be interest.  They are

22  not specifically broken out that way, but those would be

23  the payments that I think you are alluding to.

24      Q.   And so if PUP had never entered into the

25  transactions with Pac West and the bank defendants, it

Page 87

```
1    never would have had to pay those payments, right?
2              MR. McDOWELL:  Objection to form.
3              THE WITNESS:  Yes.  The only reason they are
4         making those monthly payments was because of the
5         transactions that they agreed to enter into.
6    BY MR. FRIEDMAN:
7         Q.   Okay.  Can you take a look at page 13 of your
8    report.
9         A.   I'm there.
10        Q.   Footnote 8.
11        A.   Yes.
12        Q.   Can you just explain to us what the $4,252,717
13   number is, how you calculate that?
14        A.   Sure.  The total payments that were identified
15   in chart 13 is the $36,745,422.02.  The total advances
16   from PUP -- I'm sorry -- from Pac West to PUP are
17   identified in the footnote.  That's the $32,492,705.
18   The difference between those two is the $4,252,717,
19   which is the excess that Pac West received above and
20   beyond that which they advanced to PUP.
21        Q.   Okay.  Thank you for that.
22             So I believe you were asked whether you
23   factored in funds that were released to PUP from PUP's
24   restricted accounts.  Do you recall that line of
25   questioning?
```

1        A.    Yes.

2        Q.    Whether you accounted for that in your

3   calculations reflected in footnote 8.  To count that

4   money again after it's released from PUP's restricted

5   accounts to PUP, wouldn't that be double-counting those

6   dollars for purposes of calculating the money that

7   flowed to PUP?

8            MR. McDOWELL:  Objection to form.

9            THE WITNESS:  Well, that's what I was alluding

10           to in my response, and maybe I wasn't clear.  But

11           that's why I was saying that I didn't believe that

12           that would be a relevant calculation.  Because my

13           calculation looked at all money coming in from the

14           outside and all money going back.  Any internal

15           transfers of funds from one account to another

16           really does not come into play here.  It just is --

17           it would cancel out.

18              So I didn't believe it was relevant, but there

19           were several attempts to kind of get to the bottom

20           of that.  And I wasn't sure I was understanding

21           what was being asked, but I think what you are

22           saying makes sense to me.

23   BY MR. FRIEDMAN:

24       Q.    Right.  It seems to me that if you were

25   counting money that went from PUP's restricted account

Page 89

1    to another unrestricted PUP account, you would sort of

2    be giving the banks double credit in terms of the amount

3    of money that flowed to PUP.

4                MR. McDOWELL:  Objection to form.

5    BY MR. FRIEDMAN:

6        Q.   I am trying to put it in laymen's terms.  I

7    wonder if you agree with that understanding.

8                MR. McDOWELL:  Objection to form.

9                THE WITNESS:  Well, I do lots of analyses

10               involving forensic investigations, and we

11               differentiate internal transfers from external.

12               And if it's going from one account to another, you

13               would have an increase in this account but a

14               decrease in this account, and the two would net out

15               to zero.  So I believe that the way I have

16               accounted for it makes sense and is accurate, and

17               that to give any additional credit would not be

18               correct.

19    BY MR. FRIEDMAN:

20        Q.   All right.  Thank you for that.  Take a look

21    at page 18 of your report, please.

22        A.   Yes.

23        Q.   Actually it would be page -- I'm sorry,

24    page -- it's 16 and 17.  The chart on 16 and 17.

25        A.   Okay.

Page 90

1      Q.   I'm sorry.  I was right the first time.  It's

2   page 18.  I apologize.  Page 18, referencing money that

3   was misreported.  To your knowledge, the money that the

4   banks obtained from PUP was reported as admitted cash,

5   correct?

6      A.   Everything that was received from PUP was

7   reported as admitted cash, yes.

8      Q.   Okay.  And then just one piece of testimony I

9   wanted to clear up is, you referenced, in responding to

10  questions about the role of the OIR, you made a

11  statement that -- I believe the quote was "breadcrumbs

12  were produced," and I just want to make sure your

13  testimony is clear.  You were referring to breadcrumbs

14  being produced to the OIR; is that correct?

15     A.   Yes.  There was a whole series of transactions

16  and information that was relevant, and there were

17  certain documents that I was kind of alluding to as

18  breadcrumbs because it really wasn't the whole story.

19  It just was pieces that if somebody knew more or

20  understood more, maybe could have done something with

21  it.  But there was a lot that wasn't disclosed that

22  would have been relevant.

23          MR. FRIEDMAN:  All right.  Can we take a

24      five-minute break?

25          MR. McDOWELL:  Sure.

Page 91

1              THE VIDEOGRAPHER:  Going off the record.  The

2         time is 2:07.

3         (Recess taken in the proceedings from 2:07

4    p.m. to 2:30 p.m., after which the following proceedings

5    were had:)

6              THE VIDEOGRAPHER:  We are back on the video

7         record.  The time is 2:30.

8              THE WITNESS:  Michael, you're on mute.

9    BY MR. FRIEDMAN:

10        Q.   Thank you, Scott.  Sorry about that.

11             Going back to a question I asked prior to the

12   break to make sure I asked it correctly, the money that

13   the banks obtained from PUP, that money was reported as

14   admitted, correct?

15        A.   Yes.

16        Q.   You alluded before we broke to a statute that

17   controls who the receiver may sue on behalf of.  Do you

18   recall that?

19             MR. McDOWELL:  Objection to form.

20             THE WITNESS:  Yes.  I believe that's what I

21        was alluding to.

22   BY MR. FRIEDMAN:

23        Q.   Hang on.  I am going to try to publish

24   something.  Can you see that?

25        A.   Yes.

1      Q.   This is Florida Statute 631.3915.  I'm just

2   going to read it into the record.  It says:  "The

3   department, in its capacity as administrator, receiver,

4   or similar capacity, may pursue any actions for damages

5   or other recoveries on behalf of the insurer's estate

6   and the insurer's policyholders, creditors, and other

7   claimants."

8          Did I read that correctly?

9      A.   Yes.

10     Q.   Nothing in your report or your testimony today

11   takes issue with the fact that the Department has

12   standing to assert claims on behalf of those parties

13   identified in the statute; is that correct?

14          MR. McDOWELL:  Objection to form.

15          THE WITNESS:  That's correct.

16   BY MR. FRIEDMAN:

17     Q.   You are deferring to the statute in your

18   testimony concerning who the Department has standing to

19   sue on behalf of; is that correct?

20          MR. McDOWELL:  Objection to form.

21          THE WITNESS:  Yes, I am.

22   BY MR. FRIEDMAN:

23     Q.   Did PUP's policyholders lose their health

24   insurance when PUP went into receivership?

25     A.   I don't believe so.  That should have been

1    transferred over to other insurers.

2        Q.    And in any event, there is a claims process

3    ongoing in connection with PUP's receivership to

4    identify its claimants.  Is that right?

5        A.    That's correct.

6            MR. FRIEDMAN:  Okay.  I think we may be done,

7        but let me take just another five-minute break,

8        Brian.

9            MR. McDOWELL:  Sure.

10            THE VIDEOGRAPHER:  Going off the record.  The

11        time is 2:33.

12            (Recess taken in the proceedings from 2:33 p.m.

13    to 2:37 p.m., after which the following proceedings were

14    had:)

15            THE VIDEOGRAPHER:  We are back on the video

16        record.  The time is 2:37.

17    BY MR. FRIEDMAN:

18        Q.    One last question is:  When PUP went into

19    receivership, its policyholders lost their insurance

20    coverage with PUP, correct?

21        A.    That's my understanding.

22            MR. FRIEDMAN:  Okay.  Thank you.

23        Brian?

24            MR. McDOWELL:  I've got nothing else.

25            MR. FRIEDMAN:  Okay.

Page 94

1           MR. McDOWELL:  Thank you all.

2           THE WITNESS:  Thank you.

3           MR. BELLAS:  We will read.  If Brian and his

4      team orders the transcript, we will order a copy,

5      including a word index and a mini.

6           MR. McDOWELL:  We'll let you know.  Thank you.

7

8           (Thereupon, the taking of the videoconference

9      deposition was concluded at 2:39 p.m.  Signature and

10     formalities were not waived.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1   RE:         FLORIDA DEPARTMENT OF FINANCIAL
                SERVICES v. PACIFIC WESTERN
2   VIDEOCONFERENCE DEPO OF SCOTT BOUCHNER
    TAKEN:      FRIDAY, OCTOBER 30, 2020
3
4                           EXCEPT FOR ANY CORRECTIONS
                            MADE ON THE ERRATA SHEET BY
5                           ME, I CERTIFY THIS IS A TRUE
                            AND ACCURATE TRANSCRIPT.
6                           FURTHER DEPONENT SAYETH NOT.
7
                            _____,
8                           SCOTT M. BOUCHNER
9
    STATE OF FLORIDA        )
10                          )  SS:
    COUNTY OF _____     )
11
12          Sworn and subscribed to before me this _____
    day of _____, 20___.
13   PERSONALLY KNOWN_____OR ID._____
14
15                          _____
                            Notary Public in and for
16                          the State of Florida at
                            Large.
17
    My commission expires:
18
19
20
21
22
23
24
25

Page 96

1                        ERRATA SHEET
2    IN RE:          FLORIDA DEPARTMENT OF FINANCIAL
                     SERVICES v. PACIFIC WESTERN
3    DEPOSITION OF: SCOTT M. BOUCHNER
     TAKEN:          FRIDAY, OCTOBER 30, 2020
4

     DO NOT WRITE ON TRANSCRIPT - ENTER ANY CHANGES HERE
5

     Page #   Line #    Change              Reason
6
7    _____/_____/_____/_____
8    _____/_____/_____/_____
9    _____/_____/_____/_____
10   _____/_____/_____/_____
11   _____/_____/_____/_____
12   _____/_____/_____/_____
13   _____/_____/_____/_____
14   _____/_____/_____/_____
15   _____/_____/_____/_____
16   _____/_____/_____/_____
17   _____/_____/_____/_____
18   _____/_____/_____/_____
19   _____/_____/_____/_____
20   State of Florida:
     County of_____:
21

     Under penalties of perjury, I declare that I have read
22   my deposition transcript, and it is true and correct
     subject to any changes in form or substance entered
23   here.
     _____        _____
24   DATE                 SCOTT M. BOUCHNER
25

Page 97

CERTIFICATE OF OATH OF WITNESS

STATE  OF  FLORIDA       )

COUNTY OF BROWARD        )



          I, Fanny R. Kerbel, Court Reporter and Notary

Public in and for the State of Florida at Large, certify

that the witness, Scott M. Bouchner, appeared remotely

before me on Friday, October 30, 2020 and was duly sworn

by me via videoconference after producing

government-issued identification.


Signed this 2nd day of November, 2020.

_____

FANNY R. KERBEL, Court Reporter

Notary Public - State of Florida

Commission No. GG 951739

Expires May 16, 2024.

Page 98

1                    CERTIFICATE OF REPORTER

2

3    STATE  OF  FLORIDA    )

     COUNTY OF BROWARD      )

4

5              I, FANNY R. KERBEL, Court Reporter, do hereby

6    certify that I was authorized to and did

7    stenographically report the videoconference deposition

8    of Scott M. Bouchner, the witness herein on Friday,

9    October 30, 2020, that a review of the transcript was

10   not waived; and that the foregoing transcript, pages 1

11   through 94, is a true and complete record of my

12   stenographic notes.

13             I FURTHER CERTIFY that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor

15   am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18             Dated this 2nd day of November, 2020.

19

20

21

     _____

22             FANNY R. KERBEL, Court Reporter

23

24

25

```
 1              Veritext Legal Solutions
           One Biscayne Tower, Suite 2250
 2           Two South Biscayne Boulevard
              Miami, Florida  33131
 3                 (305) 376-8800
 4   November 3, 2020
 5   Mr. Scott M. Bouchner
     c/o Michael A. Friedman, Esquire
 6   Genovese Joblove & Battista, P.A.
     100 N. Tampa Street, Suite 2600
 7   Tampa, Florida  33602-5810
     mfriedman@gjb-law.com
 8   Re:     Florida Department of Financial
             Services v. Pacific Western
 9   Depo of: Scott M. Bouchner
     Taken:   Friday, October 30, 2020
10   Read and sign by:  December 4, 2020
11   Dear Mr. Bouchner,
12        This letter is to advise you that the transcript of
     the deposition listed above is completed and is
13   available at this time for your reading and signing.
14        Please call the above number to make an appointment
     to come to the Veritext office closest to you to read
15   and sign the transcript.  Our office hours are from 8:30
     a.m. to 4:30 p.m., Monday through Friday.
16
          In the event other arrangements are made, please
17   send us a list of any and all corrections, signed and
     notarized, noting page and line numbers and the reason
18   for such changes, so we can furnish all counsel with a
     copy of same.  If the reading and signing has not been
19   completed prior to the referenced date, we shall
     conclude that you have waived the reading and signing of
20   the deposition transcript.  Your prompt attention to
     this matter is appreciated.
21
                  Sincerely,
22
          _____
23        FANNY R. KERBEL, Court Reporter
24
25
```

| & |
| --- |
| **&** 2:4,7,12,16 5:2 8:2 99:6 |

| 1 |
| --- |

**1** 3:16 9:2,8 51:16 58:18 61:13 80:16 81:23,24 98:10
**1,205,758** 24:13 25:20
**1.2** 26:4
**10** 23:14 24:4 29:2 29:11,14 31:7 33:8 36:7
**100** 2:4,7 36:15,18 43:10 99:6
**106** 31:12 32:12
**10:28** 1:17 4:3
**11** 31:3 41:22
**1100** 2:17
**11:41** 40:8,11
**12** 19:7 20:5 28:24 28:25 29:1,8,10,12 33:25 41:22 80:23
**12-31-2011** 62:19
**12680** 97:17 98:21
**12:19** 65:10,12
**13** 26:25 41:22 48:7 48:24 81:20 82:9 86:17 87:7,15
**136** 34:3,13
**14** 48:7 82:10 86:17 86:18
**14th** 2:21
**15** 82:10
**16** 51:11,24 52:15 53:12 58:2,16 59:17 65:17 67:19 68:13,25 83:3,6 84:2 89:24,24 97:21

**17** 37:10 52:15 53:12 58:2 59:17 67:20 68:13,25 75:4 83:6 84:2 89:24,24
**17th** 2:17
**18** 61:9,15 67:20 68:13 73:6,7 83:15 89:21 90:2,2
**19** 4:17
**1980s** 9:20
**1987** 6:20
**1990** 6:25
**1999** 8:3,7,8,17
**1:18** 65:12,15
**1:35** 77:16,17
**1:48** 77:18,21
**1a** 22:16,18,21 24:9 24:14 47:2
**1e** 22:17,18,21
**1f** 24:9

| 2 |
| --- |

**2** 3:17 33:22 34:3 34:13 61:12 80:16 81:24 82:2
**2.1** 34:8
**2.6** 30:8,11
**20** 25:4 56:17,21 86:18 95:12
**200** 2:13 6:11
**20006** 2:17
**2001** 33:22
**2011** 19:9 20:22 24:12 26:24 27:22 27:24 28:18 31:25 33:24 34:2,22 47:15 48:9 59:12 84:17,18,21 86:7
**2012** 19:9 20:22 26:25 27:25 28:13 34:22

**2013** 31:25 32:2
**2014** 23:12 32:2 33:1 35:19 36:15 48:10 50:19 57:9 60:7 86:18
**2016** 1:2
**2020** 1:17 4:2 29:20 95:2 96:3 97:8,12 98:9,18 99:4,9,10
**2024** 97:21
**21** 25:3
**22.7** 30:1
**2250** 99:1
**226** 34:13
**22nd** 48:10
**23.7** 30:7,17
**24** 25:13
**248,000** 84:20
**2600** 2:4,13 99:6
**26th** 86:6
**27** 37:1
**2:30** 91:4,7
**2:33** 93:11,12
**2:37** 93:13,16
**2:39** 1:17 94:9
**2nd** 2:7 97:12 98:18

| 3 |
| --- |

**3** 3:5,17 53:16 66:10 80:6,11,16 81:4,6,7,18 82:1 99:4
**3-31-2014** 61:19
**3.68** 25:16
**30** 1:17 4:2 35:22 55:18 56:7,16,17 56:21 95:2 96:3 97:8 98:9 99:9
**305** 99:3
**31** 19:9,9 24:12 28:18 34:2 47:15

84:21
**32** 30:23,24 31:18 32:14
**32,492,705** 49:18 87:17
**32.1** 33:9
**32801-3461** 2:13
**33131** 99:2
**33131-2100** 2:8
**33602-5810** 2:5 99:7
**353** 31:9
**36** 31:20 32:15,23 33:6 34:13,19 52:11 54:13 55:4 55:21 56:7,15,19 57:10
**36,745,422** 48:12 49:16
**36,745,422.02.** 87:15
**36.2** 33:9,12 34:7
**362** 34:14
**376-8800** 99:3
**38** 34:14
**38.4** 34:11

| 4 |
| --- |

**4** 21:24 99:10
**4,252,717** 49:20 87:12,18
**4.2** 49:24
**4.6** 30:14
**42** 32:15,23
**42.7.** 33:13 34:7
**421** 31:4
**43** 31:20 34:19
**444** 2:21
**44th** 2:7
**4588-0** 1:2
**460,904** 47:9

**4:30**  99:15

**5**

**5**  3:5 21:24
**5,129,947**  25:13
**500,000**  24:20
  25:24 62:12,20,21

**6**

**6**  21:24
**6.6**  33:12
**631.157**  51:16
  58:18 66:10
**631.157.**  61:12
**631.3915.**  92:1
**68**  31:6,13,18 36:19
**68.4**  33:8

**7**

**7**  20:1,4 23:19,22
  24:1
**70**  32:16
**74**  36:19
**75**  31:6,14,19
**79**  3:6

**8**

**8**  20:16,19 21:4
  22:25 23:22 25:13
  33:18 48:25 49:12
  49:12 84:7,15
  87:10 88:3
**800**  2:17
**82**  3:17

**9**

**9**  3:16 23:6,14,19
  23:21 24:1,4 32:20
  33:19
**9-30-2011**  61:17
  62:10
**9.7**  30:15
**90071**  2:21

**94**  98:11
**95**  3:6
**951739**  97:20
**96**  3:7
**9644**  4:8 6:8
**97**  3:7
**98**  3:8 31:1
**99**  3:8 31:1

**a**

**a.m.**  1:17 4:3 40:8,8
  99:15
**ability**  57:12 85:21
**able**  13:6,13 30:13
  38:19 41:8 44:16
  45:17 46:23 52:17
  57:7,19 76:15
  84:24 85:5
**accepted**  15:15
  26:20
**account**  14:2 18:6
  51:1,2 88:15,25
  89:1,12,13,14
**accountant**  7:3
**accounted**  88:2
  89:16
**accounting**  8:10
  14:16,23 15:2,9
  41:7 42:3 46:16
**accounts**  50:1,20
  50:25 69:8,8,15
  70:22 71:2 87:24
  88:5
**accrued**  31:25
  37:18,24
**accumulating**
  67:19
**accurate**  9:3,5
  81:17 89:16 95:5
**acknowledge**  39:5
  39:19

**acknowledging**
  49:15
**act**  38:18
**acted**  38:18 75:17
**action**  98:16,17
**actions**  92:4
**activities**  51:18
**activity**  26:22
  29:22 50:13
**add**  25:19,21,23
**added**  24:23 33:4
**adding**  24:18 85:9
**addition**  10:6
**additional**  30:8,12
  33:11 35:18,25
  36:3 45:16 49:20
  89:17
**address**  6:7,10
**adjudicated**  36:20
  60:11
**adjudication**  60:17
**adjusted**  21:3,4
  22:4 25:9 39:6,20
  39:23
**adjustment**  22:24
  25:2,17 27:6 61:25
**adjustments**  21:2
  21:24 22:11,15
  23:7,9,13,18,22
  24:2,5,7,9,12,16
  27:25 61:21,23
**administering**  37:6
**administration**
  6:18
**administrative**
  36:23,25 37:13
**administrator**  92:3
**admissions**  75:12
**admitted**  20:20,21
  21:12,19 24:19,20
  24:21 25:12 39:11

**acknowledging**
  49:15 41:3,3,9 62:1
  62:3,4,12,14 64:11
  64:12 66:15 69:2,5
  69:6,9,12,16,18,23
  70:4,15,19,19,23
  71:3,5,5,14,21,21
  71:25,25 72:13,19
  72:25 73:1,15,22
  90:4,7 91:14
**advanced**  87:20
**advances**  49:4,8,9
  49:11 87:15
**advice**  42:8
**advise**  99:12
**advisor**  7:6
**advisory**  8:8
**affect**  69:22 70:5
  75:17 77:1,3
**affirm**  5:10
**afforded**  78:8 79:3
**agent**  50:10
**ago**  11:24 12:14
  14:25 44:2
**agree**  5:3,7 13:15
  57:23 83:13 89:7
**agreed**  16:7 87:5
**agreement**  13:6
  57:8,9
**agreements**  76:14
**ahead**  4:25 29:13
  66:5 69:20 74:7,13
**allocable**  43:10
**allocate**  40:14 79:6
**allocating**  38:13
**allowable**  58:18
**allowed**  36:1,19
  41:20 51:17 55:19
**alluded**  91:16
**alluding**  68:8 86:23
  88:9 90:17 91:21

**alternate** 35:13
**alternative** 35:24
  60:22
**amended** 58:16
**american** 7:15
**amortized** 47:15
**amount** 36:5 37:13
  47:7,10,18 48:10
  49:17 53:15,16
  54:9 58:3,20 62:6
  68:14 71:19 75:5
  86:14 89:2
**amounts** 25:10,19
  25:21,23 30:20
  32:7 36:22 67:20
  73:21
**analyses** 75:17
  82:20 89:9
**analysis** 7:22 16:3
  24:19 28:9 32:20
  35:25 38:7 71:12
  71:22
**analyst** 7:5
**analyzed** 17:25
  86:3
**angeles** 2:21
**answer** 43:19 46:11
  51:6 54:4 55:10
  61:5 67:8 69:19
  71:7 72:5 74:10
  76:9 78:6,9,16
  85:13
**answered** 54:25
**answering** 78:15
**anyway** 54:5
**apologize** 90:2
**appearances** 2:1
**appeared** 97:7
**appearing** 1:23
**appears** 20:1 36:7
  36:10

**appendix** 9:15 17:7
  80:1
**applicability** 67:2
**applicable** 53:23
  54:17
**application** 15:9
**applied** 15:5 65:25
**apply** 53:17,19,24
  54:24
**applying** 14:23
**appointment** 99:14
**apportion** 38:22
  43:6 45:13,24 77:9
**apportioned** 38:10
  42:25 64:4
**apportionment**
  79:10 82:6,17
  83:13
**appreciate** 29:6
**appreciated** 99:20
**appreciating** 72:6
**approximately**
  7:20 25:15 30:2,11
  30:15,22 31:12
  33:11 84:21
**april** 48:10
**area** 7:21 15:5 48:5
**areas** 7:16 8:9,15
**argue** 54:13
**argued** 76:12
**argument** 61:2
  76:14
**arithmetic** 48:15
**arithmetically**
  65:19
**arrangements**
  10:16 99:16
**arrive** 17:1 56:24
**arriving** 75:16
**articulated** 55:8

**arts** 6:17
**asked** 16:16 55:9
  66:6 67:7 82:4
  83:20 87:22 88:21
  91:11,12
**asking** 60:2
**aspects** 15:4 18:20
  19:23 64:2
**assert** 92:12
**asserted** 16:5 18:4
  18:7 19:17 72:20
  75:24
**asset** 22:23 24:21
  62:3,4 66:13,15,16
  70:23 71:3,4 73:15
**assets** 20:20,20,21
  21:13,18,19,19
  22:20 25:6,12 28:2
  30:3 41:3,4,9 52:3
  64:11 69:2,5,6,12
  69:23 70:4,15
  71:13 73:22,23
  83:18,22
**assignment** 16:19
  16:20
**assist** 13:4
**associate** 2:20
**assume** 77:4
**assumed** 25:5
**assumes** 71:12
**assumption** 35:2
  50:14 53:3 58:9
  71:17
**attached** 9:15
  80:12,25
**attempt** 38:22 39:1
  79:6
**attempts** 88:19
**attending** 1:18
**attention** 48:25
  99:20

**attorney** 43:15
  98:14,16
**attorneys** 4:13
**attribute** 75:8
**audio** 16:2 26:2
**audited** 41:13
  64:25
**august** 48:9
**authorized** 98:6
**available** 19:3
  24:22 30:23 31:18
  32:7 34:8 36:22
  37:13 44:21 57:18
  66:15 99:13
**avenue** 2:13
**avoidable** 19:17
  47:22 48:3,13,22
  58:11 68:14 72:22
  82:11 83:1
**avoided** 60:22
**avoiding** 83:2
**award** 44:20 45:16
  58:19
**aware** 41:12,15
  43:15
**awareness** 46:18

**b**

**b** 17:7,12 53:17,18
  53:23 54:16,24
  55:6 80:1
**bachelor's** 6:17,19
  6:20
**back** 7:18,24 22:25
  24:18,23 36:7
  40:10 44:5 47:1
  48:11 50:5,7 51:3
  59:12 60:13 61:3
  65:14 66:3,6,25
  75:23 77:20 84:6
  88:14 91:6,11
  93:15

background  6:13
  6:15 9:13,18 18:13
balance  13:12,14
  13:17,25 22:22
  26:20 28:4,10,14
  31:13,16 32:13
  36:14 39:11 47:4
  47:11,15,19 50:12
balances  50:10
bank  1:8,8,9,9,10
  2:20 4:7 5:25 7:14
  82:14 83:7,11 86:4
  86:25
banks  7:16 82:11
  82:24 86:8 89:2
  90:4 91:13
bankshares  7:15
based  18:4 22:8
  27:25 28:21 32:25
  34:23 44:20 53:16
  69:20
basically  52:2 54:7
batista  5:6
battista  2:4,7 99:6
beach  4:9 6:8
bear  76:6
began  30:2
beginning  18:14
  20:3 61:17
begins  20:4 53:11
behalf  1:21 2:3,11
  5:6 91:17 92:5,12
  92:19
belabor  6:14
belief  46:3
believe  27:17 38:15
  38:16 47:16 54:16
  71:17 72:25 80:1
  82:19 83:14 87:22
  88:11,18 89:15
  90:11 91:20 92:25

believes  44:14
bellas  2:9 5:5 94:3
belonged  60:12
benefit  31:8 32:9
  52:7
benefits  13:16
berkowitz  8:4
best  19:7 41:15
  46:24 59:3 67:8
  78:15
better  43:19
beyond  38:20,23
  49:21 87:20
biggest  37:9
biscayne  6:11 99:1
  99:2
body  80:19 81:4,5
bore  46:3 76:5
bottom  23:14 24:1
  24:4 29:2,11,14
  53:12 58:2 61:9
  88:19
bouchner  1:15 3:4
  3:16 4:5,22 5:16,21
  6:6 9:8 40:13 77:25
  79:18 81:23 95:2,8
  96:3,24 97:7 98:8
  99:5,9,11
boulevard  6:11
  99:2
boundary  15:7
brant  8:4
breadcrumbs
  76:10 90:11,13,18
break  40:14 46:1
  65:6 66:2 90:24
  91:12 93:7
brian  2:14 4:24,25
  5:1,23 74:7 93:8,23
  94:3

brian.mcdowell
  2:14
briefly  7:11
broad  8:9
broke  37:22 51:22
  91:16
broken  86:22
brought  11:2
broward  97:2 98:3
building  13:5
bunch  77:23
burden  66:23
business  6:10,18,25
  7:18,19 8:13 10:15
  36:11
buy  12:7,8

## c

c  99:5
ca  1:2
calculate  87:13
calculated  19:11
  21:3,20 32:19 43:5
  86:13
calculates  50:14
  62:5
calculating  43:17
  45:2 88:6
calculation  8:12
  18:16 19:2,16
  20:23 21:9 30:9
  34:21,24 35:16
  51:2 53:3 70:5
  88:12,13
calculations  20:2
  20:16 24:6 50:22
  88:3
california  2:21
call  49:7 99:14
called  5:17 7:21
camera  4:21

cancel  88:17
canceled  50:9
cancellation  50:9
capacity  92:3,4
capital  14:11 22:3
  22:6,9 28:3 34:17
  35:6,13,18,25
  38:21 57:14 59:12
  84:10,16,25 85:6
  85:15,20
captured  72:24
care  25:9 39:10
career  10:1
carrying  63:7
case  1:2 8:20 11:2
  11:20,21 12:19,19
  13:2 14:14 15:25
  15:25 16:9,11 17:3
  17:23 18:9,20
  19:23 26:6 27:10
  28:15 32:10 45:5
  45:22 46:10 53:24
  64:16 65:21 66:1
cases  45:13,14
cash  13:7,7 24:19
  24:22,25 41:9
  50:12 57:15 61:24
  62:2,5,12 69:8,8,14
  69:16,18 70:22
  71:1,13,14 72:12
  73:14 90:4,7
categories  17:15
  18:8 22:23,23
catmull  2:19
caught  35:19
causation  44:9
cause  66:21
caused  40:17
cd  50:11
ceased  34:16

**central** 1:8
**certain** 17:15 21:2
  27:2 70:14 76:14
  78:7 90:17
**certainly** 15:3,11
  41:18 42:12,16
  45:23 46:21 64:3
  75:1 78:10 79:1
  85:2
**certainty** 43:7 44:9
  44:13,19,23 45:1,6
  45:8
**certificate** 3:7,8
  97:1 98:1
**certifications** 7:2
  9:13
**certified** 7:3,4,4,5
**certify** 95:5 97:6
  98:6,13
**cfo** 16:1
**challenged** 16:4
**change** 21:17,18
  26:4 49:24 56:15
  56:18 96:5
**changed** 28:7,21
**changes** 96:4,22
  99:18
**characterized**
  42:11
**charging** 36:10
**chart** 20:19 22:11
  23:6,25 28:23 29:2
  29:12,15 30:1 33:8
  48:7 53:11 61:8,15
  72:25 73:5 83:6
  84:14,15 87:15
  89:24
**church** 2:24 4:10
**circuit** 1:1,1
**circumstance**
  14:13 79:4

**circumstances** 14:3
  51:16
**claim** 31:25 38:4
  48:1 59:18 73:11
  78:22
**claimants** 92:7 93:4
**claiming** 51:19
**claims** 30:10,24,25
  31:2,4,8,10,14,18
  33:3,4,10 36:14,23
  37:14 58:3 78:11
  92:12 93:2
**clarification** 35:10
  81:25 85:25
**clarify** 66:2 68:4
**clarifying** 85:13
**clean** 13:12
**clear** 15:7 37:12
  39:1 42:12 63:15
  68:2 71:12 88:10
  90:9,13
**clearly** 52:11
**clients** 8:15
**close** 77:12
**closest** 99:14
**colleague** 14:24
  20:17
**collectable** 26:17
**collected** 25:11
  27:5
**collections** 25:15
**collective** 43:1
**color** 68:23
**columbia** 6:25
**column** 21:12,15
  23:19 24:1,2 25:13
  33:18 62:17 63:7
  65:19
**columns** 21:3,9,24
  23:22 80:16

**come** 25:20 29:21
  35:23 69:5 88:16
  99:14
**coming** 26:18,19
  88:13
**commercially**
  13:19
**commission** 95:17
  97:20
**common** 14:5
**communications**
  42:6
**companies** 10:2
**company** 10:12,21
  10:23 11:8,18 12:3
  12:7,11 13:4 19:12
  23:11 25:8 27:13
  30:4 34:16 35:4
  38:17,20 40:16
  41:20 52:12,13
  54:15,18 55:18
  56:1 57:7,14,15,15
  57:21 59:11 60:10
  60:12,16 61:4
  74:17 78:10,19,23
**company's** 31:15
  57:12
**compare** 19:6
  31:17 33:18,22
**compared** 19:5
  30:24
**comparing** 19:13
  32:21,22 33:7
  34:12 49:4
**complaint** 16:14
  18:5 47:25 58:17
  59:2,3,5
**complete** 9:12,16
  9:17 17:12,14,17
  46:15 81:12 98:11

**completed** 80:13
  99:12,19
**component** 86:11
**computation** 18:10
  23:2,4 26:6 50:18
**computations**
  19:22 22:19
**computed** 22:6
**conceived** 65:1
**concept** 41:1 64:10
  64:14
**concerning** 56:23
  92:18
**conclude** 44:16
  53:23 57:19 73:3,6
  99:19
**concluded** 94:9
**conclusion** 41:25
  55:23 56:3,23
**conclusions** 76:20
**conjunction** 28:9
**connected** 98:16
**connection** 8:19
  11:17 12:22 31:4
  42:16 73:5 93:3
**consent** 57:9
**conservation** 66:22
**consider** 12:17
  46:4 50:19 56:2,6
  56:11 58:3 63:22
  75:16
**consideration**
  35:13 71:20
**considerations**
  46:15
**considered** 17:5,7
  40:15,22 63:24
  64:15
**consistent** 21:22
  23:8 25:7

**constructed** 47:24
**constructing** 38:7
**consulting** 8:14,14
  10:16 11:4
**contain** 80:22
**contained** 20:6
  57:24
**contains** 79:11
  80:18
**contemplate** 71:8
**contemplating**
  72:18
**contemporaneous**
  27:12
**contend** 43:9
**contends** 62:13
**contention** 76:2
**continuation** 38:20
**continue** 36:1
  38:19 41:20 55:19
  57:4,7,12 84:24
  85:5
**continued** 8:4
  41:19 46:19
**continuing** 35:8
  41:22 83:6 85:14
**continuously** 8:17
**contracts** 26:14
**contributed** 50:4
**contribution** 55:18
**contributions**
  14:11,11 35:18
  36:1
**controls** 91:17
**convenient** 29:5
**conversation** 64:1
**conversations**
  17:22
**convert** 41:3
**conveyance** 72:21
  72:22

**conveyances** 58:11
**coopers** 8:2
**copies** 41:12
**copy** 8:22,23,24,24
  9:3,5,14 94:4 99:18
**corporate** 7:22
**corporation** 1:8 4:7
**correct** 18:23 21:14
  22:1,5,12 23:24
  26:5 35:5 39:17,21
  62:6,15 63:10
  67:16,24 73:10
  81:8,19 82:11,12
  82:15,24,25 83:8,9
  83:14,18,19 84:11
  84:12,15 86:4,8
  89:18 90:5,14
  91:14 92:13,15,19
  93:5,20 96:22
**corrected** 81:18
**corrections** 95:4
  99:17
**correctly** 91:12
  92:8
**correlate** 23:2
**corresponding**
  28:17
**costs** 37:3,13 47:19
**counsel** 2:20 4:5,23
  98:14,16 99:18
**count** 36:4 88:3
**counting** 88:5,25
**counts** 16:13,17
  18:4 58:17
**county** 1:1 95:10
  96:20 97:2 98:3
**couple** 31:21 44:2
**course** 10:1 17:23
  30:6,12 32:18
  54:13

**court** 1:1 4:11,14
  4:15,18 5:8,14 9:2
  35:10 44:1,14
  48:12 53:3 54:11
  55:2 58:10 74:3,5
  77:5,5 81:25 85:25
  97:5,18 98:5,22
  99:23
**courts** 36:20
**cover** 35:23 59:24
**coverage** 93:20
**covers** 8:9 9:20
**covid** 4:17
**cpa** 7:7,9
**created** 41:23,23
**creating** 35:16
**credit** 30:9 32:17
  33:15,16 36:9
  37:15 63:18 67:20
  89:2,17
**creditors** 78:25
  79:1,1 92:6
**credits** 52:5
**cross** 3:6 79:16
**crucial** 43:4
**curriculum** 9:14

**d**

**d** 3:2
**d.c.** 2:17 6:23 7:15
  7:16
**damages** 8:12
  16:16 18:7,10,16
  19:10,21 23:2
  31:24 32:19 37:18
  37:24 38:2,9 40:17
  43:6,9 44:15,17,20
  45:2,5 51:15,17
  54:11 58:18,19
  63:17 65:21 67:19
  78:1 79:7,8 80:21
  92:4

**data** 25:4 79:24
**date** 1:17 4:2 25:12
  30:15 36:17 96:24
  99:19
**dated** 24:12 98:18
**dates** 19:6,8 23:10
**daubert** 15:17,23
**david** 2:18 5:2
**david.haller** 2:18
**day** 19:10 28:11,11
  95:12 97:12 98:18
**days** 14:25
**deal** 50:11 56:8
**dealing** 59:13
**deals** 51:23 61:13
**dear** 99:11
**december** 19:9,9
  20:22,22 24:12
  27:22,25 28:13,18
  33:22,24 34:2,22
  34:22 47:15 84:17
  84:18,21 99:10
**decided** 38:24
**decision** 43:15
  45:12 77:6
**declare** 96:21
**decline** 38:13
**decrease** 89:14
**deducted** 36:22
**deducting** 37:12
**deep** 41:21,23
**defeat** 85:24
**defendant** 4:5 5:3
  15:24 32:10
**defendants** 1:11,21
  2:11 5:25 58:21
  60:13 66:23 82:14
  83:8,11,12 86:4,25
**deferring** 92:17
**deficit** 31:19,24
  32:11 34:6

deficits 35:17
define 44:17
defines 66:12
defining 16:20
definition 44:18
  83:1
degree 6:17,18
degrees 6:16
delray 4:9 6:8
department 1:4 4:6
  10:22 11:4 12:17
  12:21 29:20 30:4
  51:18 52:6 55:17
  66:14 92:3,11,18
  95:1 96:2 99:8
depo 95:2 99:9
deponent 95:6
deposed 14:24
deposition 1:14 3:3
  4:4,8,16 21:1 75:22
  76:21 94:9 96:3,22
  98:7 99:12,20
depositions 46:7
  75:21
depreciation 86:21
describe 8:6 20:8
  23:13
described 28:17
description 3:14
  9:12
descriptions 23:15
detail 22:15,16,19
detective 76:16
determination
  38:24 76:6
determine 26:9
  27:7 30:13 40:17
  42:3,9 46:2 65:21
devoted 76:22
dfs 29:19 58:17

difference 19:3,11
  21:16 22:3 32:14
  32:15 34:7,11,14
  35:11 49:19 50:4
  50:14,15 71:4
  80:15 87:18
different 26:12
  40:19,21 78:17
  79:4 82:20
differentiate 70:18
  89:11
direct 3:5 5:19
  48:24 79:21
disallowance 56:11
disallowed 56:3
disbursements
  30:12
disclosed 90:21
discuss 46:16,17
  67:7
discussed 46:17,18
  82:21
discussing 68:1
dispute 7:21 12:1,6
  33:5,11 60:18,21
  60:25
disqualified 15:16
distortion 16:2
  26:2
document 17:17
  80:5,7 81:6,13,13
documentation
  17:2
documents 17:5,15
  17:24 27:10 46:8
  65:3 90:17
doing 32:19 33:7
  34:12 49:15
dollar 36:18 37:15
  50:24 75:5

dollars 88:6
double 88:5 89:2
doubt 32:10
drive 4:9 6:8
due 4:15,16 47:5
  85:22
dug 41:21
duly 5:17 97:8

**e**

e 2:6,9,10,14,15,15
  2:18 3:2 11:13
earlier 12:20 32:20
  68:1 76:4 82:21
earned 30:8
economic 8:12,14
  24:25 52:22
edp 25:6
effect 42:2 70:14
effectively 86:16
effects 78:11
effort 13:25
either 26:14 56:20
  61:2 63:16 69:5
electronic 25:4
electronically 3:24
elements 15:2
employee 98:14,15
encapsulates 17:18
encountered 13:3
ends 19:13 53:12
engaged 16:11
engagement 10:25
engagements 8:10
  10:8,10
ensuing 26:23
ensure 85:20
enter 13:6 14:6
  87:5 96:4
entered 86:24
  96:22

entire 16:21
entirety 30:18
entities 78:12
entitled 61:1
entity 43:18
environment 18:19
equal 58:19
equally 41:16
equipment 25:5
equity 12:5,6 14:11
errata 3:7 95:4
  96:1
error 81:11
esquire 2:5,8,9,14
  2:15,18,19 99:5
essence 18:17
essentially 48:8
  50:15
est 1:17
establish 44:15
  45:17
established 45:6
establishing 45:1
estate 10:19 33:4
  37:6,16 52:7 92:5
estimate 23:4
evaluated 76:4
evaluation 38:8
  39:21
evaluations 45:15
event 57:11 93:2
  99:16
events 57:11
everybody 37:10
  79:13
evidenced 19:7
exactly 22:22 33:2
  76:13,19
examination 3:5,6
  5:19 79:16,21

examinations  8:11
examined  5:18
examiner  7:4
example  24:11
  32:11 39:7 59:16
  61:24 62:9
excerpt  18:14
  51:23
excess  28:1 36:15
  87:19
exclude  56:18
excluded  15:17,18
  15:23 16:9
exemplar  47:3
exhibit  3:5,12,16
  3:17 9:2,8 17:12
  80:3 81:23 82:2
exhibits  3:23
expect  19:25
expenses  30:14
  36:23 37:1
experience  9:18
  14:5
expert  3:16 8:11
  9:7 14:23 15:15,16
  15:22 16:1,5,8
  17:21 18:2 38:23
  55:11
expertise  15:5
expires  95:17 97:21
explain  20:11 24:2
  29:1,5,11 32:24
  47:6,23 49:12
  51:10 87:12
explained  76:13
explanation  24:3
explanatory  49:14
extended  84:2
extent  15:8 17:15
  26:25 36:2,20 43:2
  49:22 53:20 54:11

61:25 79:20 81:3,4
  82:5
external  89:11
extraordinary  85:3

**f**

f  1:9 23:14 24:4
fabre  45:15
face  57:20 70:9
  75:14
fact  4:22 38:25
  45:13 56:7,18
  92:11
factor  43:4 45:19
  71:22
factored  77:8 87:23
factors  40:21 57:16
facts  46:2,4 73:6,11
fair  15:2,3,11 18:10
  18:22 38:14,15
  47:1 63:6 72:11
  73:5 84:5,14,23
fairly  49:14 63:15
familiar  12:23
  14:13,16 44:8
fanny  1:22 4:11
  97:5,18 98:5,22
  99:23
far  5:23
fault  38:13 40:14
  40:15
feeds  29:1
fees  30:16,19
fifty  25:24
figure  76:16
filed  16:14 21:10
  21:22 29:19 61:20
  65:3 70:21 74:14
filing  61:19 74:18
filings  20:21 61:16
final  62:17

finance  47:20
financial  1:4,9 4:6
  8:14 10:22 11:4
  12:18,21 14:22
  27:9 28:22 29:19
  29:20 41:13 46:18
  61:14 69:7 70:21
  73:22 74:18 95:1
  96:2 99:8
financially  98:17
financials  64:11,25
  69:16 70:10
financing  12:3
  47:12
find  9:1 48:13
  54:12 55:2 74:20
  75:1
finding  52:16
finds  53:4 58:10
fine  51:14
firm  5:24 8:3 11:3
  12:20
first  1:9 5:17 7:15
  19:25 21:9 24:12
  24:18 27:21 28:11
  34:25 40:25 51:9
  51:22 61:17 86:7
  90:1
five  19:8 20:23
  23:10 34:22 40:2
  62:20 77:11,13
  90:24 93:7
flip  17:5 84:6
floor  2:7,21 6:11
florida  1:1,4,23 2:5
  2:8,13 4:6,9,12 6:9
  6:12 11:15 19:21
  35:7 51:16 58:18
  92:1 95:1,9,16 96:2
  96:20 97:2,6,19
  98:3 99:2,7,8

flow  57:15 62:5
flowed  88:7 89:3
flower  2:21
followed  28:18
following  40:8
  65:12 77:18 91:4
  93:13
follows  5:18
footnote  48:25 49:2
  49:12,12 87:10,17
  88:3
foregoing  98:10
forensic  7:21 8:8
  8:10 89:10
form  9:23 13:21
  14:8 37:20 38:1
  39:8,13 40:20 42:4
  42:23 43:13 44:12
  45:3,9 46:3,5 49:6
  50:2 52:25 53:9,25
  55:1,14 56:4,13
  57:1 58:5,13,23
  59:10,20 60:8,19
  62:23 63:3,9,13,23
  64:8,18 65:23 67:5
  67:17,22 68:6,18
  69:3,13,24 70:6,16
  71:6,15 72:2,15
  73:8,13,20 74:3,22
  75:3,10,19 76:8
  77:2 78:3,18 79:9
  82:18 84:19 85:1,8
  85:18 86:9 87:2
  88:8 89:4,8 91:19
  92:14,20 96:22
formalities  94:10
forming  41:25
  79:25
forth  75:23 79:22
forty  25:25

**forwarded** 8:25
**found** 41:24 52:10
 68:14
**four** 7:23 48:5,5,6
**fourteen** 25:25
**fraud** 7:4 8:11
**fraudulent** 53:4
 54:20,21 55:3
 58:11 72:20,21,22
**friday** 1:17 95:2
 96:3 97:8 98:8 99:9
 99:15
**friedman** 2:5 3:6
 4:25 5:4,9 9:23
 13:21 14:8 37:20
 38:1 39:8,13 40:4
 40:20 42:4,23
 43:13,21,25 44:4
 44:12 45:3,9 46:5
 49:6 50:2 52:25
 53:9,25 55:1,14
 56:4,13 57:1 58:5
 58:13,23 59:10,20
 60:8,19 62:23 63:3
 63:9,13,23 64:8,18
 65:8,23 67:5,17,22
 68:6,18 69:3,13,24
 70:6,16 71:6,15
 72:2,15 73:8,13,20
 74:2,6,11,22 75:3
 75:10,19 76:8 77:2
 78:3,18 79:9,13,15
 79:17 81:20 82:3
 82:22 84:22 85:4
 85:11 86:1,12 87:6
 88:23 89:5,19
 90:23 91:9,22
 92:16,22 93:6,17
 93:22,25 99:5
**frye** 15:17

**full** 6:5 9:12 22:22
 37:15 58:20
**fully** 76:25
**funding** 41:19,21
 46:19
**funds** 14:1 36:3
 49:25 50:4,19,25
 52:3,4,8,11 54:7,9
 55:24 58:4 59:16
 60:10,12,24 61:1,3
 87:23 88:15
**furnish** 99:18
**further** 79:12 95:6
 98:13
**future** 36:9 47:18

**g**

**gained** 46:9
**gather** 61:1
**general** 2:20 8:6
 12:25 14:18 18:25
 48:18 49:15 61:11
 84:6
**generally** 12:24
 18:11,16 22:14
 25:7 29:22 44:10
 45:4 82:6 83:24
**generate** 37:7
**generated** 37:2,16
**genovese** 2:4,7,8
 5:5,5 44:2 99:6
**geographic** 7:16
**george** 6:22 7:13
**gg** 97:20
**gilbert** 2:15 5:2
 77:12
**give** 5:11 30:23
 67:20 77:13 89:17
**given** 32:9 42:8
 46:24
**giving** 15:5 16:4
 30:9 32:17 33:15

 33:16 36:9 37:15
 48:23 54:16,19
 55:10 83:21 89:2
**gjb** 2:6,9,10 99:7
**go** 4:25 6:13 9:22
 17:9 22:21 23:16
 28:25 29:13 33:25
 59:3 60:13 61:3
 66:5,25 69:20 74:7
 74:13
**goddard** 2:24
**goes** 50:18 63:25
**going** 6:1,13 17:2
 18:23 20:10 26:18
 26:19 40:5 43:3
 48:17 55:20 61:2
 64:24 65:9 76:13
 77:15 80:2,10
 88:14 89:12 91:1
 91:11,23 92:2
 93:10
**good** 4:15 5:21,23
 32:17
**government** 4:20
 97:10
**graduated** 7:13
**great** 43:25 79:15
**greater** 32:6
**ground** 28:6
**grounds** 16:9
**group** 8:9 51:23
**groups** 51:22
**grow** 85:5,9
**growing** 85:23
**guess** 59:3
**guys** 40:2 43:21
 65:6

**h**

**h** 2:8
**half** 7:18 29:14

**haller** 2:18 5:2
**hand** 5:9
**hang** 91:23
**happen** 19:15
**happened** 15:21
 19:14 25:7,14,18
 26:22,25 29:17
 32:18 33:1 57:6
**hard** 44:17 54:13
 55:23 70:17
**harm** 54:17
**headed** 24:1
**health** 25:9 39:10
 54:14 55:25 66:7
 92:23
**hear** 37:21 43:21
 43:24 74:2 79:13
**held** 4:8
**help** 28:23
**helpful** 20:14
**hidden** 80:16
**high** 44:19
**higher** 31:15 32:3
**hindsight** 31:8
**history** 7:12
**hklaw.com** 2:14,15
 2:18
**hmm** 29:24 33:14
**hmo** 22:10
**hold** 6:16 7:2
**holders** 78:23
**holding** 4:21
**hole** 41:21
**holland** 2:12,16 5:2
 5:24
**hours** 99:15
**hypothetical** 56:21
**hypothetically**
 56:16 70:3

**i**

**identification** 4:21
9:9 82:2 97:10
**identified** 19:2,21
22:2,25 25:2 30:3
62:3 63:7 68:13
69:7,16 70:9,23
71:3 79:25 80:6,20
80:23 84:20 87:14
87:17 92:13
**identifies** 19:8
20:19
**identify** 8:22 17:12
18:6 22:14 81:22
93:4
**identifying** 16:2
19:17 48:18 62:11
72:19 82:13,23
83:7,11 84:9,14
**impact** 57:20 72:7
73:1
**impacted** 57:12
78:13 79:2
**important** 41:16,17
41:18 42:17 45:1
52:3
**improper** 15:24
52:11,20 53:21
54:12 55:4,24
**improve** 13:16,25
**inability** 78:10
**inadvertent** 81:11
**include** 30:19
33:10 50:24
**included** 17:3
20:17,21 22:8 27:4
36:25 37:1 47:5
48:8 52:14,18
58:17 66:24
**includes** 30:18

**including** 8:10 52:4
94:5
**incorrect** 41:10
**increase** 89:13
**increasing** 14:7,10
**incurred** 30:15
36:11,17 38:3
**incurring** 37:3
**index** 3:5,12 94:5
**indicative** 42:14
**individual** 12:5
17:16 63:19 69:22
**information** 17:4,6
18:13 26:11 44:16
44:21 46:18 48:17
49:22 52:17 72:24
76:25 77:4 80:18
81:4,5 84:13 90:16
**infrequently** 13:20
**inherent** 50:21
**inherited** 31:11
**initial** 27:23 39:4
42:13 46:17 57:8
61:18 64:9
**initially** 59:23
**initiating** 40:25
**inner** 76:18
**insolvency** 7:5
10:20 11:3 28:14
41:24
**insolvent** 10:13
12:11 28:4,10 52:7
**instance** 15:18
27:21 73:17,18
**instances** 13:24
61:16
**instituted** 66:18
**insufficient** 35:6
38:21 59:12
**insurance** 10:2,12
10:21,23 11:8,18

11:22 12:2,7,11,15
12:16 18:18,20
52:12 92:24 93:19
**insureds** 78:20,21
85:22
**insurer** 52:5,9 55:6
55:13 66:15,17,20
68:15,17 83:23
85:16,17
**insurer's** 52:7 92:5
92:6
**insurers** 10:13 14:6
93:1
**insurer's** 66:21
**intend** 6:14 67:6
**intending** 68:7
**intentionally** 6:2
**interest** 30:8 47:18
50:16 60:17 86:7
86:11,14,21
**interested** 98:17
**internal** 88:14
89:11
**interrupting** 43:22
**interruption** 26:2
**introduced** 9:8
82:2
**introducing** 41:1
**investigations**
89:10
**involved** 10:19
12:11 14:20 45:14
46:10 64:2
**involvement** 41:7
46:17
**involves** 15:8
**involving** 10:23
11:21 14:10 19:22
61:24 89:10
**irrelevant** 51:2

**issue** 13:23 56:19
59:14 61:23 66:12
76:22 92:11
**issued** 4:20 97:10
**issues** 16:2 45:11
**item** 22:2 47:5,6
62:9 63:20
**items** 23:14 24:3
39:5 56:2,6 73:7

**j**

**jeffrey** 2:24
**jeopardize** 52:8,12
53:21 54:8,10,14
55:12,25 68:16
85:16
**jeopardized** 66:19
**jeopardizing** 55:5
83:23
**jgenovese** 2:9
**job** 7:14
**joblove** 2:4,7 5:6
99:6
**john** 2:8 5:5
**join** 44:5
**joined** 7:19 8:3
12:20
**joint** 43:16
**joseph** 2:19
**judge** 16:7
**judicial** 1:1
**june** 29:20 36:15
57:9
**jury** 16:7

**k**

**k** 1:8,9
**keep** 64:23
**keeping** 37:16
**kerbel** 1:22 4:11
97:5,18 98:5,22
99:23

**kind** 61:5 63:25
88:19 90:17
**knew** 90:19
**knight** 2:12,16 5:2
5:24
**know** 13:13 30:25
31:1 33:2 36:5 37:4
37:8 43:2,5 44:2,18
46:8 49:7 51:20,24
52:7 60:25 61:4
66:1 67:10 71:7
75:11 76:1 78:7,13
79:4 83:25 84:2
94:6
**knowledge** 46:9
69:11 90:3
**known** 32:4,5
95:13
**kpmg** 7:24

**l**

**l** 2:18
**lag** 27:9
**language** 58:25
59:2,4
**large** 1:23 95:16
97:6
**law** 45:5
**law.com** 2:6,9,10
99:7
**lawyer** 5:24
**lay** 16:1 51:16
**laymen's** 89:6
**lease** 47:12 76:14
**leaseback** 12:23
13:1,3,16 14:14
41:2
**leasebacks** 13:12
**leases** 50:8,10
59:25 86:20
**leasing** 13:6

**leave** 14:23
**leaves** 33:9
**led** 38:20 64:10
65:2 74:18 78:14
**ledgers** 48:18
**left** 8:1 31:19 77:6
**legal** 43:14 52:21
99:1
**lengthy** 17:6
**letter** 3:8 99:12
**level** 44:19
**liabilities** 21:18
22:21 24:22 28:2
31:12 32:5,6,7,12
33:17 34:10,18
36:16,17 78:11
**liability** 13:13
22:23 43:16 47:4
75:13 77:7 82:6
**liable** 52:6
**lie** 77:23
**limited** 18:10 52:4
61:23
**line** 9:22 15:7 25:3
25:13 47:5,6 62:9
73:7 87:24 96:5
99:17
**liquidate** 25:8
**liquidation** 10:24
19:4,12,14 23:5,7,9
23:10,12,22 24:1,9
24:21 25:6,17,18
27:6 29:18 32:3,19
32:21 33:1,23 34:3
34:9 36:18 55:20
57:6 66:22
**liquidity** 13:4,23
**list** 17:5,6,12,14,17
46:15 68:25 99:17
**listed** 58:1 99:12

**litigation** 10:17
11:23 47:9 79:5
**little** 37:22
**llp** 2:12,16
**loaf** 76:11
**location** 1:18
**long** 38:19
**longer** 28:2 34:17
**look** 23:15,25 24:11
24:14 29:14 30:21
33:21 34:5 36:7,14
42:6,8 46:20 47:1
47:25 48:4 49:17
59:4 62:19 70:20
76:11 81:1,20 83:3
83:15 87:7 89:20
**looked** 17:18,25
23:10 25:13,17
26:21,24 28:6
38:12 46:2 47:17
66:3 88:13
**looking** 18:2 19:20
22:25 27:4 28:12
29:2 39:4 49:2 51:3
56:6 57:13,14,15
57:16 81:7,14 82:9
84:15
**looks** 20:5 29:17
**los** 2:21
**lose** 92:23
**losses** 40:16
**lost** 44:1 93:19
**lot** 29:22 46:8,21
90:21
**lots** 46:7,8 75:21
89:9
**louis** 1:9,9
**lunch** 65:6
**luncheon** 65:11
**lybrand** 8:2

**m**

**m** 1:15 95:8 96:3,24
97:7 98:8 99:5,9
**madam** 74:3
**magnitude** 57:19
**mail** 2:6,9,10,14,15
2:18
**maintaining** 85:23
**major** 9:19
**making** 13:9 15:7
35:1 57:2,3 68:3
87:4
**management** 7:3
**march** 86:18
**mark** 9:2 80:3
81:22
**marquette** 16:14
27:24
**maryland** 7:17
**master's** 6:18,24
**matter** 4:6 10:20
10:23 11:6,23
15:20 16:24 71:25
99:20
**matters** 12:10
14:20
**maximum** 36:9
**mb** 1:9
**mcdowell** 2:14 3:5
4:24,25 5:1,1,20,23
9:10,25 14:4,15
37:23 38:6 39:9,16
40:1,12,23 42:18
43:8,24 44:7,25
45:7,20 46:13
49:10 50:17 53:5
53:10 54:3 55:7,15
56:10,22 57:22
58:7,15 59:7,15
60:3,14 61:7 62:25
63:5,11,21 64:6,13

64:21 65:5,16 66:4
67:13,18,25 68:11
68:24 69:10,21
70:2,11,24 71:11
71:23 72:10 73:4,9
73:16,25 74:8,12
74:25 75:7,15 76:3
76:23 77:11,22
78:4,24 79:12,14
81:24 82:18 84:19
85:1,8,18 86:9 87:2
88:8 89:4,8 90:25
91:19 92:14,20
93:9,24 94:1,6
**mcgladrey** 27:18
74:17
**mean** 14:9,19 17:14
18:11 42:5,8 43:15
44:11 45:10,12
46:6,7,8 49:14
50:23 57:3 58:22
67:23 75:20 76:9
83:25 85:9
**means** 30:22
**meant** 85:12
**measure** 46:3
**measures** 85:3
**measuring** 27:20
**mechanics** 21:8
**members** 85:10
**memory** 67:1
**mentioned** 11:23
12:13 40:13
**merely** 71:18
**merged** 8:2
**method** 26:6 65:20
**methodology** 15:24
18:3 20:8 35:12
47:16 51:10 53:13
**mfriedman** 2:6
99:7

**miami** 2:8 6:12
99:2
**michael** 2:5 5:4 6:6
91:8 99:5
**mid** 50:19
**middle** 53:12 58:2
**midstream** 44:5
**million** 25:16 26:4
30:1,7,8,11,14,17
30:23,24 31:4,6,9
31:12,14,18,19,20
32:12,14,15,16,23
33:6,8,9,9,12,22
34:3,8,11,13,13,14
34:19 35:22 36:15
36:18,19 37:1,10
49:24 52:11 54:13
55:4,18,21 56:7,7
56:15,16,17,17,19
57:10 62:20 75:4
**mind** 17:4 42:19
**mine** 15:13
**mini** 94:5
**minimum** 22:9
**minor** 46:23
**minute** 90:24 93:7
**minutes** 9:21 40:2
77:11,13
**misreported** 73:12
73:19,24 74:9,15
83:18 90:3
**misreporting** 64:7
64:15 83:22
**misspoken** 54:5
**misstated** 73:7
**misstatement**
61:13 63:2,16
**misstatements**
62:24 63:8,18
**mm** 29:24 33:14

**moment** 11:24
12:14 46:25
**monday** 99:15
**money** 36:2,4 53:21
57:17 82:23 83:11
88:4,6,13,14,25
89:3 90:2,3 91:12
91:13
**monies** 26:18 30:10
35:16 37:2 48:2
49:20 50:5,6 52:4
60:23
**month** 26:18 28:12
28:12
**monthly** 13:9 87:4
**months** 48:5
**morning** 4:15 5:21
8:25 80:11 82:4
83:20
**mso** 26:12,21 27:8
39:10,19,23 56:11
**msos** 26:23 27:3
35:17
**multiple** 64:2 74:16
78:12
**multiplying** 53:16
**mute** 91:8

**n**

**n** 2:4 3:2 99:6
**n.a.** 1:10
**n.w.** 2:17
**naic** 25:3
**name** 4:10 5:23 6:5
**national** 1:9
**natural** 18:8
**nature** 8:16 10:8,25
12:1,9 23:13
**nearly** 37:1
**necessarily** 10:21
73:1

**necessary** 55:22
56:5
**need** 4:16 16:7
17:11 29:12 33:3
44:3 45:5 51:6
69:25 71:8 72:4,17
**needed** 35:21,22
36:5 38:18 56:17
59:13
**negative** 25:24,25
26:4 34:13
**net** 20:20 22:4 24:1
25:12 31:24 48:11
49:3 89:14
**never** 36:6 60:23
60:24 80:13 86:24
87:1
**new** 39:18 80:14,24
**nine** 25:25
**ninth** 1:1
**nolan** 2:24 4:10
**non** 20:20 21:12,19
24:19,20,21 41:3
62:4 64:11 69:18
69:23 70:4,15 71:5
71:25 72:13 73:1
**normal** 10:18 30:14
**notarized** 99:17
**notary** 1:22 95:15
97:5,19
**note** 3:23
**notes** 14:12 98:12
**noting** 99:17
**notwithstanding**
81:18 84:25 85:6
85:14
**november** 97:12
98:18 99:4
**number** 3:14 15:15
25:20 30:24 31:5
32:3,13 34:6 36:19

[number - pages]                                                    Page 112

37:9,11 49:24
61:20 62:17 78:16
87:13 99:14
**numbers**  25:3
28:20 29:9 33:18
99:17

**o**

**o**  11:13 99:5
**oath**  3:7 97:1
**object**  9:23 38:1
39:13 40:20 52:25
53:25 58:13 59:20
60:8,19 64:8,18
69:13 71:15 72:2
73:8,13,20 75:3,19
76:8 77:2 78:3 79:9
85:8
**objection**  74:3,11
82:18 84:19 85:1
85:18 86:9 87:2
88:8 89:4,8 91:19
92:14,20
**objective**  13:18
**obligation**  13:9
**obligations**  36:11
41:20 66:17 78:8
85:22
**observation**  57:3
67:11 68:3,12
**observations**  68:23
**obtain**  6:19,24
**obtained**  58:20,22
66:14 83:7,12 90:4
91:13
**obtaining**  66:18
**obviously**  9:19
28:21
**occasions**  10:4
12:14 15:15
**october**  1:17 4:2
95:2 96:3 97:8 98:9

99:9
**offered**  15:1 55:11
**offering**  18:18,23
48:21 52:23 53:6
54:24
**office**  99:14,15
**oh**  11:13
**oir**  56:2,12 75:17
75:23 76:6,12,18
76:24 90:10,14
**okay**  10:7 11:13
12:22 16:11,15
17:8,19 18:9,25
20:10,18,24 22:11
23:21,25 24:3,14
24:17,24 27:16
29:7,13,16 32:25
33:15,20 34:1,4,15
34:20 35:1 38:12
39:4 40:1,1,4 41:5
43:25 44:6 47:14
47:21 49:11 51:7,8
51:12 54:5,6 61:8
61:10,22 65:6 66:9
72:11 77:11 79:13
79:18 83:15 84:5,8
84:23 87:7,21
89:25 90:8 93:6,22
93:25
**omissions**  9:19
**once**  17:24 30:4
31:13 74:24
**ongoing**  93:3
**open**  37:17
**operate**  34:16 35:6
36:2 55:19 57:13
85:14
**operating**  30:14
35:4 47:12 51:1
84:25

**opine**  67:6
**opining**  53:18 67:2
68:3
**opinion**  19:19,25
20:9 39:5 42:15
43:3 47:22 48:21
48:23 51:7,15
52:19,23 53:6
54:16,19,24 56:25
67:11 68:8 69:22
70:14 72:13,17,18
77:1,3 82:5 83:22
**opinions**  15:6,13
16:4,6,8,24 17:1
18:9,17,18,24,25
19:1 45:18,21 61:5
67:4,14 68:9,19
76:1 79:11,22,25
**opportunity**  57:4
**opposing**  15:22
**opposite**  44:23
**orange**  1:1 2:13
**order**  13:12 29:11
37:6 38:18 41:8
44:14 94:4
**orders**  94:4
**orlando**  2:13 5:25
**outflow**  18:8
**outlined**  78:1
**outside**  88:14
**outstanding**  31:14
34:9 39:10,10
**overall**  43:5 46:9
**overstatement**  62:7
62:8,11,20 63:6
**overview**  9:18
**owed**  47:8,10
**owned**  7:15

**p**

**p**  11:13
**p.a.**  2:4 99:6
**p.m.**  1:17 65:12,12
77:17,18 91:4,4
93:12,13 94:9
99:15
**pa**  2:7
**pac**  16:14 27:23
38:16 40:16,17
42:2 43:10 46:3,22
47:5,10 48:2,9,11
48:12 49:3,4,17,17
49:20 50:6,7 51:3
51:20 64:3,7 65:2
67:21 71:20 74:17
83:2 84:24 85:6
86:25 87:16,19
**pacific**  1:8,8 2:20
4:7 95:1 96:2 99:8
**page**  3:4,6,14 19:7
20:1,4,5,16,19 21:4
22:20,25 23:6,14
23:19,21 24:1
28:23,25 29:1,2,8
29:10,11,12,14
31:3,7 32:20 33:8
33:19,25 36:7
48:24 51:11,24
53:12,12 58:2,16
59:17,17 61:9,15
65:17 73:6,7 80:23
81:20 82:9 83:3,6,6
83:15 84:7,15
86:18 87:7 89:21
89:23,24 90:2,2
96:5 99:17
**pages**  17:9 20:5,11
48:7 52:15 67:19
68:25 84:2 86:17
98:10

paid 26:10 27:8
  30:20 48:19 60:23
  67:21
papers 27:18
part 8:1,8 15:8
  27:4 29:10 30:4
  36:20 39:20 45:18
  45:21 52:3 64:20
  71:17 74:15 86:3
  86:13
partially 81:12
participants 1:18
particular 14:13
  38:14 45:8 65:20
  68:16
parties 4:17 11:2
  40:15 64:2,5 76:2,5
  77:10 78:12,17
  79:7 92:12 98:14
  98:15
partners 12:2
party 38:14,16,17
  38:18 45:8 64:3
  78:1
passed 12:6
pay 30:10,24 31:18
  32:7 34:18 36:23
  37:13 78:11 86:19
  87:1
paying 34:9
payment 66:17
payments 13:9
  27:1,3,18 49:8 50:8
  59:23,24 71:1,2
  86:4,7,10,15,19,23
  87:1,4,14
pbellas 2:10
pdf 17:9
penalties 96:21
pending 11:15

people's 11:21
percent 31:1 43:10
performed 35:24
period 48:6
periods 26:7 48:1
  63:8
perjury 96:21
personally 95:13
pertained 26:14
pertaining 62:1
peter 2:9 5:5
pharmaceutical
  26:15,16
phone 74:23
physicians 1:4
piece 90:8
pieces 90:19
place 4:16 31:10
placed 66:21
plaintiff 1:6 2:3 5:6
  15:25 51:19
plan 1:5
planning 10:19
play 76:15 88:16
played 74:15,17
please 4:13,14 5:8
  6:5 20:13,15 58:14
  77:14 80:9 83:3
  89:21 99:14,16
plus 36:18
poe 11:10,12 12:19
point 23:3 29:22
  30:17 38:21 45:23
  45:23 49:21 55:20
  55:22 56:9 60:9
  76:2 86:17
points 23:1,5 27:20
  35:2 46:24 84:10
policyholders 92:6
  92:23 93:19

pollack 8:4
portion 47:4 86:20
  86:21
positive 34:6,12
possession 77:1
possible 35:13
powers 79:2
practice 8:5,7,16
  12:22 18:19
predicated 29:10
preference 29:3
premiums 52:5
prepare 16:18
prepared 8:19
  14:21 21:5 27:13
  73:2
preparing 81:15
present 2:23 8:3
presentation 64:10
  64:14 65:1
presented 4:20
  63:19 77:5
presenting 58:9
presumably 35:20
  55:21 65:25
presumed 66:19
presumes 52:15
pretty 17:6
price 7:19,23,24,25
  12:8
pricewaterhousec...
  8:2
primarily 12:4
primary 46:20 47:9
principal 47:19
principles 14:17
  15:9
printed 80:25
  81:10
printing 81:11

printout 80:12
prior 13:2 37:18,24
  38:3 40:13 50:1,19
  63:8,18 84:1 91:11
  99:19
probably 44:4 59:4
problem 56:9
procedure 18:19
proceed 44:4,6
proceeding 11:9
  66:18
proceedings 40:7,9
  45:17 65:11,13
  77:17,18 91:3,4
  93:12,13
proceeds 13:5 19:3
  48:11
process 28:16,19
  28:20 31:2 36:21
  41:1 93:2
processing 25:5
produced 9:6 17:3
  27:10 76:11 80:14
  80:17,21 90:12,14
producing 97:9
professional 7:2,12
  10:1 30:16,19
  42:15
profited 65:1
prompt 99:20
proof 66:23
property 52:4,5
  66:13 83:7
proposal 41:7
proposed 42:7
provide 16:5,8
  53:15
provided 3:23 12:3
  12:5 16:3 17:6
  19:22 54:2

**providers** 26:14
78:21,22
**provides** 9:17
52:17 58:19
**providing** 12:4
22:18 53:2 54:22
64:9
**provision** 53:17
61:12
**public** 1:22 95:15
97:6,19
**publish** 91:23
**pulled** 66:10
**pup** 20:21 21:10,13
21:20 27:14,15
28:10 29:17 31:11
35:14 39:6,12,15
42:2,20 43:2 48:2,9
49:3,4,16,18,21
50:1,5,6,20 59:17
67:21 69:9 70:10
71:3,19 73:15
74:14,17 84:9,16
84:24 86:4,7,24
87:16,16,20,23
88:5,7 89:1,3 90:4
90:6 91:13 92:24
93:18,20
**pup's** 64:25 87:23
88:4,25 92:23 93:3
**purely** 44:24
**purpose** 14:6
**purposes** 13:8
45:21 57:18 88:6
**pursue** 38:4 92:4
**put** 14:2 15:25
17:25 36:2,3,6
50:24 55:18 81:10
89:6

**q**

**qualifications** 9:13
**quantify** 16:16
**quarter** 19:8,13
28:7,8,13,13,16,16
28:22 29:23,23
34:23,25 61:17
**quarters** 20:23
21:21 27:19 28:7
34:22 35:3
**question** 38:11
39:18 46:6,11
50:18 52:21,22
54:1 55:9 58:14
66:25 67:7 68:9
69:19 71:8 72:5,6
73:10 74:4,9,24
77:24 78:6,15 84:6
91:11 93:18
**questioning** 87:25
**questions** 6:1,3,14
31:21 61:6 79:18
82:4 83:21 90:10
**quite** 39:17
**quote** 90:11

**r**

**r** 1:22 97:5,18 98:5
98:22 99:23
**raise** 5:8
**raises** 33:12
**ramifications** 71:9
**rang** 74:23
**range** 8:9 19:10
28:5 31:6 32:23
**ranges** 34:23
**ranging** 31:20
**ranked** 41:18
**rationale** 20:2
**reach** 55:23 56:23
76:20 77:6

**reached** 30:18
**reaching** 56:3 76:1
**read** 14:21 15:12
17:10,11,24 46:7,8
51:24 66:11 67:9,9
75:21,22 76:21
92:2,8 94:3 96:21
99:10,14
**reading** 3:8 68:21
99:13,18,19
**reality** 25:8
**realizable** 26:20
**realize** 80:24
**realized** 80:11
**really** 41:17,22,23
43:19 50:13 56:15
61:4 71:20,22
88:16 90:18
**reason** 87:3 96:5
99:17
**reasonable** 43:7
44:8,13,23 45:1,6,8
53:22
**reasons** 15:17
**recall** 59:5 82:6
83:20,24 87:24
91:18
**receivable** 25:10
**receivables** 25:10
25:11,14 26:10,12
26:13,13,17,21
27:1,8 39:11,20,24
56:12 62:1
**received** 41:12
49:20,21 87:19
90:6
**receiver** 1:4 52:6
62:13 66:16 75:2
78:9 91:17 92:3
**receivership** 11:9
30:2,5,6,13 31:5

32:18 36:21,23
37:19,25 38:3
66:18 78:14 79:3
92:24 93:3,19
**recess** 40:7 65:11
77:17 91:3 93:12
**recitation** 67:12
**recognize** 80:6
**recognizes** 71:18
**recollection** 58:24
70:20
**record** 4:1 6:16
17:11 27:17 28:11
40:5,11 51:25 65:9
65:15 66:11 77:15
77:21 81:23 91:1,7
92:2 93:10,16
98:11
**recorded** 4:4 47:11
47:12
**records** 27:7 48:18
**recoveries** 30:7
32:4 33:16 36:9
37:4,5 92:5
**recovery** 7:22 37:9
37:16 38:5
**reduce** 56:14
**reduced** 31:5,9
36:18
**reduction** 33:17
**reference** 20:11
**referenced** 90:9
99:19
**referencing** 90:2
**referred** 12:4
**referring** 23:23
41:2 70:1 81:6,14
90:13
**refers** 81:3,5
**reflect** 21:4,24
25:10 49:25 50:9

**reflected**  16:25
18:1 21:6 23:6 24:5
31:7,15 59:5 61:15
67:4 69:15 71:18
80:19 86:18 88:3
**reflects**  22:11
50:13
**refresh**  67:1
**refunded**  48:11
**regulated**  85:15
**regulator**  12:18
**regulators**  12:15
12:17
**regulatory**  18:19
41:14
**rehabilitation**
66:22
**relate**  31:24
**related**  47:22
**relates**  44:15
**relative**  45:17
98:13,15
**relatively**  48:3
**released**  49:25
50:19,25 87:23
88:4
**relevance**  49:23
**relevant**  88:12,18
90:16,22
**relied**  79:24
**rely**  42:2 68:22
**relying**  15:3,10
18:15
**remained**  59:17
**remembered**  66:6
66:8
**remittances**  48:9
**remitted**  48:2 50:5
50:7
**remote**  2:1

**remotely**  1:18,24
2:23 4:16,19 5:18
9:8 82:1 97:7
**removal**  57:10
**remove**  13:13
**rent**  86:10,14,19
**rental**  50:8 59:24
**repeat**  74:24
**replaced**  50:11
**report**  3:16 6:15
8:19,23 9:1,4,5,7
9:11,15 15:10,14
16:2,25 17:7,21
18:1,2,6,12,13,15
19:7 20:11,17 21:6
22:8,15,17 23:7,20
29:21 43:10 51:11
55:8 57:24 65:18
66:25 67:4,14
68:10 69:17 78:2
79:11,22,25 80:10
80:12,15,19,23
81:1,3,5,15,17,21
82:10 83:3,15 84:7
86:3,14 87:8 89:21
92:10 98:7
**reported**  21:13
62:6,12 66:14
73:14,21,23 90:4,7
91:13
**reporter**  1:22 3:8
3:24 4:11,14,15,18
5:8,14 9:2 26:2
35:10 44:1 74:3,5
81:25 85:25 97:5
97:18 98:1,5,22
99:23
**reporter's**  3:23
**reports**  15:13 27:9
27:11,12

**represent**  5:3,25
**representatives**
42:1,20
**represented**  10:2
12:14,16
**representing**  10:21
**require**  60:15,16
**required**  22:3,6
28:3 35:18 44:14
**requirements**  21:6
22:9 85:20
**requiring**  16:5
**research**  72:17
**residence**  6:7
**residual**  78:11
**resolution**  36:13
**resolved**  33:3
**respect**  26:21 53:11
68:19 75:12 84:1
**respective**  28:22
**responding**  68:9
90:9
**response**  65:24
66:25 88:10
**responsibilities**
76:19
**responsibility**
38:10,22 42:25
43:1 45:14,18,25
46:4 64:4,24 75:24
75:25 76:5,7 77:9
**responsible**  38:8,16
38:17,17 43:2
**responsive**  38:11
**rest**  64:22
**restricted**  14:2
49:25 50:20 51:1
60:1,5 62:2 69:18
87:24 88:4,25
**restrictions**  4:17

**restructuring**  7:6
**result**  11:3 15:24
16:17 19:4 20:25
23:11 30:20 31:17
33:24 34:10 35:17
41:19 47:8 59:8
78:13
**results**  61:14
**return**  65:17
**review**  27:7 98:9
**reviewed**  17:13
**reviewing**  19:16
**right**  5:9 8:20 12:8
13:20 15:10 18:2
18:21 20:2,10 21:4
21:10,13,17,17,20
21:21,25 22:4,13
22:19 23:23 28:19
29:9 30:22 31:10
31:19 32:1,25 34:7
35:4 36:12,24
37:14,19,25 39:4,7
39:12,24 43:11
46:1,1 47:21 48:16
48:22 49:5 53:2,7
53:15 55:16 56:14
58:25 59:19 60:7
60:18,21 62:14,17
65:5,6 67:8,15,21
72:5 73:3,10 80:13
82:14,17 83:17
85:7 87:1 88:24
89:20 90:1,23 93:4
**rights**  78:7
**risk**  39:19
**role**  38:23 90:10
**roles**  74:16
**roughly**  31:9
**rsm**  27:18 30:19
37:9,18,24 38:16
40:16 42:21 64:25

74:17,20 75:2
**running** 58:2
**runs** 20:4

**s**

**s** 2:13
**safety** 52:8,12
53:22 54:8,10,14
55:5,12,25 56:24
57:20 66:7,19 68:1
68:15,16,21 83:23
84:1 85:16,21
**sale** 12:23 13:1,3
13:12,16 14:14
41:2
**satisfy** 24:22 56:20
85:21
**save** 9:21
**savings** 35:9,11
**savona** 4:8 6:8
**saw** 26:15 27:21
28:14 42:5
**sayeth** 95:6
**saying** 33:21 43:17
53:19 59:22 63:1
70:13 72:4,8,8
88:11,22
**says** 35:16 49:12
54:7 62:19 63:15
66:13 67:10 92:2
**schedule** 3:17
24:14 47:2 52:15
80:6,11,21 81:4,6,7
81:18 82:1,10 83:5
83:17
**schedules** 18:1
22:16,18 24:9
28:17 47:2 48:4
61:21
**schiffer** 14:24
17:21,22 21:1,25
24:8 28:1 41:11

47:17
**schiffer's** 15:4,10
18:15 20:17 22:8
24:19 61:21 69:17
**school** 7:1,18,19
**scott** 1:15 3:4,16
4:4,22 5:16 6:6 9:7
91:10 95:2,8 96:3
96:24 97:7 98:8
99:5,9
**screen** 80:2
**second** 19:19 23:21
41:6 47:2,22 65:19
70:12
**seconds** 44:2
**section** 18:5 61:10
80:20 84:2
**secured** 30:10 58:3
59:18,25
**security** 60:17
**see** 15:14 20:19
22:22,22 23:19
24:8 25:13 26:22
29:10,25 32:23
33:13,18 34:2,23
41:16 42:16 48:6
76:10 80:3 91:24
**seeking** 58:17
**seen** 13:11,23,24
14:1,3,10 81:1
**select** 18:3 27:19
**self** 49:14
**sell** 13:5
**send** 99:17
**sense** 88:22 89:16
**sent** 76:15
**september** 27:24
29:21 86:6
**series** 48:4 57:11
83:21 90:15

**services** 1:4 4:7 8:9
10:22 11:5 12:18
12:21 29:20 95:1
96:2 99:8
**set** 6:15 24:12
79:22
**settlement** 30:18
37:11 74:20 75:1,5
75:12
**seventh** 6:11
**share** 80:2
**sharing** 39:20
**sheet** 3:7 13:12,14
13:17 14:1 22:22
28:4,10,14 31:13
32:13 36:14 39:12
47:4,11 95:4 96:1
**sheets** 31:16
**short** 34:19
**shortfall** 22:2 23:1
27:22 28:3 32:25
33:2,6,10,12,15,17
35:20 84:10,17,25
85:15
**shortfalls** 35:23
**shorthand** 1:22
**shortly** 8:1
**show** 28:7 52:17
66:23
**shown** 43:9 70:14
72:12 76:24
**sic** 33:22
**sign** 42:21 99:10,15
**signature** 3:6 94:9
97:17 98:21
**signed** 97:12 99:17
**significance** 42:1
42:19 72:6 75:8
**significant** 57:11
66:21 74:21 75:2
76:22

**signing** 99:13,18,19
**similar** 11:1 24:7
32:19 51:9 60:25
83:10 92:4
**similarly** 25:9
31:11 80:20
**simple** 78:9
**simplistic** 16:3
**simply** 50:3 53:13
53:19 57:2
**sincerely** 99:21
**single** 63:16
**sir** 5:8
**situation** 14:1
15:22 41:23 70:8
**situations** 13:2,11
**six** 7:20,25 25:24
**smaller** 32:10
**software** 25:5
**sold** 65:1
**solutions** 99:1
**solvency** 57:13
**somebody** 37:6
90:19
**somewhat** 72:23
**sooner** 75:18
**sorry** 4:13 15:25
25:4,22 37:21
39:17 43:22 50:6
60:20 64:19 72:3
74:2,7 84:17 87:16
89:23 90:1 91:10
**sort** 89:1
**soundness** 52:9,13
53:22 54:10 55:5
55:13 56:24 57:21
66:20 68:2,15,17
68:22 83:23 84:1
85:16
**source** 69:4

**sources** 35:13
**south** 2:21 6:11
  99:2
**southeast** 2:7
**speak** 75:5
**specific** 46:12
  58:25 65:25 68:20
  73:6,11
**specifically** 42:9
  66:24 70:1 86:22
**specifics** 75:11
**speculative** 44:22
  44:24
**spent** 17:2
**spite** 41:10
**spoke** 15:12
**ss** 95:10
**ssap** 21:5 24:20
**st** 1:9,9
**stakeholders** 19:4
**stakes** 28:5
**standing** 92:12,18
**standpoint** 24:25
**start** 20:1 51:13
**started** 30:1 81:1
**starting** 23:3 51:10
**state** 1:23 6:5 21:23
  61:17,20 63:17
  65:4 66:11 68:21
  70:22 73:23 74:15
  95:9,16 96:20 97:2
  97:6,19 98:3
**statement** 29:19
  63:19,22,25 90:11
**statements** 14:22
  25:4 28:22 41:13
  41:13,14 65:2 69:7
  69:9 70:21 73:22
  74:14,19
**statute** 35:7 58:18
  63:14 66:8 67:3,9

67:12 91:16 92:1
  92:13,17
**statutes** 19:22 35:7
  51:16,21,23 52:17
  53:24 61:10 65:25
  78:8 79:3 85:24
**statutorily** 14:21
  38:21
**statutory** 14:16,21
  14:23 15:2,9 19:21
  22:9 51:15 57:14
  58:17
**stay** 60:16
**staying** 23:21
**stenographic** 98:12
**stenographically**
  98:7
**step** 23:4 35:20
**stipulate** 4:18,23
**stipulation** 4:14
**stop** 32:11 35:8
**stopped** 32:2 35:4
  36:12 37:10
**story** 90:18
**straight** 10:15
  76:10
**straightforward**
  48:4
**street** 2:4,7,17,21
  99:6
**subject** 11:8 47:9
  51:20 59:18,22
  63:16 82:16 83:12
  96:22
**submitted** 31:4
  65:4
**subparagraph**
  61:12,13
**subscribed** 95:12
**subsequent** 25:12
  26:22

**substance** 81:5
  96:22
**subtract** 21:18
**succeeding** 26:7
**sue** 91:17 92:19
**suffered** 78:1,10
  79:7
**sufficient** 34:17
  56:8 76:24
**suggest** 26:16 45:5
  62:11
**suggested** 42:13
**suggesting** 60:15
**suite** 2:4,13,17 99:1
  99:6
**sum** 26:3
**summarize** 7:11
  58:21
**summarized** 18:14
**summary** 20:16
**supplemented**
  68:21
**sure** 7:13 9:24
  13:24 21:8 29:21
  31:23 40:3 45:12
  46:10,14,22 51:5
  57:5 59:1,6 65:7,8
  67:10 69:19 70:7
  71:9,16 72:13,16
  83:25 87:14 88:20
  90:12,25 91:12
  93:9
**surplus** 14:7,10,12
  33:23 35:21 84:10
  84:16,21,25 85:6
  85:15,20
**surpluses** 85:23
**suzanne** 2:15 5:1
**suzanne.gilbert**
  2:15

**swear** 4:18 5:10
**sweat** 12:5,6
**sweeps** 50:1
**swept** 60:24
**sworn** 5:9,18 95:12
  97:8
**synonymously**
  72:23

**t**

**tab** 80:12,25 81:9
  81:12
**tables** 47:23
**take** 4:16 24:11
  30:23 35:12 62:9
  65:6 77:11 83:3,15
  87:7 89:20 90:23
  93:7
**taken** 1:17,21 4:5
  21:9 31:8 40:7 52:8
  55:21,24 57:17
  65:11 77:17 91:3
  93:12 95:2 96:3
  99:9
**takes** 92:11
**talk** 19:24,25 29:12
  47:21 51:7 61:8
  70:12 77:12
**talked** 31:3 74:16
**talking** 45:11 61:11
  83:25
**talks** 52:2
**tallied** 59:17 65:18
**tally** 48:15 53:13
  54:22
**tallying** 48:19 69:1
**tampa** 2:4,5 99:6,7
**team** 94:4
**telemundo** 15:20
**televisa** 15:20
**tell** 6:3 19:1 40:24
  51:13 77:25 80:9

**telling** 42:10,10
**tend** 14:10
**tenet** 26:16
**term** 44:17,18
**terms** 8:6 41:7
  43:16 44:8,11 57:8
  72:23 89:2,6
**testified** 5:18 11:17
  21:1 41:10 42:20
**testify** 11:6 79:20
**testifying** 16:10
**testimony** 5:10
  8:12 12:10 15:4,8
  15:17 36:8 42:1
  46:21 71:24 90:8
  90:13 92:10,18
**thank** 5:14 43:25
  74:6 85:12 86:2
  87:21 89:20 91:10
  93:22 94:1,2,6
**thing** 43:4 76:16
**things** 12:9 17:13
  42:11 46:20 65:2
**think** 9:18 10:5,7
  10:18 15:3 16:1
  17:17 18:7,22 19:6
  29:11 32:9 38:22
  38:23 41:16 42:14
  42:17,25 44:1,4,5
  45:4 46:19 49:14
  50:3,21 52:21 54:5
  54:15,25 56:5
  57:16 60:1 64:23
  67:8 68:20 69:25
  70:8 74:10,16
  77:23 78:9,14 79:4
  79:11 86:23 88:21
  93:6
**thinking** 78:6
**third** 19:20 21:15
  51:7,15

**thought** 38:8 66:7
**three** 10:5,6,7 21:9
  24:16 25:19 26:3
  38:18 40:15 54:14
  76:5
**tick** 46:23
**time** 1:17 4:2 13:22
  17:2 19:6,8,14 23:1
  23:5 25:19 32:22
  32:24 40:6,11
  41:15 50:1 55:20
  55:22 56:9,12
  65:10,15 66:17
  69:12 70:17 76:22
  77:16,21 84:11
  86:6 90:1 91:2,7
  93:11,16 99:13
**times** 77:23
**today** 8:5 30:25
  32:23 33:5 52:24
  54:23 79:21 80:24
  92:10
**today's** 4:2
**told** 46:2 76:4
  77:23
**total** 7:25 20:20
  21:19 22:20,21
  31:7,14 38:13
  48:14 49:16,17
  50:13 53:15 86:14
  87:14,15
**totaled** 48:12 63:20
**totals** 23:19
**tough** 46:6
**tower** 99:1
**trail** 42:12
**transaction** 13:16
  27:23 42:21 47:13
  47:20 76:25 86:7
**transactions** 12:23
  13:1,3,19 14:6,9

41:2 47:8 60:7
  84:24 85:7 86:25
  87:5 90:15
**transcript** 94:4
  95:5 96:4,22 98:9
  98:10 99:12,15,20
**transfer** 54:9 61:18
  71:19 72:22
**transferred** 71:14
  72:12 93:1
**transfers** 19:18
  47:23 48:3,13,16
  48:22 49:3,16
  52:10,20 53:4,14
  53:19,20 54:8,12
  54:20,21,22,23
  55:3 58:1,10,11,20
  59:9,22 60:22
  65:19 68:13,16,20
  68:25 69:1,1,4,11
  69:23 70:4,15
  82:11,13,25 83:1,2
  83:10 88:15 89:11
**transpired** 78:13
**treat** 41:9
**treatment** 41:8,10
  42:3,7,7,13 46:16
**treble** 54:11 63:17
**trebled** 53:16 62:16
  62:17,20 65:20
**trebling** 54:23 62:7
**tri** 7:16
**trick** 6:1
**tried** 23:8
**trier** 38:25 45:13
**triple** 58:19
**true** 9:3,5 54:16
  60:6 85:10 95:5
  96:22 98:11
**trust** 11:21

**truth** 5:11,11,12
  42:10,11
**try** 39:17 84:5
  91:23
**trying** 9:21 46:14
  61:5 70:18 89:6
**turn** 19:24 26:17
  86:16
**twice** 63:2
**two** 7:24,25 10:18
  10:18 12:2,13
  14:24 17:9 21:12
  25:24 26:11 49:19
  51:9,22 62:24
  87:18 89:14 99:2
**type** 10:16 34:24
  45:15
**types** 8:13 23:8
  24:5 26:12 51:18
  79:5
**typical** 13:10

## u

**ultimate** 32:5 42:7
**ultimately** 19:14
  35:21 38:24 41:8
  42:13,15 43:14
  45:10,12 64:10
  76:17
**unavailable** 66:16
**uncommon** 14:5
**understand** 6:2
  21:8 28:23 29:4
  35:1 36:8 47:21
  49:2 54:4 62:10
  65:18 70:1 76:25
**understanding**
  12:25 16:6 71:10
  76:18 83:5 84:4,16
  85:19 88:20 89:7
  93:21

**understood** 14:21
  15:12 90:20
**unhidden** 80:17
**unique** 79:2
**united** 1:5
**university** 6:21,22
  7:14
**unravel** 76:16
**unrestricted** 89:1
**updated** 3:17 80:5
  80:6 81:7 82:1
**upfront** 13:7
**use** 13:7,8 32:13
  36:16 47:2 49:11
  52:6

**v**

**v** 95:1 96:2 99:8
**valuation** 7:4 8:13
  10:9,11,15 11:18
**value** 19:12 23:5,10
  25:1,6 30:3 32:21
  34:3 38:13
**values** 21:3,4 25:11
  31:15 80:22,22
**various** 11:2 16:13
  19:6 20:11 23:1
  48:1 51:18 84:10
**verifying** 4:22
**veritext** 4:12 99:1
  99:14
**version** 80:16
**versus** 4:7 50:5
  70:19
**video** 4:4 40:10
  65:14 77:20 91:6
  93:15
**videoconference**
  1:14 3:3 4:19 94:8
  95:2 97:9 98:7
**videographer** 2:24
  4:1,11 40:5,10 65:9

65:14 77:15,20
  91:1,6 93:10,15
**videotaped** 1:13
**view** 77:25
**views** 68:21
**violation** 52:16
**violations** 51:19
**virginia** 7:17
**vitae** 9:14
**vs** 1:7

**w**

**wait** 44:3
**waived** 94:10 98:10
  99:19
**walk** 21:7 29:25
**want** 19:24 21:7
  37:12 39:1 42:10
  47:1 51:24 66:2
  71:12 90:12
**wanted** 13:8 90:9
**washington** 2:17
  6:22,22 7:14,15,16
**waterhouse** 7:20
  7:23,24 8:1
**way** 14:18 16:22
  23:10 29:18 35:19
  59:13 61:2,18
  74:21 81:23 84:6
  86:22 89:15
**we've** 81:24 82:20
**wednesday** 21:2
**went** 7:18,23 29:18
  30:5 32:2,20 34:24
  46:22 48:12 51:1,3
  66:3,6 71:19 80:23
  82:14,23 83:2
  88:25 92:24 93:18
**west** 16:14 27:23
  38:16 40:16,17
  42:3 43:10 46:3,22
  47:5,10 48:2,9,11

48:12 49:3,4,17,18
  49:20 50:6,7 51:4
  51:20 64:3,7 65:2
  67:21 71:20 74:17
  83:2 84:24 85:7
  86:25 87:16,19
**western** 1:8,8 2:20
  4:7 95:1 96:2 99:8
**whitney** 14:24
  20:17
**widow** 12:7
**willfully** 58:20,22
**william** 2:9
**winds** 4:9 6:8
**witness** 3:6,7,8,16
  4:19,20 5:13,17
  8:11 9:7,24 13:22
  14:9 15:15 37:21
  38:2 39:14 40:3,21
  42:5,24 43:14,23
  44:13 45:4,10 46:6
  49:7 50:3 53:2 54:2
  55:2 56:5,14 57:2
  58:6,24 59:11,21
  60:9,20 62:24 63:4
  63:10,14,24 64:9
  64:19 65:7,24 67:6
  67:23 68:7,19 69:4
  69:14,25 70:7,17
  71:7,16 72:3,16
  73:14,21 74:23
  75:4,11,20 76:9
  77:3 78:19 79:10
  82:19 84:20 85:2,9
  85:19 86:10 87:3
  88:9 89:9 91:8,20
  92:15,21 94:2 97:1
  97:7 98:8
**witnesses** 46:22
**wonder** 89:7

**word** 49:11 94:5
**words** 28:18
**work** 7:12 8:13
  11:4 12:20 17:23
  20:25 27:18
**working** 7:21 10:22
**workings** 76:18
**wrapping** 77:13
**write** 62:1 96:4
**wrong** 80:11,25
  81:11

**x**

**x** 3:2

**y**

**year** 7:17 48:5,6
**years** 7:20,23,24,25
  7:25 26:23 48:5
  54:14

**z**

**zero** 89:15
**zoom** 16:2 26:2
  74:23

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.